LATHAM & WATKINS LLP
  Michele D. Johnson (Bar No. 198298)
  *michele.johnson@lw.com*
650 Town Center Drive, 20th Floor
Costa Mesa, CA  92626-1925
Tel:  (714) 540-1235
Fax:  (714) 755-8290

LATHAM & WATKINS LLP
  Colleen C. Smith (Bar No. 231216)
  *colleen.smith@lw.com*
12670 High Bluff Drive
San Diego, CA  92130-3086
Tel:  (858) 523-5400
Fax:  (858) 523-5450

LATHAM & WATKINS LLP
  Sarah A. Greenfield (*pro hac vice*)
  *sarah.greenfield@lw.com*
555 Eleventh Street NW, Suite 1000
Washington, DC  200004-1304
Tel:  (202) 637-2200
Fax:  (202) 637-2201

Attorneys for Defendants
Puma Biotechnology, Inc., Alan H. Auerbach,
and Charles R. Eyler

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HSINGCHING HSU, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>PUMA BIOTECHNOLOGY, INC., ALAN H. AUERBACH, and CHARLES R. EYLER,<br><br>Defendants. | CASE NO. 8:15-cv-00865 AG (JCGx)<br><br>Assigned to:  Hon. Andrew J. Guilford<br>Ctrm:  10D<br><br>**DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES TO CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
ORANGE COUNTY

Case No. 8:15-cv-00865 AG (JCGx)
DEFENDANTS' ANSWER AND AFFIRMATIVE
DEFENSES TO CONSOLIDATED COMPLAINT

Defendants Puma Biotechnology, Inc. ("Puma"), Alan H. Auerbach, and Charles R. Eyler (collectively, "Defendants"), by and through their attorneys of record, respectfully submit Defendants' Answer to the Consolidated Complaint for Violation of the Federal Securities Laws, filed by Lead Plaintiff Norfolk County Council, as Administering Authority of the Norfolk Pension Fund ("Norfolk Pension Fund" or "Plaintiff") on October 16, 2015 (the "Complaint").

Defendants expressly reserve the right to amend their Answer, or seek leave to amend their Answer, to modify and/or assert all claims, defenses, counterclaims and third-party claims permitted by law.

Defendants state upon information and belief as follows:

## **Answering "Jurisdiction and Venue"[1]**

1.     Defendants admit that the Complaint purports to assert claims arising under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder.  Defendants deny the allegations in Paragraph 1 to the extent they purport to assert that there is a basis in fact or law for Plaintiff's claims.  Defendants deny the remaining allegations in Paragraph 1.

2.     Defendants admit that this Court has jurisdiction over this action. Defendants deny the allegations in Paragraph 2 to the extent they purport to assert that there is a basis in fact or law for Plaintiff's claims. Defendants deny the remaining allegations in Paragraph 2.

3.     Defendants admit that venue is proper in this district.  Defendants deny the allegations in Paragraph 3 to the extent they purport to assert that there is a basis in fact or law for Plaintiff's claims. Defendants deny the remaining allegations in Paragraph 3.

---

[1] To the extent the headings and subheadings in the Complaint are intended to constitute factual allegations, Defendants deny the allegations insofar as they refer or relate to Defendants.  Defendants lack knowledge or information sufficient to form a belief as to the truth of any remaining allegations in the Complaint's headings or subheadings and therefore deny those allegations.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
ORANGE COUNTY

Case No. 8:15-cv-00865 AG (JCGx)
1   DEFENDANTS' ANSWER AND AFFIRMATIVE
DEFENSES TO CONSOLIDATED COMPLAINT

4.      Defendants deny the allegations in Paragraph 4.

**Answering "Introduction and Overview"**

5.      Defendants admit that Plaintiff purports to bring this action on behalf of itself and a putative class of all persons or entities who purchased or otherwise acquired the common stock of Puma between July 22, 2014 and May 29, 2015, and that Plaintiff purports to assert claims pursuant to Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.   Defendants deny the remaining allegations in Paragraph 5.

6.      Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 6, and on that basis deny the allegations.

7.      Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 7, and on that basis deny the allegations.

8.      Defendants admit that Puma is a development-stage pharmaceutical company formed in September 2010.  Defendants admit that Puma's primary focus has been on the development of the drug PB272 ("neratinib").  Defendants admit that neratinib was initially developed by Wyeth and Pfizer, and that Puma acquired the rights to license the drug in August 2011.  Defendants admit that neratinib is in various phases of various clinical trials for the treatment of early- and late-stage human epidermal growth factor receptor 2 ("HER2") breast cancer in the adjuvant, metastatic, neoadjuvant, and HER2 mutation settings, among other cancers. Defendants deny the remaining allegations in Paragraph 8.

9.      Defendants admit that the ExteNET trial is a Phase III clinical trial for neratinib as an extended adjuvant treatment for HER2 positive breast cancer. Defendants further admit that treatment of patients enrolled in the ExteNET trial was completed in October 2011, and that the ExteNET trial reached its primary endpoint in October 2013.  Defendants also admit that the primary endpoint for the

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
ORANGE COUNTY

2

Case No. 8:15-cv-00865 AG (JCGx)
DEFENDANTS' ANSWER AND AFFIRMATIVE
DEFENSES TO CONSOLIDATED COMPLAINT

1  ExteNET trial was disease-free survival ("DFS").  Defendants deny the remaining

2  allegations in Paragraph 9.

3        10.    Defendants deny the allegations in Paragraph 10.

4        11.    Defendants admit that Puma's stock price closed at $59.03 on July 22,

5  2014, and closed at $233.43 on July 23, 2014, and that 8,185,100 shares of Puma

6  common stock were publicly traded on July 23, 2014.  Defendants further admit

7  that on January 27, 2015, Puma completed a secondary offering, pursuant to which

8  it sold 1.15 million shares of Puma common stock for net proceeds of

9  approximately $205 million.  Defendants admit that for fiscal year 2014, Mr.

10 Auerbach's compensation consisted of approximately $610,000 in salary, $300,000

11 in bonuses, and an option grant of 150,000 shares that were valued at

12 approximately $16,876,576 as of December 15, 2014.  Defendants aver that these

13 150,000 options have an exercise price of $195.33, and that subsequent to

14 September 1, 2015 (the date these options vested) Puma's stock price has not

15 reached $195.33.  Defendants aver that Mr. Auerbach has never exercised any of

16 these 150,000 options.  Defendants also admit that for fiscal year 2014, Mr. Eyler's

17 compensation consisted of approximately $304,336 in salary, $117,610 in bonuses,

18 and an option grant of 31,500 shares that were valued at approximately $4,061,879

19 as of November 19, 2014.  Defendants aver that these 31,500 options have an

20 exercise price of $223.32, and that subsequent to September 1, 2015 (the date these

21 options vested) Puma's stock price has not reached $223.32.  Defendants also aver

22 that Mr. Eyler has never exercised any of these 31,500 options.  Defendants deny

23 the remaining allegations in Paragraph 11.

24       12.    Defendants admit that on May 13, 2015, Puma announced the release

25 of four abstracts on neratinib, including Abstract #508, which would be presented

26 at the American Society of Clinical Oncology's ("ASCO") 2015 annual meeting in

27 Chicago and were available on the ASCO website, www.abstract.asco.org.

28 Defendants further admit that Abstract #508 reported, among other data points,

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
ORANGE COUNTY

3

Case No. 8:15-cv-00865 AG (JCGx)
DEFENDANTS' ANSWER AND AFFIRMATIVE
DEFENSES TO CONSOLIDATED COMPLAINT

1  efficacy results for the ExteNET trial, including that the invasive DFS rate at the

2  two-year follow-up for patients treated with neratinib was 93.9%, compared to

3  91.6% for patients treated with placebo.  Defendants also admit that *Reuters*

4  published an article on May 13, 2015, which reported on the DFS rates for the

5  ExteNET trial set forth in Abstract #508, and that the *Reuters* article stated that

6  "Puma had previously disclosed that treatment with neratinib had resulted in a

7  significant 33 percent improvement in disease-free survival."  Defendants aver that

8  the May 13, 2015 *Reuters* article also stated that "[t]he updated trial results also

9  explained that 40 percent of patients in the trial experienced diarrhea."  Defendants

10 also admit that on May 14, 2015, *EP Vantage* published an article titled "Asco

11 preview – Puma leaves investors growling in disbelief."  Defendants further admit

12 that on May 14, 2015, Puma's stock price closed at $170.67 per share.  Defendants

13 deny the remaining allegations in Paragraph 12.

14      13.    Defendants admit that on May 29, 2015, Puma's stock price closed at

15 $195.45.  Defendants further admit that on June 1, 2015, Puma's stock price closed

16 at $169.97.  Defendants also admit that on June 2, 2015, Puma's stock price closed

17 at $146.65.  Defendants deny the remaining allegations in Paragraph 13.

18                              **Answering "Parties"**

19      14.    Defendants lack knowledge or information sufficient to form a belief

20 as to the truth of the allegation that Plaintiff purchased Puma common stock during

21 the purported class period, and on that basis deny that allegation.  Defendants deny

22 the remaining allegations in Paragraph 14.

23      15.    Defendants lack knowledge or information sufficient to form a belief

24 as to the truth of the allegations in Paragraph 15, and on that basis deny the

25 allegations.

26      16.    Defendants admit that Puma is a Delaware corporation.  Defendants

27 also admit that Puma is a development-stage pharmaceutical company that focuses

28 on the acquisition, development, and marketing of drugs for the treatment of

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
ORANGE COUNTY

4

Case No. 8:15-cv-00865 AG (JCGx)
DEFENDANTS' ANSWER AND AFFIRMATIVE
DEFENSES TO CONSOLIDATED COMPLAINT

certain cancers, and that Puma's principal offices are located at 10880 Wilshire Boulevard, Suite 2150, Los Angeles, California 90024.  Defendants further admit that between July 22, 2014 and May 29, 2015, Puma's stock traded on the New York Stock Exchange under the symbol "PBYI."

17.   Defendants admit that Alan H. Auerbach founded Puma and has served as the Company's CEO, President, and Chairman of the Board since October 4, 2011.  Defendants also admit that prior to founding Puma, Mr. Auerbach served as the founder and CEO of Cougar Biotechnology, Inc., a pharmaceutical company that was bought by Johnson & Johnson in 2009. Defendants further admit that Puma filed a Proxy Statement with the Securities and Exchange Commission ("SEC") on April 30, 2015, which stated that "Mr. Auerbach was nominated to serve as a director because of his position as our President and Chief Executive Officer and his significant experience as an executive and research analyst in the biotechnology industry."  Defendants admit that for fiscal year 2014, Mr. Auerbach's compensation consisted of approximately $610,000 in salary, $300,000 in bonuses, and an option grant of 150,000 shares that were valued at approximately $16,876,576 as of December 15, 2014. Defendants aver that the 150,000 options have an exercise price of $195.33, and that subsequent to September 1, 2015 (the date these options vested) Puma's stock has not reached $195.33.  Defendants also aver that Mr. Auerbach has never exercised any of these 150,000 options.  Defendants deny the remaining allegations in Paragraph 17.

18.   Defendants admit that Puma's Code of Business Conduct and Ethics, dated October 16, 2012, states that: "As a public company we are subject to various securities laws, regulations and reporting obligations.  Both federal law and our policies require the disclosure of accurate and complete information regarding the Company's business, financial condition and results of operations.  Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
ORANGE COUNTY

5

Case No. 8:15-cv-00865 AG (JCGx)
DEFENDANTS' ANSWER AND AFFIRMATIVE
DEFENSES TO CONSOLIDATED COMPLAINT

1   Company and result in legal liability."  Defendants deny the remaining allegations
2   in Paragraph 18.

3           19.    Defendants deny the allegations in Paragraph 19.

4           20.    Defendants admit that Charles R. Eyler served as the Company's
5   Senior Vice President of Finance and Administration and Treasurer (Principal
6   Financial and Accounting Officer) since October 4, 2011.  Defendants also admit
7   that prior to joining Puma, Mr. Eyler served as Chief Financial Officer and Chief
8   Operating Officer of Hayes Medical, Inc. from March 1999 to January 2004.
9   Defendants admit that for fiscal year 2014, Mr. Eyler's compensation consisted of
10  approximately $304,336 in salary, $117,610 in bonuses, and an option grant of
11  31,500 shares that were valued at approximately $4,061,879 as of November 19,
12  2014.  Defendants aver that these 31,500 options have an exercise price of
13  $223.32, and that subsequent to September 1, 2015 (the date these options vested)
14  Puma's stock has not reached $223.32.  Defendants also aver that Mr. Eyler has
15  never exercised any of these 31,500 options.  Defendants deny the remaining
16  allegations in Paragraph 20.

17          21.    Defendants admit that Puma's Code of Business Conduct and Ethics,
18  dated October 16, 2012, states that: "As a public company we are subject to
19  various securities laws, regulations and reporting obligations.  Both federal law and
20  our policies require the disclosure of accurate and complete information regarding
21  the Company's business, financial condition and results of operations.  Inaccurate,
22  incomplete or untimely reporting will not be tolerated and can severely damage the
23  Company and result in legal liability."  Defendants deny the remaining allegations
24  in Paragraph 21.

25          22.    Defendants deny the allegations in Paragraph 22.

26          23.    Defendants admit that Mr. Auerbach and Mr. Eyler are referred to in
27  the Complaint, collectively, as the "Individual Defendants."

28          24.    Defendants admit that Puma, Mr. Auerbach, and Mr. Eyler are

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
ORANGE COUNTY

6

Case No. 8:15-cv-00865 AG (JCGx)
DEFENDANTS' ANSWER AND AFFIRMATIVE
DEFENSES TO CONSOLIDATED COMPLAINT

referred to in the Complaint, collectively, as "Defendants."

**Answering "Background and Pre-Class Period Events"**

**Puma and Neratinib**

25.     Defendants admit that Mr. Auerbach founded Puma in 2010, and that Puma is focused on the acquisition, development, and marketing of drugs for the treatment of various forms of cancer.   Defendants admit that Puma acquired neratinib from Pfizer in August 2011.   Defendants also admit that Puma is developing neratinib for the treatment of HER2-positive breast cancer, among other cancers.  Defendants deny the remaining allegations in Paragraph 25.

26.     Defendants admit that neratinib is an irreversible tyrosine kinase inhibitor that blocks signal transduction through the epidermal growth factor receptors, HER1, HER2, and HER4.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 26, and on that basis deny the allegations.

27.     Defendants admit that between July 22, 2014 and May 29, 2015, Puma was preparing to submit a New Drug Application ("NDA") to the U.S. Food and Drug Administration ("FDA") for the approval of neratinib.  Defendants deny the remaining allegations in Paragraph 27.

**The Market for Neratinib as a Cancer Treatment**

28.     Defendants admit that there are approximately 1 million new cases of breast cancer reported each year and more than 400,000 deaths per year. Defendants also admit that approximately 20% to 25% of breast cancer tumors show over-expression of the HER2 protein.   Defendants further admit that Herceptin (trastuzumab), Perjeta (pertuzumab), and Kadcyla (T-DM1) are drugs that are approved by the FDA for treatment of HER2-positive breast cancer. Defendants also admit that most patients with HER2-positive breast cancer eventually develop resistance to treatment.  Defendants also admit that there is a need for alternatives to block HER2 signaling in patients who fail treatment with

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
ORANGE COUNTY

Case No. 8:15-cv-00865 AG (JCGx)
7   DEFENDANTS' ANSWER AND AFFIRMATIVE
DEFENSES TO CONSOLIDATED COMPLAINT

1   prior HER2 directed treatments.   Defendants deny the remaining allegations in

2   Paragraph 28.

3        29.    Defendants admit that Puma's Form 10-K filed March 3, 2014 stated

4   that "We believe that there are approximately 36,000 patients in the United States

5   and 34,000 patients in the European Union, or EU, with newly diagnosed HER2-

6   positive breast cancer, representing an estimated total market opportunity between

7   $1 billion and $2 billion."   Defendants admit that *Bloomberg* published an article

8   on July 25, 2014, entitled "Puma's Auerbach Gained on Pfizer's Breast Drug

9   Retreat," which stated that "If approved, neratinib could reap $2.5 billion in annual

10   sales by 2020, according to a report from analyst Howard Liang of Leerink

11   Partners LLC."   Defendants also admit that on January 12, 2015, Puma held a

12   conference call with analysts and investors at the J.P. Morgan Healthcare

13   Conference, and that the written transcript of this call reflects the following

14   comments by Mr. Auerbach:

15       *Here you can see the landscape for HER2-positive early stage disease. As*

16       *you can see on the, left the current standard of care is Herceptin in*

17       *combination with chemotherapy. There was a recently failed trial combining*

18       *the drug with Tykerb, lapatinib, with Herceptin as well, which was the*

19       *ALTTO trial, and there are two other ongoing studies, the APHINITY and*

20       *KAITLIN studies as well.*

21

22       *As you can see in the extended adjuvant setting, there is no ongoing*

23       *competitive trials, the only trial that was ongoing was the Herceptin trial,*

24       *the HERA, which was a failure, two years of Herceptin was now shown to be*

25       *better than one year. So Neratinib will basically have the extended adjuvant*

26       *setting all to itself with no competitive threats.*

27

28       *The market is quite large: 36,000 patients in the U.S.; 34,000 in the EU,*

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
ORANGE COUNTY

8

Case No. 8:15-cv-00865 AG (JCGx)
DEFENDANTS' ANSWER AND AFFIRMATIVE
DEFENSES TO CONSOLIDATED COMPLAINT

1   *with a treatment duration of 12 months, currently Herceptin in year one of*
2   *the adjuvant setting, does approximately $4.3 billion. And all of those*
3   *patients would be eligible for Neratinib in year two.*

4   Defendants also admit that on February 26, 2015, Cowen and Company published
5   an analyst report in which it estimated worldwide sales for neratinib in the adjuvant
6   setting would be $5.574 billion by 2028.   Defendants deny the remaining
7   allegations in Paragraph 29.

8   **Relevant Results and Statistics Discussed by Defendants and Market**
9   **Participants During the Class Period**

10   30.   Defendants admit that in the context of evaluating cancer treatments,
11   one important endpoint to demonstrate is the improved chance of survival.
12   Defendants further admit that disease-free survival ("DFS") is a specific survival
13   statistic used in evaluating cancer treatments and refers to the percentage of people
14   who survive and are cancer-free after finishing treatment.   Defendants deny the
15   remaining allegations in Paragraph 30.

16   31.   Defendants admit that on July 23, 2014, Leerink Partners published an
17   analyst report, which stated:

18   *Although we did not see a positive neratinib ExteNET outcome in adjuvant*
19   *breast cancer (met both primary and second endpoints with statistical*
20   *significance) as a complete surprise, we believe the magnitude of benefit*
21   *(HR = 0.63-0.67 depending on how disease-free survival [DFS] is*
22   *measured, likely 4% absolute improvement in DFS on top of 1-year*
23   *Herceptin) is among best-case scenarios that could be envisioned.  ExteNET*
24   *results are among the better outcomes for adjuvant studies of FDA-approved*
25   *agents, therefore should have a good chance in resulting in FDA approval.*
26   *...*
27   *DFS for the control arm was in line with historical Herceptin adjuvant*
28   *studies, likely in the range of 86-87%, which suggests a ~91% DFS in the*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
ORANGE COUNTY

9

Case No. 8:15-cv-00865 AG (JCGx)
DEFENDANTS' ANSWER AND AFFIRMATIVE
DEFENSES TO CONSOLIDATED COMPLAINT

1    *drug arm, or absolute difference of ~4% in 3-year DFS on top of 1-year*
2    *Herceptin, which improved DFS by 6%, 6%, 9% and 12%, respectively, in 4*
3    *studies.*

4    Defendants deny the remaining allegations in Paragraph 31.

5        32.    Defendants admit that on or about July 2, 2015, Cowen and Company
6    published an analyst report, which stated:

7    ***Neratinib Succeeds in 'Extended Adjuvant' Setting … Though Full Data***
8    ***Were Somewhat Disappointing***

9    *Full data from the Phase III ExteNET trial were presented during an oral*
10   *presentation at ASCO by Dr. Arlene Chan.  At 2 years, the invasive DFS*
11   *(iDFS) rate in the neratinib arm was 93.9% vs. 91.6% in the placebo arm,*
12   *representing a 2.3% absolute difference in DFS rate between the neratinib*
13   *and placebo arms... Given prior comments from PBYI, investors had*
14   *expectations of at least a 3% absolute benefit, and perhaps a benefit as high*
15   *as 4-5%.  In addition, some physicians at ASCO also focused on modest*
16   *absolute benefit.*

17   *...*

18   ***… But Grade 3 Diarrhea Was Higher Than Expected***

19   *Overall, safety was in line with previous trials, with Grade 3 diarrhea being*
20   *the only major issue, experienced by ~40% of neratinib patients. Median*
21   *duration of Grade 3 diarrhea was 5 days, with 26.4% of patients requiring*
22   *dose reductions, while 16.8% required dose discontinuations.*

23   Defendants also admit that on May 21, 2015, Cowen and Company
24   published an analyst report, which stated:

25   *At ASCO, full data from the Phase III ExteNET trial of neratinib in the*
26   *extended adjuvant setting will be showcased during an oral presentation on*
27   *June 1. The Phase III ExteNET trial was a legacy trial initiated by Pfizer*
28   *that tested maintenance neratinib monotherapy after adjuvant Herceptin*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
ORANGE COUNTY

10

Case No. 8:15-cv-00865 AG (JCGx)
DEFENDANTS' ANSWER AND AFFIRMATIVE
DEFENSES TO CONSOLIDATED COMPLAINT

1    *(extended adjuvant setting) in patients with early-stage breast cancer. Top-*
2    *line data were announced in July 2014, while an ASCO abstract provided*
3    *details on the primary and key secondary efficacy endpoints. On the primary*
4    *endpoint, at 2 years, the invasive DFS (IDFS) rate in the neratinib arm was*
5    *93.9% vs. 91.6% in the placebo arm, representing a 2.3% absolute*
6    *difference in IDFS rate between the neratinib and placebo arms (HR=0.67;*
7    *p=0.0046).*

8    *...*

9    *In terms of tolerability, the rate of Grade 3/4 diarrhea was 40%, which is*
10   *slightly higher than what has been reported in previous Phase II studies, but*
11   *it was described as manageable. Recall that Imodium prophylaxis was not*
12   *instituted in this trial.*

13

14   *Neither of our consultants were enthusiastic about the ExteNET dataset.*
15   *They noted that the prognosis for HER2+ early stage patients is already*
16   *very good with currently available therapies, therefore even though the*
17   *hazard ratio targets were met, the absolute magnitude of difference in DFS*
18   *was "trivial". Our consultants were also not fans of the subset analyses*
19   *(ER+/PR+ and centrally confirmed HER2+) disclosed in the abstract. One*
20   *of our consultants believes the subset analyses will not be an ameliorating*
21   *factor because (1) FDA is not going to make labeling decision based on a*
22   *subset analysis, and (2) in clinical practice, physicians do not prescribe*
23   *drugs based on subset analysis. Nonetheless, he is interested in seeing*
24   *ExteNET data in certain subsets of patients, specifically patients who have*
25   *higher burden of disease, node positive, larger tumors, and others. Our*
26   *second physician was somewhat more positive about neratinib, particularly*
27   *in ER+ patients, noting that this is a patient population that could*
28   *potentially benefit from neratinib. Both consultants believe that the market*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
ORANGE COUNTY

Case No. 8:15-cv-00865 AG (JCGx)
11  DEFENDANTS' ANSWER AND AFFIRMATIVE
DEFENSES TO CONSOLIDATED COMPLAINT

*share for this drug is likely to be "very small" in the extended adjuvant setting because (1) patients do very well on existing therapies, (2) neratinib has significant tolerability issues, even with Imodium prophylaxis, (3) the vast majority (~80%) are node negative, where the drug is likely to only show a modest benefit, and (4) a positive readout from the APHINITY trial might limit the use of neratinib even further.*

Defendants deny the remaining allegations in Paragraph 32.

33.   Defendants admit that in 1956, Edward L. Kaplan and Paul Meier published a paper entitled "Nonparametric Estimation from Incomplete Observations," which describes "Kaplan-Meier curves." Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 33, and on that basis deny the allegations.

34.   Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 34, and on that basis deny the allegations.

35.   Defendants admit that on July 22, 2014, UBS Securities published an analyst report, which stated:

***Key points that support higher numbers***

*The key new information that is a basis for conviction in higher numbers:*

*[1] the effect size (33% reduction in recurrence or death) establishes a new standard of care and sets a high bar for other adjuvant players in development, although we note extended adjuvant is an uncontested modality.*

*[2] The result also increases the chance of success of neratinib in other segments and indications, which are significant opportunities but now look small compared to adjuvant.  In particular, we think the neoadjuvant outlook is improved, as the FDA could accept adjuvant as a confirmatory study.*

*[3] Commentary on the call adds to our confidence: the DFS curves*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
ORANGE COUNTY

12

Case No. 8:15-cv-00865 AG (JCGx)
DEFENDANTS' ANSWER AND AFFIRMATIVE
DEFENSES TO CONSOLIDATED COMPLAINT

1      *apparently widen over time, and neratinib appears active in all subgroups*

2      *examined, suggesting broad utilization.*

3 Defendants lack knowledge or information sufficient to form a belief as to the truth

4 of the remaining allegations in Paragraph 35, and on that basis deny the remaining

5 allegations.

6      36.     Defendants admit that Paragraph 36 appears to contain a graphical

7 depiction of a slide that was presented by Dr. Arlene Chan at the 2015 American

8 Society of Clinical Oncology ("ASCO") annual meeting. Defendants deny the

9 remaining allegations in Paragraph 36.

10 **The ExteNET Trial and License Agreement with Pfizer**

11      37.     Defendants admit that neratinib is subject to clinical trials to evaluate

12 its effectiveness and safety for particular treatments before obtaining marketing

13 approval. Defendants also admit that the Phase III clinical trial of neratinib for the

14 extended adjuvant treatment of HER2-positive breast cancer (the ExteNET trial)

15 was conducted between April 2009 and October 2011, and that the ExteNET trial

16 is designed to follow up on enrolled patients at 2, 3, and 5 years following

17 treatment. Defendants deny the remaining allegations in Paragraph 37.

18      38.     Defendants admit that the ExteNET trial was originally initiated by

19 Wyeth before Wyeth's merger with Pfizer Inc. Defendants also admit that on

20 August 18, 2011, Puma and Pfizer entered into an agreement pursuant to which

21 Pfizer granted Puma a worldwide license for the development, manufacture, and

22 commercialization of neratinib (the "Original Pfizer License Agreement").

23 Defendants also admit that under the Original Pfizer License Agreement, Pfizer

24 transferred to Puma the ExteNET trial as an ongoing "legacy trial." Defendants

25 also admit that under the Original Pfizer License Agreement, Puma was obligated

26 to pay royalties to Pfizer upon Puma's achievement of certain developmental

27 milestones, as described in the agreement. Defendants further admit that under the

28 Original Pfizer License Agreement, Pfizer would be responsible for paying for all

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
ORANGE COUNTY

Case No. 8:15-cv-00865 AG (JCGx)
13 DEFENDANTS' ANSWER AND AFFIRMATIVE
DEFENSES TO CONSOLIDATED COMPLAINT

1  expenses associated this a number of ongoing clinical trials of neratinib ("legacy

2  trials") above a predetermined limit, until these trials were completed.  Defendants

3  deny the remaining allegations in Paragraph 38.

4      39.    Defendants admit that the ExteNET trial enrolled 2,821 patients with

5  early-stage HER2-positive breast cancer who had undergone surgery and adjuvant

6  treatment with Herceptin.  Defendants also admit that after the completion of one

7  year of adjuvant treatment with Herceptin, patients in the ExteNET trial were

8  randomized in a 1:1 ratio to receive extended adjuvant treatment with either

9  neratinib or placebo for a period of one year.  Defendants also admit that after

10  randomization, patients in the ExteNET trial were followed for recurrent disease,

11  ductal carcinoma in situ, or death for a period of two years after randomization into

12  the ExteNET trial or three years from the initial start of Herceptin.  Defendants

13  deny the remaining allegations in Paragraph 39.

14      40.    Defendants admit that the primary endpoint for the ExteNET trial was

15  disease-free survival ("DFS").  Defendants also admit that on July 22, 2014,

16  Defendants announced that the ExteNET trial had hit its primary endpoint, and that

17  the results of the ExteNET trial demonstrated that treatment with neratinib resulted

18  in a 33% improvement in disease-free survival versus placebo.  Defendants deny

19  the remaining allegations in Paragraph 40.

20      41.    Defendants admit that on July 22, 2014, Puma disclosed that it had

21  reached an agreement with Pfizer to amend the Original Pfizer Licensing

22  Agreement, and that under the terms of the amendment, Puma would be solely

23  responsible for the future costs associated with ongoing legacy trials Puma

24  inherited from Pfizer, including the ExteNET trial.   Defendants further admit that

25  under the terms of the amendment to the Original Pfizer Licensing Agreement,

26  upon commercialization of neratinib, Puma will be obligated to pay Pfizer annual

27  royalties on net sales of neratinib at a fixed rate in the "low- to mid-teens."

28  Defendants deny the remaining allegations in Paragraph 41.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
ORANGE COUNTY

14

Case No. 8:15-cv-00865 AG (JCGx)
DEFENDANTS' ANSWER AND AFFIRMATIVE
DEFENSES TO CONSOLIDATED COMPLAINT

**The Herceptin Adjuvent Studies – HERA, NSABP, NCCTG and BCIRG**

42.    Defendants admit that Herceptin underwent four major clinical trials in the adjuvant setting: Herceptin Adjuvant ("HERA"); National Surgical Adjuvant Breast and Bowel Project ("NSABP") B-31; North Central Cancer Treatment Group ("NCCTG") N9831; and Breast Cancer International Research Group ("BCIRG") 006.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 42, and on that basis deny the remaining allegations.

43.    Defendants admit that the HERA study compared the effects of two years of Herceptin treatment, one year of Herceptin treatment, and observation only (no Herceptin), following surgery and chemotherapy in patients with HER2-positive breast cancer.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 43, and on that basis deny the remaining allegations.

44.    Defendants admit that the NSABP B-31 and NCCTG N9831 studies were meant to evaluate the efficacy and safety of adding one year of Herceptin to adjuvant chemotherapy in the treatment of HER2-positive breast cancer. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 44, and on that basis deny the remaining allegations.

45.    Defendants admit that the BCIRG 006 study was designed to evaluate the safety of adding Herceptin either (i) following anthracycline chemotherapy in combination with the drug docetaxel; or (ii) in combination with the drugs docetaxel and carboplatin.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 45, and on that basis deny the remaining allegations.

46.    Defendants admit that at the time the Complaint was filed, Herceptin was the standard of care for adjuvant treatment of HER2-positive breast cancer.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
ORANGE COUNTY

Case No. 8:15-cv-00865 AG (JCGx)
15 DEFENDANTS' ANSWER AND AFFIRMATIVE
DEFENSES TO CONSOLIDATED COMPLAINT

1   Defendants deny the remaining allegations in Paragraph 46.

2   **Answering "Defendants' Misleading Statements and Material Omissions"**

3   47.    Defendants admit that on July 22, 2014, Puma issued a press release

4   and filed a Form 8-K with the SEC.  Defendants further admit that the press release

5   was entitled "Puma Biotechnology Announces Positive Top-line Results from

6   Phase III PB272 Trial in Adjuvant Breast Cancer (ExteNET Trial): Neratinib

7   Achieves Statistically Significant Improvement in Disease Free Survival Company

8   Plans to File for Regulatory Approval in First Half of 2015," and that the press

9   release stated:

10   *The primary endpoint of the trial was disease free survival (DFS). The*

11   *results of the trial demonstrated that treatment with neratinib resulted in a*

12   *33% improvement in disease free survival versus placebo.  The hazard ratio*

13   *was determined to be 0.67 which was statistically significant with a p-value*

14   *of 0.0046.*

15   Defendants deny the remaining allegations in Paragraph 47.

16   48.    Defendants admit that on July 22, 2014, Puma held a conference call

17   with analysts and investors to discuss the results of the ExteNET trial.  Defendants

18   admit that the written transcript of this call reflects the following exchange

19   between Mr. Auerbach and Yaron Werber, a Citi Research equity analyst:

20   ***WERBER***: *Okay.  Hey, thanks so much and congrats on this fantastically in*

21   *many ways unexpected data.  So, I have a ton of questions, maybe I'll just*

22   *take two, if you don't mind.  One is give us a little bit of a sense what was*

23   *the DFS on the control arm, first.  And then second, help us understand what*

24   *do you know about the safety profile?*

25   ***AUERBACH***: *Okay.  So, in terms of the DFS of the placebo arm of the trial,*

26   *it was in line with other reported trial.  So, it's in line with the Herceptin*

27   *adjuvant studies.  And then in terms of the safety profile, we haven't yet fully*

28   *validated the safety database.  Our anticipation is the main AE we're going*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
ORANGE COUNTY

Case No. 8:15-cv-00865 AG (JCGx)
16   DEFENDANTS' ANSWER AND AFFIRMATIVE
DEFENSES TO CONSOLIDATED COMPLAINT

*to see is what we've historically seen with neratinib which is the diarrhea. And again, we would anticipate that the diarrhea rate, the grade 3 diarrhea rate, would be in line with the 29% to 30% that's been seen in the prior studies of neratinib as a monotherapy.  Now, again, they didn't use any prophylaxis.  There was no Imodium prophylaxis used in the trial because it was started before we had come up with that.  In the current trials that we're doing, neratinib monotherapy, we've been very, very successful in being able to reduce the grade 3 diarrhea rates using the Imodium prophylaxis.*

**WERBER***: So, you're thinking that, if I'm correct, the DFS is probably around mid to high 80s, around 86% or so on the control arm?*

**AUERBACH***: Yeah.  I will be comfortable with that number.*

**WERBER***: And one would imagine, you're probably had to show around 90% or 91%, is that reasonable?*

**AUERBACH***: Yeah.  I think you can do a 33% improvement in DFS and come up with that calculation given the numbers we gave.*

Defendants deny the remaining allegations in Paragraph 48.

49.     Defendants deny the allegations in Paragraph 49.

50.     Defendants admit that on July 22, 2014, Puma held a conference call with analysts and investors to discuss the results of the ExteNET trial.  Defendants admit that the written transcript of this call reflects the following exchange between Mr. Auerbach and Howard Liang, a Leerink Partners equity analyst:

**LIANG***: Congratulation, Alan and your team.  So, can you – I assume you have seen the curves for the two arms, can you give us a sense as to whether the separation is widening over time or how would you describe the curve separation?*

**AUERBACH***: Yeah.  Thanks for that question, Howard.  Okay.  So, the trial started in April of 2009 and this data cut is as of October 2013.  So that's essentially the last patient was followed for two years.  So from those*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
ORANGE COUNTY

17

Case No. 8:15-cv-00865 AG (JCGx)
DEFENDANTS' ANSWER AND AFFIRMATIVE
DEFENSES TO CONSOLIDATED COMPLAINT

*numbers, you can see we have a lot of patients who've been in for much more than that two-year cut-off.  If we look at the curves going out beyond that, it looks like the curves are continuing to separate.  And to give a little more detail on that, if you look at the curves in the Herceptin adjuvant trials, so the HERA study, the BCIRG study, et cetera, the absolute difference in disease-free survival increases as you go out year-over-year.   So, for instance, in the BCIRG trial, the DFS difference was 6% at two years, then 7% at three years, then 8% at four years, et cetera, et cetera.  We're seeing the same preliminary trend in the ExteNET trial where the curves appear to be continuing to separate as you go out year-over-year, and the absolute DFS difference is increasing year-over-year as well.*

Defendants deny the remaining allegations in Paragraph 50.

51.    Defendants admit that on July 23, 2014, Puma's stock price closed at $233.43.  Defendants deny the remaining allegations in Paragraph 51.

52.    Defendants admit that a July 23, 2014 *MTNewswires* article entitled "Puma Biotechnology Up More Than 220% In Early Pre-Market On Results Of Breast Cancer Drug Trial" stated that "[t]he results of the trial demonstrated that treatment with neratinib resulted in a 33% improvement in disease free survival, the primary endpoint, versus placebo."  Defendants also admit that a July 23, 2014 *MarketWatch* article entitled "Puma Biotech's blast-off is not a typical short squeeze," reported that Puma's stock "soared $170.83, or 289%, to $229.86 in midday trading. Volume was 5.6 million shares, or about 14 times the daily average over the past 30 days of 411,453 shares, according to FactSet.  The blast-off follows the company's announcement late Tuesday of positive results from a Phase 3 trial of its breast cancer treatment."   Defendants deny the remaining allegations in Paragraph 52.

53.    Defendants admit that on November 13, 2014, Puma held a conference call with analysts and investors to discuss the company's NEfERTT

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
ORANGE COUNTY

18

Case No. 8:15-cv-00865 AG (JCGx)
DEFENDANTS' ANSWER AND AFFIRMATIVE
DEFENSES TO CONSOLIDATED COMPLAINT

study, a randomized, two-arm Phase II trial comparing neratinib plus taxol versus Herceptin plus taxol, as the first line treatment for HER2-positive locally recurrent or metastatic breast cancer.  Defendants further admit that the written transcript of this call reflects the following statement by Mr. Auerbach: "As investors know, a few months ago, we announced positive top line results from a trial of neratinib in extended adjuvant HER2 positive breast cancer also known as the ExteNET Trial. The primary endpoint of this trial was disease free survival and neratinib demonstrated a 33% improvement in disease free survival."  Defendants deny the remaining allegations in Paragraph 53.

54.    Defendants admit that on December 2, 2014, Puma held a conference call with analysts and investors to discuss the filing of an NDA for neratinib as an extended adjuvant treatment for breast cancer.  Defendants admit that the written transcript of this call reflects the following exchange between Mr. Auerbach and analysts Howard Liang and Eric Schmidt:

> *LIANG: Okay.  When you met with the FDA recently, did you share with the Agency the full safety result?*
>
> *AUERBACH: Yes.*
>
> *LIANG: From ExteNET?*
>
> *AUERBACH: Yes.*
>
> *LIANG: Okay.  Okay, thank you very much.*
>
> *OPERATOR: Thank you.  Our next question comes from Eric Schmidt from Cowen & Company.*
>
> *SCHMIDT: Thanks.  Just as a follow-up to Howard's question. It sounds like all of the clinical data was discussed at the meeting, Alan?*
>
> *AUERBACH: Yeah, that's correct.  So the data that was provided was the full DFS data. So the Kaplan-Meier curves, the all end points, the DFS rates, the whole nine yards.*

Defendants deny the remaining allegations in Paragraph 54.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
ORANGE COUNTY

Case No. 8:15-cv-00865 AG (JCGx)
19 DEFENDANTS' ANSWER AND AFFIRMATIVE
DEFENSES TO CONSOLIDATED COMPLAINT

55.     Defendants admit that on January 20, 2015, Puma filed a Form S-3ASR Registration Statement with the SEC, and that the Form S-3ASR was signed by Mr. Auerbach and Mr. Eyler.  Defendants also admit that on January 22, 2015, Defendants filed a Form 424B2 Prospectus with the SEC.  Defendants further admit that the January 2015 Form S-3ASR incorporates by reference Puma's July 22, 2014 press release.  Defendants further admit that the Form 424B2 Prospectus states as follows:

> *In July 2014, we announced top line results from the Phase III clinical trial of neratinib for the extended adjuvant treatment of breast cancer (the ExteNET Trial).  The ExteNET trial is a double-blind, placebo-controlled, Phase III trial of neratinib versus placebo after adjuvant treatment with Herceptin in women with early stage HER2-positive breast cancer.  More specifically, the ExteNET trial enrolled 2,821 patients in 41 countries with early-stage HER2-positive breast cancer who had undergone surgery and adjuvant treatment with trastuzumab.  After completion of adjuvant treatment with trastuzumab, patients were randomized to receive extended adjuvant treatment with either neratinib or placebo for a period of one year. Patients were then followed for recurrent disease, ductal carcinoma in situ (DCIS), or death for a period of two years after randomization in the trial. The primary endpoint of the trial was disease free survival (DFS).  The results of the trial demonstrated that treatment with neratinib resulted in a 33% improvement in disease free survival versus placebo.  The hazard ratio was determined to be 0.67, which was statistically significant with a p-value of 0.0046.*

Defendants deny the remaining allegations in Paragraph 55.

56.     Defendants admit that on February 12, 2015, Puma held a conference call with analysts and investors.  Defendants further admit that the written transcript of this call reflects the following statements by Mr. Auerbach: "So in

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW
ORANGE COUNTY

20

Case No. 8:15-cv-00865 AG (JCGx)
DEFENDANTS' ANSWER AND AFFIRMATIVE
DEFENSES TO CONSOLIDATED COMPLAINT

July, we announced that the trial hit its primarily endpoints.  That was a 33% improvement in disease-free survival, hazard ratio 0.67 with a p-value of 0.0046.  For the secondary endpoint, which is DFS that includes DCIS, that hazard ratio was 0.63 with a PV value of 0.0009.  We're going to be presenting and publishing this data sometime in 2015, and we anticipate filing for regulatory approval in this indication in the first quarter of 2016."  Defendants deny the remaining allegations in Paragraph 56.

57.     Defendants admit that on March 2, 2015, Puma filed its 2014 Annual Report on Form 10-K ("2014 10-K") with the SEC.  Defendants also admit that Puma's 2014 10-K states, with respect to the ExteNET trial, that: "The results of the trial demonstrated that treatment with neratinib resulted in a 33% improvement in disease free survival versus placebo. The hazard ratio was determined to be 0.67, which was statistically significant, with a p-value of 0.0046."  Defendants deny the remaining allegations in Paragraph 57.

58.     Defendants admit that on March 3, 2015, Puma held a conference call with analysts and investors at the Cowen & Co. Health Care Conference.  Defendants further admit that the written transcript of this call reflects the following statements by Mr. Auerbach regarding the ExteNET trial:

> So we announced the results in July of 2014, where we announced that the trial hit the primary endpoint.  It's a 33% improvement in disease-free survival.  So that's a hazard ratio of 0.67, p-value of 0.0046.  The secondary endpoint, improvement in disease-free survival that includes ductal carcinoma in situ, 37% improvement, has a ratio of 0.63, P value 0.0009, so both endpoints highly statistically significant.

Defendants deny the remaining allegations in Paragraph 58.

59.     Defendants admit that on May 7, 2015, Puma held a conference call with analysts and investors at the Deutsche Bank Health Care Conference.  Defendants further admit that the written transcript of this call reflects the

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
ORANGE COUNTY

21

Case No. 8:15-cv-00865 AG (JCGx)
DEFENDANTS' ANSWER AND AFFIRMATIVE
DEFENSES TO CONSOLIDATED COMPLAINT

1  following statements by Mr. Auerbach regarding the ExteNET trial:

2      *In July of last year we announced that the trial hit its primary end point. We*

3      *saw a 33% improvement in invasive disease-free survival. That's a hazard*

4      *ratio of 0.67 with a p-value of 0.0046. We also saw a 37% improvement in*

5      *disease-free survival that includes ductal carcinoma in situ. That's a hazard*

6      *ratio of 0.63 with a p-value of 0.0009. This data will be presented at an oral*

7      *presentation at ASCO, and we're looking to have this data published*

8      *somewhere in the same timeframe. And our current timeline is to file for*

9      *regulatory approval in this setting in the first quarter of 2016.*

10  Defendants deny the remaining allegations in Paragraph 59.

11      60.    Defendants deny the allegations in Paragraph 60.

12      61.    Defendants deny the allegations in Paragraph 61.

13      **Answering "Disclosure of the Truth About the ExteNET Trial"**

14      62.    Defendants admit that on May 13, 2015, Puma announced the release

15  of four abstracts on neratinib, including Abstract #508, which would be presented

16  at the ASCO 2015 annual meeting in Chicago and were available on the ASCO

17  website, www.abstract.asco.org. Defendants further admit that Abstract #508

18  reported, among other data points, efficacy results for the ExteNET trial, including

19  that the invasive DFS rate at the two-year follow-up for patients treated with

20  neratinib was 93.9%, compared to 91.6% for patients treated with placebo.

21  Defendants deny the remaining allegations in Paragraph 62.

22      63.    Defendants admit that on May 13, 2015, *Reuters* published an article

23  entitled "Puma Biotech breast cancer trial detailed, shares fall 25 pct," which

24  stated:

25      *Puma shares slid 25 percent after hours following release of the findings on*

26      *Wednesday by the American Society of Clinical Oncology ahead of its*

27      *annual meeting later this month.*

28

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
ORANGE COUNTY

22

Case No. 8:15-cv-00865 AG (JCGx)
DEFENDANTS' ANSWER AND AFFIRMATIVE
DEFENSES TO CONSOLIDATED COMPLAINT

1    *The Phase 3 trial involved 2,821 patients previously treated for a type of*
2    *breast cancer fueled by a protein called HER2.*

3

4    *It found that after two years, 93.9 percent of neratinib patients were alive*
5    *without their disease progressing, compared with 91.6 percent of patients*
6    *treated with a placebo.*

7

8    *Puma had previously disclosed that treatment with neratinib had resulted in*
9    *a significant 33 percent improvement in disease-free survival.*

10

11   *The updated trial results also explained that 40 percent of patients in the*
12   *trial experienced diarrhea.*

13   Defendants deny the remaining allegations in Paragraph 63.

14   64.   Defendants admit that on May 14, 2015, *FierceBiotech* published an

15   article entitled "The ASCO roundup: Thumbs down for Puma, up for Roche,

16   mixed for Bristol-Meyers," which stated:

17   *Puma's breast cancer drug neratinib managed to eke out only a slight*
18   *advantage over a placebo.  Scoring the percentage of women who were free*
19   *of invasive disease, the neratinib group hit 93.9% compared to 91.6% in the*
20   *placebo arm.  Analysts did a double take on the meager 2.3% difference and*
21   *quickly turned thumbs down on the data, especially as several of them were*
22   *looking for a much clearer distinction.*

23

24   *Puma's shares plunged about 20% overnight, which Forbes' Matthew*
25   *Herper estimates cost CEO Alan Auerbach about $250 million of his*
26   *personal fortune.*

27

28   *Investors may have been more accepting of the results of neratinib wasn't*

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
ORANGE COUNTY

23

Case No. 8:15-cv-00865 AG (JCGx)
DEFENDANTS' ANSWER AND AFFIRMATIVE
DEFENSES TO CONSOLIDATED COMPLAINT

1     *tied to a harsh side effect.  About four out of 10 patients in the drug arm*

2     *experienced severe diarrhea, which will likely have many physicians looking*

3     *to think twice before prescribing it--provided it can win an approval.*

4   Defendants deny the remaining allegations in Paragraph 64.

5     65.     Defendants admit that on May 13, 2015, Puma's stock price closed at

6   $209.72, and that on May 14, 2015, Puma's stock price closed at $170.67.

7   Defendants further admit that 3,082,400 shares of Puma were traded on May 14,

8   2015.  Defendants deny the remaining allegations in Paragraph 65.

9     66.     Defendants admit that on May 28, 2015, *TheStreet*.com published an

10   article entitled "Puma Bio Restricting Access to Breast Cancer Event at ASCO

11   Chicago," which stated:

12     *Puma Bio, embroiled in controversy over its breast cancer drug neratinib, is*

13     *turning away some investors and at least one analyst from a company event*

14     *scheduled for next Monday night during the annual meeting of the American*

15     *Society of Clinical Oncology.*

16

17     *The hotel ballroom doesn't have the capacity to accommodate the "much*

18     *larger than expected response" to Puma's investor/analyst meeting.  "We*

19     *regret to inform you that due to this response, we are unable to confirm your*

20     *reservation or accommodate you on June 1," says an email sent over the*

21     *past week to people denied entry to the gathering.  As an alternative, Puma*

22     *is offering a webcast of the event.*

23

24     *Tom Shrader, a research analyst at Stifel Nicolaus, received the "you can't*

25     *come to our meeting" email sent by Puma.  Shrader covers Puma with a*

26     *hold rating.*

27

28     *At least one well-known healthcare hedge fund manager was also sent that*

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW
ORANGE COUNTY

24

Case No. 8:15-cv-00865 AG (JCGx)
DEFENDANTS' ANSWER AND AFFIRMATIVE
DEFENSES TO CONSOLIDATED COMPLAINT

1   *same e-mail.  He asked that his name not be disclosed because he plans on*

2   *using alternative means to attend the event.*

3

4   *Puma's investor gathering is being held at the Renaissance Chicago*

5   *Downtown Hotel.  According to the hotel's web site, the*

6   *conference/ballroom reserved for the event can accommodate up to 300*

7   *people.*

8

9   *Restricting access to a corporate event might not be such a big deal if not*

10   *for Puma's penchant for selectively disclosing important information to*

11   *people deemed friendly to the company.*

12   Defendants deny the remaining allegations in Paragraph 66.

13   67.   Defendants admit that on June 1, 2015, Dr. Arlene Chan presented the

14   results of the ExteNET trial at the 2015 ASCO annual meeting in Chicago, Illinois.

15   Defendants aver that this presentation was attended by several oncologists,

16   analysts, and investors, and further aver that following the presentation, multiple

17   attendees asked questions in front of the entire audience about the ExteNET trial's

18   safety and efficacy results.  Defendants further admit that the ExteNET trial results

19   showed that the 2-year DFS rate for the entire population treated with neratinib

20   was 93.9%, and that the 2-year DFS rate for the entire population treated with

21   placebo was 91.6%.  Defendants admit that Paragraph 67 appears to contain a

22   graphical depiction of a slide that was presented by Dr. Chan during the 2015

23   ASCO annual meeting.  Defendants deny the remaining allegations in Paragraph

24   67.

25   68.   Defendants admit that on June 1, 2015, *TheStreet* published an article

26   entitled "Puma Bio Breast Cancer Drug Given Rough Treatment at ASCO '15,"

27   which states:

28   *The benefit for breast cancer patients treated with Puma's neratinib was*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
ORANGE COUNTY

25   Case No. 8:15-cv-00865 AG (JCGx)
DEFENDANTS' ANSWER AND AFFIRMATIVE
DEFENSES TO CONSOLIDATED COMPLAINT

1    *"awfully small"* for a drug that causes *"a lot of diarrhea,"* said Dr. Harold

2    Burstein, a breast cancer expert from the Dana-Farber Cancer Institute.

3

4    *Puma shares are down more than 9% to $177.04 in Monday trading.*

5    *...*

6    *The absolute disease-free survival for neratinib was 93.9% compared to*

7    *91.6% for placebo -- a difference of 2.3 percentage points. The benefit,*

8    *while statistically significant, is tough to call clinically meaningful for*

9    *breast cancer patients given the drug's toxicity, Burstein said.*

10

11    *Forty percent of patients treated with neratinib experienced grade 3*

12    *diarrhea, which is defined as seven more stools per day, incontinence and*

13    *hospitalization.*

14

15    *"This is not someone simply eating too many chili peppers and having a*

16    *single bout of diarrhea," said Burstein.*

17

18    *After the study was conducted, Puma implemented a protocol in which*

19    *patients are treated with anti-diarrhea medicines before taking neratinib.*

20    *The presenter of the ExteNet study data on Monday noted that this strategy*

21    *lowered the incidence of grade 3 diarrhea but it still occurred in up to 17%*

22    *of patients.*

23    *...*

24    *During a Q&A session at the end of the ASCO presentation, an audience*

25    *member said "neratinib seems like a terrible drug," referring to the high*

26    *rate of diarrhea. Another ASCO attendee called the ExteNet results*

27    *presented "unactionable" and criticized the study's short follow up.*

28    Defendants deny the remaining allegations in Paragraph 68.

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW
ORANGE COUNTY

26

Case No. 8:15-cv-00865 AG (JCGx)
DEFENDANTS' ANSWER AND AFFIRMATIVE
DEFENSES TO CONSOLIDATED COMPLAINT

69.     Defendants admit that on June 4, 2015, *TheStreet.com* published an article entitled "Top-Performing Biotech and Drug Stocks during ASCO '15," which states: "Puma Biotech ( PBYI) was the worst-performing biotech and drug stock during the ASCO period, falling 28% due to the underwhelming efficacy and high rate of side effects seen with the company's breast cancer drug neratinib." Defendants deny the remaining allegations in Paragraph 69.

70.     Defendants admit that on June 1, 2015, Puma's stock price opened at $191.95 and closed at $169.97.   Defendants also admit that on June 2, 2015, Puma's stock price opened at $172.67 and closed at $146.65.   Defendants deny the remaining allegations in Paragraph 70.

**Answering "Defendants' Motive and Opportunity to Defraud Investors"**

**Puma's $218.5 Million in Stock Sales**

71.     Defendants admit that Puma's common stock began trading publicly on April 20, 2012. Defendants admit further that Puma's common stock began trading on the NYSE in October 2012. Defendants admit further that since it became a public company, Puma has informed investors that as a development-stage organization, it has no revenue and significant clinical testing expenses, and will need to continue to raise working capital to finance research and product development.  Defendants also admit that Puma's 2013 Form 10-K, filed with the SEC on March 3, 2014, reported that the Company's net losses for 2012 and 2013 were $74.4 million and $54.7 million, respectively.  Defendants also admit that Puma completed a secondary offering of common stock in February 2014, pursuant to which Puma raised approximately $138 million.  Defendants deny the remaining allegations in Paragraph 71.

72.     Defendants admit that in the first three fiscal quarters of 2014, Puma reported net loss applicable to common stock of $19.8 million, $38.8 million, and $35.8 million, respectively.  Defendants also admit that Puma reported net losses in fiscal year 2014 of approximately $142 million.  Defendants also admit that as of

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
ORANGE COUNTY

27
Case No. 8:15-cv-00865 AG (JCGx)
DEFENDANTS' ANSWER AND AFFIRMATIVE
DEFENSES TO CONSOLIDATED COMPLAINT

December 31, 2014, Puma had approximately $149.4 million in total current assets. Defendants aver that Puma used $77.2 million net cash in operating activities in fiscal year 2014. Defendants deny the remaining allegations in Paragraph 72.

73. Defendants admit that Puma's Form 10-Q, filed with the SEC on November 10, 2014, states:

> *The Company's continued operations will depend on its ability to raise funds through various potential sources such as equity and debt financing. Through September 30, 2014, the Company's financing was primarily through public offerings of Company common stock and private equity placements. Given the current and desired pace of clinical development of its product candidates, management estimates that the Company has sufficient cash on hand to fund clinical development through 2015 and into 2016. The Company will need additional financing thereafter until it can achieve profitability, if ever. The Company may choose to raise additional capital before 2016 in order to fund its future development activities. There can be no assurance that such capital will be available on favorable terms, or at all, or that any additional capital that the Company is able to obtain will be sufficient to meet its needs. If it is unable to raise additional capital, the Company could likely be forced to curtail desired development activities, which will delay the development of its product candidates.*
>
> *...*
>
> *To the extent we are successful in acquiring additional product candidates for our development pipeline, our need to finance R&D will increase. Accordingly, our success depends not only on the safety and efficacy of our product candidates, but also on our ability to finance product development. Our major sources of working capital have been proceeds from public offerings of our common stock and sales of our common stock in private*

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
ORANGE COUNTY

28

Case No. 8:15-cv-00865 AG (JCGx)
DEFENDANTS' ANSWER AND AFFIRMATIVE
DEFENSES TO CONSOLIDATED COMPLAINT

1    *placements.*

2    Defendants deny the remaining allegations in Paragraph 73.

3    74.    Defendants admit that Puma completed a secondary offering of Puma

4    common stock in January 2015.  Defendants also admit that Puma's Prospectus

5    Supplement Form 424B5, filed January 20, 2015, states:  "We intend to use the net

6    proceeds of this offering for the overall development of our drug candidates,

7    including, but not limited to, research and development and clinical trial

8    expenditures, and for general corporate and working capital purposes."

9    Defendants deny the remaining allegations in Paragraph 74.

10    75.    Defendants admit that in January 2015, Puma issued 1.15 million

11    shares of its common stock at an offering price of $190 per share.  Defendants

12    further admit that net proceeds from the offering were approximately $205 million.

13    Defendants further admit that Puma reported a net loss applicable to common stock

14    of $52.5 million in the first quarter of 2015, and that Puma reported a net loss

15    applicable to common stock of $64.7 million in the second quarter of 2015.

16    Defendants deny the remaining allegations in Paragraph 75.

17    **Defendants' Class Period Compensation**

18    76.    Defendants admit that Puma's April 30, 2015 Form DEF 14A Proxy

19    Statement, filed with the SEC, states: "The Compensation Committee believes that

20    compensation paid to our Named Executive Officers should be aligned with our

21    performance on both a short-term and long-term basis, linked to results intended to

22    create value for stockholders, and that such compensation should assist us in

23    attracting and retaining key executives critical to our long-term success."

24    Defendants deny the remaining allegations in Paragraph 76.

25    77.    Defendants admit that Puma's April 30, 2015 Form DEF 14A Proxy

26    Statement, filed with the SEC, states that Puma's executive compensation package

27    consists of base salaries, annual bonuses, and equity awards.  Defendants also

28    admit that Puma's April 30, 2015 DEF 14A Proxy Statement states:

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
ORANGE COUNTY

29

Case No. 8:15-cv-00865 AG (JCGx)
DEFENDANTS' ANSWER AND AFFIRMATIVE
DEFENSES TO CONSOLIDATED COMPLAINT

> *We have in place a compensation strategy for our executives that we believe focuses on both individual and Company performance. Incentive compensation paid to our executives is awarded based on our Compensation Committee's review of our achievement of near-term corporate targets and longer term business objectives and strategies.*

Defendants further admit that Puma's April 30, 2015 Form DEF 14A Proxy Statement also states the following under the section "2014 Business Highlights":

> *Over the last three years, we created and consistently maintained long-term sustained value for our stockholders. Between our initial listing on the OTC Bulletin Board in April 2012 and the end of our 2014 fiscal year, the price of our common stock increased approximately 1,302%. In the 2014 fiscal year alone, the price of our common stock increased approximately 82.8%, closing at $189.27 on December 31, 2014, up from the closing price of $103.53 on December 31, 2013.*
>
> *In July 2014, we announced positive top line results from the Phase III clinical trial of neratinib for the extended adjuvant treatment of HER2-positive early stage breast cancer. Based on these results, we plan to file for regulatory approval of neratinib in this indication with the U.S. Food and Drug Administration in the first quarter of 2016.*

Defendants deny the remaining allegations in Paragraph 77.

78. Defendants admit that for fiscal year 2013, Mr. Auerbach received approximately $546,667 in salary and $260,000 in bonuses. Defendants also admit that on October 25, 2013, Mr. Auerbach received an option grant of 150,000 shares at an exercise price of $44.08, valued at approximately $4,555,285 as of October 25, 2013. Defendants further admit that for fiscal year 2014, Mr. Auerbach's compensation consisted of approximately $610,000 in salary, $300,000 in bonuses, and an option grant of 150,000 shares that were valued at approximately

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
ORANGE COUNTY

30

Case No. 8:15-cv-00865 AG (JCGx)
DEFENDANTS' ANSWER AND AFFIRMATIVE
DEFENSES TO CONSOLIDATED COMPLAINT

$16,876,576 as of December 15, 2014.  Defendants aver that the 150,000 options granted on December 15, 2014 have an exercise price of $195.33.  Defendants also aver that Mr. Auerbach has never exercised any of his Puma stock options. Defendants also admit that for fiscal year 2013, Mr. Eyler received approximately $282,900 in salary and $83,475 in bonuses.   Defendants also admit that on November 18, 2013, Mr. Eyler received an option grant of 31,500 shares at an exercise price of $41.50, valued at approximately $901,228 as of November 18, 2013.   Defendants admit that for fiscal year 2014, Mr. Eyler's compensation consisted of approximately $304,336 in salary, $117,610 in bonuses, and an option grant of 31,500 shares that were valued at approximately $4,061,879 as of November 19, 2014.  Defendants also aver that these 31,500 shares of options granted on November 19, 2014 have an exercise price of $223.32.  Defendants also aver that Mr. Eyler has never exercised any of his Puma stock options.  Defendants deny the remaining allegations in Paragraph 78.

### Answering "Loss Causation / Economic Loss"

79.    Defendants deny the allegations in Paragraph 79.

80.    Defendants deny the allegations in Paragraph 80.

81.    Defendants admit that Puma's stock price closed at $209.72 on May 13, 2015, and that Puma's stock price closed at $170.67 on May 14, 2015. Defendants deny the remaining allegations in Paragraph 81.

82.    Defendants admit that Puma's stock price closed at:  $195.45 on May 29, 2015, $169.97 on June 1, 2015, and $146.65 on June 2, 2015.  Defendants deny the remaining allegations in Paragraph 82.

83.    Defendants deny the allegations in Paragraph 83.

84.    Defendants deny the allegations in Paragraph 84.

### Answering "Applicability of the Presumption of Reliance"

85.    Defendants deny the allegations in Paragraph 85.

86.    Defendants deny the allegations in Paragraph 86.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
ORANGE COUNTY

Case No. 8:15-cv-00865 AG (JCGx)
31  DEFENDANTS' ANSWER AND AFFIRMATIVE
DEFENSES TO CONSOLIDATED COMPLAINT

**Answering "Class Action Allegations"**

87.     Defendants admit that Plaintiff purports to bring this action as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or otherwise acquired the common stock of Puma between July 22, 2014 and May 29, 2015.  Defendants deny the remaining allegations in Paragraph 87.

88.     Defendants admit that between July 22, 2014 and May 29, 2015, Puma's common stock was traded on the New York Stock Exchange.  Defendants admit further that between July 22, 2014 and May 29, 2015, there were more than 30 million shares of Puma common stock outstanding, and the average daily trading volume for Puma common stock was over 403,000 shares.  Defendants deny the remaining allegations in Paragraph 88.

89.     Defendants deny the allegations in Paragraph 89, including subparts (a) through (c).

90.     Defendants deny the allegations in Paragraph 90.

91.     Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 91, and on that basis, deny the allegations.

92.     Defendants deny the allegations in Paragraph 92.

**Answering "Count I"**

93.     Defendants incorporate their answers to Paragraphs 1-92.  Defendants admit that Plaintiff purports to bring Count I pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Defendants deny the remaining allegations in Paragraph 93.

94.     Defendants deny the allegations in Paragraph 94.

95.     Defendants deny the allegations in Paragraph 95.

96.     Defendants deny the allegations in Paragraph 96.

97.     Defendants deny the allegations in Paragraph 97.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
ORANGE COUNTY

32

Case No. 8:15-cv-00865 AG (JCGx)
DEFENDANTS' ANSWER AND AFFIRMATIVE
DEFENSES TO CONSOLIDATED COMPLAINT

1    98.    Defendants deny the allegations in Paragraph 98.

2    99.    Defendants deny the allegations in Paragraph 99.

3    100.   Defendants deny the allegations in Paragraph 100.

4    101.   Defendants deny the allegations in Paragraph 101.

5    102.   Defendants deny the allegations in Paragraph 102.

6    ### Answering "Count II"

7    103.   Defendants incorporate their answers to Paragraphs 1-102.
8    Defendants admit that Plaintiff purports to bring Count II pursuant to Section 20(a)
9    of the Exchange Act.  Defendants deny the remaining allegations in Paragraph 103.

10   104.   Defendants deny the allegations in Paragraph 104.

11   105.   Defendants deny the allegations in Paragraph 105.

12   106.   Defendants deny the allegations in Paragraph 106.

13   ### RESPONSE TO JURY DEMAND

14   Defendants acknowledge that Plaintiff requests a jury trial on issues so
15   triable.

16   ### AFFIRMATIVE DEFENSES

17   Without assuming any burden of proof that would otherwise rest on
18   Plaintiff, Defendants plead the following affirmative defenses:

19   ### First Affirmative Defense

20   Plaintiff's claims against Defendants are barred, in whole or in part, because
21   Plaintiff lacks standing to assert its claims against Defendants.

22   ### Second Affirmative Defense

23   At the time of their acquisition of Puma stock, Plaintiff and members of the
24   putative class knew of the allegedly untrue statements of material fact, omissions
25   of material fact, or misleading statements or other wrongful conduct upon which
26   Defendants' purported liability rests.

27   ### Third Affirmative Defense

28   Plaintiff and members of the putative class would have acquired Puma stock

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
ORANGE COUNTY

33

Case No. 8:15-cv-00865 AG (JCGx)
DEFENDANTS' ANSWER AND AFFIRMATIVE
DEFENSES TO CONSOLIDATED COMPLAINT

1  even if, when acquired, they had known of the allegedly untrue statements of

2  material fact, omissions of material fact, or misleading statements or other

3  wrongful conduct upon which Defendants' purported liability rests.

4  ### Fourth Affirmative Defense

5  Certain matters alleged to be the subject of misrepresentations and omissions

6  were publicly disclosed or were in the public domain, and as such were available to

7  Plaintiff, members of the purported class, and/or the securities markets.

8  ### Fifth Affirmative Defense

9  Plaintiff and members of the putative class knew or should have known of

10  Puma's financial condition and the risks associated with Puma's business at the

11  time of their acquisition of Puma stock, and assumed the risk that the value of the

12  Puma stock could decline.

13  ### Sixth Affirmative Defense

14  Plaintiff's claims are barred, in whole or in part, because the purported

15  misstatements or omissions or other acts alleged in the Complaint that are

16  attributed to Defendants did not affect the market price of Puma stock or otherwise

17  cause any injury to Plaintiff or any member of the putative class.

18  ### Seventh Affirmative Defense

19  Factors other than the allegedly false statements of material fact, omissions

20  of material fact, schemes, or other acts by any of the Defendants that are cited in

21  the Complaint, which allegations the Defendants deny, led to any alleged decline

22  in the value of Puma stock.  Under any theory of liability, Plaintiff and each

23  member of the putative class may not recover damages based on depreciation in

24  the value of Puma stock that resulted from factors other than the allegedly false

25  statements of material fact, omissions of material fact, schemes, or other acts by

26  any of the Defendants that are cited in the Complaint.

27  ### Eighth Affirmative Defense

28  Plaintiff's damages, if any, resulted from the acts or omissions of other

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
ORANGE COUNTY

34

Case No. 8:15-cv-00865 AG (JCGx)
DEFENDANTS' ANSWER AND AFFIRMATIVE
DEFENSES TO CONSOLIDATED COMPLAINT

persons or entities, or ongoing economic events, over which Defendants had no control. The acts of such persons or entities or such economic events constitute intervening or superseding causes of harm, if any, suffered by Plaintiff and each putative class member, relieving Defendants of any liability.

## Ninth Affirmative Defense

Under principles of contribution and indemnity, persons or entities other than Defendants are wholly or partially responsible for the purported damages, if any, Plaintiff and putative class members have sustained.

## Tenth Affirmative Defense

Any damages sustained by Plaintiff or any member of the putative class must be reduced and/or barred in proportion to the wrongful or negligent conduct of persons or entities other than Defendants under the principles of equitable allocation, recoupment, set-off, proportionate responsibility, and comparative fault.

## Eleventh Affirmative Defense

Plaintiff and members of the putative class have failed to mitigate any damages they may have suffered.

## Twelfth Affirmative Defense

Any recovery for damages allegedly incurred by Plaintiff and members of the putative class, if any, is subject to offset in an amount including, but not limited to, any tax benefits actually received by Plaintiff or each member of the putative class through its/his/her investments.

## Thirteenth Affirmative Defense

Any recovery for damages allegedly incurred by Plaintiff and members of the putative class, if any, is limited to the percentage of responsibility of Defendants in proportion to the total fault of all persons, whether or not named as parties to this action, who caused or contributed to Plaintiff's alleged damages, if any, pursuant to the proportionate liability provisions of the Private Securities Litigation Reform Act of 1995 (the "Reform Act"), as codified at 15 U.S.C. § 78u-

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
ORANGE COUNTY

35

Case No. 8:15-cv-00865 AG (JCGx)
DEFENDANTS' ANSWER AND AFFIRMATIVE
DEFENSES TO CONSOLIDATED COMPLAINT

1   4(f)(3)(A).

2   **Fourteenth Affirmative Defense**

3       Plaintiff's claims are not actionable to the extent that the alleged untrue

4   statements of material fact, omissions of material fact, misleading statements,

5   and/or other challenged statements made by Defendants fall within the Safe Harbor

6   provisions of the Reform Act, as codified at 15 U.S.C. § 77z-2(c).

7   **Fifteenth Affirmative Defense**

8       Defendants acted at all times in good faith and did not directly or indirectly

9   induce any act or acts alleged to constitute a violation of law, and every act or

10  omission alleged in the Complaint was done or omitted in good faith in conformity

11  with the rules and regulations of the Securities and Exchange Commission, and

12  therefore, pursuant to Section 23(a) of the Securities Exchange Act of 1934, there

13  is no liability for any act or omission so alleged.

14  **Sixteenth Affirmative Defense**

15      Each of Defendants alleged to be a control person under Section 20(a) of the

16  Securities Exchange Act of 1934 acted in good faith and did not directly or

17  indirectly induce any acts constituting the alleged violations and causes of action.

18  **Seventeenth Affirmative Defense**

19      This action is not properly maintainable as a class action pursuant to Federal

20  Rule of Civil Procedure 23.

21

22      Defendants have insufficient knowledge or information upon which to form

23  a belief as to whether there may be additional affirmative defenses available to

24  them.  Defendants expressly reserve the right to plead additional affirmative and

25  other defenses that may become available or apparent during this litigation and/or

26  required by any amendments to the Complaint.

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
ORANGE COUNTY

36

Case No. 8:15-cv-00865 AG (JCGx)
DEFENDANTS' ANSWER AND AFFIRMATIVE
DEFENSES TO CONSOLIDATED COMPLAINT

1    WHEREFORE, Defendants respectfully seek judgment as follows:

2    1.    That judgment be entered in favor of Defendants;

3    2.    That Plaintiff and the putative class members take nothing from

4    Defendants by their Complaint, and that the same be dismissed with prejudice;

5    3.    That Defendants be awarded the costs of defending this action,

6    including reasonable attorneys' fees, costs, and disbursements; and

7    4.    For such other and further relief as this Court deems just and proper.

8

9    Dated:    November 14, 2016            Respectfully submitted,
                                            LATHAM & WATKINS LLP
10
                                            By:  /s/ Michele D. Johnson
11
                                            Michele D. Johnson
12                                          Colleen S. Smith
                                            Sarah A. Greenfield
13
                                            *Attorneys for Defendants Puma*
14                                          *Biotechnology, Inc., Alan H. Auerbach,*
                                            *and Charles R. Eyler*
15

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
ORANGE COUNTY

37

Case No. 8:15-cv-00865 AG (JCGx)
DEFENDANTS' ANSWER AND AFFIRMATIVE
DEFENSES TO CONSOLIDATED COMPLAINT