1  LATHAM & WATKINS LLP
     Michele D. Johnson (Bar No. 198298)
2    *michele.johnson@lw.com*
     Kristin N. Murphy (Bar No. 268285)
3    *kristin.murphy@lw.com*
   650 Town Center Drive, 20th Floor
4  Costa Mesa, CA  92626-1925
   Tel:  (714) 540-1235
5  Fax:  (714) 755-8290

6  LATHAM & WATKINS LLP
     Colleen C. Smith (Bar No. 231216)
7    *colleen.smith@lw.com*
   12670 High Bluff Drive
8  San Diego, CA  92130-3086
   Tel:  (858) 523-5400
9  Fax:  (858) 523-5450

10 LATHAM & WATKINS LLP
     Sarah A. Greenfield (*pro hac vice*)
11   *sarah.greenfield@lw.com*
   555 Eleventh Street NW, Suite 1000
12 Washington, DC  200004-1304
   Tel:  (202) 637-2200
13 Fax:  (202) 637-2201

14 Attorneys for Defendants
   Puma Biotechnology, Inc., Alan H. Auerbach,
15 and Charles R. Eyler

16                  UNITED STATES DISTRICT COURT

17                 CENTRAL DISTRICT OF CALIFORNIA

18

19 HSINGCHING HSU, Individually and      CASE NO. 8:15-cv-00865 AG (JCGx)
   on Behalf of All Others Similarly
20 Situated,                             **DEFENDANTS' NOTICE OF
                                         MOTION AND MOTION TO
21              Plaintiff,               DISMISS THE NEW CLAIMS
                                         AND THEORIES IN THE FIRST
22        v.                             AMENDED COMPLAINT;
                                         MEMORANDUM OF POINTS AND
23 PUMA BIOTECHNOLOGY, INC.,             AUTHORITIES IN SUPPORT
   ALAN H. AUERBACH, and                 THEREOF
24 CHARLES R. EYLER,
                                         Date:        July 24, 2017
25              Defendants.              Time:        10:00 a.m.
                                         Courtroom:   10D
26                                       Judge:       Hon. Andrew J. Guilford

27                                       Trial Date:  November 6, 2018

28

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
ORANGE COUNTY

US-DOCS\89691943

CASE NO. 8:15-CV-00865-AG (JCGx)
DEFS.' NOTICE OF MOTION AND MOTION TO
DISMISS; POINTS & AUTHS. IN SUPPORT

1   TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2       PLEASE TAKE NOTICE that on July 24, 2017, at 10:00 a.m., or at such

3   later date and time as the Court may order, in the Courtroom of the Honorable

4   Andrew J. Guilford, Courtroom 10D, United States District Court, Central District

5   of California, located at 411 West 4th Street, Santa Ana, CA 92701, Defendants

6   Puma Biotechnology, Inc. ("Puma"), Alan H. Auerbach, and Charles R. Eyler

7   (collectively, "Defendants") will, and hereby do, move for an Order dismissing the

8   new claims and theories in the First Amended Complaint for Violations of the

9   Federal Securities Laws, dated June 6, 2017.  This Motion is made pursuant to

10  Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities

11  Litigation Reform Act, on the grounds that the new claims and theories in the First

12  Amended Complaint fail to state a claim upon which relief can be granted.

13      This motion is made following the conference of counsel pursuant to Local

14  Rule 7-3, which took place on June 13, 2017, and is based on this Notice of Motion

15  and Motion, the accompanying Memorandum of Points and Authorities, the

16  Declaration of Colleen C. Smith and exhibits thereto, the Court's record on this

17  matter, the arguments of counsel, and other evidence and argument that may be

18  presented prior to the Court's decision on this Motion.

19

20                                  Respectfully submitted,

21  Dated:  June 19, 2017            LATHAM & WATKINS LLP

22                                  By:  */s/ Michele D. Johnson*

23                                       Michele D. Johnson

24                                  *Attorneys for Defendants Puma*

25                                  *Biotechnology, Inc., Alan H.*

26                                  *Auerbach, and Charles R. Eyler*

27

28

LATHAM&WATKINS�LLP
ATTORNEYS AT LAW
ORANGE COUNTY

US-DOCS\89691943

1

No. 8:15-CV-00865 AG (JCGx)
DEFS.' NOTICE OF MOTION AND MOTION TO
DISMISS; POINTS & AUTHS. IN SUPPORT

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................. 1

II.  STATEMENT OF FACTS ................................................................... 5

    A.  Puma Dedicates Itself to Developing New, Life-Saving Breast Cancer Treatments .......................................................... 5

    B.  Puma Discloses Promising Top-Line Results of the ExteNET Trial ...................................................................... 6

    C.  Puma Releases the Full Scientific Data, Confirming the Success of the ExteNET Trial ................................................. 7

    D.  Plaintiff Files This Lawsuit and Amends Its Complaint Following Extensive Discovery ............................................... 8

III.  LEGAL STANDARD ........................................................................ 10

IV.  INCORPORATION BY REFERENCE .............................................. 11

V.  ARGUMENT ..................................................................................... 11

    A.  Plaintiff's New Claims Are Forward-Looking Statements Protected by the PSLRA Safe Harbor ................................... 12

        1.  Mr. Auerbach's Statements Regarding the Expected Safety Profile of the ExteNET Trial Were Identified as Forward-Looking ......................... 12

        2.  Mr. Auerbach's Statements Were Accompanied by Meaningful Cautionary Language ............................ 15

    B.  Plaintiff's New Claims Against Mr. Eyler Should Be Dismissed .......................................................................... 17

    C.  Plaintiff's New Scienter Theory Cannot Proceed to Further Discovery ............................................................... 18

        1.  Plaintiff's New Scienter Theory Is Not Pleaded With the Particularity Required by the PSLRA ............ 19

        2.  The Reasonable Inferences Drawn From Plaintiff's New Motive Theory Undermine—Rather Than Support—Scienter .............................................. 21

        3.  Allegations of a Generalized Motive to Sell a Company Do Not Plead Scienter ............................... 24

VI.  CONCLUSION .................................................................................. 25

LATHAM&WATKINS LLP  US-DOCS\89691943
ATTORNEYS AT LAW
ORANGE COUNTY

i

No. 8:15-CV-00865 AG (JCGx)
DEFS.' NOTICE OF MOTION AND MOTION TO
DISMISS; POINTS & AUTHS. IN SUPPORT

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re Appraisal of Dell, Inc.*,
  No. 9322-VCL, 2016 WL 3186538 (Del. Ch. May 31, 2016),
  *reargument denied,* 2016 WL 3357514 (Del. Ch. June 16, 2016).....................22

*In re Arrowhead Research Corp. Sec. Litig.*,
  No. 2:14-cv-07890, 2016 WL 6562066 (C.D. Cal. Mar. 29, 2016)...................13

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ......................................10

*Bolling v. Dendreon Corp.*,
  No. C13-0872, 2014 WL 12042559 (W.D. Wash. Jan. 28, 2014)...............16, 17

*Brennan v. Zafgen, Inc.*,
  853 F.3d 606 (1st Cir. 2017) ......................................22

*Cholla Ready Mix, Inc. v. Civish*,
  382 F.3d 969 (9th Cir. 2004)......................................23

*In re Columbia Labs., Inc. Sec. Litig.*,
  144 F. Supp. 2d 1362 (S.D. Fla. 2001)......................................13

*Colyer v. Acelrx Pharm.*,
  No. 14-CV-04416, 2015 WL 7566809 (N.D. Cal. Nov. 25, 2015) ..................13

*Curry v. Hansen Med., Inc.*,
  No. C 09-5094 CW, 2012 WL 3242447 (N.D. Cal. Aug. 10, 2012) ................18

*In re Cutera*,
  610 F.3d 1103 (9th Cir. 2010).........................................11, 12, 14, 15

*Doe v. City of Newport Beach*,
  No. SACV 15-00608-JAK (KES), 2016 WL 3176556 (C.D. Cal.
  June 2, 2016)......................................11, 20

*Feyko v. Yuhe Int'l, Inc.*,
  No. CV 11-05511 DDP, 2013 WL 816409 (C.D. Cal. Mar. 5,
  2013)......................................21

*Gammel v. Hewlett-Packard Co.*,
  905 F. Supp. 2d 1052 (C.D. Cal. 2012)............................................................11

*In re Gilead Scis. Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008)................................................................20, 23

*Glazer Capital Mgmt., LP v. Magistri*,
  549 F.3d 736 (9th Cir. 2008)...........................................................................24

*Golden Cycle, LLC v. Allan*,
  No. CIV. A. 16301, 1998 WL 892631 (Del. Ch. Dec. 10, 1998) ....................22

*Gompper v. VISX, Inc.*,
  298 F.3d 893 (9th Cir. 2002)...........................................................................22

*GSC Partners CDO Fund v. Washington*,
  368 F.3d 228 (3d Cir. 2004).............................................................................25

*In re Intrexon Corp. Sec. Litig.*,
  No. 16-cv-02398, 2017 WL 732952 (N.D. Cal. Feb. 24, 2017) ......................13

*In re Invensense, Inc. Sec. Litig.*,
  No. 15-cv-00084, 2016 WL 1182063 (N.D. Cal. Mar. 28, 2016).....................14

*Janus Capital Grp. Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011) .........................................................................................17

*Krystek v. Ruby Tuesday, Inc.*,
  No. 3:14-CV-01119, 2016 WL 1274447 (M.D. Tenn. Mar. 31,
  2016)..................................................................................................................16

*In re LeapFrog Enters., Inc. Sec. Litig.*,
  527 F. Supp. 2d 1033 (N.D. Cal. 2007) ...........................................................15

*Lipton v. Pathogenesis Corp.*,
  284 F.3d 1027 (9th Cir. 2002)..........................................................................19

*Loftus v. Primero Mining Corp.*,
  No. CV 16-01034, 2017 WL 416428 (C.D. Cal. Jan. 30, 2017).......................15

*Lopez v. Ctpartners Executive Search, Inc.*,
  173 F. Supp. 3d 12 (S.D.N.Y. 2016).................................................................15

*Mallen v. Alphatec Holdings, Inc.*,
  861 F. Supp. 2d 1111 (S.D. Cal. 2012).............................................................24

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
ORANGE COUNTY

US-DOCS\89691943

iii

No. 8:15-CV-00865 AG (JCGx)
DEFS.' NOTICE OF MOTION AND MOTION TO
DISMISS; POINTS & AUTHS. IN SUPPORT

*Marder v. Lopez,*
  450 F.3d 445 (9th Cir. 2006) ............................................................... 11

*In re Micromet, Inc. S'holder Litig.,*
  No. 7197-VCP, 2012 WL 681785 (Del. Ch. Feb. 29, 2012) ...................... 23

*Monachelli v. Hortonworks, Inc.,*
  No. 16-cv-00980, 2016 WL 7048996 (N.D. Cal. Dec. 5, 2016) ................. 16

*In re NAHC, Inc. Secs. Litig.,*
  No. CIV.A. 00-4020, See 2001 WL 1241007 (E.D. Pa. Oct. 17,
  2001) ..................................................................................................... 20

*Phillips v. LCI Int'l, Inc.,*
  190 F.3d 609 (4th Cir. 1999) ................................................................. 25

*Pittleman v. Impac Mortg. Holdings, Inc.,*
  No. SACV 07-0970 AG (MLGx), 2009 WL 648983 (C.D. Cal.
  Mar. 9, 2009) ........................................................................................ 19

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.,*
  759 F.3d 1051 (9th Cir. 2014) ......................................................... 14, 16

*Reese v. BP Exploration (Alaska) Inc.,*
  643 F.3d 681 (9th Cir. 2011) ................................................................. 17

*In re Rigel Pharm., Inc. Sec. Litig.,*
  697 F.3d 869 (9th Cir. 2012) ........................................................... 10, 24

*S'holder Representative Servs. LLC v. Gilead Scis., Inc.,*
  No. 10537-CB, 2017 WL 1015621 (Del. Ch. Mar. 15, 2017) ................... 23

*SEC v. Garber,*
  959 F. Supp. 2d 374 (S.D.N.Y. 2013) ..................................................... 18

*Sprewell v. Golden State Warriors,*
  266 F.3d 979 (9th Cir. 2001) ................................................................. 23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
  551 U.S. 308 (2007) .............................................................................. 22

*Zucco Partners, LLC v. Digimarc Corp.,*
  552 F.3d 981 (9th Cir. 2009) ..................................................... 19, 22, 24

LATHAM&WATKINS LLP   US-DOCS\89691943

ATTORNEYS AT LAW
ORANGE COUNTY

iv

No. 8:15-CV-00865 AG (JCGx)
DEFS.' NOTICE OF MOTION AND MOTION TO
DISMISS; POINTS & AUTHS. IN SUPPORT

1

## STATUTES

15 U.S.C. § 78u–4(b)(1) ................................................................................ 21

15 U.S.C. § 78u-4(b)(2)(A) .................................................................... 10, 19

15 U.S.C. § 78u-4(b)(3)(A) ......................................................................... 10

15 U.S.C. § 78u-5(i)(1) .............................................................................. 12

15 U.S.C. § 78u-5(c) ....................................................................... 11, 12, 17

## RULES

Fed. R. Civ. P. 9(b) ..................................................................................... 10

Fed. R. Civ. P. 11 ........................................................................................ 21

Fed. R. Civ. P. 12(b)(6) ......................................................................... 10, 11

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LATHAM&WATKINS LLP   US-DOCS\89691943
ATTORNEYS AT LAW
ORANGE COUNTY

v

No. 8:15-CV-00865 AG (JCGx)
DEFS.' NOTICE OF MOTION AND MOTION TO
DISMISS; POINTS & AUTHS. IN SUPPORT

## I.      INTRODUCTION

Puma Biotechnology, Inc. ("Puma" or the "Company") is a California-based development-stage biopharmaceutical company dedicated to developing its leading drug candidate, neratinib, for the treatment of patients with certain aggressive forms of breast cancer, as well as for patients with other cancers and solid tumors that have a particular type of cell mutation.  If approved for its lead breast-cancer indication, neratinib could provide a viable treatment option for women in the extended adjuvant setting (which means, following cancer surgery and a first year of post-surgery therapeutic treatment), when many patients develop a resistance to the current standard of care.

At the center of this federal securities class action are the results of a Phase III clinical trial for neratinib, called the ExteNET trial.  On July 22, 2014, Puma announced positive, statistically significant—or, "top-line"—results from the trial. Puma reported that ExteNET had achieved its primary endpoint by demonstrating a 33% improvement in disease-free survival ("DFS") at two years, as measured by what is called the hazard ratio of 0.67, among women taking neratinib versus women taking a placebo.  In summary terms, a 0.67 hazard ratio means that over the course of the two-year observed period, a breast cancer patient has a 33% lower chance of recurrence of breast cancer or death on neratinib than a patient on the current standard of care.  Based on these positive results, Puma was optimistic about the prospects for approval by the U.S. Federal Drug Administration ("FDA") of neratinib in the extended adjuvant setting—and remains so today.  Indeed, Puma recently announced that the FDA's Oncologic Drugs Advisory Committee voted to recommend approval of neratinib for the extended adjuvant treatment of certain forms of breast cancer, based on the ExteNET trial.

Several months after Puma's accurate and positive disclosure of ExteNET's "top-line" efficacy results, Puma and independent researchers presented additional, detailed data from the ExteNet trial—as is industry practice following clinical

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
ORANGE COUNTY

US-DOCS\89691943

1

No. 8:15-CV-00865 AG (JCGx)
DEFS.' NOTICE OF MOTION AND MOTION TO
DISMISS; POINTS & AUTHS. IN SUPPORT

trials.   After the presentation of those detailed scientific data at the American Society of Clinical Oncology ("ASCO") conference in June 2015, Puma's stock price dropped, and Plaintiff filed suit.   According to Plaintiff, earlier statements made by Puma and its Chief Executive Officer, Mr. Alan Auerbach, reporting on the (accurate) top-line DFS results were nevertheless rendered misleading because Puma did not also disclose several detailed efficacy metrics regarding the absolute differences in DFS rates, or the "Kaplan-Meier" curves reflecting those rates, until before and during the ASCO meeting.   That is, Plaintiff says that the 33 percent improvement as measured by the hazard ratio, while true, is misleading without also knowing the exact percentage of women who survived without the recurrence of breast cancer or death at the two-year mark on neratinib, compared with the percentage of women who survived without the recurrence of breast cancer or death at two years on the current standard of care.

Plaintiff is correct that many additional details and data about ExteNET were presented in the ASCO abstract (on May 13, 2015) and at the ASCO meeting (June 1, 2015)—again, as is typically the case with respect to complicated clinical trials. Nevertheless, Plaintiff's first consolidated complaint (operative until earlier this month) alleged that just two of those pieces of data—the absolute difference in DFS rates at the two-year mark, and the graphical depiction of DFS rates over two years in what is known as the Kaplan-Meier curves—caused stock drops on those two dates.   The consolidated complaint survived a motion to dismiss, albeit subject to the Court's observation that Plaintiff just "barely" pled an adequate inference of a motive to commit fraud, and that perhaps a summary judgment motion by Defendants was "just around the turn."   Dkt. No. 76, at 19-20.

Now, after extensive discovery, including voluminous document production by Defendants and third parties and detailed responses to numerous written discovery requests, Plaintiff seeks to challenge two additional statements made by Mr. Auerbach on July 22, 2014, regarding the expected safety profile of the

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
ORANGE COUNTY

US-DOCS\89691943

2

No. 8:15-CV-00865 AG (JCGx)
DEFS.' NOTICE OF MOTION AND MOTION TO
DISMISS; POINTS & AUTHS. IN SUPPORT

ExteNET trial.  The motive for these amendments is apparent—Plaintiff needs to fill a hole in its theory of loss causation (an essential element of its case).  To prove the necessary loss causation element, Plaintiff must show that the losses stockholders supposedly suffered when the "truth" was revealed in the ASCO abstract and at the ASCO meeting.  That is, under the prior complaint, Plaintiff must show that what caused Puma's stock price to drop in May and June 2015 was the revelation of the absolute DFS rate difference at two years (in May) and the associated Kaplan-Meier curves (in June).

Plaintiff has discovered that this is not the case.  A wealth of *other* information was disclosed in the May 2015 ASCO abstract and the June 2015 ASCO conference, including detailed information regarding ExteNET's safety results.  And of major significance to the market, new predictions were discussed and questions were raised at the ASCO conference about what the FDA might require before making a decision about whether to approve neratinib.  Accordingly, in an effort to avoid this loss-causation failure, Plaintiff now claims that Puma and Mr. Auerbach also misled investors regarding the safety profile of ExteNET, and that Puma's stock price drops were also caused by the revelation of the validated safety data.

Plaintiff's attempted "fix" is fundamentally flawed.  Mr. Auerbach clearly identified his statements about the expected ExteNET safety results as forward-looking predications of results that were not yet fully validated, and accompanied the statements with meaningfully cautionary language describing the risks that might cause the actual results to differ from Mr. Auerbach's predictions.  These types of forward-looking statements are squarely shielded from liability under the Private Securities Litigation Reform Act's safe harbor provision.  And critically, regardless of the safe harbor, defendant Charles Eyler, Puma's Senior Vice President of Finance and Administration, did not make any of these statements and cannot be held liable for them.

LATHAM&WATKINS^LLP   US-DOCS\89691943
ATTORNEYS AT LAW
ORANGE COUNTY

3

No. 8:15-CV-00865 AG (JCGx)
DEFS.' NOTICE OF MOTION AND MOTION TO
DISMISS; POINTS & AUTHS. IN SUPPORT

Plaintiff also seeks to pursue a new scienter theory, presumably to bolster what the Court described as the "barely" sufficient motive allegations.  Now, according to Plaintiff, Defendants were trying to sell the Company and therefore were motivated to prop up the stock price with misleadingly positive results.  This far-fetched motive theory does not support a strong inference of scienter, for several reasons.  First, Plaintiff offers nothing at all to support this new generalized assertion of motive.  Plaintiff does not, for example, allege that Puma was engaged in any specific discussions with any particular counter-party regarding a potential sale, that Puma had entered into a non-disclosure agreement, or that Puma had retained an investment banker to assist with a potential sale.  It alleges none of these facts because the extensive document discovery conducted to date does not support them.  Second, Plaintiff's new scienter theory does not give rise to a reasonable, much less "cogent and compelling," inference of scienter.  It defies logic to assert that Defendants tried to sell Puma by making misleading statements about preliminary, top-line results from the ExteNET trial, when any potential purchaser would have soon learned of the full trial results through a standard due diligence process into the Company's confidential information.  Plaintiff's theory therefore makes no sense.  Third, even if sufficiently particularized (they are not), Plaintiff's generalized allegations of personal profit motive still could not establish scienter, as courts have consistently held.

Plaintiff's attempt to add new claims and a new scienter theory does not withstand scrutiny under the Private Securities Litigation Reform Act ("PSLRA") and cannot fix the flaws in its existing complaint.  These new claims and allegations should be dismissed.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
ORANGE COUNTY

US-DOCS\89691943

4

No. 8:15-CV-00865 AG (JCGx)
DEFS.' NOTICE OF MOTION AND MOTION TO
DISMISS; POINTS & AUTHS. IN SUPPORT

## II.    STATEMENT OF FACTS

### A.    Puma Dedicates Itself to Developing New, Life-Saving Breast Cancer Treatments

Puma is a development-stage biopharmaceutical company dedicated to the acquisition and development of innovative therapeutics to enhance cancer care. Alan Auerbach, Puma's founder and largest stockholder, is Puma's CEO, President, and Chairman of the Board.  (First Amended Complaint ("FAC") (Dkt. No. 138) ¶ 17.)   Charles Eyler is Puma's Senior Vice President of Finance and Administration. *Id.* ¶ 20.

This case relates to Puma's development of neratinib to treat a subset of cancers called HER2-positive ("HER2+") breast cancers, a particularly aggressive form of breast cancer that "overexpress[es]" the HER2 protein and tends to spread more quickly than others. *See* Order Denying Motion to Dismiss (Dkt. No. 76) at 2-3; FAC ¶ 26.  Neratinib is intended to irreversibly bind to the HER2 receptor, and eventually slow down or stop out-of-control cell growth and signaling pathways. *Id.*  Puma is developing neratinib as an extended adjuvant therapy given after initial treatment, such as surgery, to help suppress further cancer growth. FAC ¶ 9; *see* Dkt. No. 76 at 3. While there are other drugs that combat this type of cancer, most patients develop resistance to them after a year.  FAC ¶ 28; *see* Dkt. No. 76 at 3.  There is a recognized need for a drug like neratinib to fill a critical gap in options after an initial year of treatment.  FAC ¶ 28.

Puma's Phase III clinical trial for neratinib as an extended adjuvant treatment for HER2+ breast cancer, known as the ExteNET trial, was completed in October 2013. *Id.* ¶ 9.  The primary endpoint for the ExteNET trial was improved disease-free survival ("DFS") of patients taking neratinib versus placebo at two years.  *Id.*  Historically, the main adverse event (an "unfavorable change in health") observed in clinical trials of neratinib is diarrhea.  *See id.* ¶ 53.

LATHAM&WATKINS^LLP US-DOCS\89691943
ATTORNEYS AT LAW
ORANGE COUNTY

5

No. 8:15-CV-00865 AG (JCGx)
DEFS.' NOTICE OF MOTION AND MOTION TO
DISMISS; POINTS & AUTHS. IN SUPPORT

**B.      Puma Discloses Promising Top-Line Results of the ExteNET Trial**

This case primarily arises out of Puma's announcement of statistically significant—or, "top-line"—efficacy results in the ExteNET trial.  *See* FAC ¶¶ 48-50; Dkt. No. 76 at 3.  Beginning on July 22, 2014 and throughout the Class Period, Puma reported that the ExteNET trial had achieved its primary endpoint by demonstrating a 33% improvement in DFS as measured by the hazard ratio of 0.67 among women taking neratinib versus women taking a placebo.  FAC ¶ 49 & Ex. A at 3 [Call Transcript].  On July 22, 2014, Puma hosted a conference call to discuss these positive top-line results with analysts and investors.  FAC ¶ 50.  During the call, Mr. Auerbach fielded several questions regarding the preliminary results and his expectations for what the fully validated scientific data would reveal regarding the ExteNET trial's efficacy and safety profile.  Mr. Auerbach responded to those questions with his present expectations, but explained that the detailed efficacy and safety results would be presented "at a future scientific meeting."  Ex. A at 4 [Call Transcript].

With respect to adverse events observed in the trial, Mr. Auerbach cautioned that the safety database for the ExteNET trial was not "yet fully validated," but that he anticipated seeing "what we've historically seen with neratinib, which is the diarrhea," and that the grade 3 diarrhea rates were "likely to be in line with" previously published neratinib studies, where the diarrhea rates were "29% and 30%."  *Id*. at 3-4.  When asked about the trial dropout rate due to adverse events, Mr. Auerbach warned, "I don't have [that] . . . [t]hat's part of the stuff being validated.  But . . . [for] the legacy ones that were done before . . . – when Pfizer was running it without any prophylaxis – it was usually in the 5% to 10% range . . . .  So we'd anticipate it's in that same vein."  *Id*. at 7.

At the beginning of the July 22 conference call, Puma cautioned:

[W]e may be making forward-looking statements within the meaning

of the federal securities laws and based on current expectations,

LATHAM&WATKINS LLP US-DOCS\89691943
ATTORNEYS AT LAW
ORANGE COUNTY

6

No. 8:15-CV-00865 AG (JCGx)
DEFS.' NOTICE OF MOTION AND MOTION TO
DISMISS; POINTS & AUTHS. IN SUPPORT

forecasts and assumptions. Such statements are only predictions which are subject to risk and uncertainty that could cause actual results to differ materially from those described in the forward-looking statements. Please refer to the documents that we file from time to time with the SEC, which are available on our website, including the company's Annual Report on Form 10-K for the fiscal year ended December 31, 2013, for information concerning the risks and other factors that could affect the company. You are cautioned not to place undue reliance on the forward-looking statements which speak only as of the date of this live conference call, July 22, 2014. The company undertakes no obligation to revise or update any forward-looking statements to reflect events or circumstances after the date of this conference call.

Ex. A [Call Transcript]. The referenced SEC filings, in turn, contained specific warnings regarding the various risk factors that may impact Puma's business and the potential success of neratinib, and cause actual trial results to differ from expectations. Ex. B [Puma 2013 Form 10-K]. For example, the Company warned that "[s]uccess in pre-clinical testing and early clinical trials does not ensure that later clinical trials will be successful" and that it "cannot be sure that the results of later clinical trials will replicate the results of prior clinical trials and pre-clinical testing." *Id.* Puma also cautioned that neratinib was "still in development and will require extensive clinical testing . . ." and that "[e]ven if our clinical trials are completed as planned, we cannot be certain that their results will support the safety and effectiveness of our drug candidates for our targeted indications." *Id.*

## C.   Puma Releases the Full Scientific Data, Confirming the Success of the ExteNET Trial

On May 13, 2015, Puma released Abstract #508, the summary of a journal reprint regarding the ExteNET trial, in a press release and on the American Society

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
ORANGE COUNTY

US-DOCS\89691943

7

No. 8:15-CV-00865 AG (JCGx)
DEFS.' NOTICE OF MOTION AND MOTION TO
DISMISS; POINTS & AUTHS. IN SUPPORT

of Clinical Oncology's website, in advance of ASCO's annual meeting.  FAC ¶ 66; Ex. E.  Abstract #508 reiterated that the ExteNET trial met its primary endpoint of DFS with statistical significance, demonstrating a 33% improvement in DFS versus placebo, as measured by the 0.67 hazard ratio.  *Id.*  Abstract #508 also disclosed, among other efficacy and safety data, that 40% of patients in the treatment group of the ExteNET trial experienced Grade 3 diarrhea.  FAC ¶ 66.

On June 1, 2015, the full set of scientific data from the ExteNET trial was presented at ASCO's annual meeting by a member of the ExteNET trial's Academic Steering Committee, oncologist Arlene Chan.  FAC ¶ 71.  In addition to detailed efficacy data, Dr. Chan presented the detailed, validated safety results of the ExteNET trial.  Ex. D.  Among other data points, Dr. Chan's presentation noted that 16.8% of patients dropped out of the trial as a result of diarrhea.  *Id.* at 16, 17.  The detailed, validated safety results released at the ASCO conference also presented once again the same relevant safety numbers as Abstract #508: both disclosed that approximately 40% of patients taking neratinib experienced Grade 3-4 diarrhea. Ex. D. at 16; FAC ¶ 66.

### D.     Plaintiff Files This Lawsuit and Amends Its Complaint Following Extensive Discovery

Two days after the June 1, 2015 ASCO meeting, this action was filed (Dkt. No. 1).  On October 16, 2015, Lead Plaintiff filed a Consolidated Complaint for Violations of the Federal Securities Laws ("Consolidated Complaint" or "CC") (Dkt. No. 58).  The Consolidated Complaint challenged ten statements made by Defendants during the alleged Class Period of July 22, 2014 to May 29, 2015 as false or misleading under Section 10(b) of the Exchange Act.  Plaintiff alleged primarily that Defendants' statements that treatment with neratinib demonstrated a 33% improvement in DFS as measured by the 0.67 hazard ratio were false or misleading because Defendants omitted that the DFS rate at two years for the treatment group was 93.9%, while the DFS rate for patients receiving a placebo

LATHAM&WATKINS^LLP  US-DOCS\89691943
ATTORNEYS AT LAW
ORANGE COUNTY

8

No. 8:15-CV-00865 AG (JCGx)
DEFS.' NOTICE OF MOTION AND MOTION TO
DISMISS; POINTS & AUTHS. IN SUPPORT

was 91.6%, and this 2.3% absolute difference (revealed for the first time in Abstract #508) allegedly "did not represent a 33% improvement." CC ¶ 61. Plaintiff also challenged a single statement by Mr. Auerbach on the July 22, 2014 conference call regarding a preliminary trend in the ExteNET trial's Kaplan-Meier curves (another efficacy measure), which were later presented on June 1 at the ASCO conference. CC ¶¶ 50, 61.

Defendants' motion to dismiss these claims was denied on September 30, 2016. Dkt. No. 76, at 20. The parties proceeded to discovery. On May 15, 2017, Defendants substantially completed their document production, which included documents identified by applying sixty search terms to electronically stored information collected from ten custodians jointly selected by the parties, including Mr. Auerbach and Mr. Eyler. Smith Decl. 7. In total, Defendants have produced over 44,000 documents, constituting over 257,000 pages. Smith Decl. 8. Plaintiff has also subpoenaed more than twenty third parties, who have produced over 154,000 pages of materials in this litigation. *Id.* at 9.

After receiving leave of Court (Dkt. No. 121), Plaintiff filed the First Amended Complaint on June 6, 2017 (Dkt. No. 138). In addition to the old claims based on Defendants' statements regarding the top-line efficacy results and Kaplan-Meier curves, the FAC attempts to plead new claims under Section 10(b) based on different statements regarding the safety results of the ExteNET trial. *See* FAC ¶¶ 9, 10, 12, 13, 37, 48, 53-54, 65-67, 72, 80-81, 84. Specifically, Plaintiff challenges Mr. Auerbach's July 22, 2014 statements pertaining to the expected rate of Grade 3 diarrhea and dropouts due to adverse events that would be observed in the validated results of the ExteNET trial. Plaintiff alleges these statements were revealed to be false or misleading when the full safety profile was presented at the ASCO meeting, *see* FAC ¶¶ 12-13, 48, 50, 53-54, 65, 71-72, and caused the putative Class members economic loss when Puma's stock fell from its allegedly artificially inflated price. Plaintiff also tries to plead a new theory of scienter,

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
ORANGE COUNTY

US-DOCS\89691943

9

No. 8:15-CV-00865 AG (JCGx)
DEFS.' NOTICE OF MOTION AND MOTION TO
DISMISS; POINTS & AUTHS. IN SUPPORT

namely, that Mr. Auerbach and Mr. Eyler were motivated to convey false optimistic news because they were "actively trying to sell Puma [during the Class Period] so they could cash out of their stock and option holdings." FAC ¶¶ 11, 84.

Nearly two years after the first-filed complaint and following Defendants' (and third parties') voluminous production, Plaintiff references just two documents in support of its new allegations:  (i) a July 17, 2014 email from Alvin Wong to Mr. Auerbach and unspecified "Puma executives" attaching the "ExteNET Top-Line Efficacy Analysis Part A"; and (ii) a July 18, 2014 email from Alvin Wong to Mr. Auerbach and unspecified "other Puma executives" attaching the ExteNET top-line safety tables.  FAC ¶ 48.  Plaintiff does not allege that either document was sent to or otherwise ever seen by Mr. Eyler.

## III.   LEGAL STANDARD

Well-established standards govern this motion to dismiss.  To state a claim for securities fraud under Section 10(b) and Rule 10b-5, for each challenged statement, Plaintiff must adequately plead (1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation.  *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012).

To survive dismissal under Federal Rule of Civil Procedure 12(b)(6), Plaintiff's factual allegations underlying its new claims and theories must be "plausible on [their] face" and more than "speculative."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).  "[L]abels and conclusions" and "a formulaic recitation of the elements of a cause of action" are insufficient.  *Id.*

Plaintiff must also satisfy the high standards established by Federal Rule of Civil Procedure 9(b) and the PSLRA, 15 U.S.C. § 78u-4(b)(3)(A), including pleading particularized facts supporting a "strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).  The PSLRA "provides an additional barrier at the pleading stage in the form of a safe harbor for

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
ORANGE COUNTY

US-DOCS\89691943

10

No. 8:15-CV-00865 AG (JCGx)
DEFS.' NOTICE OF MOTION AND MOTION TO
DISMISS; POINTS & AUTHS. IN SUPPORT

1   'forward-looking statements.'"  *In re Cutera*, 610 F.3d 1103, 1111 (9th Cir. 2010);

2   15 U.S.C. § 78u-5(c).   Moreover, because Plaintiff has the benefit of expansive

3   discovery, the burden of pleading particularized facts is even higher—requiring

4   "detailed allegations"—taking into account the discovery available to Plaintiff.

5   *See Doe v. City of Newport Beach*, No. SACV 15-00608-JAK (KES), 2016 WL

6   3176556, at *1 (C.D. Cal. June 2, 2016) (requiring that amended complaint provide

7   "detailed allegations" "in light of the discovery [] conducted in this action and

8   other information that is reasonably available to Plaintiff").

9   **IV.    INCORPORATION BY REFERENCE**

10          The Ninth Circuit's "incorporation by reference" doctrine permits this Court

11   to consider documents that are not attached to the complaint in connection with a

12   Rule 12(b)(6) motion to dismiss, if the complaint necessarily relies on the

13   documents and "(1) the complaint refers to the document; (2) the document is

14   central to the plaintiff's claim; and (3) no party questions the authenticity of the

15   copy attached to the 12(b)(6) motion."  *Marder v. Lopez*, 450 F.3d 445, 448 (9th

16   Cir. 2006); *see also Gammel v. Hewlett-Packard Co.*, 905 F. Supp. 2d 1052, 1061

17   (C.D. Cal. 2012).   Under this doctrine, Defendants submit five documents in

18   support of this motion, attached to the Declaration of Colleen Smith.  *See* Exs. A-

19   E.  The parties have met and conferred and Plaintiff has no objection to Defendants

20   submitting these documents pursuant to the incorporation by reference doctrine.

21   Smith Decl. ¶¶ 10-11.

22   **V.    ARGUMENT**

23          The new claims and theories Plaintiff attempts to pursue in the First

24   Amended Complaint fall far short of these heightened standards.   *First*, Mr.

25   Auerbach's statements regarding the safety profile of the ExteNET trial cannot

26   serve as the basis for liability because they are forward-looking statements

27   protected by the PSLRA's safe harbor (15 U.S.C. § 78u-5(c)).  In any event, these

28   new claims cannot survive against Mr. Eyler, who did not make any of the newly

LATHAM&WATKINS<sup>LLP</sup>   US-DOCS\89691943

ATTORNEYS AT LAW
ORANGE COUNTY

11

No. 8:15-CV-00865 AG (JCGx)
DEFS.' NOTICE OF MOTION AND MOTION TO
DISMISS; POINTS & AUTHS. IN SUPPORT

1   challenged statements.  *Second*, Plaintiff's new motive theory is insufficient as a

2   matter of law because (i) it is not pled with particularity, (ii) the allegations

3   undermine, rather than support, an inference of scienter, and (iii) a general motive

4   to sell the company is insufficient to plead a strong inference of scienter.

### A.   Plaintiff's New Claims Are Forward-Looking Statements Protected by the PSLRA Safe Harbor

#### 1.   Mr. Auerbach's Statements Regarding the Expected Safety Profile of the ExteNET Trial Were Identified as Forward-Looking

10   Under the PSLRA, forward-looking statements are immune from liability if

11   they are identified as forward-looking and are "accompanied by meaningful

12   cautionary statements identifying important factors that could cause actual results

13   to differ materially from those in the forward-looking statement[s]."  15 U.S.C.

14   § 78u-5(c)(1)(A)-(B); *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111-12 (9th Cir.

15   2010).  Forward-looking statements are predictive, and include the "plans and

16   objectives of management for future operations" and the assumptions "underlying

17   or related to" those objectives. 15 U.S.C. § 78u-5(i)(1).

18   Mr. Auerbach's statements regarding the predicted safety profile of the

19   ExteNET trial, by their plain language, were forward-looking:

20   - "Prior to Puma licensing the drug, neratinib monotherapy was previously

21      tested in two Phase II trials in patients with HER2-positive metastatic

22      breast cancer, the results of which were published . . . .  In those studies,

23      grade 3 or higher diarrhea was seen in 29% and 30% of the patients,

24      respectively. … ***Therefore, the Company anticipates that the grade 3***

25      ***diarrhea rates in the ExteNET trial are likely to be in line with what***

26      ***was previously published in the prior Phase II trials"***;

27   - "And again, ***we would anticipate that the diarrhea rate, the grade 3***

28      ***diarrhea rate, would be in line with the 29% to 30% that's been seen in***

LATHAM&WATKINS LLP   US-DOCS\89691943
ATTORNEYS AT LAW
ORANGE COUNTY
                                        12                    No. 8:15-CV-00865 AG (JCGx)
                                                   DEFS.' NOTICE OF MOTION AND MOTION TO
                                                   DISMISS; POINTS & AUTHS. IN SUPPORT

the prior studies of neratinib as a monotherapy";

- "*[W]e anticipate,* typically in the neratinib studies – the legacy ones that were done before, when Pfizer was running it without any prophylaxis – it was usually in the 5% to 10% range was the dropout rate due to AEs. *So we'd anticipate it's in that same vein*";

- "[I]n terms of patients who dropped out due to AEs, like I said, *historically with neratinib, that should be somewhere in the 5% to 10% range…*"

FAC ¶ 53-54 (emphasis added).

Courts in the Ninth Circuit have routinely held that statements relating to future performance, including the expected outlook for a drug under development, are protected as forward-looking statements. *See, e.g., In re Intrexon Corp. Sec. Litig.*, No. 16-cv-02398, 2017 WL 732952, at *3 (N.D. Cal. Feb. 24, 2017) (statements concerning potential collaborations with other companies that defendant "aims to develop," "intend to employ," "plans to develop," and "plan to pursue" were inactionable forward-looking assumptions relating to future performance); *In re Arrowhead Research Corp. Sec. Litig.*, No. 2:14-cv-07890, 2016 WL 6562066, at *6-7 (C.D. Cal. Mar. 29, 2016) (statements about the company's "goals, plans, and strategies" with respect to a drug candidate were forward-looking statements); *Colyer v. Acelrx Pharm.*, No. 14-CV-04416, 2015 WL 7566809, at *10 (N.D. Cal. Nov. 25, 2015) (statements that "assuming successful approval . . . we anticipate launching commercial sale of [product] in the . . . first quarter of 2015" qualified for protection under the safe harbor); *see also In re Columbia Labs., Inc. Sec. Litig.*, 144 F. Supp. 2d 1362, 1370 (S.D. Fla. 2001) (optimistic statements regarding expectations about the future completion of Phase III clinical trials related to an anti-HIV drug, and future plans for the product based on that assumption were forward-looking).

LATHAM&WATKINS™ US-DOCS\89691943
ATTORNEYS AT LAW
ORANGE COUNTY

13

No. 8:15-CV-00865 AG (JCGx)
DEFS.' NOTICE OF MOTION AND MOTION TO
DISMISS; POINTS & AUTHS. IN SUPPORT

Further, Mr. Auerbach used explicit language on the conference call to identify his statements regarding the anticipated safety profile as forward-looking. He unequivocally qualified his comments by saying that the fully validated data would not be available until the future. *See, e.g.*, FAC ¶ 53 ("From a safety perspective, ***the Company has not yet seen the safety results from the ExteNET trial for neratinib, as the data is still being validated***.") (emphasis added); *id.* ¶ 54 (responding to a question regarding the dropout rate due to adverse events, Mr. Auerbach warned "***I don't have that***, I apologize.  ***That's part of the stuff being validated*** . . . ) (emphasis added).  The nature of Mr. Auerbach's remarks were also identified as forward-looking at the beginning of the call, during which Puma expressly informed investors that Mr. Auerbach "may be making forward-looking statements within the meaning of the federal securities laws and based on current expectations, forecasts, and assumptions."  Ex. A.  *See In re Cutera*, 610 F.3d at 1112 (introduction to conference call that "these prepared remarks contain forward-looking statements concerning future financial performance and guidance," and that "management may make additional forward-looking statements in response to[] questions" identified statements as "forward-looking").

It makes no difference that Mr. Auerbach received a preliminary executive summary of the safety data (prior to being externally validated) for the ExteNET trial prior to the conference call, as Plaintiff alleges.  FAC ¶ 48.  Statements about future results based on "then-known and current facts" are still protected as forward-looking statements if, "examined as a whole, the challenged statements related to future expectations and performance."  *In re Invensense, Inc. Sec. Litig.*, No. 15-cv-00084, 2016 WL 1182063, at *6-7 (N.D. Cal. Mar. 28, 2016) (quoting *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1059 (9th Cir. 2014)) (statements that second quarter gross margins were "expected to be" "consistent with" recent past quarters, in the range of 48% (on a GAAP basis) 50% (on a non-GAAP basis) were protected forward-looking statements although

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW
ORANGE COUNTY

US-DOCS\89691943

14

No. 8:15-CV-00865 AG (JCGx)
DEFS.' NOTICE OF MOTION AND MOTION TO
DISMISS; POINTS & AUTHS. IN SUPPORT

predicated on current facts); *see also Lopez v. Ctpartners Executive Search, Inc.*, 173 F. Supp. 3d 12 (S.D.N.Y. 2016) (preliminary calculation of what the final quarterly results would be based on currently available information and preliminary analysis of unaudited results was a forward-looking projection under the safe harbor). Mr. Auerbach's statements regarding the anticipated rates of diarrhea and dropouts due to adverse events, although allegedly based on then-known data, clearly related to his future expectations of what the safety profile would be once fully validated.  FAC ¶ 53.

Finally, to the extent Mr. Auerbach's statements contained references to historical facts regarding the ExteNET legacy trials, those statements cannot be meaningfully distinguished from the future projection that the validated safety profile of the ExteNET trial would be "in line with" these historical results.  *See In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1046 (N.D. Cal. 2007) ("Historical statements can also be forward-looking if they are presented as factors underlying a projection or economic forecast.").   Moreover, Plaintiff does not allege that these historical facts were inaccurate.

### 2.    Mr. Auerbach's Statements Were Accompanied by Meaningful Cautionary Language

Where forward-looking statements are accompanied by meaningful cautionary language, the statements are inactionable and no further analysis is needed.   *In re Cutera*, 610 F.3d at 1112-13 (rejecting the argument that a "sufficiently strong inference of actual knowledge would overcome a claim of safe harbor protection even for statements identified as forward-looking and accompanied by meaningful cautionary language"); *Loftus v. Primero Mining Corp.*, No. CV 16-01034, 2017 WL 416428, at *9 (C.D. Cal. Jan. 30, 2017) ("[A]n identified forward-looking statement that is accompanied by a cautionary statement is protected by the safe harbor provisions, even it if is made with knowledge of its falsity.").  That rule is dispositive here.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
ORANGE COUNTY

US-DOCS\89691943

15

No. 8:15-CV-00865 AG (JCGx)
DEFS.' NOTICE OF MOTION AND MOTION TO
DISMISS; POINTS & AUTHS. IN SUPPORT

1      The newly challenged statements were each accompanied by meaningful
2 cautionary language that identified the risk that the actual safety results of the
3 ExteNET trial could differ from the anticipated results predicted by Mr.
4 Auerbach—the very risk that Plaintiff alleges materialized when the full safety
5 results were released on May 13, 2015 and June 1, 2015.  *See Monachelli v.*
6 *Hortonworks, Inc.*, No. 16-cv-00980, 2016 WL 7048996, at *7 (N.D. Cal. Dec. 5,
7 2016) (cautionary statements that identify risks that directly relate to company's
8 projections are meaningful); *Bolling v. Dendreon Corp.*, No. C13-0872, 2014 WL
9 12042559, at *8 (W.D. Wash. Jan. 28, 2014) (explaining that in the Ninth Circuit,
10 courts regularly interpret the phrase "meaningful cautionary statements" to include
11 statements that warn of the very risks on which a securities plaintiff bases his
12 claims).

13      During the July 22, 2014 conference call, while expressing optimism that the
14 safety profile of the ExteNET trial would be in line with what was historically seen
15 for neratinib in earlier clinical trials, Mr. Auerbach warned that Puma "hadn't yet
16 fully validated the safety database," and advised that the rate of diarrhea and
17 dropout rate due to adverse events were "part of the stuff being validated."  FAC
18 ¶ 54.  Mr. Auerbach's repeated invocation of these words triggered the safe harbor.
19 *Krystek v. Ruby Tuesday, Inc.*, No. 3:14-CV-01119, 2016 WL 1274447, at *7
20 (M.D. Tenn. Mar. 31, 2016) ("[T]hese comments are unspecific and are framed
21 with cautionary language such as the repeated invocation of 'we believe' and
22 'potential.' Once again, this cautious optimism is protected by the PSLRA's safe
23 harbor provision.").  Puma also cautioned investors "not to place undue reliance on
24 the forward-looking statements," and that any forward-looking statements made on
25 the July 2014 call were "only predictions which are subject to risk and uncertainty
26 that could cause actual results to differ materially from those described in the
27 forward-looking statements," including the risk factors set forth in Puma's relevant
28 SEC filings.  *See, e.g.*, *Intuitive Surgical*, 759 F.3d at 1059 (statement that

LATHAM&WATKINS<sup></sup>
ATTORNEYS AT LAW
ORANGE COUNTY

US-DOCS\89691943

16

No. 8:15-CV-00865 AG (JCGx)
DEFS.' NOTICE OF MOTION AND MOTION TO
DISMISS; POINTS & AUTHS. IN SUPPORT

comments on conference call "may be deemed to contain forward-looking statements" and "[a]ctual results may differ materially" as a results of "risks and uncertainties [] described in detail" in SEC filings contributed to meaningful cautionary language); *Bolling*, 2014 WL 12042559, at *8 (meaningful cautionary language included statements at the beginning and end of conference calls that risks and uncertainties could cause actual results to differ from predicted results, and directing investors to a full discussion of those risks and uncertainties in SEC filings).

In those SEC filings, Puma specifically warned investors of the risks associated with preliminary clinical trial results. For example, Puma warned that "[s]uccess in pre-clinical testing and early clinical trials does not ensure that later clinical trials will be successful, and *we cannot be sure that the results of later clinical trials will replicate the results of prior clinical trials and pre-clinical testing*." Ex. B (Puma 2013 Form 10-K), at 27 (emphasis added). Puma also cautioned that neratinib was "still in development and will require extensive clinical testing . . ." (*id.* at 26), and that "[e]ven if our clinical trials are completed as planned, we cannot be certain that their results will support the safety and effectiveness of our drug candidates for our targeted indications" (*id.* at 27).

The inclusion of such cautionary language precludes liability for these statements here. *See* 15 U.S.C. § 78u-5(c)(1)(A).

### B.   Plaintiff's New Claims Against Mr. Eyler Should Be Dismissed

There can be no dispute that Mr. Eyler did not make, or have ultimate authority over, any of the newly challenged statements made by Mr. Auerbach. *See Janus Capital Grp. Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011) ("[T]he maker of the statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can . . . not 'make' a statement in its own right."); *see also Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 693 n.8 (9th

LATHAM&WATKINS<sup>LLP</sup>   US-DOCS\89691943
ATTORNEYS AT LAW
ORANGE COUNTY

17

No. 8:15-CV-00865 AG (JCGx)
DEFS.' NOTICE OF MOTION AND MOTION TO
DISMISS; POINTS & AUTHS. IN SUPPORT

1  Cir. 2011) (noting that *Janus* "set[] the pleading bar even higher in private

2  securities fraud actions seeking to hold defendants primarily liable for the

3  misstatements of others"). This pleading deficiency is fatal to the new claims as

4  against Mr. Eyler.  *Curry v. Hansen Med., Inc.*, No. C 09-5094 CW, 2012 WL

5  3242447, at *5 (N.D. Cal. Aug. 10, 2012) (dismissing claims against the Senior

6  Vice President of Commercial Operations because none of the challenged

7  statements were made by or attributable to him).

8  **C.    Plaintiff's New Scienter Theory Cannot Proceed to Further**

9  **Discovery**

10  For the first time in the First Amended Complaint, Plaintiff alleges that

11  Defendants were motivated to misrepresent the results of the ExteNET trial

12  because, during the Class Period, Defendants "actively tried to sell Puma so they

13  could cash out of their stock and option holdings."  FAC ¶ 11, *see also id.* ¶ 84.

14  Plaintiff's bare-bones motive theory does not withstand scrutiny and does not

15  support a strong inference of scienter for several reasons.  *First*, despite having

16  completed extensive document discovery, Plaintiff fails to plead this theory of an

17  "active" sales process with particularity.  *Second*, Plaintiff's new scienter theory

18  does not give rise to a reasonable, much less "cogent and compelling" inference of

19  scienter.  Indeed, it defies logic to claim that Defendants sought to complete a

20  transaction by making public statements about preliminary, top-line results from

21  the ExteNET trial, when any potential purchaser would have quickly learned of the

22  full trial results through a standard due diligence process.  *Third*, even if they were

23  sufficiently particularized (they are not), Plaintiff's new allegations of personal

24  profit motive still could not establish scienter, as courts have consistently held.

25  When, as here, Plaintiff has not met the PSLRA's exacting pleading

26  requirements, the Court should not allow Plaintiff to proceed with a scienter theory

27  that is designed to expand the scope of the case (and discovery).  *See SEC v.*

28  *Garber*, 959 F. Supp. 2d 374, 379 (S.D.N.Y. 2013) ("[i]f the . . . allegations could

LATHAM&WATKINS^LLP  US-DOCS\89691943
ATTORNEYS AT LAW
ORANGE COUNTY

18

No. 8:15-CV-00865 AG (JCGx)
DEFS.' NOTICE OF MOTION AND MOTION TO
DISMISS; POINTS & AUTHS. IN SUPPORT

1  expand the scope of the case or the relief, or serve as an alternative theory of

2  liability . . . then a motion to dismiss is an appropriate vehicle to address whether

3  [a plaintiff] may proceed on this theory").

### 1.  Plaintiff's New Scienter Theory Is Not Pleaded With the Particularity Required by the PSLRA

6  Plaintiff fails to plead this new scienter theory—that Defendants were

7  motivated to drive up the stock price because they were trying to sell the

8  Company—with particularity.  To meet its pleading burden under the PSLRA,

9  Plaintiff must allege particularized facts supporting a "strong inference that the

10 defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A); *see*

11 *also Pittleman v. Impac Mortg. Holdings, Inc.*, No. SACV 07-0970 AG (MLGx),

12 2009 WL 648983, at *2 (C.D. Cal. Mar. 9, 2009) (Guilford, J.) ("The Private

13 Securities Litigation Reform Act of 1995 ('PSLRA') imposes stringent pleading

14 requirements on securities plaintiffs . . . .")  As this Court has recognized, these

15 heightened pleading standards were "intended to guard against . . . vague,

16 conclusory allegations." *Pittleman*, 2009 WL 648983, at *4.  "Generalized

17 assertions of motive, without more, are inadequate to meet [the PSLRA's]

18 heightened pleading requirements." *E.g.*, *Lipton v. Pathogenesis Corp.*, 284 F.3d

19 1027, 1038 (9th Cir. 2002); *see also Zucco Partners, LLC v. Digimarc Corp.*, 552

20 F.3d 981, 991 (9th Cir. 2009) ("[F]acts showing mere recklessness or a motive to

21 commit fraud and opportunity to do so . . . are not sufficient[;] . . . . [r]ather, the

22 plaintiff must plead . . . an extreme departure from the standards of ordinary

23 care[.]") (internal citations and quotation marks omitted).

24 Applying these standards to the original complaint, the Court previously

25 held that "[i]t [was] a close call deciding whether there's enough in the complaint

26 to support a strong inference as to motive to commit the fraud" but, taken together

27 with all the other allegations, it was sufficient to plead scienter "even if barely so."

28 Dkt. No. 76 at 19.  Now, Defendants have substantially completed document

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
ORANGE COUNTY

US-DOCS\89691943

19

No. 8:15-CV-00865 AG (JCGx)
DEFS.' NOTICE OF MOTION AND MOTION TO
DISMISS; POINTS & AUTHS. IN SUPPORT

discovery, producing over 257,000 pages of documents, based on heavily negotiated search terms, custodians, and time periods.  *See* Decl. ¶¶ 7-8; FAC ¶ 6 (noting the Complaint includes "documents produced by Defendants and relevant third parties").   Where, as here, a plaintiff has the benefit of discovery, the burden of pleading particularized facts is even higher—requiring "detailed allegations"— taking into account the discovery and other information available to the plaintiff. *See Doe v. City of Newport Beach*, No. SACV 15-00608-JAK (KES), 2016 WL 3176556, at *1 (C.D. Cal. June 2, 2016) (requiring that amended complaint provide "detailed allegations" "in light of the discovery [] conducted in this action and other information that is reasonably available to Plaintiff"); *see also In re NAHC, Inc. Secs. Litig.*, No. CIV.A. 00-4020, See 2001 WL 1241007, at *26 (E.D. Pa. Oct. 17, 2001) (dismissing claims where "there [was] a stark absence of any suggestion by the plaintiffs that they have developed any facts since the action was commenced which would, if true, [meet] the heightened requirements of the PSLRA.") (internal quotations and citations omitted).

Plaintiff's new, conclusory scienter theory does not come close to meeting these heightened pleading standards.  Plaintiff provides no support for the notion that Defendants were "actively" trying to sell the Company during the Class Period, much less trying to sell Puma at the time the alleged false statements were made.  *See In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (observing that courts are not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences").

Woefully absent from Plaintiff's First Amended Complaint is any indication of how or when a sale was pursued, or even contemplated by Defendants.  Plaintiff does not, for example, allege that Puma was engaged in discussions regarding a potential sale of the company with genuinely interested suitors, that Puma had entered into a non-disclosure agreement, or that Puma had retained an investment banker to assist with a potential sale.  It alleges none of these facts because the

LATHAM&WATKINS^LLP  US-DOCS\89691943
ATTORNEYS AT LAW
ORANGE COUNTY

20

No. 8:15-CV-00865 AG (JCGx)
DEFS.' NOTICE OF MOTION AND MOTION TO
DISMISS; POINTS & AUTHS. IN SUPPORT

1   extensive document discovery conducted to date does not support them.  Plaintiff

2   could not offer the particularized allegations that would be required to establish

3   scienter consistent with the PSLRA and its Rule 11 obligations to the Court.  *See*

4   Fed. R. Civ. P. 11(b)(3) (awareness that "factual contentions [do not] have

5   evidentiary support" is sufficient grounds to strike them from a pleading); *Feyko v.*

6   *Yuhe Int'l, Inc.*, No. CV 11-05511 DDP (PJWx), 2013 WL 816409, at *10 (C.D.

7   Cal. Mar. 5, 2013) (citing cases) ("Portions of a [complaint in a securities matter]

8   that do not comport with Rule 11's independent investigation requirement may be

9   stricken.").

10      Plaintiff's failure to present particularized allegations to support its new

11   scienter theory cannot be saved by a recitation of the old adage that "additional

12   evidentiary support will exist for the allegations set forth herein after a reasonable

13   opportunity for additional discovery."  FAC ¶ 7.  Plaintiff has had the benefit of

14   substantial document discovery; it is unclear what support for this theory Plaintiff

15   hopes to find.  Plaintiff already requested and received emails and documents from

16   Individual Defendants, Puma's executives, and Puma's Board of Directors—all of

17   whom would have had to be involved in an attempt to sell Puma.  Presumably,

18   none of these documents provides support for Plaintiff's new scienter theory, or

19   else they would have been alleged in the First Amended Complaint.  *See* 15 U.S.C.

20   § 78u–4(b)(1);  *see* Plaintiff's Unopposed Motion for Leave to Amend the

21   Consolidated Complaint (Dkt. No. 120) at 2.

22      **2.     The Reasonable Inferences Drawn From Plaintiff's New**

23      **Motive Theory Undermine—Rather Than Support—**
        **Scienter**

24      Plaintiff's non-specific motive theory should be dismissed because it makes

25   no sense and does not support a strong inference of scienter.  To determine whether

26   any allegation is sufficient to plead scienter, the Court should consider "not only

27   inferences urged by" Plaintiff when evaluating whether the complaint adequately

28   pleads scienter, but also "competing inferences" and "nonculpable explanations"

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
ORANGE COUNTY

US-DOCS\89691943

21

No. 8:15-CV-00865 AG (JCGx)
DEFS.' NOTICE OF MOTION AND MOTION TO
DISMISS; POINTS & AUTHS. IN SUPPORT

1    urged by Defendants that are "rationally drawn from the facts alleged," *Tellabs,*

2    *Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007), including

3    "inferences unfavorable to" Plaintiff.  *Metzler*, 540 F.3d at 1061 (citing *Gompper*

4    *v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002)).  The inference "must be more

5    than merely plausible or reasonable—it must be cogent and at least as compelling

6    as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 309;

7    *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009).

8        Plaintiff asks this Court to infer that Defendants were motivated to mislead

9    the market, and drive up Puma's stock price, in order to complete a sale of the

10   Company and cash out their shares.  This theory is illogical, and is certainly not as

11   cogent or compelling as the nonculpable inference that the Court must consider.

12   *Tellabs*, 551 U.S. at 314; *see also Brennan v. Zafgen, Inc.*, 853 F.3d 606, 613 (1st

13   Cir. 2017) (explaining a court should draw "all *reasonable* inferences in a

14   plaintiff's favor") (emphasis added).  It is axiomatic that a potential buyer would

15   conduct due diligence prior to purchasing a company in order to evaluate the value

16   of its assets.  *See, e.g., In re Appraisal of Dell, Inc.*, No. 9322-VCL, 2016 WL

17   3186538, at *42 (Del. Ch. May 31, 2016), *reargument denied,* 2016 WL 3357514

18   (Del. Ch. June 16, 2016) (noting buyers "compensate for information asymmetries

19   by conducting due diligence, by using their own independent industry knowledge,

20   or by hiring expert advisors"); *Golden Cycle, LLC v. Allan*, No. CIV. A. 16301,

21   1998 WL 892631, at *10 (Del. Ch. Dec. 10, 1998) (explaining company's refusal

22   to conduct due diligence "created substantial doubt as to the credibility of its

23   proposal").

24       For a development-stage pharmaceutical company like Puma, the value of its

25   assets is driven by the prospects for FDA approval—based on drug trial results—

26   and the corresponding future revenue potential.  *See* FAC ¶ 8 ("Puma is a

27   development-stage pharmaceutical company . . . with a primary focus on acquiring

28   and developing drug products"); Ex. C (Puma's 2014 Form 10-K) at 13 ("None of

LATHAM&WATKINS LLP   US-DOCS\89691943
ATTORNEYS AT LAW
ORANGE COUNTY

22

No. 8:15-CV-00865 AG (JCGx)
DEFS.' NOTICE OF MOTION AND MOTION TO
DISMISS; POINTS & AUTHS. IN SUPPORT

1    our drug product candidates may be marketed . . . until the drug has received FDA

2    approval," which generally requires extensive clinical testing, including the

3    "performance of adequate and well-controlled human clinical trials . . . to establish

4    the safety and efficacy of the drug for each proposed indication."); *see also id.* at

5    21 ("Until, and unless, we receive approval from the [FDA] . . . we cannot market

6    or sell our products and will not have product revenues.").   Through the due

7    diligence process, any buyer would inevitably ask to see the full results of the

8    ExteNET trial, including the safety results, prior to purchasing Puma—and those

9    results would have included the very data Plaintiff alleges Defendants had a motive

10   to conceal.   *See S'holder Representative Servs. LLC v. Gilead Scis., Inc.*, No.

11   10537-CB, 2017 WL 1015621, at *3 (Del. Ch. Mar. 15, 2017) (noting that

12   "[d]uring due diligence" target company provided Gilead with information about

13   drug's potential for treating certain cancers); *see also In re Micromet, Inc. S'holder*

14   *Litig.*, No. 7197-VCP, 2012 WL 681785, at *3 (Del. Ch. Feb. 29, 2012) (noting

15   that after "Micromet announced that initial results from its clinical trials" showed

16   improvements in cancer treatment, potential purchaser was given "access to an

17   online data room to conduct further due diligence").   Put simply, it defies logic to

18   infer that a potential buyer would proceed to buy a company with a single drug

19   candidate on the basis of preliminary, top-line results.   The Ninth Circuit has

20   repeatedly held that courts need not entertain such unreasonable inferences. *See In*

21   *re Gilead Scis. Sec. Litig.*, 536 F.3d at 1055 (explaining courts are not "required to

22   accept as true . . . unwarranted deductions of fact, or unreasonable inferences");

23   *Cholla Ready Mix, Inc. v. Civish*, 382 F.3d 969, 973 (9th Cir. 2004) (same);

24   *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) (same).

25        The nonculpable inferences here are logical and compelling.   Defendants

26   could not have dreamed of misleading a potential purchaser into paying an inflated

27   price for Puma's assets by hiding the full results of the ExteNET trial.   It is far

28   more reasonable that Defendants were abiding by industry practice, in disclosing

1   the preliminary positive results of the trial and preparing to present the full trial

2   results at a scientific conference.  Plaintiff's new theory is not sufficient to plead a

3   strong inference of scienter.  *See Zucco Partners*, 552 F.3d at 999 ("[W]here a

4   single statement indicative of scienter is contradicted by readily available . . .

5   evidence, it is impossible to conclude that the statement creates an inference of

6   scienter sufficiently cogent or compelling to survive under *Tellabs*.").

### 3.   Allegations of a Generalized Motive to Sell a Company Do Not Plead Scienter

9       Plaintiff's new motive theory also fails because simply claiming that

10  Defendants were motivated to sell the Company is not enough to plead motive and

11  opportunity to commit fraud.  As Puma has readily disclosed, it is a development-

12  stage biopharmaceutical company, with no current revenue and no marketing

13  department, and as such it will consider potential partners for marketing its

14  products.  Ex. C (Puma's 2014 Form 10-K) at 3-4, 6-7.  That development-stage

15  fact cannot mean that Puma executives automatically have the motive and

16  opportunity to commit fraud.  The alleged desire to sell a company is the type of

17  generic profit motivation, common to all executives, that courts have consistently

18  rejected as insufficient to establish scienter.  *E.g.*, *In re Rigel Pharm., Inc. Sec.

19  Litig.*, 697 F.3d at 884 (holding "routine corporate objectives such as the desire to

20  obtain good financing and expand" are insufficient); *Zucco*, 552 F.3d at 1006

21  (holding "mere generalized assertions about routine business objectives" are

22  insufficient); *Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1137 (S.D.

23  Cal. 2012) (holding "generalized assertions of motive based on potential profit

24  from the Scient'x acquisition are [] insufficient").

25      As the Ninth Circuit has explained, because "personal profit motive is

26  present in almost every merger, inferring scienter from [that] motive would force

27  the directors of virtually every company to defend securities fraud actions every

28  time that company effected a merger or acquisition."  *Glazer Capital Mgmt., LP v.*

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
ORANGE COUNTY

US-DOCS\89691943

24

No. 8:15-CV-00865 AG (JCGx)
DEFS.' NOTICE OF MOTION AND MOTION TO
DISMISS; POINTS & AUTHS. IN SUPPORT

1    *Magistri*, 549 F.3d 736, 748 (9th Cir. 2008) (internal quotations and citations

2    omitted); *see also GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237–38

3    (3d Cir. 2004) ("In every corporate transaction, the corporation and its officers

4    have a desire to complete the transaction, and officers will usually reap financial

5    benefits from a successful transaction."); *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609,

6    623 (4th Cir. 1999) (holding because "[s]imilar situations arise in every merger[,] .

7    . . allowing a plaintiff to prove a motive to defraud by simply alleging a corporate

8    defendants desire to . . . realize gains on company stock, would force the directors

9    of virtually every company to defend securities fraud actions.").   These generic

10   allegations alone cannot give rise to a strong inference of fraudulent intent.

11   **VI.   CONCLUSION**

12       For the foregoing reasons, Defendants respectfully request that the Court

13   enter an order:   (1) dismissing the new claims in the First Amended Complaint

14   challenging Mr. Auerbach's statements regarding the safety profile of the ExteNET

15   trial; (2) dismissing Plaintiff's new scienter theory regarding Defendants' alleged

16   motive to sell Puma; and (3) directing that further discovery in this matter should

17   not be expanded to pursue these new claims and theories.

18

19   Dated:  June 19, 2017                    Respectfully Submitted,

20

21                                           LATHAM & WATKINS LLP
                                              Michele D. Johnson

22                                            Colleen C. Smith
                                              Sarah Greenfield

23                                            Kristin N. Murphy

24
                                        By: */s/ Michele D. Johnson*

25                                           Michele D. Johnson

26

27                                           *Attorneys for Defendants Puma*
                                             *Biotechnology, Inc., Alan H.*

28                                           *Auerbach, and Charles R. Eyler*

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
ORANGE COUNTY

US-DOCS\89691943

25

No. 8:15-CV-00865 AG (JCGx)
DEFS.' NOTICE OF MOTION AND MOTION TO
DISMISS; POINTS & AUTHS. IN SUPPORT