ROBBINS GELLER RUDMAN
  & DOWD LLP
TOR GRONBORG (179109)
JASON A. FORGE (181542)
TRIG R. SMITH (237399)
SUSANNAH R. CONN (205085)
J. MARCO JANOSKI GRAY (306547)
DEBASHISH BAKSHI (311115)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
torg@rgrdlaw.com
jforge@rgrdlaw.com
trigs@rgrdlaw.com
sconn@rgrdlaw.com
mjanoski@rgrdlaw.com
dbakshi@rgrdlaw.com

Counsel for Plaintiff and the Class

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| HSINGCHING HSU, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>        vs.<br><br>PUMA BIOTECHNOLOGY, INC., et al.,<br><br>                              Defendants. | Case No. 8:15-cv-00865-AG-SHK<br><br>CLASS ACTION<br><br>MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE THE TESTIMONY OF DEFENDANTS' EXPERT DR. GREGORY K. FRYKMAN<br><br>DATE:     October 15, 2018<br>TIME:     10:00 a.m.<br>CTRM:    10D<br>JUDGE:   Hon. Andrew J. Guilford |

1454422_2

# TABLE OF CONTENTS

**Page**

1.   INTRODUCTION ........................................................................................ 1

2.   LEGAL STANDARD ................................................................................. 3

    2.1   Rule 702 and 403 Standards ............................................................. 3

    2.2   Limitations on the Admissibility of Industry Standards Evidence ........................................................................................ 4

3.   FRYKMAN'S TESTIMONY THAT PUMA'S JULY 22, 2014 PRESS RELEASE WAS IN LINE WITH AN INDUSTRY STANDARD SHOULD BE EXCLUDED ............................................. 5

    3.1   Frykman Is Not Qualified to Opine on Industry Standards for the Disclosure of Clinical Trial Results ............................................ 5

    3.2   Frykman Fails to Identify a Discernible Industry Standard for the Disclosure of Clinical Trial Results ............................................ 7

    3.3   Frykman's Disclosure Opinion Is Not the Product of Reliable Principles or Methods ...................................................................... 9

    3.4   Frykman's Disclosure Opinion Does Not Fit the Facts of the Case and Would Be Both Confusing and Misleading ...................... 12

4.   FRYKMAN'S OPINION THAT PUMA'S JANUARY 2015 OFFERING WAS "IN LINE" WITH INDUSTRY PRACTICES SHOULD BE PRECLUDED ....................................................................... 13

5.   FRYKMAN SHOULD BE PRECLUDED FROM TESTIFYING ABOUT ASCO PRESENTATION PRACTICES AND STOCK PRICE REACTIONS ............................................................................... 15

6.   CONCLUSION ......................................................................................... 17

1454422_2

1

# TABLE OF AUTHORITIES

2

**Page**

3

**CASES**

4

*Avila v. Willits Envtl. Remediation Tr.*,
  633 F.3d 828 (9th Cir. 2011) ............................................. 7, 14, 16

5

*Daubert v. Merrell Dow Pharms., Inc.*
  43 F.3d 1311 (9th Cir. 1995) .................................................. 13

6

7

*Daubert v. Merrell Pharms., Inc.*,
  509 U.S. 579 (1993) ...................................................... 3, 12, 16

8

*Dizon v. Asiana Airlines, Inc.*,
  240 F. Supp. 3d 1036 (C.D. Cal. 2017) ........................................ 8

9

10

*Fed. Hous. Fin. Agency v. Nomura Holding Am. Inc.*,
  68 F. Supp. 3d 439 (S.D.N.Y. 2014),
  *aff'd*, 873 F.3d 85 (2d Cir. 2017) ............................................ 4

11

12

*Filtration Sols. Worldwide, Inc. v. Gulf Coast Filters, Inc.*,
  2010 WL 148442 (W.D. Mo. Jan. 12, 2010) ................................. 8, 9

13

14

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) ...................................................... 12, 17

15

*Highland Capital Mgmt., L.P. v. Schneider*,
  379 F. Supp. 2d 461 (S.D.N.Y. 2005) ......................................... 15

16

17

*In re Fosamax Prods. Liab. Litig.*,
  645 F. Supp. 2d 164 (S.D.N.Y. 2009) .......................................... 7

18

*In re Rezulin Prods. Liab. Litig.*,
  309 F. Supp. 2d 531 (S.D.N.Y. 2004) ..................................... 5, 14, 15

19

20

*In re Silicone Gel Breast Implants Prods. Liab. Litig.*,
  318 F. Supp. 2d 879 (C.D. Cal. 2004) ...................................... 3, 13

21

*Johns v. Bayer Corp.*,
  2013 WL 1498965 (S.D. Cal. Apr. 10, 2013) .................................. 15

22

23

*Kumho Tire Co., Ltd. v. Carmichael*,
  526 U.S. 137 (1999) ........................................................... 3

24

*LinkCo, Inc. v. Fujitsu Ltd.*,
  2002 WL 1585551 (S.D.N.Y. July 16, 2002) ................................... 16

25

26

*Lust ex. rel. Lust v. Merrell Dow Pharms., Inc.*,
  89 F.3d 594 (9th Cir. 1996) ................................................... 3

27

*Meineker v. Hoyts Cinemas Corp.*,
  154 F. Supp. 2d 376 (N.D.N.Y. 2001) .......................................... 8

28

1454422_2

                                                                    **Page**

*Meyer v. JinkoSolar Holdings Co., Ltd.*,
  761 F.3d 245 (2d Cir. 2014) ............................................................... 10

*Miller v. Thane Int'l, Inc.*,
  519 F.3d 879, *aff'd*, 615 F.3d 1095 (9th Cir. 2010) ........................... 13

*Murray v. Marina Dist. Dev. Co.*,
  311 F. App'x 521 (3d Cir. 2008) ........................................................ 6

*Nat'l Credit Union Admin. Bd. v. UBS Sec., LLC*,
  2017 WL 235013 (D. Kan. Jan. 19, 2017) ......................................... 11

*Pension Comm. of Univ. of Montreal Pension Plan
v. Banc of Am. Sec., LLC*,
  691 F. Supp. 2d 448 (S.D.N.Y. 2010) ................................................ 9

*Ralston v. Smith & Nephew Richards, Inc.*,
  275 F.3d 965 (10th Cir. 2001) ............................................................ 6

*Rogers v. Raymark Indus., Inc.*,
  922 F.2d 1426 (9th Cir. 1991) ............................................................ 4

*S.E.C. v. Dain Rauscher, Inc.*,
  254 F.3d 852 (9th Cir. 2001) .............................................................. 4

*S.E.C. v. Tourre*,
  950 F. Supp. 2d 666 (S.D.N.Y. 2013) ........................................... 7, 16

*Sec. & Exch. Comm'n v. Bankatlantic Bancorp, Inc.*,
  2013 WL 12009694 (S.D. Fla. Nov. 14, 2013) .................................... 4

*Sec. & Exch. Comm'n v. Goldstone*,
  2016 WL 3135651 (D.N.M. May 10, 2016) ....................................... 11

*Stewart Title Ins. Co. v. Credit Suisse*,
  2015 WL 4250704 (D. Idaho July 13, 2015) ....................................... 7

*United States v. Sayre*,
  434 F. App'x 622 (9th Cir. 2011) ...................................................... 11

*United States v. Thompson*,
  229 F. Supp. 3d 91 (D. Mass. 2017) .................................................... 7

*Universal Elecs., Inc. v. Universal Remote Control, Inc.*,
  2014 WL 12586737 (C.D. Cal. Apr. 21, 2014) ................................. 14

*USA Mach. Corp. v. CSC, Ltd.*,
  184 F.3d 257 (3d Cir. 1999) ............................................................... 9

*Winebarger v. Boston Sci. Corp.*,
  2015 WL 1887222 (S.D. W. Va. Apr. 24, 2015) ........................... 8, 11

- iii -

**Page**

**STATUTES, RULES AND REGULATIONS**

Federal Rules of Civil Procedure
    Rule 30(b)(6) ................................................................. 16

Federal Rules of Evidence
    Rule 403.................................................................. *passim*
    Rule 702.................................................. 1, 3, 5, 16

17 C.F.R.
    §240.10b-5(b) ........................................................... 10

- iv -

1   Pursuant to Federal Rules of Evidence 702 and 403, Plaintiff respectfully

2   submits this memorandum of law in support of its motion to exclude the opinion of

3   Defendants' expert Dr. Gregory K. Frykman.

4   **1.    INTRODUCTION**

5   Dr. Gregory K. Frykman ("Frykman") was retained by Defendants "to provide

6   expert testimony regarding Puma Biotechnology, Inc.'s ("Puma" or "the Company")

7   July 22, 2014 announcement describing the top-line results of the ExteNET trial."

8   Amended Expert Report of Gregory K. Frykman, M.D. ("Report") at 1 (Ex. 1).[1]  The

9   primary opinions Frykman intends to offer at trial are: (1) Puma's July 22, 2014 press

10  release announcing certain results of the ExteNET trial of the drug neratinib was "in

11  line with industry standards" for the disclosure of clinical trial results (*id*. at 19-22);

12  and (2) Puma's January 2015 stock offering "was in line with biotechnology industry

13  practices."  *Id*. at 30.  Frykman also proposes to offer certain testimony regarding

14  clinical trials in general, the submission of trial results to the American Society of

15  Clinical Oncology ("ASCO"), and stock price reactions to ASCO presentations. *Id*. at

16  11-19.

17  Frykman's opinion that Puma's July 22, 2014 press release was in line with

18  some industry practice is excludable for multiple reasons.  First, Frykman is not

19  qualified to offer that opinion.  Second, Frykman's opinions are not the result of any

20  discernable, let alone reliable methodology.  He has not even identified what the

21  purported standard is for disclosures of clinical trial results and, as a result, he

22  provides no basis for opining that Puma's July 22, 2014 press release is in line with

23  any standard.  Frykman does acknowledge that disclosures by public companies about

24

---

25  [1]  All "Ex." references are to the exhibits attached to the Declaration of Debashish
    Bakshi in Support of Plaintiff's Motion to Exclude the Testimony of Defendants'
26  Expert Dr. Gregory K. Frykman, filed concurrently, unless otherwise stated.  On
    June 12, 2018, following his deposition, Frykman amended his Report and list of
27  materials considered to correct for errors and omissions.  A copy of the redlined
    Report and list of materials considered provided by Defendants' counsel are attached
28  as Exs. 2 and 3.

- 1 -

clinical trial results must include material information.  But he repeatedly concedes that he is not an expert on assessing materiality and did not assess the materiality of any of the ExteNET clinical trial results.  So, by his own admission, Frykman did not and cannot determine if Puma's press release actually included the material information necessary to be in line with any standard.  Third, Frykman's industry standard opinion would only serve to confuse and mislead the jury.  The falsity of the July 22, 2014 press release is directly tied to the statements made by Defendants in the accompanying conference call with analysts and investors.  But Frykman disavows any opinion about that conference call or whether it was in line with any standards.  Frykman also does not consider any of Defendants' other alleged misstatements in SEC filings and later conference calls.  As a result, his opinion is untethered to the facts of this case.

Frykman's proposed testimony that Puma's stock offering was in line with some industry standard suffers from the same flaws.  He is not qualified – he has never had any involvement in any stock offering for any company.  His purported "industry standard" is so vague as to be meaningless – Frykman simply posits that pharmaceutical companies often have stock offerings "some time" after the disclosure of clinical trial results.  Even this vague "standard" is unsupported and there is no analysis underlying the opinion that Puma's January 2015 offering was in line with anything.  And, as a result of these flaws, Frykman's testimony could not possibly help the jury.

Finally, Frykman should not be permitted to testify about the presentation of clinical trial results at ASCO meetings or movements in stock prices around the time of those presentations.  His lengthy narrative about the submission and presentation process is not useful, and his unqualified foray into economics and loss causation lacks any basis.

1454422_2

## 2.    LEGAL STANDARD

### 2.1    Rule 702 and 403 Standards

An expert who is qualified "by knowledge, skill, experience, training, or education" may offer opinion testimony if "(a) the expert's [specialized knowledge] will help the trier of fact understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; ***and*** (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.[2] A methodology is reliable if: the expert's theory can be or has been tested; the theory is subject to peer review and publication; there is a known rate of error of the technique or theory when applied; standards and controls exist and have been maintained; ***and*** the theory or technique of the expert has been generally accepted in the scientific community. *Daubert v. Merrell Pharms., Inc.*, 509 U.S. 579, 593-94 (1993); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) (the Court must determine whether the expert, "basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual vigor that characterizes the practice of an expert in the relevant field"). The burden of establishing the admissibility of expert testimony falls on the party seeking its admission. *See Lust ex. rel. Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

In addition to the reliability requirement, expert testimony must also be helpful and useful to the trier of fact. The Supreme Court therefore demands a "connection to the pertinent inquiry as a precondition to admissibility." *Daubert*, 509 U.S. at 592. This relevance inquiry asks whether the intended opinion "fits" the issues in dispute. *See In re Silicone Gel Breast Implants Prods. Liab. Litig.*, 318 F. Supp. 2d 879, 893 (C.D. Cal. 2004). And, of course, expert testimony may be excluded pursuant to Fed. R. Evid. 403 if its probative value is outweighed by "unfair prejudice, confusion of the

---

[2]   Emphasis is added and citations are omitted, unless otherwise noted.

1454422_2

issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403; *see Rogers v. Raymark Indus., Inc.*, 922 F.2d 1426, 1430 (9th Cir. 1991).

### 2.2  Limitations on the Admissibility of Industry Standards Evidence

The Ninth Circuit has cautioned that using industry standards to judge a defendant's actions creates a "risk . . . that the standard setters will engage in a 'race to the bottom' to set the least demanding standard to assess their conduct."  *S.E.C. v. Dain Rauscher, Inc.*, 254 F.3d 852, 857 (9th Cir. 2001).  Accordingly, even where it has been substantiated, evidence of industry practices in securities fraud actions is only admissible for the limited purpose of assisting the trier of fact in determining whether a defendant's conduct was an extreme departure from the ordinary standard of care.  *See id*. at 856-57 (finding that "to the extent there is any industry standard of conduct for investment bankers and underwriters who participate in offerings of taxable municipal notes, the standard is sparse and not particularly helpful"); *Fed. Hous. Fin. Agency v. Nomura Holding Am. Inc.*, 68 F. Supp. 3d 439, 473 (S.D.N.Y. 2014) ("compliance with the industry standards of the time (assuming that such standards are shown to have existed) may do little to suggest a defendant's due diligence was adequate"), *aff'd*, 873 F.3d 85 (2d Cir. 2017).

To be relevant to allegations of fraud, the industry standards proffered must have been known to and relied upon by the defendant at the time of the alleged false and misleading statements.  *See Sec. & Exch. Comm'n v. Bankatlantic Bancorp, Inc.*, 2013 WL 12009694, at *10 n.17 (S.D. Fla. Nov. 14, 2013) ("testimony comparing Bancorp's disclosures and performance to that of other banks will only be admissible at trial to rebut scienter to the extent that [defendants] knew of the disclosures and performance of other banks and relied upon that knowledge in their activities and decision-making process"); *see also id.* at *11 (excluding evidence of industry standards that post-dated alleged misrepresentations as irrelevant to securities fraud claims).

1454422_2

"Even if expert testimony on the ordinary practices of a profession or trade were appropriate 'to enable the jury to evaluate the conduct of the parties against the standards of ordinary practice in the industry,'" however, "it still must comport with the reliability and helpfulness requirements of Rule 702." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 543 (S.D.N.Y. 2004) (excluding industry standards evidence as unreliable where the testimony on offer was "'so vague as to be unhelpful to a fact-finder'").

**3.     FRYKMAN'S TESTIMONY THAT PUMA'S JULY 22, 2014 PRESS RELEASE WAS IN LINE WITH AN INDUSTRY STANDARD SHOULD BE EXCLUDED**

The Court should not allow Frykman to testify that Puma's July 22, 2014 press release was "in line with industry standards" for the corporate disclosure of clinical trial results.  Report at 19-22.  Frykman is not qualified to offer such testimony.  He has failed to identify any purported industry standard and his conclusion about Puma's press release is not the product of any reliable principle or methodology.  And, the proposed testimony would not help the jury and is excludable under Federal Rule of Evidence 403.

**3.1     Frykman Is Not Qualified to Opine on Industry Standards for the Disclosure of Clinical Trial Results**

Frykman is a non-practicing physician who briefly worked at the U.S. Food and Drug Administration ("FDA") 16 years ago.  He then spent seven years as a policy analyst and, for the last decade, he has been a consultant on FDA regulatory matters.  Ex. 4 (Frykman CV).  But Frykman has absolutely no experience in preparing press releases on clinical trial results (or any other subject) or analyzing whether press releases comply with any industry standard:

- He has never drafted, reviewed, or approved any clinical trial press release.  May 31, 2018 Deposition Transcript of Gregory K. Frykman, M.D. ("Frykman Tr.") (Ex. 5) at 57:8-58:4, 66:3-13, 143:4-8.

- 5 -

- He has never had any role or responsibility for determining whether to disclose clinical trial results or what trial results would need to be disclosed. *Id.* at 120:1-5, 128:17-129:18.

- As a consultant, no company has ever retained him to review or approve any clinical trial press release. *Id.* at 62:10-14, 156:22-157:2.

- At the FDA, he did not draft, review, or approve clinical trial press releases. *Id.* at 55:9-16, 55:24-56:3.

- In his time as a policy analyst, he did not prepare or approve any clinical trial press release. *Id.* at 56:20-57:7.

- He has never been retained or qualified as an expert on clinical trial press releases or any industry standard for such disclosures. *Id.* at 22:17-22, 133:8-12, 145:19-23.

- He has never taken any course, taught any course or authored any publication on the topic of clinical trial press releases or any industry standard for such releases. *Id.* at 126:5-9, 127:3-23, 128:12-16, 135:13-136:2, 136:6-12.[3]

The only thing Frykman has put forward as a qualification is that he has read a lot of press releases about clinical trials. But that does not make him an expert on the standards that are applied by and to the persons drafting and issuing those releases any more than reading about horse racing makes one a jockey. *See Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001) (orthopedic surgeon's testimony as to the adequacy of warnings accompanying medical device properly excluded where she had never drafted or been asked to draft a surgical technique or

---

[3] Indeed, Frykman seems to believe that, if he chose to do so, he would be the first person to publish on the topic of an industry standard for the disclosure of clinical trial results. Frykman Tr. at 135:13-136:5. That only underscores the deficiencies with Frykman's proposed testimony. *See Murray v. Marina Dist. Dev. Co.*, 311 F. App'x 521, 524 (3d Cir. 2008) (affirming exclusion of opinion because "when questioned at his deposition regarding the existence of casino security industry standards, [the expert witness] responded that there were 'very few' standards and he was writing the standards for the industry, but that it was a 'work in progress'").

1454422_2

1  warning of a product of any kind); *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d

2  164, 195 (S.D.N.Y. 2009) (excluding public health professor's opinion regarding

3  company's promotion, marketing, and labeling of pharmaceutical as unqualified

4  where proffered expert asserted he "'can have opinions without being an expert' on

5  the subject" merely because he had been "exposed to [marketing]").

6      While lack of experience often goes to the weight of an expert opinion rather

7  than its admissibility, that holds true only if the expert "'stays within the reasonable

8  confines of his subject area.'"  *Avila v. Willits Envtl. Remediation Tr.*, 633 F.3d 828,

9  839 (9th Cir. 2011) (affirming exclusion of cancer immunologist's opinion on the

10  composition of industrial waste).  By offering an opinion on disclosure practices that

11  is not grounded in his experience, Frykman strays well beyond his background in

12  medicine and the FDA regulatory process.  *See United States v. Thompson*, 229 F.

13  Supp. 3d 91, 93-94 (D. Mass. 2017) (excluding testimony on industry custom and

14  practice where witness "offer[ed] little actual first-hand knowledge" about how

15  companies in that industry operated); *Stewart Title Ins. Co. v. Credit Suisse*, 2015 WL

16  4250704, at *11 (D. Idaho July 13, 2015) (excluding experienced general-insurance

17  attorney's opinion on industry standards in title insurance); *S.E.C. v. Tourre*, 950 F.

18  Supp. 2d 666, 677 (S.D.N.Y. 2013) (excluding opinion on "what information would

19  and would not matter to CDO investors" because the witness "ha[d] no education,

20  expertise, or experience in this area upon which to make such a statement").  In sum,

21  Frykman is not qualified as an expert on industry standards for the disclosure of

22  clinical trial results, and the Court should preclude him from testifying at trial on the

23  subject for that reason alone.

24  **3.2     Frykman Fails to Identify a Discernible Industry Standard for the Disclosure of Clinical Trial Results**

25

26      In an expert report on the industry standard for the disclosure of clinical trial

27  results, you would expect to find a precise definition of what the purported industry

28  standard is.  But, perhaps as a result of his lack of qualifications, that can't be found in

1454422_2

Frykman's Report.  Instead, he equivocates, claiming that disclosures must "provid[e] important information to investors" and "[b]ecause the individual circumstances of each company, each drug candidate, and each clinical trial differ, there is variation in the specific types of information reflected in press releases by pharmaceutical and biotechnology companies about the results of any particular clinical trial."  Report at 10, 11.  Frykman's "inability to identify an applicable [industry] standard renders [his] opinion unreliable" and thus inadmissible.  *Winebarger v. Boston Sci. Corp.*, 2015 WL 1887222, at *39 (S.D. W. Va. Apr. 24, 2015); *see also Dizon v. Asiana Airlines, Inc.*, 240 F. Supp. 3d 1036, 1043 n.8 (C.D. Cal. 2017) (finding that plaintiff could not assert that an airline had "failed to act in line with industry standards" where they had "provid[ed] no evidence that the flight industry [had such] a standard"); *Filtration Sols. Worldwide, Inc. v. Gulf Coast Filters, Inc.*, 2010 WL 148442, at *5 (W.D. Mo. Jan. 12, 2010) (excluding expert opinion reporting favorably on impurity levels in defendant's product in part because the witness "[did] not explain what the industry standards are that the [defendant's product] meets or exceeds"); *Meineker v. Hoyts Cinemas Corp.*, 154 F. Supp. 2d 376, 379 (N.D.N.Y. 2001) (excluding expert testimony in part because "there are no industry standards to provide a foundation").

When deposed, Frykman testified that, effectively, any press release issued by a pharmaceutical company about a clinical trial result would be in line with his vague industry standard.  Frykman Tr. at 145:3-8 ("But I think the mere fact that press releases of top-line clinical results come from pharmaceutical and biotechnologies and they go through a vetting process, that the vast, vast majority are going to be in line with typical practices in the industry.").  Indeed,  of the "thousands" of clinical trial press releases he claims to have seen in the course of his career, Frykman testified that "there are none . . . that stand out to me where I've said, goodness sakes, this is just, you know, completely out of line of what I'd expect to see in a clinical trial."  *Id.* at 143:9-22.  *See also id*. at 145:14-18 ("Q. [W]ere there any press releases that you looked at for the purposes of this case that you did not believe were in line with

- 8 -

1   typical industry practices [for disclosure of top-line results of clinical trials]?   A.

2   No.").

3          In lieu of an actual industry standard, Frykman acknowledged that the contents

4   of clinical trial disclosures are made on a "***case-by-case basis***," that "some ***companies***

5   ***feel differently*** about including particular pieces of information than other companies

6   do," and that companies are going to do "what ***they perceive*** to be their legal

7   obligations" and "choose the information that they put in the press release specific to

8   ***their trial*** and to ***their drug*** that best, you know, meets ***their needs***."   Frykman Tr. at

9   109:5-8, 134:17-135:3, 201:2-5.   As a result, Frykman conceded "it's hard to say

10  uniformly that these, you know, five or 10 or 20 pieces of clinical trial results should

11  or should not be in a particular press release."   *Id*. at 109:4-13.

12         The admission that pharmaceutical companies make clinical trial disclosure

13  decisions on a discretionary and individualized basis directly contradicts Frykman's

14  intended opinion that there is, in fact, a customary practice recognized by the industry

15  at large.   This is yet another basis for exclusion.   *See USA Mach. Corp. v. CSC, Ltd.*,

16  184 F.3d 257, 267-68 (3d Cir. 1999) (excluding opinion that industry standard for

17  sales commissions was 20% where expert later admitted that figure was merely a

18  starting point for negotiations and "[e]very deal is different"); *Pension Comm. of*

19  *Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F. Supp. 2d 448, 475

20  (S.D.N.Y. 2010) (declining to consider industry standards opinion where expert

21  testified that the decision to resign from running a hedge fund would be "'up to each

22  administrator'").

23         **3.3     Frykman's Disclosure Opinion Is Not the Product of**
            **Reliable Principles or Methods**
24

25         Given the failure to identify any actual industry standard, it is self-evident

26  Frykman's opinion that Puma's press release is "in line" with an industry standard

27  could not be the result of a reliable methodology.   *See Filtration Sols. Worldwide*,

28  2010 WL 148442, at *5.   But it gets worse.   The only consistent aspect of Frykman's

- 9 -

testimony regarding an industry standard for the disclosure of clinical trial results is his recognition that, at a minimum, those disclosures need to include all material information:

- "Q.  And specifically with regard to a press release regarding clinical trial results, what do you understand a company's legally required to include in a press release regarding clinical trial results?

  A.  Material information."  Frykman Tr. at 148:13-18.

- "But, again, my general understanding is that companies are obligated to disclose anything that's material."  *Id*. at 151:5-7.

- "And where the company decides to draw the line to include or not include in their press release must meet the obligation of disclosing material information."  *Id*. at 154:18-21.

- "The minimum [disclosure] range also depends on what the obligations are in terms of materiality."  *Id*. at 285:14-16.

- "Except to the extent that important clinical trial results are – must be disclosed, if there is the determination that they're material to the company."  *Id*. at 290:13-16.

Frykman is right about the need for disclosures to include material information, albeit what he describes is a legal requirement for all public companies and not a pharmaceutical industry standard.  *See Meyer v. JinkoSolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014) ("once a company speaks on an issue or topic, there is a duty to tell the whole truth"); 17 C.F.R. §240.10b-5(b) (making it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading").  What makes this worse, for Defendants, is that Frykman also concedes that he did not and cannot opine on the issue of materiality:

- "Q.  You said as part of that engagement you couldn't answer the question, if it was material.  Why couldn't you answer that question?

1454422_2

1       A.  Materiality, I think, is something that attorneys and judges and juries

2       figure out.  That's not a medical thing."  Frykman Tr. at 24:21-25:1.

3   •   "Q.  And how do you determine what is material information regarding

4       clinical trial results?

5       A.  Well, I'm not sure I'm the person to make that determination."  *Id.* at

6       148:19-23.

7   •   "And, again, I'm – I'm not an attorney, so I don't know that I could tell

8       you about the materiality . . . ."  *Id.* at 150:4-7.

9   •   "Q.  And in this case are you offering any opinion regarding the issue of

10      materiality?

11      A.  No."  *Id.* at 150:16-18.

12  •   "As I've said before, I'm not an attorney, so I am not the person to make

13      the determination of materiality."  *Id.* at 339:23-25.

14      That is a fatal flaw.  If a press release disclosing clinical trial results must

15  contain all material information to be in line with an industry standard (which

16  Frykman says is the case), then it would be impossible to conclude that Puma's July

17  22, 2014 press release was in line with that standard without determining if the

18  disclosure in fact contained all material information.  *See, e.g.*, *Winebarger*, 2015 WL

19  1887222, at *38 ("FDA regulations are part of industry standards, and, therefore, any

20  evidence with regard to industry standards would require reference to the FDA,

21  whether it is disguised or not.").[4]

22

23  ─────────────
    [4]   Of course, even if he was qualified, it would have been improper for Frykman to
24  testify about whether or not the ExteNET trial results at issue in this case were
    material.  The jury will make that determination.  *See, e.g.*, *United States v. Sayre*, 434
25  F. App'x 622, 624 (9th Cir. 2011) (holding that "[t]he district court did not abuse its
    discretion in excluding testimony from the defense expert witness regarding who
26  qualifies as a 'reasonable investor' and what sorts of information the 'reasonable
    investor' relies upon"); *Nat'l Credit Union Admin. Bd. v. UBS Sec., LLC*, 2017 WL
27  235013, at *12 (D. Kan. Jan. 19, 2017) (excluding "any testimony by [the expert
    witness] concerning materiality to a reasonable investor"); *Sec. & Exch. Comm'n v.*
28  *Goldstone*, 2016 WL 3135651, at *42 (D.N.M. May 10, 2016) ("The parties' experts
    may not simply declare certain representations material.").

1454422_2

Not only does Frykman fail to determine whether Puma's July 22, 2014 press release contains the necessary material information, he does no comparative analysis of the release at all.  Frykman simply runs through the press release, paragraph by paragraph, and gives his retrospective and conclusory blessing to each section.  *See* Report at 19-22.  There is no application of or comparison to any industry standard. *Id.*[5]  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").  Given the lack of reliable principle or methodology underlying his opinion, Frykman should be precluded from testifying that Puma's July 22, 2014 press release was in line with any industry standard.

### 3.4     Frykman's Disclosure Opinion Does Not Fit the Facts of the Case and Would Be Both Confusing and Misleading

Even assuming for the sake of argument that Frykman was qualified to offer an opinion on Puma's July 22, 2014 press release and the opinion was the product of a reliable methodology, it would still be excludable.  That is because his testimony will not assist the jury and, instead, is more likely to be confusing and misleading.

---

[5]   This section of the Report is, however, replete with conclusory statements and improper legal opinions:

- "Puma's Press Release about the results of the ExteNET clinical trial *accurately and precisely* described the most important primary outcome measures of the ExteNET trial . . . ."  Report at 19.

- "Puma *accurately* identified the narrow adjuvant (i.e., post-surgery) breast cancer setting . . . ."  *Id.*

- "Rather, Puma *responsibly* focused only on achievement of the primary endpoint . . . ."  *Id.* at 20.

- "The next line of text, the subheadline, *carefully* notes . . . ."  *Id.*

- "Puma also *accurately* describes the population studied in the ExteNET trial . . . ."  *Id.* at 21.

- "Mr. Auerbach's statement about neratinib being a HER2-targeted drug that has demonstrated benefit in the 'extended adjuvant' setting is *fully and precisely correct* . . . ."  *Id.* at 22.

- 12 -

1    Frykman's "in line" opinion is limited to just the contents of Puma's July 22, 2014

2    press release.  Frykman Tr. at 282:18-283:18.  But, as alleged, it was Defendants'

3    misrepresentations during the accompanying conference call that rendered the press

4    release false and misleading.  *See* ECF No. 138, ¶¶50-54, 65.  The press release can

5    only be considered in context with the conference call statements.  *See Miller v. Thane*

6    *Int'l, Inc.*, 519 F.3d 879, 886 (the materially misleading nature of an "'issuer's public

7    statements cannot be analyzed in complete isolation'" but instead must be viewed

8    "'through their context and manner of presentation'"), *aff'd*, 615 F.3d 1095 (9th Cir.

9    2010).  Moreover, Defendants are alleged to have made false statements in conference

10   calls and SEC filings following July 22, 2014.  ECF No. 138, ¶¶57-63.  Frykman does

11   not opine on any of those statements.  Frykman Tr. at 283:14-18.  As a result, his

12   opinion about the July 22, 2014 press release, in isolation, does not fit the facts of the

13   case and would serve only to confuse or mislead the jury.  *Daubert v. Merrell Dow*

14   *Pharms., Inc.* 43 F.3d 1311, 1315 (9th Cir. 1995) (testimony only "fits" a case if it

15   "logically advances a material aspect of the proposing party's case"); *Silicone Gel*

16   *Breast Implants*, 318 F. Supp. 2d at 893 (same); Fed. R. Evid. 403.[6]

17   **4.    FRYKMAN'S OPINION THAT PUMA'S JANUARY 2015**
18   **       OFFERING WAS "IN LINE" WITH INDUSTRY PRACTICES**
     **       SHOULD BE PRECLUDED**

19         In a section of his Report spanning all of 8½ lines, Frykman offers the opinion

20   that Puma's January 2015 stock offering "was in line with biotechnology industry

21   practices."  Report at 30.  Actually, that opinion is only found in the heading to the

22   section.  The brief paragraphs that follow contain no analysis or conclusions about

23

24   [6]   Frykman himself appears to have been confused on the issue.  In his original
     report, and during much of his deposition, he purported to opine that Defendants'
25   "accompanying discussion in the [July 22, 2014] analyst call" was also "in-line with
     typical industry practices."  Ex. 6 (Frykman's original report) at 4; Frykman Tr. at
26   225:8-226:6.  Only after being pressed on the lack of any analysis did Frykman
     acknowledge he is not offering any opinion regarding the statements made during the
27   July 22, 2014 conference call.  *Id.* at 281:4-283:18.  Nevertheless, his amended Report
     still confusingly claims to offer opinions about "Puma's July 22, 2014 disclosure."
28   Report at 4.

1454422_2

1  Puma's stock offering.  *Id*.  Nevertheless, Frykman insists that he is offering the
2  opinion that Puma's offering was in line with some standard.  He should not be
3  permitted to do so.

4       Again, Frykman is not qualified to offer an opinion regarding industry practices
5  for stock offerings.  He has never even been involved in any stock offering by any
6  company.  Frykman Tr. at 67:5-9 ("Q.  [H]ave you ever consulted – been retained as a
7  consultant by a biotechnology company with regard to whether or not they should
8  have a stock offering?  A.  In my consulting practice, no.").  *See Avila*, 633 F.3d
9  at 839.

10      And, again, Frykman fails to set forth any discernable industry standard.  He
11 simply states that "it is well known that [biotechnology] companies often raise capital
12 following the announcement of positive news, including the announcement of a
13 successful clinical trial."  Report at 30.  How often?  How soon after the
14 announcement of "positive news"?  Is there actually a standard practice?  Frykman
15 doesn't know.  Frykman Tr. at 301:20-22 ("So it's hard to be very specific how often
16 they do it."), 302:17-18 ("So it's highly variable for each company."), 305:23-24 ("I
17 don't believe I can give you an average length of time."), 307:1-2 ("Yeah.  I'm not
18 sure I could give you a percentage of that.").  What's left is a vacuous definition of an
19 industry practice that could not possibly assist the jury.  *Rezulin Prods. Liab. Litig.*,
20 309 F. Supp. 2d at 543 ("Even if charitably viewed as a 'standard,' the testimony
21 nevertheless is 'so vague as to be unhelpful to a fact-finder.'").[7]

22

23 [7]  Frykman also offers a chart with "examples" of stock offerings following clinical
24 trial disclosures.  Report, Exhibit B.  But he was unable to explain why he selected these examples.  Frykman Tr. at 310:12-21 ("[t]he methodology revolved simply around identifying examples where there was results disclosed in a press release, and
25 then there was a – an equity offering that occurred at some point thereafter that – and that's all it was for").  *See also id.* at 316:1-6 ("Q. So the 14 examples you have here,
26 what percentage of the total number of stock offerings by development-stage pharmaceutical companies does this represent?  A. Oh, it's a small fraction of them.
27 But it was not intended to be representative.").  Nowhere in his Report is any effort made to explain whether or how these examples led to his opinion that Puma's stock
28 offering was in line with an industry practice.  *See Universal Elecs., Inc. v. Universal Remote Control, Inc.*, 2014 WL 12586737, at *10 (C.D. Cal. Apr. 21, 2014) ("Plaintiff

- 14 -

1454422_2

## 5.   FRYKMAN SHOULD BE PRECLUDED FROM TESTIFYING ABOUT ASCO PRESENTATION PRACTICES AND STOCK PRICE REACTIONS

While not part of any of his stated opinions or in what he describes as the scope of his retention, Frykman's Report contains a long, Wikipedia-like section regarding the presentation of clinical trial results at ASCO.  Report at 11-19.  Frykman simply regurgitates generic information about the submission and presentation process that he appears to have pulled from ASCO's website.  He never attempts to connect this recitation to any of his opinions.  He does not even attempt to explain why he would be qualified to testify about the ASCO process.  Indeed, Frykman has acknowledged that he has never worked with ASCO or been involved in reviewing any submissions to the organization.  Frykman Tr. at 267:12-19.

Frykman's description of the ASCO submission and presentation process "simply rehashes otherwise admissible evidence about which he has no personal knowledge" and is "inadmissible."  *Johns v. Bayer Corp.*, 2013 WL 1498965, at *28 (S.D. Cal. Apr. 10, 2013); *see also Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 468-69 (S.D.N.Y. 2005) ("an expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence"); *Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 551 (rejecting those portions of expert's testimony where it was merely "a narrative reciting selected regulatory events" on the basis that "[s]uch material, to the extent it is admissible, is properly presented through a percipient witness and documentary evidence").

---

cites no authority for the admissibility of expert testimony where the expert **considers** relevant material, but fails to provide an opinion explaining how that material leads to his conclusions.") (emphasis in original).

And while the title of his Exhibit B suggests he is opining that it is industry practice to have a stock offering between a press release disclosing top-line results of a clinical trial and a medical conference where additional trial results are disclosed (as Puma did), Frykman specifically disavowed any such opinion.  Frykman Tr. at 316:21-317:3 ("Q. Are you opining that it is well known that development-stage biotechnology companies will have a stock offering between the top-line or preliminary press release and a subsequent disclosure of the clinical trial results?  A. Yeah, I've offered no opinion on that.").  The only purpose for Frykman's chart, and his testimony about Puma's stock offering, is to confuse or mislead the jury.

1454422_2

1      Defendants will have the opportunity to offer fact witnesses with personal

2  knowledge of the ASCO submission and presentation process. *See LinkCo, Inc. v.*

3  *Fujitsu Ltd.*, 2002 WL 1585551, at *1-*2 (S.D.N.Y. July 16, 2002) ("testimony by

4  fact witnesses familiar with those documents would 'be far more appropriate . . . and

5  renders [the expert's] secondhand knowledge unnecessary for the edification of the

6  jury'"). After all, Puma's own fact witnesses were involved in the ASCO submission

7  process for the ExteNET trial results, and both Dr. Arlene Chan (who presented those

8  results at the June 1, 2015 ASCO meeting) and ASCO's Rule 30(b)(6) witness have

9  provided trial testimony in this case. At best, Frykman's testimony on ASCO

10  processes would simply waste the jury's time. *See* Fed. R. Evid. 403.

11      Finally, tacked on to the end of Frykman's description of ASCO processes, is a

12  section titled "Interpretation of Clinical Trial Results." Report at 18. Again, there

13  does not appear to be any connection to any of Frykman's stated opinions.

14  Nevertheless, Frykman writes:

15          In many instances, movement in stock prices for oncology-focused

16          drug companies can be observed to change more than usual going into,

17          during, and following the ASCO Annual Meeting. Stated another way,

18          the cancer-focused nature of the ASCO Annual Meeting tends to

19          increase the volatility of shares in small cancer drug-focused

20          pharmaceutical and biotechnology companies.

21  *Id.*

22      But Frykman does not have any training or experience that would qualify him

23  as an expert on the effect, if any, conference discussions of clinical trial results may

24  have on stock prices. *See Avila*, 633 F.3d at 839; *Tourre*, 950 F. Supp. 2d at 677

25  (proffered expert "does not meet the basic requirements of Rule 702 or *Daubert*"

26  where they have "no education, expertise, or experience" upon which to make their

27  intended opinions).

28

1454422_2

1   The opinion – if that is what Frykman intends it to be – is unsupported by any

2   evidence or analysis.  There is simply no basis for the claim that "stock prices for

3   oncology-focused drug companies can be observed to change more than usual going

4   into, during, and following the ASCO Annual Meeting."  Report at 18; *see Gen. Elec.*

5   *Co.*, 522 U.S. at 146. Defendants have a proposed expert in economics and stock price

6   movements, Dr. Paul Gompers.  Notably, Gompers does ***not*** offer any opinion about

7   the stock price movement for oncology companies and presentations at ASCO.  *See*

8   ECF  369-21 (Expert Report of Paul A. Gompers).

9   Defendants' attempt to use Frykman as a vehicle to suggest to the jury that

10  Puma's stock price decline following the disclosure of their fraud at the 2015 ASCO

11  meeting was just a normal occurrence following the disclosure of clinical trial results

12  is improper and should not be permitted.

13  **6.   CONCLUSION**

14  For the reasons set forth above, the Court should preclude Frykman from

15  testifying at trial.

16  DATED:  July 24, 2018          Respectfully submitted,

17                                 ROBBINS GELLER RUDMAN & DOWD LLP
                                   TOR GRONBORG
18                                 JASON A. FORGE
                                   TRIG R. SMITH
19                                 SUSANNAH R. CONN
                                   J. MARCO JANOSKI GRAY
20                                 DEBASHISH BAKSHI

21

22                                 s/ TOR GRONBORG
                                   ────────────────────────
23                                 TOR GRONBORG

24                                 655 West Broadway, Suite 1900
                                   San Diego, CA  92101
25                                 Telephone:  619/231-1058
                                   619/231-7423 (fax)

26                                 Counsel for Plaintiff and the Class

27

28

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on July 24, 2018, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ TOR GRONBORG
TOR GRONBORG

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
E-mail:  torg@rgrdlaw.com

1454422_2

# Mailing Information for a Case 8:15-cv-00865-AG-SHK HsingChing Hsu v. Puma Biotechnology, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael A Attanasio**
  mattanasio@cooley.com,smiyajima@cooley.com,efiling-notice@ecf.pacerpro.com,michael-attanasio-2678@ecf.pacerpro.com

- **Debashish Bakshi**
  dbakshi@rgrdlaw.com,3472014420@filings.docketbird.com

- **Amanda F Betsch**
  amanda.betsch@lw.com,amanda-betsch-0711@ecf.pacerpro.com

- **Ryan E Blair**
  rblair@cooley.com,efiling-notice@ecf.pacerpro.com,chourani@cooley.com

- **Rosalyn Chapman, RET**
  mdawson@jamsadr.com

- **Rosalyn Chapman (Ret.)**
  mdawson@jamsadr.com

- **Andrew Clubok**
  andrew.clubok@lw.com

- **Susannah R Conn**
  sconn@rgrdlaw.com,tdevries@rgrdlaw.com,3022905420@filings.docketbird.com

- **Patrick V Dahlstrom**
  pdahlstrom@pomlaw.com

- **Eric J Eastham**
  ejeastham@mintz.com,docketing@mintz.com,KCosta@mintz.com

- **Koji F Fukumura**
  kfukumura@cooley.com,efiling-notice@ecf.pacerpro.com,chourani@cooley.com

- **Gilardi & Co. LLC**
  classact@gilardi.com

- **Meryn C N Grant**
  meryn.grant@lw.com

- **Joseph Marco Janoski Gray**
  mjanoski@rgrdlaw.com,tdevries@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Tor Gronborg**
  torg@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Michele D Johnson**
  michele.johnson@lw.com,karen.patterson@lw.com,michele-johnson-7426@ecf.pacerpro.com,#ocecf@lw.com,khadijah-fields-2405@ecf.pacerpro.com,jana.roach@lw.com

- **Mary Kathryn Kelley**
  mkkelley@cooley.com,msalas@cooley.com,efiling-notice@ecf.pacerpro.com

- **Jeremy A Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com

- **Tricia L McCormick**
  tmccormick@rgrdlaw.com,e_file_sd@rgrdlaw.com,triciam@rgrdlaw.com

- **Kristin Nicole Murphy**
  kristin.murphy@lw.com,kristin-murphy-2919@ecf.pacerpro.com,#ocecf@lw.com,khadijah-fields-
  2405@ecf.pacerpro.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,ahood@pomlaw.com,kmsaletto@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,CLinehan@glancylaw.com,info@glancylaw.com,robert-prongay-0232@ecf.pacerpro.com

- **John Warren Rissier**
  warren.rissier@morganlewis.com,bernice.worley@morganlewis.com

- **Darren J Robbins**
  darrenr@rgrdlaw.com

- **Laurence M Rosen**
  lrosen@rosenlegal.com

- **Charlene Sachi Shimada**
  charlene.shimada@morganlewis.com

- **Colleen C Smith**
  colleen.smith@lw.com,colleen-c-smith-7786@ecf.pacerpro.com

- **Trig Randall Smith**
  trigs@rgrdlaw.com,kmccormack@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **John F Sylvia**
  jfsylvia@mintz.com

- **Kolin Tang**
  ktang@sfmslaw.com,pleadings@sfmslaw.com

- **Craig Edward TenBroeck**
  ctenbroeck@cooley.com,maraujo@cooley.com,efiling-notice@ecf.pacerpro.com

- **Sarah A Tomkowiak**
  sarah.tomkowiak@lw.com

- **Lucy Han Wang**
  lucy.wang@morganlewis.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require
manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order
to create notices or labels for these recipients.

- (No manual recipients)