EXHIBIT 2

*Confidential*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

HSINGCHING HSU, Individually and
on Behalf of All Others Similarly
Situated,

Plaintiff

   *vs*.

PUMA BIOTECHNOLOGY, INC., *et al*.,

Defendants

Case No. 8:15-cv-00865-AG-JCG

**Amended Expert Report of Gregory K. Frykman, M.D.**

_____

Gregory K. Frykman, M.D.

April 11, 2018 (Amended as of June 12, 2018)

*Confidential*

I.    Qualifications ................................................................................................1

      A.    Assignment and Scope ......................................................................1
      B.    Expert Qualifications and Compensation ........................................1
      C.    Information / Materials Considered .................................................3

II.   SUMMARY OF OPINIONS ........................................................................3

III.  CLINICAL TRIALS ...................................................................................4

      A.    Clinical Trials in General .................................................................4
      B.    Types / Classifications of Clinical Trials .......................................5
      C.    Clinical Trial Design .......................................................................6

            1.    Objectives ...............................................................................6
            2.    Endpoints ................................................................................7

      D.    Clinical Trial Analysis & Results ....................................................7

            1.    Analysis ...................................................................................7
            2.    Results .....................................................................................8

IV.   COMMON CLINICAL TRIAL DISCLOSURE PRACTICES IN THE
      BIOTECHNOLOGY INDUSTRY ...............................................................9

      A.    Press Releases ................................................................................10
      B.    Presentation of Clinical Trial Results ...........................................11

            1.    The Annual ASCO Conference ...............................................12
            2.    The Submission Process .........................................................12
            3.    ASCO Presentation Formats ..................................................15

                  a.    Plenary Sessions.........................................................15
                  b.    Oral Abstract Sessions ..............................................16
                  c.    Clinical Science Symposia.........................................16
                  d.    Poster Sessions ..........................................................17
                  e.    Poster Discussion Sessions .......................................17

      C.    Interpretation of Clinical Trial Results .........................................18

V.    PUMA'S JULY 22, 2014 ~~Disclosures~~**DISCLOSURE** PROVIDED
      INFORMATION THAT IS TYPICAL AND IN LINE WITH INDUSTRY
      STANDARDs .................................................................................................19

      A.    Puma's July 22, 2014 Press Release ~~and Accompanying Disclosures~~
            Provided the Most Relevant Information Regarding the Success of the
            ExteNET Trial...............................................................................19

B.     Puma's ~~Disclosures Are~~ <u>**Disclosure Is**</u> Comparable to Other Biotechnology Companies, Including Those Focused on Oncology Drug Development..............23

VI.    Puma's January 2015 Offering Was in Line with Biotechnology Industry Practices .......30

## I.      QUALIFICATIONS

### A.      Assignment and Scope

I have been retained by Latham & Watkins LLP and asked to provide expert testimony regarding Puma Biotechnology, Inc.'s ("Puma" or "the Company") July 22, 2014 ~~announcements~~**announcement** describing the top-line results of the ExteNET trial.

I have been asked to analyze the text and information conveyed in the July 22, 2014 ~~announcements~~**announcement** within the context of the norms for the industry as reflected in other pharmaceutical and biotechnology companies' announcements of important clinical trial results.

This report sets forth my findings in this matter based on the information available and the analyses I have performed through the date of this report.  This report, and my opinions contained herein, are subject to change or modification should additional relevant information become available which bears on my analyses.  I am prepared to amend my analyses and to perform additional calculations should I consider it necessary after receiving further information regarding this action.

I anticipate using at trial selected exhibits in this report, documents reviewed in connection with their preparation, and enhanced graphic versions of selected exhibits included in this report (redrafted to improve their presentation quality).  In addition, I may create or assist in the creation of certain demonstrative schedules to assist me in testifying.  To date, I have yet to create such demonstratives.

### B.      Expert Qualifications and Compensation

I began my career at the U.S. Food and Drug Administration ("FDA") as a medical officer from mid-2000 until October 2002.  During that time, I performed medical and scientific review of dozens of investigational new drug applications (INDs) and two new drug applications (NDAs) in the field of cancer medicine.  I also met with dozens of companies as the primary reviewing clinician as part of a medical and scientific team of toxicologists,

pharmacologists, chemists, biostatisticians.  I received two awards for my work at the FDA:  a Service Award in 2001, and a Team Excellence Award in 2002.

From October 2002 until March 2009, I served as a capital markets policy analyst, focusing on the pharmaceutical and biotechnology space, with a principal focus on cancer drug research, development, regulation, and policy initiatives at the FDA.  In this capacity, I authored reports to institutional investors about drugs and biologics that were intended for FDA approval or cancer drug products that were on the market, but about which there was uncertainty regarding their safety and/or efficacy, or the regulatory implications of newly emerging data.  In 2003, I was named a "Top Up and Coming Biotechnology Analyst" by the capital markets journal, *Institutional Investor*.  During my time as a capital markets policy analyst, I maintained Series 7 licensure under the National Association of Securities Dealers.

For several years in my capacity as a pharma- and biotech- focused policy analyst, I worked with healthcare investment bankers in a variety of contexts related to the financing of pharmaceutical and biotechnology companies.  My role principally involved vetting such companies' research and development plans as well as their correspondence with, and history of interacting with, the FDA, as well as evaluating these firms' stated plans to achieve registration of their products.

From March 2009 until the present, I have served as an independent consultant primarily in the fields of drug development and drug regulation, and I routinely comment and advise my clients on the financial and capital market implications about various development and regulatory opportunities.  In this capacity, I have served as an Executive-in-Residence with the Cleveland Clinic Innovations, the technology transfer office and new-company creating function of The Cleveland Clinic.

I earned a Doctorate of Medicine degree in 1992 from the Loma Linda University School of Medicine and subsequently completed an internship and a residency in Internal Medicine at the University of Southern California Medical Center.  I then completed a fellowship in Medical Oncology and Hematology in 1998 at Johns Hopkins University, and completed a two-year curriculum in cancer drug development and regulation under a

Cancer Treatment Research Award in 2000. I achieved board certification from the National Board of Medical Examiners in 1993, the American Board of Internal Medicine in 1995, and became board certified in the subspecialty of Hematology in 1998 and in the subspecialty of Medical Oncology in 1999. I maintain active medical licensure in the States of California and Maryland.

I am being compensated for my time on this matter at a rate of $565 per hour. My compensation is not contingent upon any conclusions I reach or the outcome of this matter.

My opinions in this matter are based on my education, knowledge, and research, as well as the documents and information available to me at the time of this report. I reserve the right to amend or supplement my opinions should additional information become available, and in response to opinions offered by other experts in this matter.

### C.    Information / Materials Considered

The opinions expressed in this report and the information presented in the accompanying exhibits represent my current opinions. Amendments or supplements to this report and its accompanying exhibits may be required because of developments prior to or at trial, including, but not limited to, the discovery of new evidence, expert discovery, and the testimony of any other witnesses in deposition or at trial. I reserve the right to amend, modify, and provide supplements to this report.

In preparing this report, I have reviewed numerous documents, including documents provided by Latham & Watkins LLP, and publicly available information. The documents that I rely upon include documents cited in this report and its exhibits.

## II.    SUMMARY OF OPINIONS

1.  It is common in the biotechnology industry, and particularly in the field of oncology drugs, to disclose top-line clinical trial results in a press release, while presenting the full trial data at a medical conference at a later date. The annual meeting of the American Society of Clinical Oncology (ASCO) is the most prestigious and widely attended

conference at which companies seek to present their data.  The submission process is rigorous and imposes strict confidentiality requirements.  The oral presentation sessions at ASCO, at which Puma presented its ExteNET trial data, are among the most selective presentation spots at the meeting.

2.  Puma's disclosure of top-line results on July 22, 2014 provided investors (and other stakeholders) with the information expected—namely, whether the ExteNET trial had hit its primary endpoint and, in turn, whether it could form the basis for a New Drug Application ("NDA") seeking FDA approval.  It is my opinion that Puma's disclosures in the July 22, 2014 press release, ~~and accompanying discussion in the analyst call,~~ were in-line with typical industry practices for disclosure of such top-line clinical trial results.

3.  Puma's July 22, 2014 ~~disclosures are~~ <u>disclosure is</u> comparable to other disclosures of top-line results of oncological trials, many of which I have reviewed and incorporated into my report.

4.  Development-stage biotechnology companies (such as Puma was in 2014-2015) do not have revenue because they do not have an approved product being sold on the market.  Because they need to raise money to support their research and development activities, such companies will periodically raise money through a public stock offering.  It is well known that such companies often raise capital following the announcement of positive news, including positive clinical trial results.  I have reviewed and identified many examples of companies conducting offerings following top-line announcements such as Puma's press release ~~and investor conference call~~.

## III.   CLINICAL TRIALS

### A.   Clinical Trials in General

The term 'clinical trial' is used frequently by laypeople as well as clinical and scientific professionals, and is generally intended to refer to a formal process of answering a question of clinical significance by testing an intervention on one group of volunteers, testing no such intervention on another group of volunteers, and then comparing the differences in outcome.

The specific type of clinical trial chosen for answering a particular question depends on the needs of the clinical trial sponsor, the type of disease being studied, the nature of the intervention proposed, the nature of the oversight of the study, and a host of other considerations.  The overall rationale for the existence of, and the execution of, clinical trials is to find ways to more effectively prevent, diagnose, or treat human disease.

**B.      Types / Classifications of Clinical Trials**

There are different types and classifications of clinical trials.  Several examples are provided below:

- Diagnostic trials - Looking for better, more accurate, and less invasive ways to diagnose a disease.

- Treatment trials - Looking for medications and procedures that work better or are tolerated better and have fewer side effects.

- Quality of life trials - Looking for better ways of providing supportive care for people with various diseases, including cancer.

Other important types of clinical trials exist and relate to the way data is collected (prospectively vs. retrospectively), the way the study is staged (single-stage vs. two-stage), whether or not blinding or masking of various clinical trial participants is required (single-blind vs. double-blind vs. triple-blind), what the anticipated outcome is likely to be (superiority vs. non-inferiority), the timing of patient assessment (longitudinal vs. cross-sectional), and the manner in which each study group receives its medication (parallel group vs. cross-over).

Clinical trials can also be classified by phases:

- Phase 1 trials – These trials are conducted on a small number of people and are designed to see if a treatment is safe.

- Phase 2 trials – After a treatment is considered to be relatively safe, it is evaluated in a Phase 2 trial to see if it is active in treating the disease studied.

- Phase 3 trials – If a treatment is found to be active *and* relatively safe in Phase 2 evaluation, it is then evaluated in a Phase 3 trial to see if it is more effective than standard treatments available, or has fewer side effects than standard treatments.  If a phase 3 clinical trial is successful—that is, the treatment is found to be more effective or safer that what is already available—the treatment may then be evaluated by the FDA for potential approval.

- Phase 4 trials – Once a treatment has been approved by the FDA, additional study of the drug, in various disease settings, referred to as "post-marketing" clinical trials, may be carried out.

**C.      Clinical Trial Design**

The "design" of a clinical trial refers to the incorporation and arrangement of the many design "features" and design "elements" that comprise a clinical trial.  Each element is specified and described in a document known as a *clinical trial protocol*.

The clinical trial protocol is a written document that provides background information about the proposed research study.  The protocol provides a common set of instructions for each clinical trial participant and/or stakeholder to follow and it specifies the data to be collected, as well as how such data should be acquired and formatted.  The clinical trial protocol describes in significant detail how the clinical trial will be carried out, the role each participant and/or stakeholder is expected to play, what data is important for collection, and how the accumulated clinical trial data will be analyzed.

Described below are a number of design "elements" (also referred to by some as design "features") found in most clinical trial protocols.

**1.      Objectives**

The objectives of the proposed clinical study are among the most important of the design elements found in a protocol.  They are the written statements of the primary (and, frequently, secondary) purposes of the clinical trial, and it is these study objectives that define the scope of the clinical trial and the breadth and depth of the clinical trial-related activities to be carried out by each study participant.

2.      **Endpoints**

Endpoints, also referred to as "efficacy variables" and "safety variables," determine the specific data related to the study outcomes, and they are generally rigorously collected.  In cancer clinical trials involving medications, endpoints can include objective response rates ( ORR), time to disease progression (TTP), or progression-free survival (PFS), each of which is a measures of the length of time from treatment until there is growth or progression of the tumor, and/or overall survival (OS), which is a measure of the length of time an enrolled patient remains alive after treatment assignment and initial study drug administration.

Another endpoint that is used in cancer clinical trials when a drug is being investigated is known as disease-free survival (DFS), which is similar in concept to TTP and PFS.  DFS is a measure of the time that patients are "free of" recurrent cancer.  Drugs that can increase DFS are considered very desirable.  DFS represents an attractive endpoint to use in clinical trials of cancer drugs where the median DFS of patients receiving the drug is compared to the median DFS of patients not receiving the drug.  This comparison, frequently put into the form of a ratio (risk of recurrence on any day for those surviving in the treated group divided by the corresponding risk of recurrence for the surviving patients in the control group), is known as the "*hazard ratio*."  The hazard ratio and its importance is discussed in further detail below.

In general, the definition of each clinical trial endpoint should be rigorous and unambiguous.  Moreover, it is preferable that the endpoint can be objectively assessed. Additionally, it is helpful for the endpoint to be represented by a number that measures the endpoint on a continuous—or over time—basis, rather that at one specific point in time.

**D.      Clinical Trial Analysis & Results**

1.      **Analysis**

It is important in the analysis of clinical trial data to use data from every patient, even though one or more patients may not have fully completed each required treatment and evaluation in the trial.  This is referred to as the "intent-to-treat" (ITT) principle.  That

said, it is often the case in the analysis of clinical trial data that other subgroups of patients are analyzed as well.

When analyzing the results of a clinical trial, it is critical to analyze the datasets specified in the protocol and to do so in the manner specified in the protocol. This applies to efficacy data as well as to safety data. For studies that are intended to support registration of a product through the FDA (or another international drug regulatory agency), it is commonplace for the FDA to review the sponsor's planned use of test statistics, as described in the statistical analytic plan (SAP).

### 2.   Results

How clinical trial outcomes or endpoints are measured varies depending on what disease or condition is being treated. In cancer trials, the most important and most objective endpoint is often survival time, typically measured as the time from randomization until death or the last date of contact. Methods used to analyze time to death can be used to analyze other time to event endpoints, such as the time to disease recurrence or time to disease progression (i.e., disease-free survival (DFS) and time to progression (TTP). These endpoints are often also assessed by examining effect size and its associated statistical significance.

An important result arising from a clinical trial is the *effect size*. Effect size may be summarized in a useful numerical value referred to as the *hazard ratio* for event-based clinical data. The hazard ratio (HR) is the risk of recurrence on any day for those surviving in the investigational therapy group divided by the risk of recurrence on any day for those surviving in the control group.

Thus, a hazard ratio of 1.0 indicates that there is no difference in survival rates of the two groups in a controlled trial. A hazard ratio of 1.2 indicates that that the therapy for the control group is superior to the investigational therapy, and such a result would indicate an extremely poor outcome for the investigational drug. Alternatively, a hazard ratio of 0.8 indicates that DFS in the experimental group is greater than that of the control group. Such a finding would be considered encouraging, and possibly positive depending on the

value of the associated statistical significance level (that is, the *p-value*, discussed below). A hazard ratio of 0.67 reveals that the investigational therapy has an even greater benefit than that for a hazard ratio of 0.8. Stated differently, the lower the hazard ratio, the greater the size of the effect.

The statistical significance level, numerically quantified in the form of a *p-value*, is a commonly cited and also quite an important measure of a clinical trial's success. A p-value of 0.05 has been chosen as the value that represents *nominal* significance. P-values higher than 0.05 are generally considered to be non-significant, whereas p-values lower than 0.05 are considered to be statistically significant, and p-values below 0.01 are considered to be *highly* statistically significant.

Thus, both the magnitude of effect (HR) and the statistical significance (p-value) are important to understanding the results of a clinical trial.

## IV.   COMMON CLINICAL TRIAL DISCLOSURE PRACTICES IN THE BIOTECHNOLOGY INDUSTRY

When the results of a clinical trial become available, the sponsor of the clinical trial customarily will disclose those results. While a variety of means exist for disclosing clinical trial results, sponsors most commonly disclose clinical trial results through press releases, by presentation at scientific conferences, and/or through publication in medical journals.

Many clinical trials are sponsored by pharmaceutical and biotechnology companies, and many of these companies are supported by investments from the public. Such "public investors" have invested money in these companies to both support the work of discovering and developing new and novel medications, as well as to realize a financial return. The results of one or more clinical trials can impact, sometimes significantly, the financial prospects of one or more of these companies.

Accordingly, it is common for public company sponsors to promptly disclose basic information about the success (or failure) of a clinical trial to investors once the initial or "top-line" results are available. This top-line disclosure is typically made through a press

release.  If the clinical trial has been successful, the sponsor is highly motivated to present the full clinical trial results in one of many prestigious scientific or medical conferences. These disclosure practices are described in more detail below.

## A.        Press Releases

Announcements of top-line results from clinical trials are commonplace in the pharmaceutical industry.  Results are most commonly disclosed through press releases, teleconferences, and filings required by the U.S. Securities and Exchange Commission ("SEC"), such as the Form 8-K.

While such top-line press releases vary slightly in detail depending on the status of the trial and the timing of the full presentation of results, the most important piece of the top-line disclosure is whether the trial hit its primary endpoint.  This is the critical measure of a Phase 3 clinical trial's success and the most relevant piece of information to assessing whether a drug may be approved by the FDA and, relatedly, commercialized for sale in the U.S. market.  If a clinical trial does not meet its primary endpoint, FDA approval will be nearly impossible.

In addition to providing important information to investors, a company disclosing top-line clinical results must also balance the needs of other (sometimes competing) stakeholders. First, are the professional societies, discussed in more detail below.  Top-line announcements must comply with confidentiality restrictions imposed by medical and scientific conferences at which the data might later be presented.  The professional societies that run these conferences are unlikely to accept an abstract for presentation at a major conference where the relevant clinical trial results have already been disclosed in large part.  Such presentations are highly desirable and sponsors are highly motivated to preserve the possibility of presenting in a plenary or oral session by not disclosing too much information regarding the clinical trial results ahead of the conference.  It is also important to note that there may be some time (weeks to months, usually) in between the initial disclosure of top-line results in a company's press release, and the study's fuller presentation at a scientific meeting.

Second, regulatory authorities such as the FDA can and likely will carefully vet what has
been disclosed about a drug by the company, and there may be consequences for a drug
sponsor if the company's public statements about the results differ from the results
obtained by the FDA in its own analysis of the same datasets.  If the results reported by a
company weeks or months prior to the FDA's independent analysis indicate that the
company overstated or misstated the clinical trial results, this can jeopardize the FDA's
review of the drug.  The FDA also has the ability to refer matters to the SEC for review.

As a result, a public company drug sponsor reporting top-line results of an important
clinical trial must carefully balance its need to report and summarize the most relevant
information about the success of the trial, with the company's (and its stockholders')
interests in preserving the ability to present at a major medical or scientific conference and
maintaining goodwill with the FDA in the approval process.  This careful balance requires
judgment on the part of the company sponsoring the trial.

Because the individual circumstances of each company, each drug candidate, and each
clinical trial differ, there is variation in the specific types of information reflected in press
releases by pharmaceutical and biotechnology companies about the results of any
particular clinical trial.  Such variation does not in any way mean, imply, suggest, or
indicate that a company is "hiding" something or trying to keep something suppressed
when a press release about recent clinical trial results contains little outcomes information.

**B.      Presentation of Clinical Trial Results**

Public company sponsors of successful clinical trials often present the full details about a
positive clinical trial in a medical or scientific conference related to the clinical specialty
or subspecialty in which the clinical trial was conducted.  Such conferences tend to be an
annual event, usually around the same time of year, and, they frequently rotate among a
small number of cities such as Atlanta, Orlando, and Chicago.

Within the professional discipline of medical oncology, four organizations stand out in
terms of size, membership, breadth of subject matter, and the professional concerns that
they address:  (1) the American Society of Clinical Oncology (ASCO), (2) the American
Society of Hematology (ASH), (3) the American Association for Cancer Research

11

(AACR), all of which are based in the United States, and (4) the European Society for Medical Oncology (ESMO), which is based in Europe.  Numerous other related societies exist, but they are: (1) smaller in size, (2) more circumscribed in clinical and scientific areas of interest, (3) smaller in terms of membership, and (4) potentially geographically restricted.  As a result, smaller societies tend to offer reduced opportunities for professional advancement such as education, practical training, and certification.

###### 1.     The Annual ASCO Conference

The American Society of Clinical Oncology (ASCO) is the largest professional association of cancer professionals by membership.  ASCO's own public website states it is the world's leading organization of its kind, representing more than 40,000 oncology professionals who care for people living with cancer.  ASCO's self-described mission is: "Conquering cancer though research, education, and promotion of the highest quality patient care."  ASCO's self-described vision is: "a world where cancer is prevented or cured, and every survivor is healthy."

ASCO offers, though direct sponsorship, or co-sponsorship, a number of scientific events for oncology professionals, patient advocates, industry representatives, and major media outlets worldwide.  In some cases, one or more of ASCO's affiliates will sponsor meetings, and these are identified on the ASCO website.

While ASCO sponsors a large number of meetings and congresses, the most important meeting sponsored by ASCO each year is its Annual Meeting.  At this meeting, the results of a dizzying array of clinical, translational, non-clinical, and basic cancer-related research may be found.  It is the most widely attended of all of ASCO's meetings, and it is also the meeting with the greatest number of research results presented of any cancer-related meeting.  This year, the meeting will be held in Chicago, Illinois, during the time frame June 1-5, 2018.  The Annual Meeting brings together oncology professionals from around the world to discuss state-of-the-art treatment modalities, new therapies, and ongoing controversies in the field.

###### 2.     The Submission Process

A formal process exists through which scientists, clinicians, investigators, and others may voluntarily submit a summary of their results to ASCO in the form of an "abstract." Following the submission of an abstract, the information in the abstract is evaluated, and based solely on the submitted information; the abstract may be selected (or rejected) for presentation. The abstracts are compiled into a volume of the Annual Meeting's "proceedings" and the "abstract book," as it is frequently referred to, containing all of the submitted and accepted abstracts, is made publicly available. The ASCO membership receives the "abstract book" first, and then it becomes more widely available at the beginning of the ASCO Annual Meeting. The ASCO "abstract book" is considered a publicly available document.

ASCO provides many instructions to those considering submitting an abstract to its Annual Meeting. These instructions are referred to as the "Abstract Submission Guidelines" and include information about author eligibility, abstract eligibility, submission requirements, how to determine if the research qualifies as "original" research, the necessity of identifying that the abstract information is related to a clinical trial, the necessity of identification of the funding source, abstract format, specific requirements for abstract titles, author and coauthor identification, restrictions for presenting authors, selection of topic category and topic subcategory, and how to pay the submission fee.

In addition, there is information about special responsibilities incumbent on the author of each abstract, including, among other items, mandatory agreement to the confidentiality policy, verification of institutional review board (IRB) approval for each clinical trial to be presented, verification that all coauthors are aware of the contents of the abstract and support its data, mandatory agreement, on behalf of all coauthors, that the copyright will be transferred to ASCO, mandatory adherence to ASCO's "Policy For Relationships With Companies," acquisition of disclosure information from all coauthors using the appropriate disclosure forms, compliance with ASCO's conflict of interest management decisions (including the potential for slide review prior to presentation), and assurance that all coauthors meet the definition of authorship according to the International Committee of Medical Journal Editors.

While only one of many requirements, compliance with the ASCO confidentiality policy must be taken seriously.  This policy places restrictions on the use of the information in the abstracts.  Specifically, the ASCO confidentiality policy precludes public disclosure, publication, or presentation of any of the information in the abstract.  The penalty for violation of this policy makes the particular abstract subject to rejection or removal from the ASCO meeting.  To maximize the chances that an abstract will be selected for a highly coveted plenary or oral presentation spot (more on this below), a clinical trial sponsor is well advised to ensure that any information that is expected to be highlighted in a future abstract intended for submission to ASCO remains confidential.   Indeed, ASCO vigorously enforces its confidentiality policy.  As but one example of this, in 2016 ASCO cancelled a planned presentation by Immunomedics of its breast cancer drug (IMMU-132) because the company had released previously confidential information intended for the presentation.  Among other data, Immunomedics disclosed information regarding patients' response rate and progression-free survival, resulting in disqualification from presenting this same data at ASCO.[1]

The process by which abstracts are evaluated for inclusion in the ASCO Annual Meeting for 2018 is described by ASCO on its website:

- **ASCO Focuses on the Quality of the Submitted Abstract** - Abstracts of superior quality will be selected by the ASCO Scientific Program Committee for presentation at the ASCO Annual Meeting and for publication in the *ASCO Annual Meeting Proceedings*, a supplement to the *Journal of Clinical Oncology*.

- **ASCO Notifies each First Author about its Decision -** In March, each first author will receive a letter of notification via email from the ASCO Scientific Program Committee regarding its decision on the abstract.  It is the first author's responsibility to share this information with all coauthors and study sponsors.

---

[1] Adam Feuerstein, *Immunomedics Kicked Out of Prestigious ASCO Cancer Conference*, The Street (June 3, 2016), https://www.thestreet.com/story/13594991/1/immunomedics-kicked-out-of-prestigious-asco-cancer-conference.html.

Abstracts are evaluated by the ASCO Scientific Program Committee and evaluated on the following criteria:

- **Strength of Science:**  Does the trial address an important and novel question?

- **Trial Design:**  Are the eligibility criteria, study endpoints, and planned analysis well defined in this abstract?

- **Collaboration:**  Is there potential for investigator collaboration?

- **Relevance:**  Will the results be relevant and of interest to ASCO Annual Meeting community?

- **Requirements:**

  o  The trial must be registered, open, and enrolling patients; and

  o  The abstract does not contain preliminary data or results.

Abstract submissions are considered for all types of presentation and, as such, authors are not permitted to state a preference for presentation type at the time of submission. Abstracts are judged solely on the data submitted.  Each abstract is rigorously scrutinized, including by the "Biostatistics Core," a group of cancer clinical trial-focused biostatisticians who conduct a formal statistical review of all abstracts representing Phase 3 trials.  ASCO emphasizes that failure to follow the ASCO biostatistical guidelines will have a negative impact on the grading of the abstract, further diminishing the likelihood of presentation at its Annual Meeting.

### 3.   ASCO Presentation Formats

The following types of presentations may be found at the ASCO Annual Meeting, and it is the Scientific Program Committee that makes the determination of which type of presentation each abstract will be offered.

### a.   Plenary Sessions

The ASCO plenary sessions comprise a number of research presentations which are deemed to represent the "best" science out of all the abstracts that were submitted for

presentation at that year's ASCO Annual Meeting.  Each ASCO Annual Meeting has several plenary sessions and during these plenary sessions, there are no other important scientific presentations, symposia, concurrent sessions, poster discussions, or poster presentations running at the same time.  The idea is that the plenary sessions, when the most important research outcomes will be presented, are of sufficient import that all ASCO Annual Meeting attendees should be available to attend them.  The plenary sessions are among the most heavily attended sessions at the ASCO Annual Meeting.

### b.      Oral Abstract Sessions

In addition to the plenary session, there are a small number of oral abstract sessions. These sessions routinely attract hundreds of attendees and offer a sponsoring company significant exposure to the ASCO annual meeting attendees.  This presentation format comprises several (~6 to 8) 12-minute presentations of abstracts representing important clinical and translational research findings by topic category.  Presenters are allotted 12 minutes to deliver their remarks, and 3 minutes are reserved for questions.  There is a slide presentation that accompanies the oral delivery of the scientific / clinical work, and the session is overseen by one or more study "moderators" who (1) ensure that presenters are kept within their time limits, (2) determine the order of the questions from the audience, and (3) pose questions of their own to each speaker.  Each presenter speaks from a podium, frequently using a laser pointer when referring to, or illuminating, specific data and points in the presentation slides.  The audience is (mostly) seated in a single room, and those with questions are expected to stand at a microphone, state their name and academic/corporate affiliation, and then pose their question to the presenter.  There is both an audio and a video recording of the entire session at the conference that remains available in a permanent electronic archive.

### c.      Clinical Science Symposia

Clinical Science Symposia provide foundational education on a specific topic combined with the presentation and discussion of relevant abstracts.  Novel science is put into appropriate context, including assessment of applicability to clinical practice and the need for further research.  Presenting authors should use PowerPoint slides to accompany their

16

12-minute oral presentation.  All speakers will participate in a question-and-answer panel
in the session. The duration of this session type is 90 minutes (1½ hours).

### d.      Poster Sessions

A poster is a sheet of laminated paper that contains the most important results of a
particular clinical study, or scientific investigation. Posters are displayed at a scientific
conference during a several-hour session along with dozens or hundreds of other posters.
There are standard sizes for posters, typically 4 feet high by 8 feet wide (precisely 120 cm
[47 inches] high by 240 cm [95 inches] wide), and they are attached by thumbtacks to a
vertical poster display board, whose bottom edge is about 4 feet off the ground, and which
is supported by sturdy metal legs.  The poster is supposed to be placed on its display board
at the beginning of the assigned session (date and time) and it is supposed to remain
displayed the entire duration of the session, about 3 to 4 hours.

One or more of the study authors usually stands nearby or adjacent to their poster and are
available to answer questions from meeting attendees reading their poster.  There is no
formal presentation made by any poster author, there is no lectern or podium, and there are
no presentation slides.  There is no formal audience, and there is no predetermined time
limit during which the poster contents must be presented.  Interactions between poster
authors and meeting attendees is far less formal than with an oral presentation.  There is
no video or audio recording of the poster presentation; however, the poster may be
archived by the professional society organizing the conference for future reference by the
public.

### e.      Poster Discussion Sessions

Each track-based Poster Discussion Session is 75 minutes in length and will highlight 12
abstracts from the Poster Session held earlier in the day.  Four invited discussants will each
provide a 12-minute discussion placing the selected abstracts in context, with a focus on
how the findings apply to clinical practice and future research.  These four 12-minute
discussions will be followed by a 6-minute question-and-answer panel involving the session

chair, discussant, and poster presenters.  At the conclusion of the formal session, the audience is invited to network with the panelists to discuss details about individual work.

*       *       *

The meeting sponsor typically makes publicly available, weeks ahead of the meeting, all of the abstracts that were accepted, each of which represents a summary of the key points for each poster or oral presentation scheduled for the upcoming meeting.  These abstracts are principally intended for the meeting attendees, many of whom are clinical practitioners, to determine which posters and oral presentations they wish to attend at the upcoming meeting.  However, it is likely that other audiences also receive copies of the abstracts as well.  Two groups with an interest in obtaining these abstracts are professional investors and equity analysts.

## C.      Interpretation of Clinical Trial Results

Following the presentation of complete clinical trial data at ASCO or another scientific conference, it is not uncommon to find disagreement among practitioners and key opinion leaders (KOLs) regarding the significance of the clinical trial's findings, their implications for patient care, where they might fit into the practice of medicine informally, and where they may find more formal placement into current practice management guidelines.

In many instances, movement in stock prices for oncology-focused drug companies can be observed to change more than usual going into, during, and following the ASCO Annual Meeting.  Stated another way, the cancer-focused nature of the ASCO Annual Meeting tends to increase the volatility of shares in small cancer drug-focused pharmaceutical and biotechnology companies.

While the results of one or more clinical trials for a new drug can demonstrate efficacy and thus possible clinical utility, the significance of this utility is often a matter of debate among clinical thought leaders, with some seeing no advantage over existing standard of care, and others seeing a significant advance.  Hence, a uniform view (or, even a strong consensus) about how the clinical trial results impact the standard practice of medicine,

18

and how such results should be integrated into standard practice, may be difficult to achieve.

**V.**   **PUMA'S JULY 22, 2014 ~~DISCLOSURES~~DISCLOSURE PROVIDED INFORMATION THAT IS TYPICAL AND IN LINE WITH INDUSTRY STANDARDS**

Puma's disclosure of top-line results on July 22, 2014 provided investors (and other stakeholders) with the information expected—namely, whether the ExteNET trial had hit its primary endpoint and, in turn, whether it could form the basis for a New Drug Application ("NDA") seeking FDA approval.  It is my opinion, based on my experience in the industry and my review of comparable public disclosures, that Puma's disclosures in the July 22, 2014 press release ("Puma Press Release") (**Attachment 1**~~, and accompanying discussion in the analyst call,~~ were in-line with typical industry practices for disclosure of such top-line clinical trial results.

**A.**   **Puma's July 22, 2014 Press Release ~~and Accompanying Disclosures~~ Provided the Most Relevant Information Regarding the Success of the ExteNET Trial**

Puma's Press Release about the results of the ExteNET clinical trial accurately and precisely described the most important primary outcome measures of the ExteNET trial— and the most important event in Puma's corporate history up to that point in time. Sophisticated investors would have understood that additional, detailed information would come later, in connection with presentation of the full clinical trial results at ASCO.

From the title down to the concluding paragraph, the Puma Press Release conformed with industry norms for similar disclosures.

> **Title.**  Puma accurately identified the narrow adjuvant (i.e., post-surgery) breast cancer setting in which the ExteNET trial demonstrated a statistically and clinically significant outcome.

The term "Phase 3" is also critical.  Biotechnology investors and analysts are knowledgeable and sufficiently statistically grounded to understand that the results being described in this press release emanate from a controlled trial, with concurrent enrollment occurring on each study arm.  This type of study design was expressly chosen to accurately evaluate the safety and efficacy of neratinib against the control therapy (in this case, placebo) with as much statistical validity as possible.

Because ExteNET was a Phase 3 trial, its complete results would have the potential to provide the FDA (or another regulatory authority) the information it would need to render an approval (or non-approval) decision.

**Headline.**  The headline identifies the specific improvement in outcome conferred by neratinib in the ExteNET trial, where Puma states that it is "Disease Free Survival."  It is important to note that Puma did not reveal the secondary endpoints of the trial.  Rather, Puma responsibly focused only on achievement of the primary endpoint, *and the primary outcome measures for the primary endpoint—namely, the hazard ratio and p-values*.  The particular p-value of 0.05 (discussed above), is sometimes referred to as representing "nominal significance" and tends to be viewed by statisticians and drug regulatory authorities (at least) as persuasive evidence of the positive outcome of a clinical trial, because it likely represents an outcome that did not occur on the basis of random events.

**Subheadline** (Company's Plans).  The next line of text, the subheadline, carefully notes two important plans of the company that are provided for the benefit of financial analysts and members of the investing community:

- Puma intends to obtain approval for marketing and distribution of neratinib from one or more drug regulatory authorities.  This signals that Puma believes the ExteNET clinical trial results were favorable, and sufficient to potentially support approval by the FDA.  The FDA is generally viewed as an impartial, data-driven, and rigorous evaluator of

companies' clinical trial data, particularly in the context of an application for approval of a new drug.

- Puma also notes that it will take a substantial amount of time to submit the approval package to the FDA to get neratinib on the market.

**Lead Paragraph.** The term "top line" is reiterated in the lead paragraph and doing so reaffirms, without equivocation, that only a very small fraction of the results from the ExteNET trial is described in the Puma Press Release.

Puma also accurately describes the population studied in the ExteNET trial (and, by inference, the breast cancer population documented to benefit from neratinib therapy in the 'extended adjuvant' setting of breast cancer following surgical resection and Herceptin-based adjuvant therapy), namely 'early stage HER2-positive' disease. This clarification is meant to avoid overstating the potential market for the drug and omits groups of breast cancer patients such as patients in long-term remission, patients who have metastatic disease, and patients with non-HER2 (+) disease, including those patients with triple-negative breast cancer.

**Second Paragraph.** Puma provides further details about the ExteNET trial that should be readily understood by members of the financial community and other stakeholders: (1) the size of the study (2,821 patients), and (2) the geographical breadth of the trial (41 countries), each of which offers further support that the outcomes described are valid, independent of geographic location, and globally applicable. Additional details about the ExteNET trial that would interest stakeholders are also included:

- Patients treated with neratinib were treated for one year (as opposed to a few months) which is a treatment duration that is more commonly encountered in breast cancer clinical trials, yet much less than the ~five-year duration of therapy for endocrine therapy in the (conventional) adjuvant setting; and

21

- Patients were followed for an additional two years after the one year of being on neratinib, indicating that the DFS-improving effect of neratinib on women receiving therapy after the standard Herceptin-containing regimen(s) is *durable*.

- It was not only a delay in recurrence of breast cancer that the ExteNET study considered as a clinically meaningful endpoint, but also the emergence of ductal carcinoma in situ (abbreviated 'DCIS' and which is a type of pre-cancerous breast lesion) and/or death This is important because breast cancer patients and their oncologists, as well as members of the financial community, would be expected to find all three of these outcomes of interest.

**Third Paragraph.**  The phrase "33% improvement in disease free survival versus placebo" refers to the effect size as reflected in the hazard ratio, 0.67.  This represents a significant clinical benefit, as the FDA's ultimate approval confirms.  As discussed above, the hazard ratio is a pre-specified measurement of the size of neratinib's effect on disease-free survival.  Experienced biotechnology-focused investors often view the hazard ratio as a sort of shorthand approach to understanding clinical trial outcomes.  This paragraph also expands on the sub-headline regarding FDA approval.  It informed competitors and investors that Puma would seek regulatory approval for neratinib in the novel setting of 'extended adjuvant' therapy, and that the NDA submission timing was targeted for the first six months of 2015.  The planned submission of an NDA is a significant event in the life cycle of a development-stage, pre-commercial biotechnology company.

**Concluding Paragraph.**  Mr. Auerbach's statement about neratinib being a HER2-targeted drug that has demonstrated benefit in the 'extended adjuvant' setting is fully and precisely correct, and his assertion is supported by a positive clinical trial enrolling over 2,800 early breast cancer patients.

Puma also made clear in its press release that these were not the full ExteNET trial results, which would be presented in the future at an upcoming scientific or medical conference.

### B.    Puma's ~~Disclosures Are~~Disclosure Is Comparable to Other Biotechnology Companies, Including Those Focused on Oncology Drug Development

The Puma Press Release comfortably fits within what is customary and expected of biotechnology companies—and more specifically, oncology drug companies—regarding significant clinical trial outcomes.  Included in this Expert Report at **Exhibit A** are descriptions of press releases that are substantially similar in scope and content to the Puma Press Release.  I discuss a few notable examples here, but each is worthy of comparison to Puma's press release.

**Exelixis.**  In July 2015, Exelixis, Inc. announced positive top-line results of its pivotal Phase 3 METEOR trial.  Exelixis's drug—cabozantinib—is intended to treat a type of kidney cancer known as renal cell carcinoma (RCC).  Like Puma's July 22, 2014 disclosure of positive top-line results for the ExteNET trial, Exelixis's July 2015 press release disclosed that the "trial met its primary endpoint of demonstrating a statistically significant increase in progression-free survival," and that cabozantinib "reduced the risk of disease progression or death by 42%."[2]  Exelixis also disclosed the hazard ratio (0.58) and the p-value (p<0.0001) regarding progression-free survival.[3]  According to the press release, "detailed results of the METEOR trial [were to] be submitted for presentation at an upcoming medical conference."[4]  Additionally, the company disclosed some information about its intent to seek regulatory approval of its drug in the RCC setting and the approximate timing of its anticipated regulatory submissions.  Moreover, the company provided an opportunity for the public to hear further discussion about the METEOR

---

[2] Press Release, Exelixis, *Exelixis Announces Positive Top-Line Results from METEOR, the Phase 3 Pivotal Trial of Cabozantinib versus Everolimus in Patients with Metastatic Renal Cell Carcinoma* (July 20, 2015), http://ir.exelixis.com/phoenix.zhtml?c=120923&p=irol-newsArticle&ID=2068953.

[3] *Id.*

[4] *Id.*

study outcome from the company's management on a conference call scheduled for that same day.[5]

The results of the METEOR trial were presented on September 26, 2015 at the European Cancer Conference (ECC) 2015 in Vienna, Austria as a late-breaking abstract.[6]  The ECC 2015 presentation revealed *many more details* about the METEOR study, including the Kaplan-Meier curves,[7] information about the enrolled population, the balance of patients on each arm, and the number of progression events, the point estimates, and the median PFS for each study arm were provided.[8]  Importantly, the hazard ratio, the 95% confidence interval around the hazard ratio, and the significance level of that hazard ratio, were also shown.[9]  Another key efficacy outcome was interim results on overall survival (OS).[10]  The safety of cabozantanib was presented at the ECC 2015 conference, as well, and the type, grade, and incidence of the drug-related adverse events, were also presented.[11]

**Seattle Genetics.**  In September 2014, Seattle Genetics, Inc. announced positive results from its Phase 3 AETHERA trial, testing the effectiveness of its drug ADCETRIS for the treatment of Hodgkin lymphoma.  The press release states that the trial "met its primary endpoint with ADCETRIS treatment, resulting in a statistically significant improvement in

---

[5] S&P Capital IQ, *Exelixis Inc. Special Call* (July 20, 2015).

[6] T. Choueiri et al., *4LBA Cabozantinib Versus Everolimus in Patients with Advanced Renal Cell Carcinoma: Results of the Randomized Phase 3 METEOR Trial*, 51 European J. Cancer S708 (2015).

[7] *See* European Soc'y for Med. Oncology, *ESMO @ ECC 2015: Cabozantinib Out-Performs Everolimus in Advanced Renal Cell Carcinoma* (Sept. 26, 2015), http://www.esmo. org/Conferences/Past-Conferences/European-Cancer-Congress-2015/News/Cabozantinib-Out-Performs-Everolimus-in-Advanced-Renal-Cell-Carcinoma (containing curves from presenter).

[8] T. Choueiri et al., *4LBA Cabozantinib Versus Everolimus in Patients with Advanced Renal Cell Carcinoma: Results of the Randomized Phase 3 METEOR Trial*, 51 European J. Cancer S708 (2015).

[9] *Id.*

[10] *Id.*

[11] European Soc'y for Med. Oncology, *ESMO @ ECC 2015: Cabozantinib Out-Performs Everolimus in Advanced Renal Cell Carcinoma* (Sept. 26 2015), http://www.esmo. org/Conferences/Past-Conferences/European-Cancer-Congress-2015/News/Cabozantinib-Out-Performs-Everolimus-in-Advanced-Renal-Cell-Carcinoma.

progression-free survival (PFS) *versus* placebo as assessed by an independent central review committee (hazard ratio=0.57; p-value=0.001), which equates to a 75 percent improvement in PFS."[12]  The announcement stated that the safety profile of ADCETRIS in the trial was "generally consistent" with the existing prescribing information.[13]  It also noted that the company intended to subsequently present the data at the American Society of Hematology (ASH) annual meeting in the coming December.[14]

Notably, just like Puma, Seattle Genetics first disclosed substantial *additional* information about the AETHERA trial at the ASH 2014 meeting, including the Kaplan-Meier curves for PFS (which show the point estimates for both the medians as well as the two-year progression-free survival rates), the hazard ratios for both centrally- and locally-determined PFS, the outcome by subgroups such as age, gender, and performance status (which themselves included point estimates as well as confidence intervals), as well as the type, grade, and frequency of an array of adverse events.[15]  In parallel to the presentation of Puma about neratinib, the type, grade, and frequency of adverse events are compared to the placebo arm, providing some of the most reliable safety information about the drug that is available.[16]

---

[12] Press Release, Seattle Genetics, Inc., *Seattle Genetics and Takeda Announce Positive Data from Phase 3 AETHERA Clinical Trial of ADCETRIS® (Brentuximab Vedotin) for Consolidation in Post-Transplant Hodgkin Lymphoma* (Sept. 29, 2014), http://investor.seattlegenetics.com/phoenix.zhtml?c=124860&p=irol-newsArticle&ID=1971668.

[13] *Id.*

[14] *Id.*

[15] Craig H. Moskowitz et al., *Presentation at the 56th ASH Annual Meeting: The AETHERA Trial: Results of a Randomized, Double-Blind, Placebo-Controlled Phase 3 Study of Brentuximab Vedotin in the Treatment of Patients at Risk of Hodgkin Lymphoma Progression Following Autologous Stem Cell Transplant* (Dec. 2014), http://www.researchtopractice.com/sites/default/files/5mjc/5MJCASH2015/1/1/pdf/5MJCASH2015_1-Moskowitz673.pdf#page=8.

[16] Press Release, Seattle Genetics, Inc., *Seattle Genetics and Takeda Report Phase 3 AETHERA Clinical Trial Data from ADCETRIS® (Brentuximab Vedotin) in Post-Transplant Hodgkin Lymphoma Patients at Risk of Relapse at ASH Annual Meeting*, (Dec. 6, 2014), http://investor.seattlegenetics.com/phoenix.zhtml?c=124860&p=irol-newsArticle&ID=1995471.

**Eli Lilly & Company.**  In September 2014, Eli Lilly reported that the Phase 3 results of
the RAISE trial of ramucirumab for patients with metastatic colorectal cancer showed a
positive result,  specifically noting that ramucirumab "showed a statistically significant
improvement in overall survival [the primary endpoint of the study] in patients treated
with ramucirumab…compared to placebo."[17] The press release also stated generally that
there was a statistically significant improvement in progression-free survival, but for both
overall survival and progression-free survival  was no quantitative information provided
about the RAISE study efficacy outcome.  The announcement also provided modest
information about the safety risk of ramucirumab, and it informed readers that the
company would present the data at an upcoming scientific conference in 2015.  In
addition, the company would seek regulatory approval within a 6-month window in the
first half of 2015.[18]

In a similar manner to Puma, Lilly's abstract demonstrates it presented copious outcomes
of data from the RAISE study at a scientific conference, the ASCO 2015 Gastrointestinal
Cancers Symposium, in January of that year, and the abstract alone confirmed and
quantified the claimed RAISE results from its September 2014 press release.  Specifically,
the public learned that the study was slightly overenrolled, and that the baseline patient
characteristics were similar across the study arms.[19]  Key efficacy results, in the form of
point estimates for the median overall survival and progression-free survival, were
provided, along with hazard ratios for each, along with the 95% confidence intervals
around the hazard ratios, and the significance levels of these outcomes using the chosen
tests statistics, were all made available as well.  The public learned that the results were

---

[17] Press Release, Eli Lilly & Co., *Lilly Announces CYRAMZA™ Phase III Second-Line Colorectal
Cancer Trial Meets Primary Endpoint of Overall Survival* (Sept. 12, 2014),
http://lilly.mediaroom.com/index.php?s=9042&item=137349.

[18] *Id*.

[19] Joseph Tabernero et al., Presentation at the 2015 Gastrointestinal Cancers Symposium: *RAISE:
A Randomized, Double-Blind, Multicenter Phase III Study of Irinotecan, Folinic Acid, and 5-
Fluorouracil (FOLFIRI) Plus Ramucirumab (RAM) or Placebo (PBO) in Patients (pts) with
Metastatic Colorectal Carcinoma (CRC) Progressive During or Following First-Line
Combination Therapy with Bevacizumab (bev), Oxaliplatin (ox), and a Fluoropyrimidine (fp)*
(Jan. 17, 2015), https://meetinglibrary.asco.org/record/105270/abstract.

robust, a contention supported by Lilly's assertion that "[s]ubgroup results were consistent with the OS and PFS results."[20]

In contrast with the limited information about the safety experience of ramucirumab in the RAISE study in the September 2014 press release, the ASCO GI 2015 presentation abstract revealed that ramucirumab is responsible for elevated rates of neutropenia (low white blood cell count), hypertension, diarrhea, and fatigue that occur at rates above that conferred by the background chemotherapeutic regimen, known as FOLFIRI, but that "no unexpected AEs were identified" and "[b]enefits were similar across important clinical subgroups."[21]

**Celgene.**  In November 2012, Celgene, Inc. announced that a Phase 3 study of ABRAXANE for the treatment of advanced pancreatic cancer met its primary endpoint— showing a statistically significant improvement in overall survival.[22]  Celgene did not disclose the hazard ratio or p-values in this press release, noting that it would submit the results for presentation at ASCO's upcoming Gastrointestinal Cancers Symposium. Additionally, the company noted that the safety profile was "comparable with other ABRAXANE clinical trials in pancreatic cancer" without provide any quantification of the specific types, grades, and incidence rates of the various adverse events.  Celgene indicated its plans for seeking regulatory approval for an indication in pancreatic cancer, and it specified that it had submitted a late-breaking abstract to a scientific conference to which it was, naturally, hoping for an acceptance.

Not until the January 2013 abstract for this symposium became available did Celgene describe the results of overall survival or progression-free survival, and it did so with substantial disclosure including the point estimates and 95% confidence intervals of each arm on each endpoint, as well as the hazard ratio for each endpoint, the 95% confidence

---

[20] *Id.*

[21] *Id.*

[22] Press Release, Celgene Int'l Sarl, *Abraxane Demonstrates Statistically Significant Improvement in Overall Survival for Patients with Advanced Pancreatic Cancer in Phase III Study* (Nov. 9, 2012), http://ir.celgene.com/releasedetail.cfm?releaseid=795473.

interval around the point estimate, and the significance level, as reflected in the p-values for each endpoint. [23]

Only at the 2013 ASCO Gastrointestinal Cancers Symposium did Celgene describe the robustness of the study by showing the many prespecified subgroups that achieved superior survival with the addition of ABRAXANE to standard-of-care gemcitabine. Celgene also provided results in terms of objective response rates, and safety received substantial attention with the identification, grade, and incidence of hematologic, non-hematologic, and neurologic toxicities attributable to ABRAXANE.  Notably, the abstract does not include the Kaplan-Meier curves, which were included in the full presentation materials, as is customary.[24]

**ArQule.**  In July 2012, ArQule, Inc. announced that a clinical trial for its drug candidate—tivantinib, a treatment for liver cancer—met its primary endpoint.  In particular, the press release announced a "statistically significant 56 percent improvement in time-to-progression (TTP)" – the primary endpoint – "in the intent-to-treat (ITT) population" in a randomized, controlled Phase 2 clinical trial in previously treated patients with hepatocellular carcinoma (HCC) (hazard ratio = 0.64; log rank p-value = 0.04)."[25]  ArQule did not announce the specific differences in time-to-progression data between the treatment and placebo arms, much as Puma did not disclose the specific DFS rates at 2-years +/- 28 days for the treatment and placebo arms of the ExteNET trial.   These details were only revealed later in ArQule's ASCO abstract, along with specific adverse event rates, although in the press release, the firm noted that higher doses of its drug were

---

[23] Daniel D. von Hoff et al., *Randomized Phase III Study of Weekly nab-Paclitaxel Plus Gemcitabine Versus Gemcitabine Alone in Patients with Metastatic Adenocarcinoma of the Pancreas (MPACT)*, 31  J. Clinical Oncology (ASCO Meeting Library, Abstract 80415) (Jan. 25, 2013), https://meetinglibrary.asco.org/record/80415/abstract (abstract).

[24] *Id.* (presentation slides).

[25] Press Release, ArQule, Inc., *ArQule Announces Tivantinib Meets Primary Endpoint, Significantly Extending Time to Progression in Phase 2 Trial in Second-Line Hepatocellular Carcinoma*, (Jan. 17, 2012), http://investors.arqule.com/news-releases/news-release-details/arqule-announces-tivantinib-meets-primary-endpoint-significantly.

associated with higher rates of adverse events, and that dose reduction appeared successful in mitigating against some toxicity.[26]

The study results presented at ASCO 2012 on behalf of ArQule showed that the study enrolled mostly international patients with reasonably balanced clinical and laboratory characteristics, and that dose reduction and study discontinuation as a result of adverse events was a prominent feature of tivantinib therapy in this study.[27]   A number of Kaplan-Meier curves were shown during the ASCO 2012 presentation, and the set of KM curves for time-to-progression also included the number of events upon which the curves are based, as well as the point estimates for TTP on each arm.[28]   The presenter also showed that there was little to no difference in overall survival between the treated and control groups, but that the cell marker, c-met, appears to possess prognostic significance with various study outcomes related to the intensity of c-met expression.  The safety profile of tivantinib as reflected in the type, grade, and frequency of adverse events is informatively presented, and the study outcome by biological or prognostic subgroup revealed mixed results.[29]

In sum, the common and key elements comparable press releases in the pharmaceutical and biotechnology industries include disclosure of:  the primary endpoint of the study and the effect of the drug on the primary endpoint, such as the percentage in reduction in the risk of death, including the hazard ratio, p-value(s), and confidence intervals.  Other information commonly incorporated in pharmaceutical and biotechnology company press releases about clinical trial results includes cursory information about the safety risk the drug may pose, selected information about the study design, possible plans for submission

---

[26] Lorenza Rimassa et al., *Tivantinib (ARQ 197) Versus Placebo in Patients (Pts) with Hepatocellular Carcinoma (HCC) Who Failed One Systemic Therapy: Results of a Randomized Controlled Phase II Trial (RCT)*, 30 J. Clinical Oncology 4006 (ASCO Meeting Library, Abstract 69882) (June 2, 2012), https://meetinglibrary. asco.org/records/69882/abstract.

[27] *Id.* (presentation slides).

[28] *Id.*

[29] *Id.*

of an application to regulatory authorities for permission to market ~~thenology~~**the** drug, and an announcement of a follow-up teleconference.

It is my opinion that Puma comprehensively and dutifully complied with these industry norms, and that its July 22, 2014 announcement was commensurate with the industry practice of disclosing only limited top-line results to the public.

## VI.   PUMA'S JANUARY 2015 OFFERING WAS IN LINE WITH BIOTECHNOLOGY INDUSTRY PRACTICES

Development-stage biotechnology companies, such as Puma, do not have revenue because they do not have an approved product being sold on the market.  Because they need to raise money to support their research and development activities, such companies will periodically raise money through a public stock offering.

While there are many factors such companies and their advisors consider when deciding on the appropriate timing for an offering (on which I offer no opinion), it is well known that such companies often raise capital following the announcement of positive news, including the announcement of a successful clinical trial.  Selected examples of this practice are provided in **Exhibit B**.

| Summary report: Litéra® Change-Pro TDC 10.1.0.400 Document comparison done on 6/14/2018 3:44:43 PM | |
|---|---|
| **Style name:** L&W without Moves | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** Frykman Original Report.docx | |
| **Modified filename:** Frykman Amended Report.docx | |
| **Changes:** | |
| **Add** | 11 |
| **Delete** | 13 |
| *Move From* | 0 |
| *Move To* | 0 |
| **Table Insert** | 0 |
| **Table Delete** | 0 |
| *Table moves to* | 0 |
| *Table moves from* | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 24 |