# EXHIBIT 5

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 2 of 143   Page ID #:13450

Confidential

Gregory Frykman, M.D.

Hsingching Hsu vs. Puma Biotechnology, Inc., et al.

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2             CENTRAL DISTRICT OF CALIFORNIA
 3                  SOUTHERN DIVISION
 4    -----------------------------x
      HSINGCHING HSU, individually
 5    and on Behalf of All Others
      Similarly Situated,
 6
                     Plaintiff,
 7
           vs.            No. 8:15-cv-00865-AG-JCG
 8
      PUMA BIOTECHNOLOGY, INC.,
 9    et al.,
10               Defendants.
      -----------------------------x
11
12             **CONFIDENTIAL**
13         Digital Audiovisual Deposition
14                     of
15            GREGORY K. FRYKMAN, M.D.
16               Washington, D.C.
17            Thursday, May 31, 2018
18                  9:04 a.m.
19
20
21    Reported by:
      Amy E. Sikora-Trapp
22    RPR, CRR, CLR
23    Job No. 10043275
24
25
```

**Page 2**

```
 1         Digital Audiovisual Deposition of
 2    GREGORY K. FRYKMAN, M.D., held at the offices of:
 3         Latham & Watkins LLP
 4         555 Eleventh Street, Northwest
 5         Suite 1000
 6         Washington, D.C.  20004-1304
 7
 8         Pursuant to notice, before Amy E.
 9    Sikora-Trapp, Registered Professional Reporter,
10    Certified Realtime Reporter, Certified LiveNote
11    Reporter, and Notary Public in and for the
12    District of Columbia.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1             A P P E A R A N C E S
 2    ON BEHALF OF THE PLAINTIFF AND THE CLASS:
 3         TOR GRONBORG, ESQUIRE
 4         DEBASHISH BAKSHI, ESQUIRE
 5         Robbins Geller Rudman & Dowd LLP
 6         655 West Broadway, Suite 1900
 7         San Diego, California  92101
 8         619-231-1058
 9         torg@rgrdlaw.com
10         dbakshi@rgrdlaw.com
11    ON BEHALF OF THE DEFENDANTS and THE WITNESS:
12         KRISTIN N. MURPHY, ESQUIRE
13         KEVIN H. METZ, ESQUIRE
14         CLAYTON D. LaFORGE, ESQUIRE
15         Latham & Watkins LLP
16         555 Eleventh Street, Northwest
17         Suite 1000
18         Washington, D.C.  20004-1304
19         202-637-2335
20         k.murphy@lw.com
21         k.metz@lw.com
22         c.laforge@lw.com
23              -and-
24
25
```

**Page 4**

```
 1             A P P E A R A N C E S
 2               (Continued)
 3         RYAN BLAIR, ESQUIRE
 4         (via telephone)
 5         Cooley LLP
 6         4401 Eastgate Mall
 7         San Diego, California  92121-1909
 8         858-550-6047
 9         rblair@cooley.com
10
11    ALSO PRESENT:
12    Daniel Holmstock, Videographer
13    Alexandra Highsmith, Latham & Watkins LLP
14    Summer Associate
15
16
17
18
19
20
21
22
23
24
25
```

**Page 5**

```
1    May 31, 2018

2                  C O N T E N T S

3    EXAMINATION OF

4                                          PAGE

5    GREGORY K. FRYKMAN, M.D.

6    By MR. GRONBORG                       8, 153

7

8              E X H I B I T S

9    EXHIBIT                               PAGE

10   Exhibit 608    copy of Frykman 4/11/18 expert     11

11                  report, 76 pages

12   Exhibit 609    document entitled "Compensation    34

13                  Summary for Gregory K. Frykman,

14                  M.D.," one page

15   Exhibit 610    copy of Frykman CV, four pages      42

16   Exhibit 611    document entitled:  "Medical Officer 45

17                  Positions at FDA"

18

19

20

21

22

23

24

25
```

**Page 6**

1    THE VIDEOGRAPHER:  The time on the
2    record is 9:08 a.m.  Today's date is May 31,
3    2018.  My name is Daniel Holmstock of Aptus Court
4    Reporting.
5         The court reporter today is Amy
6    Sikora of Aptus Court Reporting, located at 600
7    West Broadway, suite 300, in San Diego,
8    California.
9         This begins the video recorded
10   deposition of Dr. Gregory K. Frykman, testifying
11   in the matter of HsingChing Hsu, Individually and
12   on Behalf of All Others Similarly Situated,
13   Plaintiffs, versus Puma Biotechnology, Inc., et
14   al., Defendants.
15        The case is pending before the
16   United States District Court for the Central
17   District of California, Southern Division.  Case
18   No. 8:15-cv-00865.
19        This deposition is being held at
20   the law offices Latham & Watkins LLP at 555
21   11th Street, Northwest in Washington, D.C.
22        The video and audio recordings will
23   take place at all times during the deposition,
24   unless all counsel agree to go off the record.
25        Will counsel present please

**Page 7**

1    identify themselves and whom they represent.
2         MR. GRONBORG:  Good morning.  My
3    name is Tor Gronborg.  I'm with the firm Robbins
4    Geller, here on behalf of plaintiff and the
5    class.
6         MR. BAKASHI:  My name is Debashish
7    Bakshi, also from Robbins, Geller, and also on
8    behalf of the plaintiff and the class.
9         MS. MURPHY:  Kristin Murphy, of
10   Latham & Watkins, on behalf of defendants and the
11   witness.
12        MR. METZ:  Kevin Metz, of Latham &
13   Watkins, also on behalf of defendants and the
14   witness.
15        THE VIDEOGRAPHER:  Would the court
16   reporter please --
17        MR. GRONBORG:  Would the rest of
18   you like to introduce yourselves.
19        MR. LaFORGE:  Clayton LaForge, on
20   behalf of defendants.
21        MS. HIGHSMITH:  Alexandra
22   Highsmith, on behalf of defendants.
23        THE VIDEOGRAPHER:  Via telephone.
24        MR. BLAIR:  Ryan Blair, from
25   Cooley, on behalf of defendants, appearing by

**Page 8**

1    telephone.
2         THE VIDEOGRAPHER:  Will the court
3    reporter please administer the oath.
4         P R O C E E D I N G S
5    Whereupon,
6         GREGORY K. FRYKMAN, M.D.,
7    called as a witness, having been first duly
8    sworn by the Notary Public (Amy E. Sikora-Trapp),
9    was examined and testified as follows:
10        EXAMINATION BY COUNSEL
11        FOR THE PLAINTIFFS
12   BY MR. GRONBORG:
13   **Q.   And, Dr. Frykman, will you please**
14   **state your current address for the record?**
15   A.   5206 Iroquois, I-R-O-Q-U-O-I-S,
16   Road, Bethesda, Maryland 20816.
17   **Q.   And have you been deposed before?**
18   A.   I have not.
19   **Q.   Let me go over a couple of the**
20   **ground rules, then.  As you see, the court**
21   **reporter is going to be taking down everything**
22   **that we say today.  As a result, we need to make**
23   **sure that we don't speak over each other.**
24   **So if you can make sure that you**
25   **let me finish my questions, and I'll make sure I**

Gregory Frykman, M.D.

Hsingching Hsu vs. Puma
Biotechnology, Inc., et al.

Page 9

1 let you finish your answers.
2         Do you understand that?
3    A.   Yes.
4    Q.   All of your answers need to be
5 verbal.  So no nodding your head or shaking your
6 head yes or no.
7         Do you understand that?
8    A.   Yes.
9    Q.   Everyone nods their head in
10 response to that.
11        Do you understand you have been
12 sworn in and you're under oath as if you were in
13 a court of law?
14   A.   Yes.
15   Q.   All right.  And that your testimony
16 today may be provided to a jury?
17   A.   Yes.
18   Q.   One of the things that's going to
19 be important today for you to understand the
20 questions that are being asked to you, so if you
21 don't understand a question, will you please let
22 me know?
23   A.   Will do.
24   Q.   And then if you need to take a
25 break at some point today, we'll take breaks on a

Page 10

1 fairly regular basis, but if for any reason you
2 need a break, you need water or something else,
3 just let me know.  If we're in the middle of a
4 question, we need to just finish up that question
5 or line of questions and then we'll accommodate
6 you.  Okay?
7    A.   Sure.
8    Q.   Is there reason you can't testify
9 fully and truthfully today?
10   A.   No.
11   Q.   And did you bring any documents
12 with you today?
13   A.   I have a copy of my CV and expert
14 report.
15   Q.   Okay.  The CV you brought, do you
16 have any reason to believe it's not the CV that
17 was provided to us in this case?
18   A.   No.
19   Q.   Who are you working for in this
20 engagement?
21   A.   I'm working on behalf of Latham &
22 Watkins.
23   Q.   And are you being represented by
24 counsel today?
25   A.   Kristin Murphy.

Page 11

1    Q.   So you are being represented by
2 counsel today?
3    A.   On -- in -- with regard to this
4 matter, yes.
5    Q.   I'm going to hand you what's been
6 marked as Exhibit 608.
7         (Exhibit Number 608, copy of
8         Frykman 4/11/18 expert report, 76 pages,
9         marked for identification as of this
10        date.)
11   Q.   Does Exhibit 608 appear to be a
12 copy of your April 11, 2018, expert report,
13 including the exhibits you prepared in this
14 matter?
15   A.   Yes.  It does.
16   Q.   Is that your signature on the cover
17 page?
18   A.   Yes.
19   Q.   Are there any opinions you've been
20 asked to make in this case that are not
21 identified in your report?
22   A.   No.
23   Q.   Are there any opinions that you
24 intend to testify to in this case that are not
25 identified in the report?

Page 12

1    A.   No.
2    Q.   And are all of the opinions that
3 you intend to testify to summarized in section II
4 of the report which begins on page 3?
5    A.   The summary is in section II and
6 then things are more fully described thereafter.
7    Q.   And are there any opinions that are
8 not summarized in section II?
9    A.   To my best knowledge, no.
10   Q.   Okay.  And does your report contain
11 the complete basis for all of the opinions that
12 you've expressed therein?
13   A.   To my best knowledge, yes.
14   Q.   And have you amended or added to
15 any of these opinions since April 11, 2018?
16   A.   No.
17   Q.   And at this point in time do you
18 have any intention to amend or add to any of
19 those opinions?
20   A.   No.
21   Q.   Have you identified any errors or
22 omissions in your report?
23   A.   I noticed a spelling mistake down
24 toward the end of the prose.
25   Q.   Okay.  Anything other than that?

Gregory Frykman, M.D.

Page 13

1    A.   No.
2    Q.   Okay.  Does that spelling mistake
3  have any effect on any of your opinions?
4    A.   No.
5    Q.   And have you reviewed your report
6  since April 11, 2018?
7    A.   I'm sorry, what was your question
8  again?
9    Q.   Have you reviewed the report since
10  April 11, 2018?
11    A.   Yes.
12    Q.   So the report is titled "Expert
13  Report of Gregory K. Frykman, M.D."
14        For purposes of this case, what are
15  you claiming to be an expert on?
16    A.   My expertise revolves around what
17  the customary practices are in terms of
18  companies, biotechnology and pharmaceutical
19  companies, reporting their clinical trial
20  results, mostly in the form of press releases.
21    Q.   Anything else?
22    A.   For the most part, that's it.  I
23  also have expertise in the interpretation of what
24  these results are that are presented mostly,
25  again, by press release, and how those are

Page 14

1  interpreted and thought about by members of
2  capital markets.
3    Q.   And there are you speaking
4  generally or are you speaking about the results
5  of the ExteNET trial?
6    A.   The result of the ExteNET trial is
7  one of many things that I looked at, but it's all
8  revolving around that specific press release.
9    Q.   And are you holding yourself out in
10  this case as an expert in the interpretation of
11  the results of the ExteNET trial?
12    A.   As it relates to the press release.
13    Q.   What does that mean?
14    A.   Well, there's a number of different
15  ways in which clinical trial results are
16  presented by pharmaceutical and biotechnology
17  companies.  And the interpretation that one can
18  make depends on the information that they receive
19  at each of the different places where the
20  information comes from.
21    Q.   Okay.  And are --
22    A.   Does that -- does that make sense?
23    Q.   Well, are you holding yourself out
24  as an expert on the interpretation of the results
25  of the ExteNET trial or the results as they were

Page 15

1  presented in the press release?
2    A.   It's as the results were presented
3  in the press release, but that is very much part
4  and parcel of what the ultimate outcome of the
5  trial is that was presented in or is presented in
6  different places.
7        So there may be a -- you know, a
8  subsequent medical and scientific presentation.
9  There may be a subsequent peer-reviewed journal
10  publication, and that all -- they're all related.
11        But in this particular case, the --
12  the expertise that I have -- am bringing is with
13  respect specifically to how the results of the
14  ExteNET trial were put in the press release, and
15  then what conclusions can be drawn from that
16  press release.
17    Q.   For purposes of this case, are you
18  repre -- representing yourself to be an expert in
19  the interpretation of the ExteNET trial results
20  as they were presented in the journal Lancet?
21    A.   I can certainly speak to that.
22  That was not the specific focus of what I did.
23    Q.   But you believe you're an expert in
24  the results as they were presented in the journal
25  Lancet?

Page 16

1    A.   No.
2        MS. MURPHY:  Object to the form.
3    A.   I'm a medical oncologist who has
4  spent many years in drug development, and that is
5  something that I routinely read, results of
6  clinical trials in peer-reviewed publications.
7    Q.   Turning -- you said you were ex --
8  you had an expertise in the customary practices
9  in terms of companies reporting trial results.
10        When did you become an expert on
11  that subject?
12    A.   That expertise has become acquired
13  over many years of both training and professional
14  experience, professional work experience.
15    Q.   And so when over those many years
16  do you believe you became an expert in that
17  subject?
18        MS. MURPHY:  Object to form.
19    A.   Well, starting back with formal
20  medical education, there is formal training in
21  biostatistics and epidemiology that tends to be
22  less specific to the subject matter at hand, but
23  physicians across the country are trained at
24  least in the basics of biostats and epidemiology
25  in their training.

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 6 of 143   Page ID
#:13454
Confidential
Gregory Frykman, M.D.
Hsingching Hsu vs. Puma
Biotechnology, Inc., et al.

Page 17

1    And then in -- in my internal
2  medicine residency, the publication of many
3  clinical trial results was something that we
4  reviewed and I read, you know, personally.
5    The same thing followed, then, in
6  the subspecialty of medical oncology and
7  hematology that I trained in.
8    And then during my fellowship at
9  Johns Hopkins I was involved specifically -- and
10  I can go into this in great detail -- to the
11  extent you're interested, in both -- both
12  involved in participating in clinical trials, as
13  well as enrolling patients in clinical trials, as
14  well as reading the results of other people's
15  clinical trials.  That was a three-year
16  experience training in medical oncology and
17  hematology.
18    And then after that I was for two
19  years at the National Cancer Institute, half time
20  there and half time at the Food and Drug
21  Administration.  At the National Cancer
22  Institute, the section that I worked in was
23  called the cancer treatment evaluation program or
24  CTEP.
25    And CTEP functions as essentially a

Page 18

1  sponsor of hundreds and hundreds of clinical
2  trials.  The -- that part of the NCI is actually
3  involved in the development of a number of
4  different anticancer agents.  And the
5  development, the clinical development always
6  involved clinical trials.
7    So over the course of that two-year
8  time period I was probably involved in the direct
9  review of dozens of clinical trial protocols, as
10  well as looking at the results that came in from
11  the various sites, as well as being involved in a
12  committee called the protocol review committee,
13  where literally hundreds and hundreds of
14  protocols that were either being proposed or
15  being considered for execution by the NCI were
16  under discussion.
17    Q.   And, sir, if you can just tell me,
18  is there a year or approximate year where you
19  believe you became an expert in the customary
20  practices in terms of companies reporting
21  clinical trial results?
22    MS. MURPHY:  Object to form.
23    A.   Well, I was getting to that.  So
24  then after I --
25    Q.   Well, my question is, is there a

Page 19

1  year?  Can you identify for us a year --
2    A.   My expertise --
3    Q.   -- when you believe you became an
4  expert?
5    A.   Sure.  My expertise evolved over a
6  number of years, developed over a number of
7  years.
8    Q.   And at what year do you believe you
9  became an expert in the customary practices of
10  companies reporting clinical trial results?
11    A.   I don't --
12    MS. MURPHY:  Object to the form.
13    A.   I don't know that I can give you a
14  specific year, but by the time I was in the
15  capital markets.  So that was in late 2002 for
16  six plus years.
17    The expertise that I had developed
18  in understanding clinical trials was applied to
19  the presented results or disclosed results of
20  biotechnology and pharmaceutical companies'
21  clinical trial results in the form of press
22  releases, in the form of presentations at medical
23  and scientific meetings, and in journal articles.
24    So during that period of time, 2002
25  through early 2009, the institutional investing

Page 20

1  clients of the firm that I was employed at relied
2  on me, as well as others, to help them understand
3  what the underlying significance of companies'
4  press releases about their clinical trial results
5  actually was.
6    Q.   So by 2002 do you believe you were
7  an expert?
8    A.   So by 2002 it's certainly a
9  reasonable time point, but I don't know that
10  there's a specific discrete point in time at
11  which I woke up one day and all of a sudden was
12  an expert.
13    Q.   Can you identify for me any other
14  people who you consider to be experts in this
15  field of customary practices, in terms of
16  companies reporting trial results?
17    A.   I think any of the sell side,
18  especially medically trained sell side analysts,
19  that routinely focus on pharma and biotech
20  matters.  I think many of them would fall in that
21  same category, as well as many, many, not just
22  two or three, but dozens, of medically trained
23  analysts and portfolio managers at the
24  institutional investing shops where they have to
25  not only look at the press releases, medical and

Gregory Frykman, M.D.

Hsingching Hsu vs. Puma
Biotechnology, Inc., et al.

Page 21

1  scientific presentations, and published papers on
2  clinical trial results, they not only have to
3  understand what it means, but they're actually
4  making investment decisions based on their best
5  interpretation. So I would consider many of
6  those to be experts.
7       Q.   Okay. Can you name for me anyone
8  you consider to be your peer or in your peer
9  group as an expert in this field of customary
10  practices in terms of companies reporting trial
11  results?
12      A.   I can. I'm not sure that they are
13  happy that I'm giving their names out like this,
14  but I'm --
15           THE WITNESS: I guess I have to ask
16  counsel what the right answer is here.
17      A.   I'm certainly happy to provide
18  names.
19      Q.   Well, if you can name those, you
20  name for me who you would consider to be your
21  peers in this specialty?
22      A.   So one person that comes
23  immediately to mind is a lady named Rosemary
24  Mazanet, M-A-Z-A-N-E-T, M.D., Ph.D. Another one
25  is Robert Jackson, J-A-C-K-S-O-N. He's an M.D.

Page 22

1  William Slattery [ph], who is actually not a
2  physician but has been doing this for many, many
3  years. Tom Malley [ph], who was -- I believe was
4  a portfolio manager at GS. His at that time
5  second in command, Andy Acker. He did -- he was
6  great at this stuff.
7           Is that sort of what you're looking
8  for?
9       Q.   This question is for you to answer.
10  So if those are people you believe are -- are
11  your peers, then the answer is satisfactory. If
12  there are others that you can think of or --
13      A.   If I probably put some thought to
14  it over the next hour, I could probably come up
15  with some other names for you, but those names
16  come to mind immediately.
17      Q.   And prior to this case, have you
18  ever served as a legal expert in the customary
19  practices in terms of companies reporting
20  clinical trial results?
21           MS. MURPHY: Object to the form.
22      A.   I've never been asked to do so.
23      Q.   In any capacity have you served as
24  an expert in this field?
25      A.   Well, I certainly -- in my

Page 23

1  consulting practice I worked with at least one
2  company intimately in helping them think through
3  what their press release might need to look like,
4  and what may or may not need to be disclosed in
5  terms of the contemplated cancellation of a
6  clinical trial.
7           And the question at hand was -- it
8  was a publicly traded company. The question at
9  hand was was this something that was material.
10  That's not a question that I can answer. But if
11  it was deemed to be material by their counsel,
12  then what would be the most accurate way of
13  describing what the activity was of the company
14  in terms of terminating the trial, and what the
15  underlying rationale for doing so was.
16      Q.   What company was that?
17      A.   I'm not sure I can tell you that.
18  It's, again, a company that was a -- a private
19  consulting client of mine which I had a
20  confidentiality agreement with.
21      Q.   We can mark this deposition
22  confidential, but you do need to answer the
23  question.
24           THE WITNESS: What am I supposed to
25  do?

Page 24

1           MS. MURPHY: Go ahead and answer,
2  unless you think that's going to violate the
3  terms of any confidentiality agreement. But this
4  will be marked confidential in the transcript and
5  not be public.
6      A.   Then we're probably okay. The firm
7  is Concordia.
8       Q.   What was the clinical trial?
9       A.   I can't recall the name of the
10  clinical trial, but it was a clinical trial that
11  revolved around the use of a therapy called
12  photodynamic therapy, and it was specifically in
13  the narrow field of cholangiocarcinoma.
14      Q.   And was that in 2016 that you were
15  doing that consulting?
16      A.   That was probably in the '14-'15,
17  2014-2015, timeframe.
18      Q.   And did the company issue a press
19  release?
20      A.   I do not know that.
21      Q.   You said as part of that engagement
22  you couldn't answer the question, if it was
23  material. Why couldn't you answer that question?
24      A.   Materiality, I think, is something
25  that attorneys and juries and judges figure out.

Gregory Frykman, M.D.

Page 25

1  That's not a medical thing.
2      Q.   So what specifically were you
3  consulting with Concordia about with regard to
4  their press release?
5      A.   Well, the -- as I said before, the
6  question arose as to whether or not this
7  contemplated termination of this trial by this
8  company was going to be considered a material
9  event.  If it was not, then the company sounded
10  like it was under no obligation to publicly
11  disclose anything.
12          If they were going to have to
13  disclose it, then the question was -- that I was
14  posed -- was what should be the appropriate
15  description, the accurate description of what the
16  rationale was for terminating that specific
17  clinical trial.
18      Q.   And --
19      A.   I mean, the -- the essence of it
20  had -- boiled down to that the company could not
21  enroll patients, even though it was in at least
22  two continents.  They were having a difficult
23  time enrolling patients.
24          And if pharmaceutical patients
25  can't enroll -- if anybody can't enroll patients

Page 26

1  in a clinical trial, then the trial's going to
2  fail.
3          So the question was whether or not
4  they should continue to try to enroll the trial.
5  But if they were going to terminate it what
6  needed to be described -- if it had to be
7  publicly disclosed -- what needed to be described
8  to public investors about that.
9      Q.   And was this an FDA-approved
10  clinical trial?
11      A.   I need to be careful there.  The
12  FDA doesn't approve or not approve clinical
13  trials.  But, yes, this trial had been designed
14  in conjunction with the FDA.  And the FDA was
15  involved in the design of the study.
16          So the FDA knew full well what was
17  going on.  There was nothing that was being
18  hidden.  But it appeared after the trial got
19  going.  So the company and the FDA had agreed
20  this -- this would be the trial design that would
21  help answer the efficacy and safety questions for
22  FDA purposes in the future when the results were
23  in.
24          And then after the trial got going
25  it became clear to everybody, for a variety of

Page 27

1  reasons, that it was going to be much more
2  difficult to enroll than anybody had contemplated
3  prior to initiating the trial.
4      Q.   Was it a phase 3 trial?
5      A.   I'm sorry, to -- I want to be
6  accurate in what I tell you.  Whether you would
7  term it a phase 3 or a phase 4 trial is maybe a
8  question of semantics.
9          It was a drug that was already on
10  the market.  So by many people's terminology that
11  would be considered a phase 4 study.
12          However, the trial was specifically
13  being executed for the purpose of expanding the
14  label, the label indications of the drug, and
15  many people consider that a phase 3 trial.
16      Q.   And were you involved in the trial
17  design?
18      A.   That's an interesting question.
19  The short answer is very, very early on, when
20  that drug and the contemplated clinical trial was
21  with another company.
22          And then I was not involved for I
23  think it was a couple of years.  And during that
24  time the company had been acquired by Concordia.
25  And the clinical trial that I had been asking

Page 28

1  about two years prior had been designed by other
2  people, had been negotiated with the FDA by other
3  people.  A lot of things happened while I was not
4  involved.
5          And then the acquired -- the
6  acquirer then came back to me a couple of years
7  later and said, you know, Greg, we know you're
8  involved, you know, in this.  Can you help us
9  with what's going on now.
10      Q.   And how long was it after that
11  trial had started to enroll patients that it was
12  canceled?
13      A.   Well, I'm still not sure the
14  trial's been canceled.  I just don't know what
15  happened.  But I think the company worked pretty
16  hard on this for at least a couple of years.
17      Q.   After it had started to enroll
18  patients?
19      A.   Correct.  So from the time the
20  clinical trial was initiated, so the first
21  patient was enrolled, until the last that I was
22  involved with that particular matter with that
23  company, that was at least a two-year timeframe.
24      Q.   And when were you formally retained
25  to work in this case?

Gregory Frykman, M.D.

Page 29

1   A.   It was in the fall, I believe, of
2  last year.
3       Q.   Do you have a retention agreement
4  with or any contract with counsel in this matter?
5       A.   I am actually -- I work under a
6  firm called Eleven Canterbury --
7            (Reporter-initiated discussion off
8       the record.)
9       A.   -- and they reached out to me in
10 the, what, early fall, late summer of last year
11 and said that they had been contacted by, I want
12 to say it was Cornerstone, in looking for an
13 expert in matters related to press releases,
14 clinical trials, cancer drugs and so forth.  And
15 that's how it evolved.
16      Q.   Had you ever worked with Eleven
17 Canterbury before?
18      A.   I have.
19      Q.   And what is Eleven Canterbury?
20      A.   I don't know what the pigeonhole is
21 that they would fit into, but they are a firm
22 that provides consulting and expert witnesses for
23 the technology industry as well as the legal
24 industry.
25      Q.   And just generally what has been

Page 30

1  your prior work with Eleven Canterbury?
2       A.   I was involved as an expert witness
3  in a matter through them that my role, at least,
4  and it was finished up at the end of last year,
5  where it involved a -- it was an arbitration case
6  in which a pharmaceutical company was suing or
7  making a claim against the contract research
8  organization that was to have executed its
9  phase 3 clinical trial, and I was on the side of
10 the CRO.
11           And the question that was posed to
12 me was did the CRO meet its obligations in terms
13 of executing the clinical trial for a
14 pharmaceutical company.
15      Q.   And that engagement, did it involve
16 the customary practices of companies disclosing
17 clinical trial results?
18      A.   There were clinical trial results
19 that were disclosed.  That was not what I focused
20 on specifically in that case.
21      Q.   And, other than that case, have you
22 worked with Eleven Canterbury before?
23      A.   I don't think beyond that that I
24 have worked with them much.
25      Q.   Do you have a contract or retention

Page 31

1  agreement with Eleven Canterbury?
2       A.   I do.
3       Q.   Has anyone at Eleven Canterbury
4  assisted you in this matter?
5       A.   No.
6       Q.   How about Cornerstone, has anyone
7  at Cornerstone assisted you in this matter?
8       A.   No.
9       Q.   Have you communicated with anyone
10 at Cornerstone about this matter?
11      A.   I don't think -- at least in the
12 last several months there was one or two small
13 items that were sort of administrative in nature
14 that I talked to them about.  But that was
15 probably six months ago.
16      Q.   And what were they?
17      A.   One of them had to do with their
18 offer to be assistive in doing a lot of the
19 document acquisition and like table preparation,
20 that sort of thing, that I ended up doing a lot
21 on my own in this case.  And I politely declined.
22           The second matter had to do --
23           THE WITNESS:  And -- and, Kristin,
24 I don't know if you were involved with this or if
25 it was Jordan Cook.

Page 32

1       A.   -- but there was a small matter
2  that had to do with something in the State of
3  California.  And it had to do with the date or
4  the exact timing of my work on this case, but
5  vis-a-vis -- it sounded like a unique California
6  state requirement.
7            And between Eleven Canterbury,
8  Cornerstone, Latham and me, things were just a
9  little out of joint.  I can't remember exactly
10 what the matters were.  And I needed to get on
11 the phone with -- with -- I think it was with
12 Latham, with Cornerstone, and I think that was
13 it, and take care of it.  But it was pretty -- at
14 least in my mind it was a pretty small matter.
15      Q.   In terms of gathering or analyzing
16 documents, did anyone other than counsel assist
17 you in that?
18      A.   No.
19      Q.   You said you did a lot of it on my
20 own.  Was there some part of the gathering and
21 reviewing documents that was done by someone
22 else?
23      A.   Well, I relied on Latham to some
24 extent to help me pull a lot of the documents,
25 and we can go through them.  But there's a number

Gregory Frykman, M.D.

Hsingching Hsu vs. Puma
Biotechnology, Inc., et al.

Page 33

1   of things pertinent to this case that I have no
2   way -- I have no access to except through Latham.
3         But a lot of the -- a lot of
4   publicly available information I went and got
5   that on my own.  I don't know the extent to which
6   you want to go through.  It's all deposition
7   transcripts.  I had to get that from Latham.
8         Q.   No.  My question is simply whether
9   you got documents from anyone other than counsel?
10        A.   Except I go in online and getting
11  the things that I needed to look through.  So we
12  can go through this in detail, but there's a lot
13  here that I spent a lot of time going through.
14        Q.   Well, going back to when you were
15  first contacted about this engagement, what was
16  the first thing you did?
17        A.   I think the first thing that I did
18  was listen to what Latham, you know, told me in
19  terms of summary.  And then they sent me the
20  press release, the July 22, '14 -- 2014 press
21  release and the conference call transcript
22  following that press release.  And things, you
23  know, went from there.
24        Q.   I hand you what's been marked as
25  Exhibit 609.

Page 34

1         (Exhibit Number 609, document
2   entitled "Compensation Summary for
3   Gregory K. Frykman, M.D.," one page,
4   marked for identification as of this
5   date.)
6         Q.   Is Exhibit 609 an accurate summary
7   of the hours that you worked in preparing your
8   report?
9         A.   Yes.  I don't know what the cutoff
10  date is here, but, yes, this is approximately
11  right.
12        Q.   Presumably at or approximately the
13  time when you -- April 11, 2018?
14        A.   I think so.
15        Q.   And does it sound right that you
16  spent about 285 hours preparing your report?
17        A.   That's correct.
18        Q.   And how much time have you spent on
19  this matter between April 11, 2018, and today?
20        A.   Boy, I don't know.  In terms of
21  hours, maybe another 50 hours.
22        Q.   How is your billable rate of $565
23  an hour determined?
24        A.   That was the rate that Eleven
25  Canterbury and I agreed on.

Page 35

1         Q.   Do you charge all of client -- all
2   of your consulting clients $565 an hour?
3         A.   No.
4         Q.   Do you charge some more?
5         A.   There are some that I charge more
6   to.
7         Q.   You charge some less?
8         A.   Charge some less.
9         Q.   In this case is there any basis for
10  why you pick $565 an hour?
11        A.   This is approximately what -- start
12  again.  This is about in the middle of what I
13  charge.  There's 565, 570.  I don't -- I mean,
14  this is about where it is.
15        If it matters greatly to you, the
16  clients in the capital markets, when there is a
17  specific conference call, over a -- you know,
18  particular drug development matter, that rates
19  higher.  And then there are some legacy clients
20  that I've done work for for years for which I've
21  kept the rate the same.
22        Q.   So you referred to when there's --
23  in the capital markets when there's a particular
24  conference call, as a consultant what you are
25  being retained to do with respect to particular

Page 36

1   conference calls?
2         A.   Yeah.  It sort of depends on what
3   needs are of that particular client.  So it could
4   be on a specific FDA matter.  It could be on what
5   the -- again, what the results of clinical trials
6   disclosed in press releases might mean in terms
7   of either FDA approval or in terms of perceived
8   placement in the competitive landscape of a
9   particular therapeutic area.
10        Frequently questions will arise as
11  to how particular results would be viewed by the
12  FDA, and that, again, is looking -- spending an
13  awful lot of time looking at the press release or
14  press releases, also published clinical trials of
15  that particular drug.  And then trying to take
16  all of that information together and provide a
17  thoughtful answer to institutional investment
18  clients so those are analysts and portfolio
19  managers at, you know, hedge funds and mutual
20  funds.  But the range is -- you know, the range
21  is wide.
22        Q.   Can you identify for us a recent
23  engagement in which you have been asked to review
24  a press release and conference call?  And by
25  "identify," I mean identify the company whose

Gregory Frykman, M.D.

Page 37

1 **press release and conference call you were asked**
2 **to review.**
3       A.   Sure.  So this involved -- and I
4 actually have to pull the drug for you, but it
5 was a drug developed by a firm called Onyx, and
6 it was a specific drug that was being developed
7 for multiple myeloma that had actually been
8 developed quite well.
9             The company had announced in -- I
10 believe in a press release that they were
11 intending to register the drug, that is, seek FDA
12 approval, on the basis of two phase 2 studies.
13            And the question that was posed to
14 me that was sort of the general question, but
15 this went on for a series of months, actually,
16 was what do you, referring to me, what do you
17 believe the FDA's attitude is going to be toward
18 the -- toward the receipt of an application, drug
19 application, based on two phase 2 studies.
20 Because typically the FDA wants to see phase 3
21 randomized control trials.  And in this case
22 these were two single-arm trials that did not
23 have concurrent comparators.
24            And my response to that generally
25 revolved around, well, it depends on what the

Page 38

1 response of the disease to the drug is.  And
2 there's ways in myelomas and malignancies in
3 determining, you know, what the actual response
4 was.  And if the response was extremely high,
5 then the FDA's very likely to approve it on the
6 basis of two phase 2 studies.
7       **Q.   And at the time you did your**
8 **review, had Onyx published the full results from**
9 **either of those two phase 2 studies?**
10      A.   They had not.
11      **Q.   And other than Onyx, can you give**
12 **us another recent example of a situation where**
13 **you were retained to review publications by a**
14 **drug company?**
15      A.   The only one that comes immediately
16 to mind is the drug pemetrexed, the trade name is
17 Alimta, A-L-I-M-T-A.  And this is a drug that was
18 developed by Eli Lilly back about 16 years ago.
19 I think it got on the market for a narrow
20 malignancy called mesothelioma.
21            And there's a consulting client of
22 mine that is developing another drug, a two-drug
23 combination, for mesothelioma.  And so the
24 question posed to me was what were the -- what
25 were the clinical trials.  What was the

Page 39

1 development strategy that was put in place by
2 Lilly that led to the penult -- or the ultimate
3 development and the ultimate approval of
4 pemetrexed.
5            So that involved looking at, in
6 this case, the approved product label.  But it
7 also involved looking at the published clinical
8 trials over the years in -- of pemetrexed in
9 mesothelioma.
10      **Q.   Can you identify for me any other**
11 **examples where you have been retained to look at**
12 **publications regarding a clinical trial result**
13 **where you did so before the full results were**
14 **published?**
15      A.   I'm sorry, can you ask that
16 question again?
17      **Q.   Sure.  Like Onyx, can you identify**
18 **for me any other engagements where you were asked**
19 **to review the results of a clinical trial that**
20 **had been issued in a press release or some other**
21 **form but before the full results were issued?**
22      A.   I guess not quite to the same
23 extent, but let me qualify that by saying that to
24 a large extent this is what I do on not a daily
25 basis, on at least a weekly basis.

Page 40

1            So questions will be posed to me
2 frequently:  Can you look at this, please, and
3 tell me what you really think is going on.
4            So I'll look at the press release
5 and tell the person asking the question, well,
6 this is sort of what it looks like:  This drug is
7 either very well known to me or this drug is not
8 well known to me.  And in this case it looks like
9 that the company has undertaken development in
10 this direction.
11            And if these are the results that
12 they're talking about right now, then that's fine
13 in and of itself, but the real question is
14 what -- if it's not a phase 3 trial -- and,
15 again, you pose the question as if the results
16 were not known, and it's in the -- there's
17 something that's preliminary in the form of a
18 press release, then what are the full data
19 ultimately going to show.  And then what are the
20 implications of the data disclosed in the press
21 release for the further development of the drug,
22 for further engagement with the FDA on what the
23 competitive landscape might look like two, three
24 years down the road.  That sort of thing.
25      **Q.   And can you identify for me**

Page 37..40

Page 41

1  somewhere where you consulted on that, the drug
2  where you have done that work, looked at just the
3  press release and provide an example of what's
4  going to be two or three years down the road?
5      A.   Immediately, no.  But certainly at
6  one of the breaks I can find some and we can
7  discuss it further.
8      Q.   How would you find them?
9      A.   I'd have to give this some more
10 thought as to exactly what ones I looked at in
11 the last six months, and then look up --
12 hopefully find the press release that was handed
13 to me, and then look at and explain to you -- try
14 to explain to you as well as I could what I had
15 told the folks prior.
16     Q.   What was your income last year from
17 your consulting business?
18     A.   What was my income?
19     Q.   Uh-huh.
20          THE WITNESS:  Is that something I'm
21 supposed to talk about?
22          MS. MURPHY:  You can answer.
23     A.   I think my net income was about
24 ███████████.
25     Q.   And was that all from the

Page 42

1  consulting business?
2      A.   That -- the majority of it was, but
3  there was some work from doing expert legal work
4  that all falls under the consulting business.  I
5  have -- have other employment outside.
6      Q.   And approximately what percentage
7  of that income came from capital market clients?
8      A.   I do less of that now.  3 percent,
9  5 percent.  Something like that.
10     Q.   I hand you what will be marked as
11 Exhibit 610.
12          (Exhibit Number 610, copy of
13          Frykman CV, four pages, marked for
14          identification as of this date.)
15     Q.   And does this appear to be a copy
16 of your most up to date CV?
17     A.   Yes.
18     Q.   And does this reflect -- accurately
19 reflect that you did both your undergraduate
20 degree and your M.D. from Loma Linda University?
21     A.   Yes.
22     Q.   Did you have any caffeinated drinks
23 while you were there?
24     A.   Only off campus.
25     Q.   Okay.  I know somebody who went,

Page 43

1  so . . .
2          Did you grow up in Southern
3  California?
4      A.   I did.  I grew up in Redlands.
5      Q.   Redlands.  What high school did you
6  go to?
7      A.   I went to Loma Linda Academy in the
8  town of Loma Linda.
9          (Reporter-initiated discussion off
10         the record.)
11     Q.   And between receiving your M.D. in
12 1992 and 1995, you were an intern and then a
13 fellow; correct?
14     A.   That's not quite correct.  So 1992
15 through 1995 -- 1992 through 1993 I was an
16 intern.
17     Q.   Right.  And then a resident?
18     A.   At County USC and a resident for
19 the next two years, that is correct.
20     Q.   And during that period did you have
21 any responsibility for treating breast cancer
22 patients?
23     A.   I did, to the extent that I was
24 rotating onto the oncology service.  So in
25 internal medicine there's a lot of subspecialties

Page 44

1  that we would spend some time in.  And there were
2  certainly patients with breast cancer when I was
3  on oncology rotations that I took care of.
4      Q.   And then you identify a number of
5  fellowships between 1995 and 2000.  In any of
6  those fellowships did you have responsibility for
7  treating breast cancer patients?
8      A.   Yes.  Well, in -- in -- at Johns
9  Hopkins where I was clinically seeing patients,
10 there were many patients with breast cancer, many
11 of whom are in clinical trials that I took care
12 of.
13          When I was at the NCI and FDA, I
14 was not working primarily in the management of
15 patients.  I did have staff privileges at one of
16 the local hospitals and worked there some, but
17 that was not primarily with breast cancer
18 patients.
19     Q.   And then you spent about two years
20 as a medical officer at the FDA; is that correct?
21     A.   That's correct.
22     Q.   All right.  You said at the same
23 time you were splitting your time with the
24 National Cancer Institute?
25     A.   No.  When I was a medical officer,

Gregory Frykman, M.D.                                                    Hsingching Hsu vs. Puma
                                                                         Biotechnology, Inc., et al.

Page 45

1  I was full-time with the Food and Drug
2  Administration.
3      Q.   How many medical officers does the
4  FDA have?
5      A.   How many medical officers does the
6  FDA have?  Probably -- I'm not sure I've ever
7  heard a number.  Probably more than 50 and less
8  than 300.
9      Q.   I hand you what's been marked as
10 Exhibit 611.
11          (Exhibit Number 611, document
12     entitled:  "Medical Officer Positions at
13     FDA," marked for identification as of
14     this date.)
15     Q.   Exhibit 611 is a copy of the FDA's
16 current description of the position for medical
17 officer.  If you'd just take a moment just to
18 review it and tell me if that comports with what
19 you understood the position entailed when you
20 were at the FDA?
21     A.   That is approximately right.  It
22 sure seemed like I did an awful lot more than
23 that, but it's a decent summary.
24     Q.   Were there any specific duties or
25 responsibilities that you recall having that are

Page 46

1  not encompassed generally by this document?
2      A.   I'm sorry, ask that question again?
3      Q.   Sure.  I was wondering if there
4  were any sort of broad duties or responsibilities
5  that you had as a medical director in the 2000 to
6  2002 period that you don't think are encompassed
7  by the description of the position provided by
8  the FDA now?
9      A.   Yeah.  I don't think so.  Just make
10 sure, I was a medical officer, not a medical
11 director.  Directors were different positions.
12          And then as far as ensuring all
13 human drugs manufactured for interstate sale,
14 ensuring the safety, potency, purity,
15 effectiveness.  Ensuring --
16          THE COURT REPORTER:  A little more
17 slowly, please.
18          THE WITNESS:  I'm sorry, I'm
19 reading right from these three bullets.
20     A.   And then conducting inspections.  I
21 don't like I conducted any inspections.  But --
22 and as far as the ensuring goes, I was one of
23 many, many people who provided this assurance to
24 upper management, as well as to the American
25 public.  But this is a reasonable approximation

Page 47

1  of what I did.
2      Q.   Turning back to your report.
3  Page one of the report.
4      A.   That's Exhibit 608?
5      Q.   Correct.  Under "Expert
6  Qualifications" at the very bottom of the page,
7  you wrote -- and this is with respect to your
8  time at the FDA, "I also met with dozens of
9  companies as the primary reviewing clinician as
10 part of a medical and scientific team."
11          Do you see that?
12     A.   Uh-huh.
13     Q.   What do you mean by "primary
14 reviewing clinician"?
15     A.   So I was the clinician who was most
16 close to the protocol, clinical trial protocol,
17 to the clinical trial data, to interim data to
18 companies' development plans that they came in to
19 talk to the FDA about.
20     Q.   Were you in charge of this medical
21 and scientific time?
22     A.   I was not administratively formally
23 in charge of that, but they, as a matter of --
24 of -- of custom, looked to the clinician to be --
25 to provide guidance as to how their roles might

Page 48

1  be executed.
2          So, for example, the toxicologist.
3  So these are folks who are trained in animal
4  trials, and they are involved in the design of
5  the trials, they look at the data that comes from
6  these animal trials and so forth.  They would
7  frequently talk to me when a particular drug
8  development issue arose, and look to me to help
9  point them in the direction that would be most
10 helpful in the FDA providing guidance to the
11 company.
12          So that may sound very abstract,
13 but there are certain clinical trial results that
14 may not reflect what was seen in animal
15 toxicology studies, because animals, for a
16 variety of reasons, are more sensitive, less
17 sensitive, whatever the case is.
18          And so they would look at the
19 clinicians, not just me, but to other clinicians,
20 and ask for our take on the clinical implications
21 of a particular toxicological finding.
22     Q.   And these --
23     A.   That's -- that's just -- that's
24 just one -- you know, one narrow example of -- of
25 sort of how it worked.

Page 45..48

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 14 of 143   Page ID #:13462

Confidential

Gregory Frykman, M.D.

Hsingching Hsu vs. Puma Biotechnology, Inc., et al.

Page 49

1    Q.    And does the job description here
2  in your report correctly reflect that during your
3  time at the FDA you worked on two NDAs?
4    A.    That's correct.
5    Q.    And do you recall which drugs those
6  were?
7    A.    I do.  One was a drug that is not
8  on the market but there's -- should be plenty of
9  information out there called IntraDose,
10  I-N-T-R-A-D-O-S-E.  And another drug which is on
11  the market calls Doxil, D-O-X-I-L, and that's
12  liposomal doxorubicin.
13    Q.    And were you the primary reviewing
14  clinician for those NDAs?
15    A.    Yes.
16    Q.    And were you the person who led the
17  NDA review process?
18        MS. MURPHY:  Object to the form.
19    A.    As I said before, being the primary
20  reviewing clinician, the rest of the disciplines
21  looked to me to sort of appropriately carry out
22  what they needed to get done in terms of new
23  drug, either new drug approval or new drug
24  nonapproval.  But there were folks
25  administratively over me who oversaw the entire

Page 50

1  review process.
2    Q.    And then you referred to the
3  investigational new drug applications.  Are those
4  applications for the purpose of allowing drugs to
5  be shipped across state lines for trials?
6    A.    That's exactly right.
7    Q.    Based on your experience at the
8  FDA, is it your belief that companies typically
9  include their press releases with the new drug
10  applications?
11    A.    The answer is generally not.  I --
12  I should clarify that.  I don't know what the
13  submission practices are with regard to press
14  releases and promotional literature because I was
15  never part of that with -- with a couple of
16  exceptions.
17        It is -- I believe it's a
18  regulation that for drugs that are undergoing
19  accelerated approval, which is a different kind
20  of approval, that the company is required at the
21  time of the new drug application submission, to
22  submit their contemplated promotional literature
23  for the FDA to review.
24    Q.    And just to be clear, in the two
25  NDAs that you looked at while you were at the

Page 51

1  FDA, did the companies provide with the NDA
2  copies of the initial press releases that they
3  may have issued about clinical trial results?
4    A.    Not to my knowledge.
5    Q.    And in those NDAs did the companies
6  provide copies of any conference call transcripts
7  regarding top-line results of any of their
8  clinical trials?
9    A.    Not to my knowledge.
10    Q.    And in the INDs, was it your
11  understanding that companies would typically
12  provide press releases regarding top-line
13  clinical trial results?
14    A.    To my knowledge, they did not.  But
15  I would not necessarily have seen it, if they
16  did.  But I will add that on a few occasions --
17  and it's more than two and less than five --
18  where press releases were in fact submitted by
19  the company to the FDA prior to their issuance
20  for the purpose of acquiring FDA blessing, if you
21  will, or FDA guidance on -- on the contemplated
22  press release.
23        This was submitted to an office,
24  it's got a new name, but it used to be called
25  DDMAC, so capital D-D-M-A-C, which was the

Page 52

1  division of drug, advertising and I can't
2  remember what all it was.  But that office --
3  their purpose was mostly revolving around the
4  promotional activities of the company.  So their
5  advertising campaigns.
6        And companies would proactively --
7  and, again, this is up to them -- there was no
8  regulation that said they had to do this, but
9  companies would from time to time submit
10  contemplated press releases to DDMAC with the
11  request of the DDMAC review staff to look at the
12  press release and see if they had any pushback on
13  it.
14        Many parts of the press release, as
15  you know, are pretty standard.  You've got to get
16  the date right, the company right, the contact
17  person right, and so forth.  But what was less
18  familiar to the DDMAC reviewers was the -- the
19  discussion in the press release, either a large
20  or a small discussion, about where that
21  particular drug is in development.
22        Maybe it discusses prior clinical
23  trial results.  Maybe it discusses what their
24  plans are going forward.  Maybe it discusses a
25  recent meeting that they had with the FDA, and so

Page 53

1  forth.
2         But DDMAC would not have any
3  knowledge of -- and any ability to -- to
4  thoughtfully review and provide feedback on that
5  part of the press release.  So these were sent to
6  me, as well as other medical officers, I wasn't
7  the only one, and it only revolved around drugs
8  that were in my portfolio at the agency.
9         And the question posed to me by the
10  DDMAC folks was -- is -- is what the company is
11  saying in here essentially correct.  And in some
12  cases where I knew that -- I knew there was a
13  meeting recently or something like that, I could
14  just say, sure, that looks right, or it's not
15  quite right.  Here's kind of how I suggest it be
16  worded.
17         In other cases, you know, give me a
18  couple of days.  I've got to dig up their files
19  because I just don't know where -- where things
20  stand, and then provide feedback to DDMAC.
21         So I didn't interact directly with
22  the company, but it was DDMAC.  And DDMAC,
23  whatever they did with that, I don't know.
24         I presume that the company
25  ultimately did issue press releases.  And

Page 54

1  actually one more point on that.  I assume they
2  did issue press releases, and what happened after
3  that, I don't know.
4         But it was common, as you know -- I
5  think you know this -- that, you know, when
6  companies would have a meeting with the FDA, when
7  they would receive, for example, fast-track
8  designation, sometimes they required orphan --
9  would require an orphan designation, to my
10  knowledge, that was all press released by
11  companies.
12     Q.    And any of the press releases that
13  you say the DDMAC sent to you, did any of those
14  involve drugs that had not already been approved
15  or were not -- had not already filed an NDA?
16     A.    Oh, they were I think exclusively
17  drugs that were not on the market and for which
18  the NDA had not been submitted.  So these are
19  drugs in phase 1, phase 2 development.
20     Q.    And can you identify for us any of
21  the drugs?
22     A.    Oh, I can be remember any of that,
23  no.  That was 15 years ago.
24     Q.    And since you have left the FDA,
25  have you done any consulting work for the DDMAC

Page 55

1  office?
2     A.    No.
3     Q.    And while you were at the FDA did
4  you have any responsibility for advising public
5  companies on the contents of their public
6  disclosures?
7     A.    I'm -- I'm sorry, ask the question
8  again.
9     Q.    While you were at the FDA, did you
10  have any responsibility for advising public
11  companies on the contents of their disclosures?
12         MS. MURPHY:  Object to the form.
13     A.    No.
14     Q.    And while you were at the FDA did
15  any company approach you and ask you to review a
16  draft press release?
17     A.    No.
18     Q.    And at any time in your two years
19  at the FDA did you ever provides any guidance to
20  any public company about information that they
21  should be disclosing publicly?
22         MS. MURPHY:  Object to the form.
23     A.    I'm sorry, ask that question again.
24     Q.    Sure.  At any of the time that you
25  were at the FDA, did you ever provide any

Page 56

1  guidance to any company about what the contents
2  of their public disclosure should be?
3     A.    With regard -- the answer is no.
4     Q.    Have you ever been an employee of a
5  publicly traded company?
6     A.    Yes.  I have.
7     Q.    What was that?
8     A.    That was the Charles Schwab
9  company.
10     Q.    Any others?
11     A.    No.
12     Q.    Was the Allen Stanford group, was
13  that public?
14     A.    No.
15     Q.    Have you ever been an officer of a
16  publicly traded company?
17     A.    I was a vice president at Charles
18  Schwab.  Whether that was considered an officer
19  or not, I don't know.
20     Q.    And in your position at Charles
21  Schwab, were you -- did you have any
22  responsibility for drafting press releases issued
23  by the company?
24     A.    Issued by Charles Schwab?
25     Q.    Correct.

Gregory Frykman, M.D.

Page 57

1    A.   No.
2         Q.   Did you ever have any
3    responsibility at Charles Schwab for reviewing or
4    approving any of the press releases issued by the
5    company?
6         A.   No.  That was handled by other
7    people.
8         Q.   Now, in your career have you ever
9    been responsible for drafting a press release
10   that was going to be issued by a publicly traded
11   company?
12        A.   No.
13        Q.   Have you ever been responsible for
14   drafting a press release to be issued by a
15   biotechnology company?
16        A.   No.  I should say, with -- with
17   the -- with the exception that with one -- you
18   know, with one consulting client, with Concordia,
19   where they were contemplating terminating this
20   particular clinical trial and were thinking
21   through the obligations they had to announce
22   that.  Beyond that, no.
23        Q.   Did you draft any portion of that
24   Concordia press release?
25        A.   No.

Page 58

1         Q.   Did you have responsible for
2    drafting a portion of that Concordia press
3    release?
4         A.   No.
5         Q.   And with the exception of the
6    Concordia press release we've discussed, have you
7    ever reviewed a draft press release before it was
8    issued by a publicly traded company?
9         MS. MURPHY:  Object to the form.
10        A.   I have not reviewed draft press
11   releases.  I've consumed plenty of them.
12        Q.   Draft press releases?
13        A.   Not draft press releases.
14        Q.   Okay.  Have you ever seen a press
15   release prior to it being issued by a publicly
16   traded company?
17        A.   Yes.  Again, with regard to Charles
18   Schwab, it was -- actually, the day that I
19   started there they announced my joining the firm
20   by press release, and I think they came around
21   before and just said, hey, we're getting ready to
22   send this thing out.  Would you please look at it
23   and make sure it's accurate, which I did.
24        Q.   And did that press release involve
25   clinical trial results?

Page 59

1         A.   No.
2         Q.   In your career have you ever
3    publicly spoken on behalf of a publicly traded
4    biotechnology company?
5         MS. MURPHY:  Object to the form.
6         A.   On behalf of?
7         Q.   Correct.
8         A.   No.
9         Q.   Has any biotechnology company ever
10   asked you to represent the company in speaking
11   with investors?
12        A.   I'm sorry, I'm not sure how to
13   answer that question, and I'll explain to you
14   why.  When I was in the capital markets, so this
15   was in the late 2002 to early 2009 timeframe, my
16   role, as I've indicated, was as a policy analyst.
17        At the Stanford Group, again, I was
18   the -- I was -- I was employed the entire time by
19   the Washington Research Group, which is a firm
20   here in town, and it was owned by Schwab from --
21   before I started until late 2004.  And then the
22   firm was acquired by the Stanford group after
23   that.
24        When we were together -- when we
25   were at Stanford, Stanford offered full

Page 60

1    investment banking services for pharmaceutical
2    and biotechnology clients.  So the investment
3    banking function, which did not exist on the
4    institutional side at Charles Schwab, now was
5    present on a -- at Stanford.
6         And it was commonplace for
7    investment bankers to call me and ask me to look
8    at pitch decks from companies that had contacted
9    the firm to consider banking them, either it was
10   a subsequent raise, maybe in the public offering,
11   I can't remember all that -- exactly which --
12   which kinds of offerings there were.
13        And in some cases I was asked by
14   our investment banking staff to go to a company
15   with them to talk about what their plans might
16   be.  So this was either going to the company or
17   at, for example, the JPMorgan conference, even
18   though we were not part of JPMorgan, that's still
19   a -- a large conference with a lot of outside
20   meetings going on.  And I can remember being
21   asked a couple of times to go with our bankers to
22   go see a particular company.
23        And the inevitable question arose
24   during the discussions with the bankers and with
25   company management there, you know, so,

Gregory Frykman, M.D.

Page 61

1 Dr. Frykman, what do you think about this, that,
2 or the other.  What do you think about issues
3 with the FDA.  What do you think about, you
4 know -- you know, their development plan and so
5 forth.
6           I don't know that I was ever asked
7 to go speak publicly on behalf of any of these
8 companies.
9           On the other hand, it was -- it was
10 the case, on at least one occasion -- you know,
11 there were several occasions, but one that I
12 remember very well that actually involved Alan
13 Auerbach where a -- a traditional fundamental
14 earnings-driven analyst in our firm was covering
15 the prior company Cougar.  And the opportunity
16 arose for Cougar, in the form of at least Alan,
17 to come to our offices.  And the firm invited --
18 invited me, because I was here in D.C., this was
19 all up in New York, as well as a handful of our
20 institutional investing clients, to come and talk
21 to Alan Auerbach about Cougar matters.  So we did
22 that.
23           I don't know that that would
24 necessarily constitute a presentation by a
25 biotechnology company in a public forum, but at

Page 62

1 the same time there was certainly a robust
2 discussion about what the FDA would -- would or
3 could expect from -- I'm sorry, what the company
4 could expect from the FDA when it planned to go
5 talk to the FDA and the -- in the weeks and
6 months, you know, going forward with regard to
7 design of that trial.
8           Sorry to go on like this, but this
9 is --
10    Q.    Sure.  The question I had was
11 whether a biotechnology company has ever retained
12 you to speak on its behalf to investors, the
13 investors in the company?
14    A.    Sure.  The answer is no.
15           MS. MURPHY:  I'm sorry, we've been
16 going a little over an hour.  Is this a good time
17 to take a break?
18           MR. GRONBORG:  Yeah.  A couple of
19 minutes, sure.  Finish up one little area.
20    Q.    Other than the meeting you had with
21 Mr. Auerbach back when he was involved in Cougar,
22 have you had any other communications with him at
23 any other time?
24    A.    No.
25    Q.    And in that meeting with

Page 63

1 Mr. Auerbach did he or anyone else at Cougar ask
2 you to review any of the company's press
3 releases?
4    A.    No.
5    Q.    Did he ask you to review any of the
6 company's conference call transcripts?
7    A.    No.
8    Q.    And in any of these meetings that
9 you said you -- you had with clients of the
10 Stanford group, were you asked at any of them to
11 opine on whether or not the company's public
12 disclosures met any customary practices?
13    A.    No.
14           MR. GRONBORG:  Why don't we go off
15 the record.
16           THE VIDEOGRAPHER:  The time is
17 10:21 a.m., and we're going off the record.
18           (Recess taken.)
19           THE VIDEOGRAPHER:  The time is
20 10:34 a.m., and we are back on the record.
21 BY MR. GRONBORG:
22    Q.    Dr. Frykman, have you ever drafted
23 a conference call script for a publicly traded
24 biotechnology company?
25    A.    No.  I've not.

Page 64

1    Q.    Have you drafted a conference call
2 script for any publicly traded company?
3    A.    No.
4    Q.    Have you ever reviewed a draft
5 conference call script for a biotechnology
6 company?
7    A.    No.
8    Q.    And in your career at any state --
9    A.    Can I ask something real quick?
10 Are you referring to the first draft after the
11 conference call has occurred, or are you
12 referring to the scripted comments that are
13 expected to be read prior to the conference call
14 occurring?
15    Q.    The latter.  The scripted comments.
16           Have you ever had responsibility
17 for drafting a script?
18    A.    No.
19    Q.    And at any -- at any point in your
20 career have you been responsible for drafting a
21 Securities and Exchange Commission filing?
22    A.    No.
23    Q.    Have you ever had any involvement
24 in reviewing or approving a Securities and
25 Exchange Commission filing before it was filed?

Gregory Frykman, M.D.

Confidential

Hsingching Hsu vs. Puma
Biotechnology, Inc., et al.

Page 65

1    A.   No.
2        Q.   And I take it that you've never
3  done that for any biotechnology company?
4    A.   That's correct.
5        Q.   And have you ever reviewed a draft
6  SEC filing before it was filed?
7            MS. MURPHY:  I'm sorry.  The
8  realtime doesn't seem to be working.
9        (Reporter-initiated discussion off
10       the record.)
11       Q.   The question was have you ever
12  reviewed a draft SEC filing before it was filed?
13   A.   No.
14       Q.   And with the exception of Concordia
15  has any publicly traded company ever hired you to
16  review its public statements?
17   A.   No.
18       Q.   And with respect to Concordia were
19  you hired by the parent company or by Concordia
20  labs?
21   A.   It was Concordia labs.
22       Q.   Has any publicly traded company
23  ever hired you to assess whether their public
24  statements were in line with typical industry
25  practices?

Page 66

1            MS. MURPHY:  Object to the form.
2    A.   No.
3        Q.   Has any publicly traded company
4  ever hired you to assess whether their public
5  statements were in line with any legal
6  requirements?
7            MS. MURPHY:  Object to the form.
8    A.   No.
9        Q.   Has any publicly traded company
10  ever hired you to tell them what typical industry
11  practices are for public disclosures?
12   A.   No.  I would assume they would know
13  all that.
14       Q.   Why do you assume that?
15   A.   Because they're a member of the
16  industry.
17       Q.   In your career have you ever had
18  any responsibility for a public offering of stock
19  by a biotechnology company?
20            MS. MURPHY:  Object to the form.
21   A.   I'm sorry, reask the question.
22       Q.   Sure.  Have you ever had any
23  responsibility for a public offering of stock by
24  a biotechnology company?
25   A.   Responsibility?  I'm -- as I

Page 67

1  explained before, I've certainly been involved in
2  working with our firm's investment bankers in
3  contemplated stock offerings.  I don't know that
4  that constitutes responsibility for.
5        Q.   Well, have you ever consulted --
6  been retained as a consultant by a biotechnology
7  company with regard to whether or not they should
8  have a stock offering?
9    A.   In my consulting practice, no.
10       Q.   And when you worked at Charles
11  Schwab or Allen Stanford did -- were you
12  retained -- your group retained by any company to
13  consult with them on whether or not to have a
14  stock offering?
15   A.   Schwab did not do investment
16  banking, so that wouldn't count.  But with regard
17  to Stanford, it was not outside firms that would
18  come talk to the Stanford management group.  It
19  would be the companies themselves.  And that
20  would involve, again, initial contact with the
21  bankers, the conversation which I was not part
22  of.
23            And then that would result
24  sometimes into a pitch deck that came my way that
25  I would look at and then try to accurately

Page 68

1  provide, you know, thoughtful input to our
2  bankers about what the likely requirements would
3  be from a clinical development point of view,
4  from an FDA regulatory point of view, looking at
5  the competitive landscape.  What other products
6  are also in development in that same -- same
7  therapeutic area and so forth.
8        Q.   And in any of those engagements did
9  you ever provide any advice to any company about
10  when they should have a public offering?
11   A.   I don't think that I ever indicated
12  to them, to the company directly, when a
13  propitious moment might be.  But that was
14  frequently -- not frequently.  That was from time
15  to time discussed with the bankers.
16       Q.   Have you had any -- ever had any
17  responsibility for approving -- reviewing or
18  approving any of the documents associated with a
19  public offering of stock before they were filed
20  with the SEC?
21   A.   No.
22       Q.   Other than Concordia, have you been
23  retained as a consultant in the past eight years
24  by any other publicly traded biotechnology
25  company?

Gregory Frykman, M.D.

Page 69

1     A.   I don't think so.
2     Q.   And -- well, at any point since
3  2009, other than Concordia, have you been
4  retained by any publicly traded biotechnology
5  company?
6     A.   I -- I don't think so.
7     Q.   In the engagement with Concordia,
8  did you review any of the company's public
9  statements that had already been issued to
10 determine whether or not they were in line with
11 any industry standard?
12       MS. MURPHY:  Object to the form.
13    A.   I certainly looked at their -- some
14 of their public disclosures.  I don't know that
15 it was being done through the lens of does this
16 comport with industry standards, although I will
17 say that nothing struck me as being out of line.
18       So the company would from time to
19 time announce what they were doing with, you
20 know, a particular drug.  And that was helpful to
21 me just as background as to what they were
22 saying.  And nothing was particularly notable
23 there.
24    Q.   Did Concordia hire you to provide
25 them advice on whether or not any of those press

Page 70

1  releases were in line with typical industry
2  practices?
3     A.   No.  That wasn't the primary
4  purpose for them engaging me.
5     Q.   And have you consulted with any
6  biotechnology company, public or not, regarding
7  the timing of a stock offering?
8     A.   I thought we covered that before.
9  The answer to that was no.
10    Q.   And why did you leave the FDA after
11 two years?
12    A.   I had an opportunity to be a policy
13 analyst here in D.C.
14    Q.   And why did you want to do that?
15    A.   It was to me a rather natural
16 career progression from having spent years and
17 years and years in -- in the business in
18 regulation of -- well, I should say, the -- the
19 development of mostly cancer-related
20 pharmaceutical products, as well as in
21 regulation, as well as with a background in
22 medicine doing policy analysis where I focused on
23 very much the same things.  But this time basing
24 it on what was available in press releases,
25 publications, scientific medical conference

Page 71

1  presentations, and offering views on the
2  likelihood on a variety of issues but one of
3  which is the likelihood of FDA approval, the
4  likely outcomes of public advisory committee
5  meetings convened by the FDA.
6        In some cases where I felt like I
7  had particular insight, I would make comments to
8  institutional investment clients regarding the
9  likely outcome of clinical trials.  How I thought
10 in some cases the competitive landscape would
11 shake out with the safety and efficacy announced
12 by a company for a particular drug.  So to me it
13 was then and is still a very natural career
14 progression.
15    Q.   When was the last time you treated
16 a patient as a licensed physician?
17    A.   Probably a decade ago.
18    Q.   When was the last time you treated
19 a breast cancer patient?
20    A.   Let me -- actually, let me clarify
21 that.  It is frequent, unfortunately, that I get
22 calls from friends and family members who, you
23 know, have one or more malignancies that have
24 been diagnosed, and I'm asked my view on that.
25       It's always a little more

Page 72

1  concerning when they're not from the State of
2  California or Maryland where I have a medical
3  license, but I still try to offer, you know, some
4  advice and some recommendations.
5        As far as treating them and -- and
6  being the physician of record, that's been over a
7  decade.
8     Q.   Are you still board certified in
9  any field?
10    A.   No.  I'm not.
11    Q.   When's the last time you took a
12 board examination?
13    A.   Oh, that was in '99, 2000.
14    Q.   Now, after you went to the
15 Washington group and served as a policy analyst,
16 as a policy analyst were you ever hired to review
17 drafts of any company's public disclosures?
18    A.   Absolutely not.  They didn't send
19 me drafts.
20    Q.   In any -- did you author reports as
21 a policy analyst for the Washington group?
22    A.   I authored numerous reports.
23    Q.   Were they public reports?  Private
24 reports for a specific client?
25    A.   They were reports.  I think they

Gregory Frykman, M.D.

Hsingching Hsu, et al. vs. Puma Biotechnology, Inc., et al.

Page 73

1  were all considered publicly available.  So
2  there's nothing that was proprietary and that I
3  wrote, except to the extent that the research
4  that I and, you know, my colleagues in the
5  Washington Research Group produced was intended
6  for paying clients who were the institutional
7  investing firms that we did business with.
8         Stuff that I wrote would wind up in
9  LexisNexis and so forth, and I never paid too
10  much attention to how all that, you know,
11  occurred.
12         And then once in a while my stuff
13  would pop up in other people's hands, because
14  they'd call me out of the blue and say, you know,
15  we've got your report on X, Y, Z.  And I'd ask,
16  well, you know, who, sir, are you?  I don't
17  recognize you as a client.  And he'd explain who
18  he was and so forth.
19         But the -- the intended audience
20  were the larger and better-known mutual funds and
21  hedge funds mostly in the United States.  Some of
22  it was international.  And it was the -- you
23  know, more the pharma and biotech.  My audience
24  was the pharma and biotech focused institutional
25  investors.

Page 74

1      Q.   And in any of the reports you
2  offered -- authored as a policy analyst, did you
3  ever comment on whether or not a specific
4  company's public disclosures were in line with
5  typical industry practices?
6         MS. MURPHY:  Object to the form.
7      A.   I would frequently comment on
8  information in the press releases, both
9  information that was there, as well as
10  information that we would like to see, or I would
11  like to see, but was not there.  And the
12  inevitable question is, you know, when are we
13  going to see this information.
14      Q.   Did you ever author a report in
15  which you said a company's public disclosures
16  were or were not in line with typical industry
17  practices?
18         MS. MURPHY:  Object to form.
19      A.   I don't know that I worded it
20  exactly that way, but I was certainly forthcoming
21  about what information one would typically see in
22  a clinical study report, for example, and which
23  I've seen numerous examples of.  But that was not
24  in, you know, the press release.
25      Q.   What do you mean by "clinical study

Page 75

1  report"?
2      A.   The clinical study report is the
3  definitive report on the full outcome of a
4  particular clinical trial.
5      Q.   And in any of the reports that you
6  authored, did you ever do a comparison between
7  the initial press release about a clinical trial
8  result and the clinical study report?
9      A.   I was never able to do that,
10  because clinical study reports are kept
11  confidential to the sponsor of that study.  The
12  studies, after all, are very expensive, and the
13  clinical study report contains all the details of
14  that study.  I should say all the studies -- the
15  details of the analysis of that study.  The
16  actual details are contained in other documents,
17  which we can talk about, if you want to.
18         But the clinical study reports we
19  would, you know, have full access to at the FDA
20  and at the National Cancer Institute.  And I've
21  read probably hundreds of them over the years
22  prior to being in the capital market, so I knew
23  full well what one would generally expect.
24         And in press releases there would
25  be information at times that would be helpful to

Page 76

1  know.  Companies aren't obligated to provide
2  necessarily, but it would be helpful to know that
3  we knew what was very likely sitting in the
4  clinical study reports.
5      Q.   In your role as a policy analyst
6  with the Washington group, did you ever publicly
7  comment about whether a company's disclosure was
8  or was not in line with typical industry
9  practices?
10      A.   I thought I answered that before.
11  The answer is, I don't know that I ever
12  specifically commented on whether or not it was
13  in line with typical practices, but after you've
14  read hundreds and hundreds, and probably
15  thousands of press releases, you sort of have a
16  sense of what is typical.
17         And at the same time I know from
18  experience what should be expected in terms of
19  clinical trial results, either based on interim
20  data or on the full -- you know, the final
21  clinical study report, and would advise our
22  clients in some cases it's odd that this piece of
23  information is missing.  Maybe there's some
24  implication to it, maybe there's not.
25      Q.   Do you recall ever publicly, or in

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 21 of 143   Page ID
#:13469

Confidential

Gregory Frykman, M.D.

Hsingching Hsu vs. Puma
Biotechnology, Inc., et al.

Page 77

1   one of your published reports, ever commenting
2   that a company's press release about a clinical
3   trial was not typical?
4       A.   I don't know that I would have used
5   the word "not typical" but would -- I was
6   certainly forthcoming about where I thought that
7   additional information would be helpful that
8   isn't in there -- helpful to better gauge the
9   risk/benefit ratio of the drug.
10          But at the same time I'll add that,
11  you know, companies were under no obligation to
12  provide it, and that the information even that I
13  sought was probably beyond what most practicing
14  policy -- or practicing analysts would ask about.
15          And how I know that is that I'd see
16  other reports of other, you know, competing
17  analysts.  And I was frequently surprised at what
18  I thought was the -- the thinness or the lack of
19  deep thought about what -- in their reports about
20  some particular new piece of information.
21          So a company issued a press
22  release -- remember, when I was on -- in the
23  capital markets on Wall Street, I had a Bloomberg
24  box.  I don't know if that means anything to you,
25  but I had this -- this -- this terminal that

Page 78

1   provided the press releases that biotech and
2   pharma companies would issue.  Lots of companies
3   issue them, but the ones I was particular
4   interested in were in pharma and biotech
5   companies.
6           And I would see, you know, a
7   handful to dozens of these per day, only some of
8   which were particularly relevant.  So companies
9   issue a lot of press releases.  Pharma and
10  biotech companies issue a lot of press releases,
11  only a fraction of which were particularly
12  relevant to what I was doing.
13          I didn't need to know about their
14  earnings.  I didn't need to know about their
15  latest -- their latest re -- renegotiation of
16  their license agreement, that kind of thing.
17          But when it came time to publicly
18  releasing results of either interim or final
19  results of a clinical trial of a drug that I was
20  paying particularly close attention to, then that
21  would frequently turn into a report.  And I would
22  analyze that press release very carefully, issue
23  my report to our client, and then the clients
24  generally would send me what other analysts on
25  the street were saying about the same press

Page 79

1   release for the same drug, which I'd then look at
2   and was -- as I said before, I was surprised many
3   times at most of the sell side analysts sort of
4   taking hook, line, and sinker what the particular
5   press release said, and didn't seem to delve into
6   asking about what additional details, you know,
7   might be helpful in understanding the
8   risk/benefit ratio of the drug, the prospects for
9   the FDA, how it fit into the anticipated
10  competitive landscape, you know, and so forth.
11          So I know that's a long answer, but
12  that's, you know, a bit of how I did my job.
13      Q.   In this case, with respect to
14  Puma's July 22, 2014, press release, are you
15  opining about whether or not there is any
16  information that would have been helpful in
17  understanding the risk/benefit of the drug
18  neratinib?
19      A.   No.  My focus on this is -- is does
20  it fit within what is typically done within the
21  pharma and biotech industry in terms of public
22  disclosure of recent clinical trial outcomes.
23      Q.   And based on your review, did you
24  come to any conclusion about whether there was
25  any additional information beyond what was in the

Page 80

1   press release that would have been helpful in
2   understanding the risk/benefit nature of the
3   drug?
4           MS. MURPHY:  Objection.  No
5   foundation.
6       A.   Other people have certainly
7   commented on that, but that's not been
8   particularly my focus.
9       Q.   And did you reach any conclusion
10  about that?
11      A.   My conclusion --
12          MS. MURPHY:  Objection.  No
13  foundation.
14      A.   My conclusion was that the July 22,
15  2014, press release by Puma Biotechnology was
16  comfortably within what are industry standards.
17      Q.   Do you have any opinion at all
18  about whether there's any additional information
19  that would have been helpful if it was included
20  in that press release with regard to the
21  risk/benefit nature of the drug?
22          MS. MURPHY:  Objection.  Asked and
23  answered.
24      A.   Yeah.  I think I've answered that
25  question.

Gregory Frykman, M.D.

Page 81

1    Q.   You have to answer it again.
2        A.   Other people have made numerous
3  comments about what information ought to be
4  there.  For me, I don't think the risk/benefit
5  ratio changed -- you know, would change at all
6  with the information that other folks said is
7  missing.
8    Q.   Is that an opinion you're offering
9  in this case?
10       A.   That's correct.
11       Q.   All right.  When you say "other
12  people," who were these other people?
13       A.   There have been, and I'd have to
14  remember exactly where, perhaps you could direct
15  me, but there has been -- and I believe it was in
16  the initial complaint -- that the information
17  that was missing was the point estimates for
18  disease-free survival at two years, or two years
19  and 28 days.  And that there was safety
20  information that they -- that they say was
21  missing that they thought should have been there.
22       Those are two that come immediately
23  to mind.
24       Q.   And how did you reach the
25  conclusion that there is no information other

Page 82

1  than what was in the press release that would
2  have been helpful to understand the risk/benefit
3  nature of neratinib?
4        A.   Because the -- the safety
5  information about the drug was well described and
6  in the public domain prior to the -- prior to the
7  issuance of the press release.
8        And, secondly, that the individual
9  point estimates for disease-free survival at the
10  two-year- or two-year-and-28-day time point, that
11  has virtually no bearing on the risk/benefit
12  ratio of the drug.
13       The novel piece of information in
14  the July 22, 2014, press release was the hazard
15  ratio of 0.67 on disease-free survival.  And that
16  was a critical piece of information to understand
17  the risk/benefit ratio of the drug, which was
18  favorable.
19       Q.   Now, with regard to those
20  individual DFS points, why is it you believe
21  those have virtually no bearing on the
22  risk/benefit profile of the drug?
23       A.   Because the hazard ratio is the --
24  is the value or the number that counts
25  exponentially more than individual point

Page 83

1  estimates of DFS.
2        Q.   Counts exponentially more to who?
3        A.   To anybody that is -- I'd better be
4  careful -- counts to people that interpret
5  clinical trials.
6        Q.   Like the FDA?
7        A.   I can't tell you exactly what their
8  thought process is, but I did work there years
9  ago, and I don't think their practice has changed
10  much internally, and that it was the hazard ratio
11  that was discussed in meetings.  It was the
12  hazard ratio that was discussed in the hallways.
13  It was the hazard ratio that -- the FDA goes to
14  ASCO meetings as well, and they see the slide
15  presentations of the companies for the same drugs
16  that they regulate.
17       And it is those hazard ratios, it
18  is those clinical trial outcomes frequently --
19  not all the time -- but frequently described in
20  terms of hazard ratio that really is the -- the
21  metric of greatest interest.
22       Q.   Now, with respect to neratinib, did
23  you review any of the FDA materials to find out
24  if the FDA thought the DFS rates had virtually no
25  bearing on the risk/benefit ratio of the drug?

Page 84

1        A.   I certainly did review the FDA
2  documents, review documents regarding neratinib.
3  And I don't recall in there the FDA ever saying
4  we don't consider these point estimates to be
5  particularly interesting.  But the focus of the
6  FDA review on the efficacy side, and what
7  appeared in the label, which is the outcome of
8  their multi-month, you know, multidisciplinary
9  review was the hazard ratio.
10       Q.   Does the FDA label for neratinib
11  include the DFS rates at two years and 28 days?
12       A.   Oh, I think it probably does.
13       Q.   Why would it include that, if it
14  has virtually no bearing on the risk/benefit of
15  the drug?
16       MS. MURPHY:  Objection.  Lack of
17  foundation.
18       A.   The FDA frequently puts in the
19  label or insists the company put in the label
20  information that, albeit is of minor
21  significance, nevertheless, the FDA, probably for
22  historical and customary reasons, has that data
23  put in there.
24       But for practicing clinicians,
25  after all, they're the people that are going to

Gregory Frykman, M.D.

Page 85

1  use the drug, or they and their patients are the
2  ones that are going to use the drug, the
3  overwhelmingly more important -- not
4  marginally -- but the overwhelmingly more
5  important metric on the outcome of the ExteNET
6  trial was the hazard ratio.  I think the label
7  actually had it as .66.
8      Q.   So other than your say so, can you
9  point me to any academic article or anything else
10  which you think supports the notion that the
11  hazard ratio is overwhelmingly more important to
12  practitioners than the DFS rates?
13      A.   There are -- the hazard ratio for --
14  let's step back.  For event-based endpoints, so
15  that's things like overall survival,
16  progression-free survival, disease-free survival,
17  time to progression, these endpoints, which are
18  commonly but not exclusively used in oncology,
19  they tend to be preferentially analyzed by using
20  the hazard ratio.
21      I'm not a biostatistician, and I
22  don't claim to be one, but the hazard ratio is
23  something that is -- is commonly used, because it
24  encapsulates in a single number what the outcome
25  is between the two arms of the trial.

Page 86

1      So if they say, you know, control
2  versus experimental or drug versus placebo or
3  drug versus another drug, the hazard ratio
4  encapsulates better than individual DFS or
5  overall survival rates at a particular time
6  point, the hazard ratio encapsulates the outcome
7  of that clinical trial.
8      The other piece that's important in
9  this is the p-value or the significance level.
10  So while the hazard ratio in and of itself might
11  be interesting and anything that is less than one
12  tends to be of interest.  And the further away
13  from one you get, so at .6, .5, .4, .3, those
14  become even more interesting, suggest there's a
15  larger therapeutic effect.
16      But the other piece of information
17  that virtually always goes hand in hand with the
18  hazard ratio is the p-value, the significance
19  level.  That takes into account the size of the
20  trial as well or how many patients were on
21  each -- each of the arms.  So the power of the
22  trial.  That's a statistical term, actually --
23      Q.   I'm going to stop you just because
24  my question to you was if you can point me to any
25  publication or any authority to support your

Page 87

1  claim that practitioners overwhelmingly care the
2  most about the hazard ratio as opposed to DFS
3  rates.
4      Can you point me to any academic
5  literature or anything that supports that claim?
6      A.   I can point you to numerous
7  articles --
8      Q.   I need a one.  Name one?
9      A.   -- of clinical -- of clinical
10  trials.  I'd have to do it at the break.  But I
11  can point you to a list of clinical trials --
12      Q.   Okay.  Wait till the break.
13      What I'm trying to get at is if you
14  can name for me an article, anything that you
15  think supports that position.  So if you want to
16  take time at the break to do so, after the next
17  break we'll come back to it.
18      A.   It is -- it is commonly used at the
19  FDA and at the NCI.
20      Q.   In this case with the FDA, did you
21  review the ODAC transcript or any of the
22  materials that were submitted to the FDA as part
23  of the approval process?
24      A.   I did not seek the -- you know,
25  copies of the NDA.  I can't remember if I looked

Page 88

1  at the transcript.  I certainly looked at the FDA
2  review documents.
3      Q.   Do you know if the NDA included
4  the -- just the hazard ratio or if it also
5  included the DFS rates for the ExteNET trial?
6      A.   Well, it almost certainly included
7  all of the DS -- you know, the entire -- the
8  entire rate information.
9      Q.   And during the ODAC meeting do you
10  know if there was any discussion there about the
11  DFS rates in the ExteNET trial?
12      A.   Well, I'm --
13      MS. MURPHY:  Object to the form.
14      A.   I'm -- I'm sure there was some
15  discussion about the individual DFS rates, but
16  the -- the majority of the discussion of efficacy
17  revolved around hazard ratios.
18      Q.   At the neratinib ODAC the majority
19  concerned the hazard ratios?
20      A.   Right.  I can't tell you, because I
21  don't know that I went through the entire
22  transcript of that, but as is the case with most
23  advisory committees -- and I've been to a lot of
24  them -- the oncology drug advisory committees,
25  that the efficacy that is discussed for

Gregory Frykman, M.D.                                    Hsingching Hsu v. Puma
                                                         Biotechnology, Inc., et al.

Page 89

1  event-based trials revolves around hazard ratio.
2      Q.   How many ODAC meetings have you
3  been to?
4      A.   Dozens.
5      Q.   Have you spoken in any of them?
6      A.   I have.
7      Q.   Which ODAC meetings did you speak
8  at?
9      A.   It was the September 10 of 2001.
10 And that was the drug Doxil.  I spoke on behalf
11 of the FDA regarding its supplemental application
12 for ovarian cancer, which that supplemental
13 application was approved.  And then I also
14 spoke -- I'm sorry, that was IntraDose.  And
15 prior to that was -- was Doxil.  So, yeah.
16     Q.   Just those two are the ones you
17 spoke at?
18     A.   That's correct.
19     Q.   All right.  And let me go back to
20 it.  Are you opining in this case that at the
21 ODAC meeting for neratinib the overwhelming or
22 primary efficacy discussion was regarding the
23 hazard ratio and not DFS rates?
24          MS. MURPHY:  Object to the form.
25 Lacks foundation.

Page 90

1      A.   Yeah.  I thought I answered that
2  earlier.  I have not gone through the transcript
3  for the ODAC on neratinib in great detail.
4      Q.   Did you look at the FDA briefing
5  document?
6      A.   I probably looked at that.
7      Q.   Was it your impression that the FDA
8  briefing document with regard to efficacy
9  overwhelmingly concerned the hazard ratio and not
10 the DFS rates?
11          MS. MURPHY:  Object to form.
12     A.   I guess I -- I was not impressed
13 that there was any great emphasis on anything --
14 on terms of efficacy -- on terms of anything
15 other than hazard ratio.
16     Q.   But you looked?
17     A.   Sure.
18     Q.   Okay.  Tried to figure out what
19 they thought was the most important efficacy?
20     A.   Well, again, I --
21          MS. MURPHY:  Object to the form.
22     --   I generally know that.  And so
23 as was my practice both at the FDA when I was
24 there, as well as in capital markets, and then
25 subsequently in private consulting, when

Page 91

1  questions arise as to what is the outcome of a
2  particular -- again, controlled trial using an
3  event-based endpoint, the first thing that I, and
4  I think a lot of other people do, is go
5  immediately to the hazard ratio, see what that
6  is, and then look at the p-value and see what
7  that is.
8          And the individual outcome on the
9  primary endpoint at a particular point in time is
10 of substantially less import.
11     Q.   Do you know what the primary
12 endpoints were for the ExteNET trial?
13     A.   The primary endpoint was
14 disease-free survival.  In fact, it was invasive
15 disease-free survival, IDFS.
16     Q.   And do you know how that was
17 measured, according to the statistical analysis
18 plan?
19     A.   I do.
20     Q.   And how was it measured according
21 to the statistical analysis plan?
22     A.   That was measured from the data
23 randomization until the first detection of
24 invasive disease.
25     Q.   And how was it -- how was that

Page 92

1  result to be calculated?
2      A.   I'm not sure what you mean by how
3  it's calculated, but you count up from the date
4  that patient was randomized until there was
5  detection of some invasive disease.  That gives
6  you a number of days.  That information, whether
7  it's on the neratinib arm or the placebo arm, is
8  acquired for each patient.  And then that is
9  analyzed using what's called the log rank test
10 statistic.  And from that -- and that's what
11 statisticians do, I don't do that -- but from
12 that a -- a hazard ration and a p-value are
13 derived.
14     Q.   And with regard to the ExteNET
15 trial and the statistical analysis plan, do you
16 understand the primary endpoint was only going to
17 be represented by a hazard ratio and a p-value?
18     A.   I believe that they had a Cox
19 proportional hazards model in there as well.
20     Q.   Okay.  Anything else?
21     A.   That -- there may have been one
22 other small piece of information that I can't
23 remember.
24     Q.   Now, with res -- you said earlier
25 that you thought the safety information regarding

Gregory Frykman, M.D.

Page 93

1  neratinib was well-described and in the public
2  domain prior to July of 2014; is that right?
3       A.   Uh-huh.
4       Q.   Is that an opinion you're offering
5  in this case?
6       A.   Yes.
7       Q.   Is that in your report somewhere?
8       A.   I don't know that it's specifically
9  stated in the report, but I think it fits within
10  the -- within the -- within the summary.  Let's
11  see what I said.
12           But, yes, I -- I am testifying that
13  the results of the safety were described --
14  safety record were described in the public
15  literature, you know, up to July 22, 2014.
16       Q.   Can you show me where in your
17  summary of opinions, section II, that opinion
18  falls?
19       A.   Perhaps it's not there and it's
20  just encapsulated within the -- ah, let's see.
21  It is perhaps encapsulated in No. 2 where it's my
22  opinion that the disclosures were in line with
23  typical industry practices.
24       Q.   So are you referring there to
25  disclosures that occurred before July 22, 2014?

Page 94

1       A.   Yes.
2       Q.   You say "It is my opinion that Puma
3  disclosures in the July 22, 2014 press release,
4  and accompanying discussion in the analyst call."
5           Can you now tell me, what
6  disclosures is that meant to encapsulate?
7       A.   Sure.  So in the conference call --
8       Q.   Well, how about this:  Is there
9  anything beyond -- I'm trying to figure out --
10  you seem to be saying this involves something
11  other than the July 22, 2014, press release and
12  conference call.
13           What other disclosures besides
14  those two are encapsulated in this summary 2?
15           MS. MURPHY:  Objection.  Misstates
16  testimony.
17       A.   There were two publications it
18  refer to in the conference call where neratinib
19  safety data were described.  There was also a
20  presentation a few months before in 2014 at the
21  ACR meeting in which the I-SBY 2 trial results
22  were presented.
23       Q.   Turn to your Exhibit C, your list
24  of materials considered.  Can you show me --
25       A.   Exhibit C.

Page 95

1       Q.   Can you show me in there where you
2  considered those documents?
3       A.   I won't be able to find that in
4  there because these I looked at after this report
5  was -- after this report was produced.
6       Q.   So is this a new opinion that
7  you've come to after the report was produced?
8       A.   It's not a new opinion.  It's an
9  opinion that I've held.  I probably looked at
10  these in more detail after the -- after the
11  report was produced.
12       Q.   So you did look at them?  You did
13  consider them before you produced the reports?
14       A.   I either had seen them directly or
15  had seen a summary of it.
16       Q.   Is there a reason you didn't
17  include them in your materials considered?
18       A.   Probably because I hadn't actually
19  had the document in hand.
20       Q.   So you considered them, but you
21  didn't have the documents.  How's that?
22       A.   Yes.  I think that's reasonable.
23       Q.   How did you consider the documents
24  but not have them?
25       A.   I think I had read the transcript

Page 96

1  ahead of time and it referred to peer-reviewed
2  publications.  That certainly counts in my book.
3       Q.   But did you read those
4  peer-reviewed publications?
5       A.   At that time, no.
6       Q.   So when is it that you came to this
7  conclusion about some of Puma's public disclosure
8  about -- some of Puma's public disclosure before
9  July 22, 2014?
10       A.   That's a view that I've held since
11  I think first being contacted by Latham and
12  Eleven Canterbury about this.  So please
13  understand that this didn't all occur in a
14  vacuum, and that I've been aware of neratinib and
15  I've been aware of Puma, you know, for several
16  years.
17           It's not something that I've ever
18  spent a lot of time thinking hard about, because
19  it's not been a consulting client, and it's not
20  been something that I've, you know, spent a lot
21  of time focusing on.  On the other hand, I've
22  been aware that it's out there.
23           And when this particular question
24  arose and I was given the transcript of the
25  calls -- I didn't participate on the call in

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 26 of 143   Page ID #:13474

Confidential

Gregory Frykman, M.D.

Hsingching Hsu vs. Puma
Biotechnology, Inc., et al.

Page 97

1  '14 -- I read through the transcript and said,
2  oh, okay, yeah, this -- this all sounds about
3  right. I'm fully aware of that.
4       And then I think I talked to, you
5  know, Latham attorneys the few times that I met
6  with them and just said, you know, guys, what
7  else, you know, is out there.
8       And they said, oh, yeah, there was,
9  you know, a presentation at ACR, you know,
10  that -- the I-SBY2 trial, which I've known about,
11  I-SBY2 trial is a well-known trial. And they
12  said, you know, we'll get you the -- the slide
13  deck for it. I think that probably came after
14  the report.
15       But my view has not changed that
16  the safety information about neratinib -- and
17  this not just for neratinib -- this is
18  commonplace for lots and lots and lots of cancer
19  drugs, because what I did for many years on Wall
20  Street was keep track of what the emerging safety
21  and efficacy data were, because this occurs over
22  years, of what the accumulating information is on
23  the safety and efficacy of drugs.
24       And it's only when called upon to
25  sit down and thoroughly analyze each source of

Page 98

1  information, where I would either publish a
2  report or offer a more substantiated opinion.
3  But the general notion that neratinib was under
4  development, that it was part of a class of drugs
5  that was well known, so gefitinib, erlotinib,
6  lapatinib, these are all drugs that are on the
7  market that fall in the same general class, they
8  all have similar adverse effects and similar --
9  they have similar safety profile, this is all
10  something that's commonplace and well known to
11  me.
12       Q.  And so I'm trying to get at whether
13  you have sort of a general opinion about -- or
14  I'll skip the word "opinion," do you have a
15  general feeling about what was disclosed about
16  neratinib prior to July 22, 2014, or whether in
17  this case you are offering the opinion that the
18  disclosures about neratinib prior to July 22,
19  2014, were in line with an industry practice?
20       MS. MURPHY:  Object to the form.
21       A.  So in -- in each ca -- for both.
22  So I had a general opinion coming into this about
23  how the safety and efficacy of neratinib, you
24  know, might shake out. Certainly the safety
25  stuff was -- was out there.

Page 99

1       And the -- and then for this
2  particular case, given all the information that
3  I've gone through and that comprises the list of
4  references that are at the back of the report,
5  I'm offering an opinion that the disclosure
6  practices -- that the -- the July 22, 2014, press
7  release for Puma Biotechnology and the
8  ExteNET trial outcome was in line with pharma and
9  biotech industry standards.
10       Q.  Are you offering any opinion about
11  any disclosures that were made by Puma prior to
12  July 22, 2014?
13       MS. MURPHY:  Object to the form.
14       A.  They have all seemed within line
15  with what I'd expect for a development for -- you
16  know, early and mid-development of a small
17  molecule EGFR antagonist.
18       Q.  How many press releases did Puma
19  issue about clinical trial results prior to
20  July 22, 2014?
21       MS. MURPHY:  Object to the form.
22       A.  I don't know.
23       Q.  How many did you look at for
24  purposes of this case?
25       A.  Prior to July 22?

Page 100

1       Q.  Press releases prior to July 22,
2  2014, about clinical trial results, how many of
3  those did you look at for this case?
4       A.  I don't know that I looked at any
5  of them, because they were not of particular
6  relevance.
7       MS. MURPHY:  Can we take a short
8  break?
9       MR. GRONBORG:  Yes.
10       MS. MURPHY:  Thank you.
11       THE VIDEOGRAPHER:  The time is
12  11:19 a.m., and we are going off the record.
13       (Recess taken.)
14       THE VIDEOGRAPHER:  The time is
15  11:32 a.m. and we're back on the record.
16  BY MR. GRONBORG:
17       Q.  Dr. Frykman, would you like to
18  clarify any of your testimony regarding the scope
19  of the opinions that you're offering in this
20  case?
21       A.  Yes. What I would like to clarify
22  is that before I was called to work on this case,
23  I had a -- sort of a general understanding of the
24  development of neratinib, and this was based on
25  general knowledge of how these TKIs are developed

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 27 of 143   Page ID #:13475

Confidential

Gregory Frykman, M.D.

Hsingching Hsu vs. Puma Biotechnology, Inc., et al.

Page 101

1 where there are three or four that are on the
2 market that are similar to it, as well as
3 Herceptin, you know, has been developed.
4          But that was a general
5 understanding of the -- the emerging safety and
6 efficacy data or safety net activity that existed
7 in the public domain.
8          With regard to offering an opinion
9 in this, I've offered no opinion about the press
10 releases from Puma prior to July 22, 2014.
11      Q.   Okay.  And so in this case do you
12 intend to offer an opinion about any disclosures
13 regarding neratinib that occurred prior to
14 July 22, 2014?
15      A.   No.  I do not.  Regarding the --
16 just the July 22, 2014, press release.
17      Q.   And you did discuss -- it was your
18 feeling or your belief that the safety
19 information regarding neratinib was well
20 described and in any public domain prior to
21 July 22, 2014.
22          Is that belief relevant at all to
23 any of your decisions about the disclosures that
24 were made on July 22, 2014?
25      A.   Yes.  It is.

Page 102

1      Q.   And how is it relevant to that?
2      A.   It's relevant because the
3 antecedent on safety information with regard to
4 institutional investors is something that must be
5 incorporated into the additional information
6 provided in the July 22, 2014, press release.
7 Namely, the hazard ratio.
8      Q.   And did you come to the conclusion
9 that the safety information regarding neratinib
10 was well-described and in the public domain prior
11 to your coming to the opinion that the July 22,
12 2014, disclosures were in line with typical
13 industry practices?
14      A.   I'm sorry, try that again, please.
15      Q.   Did you come to the conclusion that
16 the safety information regarding neratinib was
17 well-described in any public domain?  Did you
18 reach that conclusion prior to -- to your coming
19 to the opinion that the July 22, 2014,
20 disclosures were in line with typical industry
21 practices?
22      A.   I -- I'm sorry.  Try that -- try
23 that one more time.
24      Q.   At some point you came to the
25 conclusion that the safety results regarding

Page 103

1 neratinib were well-described and in the public
2 domain; is that right?
3      A.   Yes.  That's correct.
4      Q.   When did you come to that
5 conclusion?
6      A.   That was in the months prior to the
7 April 11, 2018, expert report.
8      Q.   And can you --
9      A.   I can't give you a specific date,
10 but I knew a lot of information about the safety
11 of the class of agents.  And, in general,
12 neratinib would be expected to fit in that.  And
13 there was antecedent data that suggested that was
14 all true.  I can't give you a specific date, but
15 that was months before.
16      Q.   Looking at Exhibit C, can you point
17 me to which of the materials considered you
18 considered in reaching the conclusion that the
19 safety information regarding neratinib was
20 well-described in any public domain prior to
21 July 2014?
22          MS. MURPHY:  Object to the form.
23      A.   I don't know that the specific
24 documents are in here, but I can tell you what
25 they are, because it's general knowledge that I

Page 104

1 have from having been involved in drug
2 development and in reviewing clinical trial data
3 and FDA reviews of cancer drugs before.  And that
4 is the entire development programs for the drugs
5 that I mentioned before:  Gefitinib, erlotinib,
6 and lapatinib.
7      Q.   So you're saying those have the
8 same safety profile as the neratinib safety
9 profile was in the ExteNET trial?
10          MS. MURPHY:  Objection.  Lack of
11 foundation.
12      A.   Very similar safety profile, but
13 also, more importantly, very similar mechanism of
14 action.
15      Q.   Well, I want to focus on the safety
16 profile.  So the question is, is it your
17 understanding that public disclosures about those
18 drugs prior to July 2014 showed they had the same
19 safety profile as was demonstrated in the ExteNET
20 trial?
21          MS. MURPHY:  Objection.  No
22 foundation.
23      A.   Yeah.  Very similar.  I don't know
24 that I can say same.  But certainly approximately
25 similar, yes.

Gregory Frykman, M.D.

Page 105

1    Q.   What do you mean by "very similar"?
2    A.   The -- and, again, this gets back
3  to the mechanism of action.  The mechanism of
4  action of the three drugs that I mentioned are
5  similar to identical to that of neratinib.  And
6  the well-known- , well-established- ,
7  well-described safety profile is that of diarrhea
8  and that of a skin rash.
9        So knowing nothing else about a
10 particular drug, one can say, if they know it's a
11 small molecule, tyrosine kinase inhibitor against
12 one of the EGFR class members, that you could
13 say, gee, I bet there is going to be rash and
14 diarrhea associated with that drug.  So that was
15 all well known to me well before the April 11,
16 2018, expert report.
17   Q.   So in clinical trials of all of
18 those drugs within the class, across those
19 clinical trials what's the average rate of
20 grade 3 diarrhea for trial participants who are
21 on the drug?
22        MS. MURPHY:  Objection.  Lack of
23 foundation.
24   A.   Yeah.  I couldn't tell you the
25 exact rates.  That's all published data sitting

Page 106

1  in the labels and in the FDA review documents.
2    Q.   Did you know that at any time?
3    A.   Oh, I knew it, sure, years ago,
4  when gefitinib got on the market in -- in
5  probably 2004-ish; erlotinib, 2005-ish;
6  lapatinib, 2010-ish.  So at that time each of the
7  drugs that -- you know, that was up for approval
8  or had been approved, that was something that I
9  generally went to look at and see how the FDA
10 described it in the label, looked at their review
11 documents if I needed to.
12   Q.   What's the grade 3 diarrhea rate
13 that was identified in the ExteNET trial for
14 neratinib users?
15   A.   There was in -- in the ExteNET
16 trial specifically, that was 39.9 percent.
17   Q.   And what was it in gefitinib?  How
18 do you pronounce it?
19   A.   Gefitinib.
20   Q.   What was it in the primary clinical
21 trial for that drug?
22        MS. MURPHY:  Objection.  Lacks
23 foundation.
24   A.   Yeah.  I can't tell you that.
25 Well, we can look it up in the label and see.

Page 107

1  Remember, too, that -- other things that are
2  taken into account.  So they're not necess --
3    Q.   I want to focus on the diarrhea
4  rate, and then we can get to the other factors.
5        Do you compare the grade 3 diarrhea
6  rate in the ExteNET trial with the diarrhea rate
7  listed in the labels for any of the other drugs
8  in that class that had been approved?
9    A.   No.  I had no need to.
10   Q.   Well, do you know whether the
11 grade 3 diarrhea rate that was identified in the
12 ExteNET trial is higher or lower than that for
13 any of the other drugs in that class that have
14 been approved?
15   A.   I --
16        MS. MURPHY:  Objection.  Lacks
17 foundation.
18   A.   Yeah.  I -- I don't know that.  As
19 I said, I had no particular reason to go do the
20 comparison.
21   Q.   Well, do you know whether the
22 grade 3 diarrhea rate in the ExteNET trial is
23 similar to that that is listed in the label for
24 any of the other drugs in its class?
25        MS. MURPHY:  Objection.  Form and

Page 108

1  foundation.
2    A.   I think I answered that question.
3  The answer is I haven't looked and I've had no
4  reason to look.
5    Q.   Now, earlier when you were talking
6  about looking at company press releases, you
7  mentioned that you'd look to decide if there was
8  additional information that would be helpful, but
9  you said that companies are often under no
10 obligation to provide it.
11        Do you recall that?
12   A.   Yes.
13   Q.   What's your understanding of what
14 information companies are required to provide
15 regarding clinical trial results?
16        MS. MURPHY:  Objection to form.
17   A.   With regard to a press release,
18 there's sort of standard things that need to be
19 in there.  The identification of the company, the
20 date, location, a brief description, very brief
21 description of the trial, identification of that
22 trial by its name or by what's called the NCT
23 number.
24        Probably there'll be something in
25 there about what the endpoint, the primary

Case 8:15-cv-00865-AG-SHK  Document 400-5  Filed 07/24/18  Page 29 of 143  Page ID #:13477

Confidential                    Hsingching Hsu vs. Puma
Gregory Frykman, M.D.                              Biotechnology, Inc., et al.

Page 109

1  endpoint of that trial was.  And then beyond that
2  I'm not sure that a whole lot else is -- is
3  really needed.
4          The companies vary in their -- you
5  know, in what they disclose.  It's sort of on
6  a -- or a case-by-case basis.  And some companies
7  feel differently about including particular
8  pieces of information than other companies do.
9          The circumstances of each drug are
10  different, and it's -- it's hard to -- it's hard
11  to say uniformly that these, you know, five or 10
12  or 20 pieces of clinical trial results should or
13  should not be in a particular press release.
14      Q.   You used the word "obligation."
15  I'm wondering, who do those companies that are
16  issuing press releases have an obligation to to
17  include information in their press release?
18      A.   Well, again, I'm -- I'm not an
19  attorney, but I certainly had plenty of -- of
20  didactic sessions about this during my time in
21  the capital markets having to do with
22  materiality.  And there are pieces of information
23  about clinical trial results that somebody
24  probably determines is material, and therefore I
25  believe they're under a legal obligation to

Page 110

1  provide.
2          As to other stakeholders in the --
3  in the press release or stakeholders who will
4  look at press releases, companies may or may not
5  feel an obligation to the medical community.  The
6  medical community typically likes to see as much
7  data from clinical results as possible.  That's
8  why there's forums that exist for that, one of
9  which is medical and scientific meetings where
10  there are lengthy presentations with slide after
11  slide after slide about the outcome of the trial.
12          And there also peer-reviewed
13  journal publications where eight to 10 -- eight
14  to 13 pages of written text and tables and -- and
15  graphs and charts are included that also describe
16  the results of a clinical trial.
17          But in terms of top-line, and this
18  is what's key here, is that press releases for
19  clinical trials typically are focused on what's
20  the top-line.  That is usually the most important
21  outcomes in terms of the primary efficacy
22  endpoint or the primary endpoint.  And a varying
23  amount of detail, you know, thereafter.
24          But the -- the small amount of
25  information in a press release is, you know, a

Page 111

1  very small subset of -- the amount of what's in
2  press releases tends to be a very, very small
3  subset of what's in the clinical study report.
4      Q.   Well, how do you make a
5  determination about whether or not a company is
6  under an obligation to provide information?
7      A.   Well, again, I'm not an attorney,
8  so I can't speak to the legal obligations of a
9  company.  But if companies wish to be viewed
10  favorably by the medical community or have their
11  drug viewed favorably by the medical community,
12  then they would probably lean toward being more
13  forthcoming with information.
14          But at the same time there are
15  obligations on the part of the company with
16  regard to keeping data to themselves having to do
17  with a subsequent presentation at a public
18  meeting.
19          So a key consideration that goes
20  into company thinking, biotech and pharma company
21  thinking at the time they're drafting their press
22  release, is will the information that's going to
23  go into this press release, is that going to
24  preclude us from subsequent presentation at one
25  of the medical and scientific meetings out there

Page 112

1  in which clinical trial results are frequently
2  presented.
3      Q.   In this case are you opining on
4  what Puma's legal obligation was to include in
5  any of its July 22, 2014, disclosures?
6      A.   No.  I'm not.  I can't draw -- I
7  can't opine at all on the legal obligations of --
8  of Puma with regard to their press release.
9      Q.   You got a Series 7 license?
10      A.   Well, I did.  It's expired.
11      Q.   And when did that expire?
12      A.   Oh, I couldn't tell you that.
13  Probably in 2010, 2011.
14      Q.   And when's the last time you took
15  any continuing education classes with respect to
16  that license?
17      A.   None, because I'm not involved in
18  the -- except for individual investing, I'm not
19  involved in speaking with -- or speaking on
20  behalf of the firm with institutional investors.
21  I just do it individually.
22      Q.   And as you used the terms in your
23  report, is there a difference between a
24  pharmaceutical company and a biotechnology
25  company?

Case 8:15-cv-00865-AG-SHK Document 400-5 Filed 07/24/18 Page 30 of 143 Page ID #:13478

Gregory Frykman, M.D.

Confidential

Hsingching Hsu vs. Puma
Biotechnology, Inc., et al.

Page 113

1    A.   I have not tried to draw a
2  distinction, but a lot of other people do.  And
3  when I've used the term "pharma and biotech
4  companies" -- if this will be helpful, I'll
5  clarify what I mean -- and that is that these are
6  companies that are frequently small but may be --
7        Q.   My question is just whether you --
8  the way you use them they're synonymous or
9  whether, as you use them in your report, you
10 think they have very distinct meanings?
11       A.   I can tell --
12       MS. MURPHY:  Object to the form.
13       A.   I can tell you what some of the
14 perhaps subtle distinctions are, because it does
15 matter how they think about the development of
16 their drug.  But in the report I didn't try to
17 draw those distinctions, in that they are all
18 companies who have products that are either on
19 the market or in development that will be
20 required to work with the Food and Drug
21 Administration to either further develop the drug
22 or get it on the market for the first time.
23       Q.   So from 2004 to 2009, the name of
24 the research firm that you were at was the
25 Stanford Washington Research Group; is that

Page 114

1  right?
2        A.   Uh-huh.
3        Q.   And you left there in March of
4  2009?
5        A.   That's correct.
6        Q.   Why did you leave?
7        A.   The firm collapsed in the wake of a
8  discovery that the owner of the firm, Alan
9  Stanford, had been -- I think was committing
10 securities fraud.  You all would know better than
11 I do, but the -- the firm fell apart after that.
12       Q.   Were you terminated at the time the
13 firm was shut down?
14       A.   They, yeah, basically said "good
15 luck, guys."
16       Q.   Did you ever meet Alan Stanford?
17       A.   Did I ever meet him?
18       Q.   Yes.
19       A.   A couple of times he'd come by the
20 office here.  He was based in Houston, I think,
21 most of the time, but he'd show up here once in a
22 while.
23       Q.   Did you ever review any of the
24 public disclosures that were made by the Stanford
25 company?

Page 115

1        A.   With regard to their troubles?  Or
2  with regard to whatever?
3        Q.   Whatever?
4        A.   The short answer is frankly, no.  I
5  mean, I was busy being a policy analyst and
6  focusing on the drugs and the FDA and, you know,
7  some of the companies that, you know, I looked
8  at.  And between that and traveling, writing
9  research, raising a family, there wasn't a lot of
10 time to be doing much else.
11       Q.   Did you ever review any of the
12 public disclosures that were made by the Stanford
13 group company to see if they were in line with
14 typical industry practices?
15       A.   Well, the industry in that case
16 would have been the securities industry or the
17 financial industry, and that's not something -- I
18 didn't ever spend much time looking at their
19 press releases.  It was in pharma and biotech
20 where I spent lots and lots of time.
21       Q.   So do you have any opinion about
22 whether the Stanford group company's public
23 disclosures were in line with typical industry
24 practices?
25       A.   I have no opinion.

Page 116

1        Q.   It says from 2003 to the present
2  you've been on the scientific advisory board of
3  StudyLog Systems; is the right?
4        A.   That's correct.
5        Q.   What's your annual pay for being on
6  that?
7        A.   For StudyLog Systems?
8        Q.   Correct.
9        A.   Absolutely nothing.
10       Q.   Oh.  Is it a public company,
11 StudyLog Systems?
12       A.   No.  It's a private -- private
13 company.
14       Q.   Have you had any -- ever had any
15 responsibility for reviewing or approving any of
16 StudyLog's press releases?
17       A.   No, sir.  I have not.
18       Q.   And I take it StudyLog has not had
19 a stock offering; is that right?
20       A.   I'm not sure they even issued a
21 press release.  But, that's right, no stock
22 offerings.
23       Q.   And then, according to your risumi,
24 after March of 2009, you formed the Gregory K.
25 Frykman, M.D. Consulting; is that right?

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 31 of 143   Page ID #:13479

Confidential

Gregory Frykman, M.D.

Hsingching Hsu vs. Puma
Biotechnology, Inc., et al.

Page 117

1    A.    That's correct. It's not a formal
2  firm. It's simply how I do business.
3    **Q.    Okay. For most of your consulting**
4  **is it through your own firm, or do you use a firm**
5  **like Eleven something?**
6    A.    Eleven Canterbury, yeah. Most of
7  it's through my firm.
8    **Q.    Okay. And then in your CV you say**
9  **you're an executive -- that in your capacity as a**
10  **consultant you've served as executive-in-**
11  **residence with Cleveland Clinic Innovations; is**
12  **that right?**
13    A.    That's correct.
14    **Q.    All right. And do you get an**
15  **annual salary for that position?**
16    A.    No. I'm a -- I mean, I'm an
17  independent contractor and do consulting work for
18  them.
19    **Q.    And do any of your duties involve**
20  **drafting, reviewing, or approving public**
21  **statements made by the Cleveland Clinic?**
22    A.    Not frequently, although from time
23  to time I have been asked, through their -- what
24  was it? -- the press office, or through the
25  government relations office about whether or not

Page 118

1  a contemplated statement by the Cleveland Clinic
2  is medically substantiable I think is kind of how
3  it was. I have to think back. It's been several
4  years.
5    But I can give you one example
6  where they were -- this is the Cleveland Clinic
7  proper, not Innovations -- but one of the
8  gentlemen that I worked with there was posed the
9  question by the press office with regard to this
10  whole field of what's called generic biologics,
11  they're now called biosimilars, and the -- the
12  press office was contemplating issuing a public
13  statement articulating Cleveland Clinic's view on
14  biosimilars.
15    And in that -- so that request came
16  down to me, and I can't speak for the Cleveland
17  Clinic, of course, but I said, well, here's how
18  you might think about it. This way. You might
19  consider this. You might consider that.
20    What you all end up doing is, of
21  course, your decision, and you probably ought to
22  keep my name out of it, which they did. I don't
23  know whether that press release was actually ever
24  issued or not, but that was one.
25    And then in another case the

Page 119

1  Cleveland Clinic was contemplating making --
2  involving some lobbying effort on behalf of
3  hearing aid -- it's a really bizarre thing,
4  hearing aids, something like that, on Capitol
5  Hill.
6    And I can't remember if they were
7  contemplating a press release, but I was asked,
8  you know, if the contemplated position -- or
9  maybe it was a press release -- was, you know,
10  medically substantiable. And I looked at it and
11  said, well, here's sort of my thoughts on this.
12    **Q.    In either of those cases did the**
13  **Cleveland Clinic ask you to opine on whether or**
14  **not the proposed press release was in line with**
15  **typical industry practices?**
16    A.    Well, they would not, but remember
17  that the industry in which they exist is
18  healthcare services. So healthcare services is a
19  different animal from pharma and biotech. I
20  don't know if that distinction is important.
21    But healthcare services, you know,
22  it's hospitals and clinics and healthcare
23  institutions. That sort of thing. And that is a
24  different industry than is the pharma and biotech
25  industry.

Page 120

1    **Q.    Has the Cleveland Clinic ever asked**
2  **you if any of their press releases are in line**
3  **with any typical industry practices?**
4    A.    No. But that's not really what I
5  do for them.
6    **Q.    And is it correct that you**
7  **cofounded Framework Therapeutics LLC?**
8    A.    Yes.
9    **Q.    Is there a reason that's not on**
10  **your risumi?**
11    A.    I thought it was.
12    **Q.    Okay. Does that company still**
13  **exist?**
14    A.    Yes.
15    **Q.    All right. And what does it do?**
16    A.    It initially developed and then has
17  licensed a novel therapeutic product for patients
18  with a variety of diseases. The product is still
19  in clinical development. It's been licensed and
20  remains licensed to another company who has
21  undertaken some development. We're apprised from
22  time to time of what's going on, and generally
23  know what's going on.
24    But that involved me taking that
25  drug basically from scratch, doing all of the

Page 121

1  manufacturing work that needed to get it up to
2  speed for FDA approval for initial clinical
3  trials, as well as writing two clinical protocols
4  for the early development, phase 1 development of
5  this particular product.  And then that effort
6  has been licensed.
7      **Q.   What's the drug?**
8      A.   The drug is -- and this is all
9  staying confidential, I'm assuming?
10     **Q.   Yes.**
11     A.   Okay.
12     **Q.   Or counsel can mark it**
13  **confidential.**
14     A.   Okay.  The drug is called sodium
15  aluminosilicate.
16     **Q.   And what is it being tested for the**
17  **treatment of?**

 But it
20  is also envisioned to be developed for patients
21  with end-stage liver disease, what's called
22  hepatic encephalopathy, as well as for use in
23  radiation poisoning with cesium, with
24  radiocesium.

Page 122

23     **Q.   And so are you an officer of**
24  **Framework Therapeutics?**
25     A.   It's an LLC, and I am the managing

Page 123

1  member.
2      **Q.   Are there any other officers or**
3  **managing members of the company?**
4      A.   The other managing member is
5  Mr. Glenn, G-L-E-N-N, Gruett, G-R-U-E-T-T.  He
6  and I have the voting stock.  And then he has
7  three sons of whom each of them owns nonvoting
8  stock.
9         (Reporter-initiated discussion off
10       the record.)
11     **Q.   Is it a publicly traded company?**
12     A.   No, sir.  It's not.
13     **Q.   And has Framework Therapeutics ever**
14  **issued a press release?**
15     A.   No.  It has not.
16     **Q.   And did Framework Therapeutics**
17  **conduct the FDA-approved clinical trial of the**
18  **drug?**
19     A.   No.  That was conducted by the --
20  to my knowledge, that was conducted by the
21  sublicensee.
22     **Q.   And have you collected any income**
23  **as an officer or managing director of Framework**
24  **Therapeutics?**
25     A.   No, sir.  Not to date.

Page 124

1      **Q.   Looking at your CV under**
2  **"Publications" --**
3      A.   Uh-huh.
4      **Q.   -- does that accurately reflect**
5  **that you authored three medical officer reviews**
6  **during your time at the FDA?**
7      A.   That is correct -- where is it?
8  That's correct.
9      **Q.   And did any of those involve drugs**
10  **that were being developed for the treatment of**
11  **breast cancer?**
12     A.   The applications that I reviewed,
13  no, but Doxil, the drug that I mentioned earlier,
14  that drug has been developed and was
15  unsuccessfully developed in breast cancer.
16     **Q.   And since 2002 you've been the**
17  **author of one publication; is that right?**
18     A.   That sounds about right.
19     **Q.   All right.  And how do you come to**
20  **be an author of that 2013 article regarding**
21  **muscle stimulators?**
22     A.   Oh, sure.  That was -- actually, my
23  brother, you'll see, is P. Frykman, he was
24  involved in this.  He was previously a staff
25  pediatric surgeon at Cedar Sinai in LA, and he

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 33 of 143   Page ID #:13481

Confidential

Gregory Frykman, M.D.

Hsingching Hsu vs. Puma Biotechnology, Inc., et al.

Page 125

1  needed some help on the pilot trial that this
2  publication represents.
3      Q.   Does your CV accurately reflect
4  that you have not been an invited member of any
5  symposia since 2009?
6      A.   Invited symposia in terms of
7  medical and scientific meetings, that is correct.
8      Q.   And does it accurately reflect that
9  you have not given any medical presentations
10  since 2002?
11      A.   That is actually not true.  I spoke
12  at a conference about the Framework Therapeutics
13  drug -- it probably should be in here -- at a
14  conference here in Washington, D.C. about three
15  years ago now at a meeting called ASENT, I think
16  it's A-S-E-N-T, the American Society for
17  Experimental Neurotherapeutics.  And that was a
18  approximately 10-minute oral presentation on the
19  background, and at that time planned clinical
20  development of sodium aluminosilicate in hepatic
21  encephalopathy.
22          (Reporter-initiated discussion off
23      the record.)
24      Q.   Now, in this case you are opining
25  about typical industry practices for the

Page 126

1  disclosure of top-line results of clinical
2  trials; is that right?
3      A.   In the pharma and biotech industry,
4  that's correct.
5      Q.   Have you ever published any article
6  regarding the typical -- typical industry
7  practices for the disclosure of top-line results?
8      A.   As far as a peer-reviewed
9  publication, no.
10      Q.   How about any publication?
11      A.   Well, as I discussed earlier, I
12  published at least twice a week, sometimes more
13  frequently than that, research for the capital
14  markets that involve looking at a variety of
15  sources, a prominent one of which was press
16  releases.
17          And in there, as I mentioned
18  earlier, I frequently pointed out where I thought
19  information might be helpful.  I don't know that
20  I specifically ever stated to our institutional
21  investing clients that I thought this press
22  release was in line or out of line.  That's not
23  something that they would have asked me to do.
24          What they were interested in, as
25  was I, was getting at the risk/benefit -- the

Page 127

1  safety and the efficacy of -- of usually
2  developmental therapeutics.
3      Q.   In any of the reports that you
4  issued as a policy analyst, can you identify any
5  for me in which you identify what the typical
6  industry practices were for the disclosure of the
7  top-line clinical trial result?
8      A.   As I said before, I don't think
9  that I ever mentioned that to our institutional
10  investing client base.  They themselves would see
11  at least as many press release annually as I did.
12  And they would know, to the extent that they
13  cared, whether they were in line or not in line.
14      Q.   Have you ever taught any course or
15  lectured regarding the typical industry practices
16  for the disclosure of top-line results of
17  clinical trials?
18      A.   Not formally at a university, but
19  within our research group I would from time to
20  time discuss with the other healthcare analysts
21  there -- so there were four of us -- what typical
22  clinical trial results to look for in press
23  releases.
24      Q.   And did you ever tell these other
25  analysts what you thought were the typical

Page 128

1  industry practices in general for the disclosure
2  of top-line clinical trial results?
3      A.   I don't know that I termed it
4  exactly that way, but it was, you know, an
5  occasional occurrence when I'd sit down and talk
6  to them and say, guys, this is sort of what you
7  want to look for.  This is how you look for this
8  stuff.  Frequently information is not there.
9  That doesn't mean it doesn't exist, and that
10  doesn't mean that anything untoward is going on.
11  It just means that our job is hard.
12      Q.   Have you ever taken any course
13  regarding the typical industry practices for the
14  disclosure of top-line clinical trial results?
15      A.   No.  I have not, but I'm not sure a
16  course exists along those lines.
17      Q.   Have you ever had responsibility
18  for preparing a public disclosure regarding a
19  top-line clinical trial result?
20      A.   No.  I think we talked about that
21  earlier, and the answer is I have not, except to
22  the extent that the press release at Concordia,
23  the top-line result there would be -- if they
24  ever issued a press release -- the top-line
25  result would be the study's being terminated.

Gregory Frykman, M.D.

Page 129

1      Q.   Well, that was the outcome, right.
2  But was there a result from the trial?
3      A.   I'm sure there are results now.  At
4  the time I don't know that those results were
5  known.
6      Q.   Well, did -- did Concordia labs
7  ever ask you to draft or review a press release
8  specifically regarding the results of that
9  clinical trial?
10     A.   No.  Because the results were at
11 that time very, very -- I don't think the results
12 had been formally analyzed at all, and they were
13 very, very immature.
14     Q.   Since those results have been
15 formally analyzed, has Concordia come back to you
16 and asked you to review a press release regarding
17 the results?
18     A.   No.  They've not.
19     Q.   Who do you think is the foremost
20 expert in this country on the typical industry
21 practices for the disclosure of top-line results
22 of clinical trials?
23     A.   I don't know that I can point to a
24 specific individual.  But I can certainly
25 confidently tell you that the portfolio managers

Page 130

1  at the top institutional investors -- investing
2  firms in this country would certainly have an
3  opinion about that.
4      Q.   They don't --
5      A.   They -- they typically don't teach
6  courses and -- and produce publications about
7  this stuff.  There is not, to my knowledge, an
8  academic discipline that is focused on the
9  disclosure practices with regard to press
10 releases by pharma and biotech companies.
11         It's something that is -- is
12 something that goes on, you know, day in and day
13 out in the worlds of other pharmaceutical
14 companies, so competing companies.  They see each
15 others press releases.  Institutional investing
16 firms.  They -- this is what they do on a daily
17 basis.  And also on the sell side -- you know, on
18 the institutional -- I'm sorry, on the investment
19 banking side that goes on.
20         The government -- I mean, you know
21 this very well, the government issues plenty of
22 press releases and reads them as well.
23         So I don't know that there's a
24 specific formal academic discipline that -- that
25 focuses on this, and there's -- there's research

Page 131

1  about as much as it is you've learned this stuff
2  over years and years of -- of seeing it again and
3  again and again.
4      Q.   Do you think there's anyone in this
5  country who is more of an expert on the typical
6  industry practices for the disclosure of top-line
7  results of clinical trials than you are?
8         MS. MURPHY:  Object to the form.
9      A.   I wouldn't know that.  I identified
10 a number of individuals who have also seen lots
11 and lots of press releases.  But I would suggest
12 to you that perhaps, you know, I'm probably one
13 of the best.
14         There are very few people that have
15 spent time both in, you know, full subspecialty
16 medical and clinical training that have then gone
17 into the capital markets.  There's certainly a
18 number of them.  But there's -- there's --
19 there's -- it's not thousands.  And then taking
20 that subset and people that are willing to, you
21 know, serve is this capacity.  Most of them are
22 busy managing money.
23     Q.   Has anyone ever told you that they
24 thought you were one of the best experts on the
25 field of typical industry practices for the

Page 132

1  disclosure of top-line results of clinical
2  trials?
3         MS. MURPHY:  Object to the form.
4      A.   I don't know that anybody's ever
5  come to me an specifically said that.  But given
6  the number of calls that I used to get when I was
7  in capital markets, and even after I left capital
8  markets, there were a handful of institutional
9  investors who I had -- who had been clients of
10 the firm previously who tracked me down and they
11 said, you know, Greg, or Dr. Frykman, we'd like
12 to engage you on this, that, or the other
13 subject.  You're one of the few people that we
14 know that can actually give us a -- you know, a
15 thoughtful insight on -- on this particular
16 matter.  And, I mean, that was in some ways very
17 flattering.
18         So I don't know if that answers
19 your question, but I'm probably one of the better
20 ones at it.  And, in fact, when I was on Wall
21 Street I received an award, or was recognized by
22 Institutional Investor magazine as one of the top
23 and up and coming -- it's in there -- as one of
24 the top up and coming biotech analysts.
25         And part of the reason that I

Gregory Frykman, M.D.

Page 133

1  received that, I think, was by virtue of the fact
2  that I was able to provide to institutional
3  investors -- they're the ones that vote -- it's
4  not the sell side, it's the buy side that votes.
5  And there were enough people that said that Greg
6  Frykman was helpful, assistive, whatever the term
7  is, to honor me that way.
8      Q.   But is it right that this is the
9  first time you've been retained as an expert in
10  the typical industry practices for the disclosure
11  of top-line results of clinical trials?
12     A.   Yes.  This is the first time.
13     Q.   Are you aware of any publication
14  that sets forth specifically what the typical
15  industry practice for the disclosure of a
16  top-line result of a clinical trial is?
17     A.   I'm -- as I've mentioned, I think
18  two or three times before today, I don't know
19  that there's a specific publication out there,
20  but by virtue of going through lots of press
21  releases germane to this case, but more generally
22  having read, you know, literally thousands of
23  press releases that come from biotech and pharma,
24  one develops a sense, not necessarily can
25  identify specific criteria, although I'm happy to

Page 134

1  do that, but you develop a sense of sort of what
2  is middle of the road and what is an extreme
3  outlier.
4      Q.   Well, have you looked to see
5  whether there are any publications out there that
6  describe what the typical industry practice is
7  for the disclosure of top-line results are?
8      A.   I've not done that, primarily
9  because I'm of the view that probably none exist.
10  That -- that there is not -- let's put it another
11  way.
12          I'm not aware of any manual or any
13  instruction book that the -- that the institute
14  or the -- the investor relations people at pharma
15  and biotech read that's sort of a step-by-step
16  guide on -- on how this is done.
17          Each company makes their own
18  decision, as I said before, on what they're going
19  to disclose with regard to clinical trial
20  top-line results based on what they perceive to
21  be their legal obligations, as well as what
22  strategic information they want to be signaling
23  to their competitors, as well as what they feel
24  they need to disclose in terms of gaining
25  favorable views by the practitioners who will

Page 135

1  prescribe their drugs, but keeping in mind at the
2  same time it's a balancing act and it's a -- it's
3  a fine line to walk.  Balancing the need for
4  retaining a lot of clinical trial outcomes
5  information for subsequent presentation at a
6  medical and scientific meeting.
7      Q.   Are you holding yourself out to be
8  an expert on the legal obligations of
9  biotechnology companies with respect to their
10  public disclosures?
11     A.   No.  I'm not.  I -- I think I've
12  said that before.
13     Q.   Now, you've mentioned manuals and
14  such.  Are you aware of any publication that is
15  out there that sets forth how you would go about
16  determining whether or not a press release is in
17  line with typical industry practices?
18     A.   I'm not aware of any --
19  specifically in the pharma and biotech, I'm not
20  aware of -- of any manual.
21     Q.   Any doc -- any publication at all?
22     A.   I'm not aware of any.
23     Q.   And you've never published anything
24  on that specific topic?
25     A.   No.  But at the end of this I

Page 136

1  might.  I mean, this is something that I've
2  learned pretty well.
3      Q.   In the course of this engagement?
4      A.   I've had a good sense of it before,
5  and this has refined my expertise.
6      Q.   All right.  And you've never taught
7  any course about how you would go about
8  determining whether or not a press release is in
9  line with typical industry practices, have you?
10     A.   No.  I have not.  I don't know that
11  these courses exist.  But, again, that may be an
12  opportunity in the future.
13     Q.   At any point in any of the
14  positions you have had, have you ever informed
15  anyone that a public disclosure by a company was
16  not in line with industry standards?
17          MS. MURPHY:  Object to the form.
18     A.   As I've said, you know, two or
19  three times before, I was not shy.  I was quite
20  forthcoming about whether a particular -- a -- a
21  particular recently issued press release was
22  containing clinical trial results that -- that,
23  you know, appeared to accurately reflect what the
24  clinical trial actually showed.  I did that for
25  years and years on Wall Street.

**Page 133..136**

Page 137

1    So, again, I -- the audience
2 themselves, which were primarily institutional
3 investors, didn't need, and almost surely did not
4 want me to be saying, well, I think, you know,
5 XYZ company's press release is lousy, or this one
6 is -- got its format all screwed up, or this one
7 has got 10 times as much information as it needs
8 to be.  That's not the information that they
9 wanted, and that's not what my stock in trade
10 was.
11        My stock in trade was much more
12 focused on, given the information in that press
13 release, what can I and what can institutional
14 investors glean about the development of that
15 particular drug, and what are the implications in
16 terms of the FDA, in terms of the competitive
17 landscape, in terms of other drugs that are in
18 development at that time.  That was the
19 information that was -- is -- was -- was -- was
20 more actionable.
21    Q.   So have you ever seen disclosure of
22 top-line clinical trial results that you thought
23 was not in line with typical industry practices?
24        MS. MURPHY:  Object to the form.
25    A.   I'm sure I've seen plenty of them.

Page 138

1    Q.   Can you name one for me?
2    A.   Most likely not, because that was
3 years ago, and that's, again, not something that
4 I paid -- the -- the -- the offering thoughts on
5 the sufficiency or insufficiency of a press
6 release was not something that I spent time
7 worrying about.
8    Q.   So sitting here today you cannot
9 name for me any press release regarding clinical
10 trial results that you thought was not in line
11 with industry practices?
12        MS. MURPHY:  Object to the form.
13    A.   From press releases I looked at
14 years ago, no, because that was many, many years
15 ago.
16    Q.   You looked at a lot of press
17 releases for purposes of this engagement; right?
18    A.   Oh, you mean -- you mean -- I'm
19 sorry about that.
20    Q.   I mean ever.  So my question is
21 ever.
22        At any time can you name for me any
23 press release that you have ever seen regarding
24 clinical trial results that you thought was not
25 in line with industry practices?

Page 139

1    A.   I'm sorry, ask the question again.
2    Q.   At any point in time, have you
3 ever -- can you name for me any press release
4 that you have seen regarding clinical trial
5 results, top-line clinical trial results, that
6 you thought was not in line with industry
7 practices?
8    A.   I'm not sure that I can point you
9 to one, but what I can say is that, given the
10 large variability of what comprises press
11 releases of top-line clinical results from the
12 pharmaceutical and biotech industry, that -- that
13 probably most of them are in line.
14    Q.   But, as you sit here today, you
15 can't name for me any one that you've seen that
16 you thought was not in line with typical industry
17 practices?
18    A.   I -- I -- that -- I think that's
19 fair to say.  But at the same time I'm not sure
20 that there would be many that would be issued
21 that would be wildly out of line.
22        So as you've mentioned, too, that
23 press releases go through a fair bit of vetting
24 before they are issued.  And it is to me unlikely
25 that there would be very many that would be

Page 140

1 issued that are out of line with what is
2 typically expected in a press release.
3    Q.   Do you know if vetting was done for
4 Puma's July 22, 2014, press release?
5    A.   I only have a -- sort of a hazy
6 understanding of what the vetting was that was
7 done.
8    Q.   What's your -- what's the basis for
9 that understanding?
10    A.   I'm not even sure I can tell you
11 that, but I believe that there was -- this
12 probably comes from some of the deposition
13 transcripts -- there was back and forth between
14 the investor relations function, the CEO
15 function.  Probably there was -- almost certainly
16 there was input from the -- the clinical or
17 medical officer perspective, as well as the --
18 one or more people that were involved in actually
19 making the clinical trial go.  And --
20    Q.   Are you speculating based on your
21 general understanding, or are you telling me what
22 understand the facts were based on the review of
23 transcripts?
24    A.   I can tell you that I've looked at
25 transcripts, and it was in line -- what I read

Gregory Frykman, M.D.                                                      Hsingching Hsu vs. Puma
                                                                          Biotechnology, Inc., et al.

Page 141

1   was in line with what I expected.  But I'm not
2   sure that I could tell you what each of the
3   individual participants in the input into Puma's
4   draft July 22, 2014, press release was.
5        Q.   So is it your -- it would be in
6   line with what you think is typical for the IR
7   function for the company to be involved in the
8   vetting of the press release?
9        A.   Yes.
10       Q.   And do you know whether or not
11  Puma's IR group was involved in that?
12       A.   To my best knowledge, they were.
13       Q.   And do you know -- who else was
14  involved in the vetting of that press release?
15            MS. MURPHY:  Objection.  Lacks
16  foundation.
17       A.   Well, as I mentioned, certainly the
18  CEO was involved, the chief medical officer, the
19  senior-most clinical person was -- was almost
20  certainly involved, if I remember correctly.  The
21  statistical person.  And, again, exactly which of
22  the statisticians had input, that I don't recall.
23  But at least those three, in addition to the
24  person in IR, were all involved in getting the
25  press release vetted prior to its issuance.

Page 142

1        Q.   And it's your expectation that all
2   of those people would have been involved in the
3   vetting process; is that right?
4        A.   At least those, and probably a few
5   more, yeah.
6        Q.   And who are the few more who you
7   would expect, based on your experience, would
8   have been involved in the vetting process?
9        A.   I can see that somebody on the
10  pharmacology side might be involved.  I can see
11  that at last the CFO, or whoever the senior-most
12  financial person is, that they would at least
13  have a look at and make sure there was nothing
14  in there that had financial implications that
15  they weren't expecting.
16            And another -- I -- I left this
17  out, too.  Another important function that would
18  almost certainly be involved was their regulatory
19  person -- I don't know who was -- but after all,
20  they did disclose that they were planning on
21  submitting a direct application, I think it was
22  in the first half of 2015.
23            And the press release would not
24  have gone out if there had not been a regulatory
25  person that had at least looked at that, if not

Page 143

1   had substantial input in making sure that
2   accurately reflected the company's intentions at
3   the time.
4        Q.   You yourself, have you ever been
5   involved in the vetting for a press release
6   regarding top-line clinical trial results?
7        A.   I think we talked about that before
8   and I -- I said no.
9        Q.   Now, is it your belief that all
10  press releases that have been issued by
11  clinical -- issued by public companies regarding
12  clinical trial results are in line with typical
13  industry practices?
14            MS. MURPHY:  Object to the form.
15  And lacks foundation.
16       A.   Yeah.  I don't think I used the
17  word "all."  But I've looked at thousands of
18  these over the years.  And there are none that
19  stand out where -- that stand out to me where
20  I've said, goodness sakes, this is just, you
21  know, completely out of line of what I'd expect
22  to see in a clinical trial.
23       Q.   So all of those thousands, at least
24  that you've looked at, fall within typical
25  industry practices, as you're using that term

Page 144

1   here?
2        A.   With the provi --
3            MS. MURPHY:  Object to the form.
4        A.   With the proviso that it's many
5   different kinds of companies that issue them.
6   With the proviso that it's many different kinds
7   of clinical trials that are -- the top-line
8   results are reported for.  With the proviso that
9   the drugs themselves are very, very different.
10  And with regard to what the strategic intent is
11  of a company when they issue the press release.
12            So, for example, it may be the
13  case, where a top-line clinical trial result is
14  issued, where there is virtually no data.  And
15  you might look at the company that's issuing and
16  say, hmm, that's kind of weird, they don't have
17  any -- much -- much information, and why would
18  that be the case.
19            Well, they may be signaling
20  something to one of their competitors, that this
21  is what their -- their -- you know, their recent
22  clinical trial results are.  And hoping that
23  competitor wouldn't develop a competing drug or
24  that they're, you know, seeking a -- you know,
25  seeking additional financing, something like

Page 141..144

Gregory Frykman, M.D.                                    Hsingching Hsu vs. Puma
                                                        Biotechnology, Inc., et al.

---

Page 145

1  that.
2          So it's hard -- it's hard to know.
3  But I think the mere fact that press releases of
4  top-line clinical results come from
5  pharmaceutical and biotechnologies and they go
6  through a vetting process, that the vast, vast
7  majority are going to be in line with typical
8  practices of the industry.
9      Q.   So you looked in the -- for
10 purposes of this case, you looked at a number of
11 press releases regarding clinical trial results;
12 is that right?
13     A.   That's correct.
14     Q.   In any of the press -- were there
15 any of the press releases that you looked at for
16 purposes of this case that you did not believe
17 were in line with typical industry practices?
18     A.   No.
19     Q.   Have you ever been qualified by a
20 Court as an expert on the typical industry
21 practices for disclosure of top-line results of
22 clinical trials?
23     A.   No.  That's not come up yet.
24     Q.   Have you ever been qualified by a
25 Court as an expert in anything?

---

Page 146

1      A.   Arbitration, in fact, counts.  But
2  other than that, no.
3      Q.   Did you testify in that
4  arbitration?
5      A.   Yes.  I did, sir.
6      Q.   And, I'm sorry, what were you --
7  what were you an expert in in that arbitration?
8      A.   In that -- and, again, it revolved
9  around clinical trials, and the specific issue
10 was a matter that involved allegations by a
11 pharmaceutical company that their contract
12 research organization did not correctly execute
13 their clinical trial.
14     Q.   Have you ever been named as a party
15 in any lawsuit?
16     A.   No.
17     Q.   Have you ever been arrested or
18 charged with a crime?
19     A.   No.
20     Q.   Now, do you know if there are any
21 laws or regulations that govern the content of
22 public disclosures by publicly traded companies?
23     A.   Oh, yes.  I mean, there's at least
24 the obligations, the legal obligations through
25 the, what, 1933 and '34 Act -- I don't know which

---

Page 147

1  it is -- on the mandatory disclosure of material
2  information.  Beyond that, I'm not sure there's
3  laws and regulations.
4      Q.   And specifically with regard to
5  press releases by publicly traded companies, what
6  do you understand they're required to include in
7  their press releases?
8          MS. MURPHY:  Objection.  Lacks
9  foundation.
10     A.   What they are expected to include
11 and whether -- this not a legal obligation, but
12 it's --
13     Q.   I want to be specific.  I'm asking
14 what do you understand they're legally required,
15 as opposed to expected?  What do you understand a
16 publicly traded company is legally required to
17 include in a press release?
18         MS. MURPHY:  Objection.  Lacks
19 foundation.
20     A.   Yeah.  I'm not -- not being a
21 lawyer, I'm not sure I know that.  But it --
22 the -- the companies are obligated to disclose
23 material information, and they obviously have to
24 include the identity of that company and what
25 that material information is.  Beyond that, I

---

Page 148

1  don't know if they're obligated to have a contact
2  person.  They probably are.  If they're obligated
3  to -- they're probably obligated to say what date
4  the press release is being issued on, and the
5  location of the company, and the identity of the
6  company.
7          Beyond that, I'm not sure I know of
8  a whole lot else that's required, except for that
9  material information.
10         MS. MURPHY:  Are we getting close
11 to a good time for lunch?
12         MR. GRONBORG:  Pretty close.
13     Q.   And specifically with regard to a
14 press release regarding clinical trial results,
15 what do you understand a company's legally
16 required to include in a press release regarding
17 clinical trial results?
18     A.   Material information.
19     Q.   And how do you determine what is
20 material information regarding clinical trial
21 results?
22     A.   Well, I'm not sure I'm the person
23 to make that determination.
24     Q.   Do you have -- do you have an
25 understanding of what -- how the determination of

---

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 39 of 143   Page ID #:13487

Confidential

Hsingching Hsu vs. Puma
Biotechnology, Inc., et al.

Gregory Frykman, M.D.

Page 149

1  what material information regarding clinical
2  trial results would be made?
3         MS. MURPHY:  Objection.  Lacks
4  foundation.
5      A.   I can certainly offer some
6  suggestions but, again, it's not my call, on what
7  is material.  But if there's a clinical trial
8  outcome that suggests or implies that a company's
9  single asset, namely, the drug, has succeeded
10  wildly in clinical trials, and the expectation is
11  that the drug would then be approved by the FDA,
12  and that drug would be used by hundreds,
13  thousands or millions of patients, then that
14  probably gets to being material.
15         And the flip side would count as
16  well.  If it were a drug -- and this has
17  happened, I've seen it happen several times --
18  where a high-profile drug of a traded company,
19  high-profile drug fails in its pivotal trial,
20  then that I think is considered to be material,
21  and that's immediately disclosed by the company.
22      Q.   So are those the only exam -- is
23  that what you think are the only information
24  regarding clinical trial results that would be
25  material under the legal requirements in this

Page 150

1  country?
2         MS. MURPHY:  Objection to form.
3  Foundation.
4      A.   And, again, I'm -- I'm not an
5  attorney, so I don't know that I could tell you
6  about the materiality, but those certainly strike
7  me as -- as going that direction.
8         You could, with a lot of
9  imagination, probably think of other outcomes
10  that would also have substantial impact on the --
11  the likelihood of that drug either getting or not
12  getting approved by the FDA, or being successful
13  or not successful in the marketplace, even if it
14  were on the market.  But that's, you know, an
15  awful lot of hypotheticals.
16      Q.   And in this case are you offering
17  any opinion regarding the issue of materiality?
18      A.   No.
19      Q.   And are you offering any opinion
20  regarding what Puma's legal obligations were with
21  regard to what information to include in the
22  July 22, 2014, press release?
23      A.   No.
24      Q.   Do you know if the disclosure --
25  the legal disclosure requirements for press

Page 151

1  releases are the same for conference calls?
2         MS. MURPHY:  Objection.  Lacks
3  foundation.
4      A.   I have never -- I have never been
5  posed that question before.  But, again, my
6  general understanding is that the companies are
7  obligated to disclose anything that's material.
8  And that the conference calls are a common
9  practice that helps readers of the press release
10  gain a better understanding of what the outcome
11  is that's described in the press release an
12  opportunity to interact with management.  And in
13  some cases perhaps glean a little bit more
14  additional information.
15      Q.   Sorry.  My question was just if you
16  know what the legal requirements for disclosure
17  at conference calls is different than the legal
18  requirement for the disclosures in a press
19  release?
20         MS. MURPHY:  Objection.  Lacks
21  foundation.
22      A.   Yeah.  The only thing I would say
23  on that is that, provided that the conference
24  call is widely and publicly disseminated, so
25  there's another an issue of selective disclosure.

Page 152

1         So you couldn't -- what I -- I
2  believe to be out of bounds is a hastily put
3  together conference call with, say, 10 people by
4  a particular company.  But --
5      Q.   And do you know if the legal
6  requirements for the disclosure of clinical trial
7  results in an SEC filing is the same or different
8  than the legal requirements for the disclosure of
9  those results in a press release?
10         MS. MURPHY:  Objection.
11  Foundation.  Calls for a legal conclusion.
12      A.   Yeah.  I'm not able to provide much
13  information -- I'm not an attorney -- on that.
14         MR. GRONBORG:  We can take a break
15  now, if you want.
16         MS. MURPHY:  Yeah.  Okay.
17         THE VIDEOGRAPHER:  The time is
18  12:35 p.m.  We're going off the record.
19         (Luncheon recess: 12:32 p.m.)
20
21
22
23
24
25

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 40 of 143   Page ID #:13488

Confidential                                          Hsingching Hsu vs. Puma
Gregory Frykman, M.D.                                 Biotechnology, Inc., et al.

Page 153

1    A F T E R N O O N   S E S S I O N
2              (1:21 p.m.)
3          GREGORY K. FRYKMAN, M.D.,
4    having been previously sworn, resumed the
5    stand and testified further as follows:
6          THE VIDEOGRAPHER:  The time is
7    1:24 p.m., and we're back on that record.
8          EXAMINATION (Cont'd.) BY
9          COUNSEL FOR THE PLAINTIFFS
10   BY MR. GRONBORG:
11       Q.   And, Dr. Frykman, before the break
12   we were talking about the obligations of
13   companies to disclose material information.
14          Do you believe that there are legal
15   disclosure requirements specifically for publicly
16   traded pharmaceutical and biotechnology
17   companies, as opposed to public companies in
18   general?
19       A.   I'm not aware of any difference
20   between pharma and biotech companies versus other
21   publicly traded companies.  My best understanding
22   of -- of it is that there are disclosure
23   obligations per the law for companies in which
24   there is investment from public investors.
25       Q.   Is it your understanding that

Page 154

1    that -- those requirements are the same,
2    regardless of the industry the company is in?
3        A.   That's correct.
4        Q.   And what is the difference, if any,
5    between what you call typical industry practice
6    for the disclosure of top-line results and the
7    legal standard for disclosures that apply to
8    biopharmaceutical companies?
9          MS. MURPHY:  Objection.  Lacks
10   foundation.
11       A.   Yeah.  Again, I'm not sure I can
12   recite for you what the specific legal
13   obligations are.  But within pharma and biotech
14   with -- and, again, with regard to just clinical
15   trial disclosures, as I've said before, I'm -- I
16   don't believe there's any legal obligation beyond
17   that of materiality.
18          And where the company decides to
19   draw the line to include or not include in their
20   press release must meet the obligation of
21   disclosing material information.  But at the same
22   time, as I've mentioned before, and I'll -- I'll
23   describe it in a different way, they're also
24   obligated, by virtue of their desire to present
25   at future medical and scientific conferences, to

Page 155

1    not disclose too much.
2          Because companies, if they disclose
3    too much, they can actually be precluded from
4    presenting at the forum in which they very much
5    want to present the results at.  So ASCO is one
6    example.  American Society of Hematology,
7    American Society For Cancer Research, European
8    Society of Medical Oncology, these conferences is
9    where the, you know, hundreds and thousands of
10   practicing medical oncology hematologists go to
11   get the latest information.
12          Yes, it's in journals.  Yes,
13   there's other CME type activities in which they
14   can acquire some of this information, but the
15   most -- what's perceived to be the most valuable
16   information comes out at these meetings.
17          And companies -- Puma is one of
18   many, many companies -- eagerly seek to have
19   their clinical trial results presented at these
20   meetings.  And therefore are very careful to not
21   risk jeopardizing their opportunity to present at
22   these conferences.
23       Q.   Now, do you understand that
24   companies can not comply with legal disclosure
25   requirements in order to not risk jeopardizing a

Page 156

1    presentation at a conference?
2          MS. MURPHY:  Object to the form.
3    Lacks foundation.
4        A.   Yeah.  I'm not they can do that.
5        Q.   Now, do you know if there's any
6    federal agency that's charged with ensuring that
7    disclosures made by public companies comply with
8    legal requirements?
9        A.   To my knowledge, the Security and
10   Exchange Commission has a say in that.  And the
11   other one that I can think of --
12          MR. BLAIR:  Are we close to getting
13   started again?
14          MR. METZ:  Oops, we had it on mute.
15          MS. MURPHY:  Sorry, Ryan.  You were
16   muted.
17       Q.   If you want to continue.
18       A.   Yeah.  The other agency that I know
19   has say in the truthfulness of -- of either
20   disclosure or promotional literature put out by
21   companies is the Federal Trade Commission.
22       Q.   Has the SEC or the FTC ever sought
23   your opinion regarding whether or not a public
24   disclosure complied with standard industry
25   practices?

Gregory Frykman, M.D.

Page 157

1    A.   No.  I've never been asked by them
2  to vet any press releases.
3       Q.   All right.  Does the FDA have any
4  responsibility for ensuring that press releases
5  or public disclosures made by public companies
6  about clinical trial results comply with legal
7  requirements?
8         MS. MURPHY:  Objection.  Lacks
9  foundation.
10    A.   Yeah.  I'm not sure that the FDA
11  has authority to do that.  But at the same time I
12  know that, because I used to see it go on, that
13  there from time to time will be FDA people that
14  attend medical and scientific conferences.
15         And two things can occur that I've
16  seen.  One is where FDA personnel will be in the
17  audience of a presentation of some important
18  clinical trial when, in fact, there is a
19  different set of results that is presented to the
20  FDA on a confidential basis at some point in the
21  future, or even -- even prior to that.
22         And so the discussion amongst --
23  and I was one of them -- discussion amongst
24  people at the FDA is well, gee, you know, exactly
25  which results are we supposed to believe.

Page 158

1         Typically, the FDA, which has the
2  authority to demand all the clinically -- the
3  clinical trial information about a trial, they
4  can -- they can demand that.  They typically view
5  the information they get in the agency as more
6  reliable than what is presented at -- at the
7  medical and scientific conferences.  But in
8  general there's -- there's not a problem.
9         The other way that it occurs is
10  when people from the FDA -- and, again, these are
11  people from DDMAC, I mentioned that branch of the
12  FDA earlier -- they go to the hall of the -- of
13  the medical scientific meeting where all the
14  promotion is going on.  So those are where
15  companies have rented space, they have a booth,
16  they're promoting their product there.  And that
17  is considered by the FDA advertising, which they
18  regulate.
19         And there have been examples, I
20  don't know how many, but I know of one well
21  exam -- one well an example where the companies
22  were in fact violating the requirements that were
23  imposed on their advertising.  I can't tell you
24  all the details now.  That was back 15 years ago,
25  but that actually -- that occurrence made it in

Page 159

1  the Wall Street Journal.
2       Q.   Can I have you turn to page 3 of
3  your report?
4    A.   Page 3.
5       Q.   It's your summary of opinions.
6    A.   Yes.
7       Q.   Actually, let's skip that one for
8  now.  Let's have you go to your materials
9  specifically at the back, which is your
10  Exhibit C.
11         And it identifies here that you --
12  you look at Puma's SEC form 8-K for July 22,
13  2014.  In this engagement did you consider any of
14  Puma's press releases that were issued between
15  July 23, 2014, and June 1, 2015?
16    A.   Yes.  There was at least one in
17  there that reflected their discussion with the
18  agency that revolved around the need for the firm
19  to undertake larger-than-anticipated or lengthier
20  than anticipated carcinogenicity studies and
21  development of reproductive toxicology studies.
22       Q.   Is that identified in your material
23  considered?
24    A.   That I don't believe is, because
25  I've looked at it since the report was written.

Page 160

1       Q.   So you didn't look at it before the
2  report was written?
3    A.   I may have locked at it before
4  then.  I -- I -- that part I don't know.
5       Q.   Other than that, are there any
6  other Puma press releases, that and the one
7  issue -- the ones issued on July 22, 2014, that
8  you considered for this report?
9    A.   The only other one, and I can't
10  remember if it was a press release or exactly
11  what it was, was the announcement, maybe it was
12  their S-3, but announcement regarding their
13  secondary offering.
14       Q.   And is that identified in your
15  materials considered?
16    A.   I don't think it is, but it's,
17  again, not something I spent much time looking
18  at.
19       Q.   So did you only includes in your
20  materials considered the things you spent a lot
21  of time looking at?
22    A.   I tried to include everything that
23  I looked at.
24       Q.   Is there anything else that you can
25  think of that you considered in the course of

**Page 157..160**

Gregory Frykman, M.D.

Page 161

1  this engagement that's not identified in
2  Exhibit C?
3      A.   No.
4      Q.   You considered Puma's July 22,
5  2014, business update call transcript; is that
6  right?
7      A.   Yes.
8      Q.   Okay.  And you've identified that
9  in these -- the first bullet points in here?
10     A.   I believe it's in there, yeah.
11     Q.   Okay.  Do you know if there are any
12  slides that were used in conjunction with that
13  conference call?
14     A.   I do not know that.
15     Q.   All right.  Did you consider any
16  slides that may have been used in conjunction
17  with that conference call?
18     A.   I did not, but I would have
19  probably asked -- if they existed, I would have
20  probably asked for them, if they were referred to
21  in the transcript of the call.  So I don't recall
22  in there any of the speakers say, you know, look
23  at slide 3, look at slide 5.  What the case is.
24     Q.   Did you consider any of the
25  company's other conference call transcripts

Page 162

1  between July 23, 2014, and June 1, 2015?
2      A.   Of Puma's?
3      Q.   Puma's.
4      A.   No.  That was not a focus of what I
5  did.
6      Q.   Prior to July 22, 2014, do you know
7  if Puma ever hosted a public conference call to
8  discuss the results of a clinical trial?
9      A.   I don't know if they -- if they
10  did.
11     Q.   Following July 22, 2014, do you
12  know if Puma has ever hosted a conference call in
13  which they discussed the results of the clinical
14  trial?
15         MS. MURPHY:  Objection.  Lacks
16  foundation.
17     A.   I believe there was a subsequent
18  call on updated results, but I could be mistaken
19  on that.  Again, that's not something that I
20  focused on.
21     Q.   All right.  Well, have you --  did
22  you consider any Puma conference call transcripts
23  other than the one for July 22, 2014?
24     A.   No.
25     Q.   And other than the July 22, 2014,

Page 163

1  form 8-K, did you consider any of the company's
2  other SEC filings from any point in time?
3      A.   I don't believe I did.
4      Q.   None of the company's quarterly SEC
5  filings?
6      A.   Not that I recall.
7      Q.   Did you consider the company's
8  March 2015 form 10-K?
9      A.   I may have looked at it briefly,
10  but it wasn't something that was any more
11  informative than the information that I had in
12  hand prior.
13     Q.   You say "may have."  Did you look
14  at that form 10-K?
15     A.   I honestly can't remember.
16     Q.   How would you be able to make the
17  conclusion that it was no more informative than
18  the materials you had, if you didn't look at it?
19     A.   I may have looked at it.  And I may
20  have said, you know, with regard to --
21     Q.   I need to know if I looked at it.
22  Did you look at it?
23     A.   Sir, I -- I honestly don't
24  remember.
25     Q.   Okay.  Well, how -- did you draw a

Page 164

1  conclusion that it was no more informative than
2  the information you already had?
3          MS. MURPHY:  Objection.  Lacks
4  foundation.
5      A.   I'm not sure I could draw that
6  conclusion, but I can tell you that in general,
7  when I have looked at pharmaceutical and biotech
8  company 10-Ks, where I have been informed of the
9  development progress for one or more of their
10  drugs, that I have found them to be not that
11  informative.
12     Q.   And do you assume that was the case
13  with Puma?
14     A.   If I looked at it, then I would
15  assume that to be true, but I can't be sure.
16     Q.   Well, did you consider any of
17  Puma's SEC filings related to the company's
18  January 2015 stock offering?
19     A.   I don't know that I looked at
20  anything in great detail.  I may have looked at
21  it briefly.  But I did not spend much time
22  looking at it.
23     Q.   You say you may have looked at it.
24  What is "it"?
25     A.   At the S-3.

**Page 161..164**

Gregory Frykman, M.D.

Page 165

1    Q.   How many S-3s did the company issue
2  with respect to that January 2015 stock offering?
3    A.   I don't know that.
4    Q.   The one you may have looked at, do
5  you know what the date of it was?
6    A.   I -- I don't.  I would ima -- I --
7  I can't tell you.
8    Q.   Did you try and keep track of the
9  documents that you looked at?
10    A.   I did my best, sir.
11    (Discussion off the record.)
12    MR. GRONBORG:  Let's go off the
13  record for a second.  Sorry.
14    THE VIDEOGRAPHER:  The time is
15  1:38 p.m.  We're going off the record.
16    (Recess taken.)
17    THE VIDEOGRAPHER:  The time is
18  1:39 p.m., and we're back on the record.
19  BY MR. GRONBORG:
20    Q.   And, sir, did you try and keep
21  track of all of the documents that you considered
22  in the course of this engagement?
23    A.   I did, sir.  I tried my best.
24    Q.   How'd you do that?
25    A.   It was keeping track of the press

Page 166

1  releases, the articles that I read, the FDA
2  materials and drug labels.
3    Q.   I meant more rudimentary, though.
4  Did you write them down or did you keep a
5  spreadsheet?
6    A.   These were kept in a -- a draft
7  spreadsheet that I was working on.  And then
8  the -- the documents that I received from Latham,
9  there was an email record of those being sent.
10  And then in general things like Google and
11  PubMed, so forth, I accessed those, you know --
12  you know, as a matter of routine.
13    Q.   The next section on your Exhibit C
14  lists deposition transcripts?
15    A.   Yes.
16    Q.   Do you see that?  How much time did
17  you spend reviewing those?
18    A.   Well, they varied in length from
19  probably an hour to -- for the short
20  transcripts -- to several hours per transcript,
21  sometimes six or eight hours, perhaps.
22    Q.   And did you review the exhibits for
23  each of those transcripts?
24    A.   In some cases, I did.  In most
25  cases, I did not.

Page 167

1    Q.   Did you have all of the exhibits to
2  those transcripts?
3    A.   I had the ones that I asked for.
4    Q.   Well, did you ask for all of the
5  exhibits for each of the transcripts?
6    A.   Typically, I did not ask for all
7  the exhibits.
8    Q.   And did you list in here all of the
9  exhibits that you asked for?
10    A.   I believe I did.
11    Q.   Would those be in the documents
12  that are the first bullet pointed section?
13    A.   I wouldn't, sir, be able to tell
14  you where in here is listed the exhibits to the
15  transcripts that I considered.  I can't tell you
16  where they're -- they are listed.
17    Q.   Well, are they listed?
18    A.   Then perhaps they're -- maybe in --
19  in some of these cases I didn't ask for any -- I
20  just -- that part was -- was -- was much less of
21  a focus of mine.  My focus was getting a general
22  understanding of what the various deponents said.
23    And if there was something that I
24  felt was particularly important, and I know this
25  came up more recently, then I -- I did ask for

Page 168

1  the -- the -- the exhibits.  But that's not
2  something that I spent time looking through.
3    Q.   Somewhere do you have a list of the
4  deposition exhibits that you considered in this
5  engagement?
6    A.   I do.  It's on my laptop.  It was
7  sent by Latham.
8    Q.   They would have kept that at some
9  point.
10    Now, with respect to Mr. Auerbach's
11  deposition, do you know that was a two-day
12  deposition?
13    A.   Yes.
14    Q.   Okay.  Did you look at both days or
15  just the January 28th transcript?
16    A.   I think I looked at both days.  No.
17  I did look at both days.
18    Q.   And next you list in your materials
19  considered data and database.
20    Do you see that?
21    A.   Yes.
22    Q.   And what do you mean when you say
23  you considered Google?
24    A.   Well, it was common to type in a
25  keyword into Google that was of relevance to the

Page 165..168

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 44 of 143   Page ID
#:13492
Confidential
Gregory Frykman, M.D.
Hsingching Hsu vs. Puma
Biotechnology, Inc., et al.

Page 169

1  particular press release or document that I was
2  looking up.  And then -- we've done this for
3  years -- looking at what the hits are, and then
4  honing down on the specific document that might
5  be helpful.
6      Q.   You say it was common.  Are you
7  saying -- did you do specific searches on Google
8  for the purposes of this engagement?
9      A.   Very much so.
10     Q.   An did you keep a list of the
11 searches that you did on Google?
12     A.   I did not.
13     Q.   So as you sit here today, do you --
14 can you identify for us the specific searches
15 that you did on Google?
16     A.   I can't identify for you individual
17 searches, but, for example --
18     Q.   Well, how many searches did you do
19 on Google?
20     A.   Probably thousands.
21     Q.   Thousand -- for purposes of this
22 engagement, you did thousands of searches on
23 Google?
24     A.   Uh-huh.  Of various things, yes.
25     Q.   Did you keep track of what the

Page 170

1  results of those searches were?
2      A.   I did not.
3      Q.   Do you have -- do you still have
4  your browser history for your Google searches?
5      A.   I don't think.  I've not -- I don't
6  think I've made a point to erase it, I just -- I
7  don't know.  I'm surprised in some ways this is
8  coming up.  But it's common in --
9      Q.   Was it your impression as an expert
10 that you didn't need to identify what searches
11 you did on a database?
12     A.   For commonly used generic
13 databases, such as Google and PubMed, I was
14 advised that not a specific record needed to be
15 kept of each search that was done.
16     Q.   So how is it you believe you did
17 thousands of searches on Google?
18     A.   Because in the course of going
19 through all these documents over months and
20 months, it was commonplace for questions in my
21 mind to arise as to what a particular drug was.
22 I had to look that up.  What a particular outcome
23 was.  I needed to look that up.  Where particular
24 drugs' clinical trial results had been presented
25 at which medical conference, and on and on and

Page 171

1  on.
2      Q.   Did you do a Google search for what
3  the typical industry practices are for the public
4  disclosure of clinical trial results?
5      A.   I probably did and didn't find
6  anything that was particularly relevant.
7      Q.   So you did do it or you probably
8  did it?
9      A.   Almost -- no.  Not almost
10 certainly.  I certainly did look up information
11 regarding, you know, formatting and -- and sort
12 of best practices there.  But beyond that, as
13 I've testified before, I'm not aware of any
14 academic articles or cookbooks or handbooks on
15 how this is done, so that's not something that I
16 would have necessarily looked for.
17     Q.   Did you do a Google search for what
18 the standard industry practices are for the
19 contents of a press release regarding a clinical
20 trial?
21     A.   With regard to clinical trials, no.
22 But with regard to, you know, general elements to
23 refresh my memory of all the thousands that I've
24 read what are sort of the common elements,
25 absolutely.

Page 172

1      Q.   Well, are all of the materials that
2  you reviewed on Google that are relevant to your
3  opinion identified in Exhibit C?
4      A.   Yes.
5      Q.   So every -- every document that you
6  found through your Google searches that is
7  relevant to your opinions?
8      A.   That's correct.  That had some
9  relevance to this case is -- is -- yes.
10     Q.   And in all of those thousands of
11 Google searches, did you see any press releases
12 regarding clinical trial results that you
13 believed was not in line with standard industry
14 practices?
15     A.   As I testified before, I don't
16 recall seeing any press releases, either well
17 before this case or revolving around this case,
18 that did not fit within the -- the industry
19 standards.
20     Q.   And here what do you mean when you
21 say you considered PubMed?
22     A.   PubMed, as you probably know, is a
23 publicly available database provided by the
24 National Library of Medicine, and it is intended
25 to make available and for free to the public a

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 45 of 143   Page ID #:13493

Confidential

Gregory Frykman, M.D.                                                    Hsingching Hsu vs. Puma
                                                                        Biotechnology, Inc., et al.

Page 173

1  lot, not all, but a lot of the world's biomedical
2  literature, specifically as related to human
3  medicine.
4        So it was common for me to go to
5  PubMed, where there was a drug of interest, and
6  many have been identified in here, and look and
7  see what the peer-reviewed publication track
8  record is for that particular drug.
9     Q.   And how many searches did you do on
10  PubMed?
11     A.   Oh, probably hundreds.
12     Q.   And did you keep track of the
13  searches you did on PubMed?
14     A.   I did not attempt to keep track of
15  them.  Again, it was much more of a exercise
16  looking for publications that beared some
17  relevance to the, you know, immediate question at
18  hand.
19     Q.   Did you keep track of the search
20  terms that you'd used for your searches on
21  PubMed?
22     A.   Well, to some extent PubMed keeps
23  those on -- on is own, so I don't have to
24  remember those.  I don't know if they're still
25  there or not.  But I can certainly give you many

Page 174

1  of them that I looked up.
2     Q.   Well, you believe PubMed still
3  retains a record of the searches that you did for
4  purposes of this engagement?
5     A.   I do not know whether they still --
6  whether it's still kept.  But it is certainly the
7  case with PubMed, when you use it, say, over an
8  hour's period of time, that each of the keywords
9  that you put in will be retained by PubMed and
10  will -- I think they even call it in the right
11  hand -- lower right-hand corner something along
12  the lines of "search history."
13     Q.   So you think that search history
14  for the searches that you did for this engagement
15  may still exist?
16     A.   Might exist.  Don't know.
17     Q.   And what do you mean by that you
18  considered the ASCO meeting library?
19     A.   Again, another database.  This one
20  is completely provided by ASCO.  But this is an
21  attempt by ASCO to make available to the public,
22  albeit there's a charge, for the public accessing
23  the -- at least the oral presentation -- I can't
24  remember if the posters are in there or not,
25  certainly the abstracts, and in many cases -- in

Page 175

1  some cases the presentation slide decks for years
2  and years of ASCO annual meetings, and it may be
3  some of their other symposia, GI, TU, and so
4  forth.
5     Q.   And how many searches did you do of
6  the ASCO meeting library for purposes of this
7  engagement?
8     A.   Probably dozens.
9     Q.   What do you mean by "dozens"?
10     A.   Probably more than 25 and less than
11  200.
12     Q.   Did you keep track of the searches
13  that you did on the ASCO meeting library?
14     A.   No, sir.  I did not.
15     Q.   And what do you mean here by you
16  considered clinicaltrials.gov?
17     A.   So that is another resource
18  available to people that are involved in clinical
19  trials.  It's funded by the government, and the
20  purpose of which is to provide a publicly
21  available database of clinical trials that are
22  currently ongoing, as well as those that have
23  complete.  And it contains a synopsis of the
24  clinical trial design elements for, again, trials
25  that are ongoing, as well as trials that have

Page 176

1  completed.  And was -- remained -- was -- is a --
2  you know, a good resource to quickly get up to
3  speed on individual clinical trials, especially
4  if they're -- haven't been published on.
5     Q.   And how many searches did you do on
6  the clinicaltrials.gov database?
7     A.   Probably hundreds.
8     Q.   Did you keep track of those
9  searches?
10     A.   I did not, except to the extent
11  that the relevant information from them was
12  incorporated into the -- you know, incorporated
13  into this -- this table that I had created.
14     Q.   So is there any relevant
15  information from any of the databases you looked
16  at that is not specifically identified in
17  Exhibit C in another section?
18     A.   I -- I don't think so.
19     Q.   So of all the searches that you
20  did, the only relevant materials that you saw are
21  those that are otherwise specifically identified
22  in Exhibit C; is that right?
23     A.   Correct.
24     Q.   On clinicaltrials.gov, did you see
25  any press releases regarding top-line clinical

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 46 of 143   Page ID #:13494

Confidential

Gregory Frykman, M.D.

Hsingching Hsu vs. Puma
Biotechnology, Inc., et al.

Page 177

1  trial results?
2      A.   I did not see any press re --
3  releases regarding clinical trial results.
4      Q.   How about conference call
5  transcripts regarding top-line clinical trial
6  results, did you see those?
7      A.   Yeah.  Neither of those documents
8  would be kept on clinicaltrials.gov, to my best
9  knowledge.
10      Q.   And how about on the ASCO meeting
11  library?  On that meeting library did you see any
12  press releases regarding the top-line results of
13  clinical trials?
14      A.   To my best knowledge, that is not a
15  form where those would appear.
16      Q.   And how about conference call
17  transcripts regarding top-line clinical trial
18  results, did you see any of those on the ASCO
19  meeting library?
20      A.   No.  I did not.  That would not be
21  a forum where one would expect to find those
22  documents.
23      Q.   And on the PubMed database, did you
24  see any press releases regarding top-line
25  clinical trial results?

Page 178

1      A.   No.  Because that is not a database
2  that contains press releases.
3      Q.   And how about conference call
4  transcripts regarding top-line clinical --
5  clinical trial results, did you see any of those
6  on the PubMed database?
7      A.   No.  I did not.  That's not where
8  they would be -- PubMed doesn't archive those.
9      Q.   All right.  So other than Google,
10  was there any other source you used to obtain
11  top-line clinical trial result press releases or
12  conference calls that you considered for purposes
13  of this engagement?
14      A.   Yes.  There was a LexisNexis
15  database called Intelligize that I accessed with
16  help from the Latham attorneys, and I would give
17  them the -- a number of keywords and ask them to
18  search for press releases that contained one or
19  more of these keywords.  And those included
20  things like overall survival, disease-free
21  survival, response rate, log rank test,
22  significance value or significance test, p-value,
23  endpoints, statistical power, dropout rate,
24  progression-free survival, time to progression,
25  and so forth.

Page 179

1      Q.   Well, is that a complete list of
2  these search terms that you provided to counsel
3  to do searches for you?
4      A.   That's a representative subset.
5      Q.   Do you have a complete list of
6  these search terms that were provided to counsel
7  to do these searches?
8      A.   Yeah.  I can -- we can get that for
9  you.
10      Q.   Okay.  Is that something you have?
11      A.   It's something that's sitting on my
12  computer that was part of an email.
13      Q.   Is there a reason why you didn't
14  identify the LexisNexis Intelligize database here
15  in your report?
16      A.   I -- I guess that is one that I
17  just wasn't thinking of at the time that I was
18  putting this together.
19      Q.   Did you get the results of any of
20  the searches on the Intelligize database?
21      A.   Yes.  I did.  In the form of press
22  releases.
23      Q.   Well, do you know how many hits
24  there were for any of the terms that you provided
25  to counsel?

Page 180

1      A.   I don't know the exact steps that
2  were taken from providing the Latham attorneys
3  the search terms.  But a few weeks after I gave
4  them the search terms I received 50, 75 press --
5  maybe 100, I can't remember the number, press
6  releases that met one or more of the criteria
7  that I gave them.
8      Q.   Was it your un -- when you say
9  "criteria," did you provide them with any --
10      A.   Or, I'm sorry, the search terms.
11      Q.   Did you give them any other
12  parameters for the search?
13      A.   I don't think any additional
14  parameters, but there were, I -- I suppose other
15  terms.  You know, phase 2, phase 3.
16          MS. MURPHY:  I would just caution
17  you here, to the extent it relates to your
18  methodology, you can absolutely tell him, but to
19  the extent it -- it involves, you know,
20  attorney-client --
21          THE WITNESS:  Privilege.
22          MR. GRONBORG:  This all sounds like
23  methodology, though.
24          MS. MURPHY:  Sure.  I just want to
25  remind him.

Gregory Frykman, M.D.

Page 181

1    Q.   Well, did you give a -- date ranges
2  for these searches?
3    A.   I don't know that I gave specific
4  date ranges.  But the focus of looking through
5  the press releases was an emphasis on more recent
6  ones than older ones.
7    Q.   What do you mean by "more recent"?
8    A.   Oh, say in the last five to 10
9  years.  Things that were -- and I don't know that
10  we even saw any.  Clinical trial results that
11  were top-line clinical trial results that were
12  issued in the '90s and '80s, I don't think we
13  looked at those at all.  I don't think I looked
14  at those at all.
15    Q.   Now, do you believe that have
16  listed in your Exhibit C all of the press
17  releases that you received from Latham & Watkins
18  as a result of these searches?
19    A.   Yes.  With one proviso.  And that
20  is that if it involved, say, a medical device,
21  then those are excluded.
22    Q.   So of the 50, 75, or 100 you
23  received, how many did you exclude because it
24  involved a medical device?
25    A.   I don't know.  15.  Ah, probably

Page 182

1  more than that.  20, 30.  Something like that.
2    Q.   And do you know whether or not the
3  50, 75, to 100 press releases you received,
4  whether or not that encompassed all of the press
5  releases that hit on the various search terms
6  that you've provided?
7    A.   I don't have that information.
8    Q.   So as you sit here today, do you
9  know how many different press releases hit on
10  those search terms?
11    A.   I don't know.
12    Q.   Did you give Latham & Watkins any
13  instructions about, of all of the press releases
14  that hit on the search terms, which ones to
15  provide you?
16    A.   Beyond the search terms, I don't
17  recall giving them specific instructions.
18    Q.   Well, was it your expectation that
19  they were going to give to you every press
20  release that hit on any of the search terms?
21    A.   I don't know that I had that
22  expectation, but I would have imagined -- I
23  didn't ever discuss this with them -- that things
24  that were errantly archived in Intelligize that
25  came up that were clearly unrelated, they would

Page 183

1  have taken those out.
2    Q.   And how do you understand they
3  would have figured out if it was clearly
4  unrelated?
5    A.   Well, if it was from a technology
6  company or from a green company or some federal
7  government agency, so, you know, NIH, FDA.  These
8  agencies also issue press releases, and it's very
9  possible that some of those, you know, got in
10  there as well.  I just don't know that.
11    Q.   All right.  Was it your impression
12  that you received every press release from a
13  biotechnology or pharmaceutical company that hit
14  on any of your search terms?
15    A.   Yes.
16    Q.   Looking at --
17    A.   Well, actually, let me -- let me
18  caveat that for a moment.  I -- I don't know the
19  extent to which LexisNexis or Intelligize
20  actually captured all of the pharma and biotech
21  press releases.  So it could be there were many
22  companies out there or a few companies, I don't
23  know that, that issued press releases that for
24  one reason or another were not archived in
25  Intelligize.

Page 184

1    But Intelligize seemed -- or the
2  LexisNexis database seemed to be a good source in
3  which to find press releases to analyze.
4    Q.   So look at page -- starting at
5  page 15 of your Exhibit C, the materials
6  considered.
7    A.   15, yes.
8    Q.   The section titled "Company
9  Disclosures."
10    A.   Yes.
11    Q.   So how many of those company
12  disclosures that are listed here did you get from
13  a source other than Intelligize?
14    A.   I do not know that.  So as I have
15  testified earlier, the focus of my work was on
16  the press releases of the clinical trial results.
17    There were also a number of press
18  releases that related to offerings, usually
19  secondary offerings, that followed the disclosure
20  of clinical trial results.  And in those cases
21  the question that -- that I -- what I did at that
22  point then was to very cursorily look at those
23  press releases that related to offerings and see
24  that they in fact did represent a follow-on
25  offering that occurred after a press release.

Page 181..184

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 48 of 143   Page ID #:13496

Confidential

Gregory Frykman, M.D.

Hsingching Hsu vs. Puma Biotechnology, Inc., et al.

Page 185

1   So I was not offering an opinion,
2 and still didn't offer an opinion, on the wisdom
3 of that offering, on the timing of that offering,
4 whether it was a good timing or bad timing, and
5 so forth.
6   Q.   How did you get the press releases
7 regarding the secondary offerings?  Some of them?
8   A.   These were ones that I had talked
9 to Latham attorneys about.
10   Q.   How -- did you provide them --
11 did -- did these come from a certain of some
12 database?
13   A.   These came from offerings that I
14 was aware of and that they were aware of.  So
15 just offerings in general.  And then the search
16 was honed down to the companies that met the
17 criteria of follow-on offering following the --
18 following the release of top-line clinical
19 results.
20   Q.   Well, did you do a search of some
21 sort for all press releases regarding stock
22 offerings by biopharmaceutical companies?
23   A.   No, sir.  I did not do an
24 exhaustive search for that.
25   Q.   Did you provide Latham with any

Page 186

1 search terms to use to search any database with
2 regard to press releases regarding stock
3 offerings?
4   A.   I did not.  It was more of a
5 discussion of what I know about this company, this
6 company, this company.  Could you kindly get me
7 the releases revolving around the offering on
8 this date or around this time.
9   Q.   Is there any press release in your
10 materials considered regarding a stock offering
11 that was not provided to you by Latham & Watkins?
12   A.   I think all of these were.  I mean,
13 I -- I guess I could have gone out and gotten
14 them myself.  But a number of these, you know,
15 array, some of those --
16   Q.   Do you go out and get any of them
17 yourself?
18   A.   I -- sir, I can't recall which ones
19 I may have gotten myself and which ones the
20 Latham attorneys supplied.
21   Q.   Did you do any Google searches
22 regarding stock offerings by biopharmaceutical
23 companies?
24   A.   In this case, because these are
25 pretty common, I did not do that.  But --

Page 187

1   Q.   What is it that's pretty common?
2   A.   The secondary offering of stock
3 following the top-line results disclosure by a
4 pharmaceutical company.
5   Q.   In the last 10 years, how many
6 offerings have there been by biopharmaceutical
7 companies following top-line disclosure of
8 clinical trial results?
9   A.   Oh, probably hundreds and hundreds.
10   Q.   Do you know how many have been
11 done?
12   A.   I've not sought to figure that
13 number out.  But it was a -- you know, it's a
14 number at least in that range.  It's not -- I
15 can -- I can be very confident it's not five, and
16 it's probably not 10,000, but it's somewhere in
17 the, you know, in the hundreds.  And it was a
18 common practice when I was in capital markets to,
19 you know, see this occur.
20   So this a repetitive pattern that I
21 knew very well from my time in capital markets
22 where a company would issue a press release, then
23 at some point in the future there would be a
24 fuller disclosure of the data, either by virtue
25 of a peer-reviewed publication or presentation at

Page 188

1 a medical or scientific conference.  And
2 somewhere either preceding or following that
3 presentation of the fuller data there would be
4 disclosure that they were either starting
5 offering -- and in some cases I'd see a
6 disclosure that they had just completed their
7 offering.
8   Q.   And in the course of this
9 engagement did you make any effort to determine
10 how many stock offerings there had been by
11 biotechnology companies between the date of an
12 initial clinical trial press release and the date
13 that fuller data is published?
14   A.   I didn't seek to figure that out.
15 But I can, you know, confidently guess it's in
16 the hundreds.
17   Q.   But that would be a guess?
18   A.   Maybe -- well -- I'm sorry?
19   Q.   That would be a guess; right?
20   A.   Yes.
21   Q.   Okay.
22   A.   Because I -- I didn't go through
23 and try to figure out how many offerings there
24 were over a, you know, 10-year period within a
25 year of following top-line clinical results

Gregory Frykman, M.D.

Page 189

1  disclosure.
2      Q.   Well, what percentage of stock
3  offerings by biotechnology companies occur
4  between an initial clinical trial top-line result
5  press release and a fuller disclosure of the
6  clinical trial results?
7          MS. MURPHY:  Objection.  Lacks
8  foundation.
9      A.   I don't know that I can answer that
10  question.  I suppose somebody could, if you spent
11  the time to figure that all out.  But typically
12  what would happen is that companies -- many, many
13  small pharma and biotechnology companies are
14  100 percent dependent on invested capital to fund
15  their operations.
16          And so top-line clinical result
17  disclosure was one of several factors that they
18  would take into account when they would seek to
19  raise capital in a secondary offering.  There was
20  one that I commonly saw.
21      Q.   Got it.  Of -- of the press
22  releases in your list of company disclosures here
23  regarding clinical trial results --
24      A.   Uh-huh.
25      Q.   -- are there any of those that you

Page 190

1  obtained, other the materials that were provided
2  to you by Latham, from the Intelligize database?
3          MS. MURPHY:  Object to the form.
4  Lacks foundation.
5      A.   Yeah.  Try that question again.
6      Q.   Sure.  In any of the press releases
7  in this chart that begins on Exhibit 15, did you
8  obtain any of those from any source other than
9  through Latham & Watkins and the search of the
10  Intelligize database?
11      A.   Yes.  There were some that I went
12  and just got on my own.  Whether or not I
13  ultimately got them from Latham as well or not, I
14  don't know.  But, for example, Aveo, look on
15  page 18, Aveo, the story I know reasonably well.
16  And almost certainly took a look at that one.
17      Q.   Where did you get that press
18  release?
19      A.   That was on the Aveo website.  So I
20  went to Google and typed in "Aveo," and that took
21  me right to the Aveo company website, and I
22  looked at their press releases and looked to see
23  what they had available.
24      Q.   Are there any other company
25  websites that you looked at to obtain materials

Page 191

1  for purposes of this engagement?
2      A.   There were, but typically they
3  would direct me to the actual publication.  So in
4  many cases companies have in their company
5  website a peer-reviewed publication that
6  discusses their drug.  And I would go, then, if
7  it was on their website, pull it from there.  If
8  I couldn't get it from there, then I'd go to
9  PubMed, look it up there, and pull it from there.
10          In some cases neither the company
11  nor the website nor PubMed would have it.  I'd
12  have to just sort of do a general Google search,
13  but that's sort of what the process was.
14      Q.   Looking back at page 2 of your
15  material considered, you have a list there of 22
16  drug labels.
17          Do you see that?
18      A.   Page 2, yes.
19      Q.   And what was the relevance of
20  looking at the drug labels for this engagement?
21      A.   The purpose for looking at the drug
22  labels was, in many cases, to see how the FDA had
23  the company in their label describe the clinical
24  trial results that were disclosed at least
25  months, if not years, prior in their press

Page 192

1  releases.
2      Q.   So did you look at the initial
3  clinical trial press release for every one of the
4  drugs that you've identified here that you looked
5  at the label?
6      A.   Almost certainly.
7      Q.   Was that your goal, to do a
8  comparison of the initial clinical trial press
9  release with the label?
10      A.   That was one of them.
11      Q.   And how did you choose these 22
12  drugs to look at the label?
13      A.   Well, the labels to these drugs
14  refer to the press releases that I indicated I
15  had looked at previously.  And so it was a
16  relatively simple matter to take that drug from
17  the press release, say, two or three years
18  before, and then go to the -- either the FDA
19  website where the labels exist or sometimes I had
20  to go to the company website or sometimes,
21  frankly, you know, again, Google searching, had
22  to do that a few times for this, and then look to
23  see if the data presented in the press release
24  matched up -- this is one of the things --
25  matched up with what the ultimate result was in

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 50 of 143   Page ID #:13498
Confidential
Gregory Frykman, M.D.
Hsingching Hsu vs. Puma
Biotechnology, Inc., et al.

Page 193

1  the product label that was approved by the FDA.
2      Q.    And in the course of this
3  engagement, did you look at the label for
4  Nerlynx?
5      A.    I have, yes.
6      Q.    Is there a reason why that's not
7  identified here?
8      A.    That's a fair question.  And,
9  again, probably one where I just simply didn't --
10  didn't get it in.  But, yes, that was looked at
11  in there and it should be in there.
12      Q.    All right.  Next you have certain
13  FDA materials.  It looks like these are for 19
14  drugs that you looked at FDA materials?
15      A.    I didn't count the drugs, but that
16  number sounds approximately right.
17      Q.    And did you try and look at the FDA
18  materials for all of the drugs that you were
19  considering their initial top-line result press
20  release for?
21      A.    That's one of the things that I try
22  to do, yes.  But that wasn't the only reason, but
23  yes.
24      Q.    And did you consider the FDA
25  materials for neratinib or Nerlynx?

Page 194

1      A.    I did, and they may not be listed
2  in here as well.  But, yes, I looked at them
3  previously.
4      Q.    Specifically, do you recall which
5  FDA materials for Nerlynx you looked at?
6      A.    Oh, I think I looked at all the
7  publicly available documents.  So that would be
8  the medical officer's review, team leader review,
9  pharmacology, statistician, and so forth.
10      Q.    And for purposes of this
11  engagement, what -- why were you looking at these
12  FDA materials?
13      A.    Because an important question that
14  I kept in mind with this, but was always kept in
15  mind when I was doing policy analysis, was to
16  what extent is the material in the press releases
17  either confirmed or refuted by an independent
18  third party, namely the FDA.
19      Q.    And was that relevant to your
20  determination about whether or not a press
21  release was in line with industry standards?
22      A.    I don't know that that specifically
23  was being -- part of it -- the -- coming to the
24  conclusion with the press release was in line.
25          But the fact that the important key

Page 195

1  clinical trial outcomes disclosed in the press
2  release were confirmed in the FDA review
3  documents and then in the label was comforting in
4  that the disclosures by Puma were in fact
5  accurate and that they reflected accurately what
6  the results of that clinical trial were.
7      Q.    And in order to make a
8  determination about whether a top-line clinical
9  trial result is in line with industry practices,
10  do you need to look at FDA materials or an
11  FDA-approved label?
12          MS. MURPHY:  Object to form.
13      A.    No.  You don't need to look at it.
14  It might be helpful, but it's not necessary.
15      Q.    Next you list out a series of
16  conference abstracts and related documents.
17          Do you see that?
18      A.    Yes.
19      Q.    And are these documents you got by
20  searching sort of ASCO and other databases?
21      A.    Yes.
22      Q.    And how did you select which
23  conference abstracts to consider?  And by that I
24  mean these specific abstracts.  How did you
25  choose these specific abstracts to consider for

Page 196

1  this engagement?
2      A.    The specific abstracts cited were
3  selected because they were again related to the
4  press releases that I identified as similar to or
5  not quite as similar to Puma's.  But the specific
6  question was, okay, there's a press release that
7  describes top-line clinical trial results.  Then
8  there's a meeting presentation that occurs at
9  some point in the future.  Almost all the time
10  there is an abstract that goes with that, with
11  that presentation.
12          And so the question was, well, what
13  did the abstract say that either might be
14  divergent from or parallel with what was in the
15  clinical trial -- I'm sorry, in the press release
16  about top-line clinical results, or was there
17  something different in the press re -- in the
18  abstract that was not in the full presentation at
19  the medical and scientific conference.
20      Q.    Have you ever presented any
21  clinical trial results at any of the conferences
22  whose abstracts you identify here?
23      A.    Clinical trial results, no.  But
24  there is an abstract or a -- a poster that I
25  presented at ASCO in, I think it's on there, that

Gregory Frykman, M.D.

Page 197

1 revolved around the use of -- yeah, it's on the
2 last page -- that revolved around the use of
3 anthracyclines, that's a class of drugs, as an
4 example of how an electronic resource actually
5 set up by the FDA worked.
6     Q.   And when you say -- where is that
7 listed here?
8     A.   That's on the last page of -- at
9 least of 610.
10     Q.   Got it.
11     A.   Exhibit 610.
12     Q.   Not here in your material
13 considered?
14     A.   No. 7.  That's correct.  So that
15 was a poster presentation, and the abstract was
16 submitted.  It was the same process as I've
17 described in my short report about ASCO.
18     Q.   Then you have a long list here of
19 journal articles.  Did you read all of those
20 journal articles for purposes of this engagement?
21     A.   I did, sir.
22     Q.   And did you compare any of the
23 top-line -- did you compare the top-line clinical
24 trial press releases that were associated with
25 all of the drugs that were discussed in these

Page 198

1 journal articles?
2     A.   I'm sorry, ask that question again.
3     Q.   Sure.  Did you -- did you consider
4 the top-line clinical trial result press releases
5 that were associated with all of the drugs that
6 are discussed in these various journal articles?
7     A.   Probably the vast majority of them,
8 since that was the primary purpose.
9     Q.   Was that -- the goal was to do a
10 comparison between the initial press release
11 about a clinical trial result and what was
12 ultimately published in the journal article?
13     A.   Yes.  That was generally the ideal.
14     Q.   And was it your belief that all of
15 the press releases you saw that were associated
16 with these journal articles, the drug discussed
17 in the journal articles, that they were all in
18 line with standard industry practices?
19     A.   Regarding the press releases?
20     Q.   Correct.
21     A.   Yes.  Again, as I mentioned before,
22 the specific information provided in each press
23 release could vary widely, and that's because a
24 drug for chronic lymphocytic leukemia is
25 different than a drug for colon cancer, is

Page 199

1 different from a drug for breast cancer, but --
2 and it could be phase 2 versus phase 3, in which
3 case phase 2 there wouldn't necessarily be
4 comparative data.  But in terms of comporting
5 with what is commonly done in the industry, the
6 answer yes.
7     Q.   And then turning to the chart again
8 that starts on page 15.
9     A.   Page 15.  Uh-huh.
10     Q.   Just going through it, it looks
11 like you have press releases from May 2003 to
12 March 2018.  Does that sound like approximately
13 the date range?
14     A.   May 2003 the -- 2003 seems a little
15 early, but, yeah, that's . . .
16     Q.   And for purposes of getting these
17 biopharmaceutical company press releases, did you
18 limit yourself to any particular type of
19 pharmaceutical or biotechnology company?
20     A.   No.  This was intended to try to be
21 representative and reflect what really goes on in
22 the industry, so there's some large companies
23 that are listed as well as, you know, smaller
24 companies.
25     Q.   Well, is it your understanding that

Page 200

1 the standard industry practices for the
2 disclosure of top-line clinical trial results
3 differs by the size of the company?
4     A.   It can.  It may not necessarily,
5 but it can.
6     Q.   Well, how does that standard
7 industry practice differ, depending on the size
8 of the company?
9     A.   That revolves around the question
10 of materiality, and whether or not the counsel at
11 each respective company, large or small, views
12 the nature of the information to be presented as
13 material.  So, for example, a large company, such
14 as Eli Lilly, that has a positive clinical trial
15 result that may be one positive result in a
16 phase 3 trial for a large program, that in and of
17 itself may not actually be material to the
18 company.
19         Whereas a phase 3 result, similarly
20 sized trial, similar disease, even similar class
21 of drug, wouldn't be the identical drug, but a
22 similar class of drug, similar trial design for a
23 small company, in which that small company -- in
24 which that result was positive, that might be
25 deemed a material event for the -- for the small

Page 197..200

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 52 of 143   Page ID #:13500

Confidential

Gregory Frykman, M.D.

Hsingching Hsu vs. Puma
Biotechnology, Inc., et al.

Page 201

1  company.
2           Each company is going to choose the
3  information that they put in the press release
4  specific to their trial and to their drug that
5  best, you know, meets their needs.  But it may
6  also be the case that the large company is not
7  planning on presenting any results at a
8  forthcoming medical scientific conference until
9  additional clinical results become available.
10  Whereas a small company, as is the case with
11  Puma, may be very interested in having that
12  single study's results presented at an upcoming
13  meeting.
14      Q.   Now, do you consider yourself to be
15  an expert on the standard industry practice for
16  the disclosure of top-line clinical trial results
17  for all companies, regardless of size?
18      A.   Within bio -- within the
19  biotechnology and pharmaceutical industries, yes.
20      Q.   In going through the company
21  disclosure section, I noted that there were four
22  conference call transcripts.
23           Other than Puma's, does that sound
24  right, that you reviewed four conference call
25  transcripts?

Page 202

1      A.   Could you show me where that was?
2      Q.   In --
3      A.   Oh, I see.
4      Q.   -- that section, "Company
5  Disclosures."
6      A.   I'm sorry, could you show me where?
7      Q.   Do you want to know which ones?
8  Where they are?
9      A.   Yeah.
10      Q.   Page 16, ArQule.
11      A.   16.  ArQule, okay.
12      Q.   January 17, 2012.  Page 20, Celgene
13  Corporation, November 13, 2012?
14      A.   I'm sorry, Celgene is where?
15      Q.   Page 20.  As you sit here today, do
16  you know what transcripts you looked at for
17  purposes of this engagement?
18      A.   The ones that had relevance to the
19  issues that I needed to address.
20      Q.   Did you look at any, other than the
21  ones you've listed here?
22      A.   I -- I don't think so but --
23      Q.   Two with Celgene on page 23?
24      A.   Cel --
25      Q.   Exelixis?

Page 203

1      A.   -- gene.  Just a moment.
2      Q.   On page 20?
3      A.   Exelixis.
4      Q.   Exelixis, page 23, the Jan --
5  July 20, 2015, transcript?
6      A.   July -- I'm sorry, but where is
7  that?
8      Q.   Page 23.
9      A.   23.  On Exelixis.  Uh-huh.
10      Q.   Page 30, Seattle Genetics,
11  September 29, 2014, transcript?
12      A.   30, Sea Gen, uh-huh.
13      Q.   Other than those four, and Puma's,
14  did you consider any other conference call
15  transcripts for purposes of this engagement?
16      A.   I -- I don't think so.
17      Q.   And is it your testimony that
18  those -- other than Puma, those are the only four
19  conference call transcripts by pharmaceutical
20  companies that would be relevant to your
21  opinions?
22      A.   Just a moment.  Uhm, I -- you --
23  those are -- are certainly relevant.  You can
24  probably throw in a whole bunch more, but in
25  general my views I don't think would change that

Page 204

1  much.
2      Q.   Well, how did you make the
3  determination that these were the four that were
4  certainly relevant to your opinions regarding
5  standard industry practices for disclosure of
6  top-line clinical trial results?
7      A.   Because these had to do with the --
8  the antecedent press release on top-line clinical
9  trial results.  And in the course of my work on
10  the capital markets I sat on -- I listened to
11  dozens and dozens and dozens of these calls, you
12  know, over the six years I was in capital
13  markets.
14      Q.   So you didn't consider those for
15  this engagement, did you?
16      A.   No.  There is a certain pattern to
17  how these go.  And the -- the additional
18  information, frankly, that comes from these calls
19  is a lot less valuable, I found, over the years
20  of doing this than might be initially perceived.
21           So the press release contains the
22  vast majority of the truly relevant information
23  for making an assessment of the efficacy and
24  safety of -- of a drug vis-a-vis that announced
25  clinical trial result.  But companies would

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 53 of 143   Page ID #:13501

Gregory Frykman, M.D.

Confidential

Hsingching Hsu vs. Puma Biotechnology, Inc., et al.

Page 205

1  frequently -- and, again, I sat on many, many of
2  these calls -- they would have a conference call
3  following that press release to add -- and the
4  term of art in the industry is to add "color" to
5  what was presented in the press release.  But I
6  typically found those to be of little additional
7  relevance to the main import of the press
8  release.
9      Q.   It's your understanding that
10  securities analysts who cover companies, that it
11  is typically their opinion that the press
12  releases, as opposed to the conference calls,
13  contain the vast majority of relevant
14  information?
15          MS. MURPHY:  Objection to form.
16  Lacks foundation.
17      A.   Yeah.  I don't know that I've
18  talked to a lot of securities analysts about what
19  they view as -- as particularly important.  They
20  go about their business sort of in their way.
21          Remember that they were much more
22  focused in general than I was on the -- on the
23  business model of the company, and trying to
24  predict what the stock price was going to be.
25  This was important for their client base, and

Page 206

1  that was different than what I spent a lot of
2  time doing.
3          They tended to -- as I mentioned
4  earlier, they tended to focus less on the FDA
5  relevance, on the relevance to risk/benefit ratio
6  probably than I did, because of my background in
7  clinical trial -- in -- in clinical trials and in
8  drug development.  And that's -- you know, to
9  some extent that's why, you know, I had a -- you
10  know, I had an expertise on Wall Street.
11          There tended to be a lot more
12  focus, at least in my experience, on the
13  questioners that would join these calls on issues
14  having to do with the balance sheet and dealing
15  with the income statement that were of no
16  relevance to what I was doing, and of no
17  relevance to -- you know, to this case as well.
18      Q.   And the four conference calls that
19  you looked at for purposes of this engagement, do
20  you think that those are particularly
21  representative examples of the conference
22  calls -- of the typical industry practice for a
23  conference call following a top-line clinical
24  trial result?
25      A.   For the most part, yeah.

Page 207

1      Q.   And how did you -- with regard to
2  the various press releases that I looked at for
3  top-line clinical trial results, did you try and
4  determine which ones were followed immediately by
5  a conference call?
6      A.   In -- that was always something I
7  looked at.  Whether or not I made particular note
8  of it is a different matter.  But it was both
9  commonplace but -- and maybe half of the press
10  releases that I looked at said that the company
11  would be having a conference call at some point
12  in the near future, either that day or the next
13  day.
14          So yes, again, it's common practice
15  and I would, you know, sometimes note it,
16  sometimes not note it.  But it was something that
17  was common.
18      Q.   How many press rele -- for this
19  engagement, as you've identified here, how many
20  press releases that you consider to be top-line
21  clinical trial press releases did you consider?
22      A.   Oh, I think that -- the number that
23  we got down to that seemed to fit the search room
24  criteria was on the order of 40 or 50.
25      Q.   It's your impression that about

Page 208

1  half of those identified in the press release
2  that they were going to have a conference call;
3  is that right?
4      A.   Yeah.  More or less.  Maybe
5  35 percent, maybe 60 percent, something like
6  that.  But it wasn't scattered.  It wasn't one or
7  two, and it wasn't every one of them.
8      Q.   So of the call it 20 to 25 press
9  releases that you looked at that were going to be
10  followed by a conference call, you looked at four
11  of them, the conference call themselves; is that
12  right?
13          MS. MURPHY:  Objection.  Lacks
14  foundation.
15      A.   That's correct.
16      Q.   How did you identify those
17  transcripts?
18      A.   Those were ones where they were
19  highlighted in the prose section of my expert
20  report.  And the -- the purpose of listening to
21  that was to just check and see if there was
22  anything that was particularly new that wasn't in
23  the press release that were on these transcripts.
24      Q.   Did you identify any -- step back.
25  You said listen to them.  Did you listen to them

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 54 of 143   Page ID #:13502

Confidential

Gregory Frykman, M.D.

Hsingching Hsu vs. Puma
Biotechnology, Inc., et al.

Page 209

1  or did you read the transcript?
2      A.   I'm sorry, read the transcript.
3      Q.   In any of the four transcripts that
4  you looked at, in any of them did the company
5  disclose any information about the clinical trial
6  results that was not disclosed in the
7  accompanying press release?
8      A.   That was frequent, but at the same
9  time it wasn't relevant.
10     Q.   When you say "frequent," how many
11 of the four -- of the four you looked at, how
12 many disclosed more information about the
13 clinical trial results than was in the
14 accompanying press release?
15     A.   Individual pieces of information, I
16 don't know, one to three.  But bear in mind that
17 those -- maybe one to five.  But bear in mind
18 that those are not necessarily of any relevance.
19     Q.   I want to make sure -- you said one
20 to three, one to five.  You looked at four
21 transcripts; right?
22     A.   Yes.
23     Q.   Okay.  And it's your -- it's your
24 belief that in one to three of those
25 transcripts --

Page 210

1      A.   I -- I misspoke.  I'm sorry.
2      Q.   Okay.
3      A.   So in -- of the four transcripts,
4  in each one of them somewhere between one and
5  five discrete, individual comments about that
6  clinical trial were available that were not in
7  the individual press release itself.
8      Q.   When you say about the clinical
9  trial, are you specifically referring to a result
10 of the clinical trial?
11         MS. MURPHY:  Objection to form.
12     A.   Well, it could be a result, which
13 was frequently not there, or it could be the
14 comment by the person speaking about the clinical
15 trial that was not present in the press release.
16     Q.   So in how many of those four
17 transcripts did the company discuss a result from
18 the clinical trial that was not included in the
19 accompanying press release?
20     A.   Maybe once or none or twice.  I
21 mean, it's sort of hard to -- it's sort of hard
22 to be specific, and I'll explain to you why.
23         So, for example, I --
24     Q.   Before you get -- once or twice --
25 I'm still trying to get at is that once or twice

Page 211

1  in the transcripts, or of the four transcripts --
2  the first question was of the four transcripts,
3  how many included a disclosure of a result of the
4  clinical trial that was not in the press release?
5         MS. MURPHY:  Objection.  Lacks
6  foundation.
7      A.   So that occurred, you know, once or
8  twice per transcript.
9      Q.   Every -- so all four of these
10 transcripts, they disclosed a result of the
11 clinical trial that was not included in the press
12 release?
13         MS. MURPHY:  Objection.  Misstates
14 testimony.
15     A.   Well, again, disclosing a clinical
16 trial result is different than making a comment
17 about some aspect of the clinical trial that the
18 audience may or may not attribute some relevance
19 to.
20     Q.   And my question was, specifically
21 of those four transcripts, in how many of them
22 did the company disclose a clinical trial result
23 that was not included in the accompanying press
24 release?
25     A.   And I think I told you one or --

Page 212

1  zero, one, or two.
2      Q.   And which?
3      A.   We'd have to go back and -- and
4  look at each one.  But I can -- I can give you
5  sort of an idea.
6      Q.   Can you tell me -- and I want to be
7  specific so we're not here all day -- can you
8  tell me, of those four, which, zero, one or two,
9  you thought included -- in which the company
10 disclosed the result of a clinical trial that was
11 not included in the accompanying press release?
12     A.   I can't do that now because that
13 was, frankly, a minor part of my consideration in
14 doing all this.  But I can give you an idea of
15 the sorts of things --
16     Q.   No.  I don't need the idea.  I just
17 was trying to see if we can get the question
18 answered.
19         Of those four, is there any one
20 that you are certain that the company included or
21 disclosed the results of the clinical trial in
22 the conference call that it did not in the
23 accompanying press release?
24     A.   I can't do that for you right now.
25     Q.   Is it your opinion that it is

Case 8:15-cv-00865-AG-SHK  Document 400-5  Filed 07/24/18  Page 55 of 143  Page ID #:13503

Confidential

Gregory Frykman, M.D.                                    Hsingching Hsu vs. Puma
                                                        Biotechnology, Inc., et al.

Page 213

1 typical for companies in this industry to
2 disclose clinical trial results in a conference
3 call that are not disclosed in an accompanying
4 press release?
5       MS. MURPHY: Objection. Lacks
6 foundation.
7       A. As I've said before, it is
8 commonplace for additional aspects of the
9 clinical trial to be discussed on a conference
10 call following the press release of top-line
11 clinical trial results.
12      Q. Does that include the re --
13 clinical trial results specifically?
14      A. Well, again, I'm -- I'm sorry to
15 make this difficult, but please understand that
16 the mere comment by the speaker about the results
17 of a clinical trial that may not disclose any new
18 numerical information but serves as a notice that
19 a particular aspect of that disease was looked at
20 in consideration of -- for that drug, that that
21 in and of itself is attributed by many people as
22 additional clinical trial results.
23      Q. Well, let's use your terminology
24 there. Of the four conference call transcripts
25 you looked at for purposes of this engagement, in

Page 214

1 how many of them did the company disclose new
2 numerical information about the trial results
3 that was not included in the press release?
4       MS. MURPHY: Objection. Asked and
5 answered.
6       A. Zero or one.
7       Q. Okay. Can you think of -- when you
8 say the one, is there one that stands out to you?
9       A. No.
10      Q. Now, is it your impression --
11      MS. MURPHY: Tor, sorry. We've
12 been going for a while. Can we take a short
13 break?
14      MR. GRONBORG: In a moment.
15      Q. Is it your impression that it is
16 typical industry practice for a company to
17 disclose new numerical information about a
18 clinical trial result in a conference call that
19 they do not put in the accompanying press
20 release?
21      A. No, sir. That is actually
22 atypical.
23      MR. GRONBORG: We can take a break.
24      MS. MURPHY: Thank you.
25      THE VIDEOGRAPHER: The time is

Page 215

1 2:40 p.m., and we are going off the record.
2       (Recess taken.)
3       THE VIDEOGRAPHER: The time is
4 3 p.m., and we are back on the record.
5 BY MR. GRONBORG:
6       Q. Doctor, we were looking at the
7 company disclosures that you've listed in your
8 materials considered starting at page 15. And I
9 understood you to say you thought there were
10 about 40 to 50 press releases that you looked at
11 in this engagement that concerned top-line
12 clinical trial results; is that correct?
13      A. Yes. That's a fair estimate.
14      Q. And how many companies, how many
15 different companies did you look at?
16      A. Well, again, the company was not
17 the focus. The clinical trial was the focus. So
18 it could be the case, as in the case of Puma,
19 where there was just a single trial with a single
20 company. But it was also the case in -- in some
21 examples where there were several clinical trials
22 that were for the same drug issued by the same
23 company.
24      Q. So how many companies top-line
25 clinical trial results did you consider for

Page 216

1 purposes of this engagement?
2       A. How many companies. A small
3 fraction. Less than the 40 to 50. 35 to 45.
4       Q. And during the period 2003 to 2015,
5 how many publicly traded pharmaceutical and
6 biotechnology companies were there?
7       A. Oh, there were hundreds.
8       Q. Do you have any -- more than 500?
9       A. That's a fair -- so certainly more
10 than 200 and -- 100 to 300, somewhere in there.
11      Q. It's your impression there were 100
12 to 300 pharmaceutical and biotechnology companies
13 that existed in 2003?
14      A. Publicly -- publicly traded in the
15 2003 to -- ah, there was probably more than that.
16 Probably 500.
17      Q. And of those companies, those
18 publicly traded biotechnology companies and
19 pharmaceutical companies, do you know how many of
20 them issued press releases with top-line clinical
21 trial results during the period 2003 to 2018?
22      A. I don't. But we could get an
23 estimate of -- of that, which would be maybe one
24 per company per year.
25      Q. Well, is it your impression that

Gregory Frykman, M.D.

Page 217

1  all -- all of the publicly traded
2  biopharmaceutical companies issued a top-line
3  press release about a clinical trial result
4  sometime between 2003 and 2018?
5      A.   I imagine that at least one of
6  them -- I imagine there was at least one
7  disclosure.  It's possible there was not.  But
8  most likely.
9      Q.   So it would be fair to say you
10  looked at 35 to 45 companies out of a total of
11  approximately 500 companies?
12      A.   500's a good guesstimate, sure.
13      Q.   And how many -- during that period
14  2003 to 2018, how many top-line clinical trial
15  press releases were issued by publicly traded
16  companies?
17      A.   Oh --
18          MS. MURPHY:  Objection.  Lacks
19  foundation.
20      A.   -- many hundreds, if not out of a
21  thousand.
22      Q.   Did you try and find out for
23  purposes of this engagement?
24      A.   No.  I did not.
25      Q.   Did you try and figure out what

Page 218

1  percentage of the top-line clinical trial press
2  releases that were issued by publicly traded
3  companies that you looked at for purposes of this
4  engagement?
5      A.   I did not focus on that.  But, on
6  the other hand, bear in mind that top-line
7  results of clinical trials for publicly traded
8  pharma and biotech companies didn't all --
9  were -- were not all particularly relevant.  Many
10  of them were not relevant to this exercise.
11          So the reason is that there could
12  have been clinical trials that were done by any
13  one of these companies for which top-line results
14  were presented in a press release that were of
15  little relevance to the company's outcome in
16  terms of the development of their drug for
17  reasons along these lines:  One is it could have
18  been a phase 1 study, a phase 1A study, or a
19  phase 1B study, especially small, albeit publicly
20  traded, thinly capitalized companies will be
21  predisposed to disclosing these results, because
22  it's important for them, but may bear no
23  relevance to the ultimate approvability of the
24  drug.
25          It's simply an important event in

Page 219

1  their corporate history, because they're so small
2  and so young, that disclosing results of a
3  phase 1A trial are a big deal for that company.
4  And may even have been deemed material, but that
5  offers little or no relevance -- that has little
6  or no relevance to the ultimate risk/benefit
7  ratio of the drug to its approval by regulatory
8  authorities, except filling in the microplace and
9  so on.
10      Q.   So was every press release that you
11  look at a top-line clinical result for a phase 3
12  trial?
13      A.   No.
14      Q.   Okay.  And between 2003 and 2018,
15  how many top-line clinical result press releases
16  were issued by publicly traded companies
17  regarding a phase 3 trial?
18          MS. MURPHY:  Objection.  Lacks
19  foundation.
20      A.   I'm sorry, ask the question again.
21      Q.   Sure.  During -- between 2003 and
22  2018, how many publicly traded biopharmaceutical
23  companies, biotechnology companies, issued
24  top-line clinical trial press releases regarding
25  a phase 3 trial?

Page 220

1      A.   Oh, probably hundreds.
2      Q.   Over a thousand?
3      A.   I don't know if I could go that
4  far, but there's hundreds of drugs in
5  development.  A fraction of those are phase 3
6  drug candidates at any one time.  And most of
7  the -- most of their phase 3 results will be --
8  probably be press released, although not
9  necessarily.
10          So I don't know if that helps you
11  or we can try again.
12      Q.   Now, between 2003 and 2018, how
13  many publicly traded companies issued top-line
14  clinical trial results in a press release where
15  the result was relevant to the company's outcome?
16          MS. MURPHY:  Objection.  Lacks
17  foundation.
18      A.   Yeah.  That one's really hard to
19  say, because you'd have to know what the size of
20  the company was, what the outcome of the trial
21  was.  Where that outcome, if it were positive,
22  fit into the clinical management paradigm and so
23  forth.  So that's a really hard question to
24  answer.
25      Q.   So of the press releases, including

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 57 of 143   Page ID
#:13505

Confidential

Gregory Frykman, M.D.

Hsingching Hsu vs. Puma
Biotechnology, Inc., et al.

Page 221

1  top-line clinical results from phase 3 trials
2  that have been issued by public companies between
3  2003 and 2018, of all of those, what percentage
4  did you consider for purposes of this engagement?
5       MS. MURPHY:  Objection.  Lacks
6  foundation.
7       A.   Yeah.  I don't -- again, I don't
8  know what the denominator is -- or the
9  denominator.  I've given you the numerator, but I
10  don't know what the denominator is.
11       Q.   So you don't know what percentage
12  you've looked at?
13       A.   I do not.
14       Q.   During that 2003 to 2018 period, do
15  you know how many top-line clinical result press
16  releases were issued that disclosed the results
17  of oncology clinical trials?
18       A.   Again, I don't.  Oncology tends to
19  be -- no.  Oncology is or cancer drugs are, you
20  know, one of many types of drugs that are
21  developed.  But the percentage of companies that
22  are oncology focused divided by the total number
23  of publicly traded companies would be an awfully
24  difficult number to give you.
25       And, again, in the case of large

Page 222

1  companies their product mix may very well include
2  oncology drugs, but there may be many drugs that
3  are not oncology drugs, so that one's hard to
4  answer.
5       Q.   You don't know what the total
6  number is; is that right?
7       A.   I do not know, that's correct.
8       Q.   And of the 35 to 40 top-line
9  clinical result press releases that you looked at
10  for this engagement, how many of those involve an
11  oncology drug?
12       A.   Uhm, a fraction.  Let's -- let's
13  see.  Maybe 10 of the 40, say.
14       Q.   And during that 2003 to 2018 period
15  how many publicly traded pharmaceutical or
16  biotechnology companies that issued a phase 3
17  top-line clinical trial press release, how many
18  of those had a conference call in connection with
19  the press release?
20       MS. MURPHY:  Objection.  Lacks
21  foundation.
22       A.   Yeah.  I don't know that either.
23  But as I stated earlier, the ratio of the ones
24  that I looked at tend to be about half.  So a --
25  a reasonable guesstimate is half of those.

Page 223

1       Q.   Is that your best -- your best
2  guesstimate would be half the companies?
3       And specifically with respect to --
4       THE COURT REPORTER:  Can I get a
5  verbal answer to that.
6       A.   Yes.
7       THE COURT REPORTER:  Thank you.
8       Q.   And specifically with respect to
9  clinical trial results for oncology drugs, of the
10  companies that issued press releases with the
11  top-line results of oncology drugs, how many of
12  those had conference calls in connection with
13  press releases?
14       A.   That probably is a higher fraction,
15  and I say that because that's the universe that
16  I'm most familiar with.  In my time on the
17  street, and I still think it's the case now,
18  the -- the -- if your question was revolving
19  around phase 3 studies in which top-line results
20  were presented initially by press release, that
21  were followed by -- very soon thereafter by a
22  conference call about that trial, that proportion
23  is probably higher, 60, 70 percent.
24       Q.   And of the conference call, the
25  four conference calls that you considered for

Page 224

1  this engagement, how many of those concerned
2  oncology drugs?
3       A.   I think each one of them did.
4       Q.   And was that intentional on your
5  part, to only look at conference calls regarding
6  oncology drugs?
7       A.   It was not intentional looking at
8  the conference calls.  It was driven by the --
9  the press releases that were most relevant to
10  looking at -- as comparables looking at Puma's
11  press release.
12       Q.   If I can just have you turn back to
13  your report.  And page 1, the assignment and
14  scope.
15       Do you see in the first sentence
16  you say that you were asked to provide expert
17  testimony regarding Puma Biotechnology, Inc.'s
18  July 22, 2014, announcements describing the
19  top-line results of the ExteNET trial.
20       Do you see that?
21       A.   Yes.
22       Q.   So you use the plural,
23  announcements.  Which announcements are you
24  referring to?
25       A.   The press release and the

Gregory Frykman, M.D.

Page 225

1  transcript.
2      Q.   The conference call transcript?
3      A.   The conference call transcript.
4      Q.   And what specific expert testimony
5  were you asked to provide regarding Puma's
6  announcement during the conference call?
7      A.   Ask that question again, please.
8      Q.   Sure.  Which specific -- or what
9  specific expert testimony were you asked to
10  provide regarding Puma's announcements during the
11  conference call?
12      A.   That revolved around the comments
13  that were made by the speaker, Alan Auerbach, in
14  both his prepared remarks, as well as the Q and A
15  that other -- that Wall Street analysts did with
16  Alan in the second half of the call.
17      Q.   So are you opining here on the --
18  the conference call as a whole or specific
19  announcements in that conference call?
20      A.   I'm offering opinion that that
21  conference call -- the press release was within
22  industry standards, and the conference call, the
23  discussion in that conference call, was within
24  industry standards.
25      Q.   In total?  The entire conference

Page 226

1  call?
2      A.   Yes.
3      Q.   And are you making the same opinion
4  with regard to each specific statement that
5  Mr. Auerbach made during that conference call?
6      A.   Yes.
7      Q.   And, as you use the term here, what
8  do you mean by "top-line results"?
9      A.   The top-line results, what I'm
10  specifically referring to, is the small fraction
11  of clinical trial results that are most relevant
12  to -- to describe the outcome of the clinical
13  trial.
14      Q.   How do you determine what results
15  are most relevant?
16      A.   Well, that is not my determination
17  of what went into the press release, that's what
18  Puma decided was the most relevant to go in the
19  press release.  So they're the ones that decided.
20      Q.   Well, do you have any expertise in
21  determining what results from a clinical trial
22  should be considered top-line?
23      A.   Absolutely.
24      Q.   Are you opining in this case which
25  of the results of the ExteNET trial are

Page 227

1  considered to be top-line?
2      A.   Absolutely.
3      Q.   All right.  Is that an opinion
4  you've offered somewhere in your report?
5      A.   I think it's in here, but I'm
6  certainly happy to articulate it more fully.
7      Q.   Well, I'm trying to find out if
8  it's -- you understand you're required to
9  identify your opinions in your report?
10      A.   Yes.
11      Q.   And I don't see in your report
12  anywhere where you opined on what the top-line
13  results of the ExteNET trial are.  Did I miss
14  something?
15          MS. MURPHY:  Object to the form.
16      A.   The -- the -- the top-line results
17  are what they are.  I mean, there's no mystery
18  about that.  So I guess I'm not sure if your
19  question is revolving around what do I think
20  top-line results of clinical trials ought to be.
21  I'm certainly happy to offer you some thoughts
22  there.
23      Q.   No.  I'm asking in this case are
24  you opining on specifically what the top-line
25  results of the ExteNET trial are?

Page 228

1      A.   They exist.  And I'm happy to read
2  them to you and tell you that I agree with them.
3      Q.   Well, are you -- is it your opinion
4  that whatever results Puma disclosed on July 22,
5  2014, are therefore the top-line results?
6      A.   Yes.
7      Q.   All right.  Are you ind -- did you
8  independently review the results of the trial,
9  and are you offering an opinion that, based on
10  your independent review, you believe there are
11  specific results that are top-line results?
12      A.   That as well.
13      Q.   Where do you offer that opinion?
14      A.   It may not be in this report, but
15  that is something that I am happy to discuss with
16  you.  That is --
17      Q.   Well, you've got a requirement to
18  include your opinions in your report.  I'm trying
19  to find out if you're offering an opinion that
20  you did not put in your report?
21      A.   I am explaining that the results
22  that Puma has in their July 22, 2014, press
23  release are top-line results, and that those
24  results, based on my experience and expertise,
25  are top-line results that are commonly seen in

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 59 of 143   Page ID #:13507
Confidential
Gregory Frykman, M.D.
Hsingching Hsu vs. Puma Biotechnology, Inc., et al.

Page 229

1  other press releases for top-line clinical
2  results or other clinical trials for their
3  top-line results.
4      Q.   Point to me what in your report you
5  identify the -- you say that you opine as to what
6  the top-line results of the ExteNET trial are.
7      A.   It may not be exactly articulated
8  that way, but the -- it is my opinion here in
9  No. -- section 2, No. 2 that Puma's disclosure of
10  top-line results provided investors with the
11  information expected.
12      Q.   Is that your definition of what a
13  top-line result is?
14      A.   It is -- and it is my opinion, as
15  I've said before, that the accompanying
16  discussion call, as well as the press release,
17  that what Puma did was in line with what's
18  expected in the industry.
19      Q.   And I'm asking where in your report
20  you identify that you have come to the conclusion
21  that the results that were disclosed on July 22,
22  2014, were the top-line results?
23      A.   I am not sure that that needed to
24  be in there, because that is a fact.  That's not
25  disputed.

Page 230

1      Q.   You don't think it's disputed by
2  who?
3      A.   The press release itself says that
4  these are the top-line results, and then proceeds
5  to describe what the top-line results.
6      Q.   Do you believe every company's
7  press release is accurate?
8      A.   I certainly read press releases
9  with a -- with -- with a skeptical attitude until
10  I've been able to confirm otherwise.
11      Q.   Did you independently make an
12  assessment about what the top-line results of the
13  ExteNET trial were?
14      A.   To the extent that I had
15  independent documents and data available, yes.
16      Q.   Do you know what results from the
17  ExteNET trial Alan Auerbach had prior to July 22,
18  2014?
19      A.   My understanding is that he had
20  unvalidated results of -- of early safety and
21  efficacy results.  And the one result that he had
22  unequivocal validation of, but I think the only
23  result that he had complete confidence in,
24  because it had been fully validated by both
25  himself or by both his firm, as well as

Page 231

1  independently by an outside statistical firm, was
2  the hazard ratio, the associated -- and the
3  associated p-values or p-value for the primary
4  endpoint of DFS.
5      Q.   Is it your understanding that you
6  could fully val -- have a fully validated hazard
7  ratio without having fully validated DFS rates?
8      A.   I'm sorry, ask the --
9      Q.   Do you think it's possi --
10      A.   -- question again.
11      Q.   Do you think it's possible to fully
12  val -- validate a hazard ratio without having
13  fully validated DFS rates?
14          MS. MURPHY:  Objection.  Lacks
15  foundation.
16      A.   Yeah.  I'm not sure I've ever
17  confronted that.  So I -- I don't know.  But
18  typically, when hazard ratios are discussed,
19  there is an underlying assumption that the DFS
20  rates have been correctly calculated.
21      Q.   So in this case did you look at any
22  of the materials that Alan Auerbach had regarding
23  the results of the ExteNET trial, any of the
24  materials that predated July 22, 2014?
25      A.   Yes.

Page 232

1      Q.   And what did you look at?
2      A.   I looked at the Rowe, the outside
3  statistical firm, I looked at their description
4  of top-line efficacy results.  I don't know what
5  document that number is, but that.
6          And then there was a long --
7  another long document that contained pages and
8  pages, I think it was a couple hundred pages,
9  of -- of safety data tables like they are
10  formatted for FDA submission purposes.
11      Q.   And you understood that predated
12  July 22, 2014?
13      A.   Yes.  A few days before, I think.
14      Q.   And is that identified in your
15  materials considered?
16      A.   That -- I don't know if that is or
17  is not.  That's something that I looked at more
18  recently.
19      Q.   Do you have a list of all these
20  things that you've looked at more recently?
21      A.   I can certainly put a list together
22  akin to what's here.
23          MS. MURPHY:  We're going to object,
24  to the extent that calls for attorney-client
25  privileged information.

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 60 of 143   Page ID #:13508
Gregory Frykman, M.D.
Confidential
Hsingching Hsu vs. Puma
Biotechnology, Inc., et al.

Page 233

1    MR. GRONBORG:  He's talked about it
2  in his deposition, so I think we're entitled to
3  it.
4    Q.   Now, as use the term, is there any
5  difference between the primary endpoint for a
6  clinical trial as it's identified in a
7  statistical analysis plan and a top-line result?
8    A.   I'm sorry, reask the question.
9    Q.   Sure.  As you use this term
10  "top-line result," is there any difference
11  between that and what a clinical trial's
12  statistical analysis plan identifies as the
13  primary endpoints?
14    A.   So top-line results incorporate the
15  outcome on the primary efficacy endpoint.  But
16  the top-line results may include more than that.
17    Q.   So is it your understanding that a
18  top -- the top-line results would include all of
19  the primary endpoints but maybe more?
20    A.   It almost certainly include the
21  primary efficacy endpoint, and it may or may not
22  include much else after that.
23    Q.   And you were saying or opining that
24  Puma disclosed the top-line results in their
25  July 22, 2014, disclosures.  Did that include the

Page 234

1  results that were discussed during the conference
2  call?
3    A.   I'm sorry, ask the question again.
4    Q.   Sure.  With respect to -- you're
5  saying that Puma disclosed the top-line results
6  of the ExteNET trial on July 22, 2014.
7    A.   Uh-huh.
8    Q.   Does that include the results that
9  were discussed during the conference call?
10    A.   I think most of the results that
11  were in the July 22 press release, 2014 press
12  release, were also discussed.  Maybe not in quite
13  the same detail, but they were discussed on the
14  conference call that followed thereafter.
15    Q.   And do you believe that Puma
16  discussed any other clinical trial -- or any
17  clinical trial results during the conference call
18  that were not included in the press release?
19    MS. MURPHY:  Objection.  Lacks
20  foundation.
21    A.   Yes.  They did.  They talked about
22  other companies' clinical trials.
23    Q.   I was just talking about the
24  ExteNET trial.
25    A.   Okay.  I'm sorry.  Reask the

Page 235

1  question.
2    Q.   Sure.  Were you under the
3  impression that Puma discussed any results from
4  the ExteNET trial during the conference call that
5  were not -- were not included in the press
6  release?
7    MS. MURPHY:  Objection.  Lacks
8  foundation.
9    A.   The answer is they, to my
10  knowledge, did not disclose any additional
11  information, but they did describe other -- as I
12  mentioned earlier -- other aspects of the
13  clinical trial that certain analysts or certain
14  persons on the call may have attributed some
15  value to, some prognostic or value in terms of
16  what clinical trial results do.
17    Q.   Well, did Puma provide any --
18    A.   I -- I'm sorry.  Go -- go ahead.
19    Q.   Did Puma provide any numerical
20  information about that the results of the ExteNET
21  trial during the conference call that they did
22  not provide in the July 22, 2014, press release?
23    A.   Yes.  They actually discussed the
24  diarrhea rate in the conference call that was not
25  in the press release.

Page 236

1    Q.   Anything else?
2    A.   Off the top of my head, I -- I
3  don't recall.
4    Q.   And the diarrhea rate, is that
5  something you considered top-line result?
6    A.   Not necessarily.
7    Q.   In this case was that a top-line
8  result for the ExteNET trial?
9    A.   As I said, not necessarily.  I
10  don't consider that necessarily a top-line
11  result.
12    Q.   Does not necessarily mean no?  It's
13  your opinion that was not a top-line result?
14    A.   No.  It was not a top --
15    MS. MURPHY:  Objection to form.
16    A.   It was not a top-line result.
17    Q.   And how did you reach that opinion?
18    A.   Because the information was already
19  out there in the public domain.
20    Q.   Were the results of the ExteNET
21  trial, safety results of the ExteNET trial,
22  already in the public domain?
23    A.   No.  They weren't.
24    Q.   Were the results of the ExteNET
25  trial or the results of any diarrhea rate from

Gregory Frykman, M.D.

Hsingching Hsu vs. Puma
Biotechnology, Inc., et al.

Page 237

1  the ExteNET trial in the public domain as of
2  July 22, 2014?
3       A.   You asked that question earlier and
4  the answer is no.
5       Q.   Now, because you said some results
6  were out there, did that affect whether or not --
7  whether something is a top-line result from a
8  clinical trial?
9       A.   Very much so.
10      Q.   All right.  So is it your vision
11  that top-line clinical trial results are only
12  results that have not previously been publicly
13  disclosed?
14           MS. MURPHY:  Objection.
15      A.   Yeah.  I didn't -- I didn't say
16  that.
17           (Reporter-initiated discussion off
18           the record.)
19      Q.   So is it your opinion that only
20  results that have not been previously disclosed
21  are top-line clinical results?
22      A.   No.
23      Q.   So when I asked you whether or not
24  you thought the diarrhea rate in the ExteNET
25  trial was a top-line clinical result you said no,

Page 238

1  because it had already been disclosed?
2       A.   Right.
3       Q.   So why is it you believe the
4  diarrhea result was not a top-line clinical
5  result for the ExteNET trial?
6           MS. MURPHY:  Objection.  Lacks
7  foundation.
8       A.   Because, A, the results were
9  already out there.  The results of the diarrhea
10  rate were already out there for neratinib
11  specifically.  The results of other clinical
12  trials with other referred to interacting small
13  molecule TKIs was also known.  And the key piece
14  of information in the ExteNET trial results was
15  the hazard ratio against placebo in the extended
16  adjuvant breast cancer setting.
17           (Reporter-initiated discussion off
18           the record.)
19      Q.   What do you think is the key safety
20  information from the ExteNET trial?
21           MS. MURPHY:  Objection.  Lacks
22  foundation.
23      A.   The key safety information is the
24  table -- includes the table that Rowe had -- the
25  extensively table that Rowe had put together

Page 239

1  for -- for Puma.
2       Q.   If entire table is what you
3  consider to be the key safety information?
4       A.   That's the key safety information,
5  that's correct, because it is from that
6  information that the risk/benefit ratio of the
7  drug is sorted out.
8       Q.   And other than the hazard ratio, is
9  there anything else that you consider to be the
10  key efficacy information from the trial?
11           MS. MURPHY:  Objection.  Lacks
12  foundation.
13      A.   The only other piece -- key
14  efficacy outcome in the ExteNET trial that I view
15  as important is the p-value.  The significance
16  level is associated with a hazard ratio of 0.67.
17      Q.   So those are the only two things --
18  those are the only two things that you think are
19  key efficacy results from the trial; right?
20      A.   That's correct.
21      Q.   But the entire list of safety
22  information in that Rowe document, you think that
23  entire list of information, everything in there,
24  is a key safety result?
25      A.   It is a -- it is -- I don't know if

Page 240

1  key is the right word, but it's the safety result
2  of the ExteNET clinical trial.
3       Q.   Key was the word you used.
4       A.   I'm happy to stick with "key,"
5  but -- but when we talk about risk/benefit ratio
6  of drugs, it's not a discrete AE, and it's not a
7  discrete single efficacy outcome that we look at.
8  We look at the totality of the data.
9       Q.   You looked at the ASCO abstract
10  that was associated with the ExteNET trial; is
11  that right?
12      A.   I have.
13      Q.   All right.  Was it your impression
14  that the ASCO abstract included key safety and
15  efficacy results from the trial?
16           MS. MURPHY:  Object to the form.
17      A.   It included important results that
18  ASCO requires in the submitted abstracts.
19      Q.   Is it your understanding that ASCO
20  has specific requirements regarding what results
21  need to be included in the abstract?
22      A.   They have some specific
23  requirements, yes.
24      Q.   Was it your impression here that
25  ASCO told Puma and the other people involved in

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 62 of 143   Page ID
#:13510
Confidential                                          Hsingching Hsu vs. Puma
Gregory Frykman, M.D.                                 Biotechnology, Inc., et al.

Page 241

1  the clinical trial what results to include in the
2  abstract?
3      A.   I don't know if they received a
4  phone call or an email saying you've got to put
5  this information in, but the general guidelines
6  for submission of clinical trial results to ASCO
7  says that efficacy outcomes and safety outcomes
8  need to be included.
9      Q.   Well, they don't say that all
10 efficacy and safety outcomes need to be included
11 in the abstract, do they?
12     MS. MURPHY:  Objection.  Lacks
13 foundation.
14     A.   I'd have to go back and look and
15 see exactly what they require, but they -- ASCO
16 wants a -- a very limited textual synopsis of the
17 outcomes of the clinical trial such that its
18 reviewers of that abstract can make a judgment as
19 to the significance of the results for -- in
20 terms of prioritizing presentation at the
21 upcoming meeting.
22     Q.   So what guidance does ASCO give
23 companies regarding which of the efficacy and
24 safety results to include in an abstract?
25     A.   I don't have the text right in

Page 242

1  front of me so I can't tell you exactly, but it's
2  supposed to be what -- what the company believes
3  to be a fair representation of what the clinical
4  trial outcome -- outcomes are.
5      Q.   Now, next in here, I'm still under
6  the assignment and scope, you say, "I've been
7  asked to analyze the text and information" --
8      A.   I -- I'm sorry, the second
9  paragraph?
10     Q.   Page 1.
11     A.   Yeah.
12     Q.   The second paragraph.  "I have been
13 asked to analyze the text and information
14 conveyed in the July 22, 2014 announcements
15 within the context of the norms for the industry
16 as reflected in other pharmaceutical and
17 biotechnology companies' announcements of
18 important clinical trial results."
19     Do you see that?
20     A.   Uh-huh.
21     Q.   What do you mean by "analyze"?
22     A.   To do very much what I did when I
23 was a policy analyst, and that is look at the
24 text in each press release and come to a sense of
25 whether or not, first of all, it's an important

Page 243

1  clinical trial result for a company, it may not
2  be.  And then if it is an important clinical
3  trial result for the company, then dig in further
4  to determine what that result is.  It could be
5  negative, it could be positive.
6      And if it's positive, then to what
7  extent is it positive, so what is the statistical
8  significance level that's available.  And then go
9  one step further and think through what the --
10 I'm sorry, then also look at and see what are the
11 other clinical trial results that are in there
12 that might speak to what the further development
13 of that drug might look like and where it might
14 sit within the competitive landscape looking
15 forward, you know, to eventual FDA approval.
16     Q.   In this case you're not offering an
17 opinion about whether or not the ExteNET trial
18 was an important trial result for Puma, are you?
19     A.   I don't know that I've said that
20 overtly in my expert report, but I'm more than
21 happy to offer you that.  It is an important
22 clinical trial --
23     Q.   Okay.
24     A.   -- in the life of the company.
25     Q.   And I want to be clear.  When I'm

Page 244

1  asking you are you offering an opinion, I'm
2  saying is it something you are offering.
3      A.   That would be in my report.
4      Q.   I'm not asking you for your
5  opinion.
6      A.   Yes.  I don't know that it says it
7  specifically in here.
8      Q.   Are you offering an opinion in this
9  case about what the results of the ExteNET trial
10 were?
11     A.   Well, we've talked about that
12 before, and the results are what they are.
13     Q.   Are you here to testify about what
14 the results of the trial were?
15     A.   I can certainly read to you what
16 the press release and what the Lancet oncology
17 publication is and go through them.
18     Q.   I need to ask, are you offering an
19 opinion that tells the jury these are what the
20 results of the trial are?
21     A.   I don't think I've been asked to do
22 that specifically.
23     Q.   Have you been asked in this case or
24 are you planning to provide an opinion on what
25 the statistical significance of any of the trial

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 63 of 143   Page ID
#:13511

Gregory Frykman, M.D.

Confidential                                    Hsingching Hsu vs. Puma
                                                Biotechnology, Inc., et al.

Page 245

1  results, the ExteNET trial results, were?
2      A.   Again, that was not a primary focus
3  of what I did. I don't know that that appears
4  anywhere in the -- my expert report.
5      Q.   Are you offering an opinion in this
6  case about what other clinical trial results
7  there are that may be relevant to the ExteNET
8  trial?
9      A.   As concerns their appearance in
10  press releases about them, yes.
11      Q.   Now, did you consider any press
12  releases about other clinical trial results for
13  neratinib?
14      A.   For neratinib? No.
15      Q.   Now, can you show me where in your
16  report you discuss the analysis you did of any of
17  Puma's announcements during the July 22, 2014,
18  conference call?
19          MS. MURPHY: Objection. Lacks
20  foundation.
21          MR. GRONBORG: I agree.
22      Q.   You can go ahead.
23      A.   I'm sorry, ask your question again.
24      Q.   My question is, can you show me
25  where in your report you discuss at all the

Page 246

1  analysis that you did of the announcements made
2  during Puma's July 22, 2014, conference call?
3      A.   The analysis of Puma's press
4  release?
5      Q.   Conference call.
6      A.   Of the conference call. I think
7  that -- I don't think that appears specifically
8  in here and summarized in my comments about the
9  conference call and the press release being in
10  line with other press releases in the industry.
11      Q.   And I want to focus on the
12  conference call. Can you point me to any page in
13  your report in which you discuss any analysis
14  that you did of Puma's July 22, 2014, conference
15  call.
16      A.   I can't point you in there, but I
17  certainly looked through it and -- and am able to
18  speak to it because I've been through it.
19      Q.   Well, I'm asking you if it's in
20  your report anywhere?
21      A.   Not beyond the extent to which I
22  say it's my opinion that the press release and
23  the accompanying discussion in the analyst call
24  were in line with typical industry practices.
25      Q.   So other than that one line on

Page 247

1  page 4, is there anywhere else in your report
2  where you discuss any analysis of Puma's July 22,
3  2014, conference call?
4      A.   I don't think so.
5      Q.   Is there anywhere in your report
6  where you discuss any analysis of any company's
7  conference call?
8      A.   Other companies' conference calls.
9  No.
10      Q.   And the sentence you just read to
11  me, that's in your summary of opinions. You
12  understand the rest of your report discusses
13  those opinions.
14          Is there any discussion anywhere in
15  your report related to that summary of opinion
16  regarding Puma's July 22, 2014, conference call?
17      A.   I'm sorry, ask that question again.
18      Q.   Sure. Is there any discussion
19  anywhere in your report, other than the summary
20  of opinions, regarding Puma's July 22, 2014,
21  conference call?
22      A.   No.
23      Q.   So describe for me the methodology
24  you used to make -- to determine that Puma's
25  July 22, 2014, conference call was in line with

Page 248

1  industry standards.
2      A.   Sure. So that was reading the
3  subject transcript and then comparing it to the
4  dozens, if not hundreds, of conference calls that
5  I participated in over the years as a policy
6  analyst. Conference calls following the
7  announcement of clinical trial results.
8          And then after reading through the
9  transcript, thinking if there was anything
10  that -- that stood out that was particularly
11  unusual about that call, about the July 22, 2014,
12  conference call. And the answer was no. It was
13  very much in line with the dozens if not hundreds
14  of conference calls that I participated in when I
15  was on Wall Street.
16      Q.   How long did that take you to do,
17  that analysis?
18      A.   That analysis was probably reading
19  through the transcript, looking at the press
20  release several times. So . . .
21      Q.   As part of your methodology, did
22  you look at the four conference calls that --
23  transcripts you identified in your materials
24  considered?
25      A.   As I said before, they -- none of

Gregory Frykman, M.D.

Page 249

1  them were particularly informative.  They all
2  seemed part and parcel of the way that most
3  companies most of the time do conference calls
4  following the disclosure of clinical trial
5  results in a press release.
6      Q.   And you --
7      A.   There was nothing that stood out.
8      Q.   And it's your impression that you
9  have participated or listened in on dozens, if
10 not hundreds, of conference calls that followed a
11 top-line clinical trial press release; is that
12 right?
13     MS. MURPHY:  Objection to form and
14 foundation.
15     A.   Certainly at least dozens.
16 Hundreds may be -- may be on the -- on the high
17 end.  But remember that there are, as I said
18 before, there's a lot of press releases about
19 clinical trials that occur each year that are not
20 necessarily of particular relevance to -- that
21 are not regarding phase 3 studies.
22     So it was commonplace for small
23 companies, as I mentioned before, to put out a
24 press release on a phase 1 trial which is very
25 new to institutional investors.

Page 250

1      Q.   So your dozens or hundreds, is that
2  phase -- press -- conference calls regarding
3  phase 3?
4      A.   So the question you asked me was --
5  was sort of everything.  If you narrow down to
6  just, you know, phase 2 or phase 3 or important
7  calls, it's -- it's certainly dozens.
8      Q.   When is the last time you listened
9  to or participated in a conference call by a
10 company discussing top-line clinical trial
11 results for a phase 2 or phase 3 study?
12     A.   Oh, it's been a -- it's been
13 several years.  I couldn't give you an exact
14 date.  But I listened to them occasion --
15     Q.   Since 2009?
16     A.   Oh, yeah.  I listened to them
17 occasionally after that.
18     Q.   What's the last one you can
19 remember listening to?
20     A.   It was regarding a recorded call
21 for this myeloma drug that I had mentioned to you
22 that I did work for Institutional Investor, and
23 I'd needed to go back to that conference call,
24 listen to that, and hear what the discussion was.
25     Q.   What was the name of the drug?

Page 251

1      A.   You know, sir, I'm sorry.  I can't
2  remember.  And I'm happy to give it to you at the
3  break, if that's important.
4      Q.   And was this a call you were
5  listening to live as it happened?
6      A.   No.  It was not live.  It was
7  recorded.
8      Q.   When's the last time you were --
9  listened to or participated in a conference call
10 as it was happening regarding a phase 2 or
11 phase 3 top-line clinical trial result?
12     A.   Yeah.  That was probably in the
13 pre-March 2009 timeframe.
14     Q.   So other than reading the
15 transcript, and thinking in your mind if it was
16 similar to the dozens you had read previously --
17     A.   Listen -- listened to previously.
18     Q.   Listened to previously.  Let me be
19 clear.  You didn't listen to this one, though;
20 right?  You read it?
21     A.   I read it.  Correct.
22     Q.   Okay.  So other than reading this
23 transcript and just deciding in your mind whether
24 it was similar to those that you had listened to
25 previously, was there anything -- anything else

Page 252

1  you did to reach the conclusion that Puma's
2  July 22, 2014, conference call statements were in
3  line with industry practices?
4      A.   Nothing additional, except to the
5  extent that, in order to offer that opinion
6  required having listened to lots of calls
7  previously with a background that provided the
8  ability to interpret -- recall and interpret what
9  was said, and then to place that in the context
10 of anticipated future drug development.
11     Q.   I think -- can you identify for us
12 the specific calls that you listened to in the
13 past that provided the basis for your ability to
14 opine on whether Puma's was in line with standard
15 industry practices?
16     A.   Eight years, seven years, nine
17 years later, I don't know that I can recall any.
18 Probably the Genentech, that was a classic call,
19 the Genentech call about the Avastin or
20 bevacizumab clinical trial results in I think it
21 was 2003.
22     The results of Imclone's drug
23 Cetuximab in head and neck cancer, that was
24 certainly an important one.  But, sir, that's
25 what I did, not day in and day out, but certainly

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 65 of 143   Page ID #:13513

Gregory Frykman, M.D.

Confidential

Hsingching Hsu vs. Puma Biotechnology, Inc., et al.

Page 253

1  on a -- on a monthly basis for a number of years.
2      Q.    Any others you can think of,
3  specific calls?
4      A.    Off the top of my head, no.
5      Q.    And sort of this thing you called
6  the norms for the industry, when did that become
7  a norm in the pharmaceutical and biotechnology
8  industry?
9      A.    When did what become a norm?
10     Q.    Whatever you called the norms.
11     A.    It was the norms as of when I
12  started on Wall Street in -- at least 2002 and
13  even prior to that.  As I mentioned earlier, when
14  I would look at press releases when I was a
15  medical officer at the FDA, they seemed to follow
16  a similar pattern.  So maybe even back to 2000.
17     Q.    And at any point between 2002 and
18  today has the -- have the norms changed at all?
19     A.    I have not seen any changes.  I've
20  not heard anybody say that things have changed.
21  I certainly see institutional investors at
22  meetings and -- and talk to them occasionally.
23  That's a subject, frankly, that's never, you
24  know, come up.  It's just not something that
25  we've -- we've discussed.  I certainly do look at

Page 254

1  press releases even today.  Not today, but
2  certainly look at press releases.
3          I looked at at least a dozen of
4  them this year in 2018, and they all seem to
5  follow about the same format and seem to contain
6  about the same information as they did 15, 17
7  years ago when I got started.
8      Q.    How many conference calls from 2018
9  have you read or listened to?
10     A.    Just the re -- not even recorded.
11  I don't think I've done any -- any conference
12  calls following the results of important clinical
13  trials by, you know, pharmaceutical and
14  biotechnology companies.
15     Q.    At any point since 2002 to today,
16  have you heard anyone say what they believe the
17  norm was in the industry with respect to the
18  disclosure of top-line clinical trial results?
19     A.    I don't believe anybody talked
20  about that, because that's not something that we
21  would talk about.  What is of much greater
22  interest in talking to institutional investors
23  and other analysts is what the results of the
24  data actually imply in terms of development,
25  company prospects, competitive landscape, and so

Page 255

1  forth.
2      Q.    Can I have you turn to section 2,
3  which is your summary of opinions.
4      A.    Okay.
5      Q.    It starts on page 3.
6      A.    Uh-huh.
7      Q.    And the first of the opinions, you
8  write, "It is common in the biotechnology
9  industry, and particularly in the field of
10  oncology drugs, to disclose top-line clinical
11  trial results in a press release, while
12  presenting the full trial data at a medical
13  conference at a later date."
14          Do you see that?
15     A.    Yes.
16     Q.    What do you mean by "common"?
17     A.    It is done multiple times per year.
18     Q.    More than 50 percent of the time?
19     A.    Well, I'm not quite sure how you
20  would come up with that percentage, but the
21  standard practice is that the company will issue
22  a press release about important clinical trial
23  results because they're either under an
24  obligation for materiality or they have a
25  strategic reason to disclose those results soon

Page 256

1  after they get them and they can't wait for the
2  forum in which the full results would be
3  presented.  That's commonly done.
4      Q.    Well, so if that happens less than
5  50 percent of the time, would you still consider
6  it to be a standard practice?
7      A.    I'm not quite sure how to answer
8  that question.
9      Q.    Well, I'm asking, does standard
10  practice mean something that occurs more than
11  50 percent of the time?
12          MS. MURPHY:  Objection.  Lacks
13  foundation.
14     A.    That -- I quite -- don't quite know
15  what the -- the relevance of that question or how
16  to answer the question.
17     Q.    Well, in the biotechnology
18  industry, what percentage of the time do
19  companies disclose top-line clinical trial
20  results in a press release while presenting the
21  full trial data at a medical conference at a
22  later date?
23          MS. MURPHY:  Objection.  Lacks
24  foundation.
25     A.    To my best knowledge, that goes on

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 66 of 143   Page ID #:13514

Confidential

Gregory Frykman, M.D.

Hsingching Hsu vs. Puma
Biotechnology, Inc., et al.

Page 257

1  much more frequently than not disclosing the
2  results of phase 3 studies that are -- or
3  important clinical trials that are contemplated
4  for presentation at a forthcoming medical or
5  scientific conference.
6      Q.   So more than 50 percent of the
7  time?
8      A.   I'm reluctant to put a number on
9  it, but I think it's much more common to do it
10 this way than to do it other ways.
11     Q.   And you say in here, "particularly
12 in the field of oncology." So how much more
13 common is it in the field of oncology compared to
14 the biotechnology industry as a whole?
15     A.   So, again, I don't know that I can
16 give you specific numbers, but virtually every
17 drug that I followed on Wall Street over six plus
18 years in which late clinical development -- so, I
19 didn't look at all drugs, but I looked at a
20 number of them -- and in virtually every case
21 where there was a publicly traded company
22 involved, which was most of the ones that I
23 looked at, the results of an important clinical
24 trial were disclosed in the form of a press
25 release first, with the company indicating in

Page 258

1  that press release that full results would be
2  coming later at a medical or scientific
3  conference.
4      That led, then, to a discussion
5  amongst the buy side and the sell side as to
6  which the likely conference would be. And you
7  can, depending on when the result comes, you can
8  sort of look at the calendar and, you know, kind
9  of guesstimate.
10     Q.   So how much more likely is -- how
11 much more likely is that, or how often does that
12 occur for oncology companies compared to the
13 biotechnology industry as a whole?
14     MS. MURPHY:  Object to the form.
15     A.   As I said before, in -- in my
16 experience it occurred virtually all the time.
17 So 90 percent of the time.
18     Q.   90 percent?
19     A.   Within oncology. But bear in mind,
20 too, that I've never done a comparison, for
21 example, to rheumatology drugs or to depression
22 drugs or something like that. It's not something
23 that I've done.
24     Q.   When you refer to top-line clinical
25 trial results, specifically in the field of

Page 259

1  oncology, is it your impression that for oncology
2  clinical trials they always use the same results,
3  meaning the same metric in their top-line press
4  releases?
5      A.   I'm sorry, ask the question again.
6      Q.   Sure. For oncology clinical
7  trials, is it your impression that companies
8  always use the same metrics, for example, hazard
9  ratio, as their top-line result for press
10 releases?
11     A.   Well, in order to answer that
12 question, it depends on what the type of trial
13 is.
14     Q.   Well, no. I'm asking you if it's
15 your impression that they always use the same
16 metics in their press releases?
17     A.   Yeah. But I'm trying to answer the
18 question. The -- the reason I hesitate is that
19 your question was do all -- do oncology companies
20 use the same metrics in their press releases.
21 And my answer to that is it depends on the phase
22 of the clinical trial.
23     Q.   Talking about phase 3 trials.
24     A.   Okay. So phase 3 trials. Hazard
25 ratio tends to be, but it is not universal, it

Page 260

1  tends to be one of the more commonly used metrics
2  for the outcome on the primary efficacy endpoint.
3      Q.   What are the other more commonly
4  used metrics?
5      A.   Right. So I mentioned many of
6  those earlier today, and I'll -- I'll go through
7  them today. So another important one is the raw
8  survival. Another one is time to progression or
9  time to disease progression. Another one is
10 progression-free survival. Disease-free
11 survival.
12     And you can -- and there's yet
13 another one called event-free survival. So
14 there's a lot of sort of variations on the same
15 theme. All of those are event-based endpoints,
16 and hazards ratios are typically used to describe
17 the outcome.
18     But bear in mind that there are
19 also phase 3 trials in which efficacy may not be
20 the primary endpoint, in which case the -- the
21 metric of hazard ratio doesn't necessarily apply.
22     Q.   And in the past 15 years for
23 oncology clinical trials, how many of the press
24 releases regarding the top-line results have only
25 included a hazard ratio?

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 67 of 143   Page ID #:13515

Confidential

Gregory Frykman, M.D.

Hsingching Hsu vs. Puma
Biotechnology, Inc., et al.

Page 261

1        MS. MURPHY:  Object to the form.
2        A.   Yeah.  I don't have that
3  information.  I simply don't have it.
4        Q.   Okay.  And press release regarding
5  the top-line results in phase 3 oncology clinical
6  trials in the last 15 years, how many of them
7  have included a PFS or DFS rate?
8        A.   I'm sorry, ask that question again.
9        Q.   Sure.  Of press releases regarding
10  top-line clinical results in phase 3 oncology
11  trials, of those, how many have included a DFS or
12  PFS rating?
13        MS. MURPHY:  Object to the form.
14  Lacks foundation.
15        A.   I'm not sure I can give you an
16  absolute number.  But the -- that endpoint is a
17  commonly used primary efficacy endpoint, so it's
18  seen frequently.  And I can tell you that it's
19  become more common, say, than it was 25 years
20  ago, 20 years ago, because the FDA has been and
21  guided companies that it is more willing to
22  approve drugs on the basis of successful outcome
23  on PFS, DFS, as opposed to overall survival.
24        Q.   And when did it become more common?
25        A.   There was an evolution that

Page 262

1  occurred in the 2001 to 2005-ish timeframe.
2        Q.   Now, you go on here to talk about
3  the ASCO conference and the organization's strict
4  confidentiality requirements.  This is on the
5  bottom of page 3 and the top of page 4.
6        Do you see that?
7        A.   The bottom of page -- or the top of
8  page 4. Yes.
9        Q.   And part of this engagement did you
10  review ASCO's confidentiality policy?
11        A.   Yes.
12        Q.   Is that something you identified in
13  your materials considered?
14        A.   I don't know that it wound up here,
15  but it was part of the Google search, probably.
16        Q.   Okay.
17        A.   It was -- go ahead.
18        Q.   Sure.  But you think that -- you're
19  certain you did consider it as part of this
20  engagement?
21        A.   Yes.
22        Q.   And what year's confidentiality
23  policy did you review?
24        A.   I reviewed the one that was in
25  place at the time that the ExteNET result, the

Page 263

1  abstract, I'm sorry, the 508, the transcript 508
2  was submitted.  So that was what?  In '15, May of
3  '15 or February of '15.
4        Q.   And how do you know you reviewed
5  the one that was in place then?
6        A.   That I cannot recall, but I
7  remember asking the question of myself let's make
8  sure we get the right -- the right date, and I
9  believe it's been updated since then.
10        Q.   So did you also look at the newer,
11  more upgraded one?
12        A.   I probably glanced at it.  I don't
13  know that I digested it.
14        Q.   Should that also be in your
15  materials considered?
16        A.   I suppose.
17        Q.   Do you know what the
18  confidentiality policy that ASCO had as of
19  July 2014 was?
20        MS. MURPHY:  Object to the form.
21        A.   No.  Because that's not something
22  that I focused on.
23        Q.   Do you know if it's the same
24  confidentiality policy that you looked at?
25        MS. MURPHY:  Objection.  Lacks

Page 264

1  foundation.
2        A.   I wouldn't be surprised.  I don't
3  think they change more than, say, once a year.  I
4  don't know that.
5        Q.   Well, do you know if there are any
6  changes between ASCO's confidentiality policy
7  between July 2014 and March 2015?
8        MS. MURPHY:  Objection.  Lacks
9  foundation.
10        A.   I also -- I -- I don't recall that.
11        Q.   Now, you say ASCO imposes strict
12  confidentiality requirements.  Is that just based
13  on your reading of the policy?
14        A.   It's based on my reading of the
15  policy, but also, having grown up in the field of
16  oncology and knowing a lot of people, you know,
17  over the years that have submitted abstracts,
18  that people -- we talked about those people --
19  tend to be very careful and err on the side of
20  caution about what they discuss regarding their
21  abstract and their contemplated presentation
22  until the abstract book comes out.
23        Q.   Is ASCO's policy stricter than the
24  confidentiality policy for the San Antonio breast
25  cancer conference?

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 68 of 143   Page ID #:13516

Confidential

Gregory Frykman, M.D.

Hsingching Hsu vs. Puma
Biotechnology, Inc., et al.

Page 265

1  A.  I -- I don't know the answer to
2  that.  I wouldn't be surprised if it is, but
3  maybe only marginally so.  But in general the
4  medical and scientific conferences have these --
5  have these in place.
6      Q.  Have you ever considered the San
7  Antoinio breast cancer symposium's
8  confidentiality breast cancer policy?
9      A.  I've attended it, but I've never
10 spent time looking at their confidentiality
11 policy.
12     Q.  How about ESMO, have you ever seen
13 their confidentiality policy?
14     A.  I have not.
15         MS. MURPHY:  When you get to a
16 point to take a break.
17         MR. GRONBORG:  Okay.
18     Q.  Do you know if that's stricter than
19 the ASCO policy?
20     A.  I don't know, but my general
21 impression is it is no more strict, and probably
22 less so.
23     Q.  When is it that you understand that
24 ASCO requires a company to adhere to is
25 confidentiality policy?

Page 266

1         MS. MURPHY:  Object to the form.
2  Lacks foundation.
3      A.  I'm sorry, ask the question again.
4      Q.  Sure.  When is it, do you
5  understand, that ASCO requires a company to
6  adhere to its confidentiality policy?
7         MS. MURPHY:  Same objection.
8      A.  Yeah.  I believe that's from the
9  date that it submits the abstract until the time
10 of the presentation at the ASCO annual meeting.
11     Q.  And when do you understand Puma
12 submitted its abstract that's relevant in this
13 case?
14     A.  I believe that was in February of
15 2015.
16     Q.  And does the ASCO
17 confidentiality -- confidentiality policy
18 identify any exceptions?
19     A.  It does.  And, again, this is more
20 legalese than I've had to -- than I've ever had
21 to particularly worry about.  But there is this
22 SEC exception, and it is along the lines of if
23 the company perceives that it is under obligation
24 for materiality purposes to disclose some
25 clinical trial results, that it needs to notify

Page 267

1  ASCO, I think ahead of time, and that ASCO will
2  release it from its standard confidentiality
3  requirements.
4      Q.  And are you opining in this case
5  about what is or is not required under ASCO's
6  confidentiality policy?
7      A.  No.
8      Q.  Are you opining in this case what
9  is -- what any of the exceptions are to the ASCO
10 confidentiality policy?
11     A.  No.
12     Q.  Have you ever been a reviewer for
13 ASCO in determining whether to accept a
14 submission for presentation?
15     A.  I have not.
16     Q.  Has ASCO ever asked you to consult
17 or provide them any advice regarding their
18 confidentiality policy?
19     A.  No.
20     Q.  And have you ever provided
21 consulting services for any company with regard
22 to a submission to ASCO?
23     A.  I am sure that has come up.  It
24 probably came up with Concordia along the lines
25 of, hey, Dr. Frykman, we're contemplating

Page 268

1  submitting an abstract or two to ASCO on this,
2  that, and the other, you know, what do you think.
3  I frankly don't have any detailed recollection of
4  that at all.
5         And then more recently there --
6  with a different consulting client, there's been
7  discussion about what contemplated abstract --
8  abstracts about a clinical trial might be
9  submitted to ASCO that the company is working on
10 presently.
11     Q.  What drugs was Concordia
12 considering submitting an ASCO abstract on that
13 you were involved in?
14     A.  It was the same drug, the
15 photodynamic therapy drug.
16     Q.  The one where they canceled the
17 trial?
18     A.  Where they were contemplating
19 canceling the trial.  But they had some early
20 data and the question, I think, revolved around
21 the submission of some safety information.  I
22 don't recall the details.
23         MR. GRONBORG:  All right.  Go off
24 the record.
25         THE VIDEOGRAPHER:  Okay.  The time

Gregory Frykman, M.D.

Confidential

Hsingching Hsu vs. Puma
Biotechnology, Inc., et al.

Page 269

1  is 4:05 p.m.  We're going off the record.
2       (Recess taken.)
3       THE VIDEOGRAPHER:  The time is
4  4:33 p.m., and we're back on the record.
5  BY MR. GRONBORG:
6       Q.  Doctor, we were looking at your
7  summary of opinions.  And if I could have you
8  turn to the No. 2.  And you start, "Puma's
9  disclosure of top-line results on July 22, 2014
10  provided investors (and other stakeholders) with
11  the information expected."
12       Do you see that?
13       A.  Yes.
14       Q.  All right.  As of July 22, 2014,
15  were you an investor in Puma?
16       A.  No.  I was not.
17       Q.  And do you have a specific
18  knowledge of who any of the investors in Puma
19  were at that time?
20       A.  I do.  And that was from simply
21  looking at the public disclosures at that time to
22  see who the institutional investors were.
23       Q.  And which public disclosures did
24  you look at to determine who the institutional
25  investors were?

Page 270

1       A.  What is it?  I can't even recall.
2  13F or something like that.
3       Q.  And is there a reason those are not
4  identified in your materials considered?
5       A.  No particular reason.  Probably
6  something I glanced at very briefly and -- and
7  that was kind of it.
8       Q.  Well, was it relevant to any of
9  your opinions who the investors in Puma were?
10       A.  No.  It was not relevant.
11       Q.  How do you know what information
12  Puma's investors expected in July of 2014?
13       A.  Because investors typically want to
14  see information about the safety and efficacy of
15  drugs for which clinical trial results are
16  disclosed.
17       Q.  And particularly what safety and
18  efficacy information do you think investors
19  typically want to see?
20       A.  The identical information we've
21  talked about before.  They want to see, in the
22  case of catch clinical trials, they want to see
23  the efficacy results on the primary efficacy
24  endpoint.  And they always want to see as much
25  information as they can.  Doesn't mean it's going

Page 271

1  to be provided.  But they typically like to know
2  also what the safety information is about the
3  drug.
4       Q.  And is it your opinion that all of
5  Puma's investors expected the same information in
6  July of 2014?
7       A.  I can't tell you what all the
8  inspectors -- investors expected, but bear in
9  mind that investors like those that were invested
10  in Puma were clients of my firm for the several
11  years I was on Wall Street.  And the questions
12  that they posed to me then about the safety and
13  efficacy of drugs is almost certainly identical
14  to what questions they would have about the
15  results of neratinib and the ExteNET trial.
16       Q.  How many of the clients of the
17  Washington group, when you were there, were
18  investors in Puma in July of 2014?
19       A.  I can't tell you that information,
20  but in that list, ah, maybe three, four.
21       Q.  What are the three you're thinking
22  of?
23       A.  The ones that I'm thinking of, I
24  believe it was Fidelity had an investment.  The
25  others now I cannot remember.  But they were, you

Page 272

1  know, well-known names on the street that were,
2  you know, previously clients of the firm.
3       Q.  Did you survey any Puma investors
4  regarding what information they expected in July
5  of 2014?
6       A.  No.
7       Q.  You then go on with respect to the
8  information expected, and say, it was "whether
9  the ExteNET trial had hit its primary endpoint
10  and, in turn, whether it could form the basis of
11  a New Drug Application seeking FDA approval."
12       Do you see that?
13       A.  Yes.
14       Q.  And is that specifically the
15  information that you thought Puma's investors
16  expected in July of 2014?
17       A.  It's pretty close.
18       Q.  Is that all the information that
19  you think Puma's investors expected in July of
20  2014?
21       A.  Well, I can't tell you what all of
22  Puma's investors expected, but I can tell you
23  what a representative sample of the investors
24  that I'm aware of in ExteNET -- rather, in Puma,
25  I can confidently tell you what they typically

Gregory Frykman, M.D.

Page 273

1  expect.
2       Q.   Does that representative sample
3  include anything other than Fidelity?
4       A.   There were a few other firms that I
5  saw in there.
6       Q.   So who else is in your
7  representative sample?
8       A.   I can't tell you the names.  If we
9  had the -- the list of investors, I'd be happy to
10 go through it with you.
11      Q.   How do you know it's a
12 representative sample?
13      A.   Because the ownership of the firm
14 is disclosed on the -- on the form, and that
15 seemed to be a decent number of -- of shares that
16 were held by -- by these firms.
17      Q.   How many form 13s or form 14s did
18 you look at to determine whether or not you were
19 commenting about a representative sample of
20 Puma's investors?
21      A.   I didn't look at any, except those
22 that were -- if it was available -- around the
23 time of the July 22, '14, press release.
24      Q.   And do you think you looked at
25 every form 13 or form 14 that was available

Page 274

1  around the time of the July 22, 2014, press
2  release?
3       A.   I don't know the fraction that I
4  looked at.  But, remember, I looked at many of
5  these before during my time on the street and
6  generally know what to expect.  And it was a very
7  quick thing to simply see what the institutional
8  shareholder -- shareholder base was.  And -- and
9  said, yes, you know, have an understanding
10 of -- of -- of how the investment community, at
11 least these members of the investment community,
12 viewed Puma.
13           And if I had seen a large number of
14 funds owning lots and lots of shares that I'd
15 never seen before, then that might raise
16 questions.  But when I took a look at it -- and,
17 again, it was a very brief -- it was not the
18 focus of my work here, but it was simply a -- a
19 matter of course that I typically do when I, you
20 know, look at a company and the results, is to
21 see who -- you know, who has positions in the
22 company.
23      Q.   Who do you understand -- or who do
24 you understand files these forms 13s and 14s?  Is
25 that Puma?

Page 275

1       A.   No.  I believe it is the funds
2  themselves.
3       Q.   So you went and did a search
4  through funds form 13s and 14s to look and
5  determine which ones owned Puma?
6       A.   No.  Now I can't remember exactly
7  where I looked.  But it was a -- it's something
8  that I've done commonly in the past, and I don't
9  recall it being particularly difficult to do.
10      Q.   So in this case how did you
11 determine which funds were investors in Puma as
12 of July 22, 2014?
13           MS. MURPHY:  Objection.  Lacks
14 foundation.
15      A.   I simply went and looked at the --
16 at what was available and -- and went back to --
17 at least I thought I went back -- to what was the
18 case in -- in July of 2014.
19      Q.   What was available that let you
20 know which institutions were investors in Puma as
21 of July 2014?
22      A.   Now, sir, I don't know what the
23 exact form was that I -- I looked at.
24      Q.   So how do you know that what you
25 looked at was a representative sample of the

Page 276

1  investors in the company as of July 2014?
2       A.   If your question is the number of
3  individual holders of the stock, it was a small,
4  small minority.  If you're asking the question
5  about the number of shares that were represented
6  by those funds, then that's a different answer.
7       Q.   So how many shares of Puma stock
8  were held by your representative sample as of
9  July 2014?
10      A.   I can't -- I can't tell you that.
11      Q.   Did you know at any point in time
12 during this engagement?
13      A.   Again, that was not something I
14 focused on or recollection.  My vague
15 recollection was it was, you know, 20, 30 percent
16 of the outstanding shares.  And then I will say
17 also that Alan Auerbach, I believe he owns
18 20 percent of the company by himself.
19      Q.   Well, was he included in your
20 representative sample of investors?
21      A.   I guess I haven't sat and thought
22 that all through before, but he's certainly an
23 interested long investor that would be part of
24 that sample, yes.
25      Q.   So he is part of your

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 71 of 143   Page ID
#:13519
Confidential
Gregory Frykman, M.D.
Hsingching Hsu vs. Puma
Biotechnology, Inc., et al.

Page 277

1  representative sample?
2      A.   Uh-huh.
3          MS. MURPHY:  Objection.  Misstates
4  his testimony.
5      Q.   And how do you know that this
6  representative sample held 20 to 30 percent of
7  the outstanding shares of Puma as of July 2014?
8      A.   I don't know that with great
9  certainty, and I think I've said already, that
10  it's sort of a vague recollection.  It was not
11  something, again, that I spent probably more than
12  a few seconds looking at, just glancing at it
13  briefly, and then moved on to other matters.
14      Q.   And when was it you glanced at it
15  quickly to come up with this vague recollection
16  that your representative sample of investors held
17  20 to 30 percent of the outstanding shares?
18      A.   It was what I explained to you
19  earlier.  It was a -- it was a listing of the
20  holders and of the number of shares that they
21  held.
22      Q.   But you don't know what -- in what
23  filing or what other document that's contained
24  in?
25      A.   I think that what I was looking at

Page 278

1  was all derived from publicly available filings.
2      Q.   And did you find those on your
3  Google searches?
4      A.   That may have been how I found it.
5  Honestly, I can't remember.  That was something
6  that was far from a focus of what I did.
7      Q.   So is it your opinion that the only
8  thing investors expected Puma to say, when they
9  initially announced the results of the ExteNET
10  trial, was that it had hit its primary endpoint
11  and in turn could form the basis for a new drug
12  application?
13          MS. MURPHY:  Objection.  Lacks
14  foundation.
15      A.   That is incredibly important
16  information for investors to know.  Investors
17  always want and expect more information than
18  companies typically provide.  So it provided the
19  information that they would expect, if the trial
20  were positive, if the trial showed the outcome
21  that they did.
22      Q.   So Puma's press release included
23  more than that the ExteNET trial had hit its
24  primary endpoint and could form the basis for a
25  new drug application; right?

Page 279

1      A.   I'm sorry.  Say that again.
2      Q.   Puma's July 22, 2000 [as spoken],
3  press release included more than that the ExteNET
4  trial had hit its primary endpoint, and that it
5  was going to form the basis for an NDA; correct?
6      A.   It had, yes, similar information in
7  there, yes.
8      Q.   So is it your opinion that Puma's
9  July 22, 2014, press release actually contained
10  more information than what investors expected?
11      A.   I -- I don't think I've said that.
12  But, again, the focus of what I have -- of my
13  work on this case has been to look at the press
14  release that Puma issued and try to see how that
15  fit in with what are common pharma and biotech
16  press release standards.
17          And as to the, you know, specific
18  nature of the information, the specific validity
19  of that information, how well vetted that was,
20  that's really outside of what my remit was for
21  this case.
22      Q.   So do you believe that if Puma's
23  July 22, 2014, press release had simply said that
24  the ExteNET trial hit its primary endpoint and
25  that it would form the basis for an NDA, that

Page 280

1  that would be in line with industry standards?
2          MS. MURPHY:  Objection.
3  Foundation.
4      A.   Yeah.  That's a hypothetical
5  question.  I'm not sure I can answer that real
6  accurately.
7      Q.   Why can't you answer that
8  accurately?
9      A.   Because it's hypothetical.  That's
10  not what actually occurred.
11      Q.   And I'm asking you if that was --
12  if Puma had issued a press release in which it
13  had only said that the ExteNET trial had hit its
14  primary endpoint and that it was going to form
15  the basis of a NDA, and they otherwise did not
16  give any numerical results, would that be in line
17  with what you believe are standard industry
18  practices?
19          MS. MURPHY:  Objection.
20  Foundation.
21      A.   Yes.
22      Q.   Now, is it your opinion that Puma's
23  July 22, 2014, conference call, is it your
24  opinion did that contain any information beyond
25  that the ExteNET trial had hit its primary

Gregory Frykman, M.D.

Hsingching Hsu vs. Puma
Biotechnology, Inc., et al.

Page 281

1 endpoint and that it would form the basis for an
2 NDA?
3      A.   I'm sorry, reask your question.
4      Q.   Sure.  Is it your impression that
5 Puma's July 22, 2014, conference call contained
6 information beyond just that the ExteNET trial
7 had hit its primary endpoint and in turn could
8 form the basis of an NDA?
9           MS. MURPHY:  Objection.
10 Foundation.
11      A.   I'm not sure I know how to answer
12 that.  But let me say that I misspoke earlier
13 when I said that the -- that one of the summary
14 opinions that I had was regarding the -- the
15 similarity of the accompanying discussion and the
16 conference call, that that fit in with industry
17 standards.  And I realized that was a
18 mistake when we were talking earlier.  That was
19 from residual text from an earlier draft of this
20 expert report.
21           MS. MURPHY:  I just caution you not
22 to reveal any privileged back and forth
23 communications between the attorneys and you.
24 But I think there is a correction that he'd like
25 to make to the report.

Page 282

1      Q.   Why don't we do that.  Tell me what
2 the correction to the report is.  Tell me where
3 you're looking.
4      A.   Sure.  So that is on page 4,
5 section 2, "Summary of Opinions," No. 2.
6      Q.   Right.
7      A.   And it's the last sentence which
8 says "It is my opinion that Puma's disclosures in
9 the July 22, 2014 press release, and accompanying
10 discussion on the analyst call, were in line with
11 typical industry practices for disclosure of such
12 top-line clinical trial results."
13           And that is mistaken, in that the
14 phrase "and accompanying discussion in the
15 analyst call" was actually not part of what I
16 did -- offer -- an opinion that I'm offering in
17 this case.
18      Q.   So are you offering an opinion in
19 this case about whether or not any of the
20 disclosures that were made during Puma's July 22,
21 2014, conference call were in line with industry
22 standards?
23      A.   I am not making any opinion about
24 that.
25      Q.   Okay.  And as you use Puma's

Page 283

1 disclosures throughout this report, should we
2 read that to just mean the company's July 22,
3 2014, press release?
4      A.   That's correct.
5      Q.   Okay.  You do not -- with that
6 correction, there's nowhere in this report where
7 you use public disclosures to encompass any of
8 the statements that were made on the conference
9 call; is that right?
10      A.   That's correct.
11      Q.   Are you offering any opinion at all
12 regarding Puma's July 22, 2014, conference call?
13      A.   No.
14      Q.   And are you offering any opinion at
15 all regarding any of Puma's disclosures, outside of
16 those in the July 22, 2014, press release,
17 regarding the ExteNET trial?
18      A.   No.  I'm not.
19      Q.   Now, you conclude your summary of
20 opinion 2, and actually I'm going to read it with
21 the correction you just provided.  "It is my
22 opinion Puma's disclosures in the July 22, 2014,
23 press release were in line with typical industry
24 practices for disclosure of such top-line
25 clinical trial results."

Page 284

1           Do you see that?
2      A.   Yes.
3      Q.   And is that a proper reading of
4 that opinion with your correction?
5      A.   Yes.
6      Q.   And when you say "in line" there,
7 what to you mean by "in line"?
8      A.   That the particular format and that
9 the particular pieces of -- results that were
10 included, as well as the offering for conference
11 call and discussion about plans for disclosure to
12 regulatory agency to the NDA, that was all in
13 line with pharma and biotech industry standards
14 for press releases for clinical trial results,
15 important clinical trial results.
16      Q.   And, more generally, what do you
17 mean by "in line"?  Does "in line" mean similar
18 to?
19      A.   "In line" means that it is within
20 an accepted or within a commonplace range of
21 disclosures.  So that had to do with the primary
22 endpoint.  That has to do with plans for future
23 regulatory document submission.  That has to do
24 with sample size.  That has to do
25 with significance level.

Gregory Frykman, M.D.

Page 285

1    Q.   And within the biotechnology or
2  pharmaceutical industry, what is the accepted or
3  commonplace range of disclosures?
4    A.   That, again, depends on the
5  therapeutic area, and it depends on the type of
6  clinical trial.  And it depends on the plans that
7  the company has for future submission of the full
8  clinical trial data to medical and scientific
9  conferences.
10    Q.   So for a phase 3 oncology clinical
11  trial, describe for me what is the minimum
12  disclosure that falls within this range of
13  accepted or commonplace disclosures?
14    A.   Sure.  The minimum range also
15  depends on what the obligations are in terms of
16  materiality.  So it is -- it is commonplace
17  for -- and I think we've -- I've talked about
18  this before -- to disclose the outcome on the
19  primary endpoint of the trial.  Usually that is
20  associated with, but not necessarily, but
21  generally, most of the time, it's associated with
22  a significance level.
23         So the reader sees that there is
24  a -- an effect, an effect size that is derived
25  from in this case the hazard ratio, but there

Page 286

1  could be another metric, and that the
2  significance level of that is either high or low.
3  That comprises the minimum data set for
4  disclosure of clinical trial results.
5         If there's no antecedent
6  information at all about the drug, and the
7  company feels that the drug -- that getting the
8  safety information is also important to get out
9  from, then it's certainly at liberty to include
10  that, but in cases where there is available
11  safety information, then a company may well
12  choose not to present anything, in terms of
13  safety.
14         For phase 3 studies, it's not
15  mandatory, but it's commonplace to see what a
16  company's plans are with regard to submission of
17  an application for drug approval to regulatory
18  authorities.  It's also common, as we have talked
19  about before, but by no means mandatory, to have
20  a conference call that accompanies the press
21  release.
22         I don't think there's any commonly
23  accepted publication that says this is the
24  absolute minimum data set, but by looking at lots
25  and lots of press releases, and having an

Page 287

1  understanding of what has happened in terms of
2  clinical trials, in terms of clinical
3  development, in terms of strategy with regard to
4  regulatory agencies, and all of that is
5  summarized at an extremely high level in press
6  releases, and seeing lots and lots of these, one
7  can derive a sense of what is in line, what is
8  commonplace, what is typically done.
9    Q.   All right.  So I asked you, and
10  you're talking about what would be at the minimum
11  end.  Now this accepted or commonplace range
12  you've described.
13         Describe for us what would be in a
14  press release regarding a phase 3 oncology
15  clinical trial result.
16         What would be in a press release
17  that is at the maximum or top end of this range
18  you've described?
19    A.   At the top end in terms of
20  information disclosure.
21    Q.   Yes.
22    A.   You can think about putting all
23  kinds of stuff in there.  And I can go through
24  that -- it might take a little while -- but I'm
25  certainly happy to go through that.  But what you

Page 288

1  might include is a lot more information about the
2  prognostic subsets.
3         So within a clinical trial there
4  are patients that are enrolled that have
5  favorable and unfavorable prognostic -- disease
6  characteristics, and you might include results
7  about one of those.  You might include one or a
8  lot of results on the secondary endpoints, the
9  prospectively defined secondary endpoints.
10         Something that is also commonly
11  included -- not commonly, something that can be
12  included in clinical trials, in press releases
13  that I've seen, is discussion about unplanned,
14  what we call post hoc analyses, where the
15  endpoint was not prospectively declared, but the
16  company has still gone through and found some
17  results that they believe are interesting with
18  regard to unplanned subsets.
19         There may be other populations that
20  are analyzed.  So the intent to treat population
21  is the preferred population for the FDA.  But
22  there could be other populations such as the per
23  protocol population that might be included.
24         Additionally -- and I'm sorry to go
25  on like this, but there's an awful lot that you

Case 8:15-cv-00865-AG-SHK  Document 400-5  Filed 07/24/18  Page 74 of 143  Page ID
#:13522
Confidential
Gregory Frykman, M.D.
Hsingching Hsu vs. Puma
Biotechnology, Inc., et al.

Page 289

1  could put in there. It has to do --
2      Q.   Is there a fixed list of
3  information that you believe or would represent
4  the maximum or high end of this accepted or
5  commonplace range of disclosures?
6      A.   Well, at the maximum end you can
7  think about including the entire peer-reviewed
8  publication, or even the entire clinical study
9  report. No company's going to do that. But you
10  could --
11      Q.   Are there any results? Are there
12  any -- is there anything you could think of that
13  in your mind, if it was included in a top -- in a
14  clinical trial press release would place it
15  outside of the range of what's in line with
16  industry practices?
17      A.   Which would be outside the range?
18      Q.   Uh-huh.
19      A.   Certainly reciting the entire
20  peer-reviewed publication would be well beyond
21  what most companies do most of the time. That
22  would have out of line.
23      Q.   Anything other than that?
24      A.   And then even on the more extreme
25  end would be the -- would be the clinical study

Page 290

1  report. But, again, I mean, that's sometimes,
2  you know, hundreds and hundreds of pages long.
3  So I don't know if that helps you, but that's --
4      Q.   It does.
5      A.   -- but that's how you could think
6  of the extreme end.
7      Q.   Do you know if the SEC has ever
8  commented on this purported typical industry
9  practice for the disclosure of top-line clinical
10  trial results?
11      A.   I'm not aware of SEC comments.
12  That's -- only came to me attention being on Wall
13  Street for six plus years. Except to the extent
14  that important clinical trial results are -- must
15  be disclosed, if there is the determination that
16  they're material to the company.
17      Q.   And do you know if the FDA has ever
18  commented on what you call a typical industry
19  practice for the disclosure of top-line clinical
20  trial results?
21      A.   To my best knowledge, no. That's
22  not something that the FDA does.
23      Q.   Turning to your third summary of
24  opinions here, you say, "Puma's July 22, 2014
25  disclosures are comparable to other disclosures

Page 291

1  of top-line results of oncological trials, many
2  of which I have reviewed and incorporated into my
3  [report] results."
4          Do you see that?
5      A.   Into my report, yes.
6      Q.   Into my report. Excuse me.
7          And disclosures here you're
8  referring just to the July 22, 2014, press
9  release; correct?
10      A.   To -- well, Puma's are comparable
11  to the several others in here, yes.
12      Q.   Okay. Just the press release. Not
13  the disclosures we're talking about; correct?
14      A.   Correct.
15      Q.   Okay. And what standard do you use
16  to determine if one set of disclosures is
17  comparable to another?
18      A.   That was done by looking at the
19  conveyance of information about the clinical
20  trial outcome. Whatever that clinical trial or
21  that company felt was important to convey. I
22  realize that's sort of general.
23          But the standard that I used was to
24  look and see what information the companies, in
25  these very special releases, convey about their

Page 292

1  clinical trial that conveyed a -- conveyed
2  information about whether it was positive or
3  negative. If positive, the extent to which it
4  was positive. And beyond that, frankly, little
5  else mattered.
6      Q.   Is comparable -- is comparable, as
7  you use it here, the same as "in line with," as
8  you use that in paragraph 2?
9      A.   Yes.
10      Q.   All right. And --
11      A.   I think for the most part, yeah. I
12  didn't intend to draw a decision.
13      Q.   And when you refer to "disclosures
14  of top-line results of clinical [oncological]
15  trials, many of which I've reviewed and
16  incorporated into my report," are you referring
17  to just the ones you write about in your report
18  or all of those you've looked at in your
19  materials considered?
20          MS. MURPHY: Object to form.
21      A.   Yes. This relates to the ones that
22  have been incorporated into the report in one of
23  the exhibits.
24      Q.   And of the -- of the disclosures
25  that you reviewed and incorporated into your

Page 293

1  report, how many of those in the press release
2  disclosed more information than Puma did?
3      A.   I would have to go back and look at
4  each of them.  But I think they were generally in
5  line, and maybe in some cases there was some more
6  information than Puma had.
7      Q.   Well, did you review any that
8  disclosed less information than Puma did?
9      A.   I did.  They may not be in the --
10  in this report here because they did not, for
11  example -- you know, they were not related to an
12  oncology drug or something along those lines.
13      Q.   Well, specifically with regard to
14  the disclosures of top-line results of
15  oncological trials, did you review any that had
16  less information than Puma had in its July 22,
17  2014, press release?
18      A.   I don't recall that specifically
19  now.  So I didn't keep a tally of exactly what
20  the individual elements of results were included,
21  but the key outcome is -- as I said before, is
22  conveyance of information about the positivity or
23  negativity of a trial, and then a sense of what
24  the magnitude of the effect was, and a sense of
25  the significance of that effect.  And beyond that

Page 294

1  the rest of it was a lot less important.
2      Q.   Did you incorporate into your
3  report any disclosures of the top-line results of
4  oncology trials that included less information
5  than Puma included in its July 22, 2014, press
6  release?
7      A.   Uhm, in terms of number of words
8  and individual deal elements, that I cannot tell
9  you.  But, as I said, what is important when I
10  read, and I think certainly my institutional
11  investing clients when I was on Wall Street, they
12  read press releases.
13          The information that is most
14  critical is a sense in terms of efficacy exactly
15  how the drug did.  So what the effect size is,
16  and then what the significance level is.
17          So, for example, there could be
18  press releases with a lot more information about
19  those two pieces of outcome, but it still refers
20  to -- it still points to a positive clinical
21  trial.
22      Q.   Now, of all of the disclosures of
23  top-line results of oncological trials that you
24  considered for this engagement, did you keep
25  track of how many of them included more clinical

Page 295

1  trial results than were included in Puma's
2  July 22, 2014, release?
3          MS. MURPHY:  Object to the form.
4      A.   Yeah.  I thought I addressed that
5  before.  I was focused on determining whether or
6  not the press release --
7      Q.   My question is just whether you
8  kept track of how many had more -- more results
9  than were included in Puma's.  Did you keep track
10  of -- have a tally of that?
11      A.   I did not keep a tally sheet of
12  whether these particular words were included or
13  were not included in each individual press
14  release.
15      Q.   How about actual results, numerical
16  results of a clinical trial, did you make any
17  determination about which of the press releases
18  had more or fewer numerical results from the
19  clinical trial in their press release compared to
20  Puma's?
21          MS. MURPHY:  Object to the form.
22      A.   Yeah.  As I said before, I didn't
23  keep track of that either, because that is not
24  how one reads press releases to understand what
25  the outcome of a clinical trial that's being

Page 296

1  discussed really is.
2      Q.   Did you keep a tally of
3  specifically what metrics were used in all of the
4  oncological trial result press releases that you
5  reviewed?
6          MS. MURPHY:  Object to the form.
7      A.   Yeah, again, a specific tally, no.
8  But I think in all or virtually all of the cases
9  hazard ratio was the preferred or the used metric
10  of -- of effect size.
11      Q.   And -- well, how many of the
12  oncological top-line clinical trial results'
13  press releases that you reviewed included an
14  efficacy result other than a hazard ratio?
15      A.   In terms of the ones that are in
16  the report or ones that --
17      Q.   Start with the ones that are in the
18  report.
19      A.   And reask the question.
20      Q.   Yeah.  How -- of the press releases
21  that you incorporated into the report -- is it
22  five?  Do you recall how many you incorporated?
23      A.   I think there were nine.
24      Q.   Okay.  Of the nine press releases
25  you incorporated into the report, how many of

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 76 of 143   Page ID #:13524

Confidential

Gregory Frykman, M.D.

Hsingching Hsu vs. Puma Biotechnology, Inc., et al.

Page 297

1 those included efficacy information other than
2 the hazard ratio?
3      A.   Oh, I think very few or none.
4      Q.   And of all of the ones that you've
5 considered for purposes of this engagement, how
6 many included an efficacy result other than the
7 hazard ratio?
8      A.   Oh, the vast majority, because --
9 because many of those were not even -- they
10 didn't use event-based endpoints.
11      Q.   So of the oncology trials that use
12 event-based endpoints and the press releases that
13 you considered for this engagement, how many had
14 an efficacy endpoint other than a hazard ratio?
15      A.   Virtually all of them.
16      Q.   Let's turn to your summary of
17 opinion No. 4.
18      A.   Uh-huh.
19      Q.   And it seems to be regarding the
20 stock offering.  And you refer to
21 development-stage biotechnology companies?
22      A.   Uh-huh.
23      Q.   What do you mean by
24 "development-stage biotechnology companies"?
25      A.   Right.  Another term that is used

Page 298

1 somewhat is pre-revenue companies.  So these are
2 companies who are dependent on raising capital.
3 They don't have internal or retained earnings
4 that they can then pour back into further
5 development of drugs.
6      Q.   And is the industry standard for
7 top-line result disclosures for development-stage
8 biotechnology companies different than it is for
9 other biotechnology companies?
10      A.   I'm sorry, ask your question again.
11      Q.   Sure.  Is the industry standard for
12 the public disclosure of clinical trial results
13 different for development-stage biotechnology
14 companies than it is for other biotechnology
15 companies?
16      A.   Sure.  It can be.
17      Q.   And how is that different?
18      A.   Because in companies that have
19 revenue coming in that they can put back into
20 development, the success or failure of a drug in
21 a phase 3 trial may not be deemed material.
22      Q.   So in this case --
23      A.   Therefore, they may not need to
24 disclose anything, and they disclose something,
25 you know, very, very minimal.

Page 299

1      Q.   In this case when you were opining
2 on the typical industry practices or industry
3 standards, are you opining that Puma's July 22,
4 2000, [as spoken] press release was in line with
5 typical industry practices for development-stage
6 biotechnology companies?
7      MS. MURPHY:  Object to the form.
8 Lacks foundation.
9      A.   I don't know that I've drawn a
10 distinction.  But I'm certainly happy to say
11 that's the case.
12      Q.   Well, are you say -- when -- are
13 you saying it's in line with industry practices
14 for biotechnology companies of any size or --
15      A.   Broadly, yes.
16      Q.   And how many press releases
17 regarding the disclosure of top-line results for
18 oncology trials that were issued by
19 development-stage biotechnology companies did you
20 look at?
21      A.   Reask the question.
22      Q.   Yeah.  How many press releases
23 issued by development-stage biotechnology
24 companies regarding top-line results of an
25 oncology trial did you look at?

Page 300

1      A.   Uhm, boy.  I don't know.  15,
2 maybe.
3      Q.   And that's on onc -- I understood
4 you looked at about 10 to 15 total top-line press
5 releases regarding oncology trials.  Were all of
6 those from development-stage biotechnology
7 companies?
8      A.   Not all.  But many of them are.  I
9 don't know that I can give you an exact number.
10      Q.   Did you make an effort to
11 specifically look at the rele- top-line clinical
12 trial releases from development-stage oncology
13 companies?
14      A.   I did not make a specific effort to
15 do that, although it was something that I kept in
16 mind as I went through these.  The -- the focus
17 of my work was to look at the pharma and
18 biotechnology industry, and to look at the
19 disclosure practices, and see where Puma's press
20 release in the July 22, 2014, press release fit
21 in.
22      Q.   So next you say, "Because they need
23 to raise money to support their research and
24 development activities, such companies will
25 periodically raise money for a public stock

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 77 of 143   Page ID #:13525
Confidential

Gregory Frykman, M.D.

Hsingching Hsu vs. Puma
Biotechnology, Inc., et al.

Page 301

1  offering."
2          Do you see that?
3      A.   Uh-huh.
4      Q.   And is it your understanding that
5  that's the only way development-stage
6  biotechnology companies raise money?
7      A.   That's not the only way they can
8  raise money, but that's a commonly chosen route
9  to raise capital.
10     Q.   And when you say "periodically,"
11  what do you mean by "periodically"?
12     A.   That is -- occurs every year, two
13  years.  I chose that word specifically because
14  it's not specific in terms of when they do it.
15  It occurs when the capital markets are open to
16  secondary offerings.  Sometimes the window for
17  offerings is closed.
18          It has to do with their need for
19  cash.  It has to do with where their drug or
20  drugs are in development, and so forth.  So it's
21  hard to be very specific about how often they do
22  it.  But it's something that periodically
23  do.
24     Q.   Well, on average how often do
25  development-stage biotechnology companies

Page 302

1  typically raise money for stock offerings?
2      A.   I don't know that I can give you a
3  specific, you know, number of times per year or
4  per five years.  I don't know that.  I think it's
5  highly variable.
6      Q.   Well, on average what is the
7  typical amount of time between public stock
8  offerings for development-stage biotechnology
9  companies?
10          MS. MURPHY:  Objection.  Lacks
11  foundation.
12     A.   I don't know that I can provide
13  that information.  I mean, this is something that
14  could be figured out, but it is so dependent on
15  what their cash position is and what their --
16  known as the burn rate -- the amount of cash
17  they're spending on a quarterly basis.  So
18  it's highly variable for each company.
19     Q.   How is it dependent on their cash
20  position or burn rate?
21     A.   Well, the general arithmetic is
22  that if there is a large cash position, and the
23  quarterly expenditures, the burn rate, is quite
24  low relative to that, then they may be able to go
25  for years without needing to raise additional

Page 303

1  capital.
2          Alternatively, as unfortunately
3  happens from time to time, a company's need for
4  capital, need for cash to pay for all the
5  expensive clinical trials they have to do,
6  becomes acute.  And -- otherwise they have to cut
7  back on the development of their -- of their
8  products.  And in those situations the need to
9  raise capital is -- is, you know, quite urgent.
10     Q.   In this case are you offering any
11  opinion about why Puma conducted its January 2015
12  stock offering?
13     A.   I have opined in my report that
14  this is something that pharmaceutical and
15  biotechnologies commonly do.
16     Q.   Are you opining about why --
17     A.   I've offered no.
18     Q.   -- they had the offering in January
19  of 2015?
20     A.   Yeah.  I've offered no opinion why.
21     Q.   You go on to say "It is well known
22  that companies often raise capital following
23  the announcement of positive news, including
24  positive [clinical] trial results."
25          Do you see that?

Page 304

1      A.   Yes.
2      Q.   And do you mean by that that they
3  raise money following the announcement of
4  positive clinical trial results but before they
5  issue the full results at conference or in a
6  journal?
7      A.   Yes.  That can occur.
8      Q.   Well, is that your opinion?
9      A.   Again, my opinion has simply
10  revolved around the fact that companies do this.
11  That they raise capital following -- following
12  the announcement of clinical trial results.
13     Q.   Well, when you say "following the
14  announcement of positive news," what do you mean?
15  How -- how soon following the announcement of
16  positive news do you think it's well known that
17  companies raise capital?
18     A.   That's highly variable.  It could
19  be days.  It could be weeks to months.
20     Q.   Well, how about an offering 18
21  months after the announcement of positive news,
22  is that something that would fall within your
23  statement here that it's well known companies
24  often raise capital following the announcement of
25  positive news?

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 78 of 143   Page ID #:13526

Confidential

Gregory Frykman, M.D.

Hsingching Hsu vs. Puma
Biotechnology, Inc., et al.

Page 305

1    A.   I don't know whether I or anyone
2  else could state with certainty that the raise,
3  in the hypothetical example 18 months after the
4  announcement of positive news, is related to that
5  positive news.  It may be related to a whole
6  bunch of other factors.
7    Q.   And when you say it's well known
8  such companies often raise capital, can you tell
9  me, is it well known how soon after the
10 announcement of positive news companies often
11 raise capital?
12   A.   I don't think I've offered an
13 opinion on that.
14   Q.   Do you have an opinion on that?
15   A.   Not in terms of this report, except
16 it's a commonly -- it's a -- it's a well-known
17 phenomenon, if you will, that this occurs.
18   Q.   Well, on average how long after the
19 announcement of positive news, including positive
20 clinical trial results, do development-stage
21 biotechnology companies raise capital through a
22 stock offering?
23   A.   I don't believe I can give you an
24 average length of time.
25   Q.   Do you know if it's more or less

Page 306

1  than a year?
2    A.   As I've said, it could be days.
3  And in the table that is in my report there's
4  some that occur within days of the announcement
5  of positive news, but it can also happen months
6  afterward.
7    Q.   And I asked you, do you have any
8  idea on average how long it is between when you
9  say a development-stage biotechnology company
10 issues positive clinical trial results and they
11 raise capital through a stock offering?
12      MS. MURPHY:  Objection.  Asked and
13 answered.
14   A.   Yeah.  I don't know that I can give
15 you an average.
16   Q.   Do you know if it's more or less
17 than 2012 months?
18   A.   I can't give you a specific figure.
19   Q.   Well, what percentage of
20 development-stage biotechnology companies have
21 had a stock offering within six months of
22 disclosing positive clinical trial results in the
23 last 10 years?
24      MS. MURPHY:  Objection.  Lacks
25 foundation.

Page 307

1    A.   Yeah.  I'm not sure I could give
2  you a percentage of that.
3    Q.   And -- well, can you tell me what
4  percentage of development-stage biotechnology
5  companies have had a public stock offering
6  between a press release disclosing top-line
7  results of a clinical trial and the presentation
8  of those results at a conference?
9    A.   I do not have those numbers.  I
10 wouldn't be able to give you that.
11   Q.   And in the last 10 years how many
12 development-stage biotechnology companies have
13 had a stock offering between the -- a press
14 release disclosing the top-line clinical trial
15 results and the presentation of those results at
16 a conference?
17      MS. MURPHY:  Objection.  Lacks
18 foundation.
19   A.   Yeah.  I think I just answered
20 that.  I -- I don't know that number, sir.
21   Q.   Okay.  Well, I asked you what -- so
22 you don't know what percentage have done it?  You
23 don't know what number have done it?
24   A.   No.  Except I've seen it before.
25 Again, I was only marginally involved, as I

Page 308

1  testified earlier, in working with our investment
2  bankers in contemplating offerings.  I was not
3  privy and don't think I ever asked them all these
4  questions.  It changes most likely with the
5  economy.  But I don't have any specific numbers
6  for you on those.
7    Q.   Of the investment bankers you
8  worked with, were any of them ever underwriters
9  for a public stock offering?
10   A.   Perhaps in their prior positions
11 with other brokerages, but I don't believe --
12   Q.   But you don't remember?
13   A.   I don't believe that the Stanford
14 Financial Group actually did underwriting.
15   Q.   Now, when you reviewed for this
16 engagement, did you see any development-stage
17 biotechnology companies that had a stock offering
18 after lying about their clinical trial results?
19      MS. MURPHY:  Object to the form.
20   A.   Yeah.  No, sir.  I did not.
21   Q.   Did you see any company, any
22 development-stage biotechnology company, that had
23 a public stock offering following an announcement
24 of positiveness news that was incorrect?
25      MS. MURPHY:  Object to the form.

Gregory Frykman, M.D.

Page 309

1  Lacks foundation.
2      A.   No.
3      Q.   And in any of the examples you
4  reviewed for this engagement, do you know whether
5  the development-stage biotechnology company was
6  sued for violating the federal securities laws
7  based on the clinical trial results that had been
8  announced?
9          MS. MURPHY:  Objection.
10 Foundation.
11     A.   Yeah.  I -- I don't know about
12 that.
13     Q.   So you then say "I have reviewed
14 and identified many examples of companies
15 conducting offerings following top-line
16 announcements such as Puma's press release and
17 investor [conference] call."
18         Do you see that?  The very last
19 sentence.
20     A.   Yes.
21     Q.   And are those the examples that you
22 identify in your Exhibit B?
23     A.   Let me go there, but I think so.
24     Q.   The page right before your
25 "Materials Considered."

Page 310

1      A.   Yes.
2      Q.   And what methodology did you use to
3  identify these companies and the stock offerings?
4      A.   As I mentioned, some of these I
5  knew about from doing the work with regard to the
6  press releases.  And in some cases that was
7  discussions with the Latham attorneys.
8      Q.   So -- well, was there was a
9  methodology to -- to identify these, other than
10 the discussion with the attorneys and the ones
11 you already knew about?
12     A.   The methodology revolved simply
13 around identifying examples where there was
14 results disclosed in a press release, and then
15 there was a -- an equity offering that occurred
16 at some point thereafter that -- and that's all
17 it was for, was to say, there is more than one or
18 two examples of where companies disclose results
19 in a press release, and then at some point in the
20 future, usually days to weeks to months, there
21 was a secondary offering.
22     Q.   So other than the timing of the
23 stock offering, in comparison to the press
24 release and a subsequent disclosure, do these
25 stock offerings have anything in common?

Page 311

1      A.   I'm offering no opinion on that.
2      Q.   For example, did they all have that
3  the same law firm involved in them?
4      A.   I have no opinion on that.
5      Q.   Did you look?
6      A.   No, sir.  That was not part of my
7  focus.
8      Q.   Did they all have the same
9  underwriters?  Was there an underwriter common to
10 all of them?
11     A.   I don't know.  I -- I don't think
12 so, but that was not something that I was focused
13 on looking at.
14     Q.   And for each of these offerings did
15 you consider the documents, the offering
16 documents?
17     A.   I think it -- I focused merely on
18 the announcement that -- the press release, that
19 there was an offering going on and that the
20 offering was closed.  And beyond that that was
21 not the focus of -- what I worked on.
22     Q.   For all of these offerings, did you
23 consider whether or not the company had released
24 any additional information about the clinical
25 trial in question between the top-line release

Page 312

1  and the stock offering?
2      A.   Generally, not.  Because the time
3  difference was relatively small.  But there's no
4  reason why that wouldn't be the case.
5      Q.   My question is, did you make a
6  determination about whether the company had
7  issued any additional information about the
8  clinical trial between the top-line release and
9  the stock offering?
10     A.   I did not specifically undertake
11 that -- that investigation.
12     Q.   Did you make a determination about
13 which of these companies held conference calls in
14 conjunction with the top-line press release?
15     A.   I'm sorry, ask the question again.
16     Q.   Did you make a determination about
17 which of these companies held a conference call
18 in connection with the top-line press release?
19     A.   No.  That was not part of what I
20 did.
21     Q.   As you sit here today, do you know
22 which of the companies had conference calls in
23 connection with the top-line press release?
24     A.   I -- a few of them that I -- I'm
25 almost certain they did.  So, for example,

Gregory Frykman, M.D.

Hsingching Hsu vs. Puma
Biotechnology, Inc., et al.

Page 313

1  Exelixis.  Omeros, I believe.  But the others
2  I -- I simply don't know.
3       Q.    Did you --
4       A.    Again, that was not a focus of what
5  I worked on.
6       Q.    Did you review the Omeros
7  conference call that was done in connection with
8  the March 13, 2012, conference call?
9       A.    I did not review the conference
10  call, no.  The press release, yes.
11       Q.    Did you make any determination
12  about whether, in any of these instances, the
13  company disclosed additional information about
14  the top-line results of the clinical trial in the
15  conference call that was associated with the
16  press release?
17       A.    No.  Because that was not the focus
18  of putting together this table, and of looking at
19  this information.
20       Q.    For any of the 14 examples that you
21  provide here in Exhibit B, do you know what
22  results the company's executives had at the time
23  of the initial top-line press release?
24       MS. MURPHY:  Object to form.
25       A.    I'm sorry, ask the question again.

Page 314

1       Q.    Sure.  Do you -- for any of these
2  14 examples, do you know what information the
3  company's executives had regarding the trial
4  results at the time they issued the top-line
5  press release?
6       A.    I don't know what they had.  I know
7  what was issued in the press release.
8       Q.    And for any of these companies do
9  you know if the executives had more information
10  about the clinical trial release -- results than
11  was included in the initial press release?
12       MS. MURPHY:  Object to the form.
13       A.    Yeah.  I have no knowledge of that.
14       Q.    Now, how many stock offerings have
15  there been by development-stage pharmaceutical
16  companies in the past 15 years?
17       MS. MURPHY:  Objection.  Lack of
18  foundation.
19       A.    We talked about that earlier, and I
20  can't remember what the number was that I said,
21  but it is whatever the number was previously.
22       Q.    I don't recall you providing a
23  number.  So, again, what -- what do you
24  understand the number is for the stock offerings
25  by development-stage pharmaceutical companies in

Page 315

1  the past 15 years?
2       MS. MURPHY:  Objection.  Lack of
3  foundation.
4       A.    Can we go back and look and see if
5  I've talked about that before, because I sure
6  thought that came up a while back.
7       Q.    Well, you have to answer here.
8       A.    Reask the question.
9       Q.    How many stock offerings have there
10  been by development-stage pharmaceutical
11  companies in the past 15 years?
12       MS. MURPHY:  Same objection.
13       A.    15 years, development-stage
14  biopharmaceutical companies across all
15  therapeutic areas, hundreds.
16       Q.    And in the past six years how many
17  stock offerings have there been by
18  development-stage pharmaceutical companies?
19       MS. MURPHY:  Lacks foundation.
20       A.    I'm sorry, what's the question?
21       Q.    In the past six years, how many
22  stock offerings have there been by
23  development-stage pharmaceutical companies?
24       A.    At least dozens, probably a few
25  hundred.

Page 316

1       Q.    So the 14 examples you have here,
2  what percentage of the total number of stock
3  offerings by development-stage pharmaceutical
4  companies does this represent?
5       A.    Oh, it's a small fraction of them.
6  But it was not intended to be representative.  It
7  was simply to illustrate the point that the
8  secondary raises by develop -- by
9  development-stage pharmaceutical companies,
10  biotech pharmaceutical companies, is something
11  that is well known to occur following the results
12  of -- following results of clinical trials or
13  following positive news.  The announcement of
14  positive news in press releases.
15       Q.    And let me go back.  Are -- are you
16  opining that it is well known that companies will
17  have public offerings of stock between the
18  top-line or preliminary press release and a
19  subsequent release of clinical trial results?
20       A.    I'm sorry, ask the question again.
21       Q.    Are you opining that it is well
22  known that development-stage biotechnology
23  companies will have a stock offering between the
24  top-line or preliminary press release and a
25  subsequent disclosure of the clinical trial

Gregory Frykman, M.D.

Hsingching Hsu vs. Puma
Biotechnology, Inc., et al.

Page 317

1  results?
2      A.   Yeah.  I've offered no opinion on
3  that.
4      Q.   If I could have you turn to
5  page 19, section V A of your report.
6          MS. MURPHY:  Would you like to take
7  a break?  It's late in the day.
8      Q.   Was that a yes?
9      A.   Yeah.
10         MR. GRONBORG:  Okay.  Go ahead.
11         THE VIDEOGRAPHER:  The time is
12  5:33 p.m.  We're going off the record.
13         (Recess taken.)
14         THE VIDEOGRAPHER:  The time is
15  5:44 p.m., and we're back on the record.
16  BY MR. GRONBORG:
17     Q.   Will you please turn to page 19 of
18  your report.
19     A.   Yes.
20     Q.   And section V A.
21     A.   Yes.
22     Q.   The first sentence there reads,
23  "Puma's Press Release about the results of the
24  ExteNET clinical trial accurately and precisely
25  described the most important primary outcome

Page 318

1  measures of the ExteNET trial."
2      Do you see that?
3      A.   Yes.
4      Q.   What do you mean by "accurately and
5  precisely"?
6      A.   The numerical figures that were
7  provided in terms of hazard ratio and in terms of
8  significance level, as well as the sample size
9  and the number of countries in which the trial
10  was conducted, were accurate and precise and
11  compared almost exactly with that which the FDA
12  ultimately stated in its review documents about a
13  year and a half, two years later.
14     Q.   Was the hazard ratio identified in
15  the press release the same as the hazard ration
16  that was in the FDA materials that you saw?
17     A.   It was slightly different, and it
18  was 0.67, if I recall correctly, in the July 22,
19  2014, press release.  And it was 0.66 in the FDA
20  review documents and what ultimately wound up in
21  the legal.
22     Q.   Do you know what clinical trial
23  results the company had, safety resul -- excuse
24  me -- efficacy results the company had prior to
25  July 22, 2014?

Page 319

1      A.   I know what it had based on what
2  Rowe had sent it.
3      Q.   Do you think you saw something that
4  Rowe had sent the company that had the efficacy
5  results in it?
6      A.   Yes.
7      Q.   And what was that?
8      A.   That was the summary of the results
9  provided by Rowe and then to the company around
10  July 17, 18.  Somewhere in there.
11     Q.   Where is that document in your
12  materials considered?
13     A.   Well, that document was actually
14  not part of what I considered in this report.
15     Q.   So what --
16     A.   In producing this report.
17     Q.   What did you make your -- what did
18  you base your decision on or your opinion on that
19  Puma's press release accurately described the
20  most important primary outcome measure?
21     A.   Based on the review of the FDA
22  documents.
23     Q.   Are you assuming --
24     A.   The FDA review documents.
25     Q.   Are you assuming what the company

Page 320

1  had in July of 2014 was the same as what the FDA
2  had years later?
3          MS. MURPHY:  Objection.  Lacks
4  foundation.
5      A.   It is almost identical.
6      Q.   Do you know if it's the same as
7  what the company had in July of 2014?
8      A.   I don't know for sure, but please
9  remember, that I worked at the FDA part-time for
10  two years and part-time for -- for two more
11  years, and the results of clinical trials that
12  came in to the FDA in the form of a new drug
13  application were the results that were -- were
14  for the same clinical trial that companies had
15  discussed at ASCO before, that it had written
16  press releases on before, and so forth.
17         So I had no reason to believe that
18  what was being submitted to the FDA was anything
19  different than what the results of the ExteNET
20  trial were.  The top-line of which -- the
21  results -- top-line results of which were in the
22  July 22, 2014, press release.
23     Q.   And with regard to the safety
24  results, is it your understanding that the
25  company had the identical or almost identical

Page 321

1 safety results as of July 22, 2014, as were later
2 submitted to the FDA?
3    A.   Yes.  They had them.  In what state
4 of validation they were at that time is less
5 clear.
6    Q.   And how clear are you about what
7 stage of validation the efficacy results were in?
8    A.   The efficacy results on the primary
9 efficacy endpoint of IDFS and the significance
10 levels, so in terms of hazard ratio and in terms
11 of significance level, that was without --
12 without question.  That the company knew was
13 fully validated by both Rowe and internally.  And
14 there was no question that that's what the
15 results were.
16    Q.   What's your basis for that
17 statement?
18    A.   That came from one or more of the
19 deposition transcripts that I read that were
20 either from Colin [ph] or from Claire Sherman or
21 Alvin Wong.  I can't remember exactly whose --
22 and it may have been more than one.
23       But as I read through those, I was
24 led to believe confidently that the company, and
25 Alan specifically, felt comfortable with the

Page 322

1 validation efforts that had gone into the
2 determination of the efficacy outcome disclosed
3 in the press release that he was willing to have
4 it disclosed.
5    Q.   And in this engagement did you
6 assume that the statements that were made by
7 company representatives during depositions were
8 accurate?
9    A.   Yes.  I believe they were all sworn
10 as well.
11    Q.   Did you make any effort to
12 independently confirm their accuracy of any of
13 the statements that were made by company
14 representatives during depositions?
15    A.   I'm sorry, ask the question again.
16    Q.   Did you ind -- make any effort to
17 independently ascertain the accuracy of any
18 statements that were made by company
19 representatives during depositions in this case?
20    A.   To the extent that they made
21 comments about ExteNET clinical trial results
22 that I could -- that I felt comfortable with,
23 yes.  But that was not a formal part of the
24 process that I undertook.
25    Q.   Now, in the next sen -- paragraph

Page 323

1 you start off referring to sophisticated
2 investors.
3       Do you see that?
4    A.   I'm sorry.  Point to me where
5 again.
6    Q.   Page 19 --
7    A.   There we go.  I see it, yes.
8    Q.   Who are sophisticated investors?
9    A.   Sophisticated investors are
10 those -- they -- they tended to be represented
11 amongst the institutional investing clients that
12 our firm had when I was in the capital markets.
13       So these tended to be, not always,
14 but they tended to be portfolio managers and
15 their analysts that worked at some of the top
16 mutual funds and some of the top hedge funds in
17 this country.
18       And this is to draw a distinction
19 between what we would call in the -- in the
20 industry retail investors.  So these are
21 noninstitutional investors.  They may still be
22 sophisticated, but they typically, because we
23 didn't -- really talk to them that much.
24       But the sophisticated investors,
25 the folks that we interacted with, who had been

Page 324

1 in the pharma and biotech investing space on the
2 investment side for many, many years were not
3 just familiar, very familiar, with the idea that
4 press releases were only a small snippet of the
5 information available about a clinical trial.  It
6 would be eventually available.  But that for
7 materiality reasons or strategic reasons needed
8 to be disclosed, and that the full discussion of
9 the results would appear in a future medical and
10 scientific conference.
11    Q.   Are you a sophisticated investor,
12 as you use that term?
13    A.   No, sir.  I am not.
14    Q.   Are you offering any opinion in
15 here about what retail investors would have
16 understood with respect to Puma's July 22, 2014,
17 press release?
18    A.   No.  I'm not offering any opinion
19 about that.
20    Q.   Turning to page 21.  It's the
21 section that is titled "Lead Paragraph."
22       Do you see that?
23    A.   Yes.
24    Q.   And the second sentence starts,
25 "Puma also accurately describes the population

Gregory Frykman, M.D.

Page 325

1  studied in the ExteNET trial."
2          Do you see that?
3      A.  I do.
4      Q.  How did you reach the opinion that
5  Puma's description of the population in the
6  ExteNET trial was accurately described?
7      A.  Because I was able to look at the
8  FDA review documents and the approved FDA label
9  for neratinib and found that what was in the
10  press release -- can I twist somebody's arm for a
11  copy of the press release?
12     Q.  No.  We don't have that.  You can
13  go ahead.
14     A.  That the description of the
15  population enrolled in the ExteNET trial was
16  virtually identical to that which was described
17  in the FDA review documents.
18     Q.  All right.  So is your opinion
19  there regarding the accurate description in the
20  July 22, 2014, press release about the population
21  study based on anything other than the FDA
22  materials that were submitted later and the FDA
23  label that was submitted after this press release
24  was issued?
25     A.  No.

Page 326

1      Q.  So looking at the next section,
2  refer to the second paragraph.
3      A.  Yes.
4      Q.  And if I could point you to the
5  second bullet point, the very bottom of page 21.
6      A.  Uh-huh.
7      Q.  You say "Patients were followed for
8  an additional two years after the one year of
9  being on neratinib, indicating that the
10  DFS-improving effect of neratinib on women
11  receiving therapy after the standard
12  Herceptin-containing regimen[(s)] is durable."
13         Do you see that?
14     A.  Yes.
15     Q.  And so is it your understanding
16  that the results that were presented on July 22,
17  2014, those were results from one year of
18  neratinib and two years following the use of
19  neratinib?
20     A.  Yes.  That was my understanding.
21     Q.  What was the basis for that
22  understanding?
23     A.  I believe it said it in the press
24  release.
25     Q.  To your understanding, that's what

Page 327

1  the press release provided you?
2      A.  I -- well, that's why I'd like a
3  copy of it.  But, yes, I believe so.
4      Q.  And why is it you thought indicated
5  the DFS-improving effect of neratinib was
6  durable?
7      A.  For two reasons.  One is that the
8  effort to develop drugs in the extended adjuvant
9  setting of breast cancer had up to date been a
10  failure.  And there were at -- at least three
11  trials, and maybe more, that had studied the
12  drug's activity or efficacy in this indication in
13  the setting and had failed.
14         The fact that this effect was able
15  to last two years beyond when the drug was
16  stopped is, in the drug development world, a
17  suggestion that the effect is not transient but
18  durable.
19     Q.  What if they'd only had one year of
20  results following the use of the neratinib --
21         MS. MURPHY:  Objection.
22     Q.  -- would that -- would you have
23  reached the same conclusion regarding durable?
24         MS. MURPHY:  Objection.  Lacks
25  foundation.

Page 328

1      A.  Yeah.  That's kind of a
2  hypothetical situation.  It would certainly be a
3  less strong case that the drug provided durable
4  improvement in DFS.
5      Q.  And do you know what the hazard
6  ratio was for the drug between the time when
7  people stopped taking it and the results of the
8  ExteNET trial were announced in July of 2014?
9         MS. MURPHY:  Object to the form.
10  Lacks foundation.
11     A.  Yeah.  I've -- I know that analysis
12  was done.  I honestly can't remember what the
13  hazard ratios were.
14     Q.  So are you offering the opinion in
15  this case that the DFS-improving effects of
16  neratinib on women receiving the therapy after
17  the standard Herceptin-containing regimen is
18  durable?
19     A.  Absolutely.
20     Q.  So that's an opinion you've been
21  asked to offer here?
22     A.  I don't know that I've been asked
23  to offer it.  But it emanates from the
24  now-updated clinical trial results that, again,
25  is not reflected in here, but I think out to five

Gregory Frykman, M.D.

Page 329

1  years there's data, and certainly the two-year
2  time point.
3      Q.   What is the basis, then, for this
4  opinion you're offering that the DFS-improving
5  effect of neratinib is durable?
6      A.   It was that the effect of neratinib
7  after its cessation after a year of therapy
8  resulted in a therapeutic effect that was
9  retained for two more years.  That's a remarkable
10  outcome.
11      Q.   Anything beyond that?
12      A.   As I've said, the updated results.
13  And I don't know when I looked at them.  It's not
14  part of this reports.  But the updated results
15  for, I believe it's five years now, are out, and
16  they also indicate that the effect has remained
17  intact.
18      Q.   And what information do you
19  understand the company had regarding the
20  DFS-improving effect of neratinib on women
21  receiving therapy after the standard
22  Herceptin-containing regimen, what do you
23  understand the company had as of July 22, 2014?
24      A.   It only had sufficiently powered
25  data at two years.

Page 330

1      Q.   And is it your understanding that
2  the hazard ratio that was identified in the
3  July 22, 2014, press release, that that was for
4  the one year of neratinib and two years post
5  neratinib?
6      A.   Yes.  That's correct.
7      Q.   Okay.  So that was for the entire
8  three-year time period?
9      A.   Well, three years from time that
10  neratinib started until the end of the two years
11  post -- post neratinib.
12      Q.   And that conclusion, that's based
13  on what you read in the press release and the
14  other materials you considered?
15      A.   I think it was in the press
16  release.
17      Q.   Last, on page 22, you have the
18  concluding paragraph?
19      A.   Yes.
20      Q.   And you write, "Mr. Auerbach's
21  statement about neratinib being a HER2-targeted
22  drug that had demonstrated benefit in the
23  'extended adjuvant' setting is fully and
24  precisely correct."
25          Do you see that?

Page 331

1      A.   Yes.
2      Q.   What do you mean by "fully"
3  correct?
4      A.   That is to emphasize that that
5  statement is -- is correct.
6      Q.   Well, how is it fully correct?
7      A.   That it's nothing less than fully
8  correct.  So there may be some that argue, well,
9  you know, maybe not enough clinical benefit's
10  been demonstrated, or maybe there's reason to
11  think that the benefit is not what is purported
12  to be the case.  But Mr. Auerbach made the
13  statement that the drug has demonstrated benefit
14  in the extended adjuvant setting, a
15  accomplishment that heretofore had been
16  unrealized, and that outstanding outcome is
17  fully -- his statement is fully and precisely
18  correct.
19      Q.   What methodology do you use to
20  determine whether a press release is fully
21  correct?
22      A.   No.  The statement that he made
23  is -- what I'm trying to say in there, I thought
24  it was articulated correctly, is that his
25  statement about there -- about benefit being

Page 332

1  demonstrated in the ExteNET trial is fully and
2  precisely correct.
3      Q.   By "fully" do you mean it includes
4  all the important information about the
5  demonstrated benefit in the extended adjuvant
6  setting?
7          MS. MURPHY:  Object to the form.
8      A.   I'm sorry, ask the question again.
9      Q.   Sure.  By "fully correct" do you
10  mean it includes all of the important information
11  regarding the demonstrated benefit in the
12  extended adjuvant setting?
13      A.   Yes.
14      Q.   And by "fully correct" do you mean
15  it includes all material information about the
16  demonstrated benefit of neratinib in the extended
17  adjuvant setting?
18      A.   I'm sorry, ask the question again.
19      Q.   Sure.  When you say the statement
20  was fully correct --
21      A.   Yes.
22      Q.   -- are you opining that the
23  statement included all of the material
24  information regarding the demonstrated benefit of
25  neratinib in the extended adjuvant setting?

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 85 of 143   Page ID #:13533

Confidential                                                    Hsingching Hsu vs. Puma
Gregory Frykman, M.D.                                           Biotechnology, Inc., et al.

Page 333

1    A.   Well, I'm not going to be able to
2  offer you an opinion about what's material and
3  what's not.  But I'm very willing to offer a view
4  that Mr. Auerbach's statement is correct, that
5  benefit has been demonstrated, or benefit wsa
6  demonstrated in the extended adjuvant setting.
7    Q.   And I'm keying in on that word
8  "fully."  Are you offering the opinion that
9  Mr. Auerbach's statement included all of the
10 important information regarding the demonstrated
11 benefit of neratinib in the extended adjuvant
12 setting?
13     MS. MURPHY:  Object to the form.
14     A.   Yeah.  I don't know exactly what
15 was in his head at that point.  But giving my
16 experience in clinical drug development and
17 specifically in oncology drug development, a key
18 determination that is made by the Food and Drug
19 Administration, and something that I carried with
20 me in practice as a policy analyst, was to look
21 at the clinical benefit and try to estimate what
22 the clinical benefit is of a particular drug in a
23 particular oncologic indication.
24        In this case it is my view that a
25 hazard ratio of 0.67 offers a clinical benefit to

Page 334

1  women with breast cancer, but I'm also very
2  willing to say that Mr. Auerbach's statement
3  about there being demonstrated benefit in the
4  extended adjuvant setting in breast cancer for
5  women is a fully and precisely correct statement.
6    Q.   Now, are you opining in this case
7  that the entirety of the July 22, 2014, press
8  release is fully and precisely correct?
9        MS. MURPHY:  Object to the form.
10     A.   Yeah.  That's not what I've said
11 her.
12     Q.   But are you offering that opinion
13 in this case?
14     A.   To the best of my knowledge.
15     Q.   So are you opining in this case
16 that the entirety, the entire press release was
17 fully and precisely correct?
18     A.   No.  What I am opining on in this
19 case is that the July 22, 2014, press release
20 from Puma about the ExteNET clinical trial
21 results fits within the standards of press
22 releases for clinical trial results for
23 pharmaceutical and biotechnology companies.
24     Q.   Let me have you turn to page 23 of
25 your report.  And you see that's a section where

Page 335

1  you discuss certain of the press releases?
2    A.   Yes.
3    Q.   You discuss five press releases
4  here.  How did you choose those five to discuss
5  in your report?
6    A.   These were chosen because they --
7  in the analysis they had many of the same -- the
8  clinical trials underlying them had many
9  similarities to the underlying clinical trial for
10 Puma.  So for the ExteNET trial.
11     Q.   And in the last 15 years how many
12 clinical trials are there that you believe have
13 many similarities to the ExteNET trial?
14     A.   Well, that question is difficult to
15 answer, because one can look at any number of --
16 of similarities or differences.
17        What I tried to do here was to
18 focus on specifically cancer drugs.  And by that
19 I mean not just cancer drugs that are used in the
20 management of malignancy, but specifically drugs
21 that were focused on shrinking a tumor or causing
22 patients to hopefully live longer or live longer
23 without their disease by going after the tumor,
24 as opposed to what we call supportive care drugs,
25 the drugs that treat side effects.

Page 336

1    Q.   Have you consulted for any of the
2  companies that you identify in this section of
3  your report?
4    A.   Exelixis, no.  Seattle Genetics,
5  no.  Eli Lilly, no.  Celgene, no.  And ArQul, no.
6    Q.   And you say at the beginning of
7  that section that "The Puma Press Release
8  comfortably fits within what is customary and
9  expected of biotechnology companies."
10     A.   Yes.
11     Q.   And is "customary" and "expected"
12 there, using that, any different than you've used
13 industry standard or industry practice elsewhere
14 in your report?
15     A.   It means essentially -- I intended
16 it to mean essentially the same.
17     Q.   And in the course of this
18 engagement did you identify any press release
19 regarding a top-line clinical trial result that
20 you felt did not comfortably fit within what is
21 customary and expected?
22     A.   No.  I think I testified to that
23 earlier.
24     Q.   So turn to the last -- to the end
25 of this section.  Page 29.  Or, excuse me,

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 86 of 143   Page ID #:13534

Confidential

Gregory Frykman, M.D.

Hsingching Hsu vs. Puma
Biotechnology, Inc., et al.

Page 337

1  page 30.
2        The very last paragraph of the
3  section you say, "It is my opinion that Puma
4  comprehensively and dutifully complied with these
5  industry norms, and that its July 22, 2014
6  announcement was commensurate with the industry
7  practice of disclosing only limited top-line
8  results to the public."
9        Do you see that?
10       A.   Yes.
11       Q.   What do you mean by
12  "comprehensively"?
13       A.   That the -- the result of the
14  ExteNET clinical trial was correctly described
15  as -- as positive, and that there was a firm
16  basis for that in terms of the hazard ratio and
17  in terms of the significance level.
18       Q.   Do you know what the term
19  "comprehensive" means?  The dictionary definition
20  of it?
21       A.   Comprehensively means explaining
22  the full basis for something.
23       Q.   And is that what you mean when you
24  used "comprehensively" from?
25       A.   Yes.  The full -- yes.  The full

Page 338

1  basis for stating that the -- that the ExteNET
2  clinical trial was -- was positive is
3  comprehensively described in the form of -- in
4  the form of the hazard ratio and in terms of the
5  significance level.
6        Q.   Take a drink?  Do you want to get
7  it?  We'll go off.
8        A.   No.  Keep going.
9        Q.   Okay.  And you also say "dutifully"
10  there.  What is -- what's your understanding of
11  what the word "dutifully" means?
12       A.   That they were fulfilling their
13  obligation, which I believe, I cannot say for
14  sure, but I certainly believe that, based on my
15  not -- not being an attorney, that this was a
16  material event.  That the outcome of the ExteNET
17  trial was a material event in the life of the
18  company, and that they complied with their
19  obligation to present material results.  Material
20  outcome for the investors of that company.
21       Q.   So are you opining here that in its
22  July 22, 2014, press release that Puma disclosed
23  all material results of the ExteNET trial?
24           MS. MURPHY:  Object to the form.
25       A.   Yeah.  I -- I don't think I've said

Page 339

1  that.
2        Q.   Well, what -- what -- what
3  obligation is it that you understood Puma
4  fulfilled with respect to the July 22, 2014,
5  press release?
6            MS. MURPHY:  Objection.  Misstates
7  the testimony.
8        A.   The obligation that my under -- of
9  my -- the obligation that I understand Puma
10  dutifully complied with or fulfilled was that of
11  disclosing material information about the company
12  to its investors.
13       Q.   So you are opining the company
14  dutifully disclosed material information to its
15  investors?
16           MS. MURPHY:  Objection.  Lacks
17  foundation.
18       A.   Yes.
19       Q.   Okay.  And can -- where in your
20  opinion do you analyze whether or not the company
21  dutifully disclosed material information to its
22  investors?
23       A.   As I've said before, I'm not an
24  attorney, so I am not the person to make a
25  determination of materiality.

Page 340

1        On the other hand, the outcome of a
2  relatively large phase 3 trial for a drug, the
3  most important drug for -- for this particular
4  company, that -- that that is an important
5  outcome that investors will want to know and
6  should be told about.
7        Q.   If you did not make a determination
8  about the materiality of any aspect of the
9  ExteNET trial, how is it you are able to make an
10  opinion that the company dutifully disclosed all
11  of the material aspects of that trial?
12       A.   I'm sorry, ask the question again.
13       Q.   Well, in this case you did not make
14  an effort to determine what were the material
15  aspects or results of the ExteNET trial; is that
16  right?
17           MS. MURPHY:  Objection.  Lack of
18  foundation.
19       A.   I don't think I've said that.
20       Q.   All right.  Then I'll take that
21  back.
22        In this engagement did you identify
23  what the material aspects or results were of the
24  ExteNET trial as of July 22, 2014?
25       A.   I have identified what are

Gregory Frykman, M.D.

Page 341

1  important outcome results for the ExteNET
2  clinical trial.  Other people will have to make a
3  determination as to the materiality.  But my
4  experience in the capital markets and sitting
5  through didactic sessions about being careful
6  with --
7      Q.   Where in your report do you
8  identify what the important results were of the
9  ExteNET trial as of July 22, 2014?
10     A.   I thought we've talked about that
11  multiple times.  The single-most important --
12     Q.   And I'm asking where in your report
13  do you identify what the important results were
14  of the ExteNET trial as of July 2014?
15     A.   We've talked about that many times.
16     Q.   Can you point me to a page?
17     A.   It was the importance of the
18  outcome on the DFS endpoint and on the hazard
19  ratio.
20     Q.   And can you point me to a page
21  where you identify what you in this engagement
22  determined were the important results of the
23  ExteNET trial?
24     A.   I thought we've been talking about
25  that most of today.  I thought it was fully

Page 342

1  encapsulated within my views on the disclosure,
2  and on my discussion in here of clinical trials.
3      Q.   Is there a page you're looking at?
4      A.   There's a --
5      Q.   Can you tell me what pages you're
6  looking at that you think encapsulate your
7  opinions regarding what the important results of
8  the ExteNET trial were as of July 2014?
9      A.   Look at the section here on page 7
10  regarding endpoints.  That doesn't say
11  specifically that this was the most -- I don't
12  think it says here the most important point.
13     Q.   Doesn't even talk about the ExteNET
14  trial, does it?
15     A.   Bus this was intended to serve
16  as --
17     Q.   Sir, does that section of your
18  report talk about the ExteNET trial?
19     A.   I don't see it mentioned here, no.
20     Q.   Okay.  Can you point to any other
21  page wherein you think you identify what you are
22  opining were the important results of the ExteNET
23  trial as of July 2014?
24          MS. MURPHY:  Objection.  Lacks
25  foundation.

Page 343

1      A.   Well, let's get back to what my --
2      Q.   Let's -- let's work on my question
3  first.
4      A.   -- what my remit was for this
5  engagement.
6      Q.   My -- my question --
7      A.   And that was to look at the --
8      Q.   Sir, if you can answer my question.
9          It is, can you point me to a page
10  in your report where you identify what you are
11  opining were the important results of the ExteNET
12  trial as of July 2014?
13          MS. MURPHY:  Object to foundation.
14     Q.   I'm looking for a page number.
15     A.   We've discussed that multiple times
16  today.
17     Q.   Can you give me a page number?
18     A.   I don't think there is a specific
19  page where I come out and said that the -- that
20  the DF -- that the DFS endpoint for the ExteNET
21  clinical trial was the most important, you know,
22  outcome on the trial.  The hazard ratio on -- of
23  that.
24          But that's certainly been, you
25  know, discussed many, many times today and is

Page 344

1  encapsulated within the views that I've expressed
2  in the expert report.
3      Q.   Well, sir, is your view of what the
4  important results of the clinical trial, the
5  ExteNET clinical trial, are there -- those
6  important results, did they change at all between
7  July 2014 and June of 2015?
8          MS. MURPHY:  Objection.  Lacks
9  foundation.
10     A.   Not to my knowledge.
11     Q.   All right.  So -- and when you --
12  when you were offering what you say is your
13  opinion regarding the important results of the
14  ExteNET clinical trial, are those important
15  results the same at all times between July 2014
16  and the submission of the NDA to the FDA?
17          MS. MURPHY:  Same objection.
18     A.   Yes.  To my knowledge, they've
19  stayed virtually identical.
20     Q.   And your view of what the important
21  results would be the same regardless of time?
22     A.   At least through -- yes, through
23  approval of the drug by the FDA last year.
24     Q.   And, again, is that some -- opinion
25  you're offering in this case what the important

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 88 of 143   Page ID #:13536

Gregory Frykman, M.D.

Confidential

Hsingching Hsu vs. Puma
Biotechnology, Inc., et al.

Page 345

1  results were in this trial?
2      A.   The opinion that I have offered in
3  this trial --
4      Q.   I'm asking if you're offering that
5  opinion, what the important results were of the
6  ExteNET trial?
7          MS. MURPHY:  I'm sorry, can you
8  repeat.
9      Q.   Sure.  My question is, are you
10 offering the opinion in this case about which
11 results from the ExteNET trial were important?
12         MS. MURPHY:  Object to the form.
13     A.   The most important results for the
14 ExteNET clinical trial --
15     Q.   I'm asking you, are you offering an
16 opinion in this case about which results from the
17 ExteNET trial are important?
18     A.   Probably better take a break.
19     Q.   Okay.  Let's take a break.
20         THE VIDEOGRAPHER:  The time is
21 6:19 p.m.  We're going off the record.
22         (Recess taken.)
23         THE VIDEOGRAPHER:  The time is
24 6:27 p.m. and we're back on the record.
25

Page 346

1  BY MR. GRONBORG:
2      Q.   In this case are you offering an
3  opinion about which results of the ExteNET trial
4  were important as of July 22, 2014?
5      A.   In this case I'm offering an
6  opinion about how the July 22, 2014, press
7  release of Puma regarding the ExteNET clinical
8  trial results fits in with press releases within
9  the pharma and biotech industry, as I've stated
10 many, many times.
11         Part of that is coming to
12 conclusions about the -- the validity of the
13 ExteNET clinical trial and the outcomes and the
14 meaning -- the interpretation of those outcomes
15 based on the reported disclosed clinical trial
16 results.
17     Q.   Are you offering an opinion in this
18 case regarding which of the clinical trial
19 results were important to anybody as of July 22,
20 2014?
21         MS. MURPHY:  Objection.  Asked and
22 answered.
23     A.   To the extent that they help inform
24 my opinion about the -- the July 22, 2014, press
25 release, yes.  But that is not an independent

Page 347

1  opinion being expressed here.  It is all part of
2  the -- all part of the opinion that I provide
3  about the -- the similarity of the July 22, 2014,
4  press release and how it comports with industry
5  pharma and biotech industry press release
6  reporting standards.
7      Q.   And as you use that term
8  "important," how is it different from the concept
9  of materiality?
10     A.   If I used the word -- I'm not quite
11 sure how I use the word "important."  But as I've
12 mentioned many times today, there are more
13 important and less important results of the
14 ExteNET clinical trial.
15         MS. MURPHY:  All right.  We're
16 going to stop --
17     Q.   And are there --
18         MS. MURPHY:  -- the deposition now.
19 It's been seven hours.  We've been here for a
20 very long day.  He's been available to answer all
21 of your questions.  We think you've had a full
22 and fair opportunity, so we're going to cut it
23 off now.  We request the opportunity to read and
24 sign his deposition.
25         MR. GRONBORG:  And as noted on the

Page 348

1  last break, we don't believe we've had the full
2  opportunity to ask all of the relevant questions
3  regarding the report, particularly given the
4  nonresponsive answers, the number of segues we've
5  had regarding opinions that are not identified in
6  the report and/or that subsequently we were told
7  were not actually opinions that were being
8  offered, or regarding documents that were also
9  not identified, as required in the report.
10         So we ask that we be provided with
11 an additional 75 minutes for questioning.
12         MS. MURPHY:  We disagree with your
13 characterization of what was taking time here,
14 and we're not willing to take more time.
15         MR. GRONBORG:  Okay.  Then we'll
16 take it up with the Court.
17         MS. MURPHY:  Okay.
18         THE VIDEOGRAPHER:  The time is
19 6:30 p.m., May 31, 2018.  We are going off the
20 record, completing today's videotaped session.
21         (Signature not having been waived,
22 the deposition of GREGORY K. FRYKMAN, M.D. was
23 concluded at 6:27 p.m.)
24
25

Page 345..348

Case 8:15-cv-00865-AG-SHK  Document 400-5  Filed 07/24/18  Page 89 of 143  Page ID #:13537

Confidential

Gregory Frykman, M.D.

Hsingching Hsu vs. Puma Biotechnology, Inc., et al.

**Page 349**

```
 1          CERTIFICATE OF SHORTHAND REPORTER
 2      I, AMY E. SIKORA-TRAPP, RPR, CRR, CLR, and
 3  Notary Public in and for the District of
 4  Columbia, hereby certify that the foregoing
 5  deposition of GREGORY K. FRYKMAN, M.D. was taken
 6  before me on the 31st day of May, 2018.
 7      That the said witness was duly sworn before
 8  the commencement of the testimony; that the said
 9  testimony was taken stenographically by me and
10  then transcribed.
11      I further certify that I am not kin to any
12  of the parties to this action nor am I interested
13  directly or indirectly in the matter in
14  controversy; nor am I in the employ of any of the
15  counsel in this action.
16      Further, that if the foregoing pertains to
17  the original transcript of a deposition in a federal
18  case, before completion of the proceedings, review of
19  the transcript [X] was [ ] was not requested.
20      IN WITNESS WHEREOF, I have hereunto set my
21  hand this 4th day of June, 2018.
22
23      _____
         AMY E. SIKORA-TRAPP, RPR, CRR, CLR
24              Notary Public
           in and for the District of Columbia
25  My Commission expires:  7/31/19
```

**Page 350**

```
 1      DECLARATION UNDER PENALTY OF PERJURY
 2  Case Name: Hsingching Hsu vs. Puma
                Biotechnology, Inc., et al.
 3  Date of Deposition: 05/31/2018
 4  Job No.: 10043275
 5
 6          I, GREGORY FRYKMAN, M.D., hereby certify
 7  under penalty of perjury under the laws of the State of
 8  _____ that the foregoing is true and correct.
 9          Executed this _____ day of
10  _____, 2018, at _____.
11
12
13              _____
14              GREGORY FRYKMAN, M.D.
15
16  NOTARIZATION (If Required)
17  State of _____
18  County of _____
19  Subscribed and sworn to (or affirmed) before me on
20  this _____ day of _____, 20__,
21  by_____,    proved to me on the
22  basis of satisfactory evidence to be the person
23  who appeared before me.
24  Signature: _____ (Seal)
25
```

**Page 351**

```
 1  DEPOSITION ERRATA SHEET
 2  Case Name: Hsingching Hsu vs. Puma
                Biotechnology, Inc., et al.
    Name of Witness: Gregory Frykman, M.D.
 3  Date of Deposition: 05/31/2018
    Job No.: 10043275
 4  Reason Codes:  1. To clarify the record.
                   2. To conform to the facts.
 5                 3. To correct transcription errors.
 6  Page _____ Line _____ Reason _____
 7  From _____ to _____
 8  Page _____ Line _____ Reason _____
 9  From _____ to _____
10  Page _____ Line _____ Reason _____
11  From _____ to _____
12  Page _____ Line _____ Reason _____
13  From _____ to _____
14  Page _____ Line _____ Reason _____
15  From _____ to _____
16  Page _____ Line _____ Reason _____
17  From _____ to _____
18  Page _____ Line _____ Reason _____
19  From _____ to _____
20  Page _____ Line _____ Reason _____
21  From _____ to _____
22  Page _____ Line _____ Reason _____
23  From _____ to _____
24  Page _____ Line _____ Reason _____
25  From _____ to _____
```

**Page 352**

```
 1  DEPOSITION ERRATA SHEET
 2  Page _____ Line _____ Reason _____
 3  From _____ to _____
 4  Page _____ Line _____ Reason _____
 5  From _____ to _____
 6  Page _____ Line _____ Reason _____
 7  From _____ to _____
 8  Page _____ Line _____ Reason _____
 9  From _____ to _____
10  Page _____ Line _____ Reason _____
11  From _____ to _____
12  Page _____ Line _____ Reason _____
13  From _____ to _____
14  Page _____ Line _____ Reason _____
15  From _____ to _____
16  Page _____ Line _____ Reason _____
17  From _____ to _____
18  Page _____ Line _____ Reason _____
19  From _____ to _____
20  Page _____ Line _____ Reason _____
21  From _____ to _____
22  _____ Subject to the above changes, I certify that the
            transcript is true and correct
23  _____ No changes have been made. I certify that the
            transcript  is true and correct.
24
            _____
25              GREGORY FRYKMAN, M.D.
```

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 90 of 143   Page ID #:13538

Confidential

Gregory Frykman, M.D.                                    Hsingching Hsu vs. Puma
                                                        Biotechnology, Inc., et al.

**Exhibits**

**ALL COMBINED**

**EX 608 - FRYKMAN, G** 5:10 11:6,7,11 47:4

**EX 609 - FRYKMAN, G** 5:12 33:25 34:1,6

**EX 610 - FRYKMAN, G** 5:15 42:11,12 197:11

**EX 611 - FRYKMAN, G** 5:16 45:10,11,15

**$**

**$450,000** 41:24

**$565** 34:22 35:2,10

**0**

**0.66** 318:19

**0.67** 82:15 239:16 318:18 333:25

**1**

**1** 54:19 121:4 159:15 162:1 218:18 224:13 242:10 249:24

**10** 89:9 109:11 110:13 137:7 152:3 181:8 187:5 222:13 300:4 306:23 307:11

**10,000** 187:16

**10-K** 163:8,14

**10-ks** 164:8

**10-minute** 125:18

**10-year** 188:24

**100** 180:5 181:22 182:3 189:14 216:10,11

**10:21** 63:17

**10:34** 63:20

**11** 11:12 12:15 13:6, 10 34:13,19 103:7 105:15

**11:19** 100:12

**11:32** 100:15

**11th** 6:21

**12:32** 152:19

**12:35** 152:18

**13** 110:14 202:13 273:25 313:8

**13F** 270:2

**13s** 273:17 274:24 275:4

**14** 33:20 97:1 273:23, 25 313:20 314:2 316:1

**14-'15** 24:16

**14s** 273:17 274:24 275:4

**15** 54:23 158:24 181:25 184:5,7 190:7 199:8,9 215:8 254:6 260:22 261:6 263:2,3 300:1,4 314:16 315:1,11,13 335:11

**16** 38:18 202:10,11

**17** 202:12 254:6 319:10

**18** 190:15 304:20 305:3 319:10

**19** 193:13 317:5,17 323:6

**1933** 146:25

**1992** 43:12,14,15

**1993** 43:15

**1995** 43:12,15 44:5

**1:21** 153:2

**1:24** 153:7

**1:38** 165:15

**1:39** 165:18

**1A** 218:18 219:3

**1B** 218:19

**2**

**2** 37:12,19 38:6,9 54:19 93:21 94:14, 21 180:15 191:14,18 199:2,3 229:9 250:6, 11 251:10 255:2 269:8 282:5 283:20 292:8

**20** 109:12 182:1 202:12,15 203:2,5 208:8 261:20 276:15,18 277:6,17

**200** 175:11 216:10

**2000** 44:5 46:5 72:13 253:16 279:2 299:4

**2001** 89:9 262:1

**2002** 19:15,24 20:6,8 46:6 59:15 124:16 125:10 253:12,17 254:15

**2003** 116:1 199:11,14 216:4,13,15,21 217:4,14 219:14,21 220:12 221:3,14

**222:14 252:21**

**2004** 59:21 113:23

**2004-ish** 106:5

**2005-ish** 106:5 262:1

**2009** 19:25 59:15 69:3 113:23 114:4 116:24 125:5 250:15 251:13

**2010** 112:13

**2010-ish** 106:6

**2011** 112:13

**2012** 202:12,13 306:17 313:8

**2013** 124:20

**2014** 33:20 79:14 80:15 82:14 93:2,15, 25 94:3,11,20 96:9 98:16,19 99:6,12,20 100:2 101:10,14,16, 21,24 102:6,12,19 103:21 104:18 112:5 140:4 141:4 150:22 159:13,15 160:7 161:5 162:1,6,11,23, 25 203:11 224:18 228:5,22 229:22 230:18 231:24 232:12 233:25 234:6,11 235:22 237:2 242:14 245:17 246:2,14 247:3,16, 20,25 248:11 252:2 263:19 264:7 269:9, 14 270:12 271:6,18 272:5,16,20 274:1 275:12,18,21 276:1, 9 277:7 279:9,23 280:23 281:5 282:9, 21 283:3,12,16,22 290:24 291:8 293:17 294:5 295:2 300:20

318:19,25 320:1,7, 22 321:1 324:16 325:20 326:17 328:8 329:23 330:3 334:7, 19 337:5 338:22 339:4 340:24 341:9, 14 342:8,23 343:12 344:7,15 346:4,6,20, 24 347:3

**2014-2015** 24:17

**2015** 142:22 159:15 162:1 163:8 164:18 165:2 203:5 216:4 264:7 266:15 303:11,19 344:7

**2016** 24:14

**2018** 6:3 11:12 12:15 13:6,10 34:13,19 103:7 105:16 199:12 216:21 217:4,14 219:14,22 220:12 221:3,14 222:14 254:4,8 348:19

**20816** 8:16

**21** 324:20 326:5

**22** 33:20 79:14 80:14 82:14 93:15,25 94:3, 11 96:9 98:16,18 99:6,12,20,25 100:1 101:10,14,16,21,24 102:6,11,19 112:5 140:4 141:4 150:22 159:12 160:7 161:4 162:6,11,23,25 191:15 192:11 224:18 228:4,22 229:21 230:17 231:24 232:12 233:25 234:6,11 235:22 237:2 242:14 245:17 246:2,14 247:2,16,20,25

248:11 252:2 269:9, 14 273:23 274:1 275:12 279:2,9,23 280:23 281:5 282:9, 20 283:2,12,16,22 290:24 291:8 293:16 294:5 295:2 299:3 300:20 318:18,25 320:22 321:1 324:16 325:20 326:16 329:23 330:3,17 334:7,19 337:5 338:22 339:4 340:24 341:9 346:4,6,19,24 347:3

**23** 159:15 162:1 202:23 203:4,8,9 334:24

**25** 175:10 208:8 261:19

**28** 81:19 84:11

**285** 34:16

**28th** 168:15

**29** 203:11 336:25

**2:40** 215:1

────────

**3**

**3** 12:4 27:4,7,15 30:9 37:20 40:14 42:8 86:13 105:20 106:12 107:5,11,22 159:2,4 161:23 180:15 199:2 200:16,19 215:4 219:11,17,25 220:5, 7 221:1 222:16 223:19 249:21 250:3,6,11 251:11 255:5 257:2 259:23, 24 260:19 261:5,10 262:5 285:10 286:14 287:14 298:21 340:2

**30** 182:1 203:10,12 276:15 277:6,17 337:1

**300** 6:7 45:8 216:10, 12

**31** 6:2 348:19

**34** 146:25

**35** 208:5 216:3 217:10 222:8

**39.9** 106:16

────────

**4**

**4** 27:7,11 86:13 247:1 262:5,8 282:4 297:17

**4/11/18** 11:8

**40** 207:24 215:10 216:3 222:8,13

**45** 216:3 217:10

**4:05** 269:1

**4:33** 269:4

────────

**5**

**5** 42:9 86:13 161:23

**50** 34:21 45:7 180:4 181:22 182:3 207:24 215:10 216:3 255:18 256:5,11 257:6

**500** 216:8,16 217:11

**500's** 217:12

**508** 263:1

**5206** 8:15

**555** 6:20

**565** 35:13

**570** 35:13

**5:33** 317:12

**5:44** 317:15

────────

**6**

**6** 86:13

**60** 208:5 223:23

**600** 6:6

**608** 11:6,7,11 47:4

**609** 33:25 34:1,6

**610** 42:11,12 197:9, 11

**611** 45:10,11,15

**66** 85:7

**6:19** 345:21

**6:27** 345:24 348:23

**6:30** 348:19

────────

**7**

**7** 112:9 197:14 342:9

**70** 223:23

**75** 180:4 181:22 182:3 348:11

**76** 11:8

────────

**8**

**8-K** 159:12 163:1

**80s** 181:12

**8:15-cv-00865** 6:18

────────

**9**

**90** 258:17,18

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 92 of 143   Page ID
#:13540
Confidential
Gregory Frykman, M.D.
Hsingching Hsu vs. Puma
Biotechnology, Inc., et al.

**90s** 181:12

**99** 72:13

**9:08** 6:2

---

**A**

**A-l-i-m-t-a** 38:17

**A-s-e-n-t** 125:16

**a.m.** 6:2 63:17,20
100:12,15

**ability** 53:3 252:8,13

**able** 75:9 95:3 133:2
152:12 163:16
167:13 230:10
246:17 302:24
307:10 325:7 327:14
333:1 340:9

**absolute** 261:16
286:24

**absolutely** 72:18
116:9 171:25 180:18
226:23 227:2 328:19

**abstract** 48:12
196:10,13,18,24
197:15 240:9,14,21
241:2,11,18,24
263:1 264:21,22
266:9,12 268:1,7,12

**abstracts** 174:25
195:16,23,24,25
196:2,22 240:18
264:17 268:8

**academic** 85:9 87:4
130:8,24 171:14

**Academy** 43:7

**accelerated** 50:19

**accept** 267:13

**accepted** 284:20
285:2,13 286:23

**287:11** 289:4

**access** 33:2 75:19

**accessed** 166:11
178:15

**accessing** 174:22

**accommodate** 10:5

**accompanies** 286:20

**accompanying** 94:4
209:7,14 210:19
211:23 212:11,23
213:3 214:19 229:15
246:23 281:15
282:9,14

**accomplishment**
331:15

**account** 86:19 107:2
189:18

**accumulating** 97:22

**accuracy** 322:12,17

**accurate** 23:12 25:15
27:6 34:6 58:23
195:5 230:7 318:10
322:8 325:19

**accurately** 42:18
67:25 124:4 125:3,8
136:23 143:2 195:5
280:6,8 317:24
318:4 319:19 324:25
325:6

**Acker** 22:5

**acquire** 155:14

**acquired** 16:12 27:24
28:5 59:22 92:8

**acquirer** 28:6

**acquiring** 51:20

**acquisition** 31:19

**ACR** 94:21 97:9

**act** 135:2 146:25

**action** 104:14 105:3,4

**actionable** 137:20

**activities** 52:4 155:13
300:24

**activity** 23:13 101:6
327:12

**actual** 38:3 75:16
191:3 295:15

**acute** 303:6

**add** 12:18 51:16
77:10 205:3,4

**added** 12:14

**addition** 141:23

**additional** 77:7 79:6,
25 80:18 102:5
108:8 144:25 151:14
180:13 201:9 204:17
205:6 213:8,22
235:10 252:4 302:25
311:24 312:7 313:13
326:8 348:11

**Additionally** 288:24

**address** 8:14 202:19

**addressed** 295:4

**adhere** 265:24 266:6

**adjuvant** 238:16
327:8 330:23 331:14
332:5,12,17,25
333:6,11 334:4

**administer** 8:3

**Administration** 17:21
45:2 113:21 333:19

**administrative** 31:13

**administratively**
47:22 49:25

**adverse** 98:8

**advertising** 52:1,5
158:17,23

**advice** 68:9 69:25
72:4 267:17

**advise** 76:21

**advised** 170:14

**advising** 55:4,10

**advisory** 71:4 88:23,
24 116:2

**AE** 240:6

**affect** 237:6

**afterward** 306:6

**agencies** 183:8 287:4

**agency** 53:8 156:6,18
158:5 159:18 183:7
284:12

**agents** 18:4 103:11

**ago** 31:15 38:18
54:23 71:17 83:9
106:3 122:13 125:15
138:3,14,15 158:24
254:7 261:20

**agree** 6:24 228:2
245:21

**agreed** 26:19 34:25

**agreement** 23:20
24:3 29:3 31:1 78:16

**ah** 93:20 181:25
216:15 271:20

**ahead** 24:1 96:1
235:18 245:22
262:17 267:1 317:10
325:13

**aid** 119:3

**aids** 119:4

**akin** 232:22

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 93 of 143   Page ID
#:13541

Gregory Frykman, M.D.

Confidential

Hsingching Hsu vs. Puma
Biotechnology, Inc., et al.

al 6:14

Alan 61:12,16,21
114:8,16 225:13,16
230:17 231:22
276:17 321:25

albeit 84:20 174:22
218:19

Alexandra 7:21

Alimta 38:17

allegations 146:10

Allen 56:12 67:11

allowing 50:4

Alternatively 303:2

aluminosilicate
121:15 125:20

Alvin 321:21

amend 12:18

amended 12:14

American 46:24
125:16 155:6,7

amount 110:23,24
111:1 302:7,16

amy 6:5 8:8

analyses 288:14

analysis 70:22 75:15
91:17,21 92:15
194:15 233:7,12
245:16 246:1,3,13
247:2,6 248:17,18
328:11 335:7

analyst 59:16 61:14
70:13 72:15,16,21
74:2 76:5 94:4 115:5
127:4 242:23 246:23
248:6 282:10,15
333:20

analysts 20:18,23

36:18 77:14,17
78:24 79:3 127:20,
25 132:24 205:10,18
225:15 235:13
254:23 323:15

analyze 78:22 97:25
184:3 242:7,13,21
339:20

analyzed 85:19 92:9
129:12,15 288:20

analyzing 32:15

and/or 348:6

Andy 22:5

animal 48:3,6,14
119:19

animals 48:15

announce 57:21
69:19

announced 37:9
58:19 71:11 204:24
278:9 309:8 328:8

announcement
160:11,12 225:6
248:7 303:23 304:3,
12,14,15,21,24
305:4,10,19 306:4
308:23 311:18
316:13 337:6

announcements
224:18,23 225:10,19
242:14,17 245:17
246:1 309:16

annual 116:5 117:15
175:2 266:10

annually 127:11

answer 21:16 22:9,11
23:10,22 24:1,22,23
26:21 27:19 36:17
41:22 50:11 56:3
59:13 62:14 70:9

76:11 79:11 81:1
108:3 115:4 128:21
189:9 199:6 220:24
222:4 223:5 235:9
237:4 248:12 256:7,
16 259:11,17,21
265:1 276:6 280:5,7
281:11 315:7 335:15
343:8 347:20

answered 76:10
80:23,24 90:1 108:2
212:18 214:5 306:13
307:19 346:22

answers 9:1,4 132:18
348:4

antagonist 99:17

antecedent 102:3
103:13 204:8 286:5

anthracyclines 197:3

anticancer 18:4

anticipated 79:9
159:20 252:10

Antoinio 265:7

Antonio 264:24

anybody 25:25 27:2
83:3 253:20 254:19
346:19

anybody's 132:4

apart 114:11

appear 11:11 42:15
177:15 324:9

appearance 245:9

appeared 26:18 84:7
136:23

appearing 7:25

appears 245:3 246:7

application 37:18,19
50:21 89:11,13

142:21 272:11
278:12,25 286:17
320:13

applications 50:3,4,
10 124:12

applied 19:18

apply 154:7 260:21

apprised 120:21

approach 55:15

appropriate 25:14

appropriately 49:21

approvability 218:23

approval 36:7 37:12
39:3 49:23 50:19,20
71:3 87:23 106:7
121:2 219:7 243:15
272:11 286:17
344:23

approve 26:12 38:5
261:22

approved 39:6 54:14
89:13 106:8 107:8,
14 149:11 150:12
193:1 325:8

approving 57:4 64:24
68:17,18 116:15
117:20

approximate 18:18

approximately 34:10,
12 35:11 42:6 45:21
104:24 125:18
193:16 199:12
217:11

approximation 46:25

April 11:12 12:15
13:6,10 34:13,19
103:7 105:15

Aptus 6:3,6

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 94 of 143   Page ID
#:13542
Gregory Frykman, M.D.                Confidential          Hsingching Hsu vs. Puma
                                                            Biotechnology, Inc., et al.

**arbitration** 30:5
146:1,4,7

**archive** 178:8

**archived** 182:24
183:24

**area** 36:9 62:19 68:7
285:5

**areas** 315:15

**argue** 331:8

**arithmetic** 302:21

**arm** 92:7 325:10

**arms** 85:25 86:21

**arose** 25:6 48:8 60:23
61:16 96:24

**Arqul** 336:5

**Arqule** 202:10,11

**array** 186:15

**arrested** 146:17

**art** 205:4

**article** 85:9 87:14
124:20 126:5 198:12

**articles** 19:23 87:7
166:1 171:14
197:19,20 198:1,6,
16,17

**articulate** 227:6

**articulated** 229:7
331:24

**articulating** 118:13

**ascertain** 322:17

**ASCO** 83:14 155:5
174:18,20,21 175:2,
6,13 177:10,18
195:20 196:25
197:17 240:9,14,18,
19,25 241:6,15,22
262:3 263:18 264:11

265:19,24 266:5,10,
16 267:1,9,13,16,22
268:1,9,12 320:15

**ASCO'S** 262:10
264:6,23 267:5

**ASENT** 125:15

**asked** 9:20 11:20
22:22 36:23 37:1
39:18 59:10 60:13,
21 61:6 63:10 71:24
80:22 117:23 119:7
120:1 126:23 129:16
157:1 161:19,20
167:3,9 214:4
224:16 225:5,9
237:3,23 242:7,13
244:21,23 250:4
267:16 287:9 306:7,
12 307:21 308:3
328:21,22 346:21

**asking** 27:25 40:5
79:6 147:13 227:23
229:19 244:1,4
246:19 256:9 259:14
263:7 276:4 280:11
341:12 345:4,15

**aspect** 211:17 213:19
340:8

**aspects** 213:8 235:12
340:11,15,23

**assess** 65:23 66:4

**assessment** 204:23
230:12

**asset** 149:9

**assignment** 224:13
242:6

**assist** 32:16

**assisted** 31:4,7

**assistive** 31:18 133:6

**associated** 68:18
105:14 197:24
198:5,15 231:2,3
239:16 240:10
285:20,21 313:15

**assume** 54:1 66:12,
14 164:12,15 322:6

**assuming** 121:9
319:23,25

**assumption** 231:19

**assurance** 46:23

**attempt** 173:14
174:21

**attend** 157:14

**attended** 265:9

**attention** 73:10 78:20
290:12

**attitude** 37:17 230:9

**attorney** 109:19
111:7 150:5 152:13
338:15 339:24

**attorney-client**
180:20 232:24

**attorneys** 24:25 97:5
178:16 180:2 185:9
186:20 281:23
310:7,10

**attribute** 211:18

**attributed** 213:21
235:14

**atypical** 214:22

**audience** 73:19,23
137:1 157:17 211:18

**audio** 6:22

**Auerbach** 61:13,21
62:21 63:1 225:13
226:5 230:17 231:22
276:17 331:12

**Auerbach's** 168:10
330:20 333:4,9
334:2

**author** 72:20 74:14
124:17,20

**authored** 72:22 74:2
75:6 124:5

**authorities** 219:8
286:18

**authority** 86:25
157:11 158:2

**available** 33:4 70:24
73:1 172:23,25
174:21 175:18,21
190:23 194:7 201:9
210:6 230:15 243:8
273:22,25 275:16,19
278:1 286:10 324:5,
6 347:20

**Avastin** 252:19

**Aveo** 190:14,15,19,
20,21

**average** 105:19
301:24 302:6
305:18,24 306:8,15

**award** 132:21

**aware** 96:14,15,22
97:3 133:13 134:12
135:14,18,20,22
153:19 171:13
185:14 272:24
290:11

**awful** 36:13 45:22
150:15 288:25

**awfully** 221:23

**B**

**back** 16:19 28:6
33:14 38:18 47:2

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 95 of 143   Page ID #:13543

Gregory Frykman, M.D.

Confidential

Hsingching Hsu vs. Puma Biotechnology, Inc., et al.

62:21 63:20 85:14 87:17 89:19 99:4 100:15 105:2 118:3 129:15 140:13 153:7 158:24 159:9 165:18 191:14 208:24 212:3 215:4 224:12 241:14 250:23 253:16 269:4 275:16,17 281:22 293:3 298:4,19 303:7 315:4,6 316:15 317:15 340:21 343:1 345:24

**background** 69:21 70:21 125:19 206:6 252:7

**bad** 185:4

**BAKASHI** 7:6

**Bakshi** 7:7

**balance** 206:14

**balancing** 135:2,3

**bankers** 60:7,21,24 67:2,21 68:2,15 308:2,7

**banking** 60:1,3,9,14 67:16 130:19

**base** 127:10 205:25 274:8 319:18

**based** 21:4 37:19 50:7 76:19 79:23 100:24 114:20 134:20 140:20,22 142:7 228:9,24 264:12,14 309:7 319:1,21 325:21 330:12 338:14 346:15

**basically** 114:14 120:25

**basics** 16:24

**basing** 70:23

**basis** 10:1 12:11 35:9 37:12 38:6 39:25 109:6 130:17 140:8 157:20 252:13 253:1 261:22 272:10 278:11,24 279:5,25 280:15 281:1,8 302:17 321:16 326:21 329:3 337:16,22 338:1

**bear** 209:16,17 218:6, 22 258:19 260:18 271:8

**beared** 173:16

**bearing** 82:11,21 83:25 84:14

**beginning** 336:6

**begins** 6:9 12:4 190:7

**behalf** 6:12 7:4,8,10, 13,20,22,25 10:21 59:3,6 61:7 62:12 89:10 112:20 119:2

**belief** 50:8 101:18,22 143:9 198:14 209:24

**believe** 10:16 15:23 16:16 18:19 19:3,8 20:6 22:3,10 29:1 37:10,17 50:17 81:15 82:20 92:18 109:25 140:11 145:16 152:2 153:14 154:16 157:25 159:24 161:10 162:17 163:3 167:10 170:16 174:2 181:15 228:10 230:6 234:15 238:3 254:16,19 263:9 266:8,14 271:24 275:1 276:17 279:22 280:17 288:17 289:3 305:23

308:11,13 313:1 320:17 321:24 322:9 326:23 327:3 329:15 335:12 338:13,14 348:1

**believed** 172:13

**believes** 242:2

**benefit** 330:22 331:11,13,25 332:5, 11,16,24 333:5,11, 21,22,25 334:3

**benefit's** 331:9

**best** 12:9,13 21:4 131:13,24 141:12 153:21 165:10,23 171:12 177:8,14 201:5 223:1 256:25 290:21 334:14

**bet** 105:13

**Bethesda** 8:16

**better** 77:8 83:3 86:4 114:10 132:19 151:10 345:18

**better-known** 73:20

**bevacizumab** 252:20

**beyond** 30:23 57:22 77:13 79:25 94:9 109:1 147:2,25 148:7 154:16 171:12 182:16 246:21 280:24 281:6 289:20 292:4 293:25 311:20 327:15 329:11

**big** 219:3

**billable** 34:22

**bio** 201:18

**biologics** 118:10

**biomedical** 173:1

**biopharmaceutical** 154:8 185:22 186:22 187:6 199:17 217:2 219:22 315:14

**biosimilars** 118:11, 14

**biostatistician** 85:21

**biostatistics** 16:21

**biostats** 16:24

**biotech** 20:19 73:23, 24 78:1,4,10 79:21 99:9 111:20 113:3 115:19 119:19,24 126:3 130:10 132:24 133:23 134:15 135:19 139:12 153:20 154:13 164:7 183:20 218:8 279:15 284:13 316:10 324:1 346:9 347:5

**biotechnologies** 145:5 303:15

**biotechnology** 6:13 13:18 14:16 19:20 57:15 59:4,9 60:2 61:25 62:11 63:24 64:5 65:3 66:19,24 67:6 68:24 69:4 70:6 80:15 99:7 112:24 135:9 153:16 183:13 188:11 189:3,13 199:19 201:19 216:6,12,18 219:23 222:16 224:17 242:17 253:7 254:14 255:8 256:17 257:14 258:13 285:1 297:21,24 298:8,9, 13,14 299:6,14,19, 23 300:6,18 301:6, 25 302:8 305:21 306:9,20 307:4,12

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 96 of 143   Page ID
#:13544

Gregory Frykman, M.D.

Confidential

Hsingching Hsu vs. Puma
Biotechnology, Inc., et al.

308:17,22 309:5
316:22 334:23 336:9

**bit** 79:12 139:23
151:13

**bizarre** 119:3

**Blair** 7:24 156:12

**blessing** 51:20

**Bloomberg** 77:23

**blue** 73:14

**board** 72:8,12 116:2

**boiled** 25:20

**book** 96:2 134:13
264:22

**booth** 158:15

**bottom** 47:6 262:5,7
326:5

**bounds** 152:2

**box** 77:24

**boy** 34:20 300:1

**branch** 158:11

**break** 9:25 10:2 62:17
87:10,12,16,17
100:8 152:14 153:11
214:13,23 251:3
265:16 317:7
345:18,19 348:1

**breaks** 9:25 41:6

**breast** 43:21 44:2,7,
10,17 71:19 124:11,
15 199:1 238:16
264:24 265:7,8
327:9 334:1,4

**brief** 108:20 274:17

**briefing** 90:4,8

**briefly** 163:9 164:21
270:6 277:13

**bring** 10:11

**bringing** 15:12

**broad** 46:4

**Broadly** 299:15

**Broadway** 6:7

**brokerages** 308:11

**brother** 124:23

**brought** 10:15

**browser** 170:4

**bullet** 161:9 167:12
326:5

**bullets** 46:19

**bunch** 203:24 305:6

**burn** 302:16,20,23

**Bus** 342:15

**business** 41:17 42:1,
4 70:17 73:7 117:2
161:5 205:20,23

**busy** 115:5 131:22

**buy** 133:4 258:5

---

**C**

---

**ca** 98:21

**caffeinated** 42:22

**calculated** 92:1,3
231:20

**calendar** 258:8

**California** 6:8,17
32:3,5 43:3 72:2

**call** 33:21 35:17,24
36:24 37:1 51:6 60:7
63:6,23 64:1,5,11,13
73:14 94:4,7,12,18
96:25 149:6 151:24
152:3 154:5 161:5,

13,17,21,25 162:7,
12,18,22 174:10
177:4,16 178:3
201:22,24 203:14,19
205:2 206:23 207:5,
11 208:2,8,10,11
212:22 213:3,10,24
214:18 222:18
223:22,24 225:2,3,6,
11,16,18,19,21,22,
23 226:1,5 229:16
234:2,9,14,17 235:4,
14,21,24 241:4
245:18 246:2,5,6,9,
12,15,23 247:3,7,16,
21,25 248:11,12
250:9,20,23 251:4,9
252:2,18,19 280:23
281:5,16 282:10,15,
21 283:9,12 284:11
286:20 288:14
290:18 309:17
312:17 313:7,8,10,
15 323:19 335:24

**called** 8:7 17:23
18:12 24:11 29:6
37:5 38:20 49:9
51:24 92:9 97:24
100:22 108:22
118:10,11 121:14,21
125:15 178:15
253:5,10 260:13

**calls** 36:1 49:11
71:22 96:25 132:6
151:1,8,17 152:11
178:12 204:11,18
205:2,12 206:13,18,
22 223:12,25 224:5,
8 232:24 247:8
248:4,6,14,22 249:3,
10 250:2,7 252:6,12
253:3 254:8,12
312:13,22

**campaigns** 52:5

**campus** 42:24

**canceled** 28:12,14
268:16

**canceling** 268:19

**cancellation** 23:5

**cancer** 17:19,21,23
29:14 43:21 44:2,7,
10,17,24 71:19
75:20 89:12 97:18
104:3 124:11,15
155:7 198:25 199:1
221:19 238:16
252:23 264:25
265:7,8 327:9 334:1,
4 335:18,19

**cancer-related** 70:19

**candidates** 220:6

**Canterbury** 29:6,17,
19 30:1,22 31:1,3
32:7 34:25 96:12
117:6

**capacity** 22:23 117:9
131:21

**capital** 14:2 19:15
35:16,23 42:7 51:25
59:14 75:22 77:23
90:24 109:21 126:13
131:17 132:7
187:18,21 189:14,19
204:10,12 298:2
301:9,15 303:1,4,9,
22 304:11,17,24
305:8,11,21 306:11
323:12 341:4

**capitalized** 218:20

**Capitol** 119:4

**captured** 183:20

**carcinogenicity**
159:20

Confidential

Gregory Frykman, M.D.

Hsingching Hsu vs. Puma
Biotechnology, Inc., et al.

**care** 32:13 44:3,11 87:1 335:24

**cared** 127:13

**career** 57:8 59:2 64:8, 20 66:17 70:16 71:13

**careful** 26:11 83:4 155:20 264:19 341:5

**carefully** 78:22

**carried** 333:19

**carry** 49:21

**case** 6:15,17 10:17 11:20,24 13:14 14:10 15:11,17 22:17 28:25 30:5,20, 21 31:21 32:4 33:1 35:9 37:21 39:6 40:8 48:17 61:10 79:13 81:9 87:20 88:22 89:20 93:5 98:17 99:2,24 100:3,20,22 101:11 112:3 115:15 118:25 125:24 133:21 144:13,18 145:10,16 150:16 161:23 164:12 172:9,17 174:7 186:24 199:3 201:6, 10 206:17 215:18,20 221:25 223:17 226:24 227:23 231:21 236:7 243:16 244:9,23 245:6 257:20 260:20 266:13 267:4,8 270:22 275:10,18 279:13,21 282:17,19 285:25 298:22 299:1,11 303:10 312:4 322:19 328:3, 15 331:12 333:24 334:6,13,15,19

340:13 344:25 345:10,16 346:2,5, 18

**case-by-case** 109:6

**cases** 53:12,17 60:13 71:6,10 76:22 119:12 151:13 166:24,25 167:19 174:25 175:1 184:20 188:5 191:4,10,22 286:10 293:5 296:8 310:6

**cash** 301:19 302:15, 16,19,22 303:4

**catch** 270:22

**category** 20:21

**causing** 335:21

**caution** 180:16 264:20 281:21

**caveat** 183:18

**Cedar** 124:25

**Cel** 202:24

**Celgene** 202:12,14, 23 336:5

**Central** 6:16

**CEO** 140:14 141:18

**certain** 48:13 185:11 193:12 204:16 212:20 235:13 262:19 312:25 335:1

**certainly** 15:21 20:8 21:17 22:25 41:5 44:2 62:1 67:1 69:13 74:20 77:6 80:6 84:1 88:1,6 96:2 98:24 104:24 109:19 129:24 130:2 131:17 140:15 141:17,20 142:18 149:5 150:6

171:10 173:25 174:6,25 190:16 192:6 203:23 204:4 216:9 227:6,21 230:8 232:21 233:20 244:15 246:17 249:15 250:7 252:24,25 253:21,25 254:2 271:13 276:22 286:9 287:25 289:19 294:10 299:10 328:2 329:1 338:14 343:24

**certainty** 277:9 305:2

**certified** 72:8

**cesium** 121:23

**cessation** 329:7

**Cetuximab** 252:23

**CFO** 142:11

**change** 81:5 203:25 264:3 344:6

**changed** 81:5 83:9 97:15 253:18,20

**changes** 253:19 264:6 308:4

**characteristics** 288:6

**characterization** 348:13

**charge** 35:1,4,5,7,8, 13 47:20,23 174:22

**charged** 146:18 156:6

**Charles** 56:8,17,20, 24 57:3 58:17 60:4 67:10

**chart** 190:7 199:7

**charts** 110:15

**check** 208:21

**chief** 141:18

**cholangiocarcinoma** 24:13

**choose** 192:11 195:25 201:2 286:12 335:4

**chose** 301:13

**chosen** 301:8 335:6

**chronic** 198:24

**circumstances** 109:9

**cited** 196:2

**claim** 30:7 85:22 87:1,5

**claiming** 13:15

**Claire** 321:20

**clarify** 50:12 71:20 100:18,21 113:5

**class** 7:5,8 98:4,7 103:11 105:12,18 107:8,13,24 197:3 200:20,22

**classes** 112:15

**classic** 252:18

**Clayton** 7:19

**clear** 26:25 50:24 243:25 251:19 321:5,6

**clearly** 182:25 183:3

**Cleveland** 117:11,21 118:1,6,13,16 119:1, 13 120:1

**client** 23:19 35:1 36:3 38:21 57:18 72:24 73:17 78:23 96:19 127:10 205:25 268:6

**clients** 20:1 35:2,16, 19 36:18 42:7 60:2 61:20 63:9 71:8 73:6

Index: care–clients

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 98 of 143   Page ID #:13546

Confidential

Gregory Frykman, M.D.

Hsingching Hsu vs. Puma Biotechnology, Inc., et al.

76:22 78:23 126:21 132:9 271:10,16 272:2 294:11 323:11

**clinic** 117:11,21 118:1,6,17 119:1,13 120:1 121:19

**Clinic's** 118:13

**clinical** 13:19 14:15 16:6 17:3,12,13,15 18:1,5,6,9,21 19:10, 18,21 20:4 21:2 22:20 23:6 24:8,10 25:17 26:1,10,12 27:20,25 28:20 29:14 30:9,13,17,18 36:5,14 38:25 39:7, 12,19 44:11 47:16, 17 48:13,20 51:3,8, 13 52:22 57:20 58:25 68:3 71:9 74:22,25 75:2,4,7,8, 10,13,18 76:4,19,21 77:2 78:19 79:22 83:5,18 86:7 87:9,11 99:19 100:2 104:2 105:17,19 106:20 108:15 109:12,23 110:7,16,19 111:3 112:1 120:19 121:2, 3 122:1,11 123:17 125:19 126:1 127:7, 17,22 128:2,14,19 129:9,22 131:7,16 132:1 133:11,16 134:19 135:4 136:22,24 137:22 138:9,24 139:4,5,11 140:16,19 141:19 143:6,11,12,22 144:7,13,22 145:4, 11,22 146:9,13 148:14,17,20 149:1, 7,10,24 152:6 154:14 155:19

157:6,18 158:3 162:8,13 170:24 171:4,19,21 172:12 175:18,21,24 176:3, 25 177:3,5,13,17,25 178:4,5,11 181:10, 11 184:16,20 185:18 187:8 188:12,25 189:4,6,16,23 191:23 192:3,8 195:1,6,8 196:7,15, 16,21,23 197:23 198:4,11 200:2,14 201:9,16 204:6,8,25 206:7,23 207:3,21 209:5,13 210:6,8,10, 14,18 211:4,11,15, 17,22 212:10,21 213:2,9,11,13,17,22 214:18 215:12,17, 21,25 216:20 217:3, 14 218:1,7,12 219:11,15,24 220:14,22 221:1,15, 17 222:9,17 223:9 226:11,12,21 227:20 229:1,2 233:6,11 234:16,17,22 235:13,16 237:8,11, 21,25 238:4,11 240:2 241:1,6,17 242:3,18 243:1,2,11, 22 245:6,12 248:7 249:4,11,19 250:10 251:11 252:20 254:12,18 255:10,22 256:19 257:3,18,23 258:24 259:2,6,22 260:23 261:5,10 266:25 268:8 270:15,22 282:12 283:25 284:14,15 285:6,8,10 286:4 287:2,15 288:3,12 289:8,14,25 290:9,

14,19 291:19,20 292:1,14 294:20,25 295:16,19,25 296:12 298:12 300:11 303:5,24 304:4,12 305:20 306:10,22 307:7,14 308:18 309:7 311:24 312:8 313:14 314:10 316:12,19,25 317:24 318:22 320:11,14 322:21 324:5 328:24 331:9 333:16,21,22, 25 334:20,22 335:8, 9,12 336:19 337:14 338:2 341:2 342:2 343:21 344:4,5,14 345:14 346:7,13,15, 18 347:14

**clinically** 44:9 158:2

**clinicaltrials.gov** 175:16 176:6,24 177:8

**clinician** 47:9,14,15, 24 49:14,20

**clinicians** 48:19 84:24

**clinics** 119:22

**close** 47:16 78:20 148:10,12 156:12 272:17

**closed** 301:17 311:20

**CME** 155:13

**cofounded** 120:7

**Colin** 321:20

**collapsed** 114:7

**colleagues** 73:4

**collected** 123:22

**colon** 198:25

**color** 205:4

**combination** 38:23

**come** 22:14,16 61:17, 20 67:18 79:24 81:22 87:17 95:7 102:8,15 103:4 114:19 124:19 129:15 132:5 133:23 145:4,23 185:11 229:20 242:24 253:24 255:20 267:23 277:15 343:19

**comes** 14:20 21:22 38:15 48:5 140:12 155:16 204:18 258:7 264:22

**comfortable** 321:25 322:22

**comfortably** 80:16 336:8,20

**comforting** 195:3

**coming** 98:22 102:11, 18 132:23,24 170:8 194:23 258:2 298:19 346:11

**command** 22:5

**commensurate** 337:6

**comment** 74:3,7 76:7 210:14 211:16 213:16

**commented** 76:12 80:7 290:8,18

**commenting** 77:1 273:19

**comments** 64:12,15 71:7 81:3 210:5 225:12 246:8 290:11 322:21

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 99 of 143   Page ID #:13547

Confidential

Gregory Frykman, M.D.

Hsingching Hsu vs. Puma Biotechnology, Inc., et al.

**Commission** 64:21, 25 156:10,21

**committee** 18:12 71:4

**committees** 88:23,24

**committing** 114:9

**common** 54:4 151:8 168:24 169:6 170:8 171:24 173:4 186:25 187:1,18 207:14,17 255:8,16 257:9,13 261:19,24 279:15 286:18 310:25 311:9

**commonly** 85:18,23 87:18 170:12 189:20 199:5 228:25 256:3 260:1,3 261:17 275:8 286:22 288:10,11 301:8 303:15 305:16

**commonplace** 60:6 97:18 98:10 170:20 207:9 213:8 249:22 284:20 285:3,13,16 286:15 287:8,11 289:5

**communicated** 31:9

**communications** 62:22 281:23

**community** 110:5,6 111:10,11 274:10,11

**companies** 13:18,19 14:17 16:9 18:20 19:10 20:16 21:10 22:19 30:16 47:9 50:8 51:1,5,11 52:6, 9 54:6,11 55:5,11 60:8 61:8 67:19 76:1 77:11 78:2,5,8,10 83:15 108:9,14 109:4,6,8,15 110:4

111:9 113:4,6,18 115:7 130:10,14 135:9 143:11 144:5 146:22 147:5,22 151:6 153:13,17,20, 21,23 154:8 155:2, 17,18,24 156:7,21 157:5 158:15,21 183:22 185:16,22 186:23 187:7 188:11 189:3,12,13 191:4 199:22,24 201:17 203:20 204:25 205:10 213:1 215:14,15,24 216:2, 6,12,17,18,19 217:2, 10,11,16 218:3,8,13, 20 219:16,23 220:13 221:2,21,23 222:1, 16 223:2,10 241:23 249:3,23 254:14 256:19 258:12 259:7,19 261:21 278:18 289:21 291:24 297:21,24 298:1,2,8,9,14,15,18 299:6,14,19,24 300:7,13,24 301:6, 25 302:9 303:22 304:10,17,23 305:8, 10,21 306:20 307:5, 12 308:17 309:14 310:3,18 312:13,17, 22 314:8,16,25 315:11,14,18,23 316:4,9,10,16,23 320:14 334:23 336:2,9

**companies'** 19:20 20:3 47:18 234:22 242:17 247:8

**company** 23:2,8,13, 16,18 24:18 25:8,9, 20 26:19 27:21,24

28:15,23 30:6,14 36:25 37:9 38:14 40:9 48:11 50:20 51:19 52:4,16 53:10, 22,24 55:15,20 56:1, 5,9,16,23 57:5,11,15 58:8,16 59:4,9,10 60:14,16,22,25 61:15,25 62:3,11,13 63:24 64:2,6 65:3, 15,19,22 66:3,9,19, 24 67:7,12 68:9,12, 25 69:5,18 70:6 71:12 77:21 84:19 108:6,19 111:5,9,15, 20 112:24,25 114:25 115:13 116:10,13 120:12,20 122:21 123:3,11 134:17 136:15 141:7 144:11,15 146:11 147:16,24 148:5,6 149:18,21 152:4 154:2,18 164:8 165:1 183:6,13 184:8,11 186:5,6 187:4,22 189:22 190:21,24 191:4,10, 23 192:20 199:17,19 200:3,8,11,13,18,23 201:1,2,6,10,20 202:4 205:23 207:10 209:4 210:17 211:22 212:9,20 214:1,16 215:7,16,20,23 216:24 219:3 220:20 242:2 243:1,3,24 250:10 254:25 255:21 257:21,25 265:24 266:5,23 267:21 268:9 274:20,22 276:1,18 285:7 286:7,11 288:16 290:16 291:21 302:18 306:9

308:21,22 309:5 311:23 312:6 313:13 318:23,24 319:4,9, 25 320:7,25 321:12, 24 322:7,13,18 329:19,23 338:18,20 339:11,13,20 340:4, 10

**company's** 63:2,6,11 69:8 72:17 74:4,15 76:7 77:2 115:22 137:5 143:2 148:15 149:8 161:25 163:1, 4,7 164:17 218:15 220:15 230:6 247:6 283:2 286:16 289:9 303:3 313:22 314:3

**comparable** 290:25 291:10,17 292:6

**comparables** 224:10

**comparative** 199:4

**comparators** 37:23

**compare** 107:5 197:22,23

**compared** 257:13 258:12 295:19 318:11

**comparing** 248:3

**comparison** 75:6 107:20 192:8 198:10 258:20 310:23

**Compensation** 34:2

**competing** 77:16 130:14 144:23

**competitive** 36:8 40:23 68:5 71:10 79:10 137:16 243:14 254:25

**competitor** 144:23

Gregory Frykman, M.D.

Confidential

Hsingching Hsu vs. Puma Biotechnology, Inc., et al.

**competitors** 134:23 144:20

**complaint** 81:16

**complete** 12:11 175:23 179:1,5 230:23

**completed** 122:8,10, 12 176:1 188:6

**completely** 143:21 174:20

**completing** 348:20

**complied** 156:24 337:4 338:18 339:10

**comply** 155:24 156:7 157:6

**comport** 69:16

**comporting** 199:4

**comports** 45:18 347:4

**comprehensive** 337:19

**comprehensively** 337:4,12,21,24 338:3

**comprises** 99:3 139:10 286:3

**computer** 179:12

**concept** 347:8

**concerned** 88:19 90:9 215:11 224:1

**concerning** 72:1

**concerns** 245:9

**conclude** 283:19

**concluded** 348:23

**concluding** 330:18

**conclusion** 79:24

80:9,11,14 81:25 96:7 102:8,15,18,25 103:5,18 152:11 163:17 164:1,6 194:24 229:20 252:1 327:23 330:12

**conclusions** 15:15 346:12

**Concordia** 24:7 25:3 27:24 57:18,24 58:2, 6 65:14,18,19,21 68:22 69:3,7,24 128:22 129:6,15 267:24 268:11

**concurrent** 37:23

**conduct** 123:17

**conducted** 46:21 123:19,20 303:11 318:10

**conducting** 46:20 309:15

**conference** 33:21 35:17,24 36:1,24 37:1 51:6 60:17,19 63:6,23 64:1,5,11,13 70:25 94:7,12,18 125:12,14 151:1,8, 17,23 152:3 156:1 161:13,17,25 162:7, 12,22 170:25 177:4, 16 178:3,12 188:1 195:16,23 196:19 201:8,22,24 203:14, 19 205:2,12 206:18, 21,23 207:5,11 208:2,10,11 212:22 213:2,9,24 214:18 222:18 223:12,22, 24,25 224:5,8 225:2, 3,6,11,18,19,21,22, 23,25 226:5 234:1,9, 14,17 235:4,21,24

245:18 246:2,5,6,9, 12,14 247:3,7,8,16, 21,25 248:4,6,12,14, 22 249:3,10 250:2,9, 23 251:9 252:2 254:8,11 255:13 256:21 257:5 258:3, 6 262:3 264:25 280:23 281:5,16 282:21 283:8,12 284:10 286:20 304:5 307:8,16 309:17 312:13,17,22 313:7, 8,9,15 324:10

**conferences** 154:25 155:8,22 157:14 158:7 196:21 265:4 285:9

**confidence** 230:23

**confident** 187:15

**confidential** 23:22 24:4 75:11 121:9,13 157:20

**confidentiality** 23:20 24:3 262:4,10,22 263:18,24 264:6,12, 24 265:8,10,13,25 266:6,17 267:2,6,10, 18

**confidently** 129:25 188:15 272:25 321:24

**confirm** 230:10 322:12

**confirmed** 194:17 195:2

**confronted** 231:17

**conjunction** 26:14 161:12,16 312:14

**connection** 222:18 223:12 312:18,23

313:7

**consider** 20:14 21:5, 8,20 27:15 60:9 84:4 95:13,23 118:19 159:13 161:15,24 162:22 163:1,7 164:16 193:24 195:23,25 198:3 201:14 203:14 204:14 207:20,21 215:25 221:4 236:10 239:3,9 245:11 256:5 262:19 311:15,23

**consideration** 111:19 212:13 213:20

**considered** 18:15 25:8 27:11 56:18 73:1 94:24 95:2,17, 20 103:17,18 149:20 158:17 159:23 160:8,15,20,25 161:4 165:21 167:15 168:4,19,23 172:21 174:18 175:16 178:12 184:6 186:10 191:15 197:13 215:8 223:25 226:22 227:1 232:15 236:5 248:24 262:13 263:15 265:6 270:4 292:19 294:24 297:5,13 309:25 319:12,14 330:14

**considering** 193:19 268:12

**constitute** 61:24

**constitutes** 67:4

**consult** 67:13 267:16

**consultant** 35:24 67:6 68:23 117:10

**consulted** 41:1 67:5 70:5 336:1

**consulting** 23:1,19 24:15 25:3 29:22 35:2 38:21 41:17 42:1,4 54:25 57:18 67:9 90:25 96:19 116:25 117:3,17 267:21 268:6

**consumed** 58:11

**Cont'd** 153:8

**contact** 52:16 67:20 148:1

**contacted** 29:11 33:15 60:8 96:11

**contain** 12:10 205:13 254:5 280:24

**contained** 75:16 178:18 232:7 277:23 279:9 281:5

**containing** 136:22

**contains** 75:13 175:23 178:2 204:21

**contemplated** 23:5 25:7 27:2,20 50:22 51:21 52:10 67:3 118:1 119:8 257:3 264:21 268:7

**contemplating** 57:19 118:12 119:1,7 267:25 268:18 308:2

**content** 146:21

**contents** 55:5,11 56:1 171:19

**context** 242:15 252:9

**continents** 25:22

**continue** 26:4 156:17

**continuing** 112:15

**contract** 29:4 30:7,25 146:11

**contractor** 117:17

**control** 37:21 86:1

**controlled** 91:2

**convened** 71:5

**conversation** 67:21

**convey** 291:21,25

**conveyance** 291:19 293:22

**conveyed** 242:14 292:1

**Cook** 31:25

**cookbooks** 171:14

**Cooley** 7:25

**copies** 51:2,6 87:25

**copy** 10:13 11:7,12 42:12,15 45:15 325:11 327:3

**corner** 174:11

**Cornerstone** 29:12 31:6,7,10 32:8,12

**corporate** 219:1

**Corporation** 202:13

**correct** 28:19 34:17 43:13,14,19 44:20, 21 47:5 49:4 53:11 56:25 59:7 65:4 81:10 89:18 103:3 114:5 116:4,8 117:1, 13 120:6 124:7,8 125:7 126:4 145:13 154:3 172:8 176:23 197:14 198:20 208:15 215:12 222:7 239:5,20 251:21 279:5 283:4,10 291:9,13,14 330:6, 24 331:3,5,6,8,18,21 332:2,9,14,20 333:4

334:5,8,17

**correction** 281:24 282:2 283:6,21 284:4

**correctly** 49:2 141:20 146:12 231:20 318:18 331:24 337:14

**Cougar** 61:15,16,21 62:21 63:1

**counsel** 6:24,25 8:10 10:24 11:2 21:16 23:11 29:4 32:16 33:9 121:12 153:9 179:2,6,25 200:10

**count** 67:16 92:3 149:15 193:15

**countries** 318:9

**country** 16:23 129:20 130:2 131:5 150:1 323:17

**counts** 82:24 83:2,4 96:2 146:1

**County** 43:18

**couple** 8:19 27:23 28:6,16 50:15 53:18 60:21 62:18 114:19 232:8

**course** 18:7 118:17, 21 127:14 128:12,16 136:3,7 160:25 165:22 170:18 188:8 193:2 204:9 274:19 336:17

**courses** 130:6 136:11

**court** 6:3,5,6,16 7:15 8:2,20 9:13 46:16 145:20,25 223:4,7 348:16

**cover** 11:16 205:10

**covered** 70:8

**covering** 61:14

**Cox** 92:18

**created** 176:13

**crime** 146:18

**criteria** 133:25 180:6, 9 185:17 207:24

**critical** 82:16 294:14

**CRO** 30:10,12

**CTEP** 17:24,25

**current** 8:14 45:16

**currently** 175:22

**cursorily** 184:22

**custom** 47:24

**customary** 13:17 16:8 18:19 19:9 20:15 21:9 22:18 30:16 63:12 84:22 336:8,11,21

**cut** 303:6 347:22

**cutoff** 34:9

**CV** 10:13,15,16 42:13,16 117:8 124:1 125:3

---

**D**

**D-d-m-a-c** 51:25

**D-o-x-i-l** 49:11

**D.C.** 6:21 61:18 70:13 125:14

**daily** 39:24 130:16

**Daniel** 6:3

**data** 40:18,20 47:17 48:5 76:20 84:22

Gregory Frykman, M.D.

91:22 94:19 97:21 101:6 103:13 104:2 105:25 110:7 111:16 144:14 168:19 187:24 188:3,13 192:23 199:4 230:15 232:9 240:8 254:24 255:12 256:21 268:20 285:8 286:3, 24 329:1,25

**database** 168:19 170:11 172:23 174:19 175:21 176:6 177:23 178:1,6,15 179:14,20 184:2 185:12 186:1 190:2, 10

**databases** 170:13 176:15 195:20

**date** 6:2 11:10 32:3 34:5,10 42:14,16 45:14 52:16 92:3 103:9,14 108:20 123:25 148:3 165:5 181:1,4 186:8 188:11,12 199:13 250:14 255:13 256:22 263:8 266:9 327:9

**day** 20:11 58:18 78:7 130:12 207:12,13 212:7 252:25 317:7 347:20

**days** 53:18 81:19 84:11 92:6 168:14, 16,17 232:13 304:19 306:2,4 310:20

**DDMAC** 51:25 52:10, 11,18 53:2,10,20,22 54:13,25 158:11

**deal** 219:3 294:8

**dealing** 206:14

**Debashish** 7:6

**decade** 71:17 72:7

**decent** 45:23 273:15

**decide** 108:7

**decided** 226:18,19

**decides** 154:18

**deciding** 251:23

**decision** 118:21 134:18 292:12 319:18

**decisions** 21:4 101:23

**deck** 67:24 97:13

**decks** 60:8 175:1

**declared** 288:15

**declined** 31:21

**deemed** 23:11 200:25 219:4 298:21

**deep** 77:19

**defendants** 6:14 7:10,13,20,22,25

**defined** 288:9

**definition** 229:12 337:19

**definitive** 75:3

**degree** 42:20

**delve** 79:5

**demand** 158:2,4

**demonstrated** 104:19 330:22 331:10,13 332:1,5,11,16,24 333:5,6,10 334:3

**denominator** 221:8,9, 10

**dependent** 189:14

298:2 302:14,19

**depending** 200:7 258:7

**depends** 14:18 36:2 37:25 259:12,21 285:4,5,6,15

**deponents** 167:22

**deposed** 8:17

**deposition** 6:10,19, 23 23:21 33:6 140:12 166:14 168:4,11,12 233:2 321:19 347:18,24 348:22

**depositions** 322:7, 14,19

**depression** 258:21

**derive** 287:7

**derived** 92:13 278:1 285:24

**describe** 110:15 134:6 154:23 191:23 226:12 230:5 235:11 247:23 260:16 285:11 287:13

**described** 12:6 26:6, 7 82:5 83:19 93:13, 14 94:19 101:20 106:10 151:11 197:17 287:12,18 317:25 319:19 325:6,16 337:14 338:3

**describes** 196:7 324:25

**describing** 23:13 224:18

**description** 25:15 45:16 46:7 49:1 108:20,21 232:3

325:5,14,19

**design** 26:15,20 27:17 48:4 62:7 175:24 200:22

**designation** 54:8,9

**designed** 26:13 28:1

**desire** 154:24

**detail** 17:10 33:12 90:3 95:10 110:23 164:20 234:13

**detailed** 268:3

**details** 75:13,15,16 79:6 158:24 268:22

**detection** 91:23 92:5

**determination** 111:5 148:23,25 194:20 195:8 204:3 226:16 290:15 295:17 312:6,12,16 313:11 322:2 333:18 339:25 340:7 341:3

**determine** 69:10 148:19 188:9 207:4 226:14 243:4 247:24 269:24 273:18 275:5,11 291:16 331:20 340:14

**determined** 34:23 341:22

**determines** 109:24

**determining** 38:3 135:16 136:8 226:21 267:13 295:5

**develop** 113:21 134:1 144:23 316:8 327:8

**developed** 19:6,17 37:5,6,8 38:18 100:25 101:3 120:16 121:20 124:10,14,15

Index: database–developed

Confidential

Gregory Frykman, M.D.

Hsingching Hsu vs. Puma Biotechnology, Inc., et al.

221:21

**developing** 38:22

**development** 16:4 18:3,5 35:18 39:1,3 40:9,21 47:18 48:8 52:21 54:19 61:4 68:3,6 70:19 98:4 99:15 100:24 104:2, 4 113:15,19 120:19, 21 121:4 125:20 137:14,18 159:21 164:9 206:8 218:16 220:5 243:12 252:10 254:24 257:18 287:3 298:5,20 300:24 301:20 303:7 327:16 333:16,17

**development-stage** 297:21,24 298:7,13 299:5,19,23 300:6, 12 301:5,25 302:8 305:20 306:9,20 307:4,12 308:16,22 309:5 314:15,25 315:10,13,18,23 316:3,9,22

**developmental** 127:2

**develops** 133:24

**device** 181:20,24

**DF** 343:20

**DFS** 82:20 83:1,24 84:11 85:12 86:4 87:2 88:5,11,15 89:23 90:10 231:4,7, 13,19 261:7,11,23 328:4 341:18 343:20

**DFS-IMPROVING** 326:10 327:5 328:15 329:4,20

**diagnosed** 71:24

**diarrhea** 105:7,14,20 106:12 107:3,5,6,11, 22 235:24 236:4,25 237:24 238:4,9

**dictionary** 337:19

**didactic** 109:20 341:5

**Diego** 6:7

**differ** 200:7

**difference** 112:23 153:19 154:4 233:5, 10 312:3

**differences** 335:16

**different** 14:14,19 15:6 18:4 46:11 50:19 109:10 119:19,24 144:5,6,9 151:17 152:7 154:23 157:19 182:9 196:17 198:25 199:1 206:1 207:8 211:16 215:15 268:6 276:6 298:8, 13,17 318:17 320:19 336:12 347:8

**differently** 109:7

**differs** 200:3

**difficult** 25:22 27:2 213:15 221:24 275:9 335:14

**dig** 53:18 243:3

**digested** 263:13

**direct** 18:8 81:14 142:21 191:3

**direction** 40:10 48:9 150:7

**directly** 53:21 68:12 95:14

**director** 46:5,11 123:23

**Directors** 46:11

**disagree** 348:12

**discipline** 130:8,24

**disciplines** 49:20

**disclose** 25:11,13 109:5 134:19,24 142:20 147:22 151:7 153:13 155:1,2 209:5 211:22 213:2, 17 214:1,17 235:10 255:10,25 256:19 266:24 285:18 298:24 310:18

**disclosed** 19:19 23:4 26:7 30:19 36:6 40:20 98:15 149:21 191:24 195:1 209:6, 12 211:10 212:10,21 213:3 221:16 228:4 229:21 233:24 234:5 237:13,20 238:1 257:24 270:16 273:14 290:15 293:2,8 310:14 313:13 322:2,4 324:8 338:22 339:14,21 340:10 346:15

**disclosing** 30:16 55:21 154:21 211:15 218:21 219:2 257:1 306:22 307:6,14 337:7 339:11

**disclosure** 56:2 76:7 79:22 96:7,8 99:5 126:1,7 127:6,16 128:1,14,18 129:21 130:9 131:6 132:1 133:10,15 134:7 136:15 137:21 145:21 147:1 150:24,25 151:16,25

152:6,8 153:15,22 154:6 155:24 156:20,24 171:4 184:19 187:3,7,24 188:4,6 189:1,5,17 200:2 201:16,21 204:5 211:3 217:7 229:9 249:4 254:18 269:9 282:11 283:24 285:12 286:4 287:20 290:9,19 298:12 299:17 300:19 310:24 316:25 342:1

**disclosures** 55:6,11 63:12 66:11 69:14 72:17 74:4,15 93:22, 25 94:3,6,13 98:18 99:11 101:12,23 102:12,20 104:17 112:5 114:24 115:12,23 135:10 146:22 151:18 154:7,15 156:7 157:5 184:9,12 189:22 195:4 202:5 215:7 233:25 269:21,23 282:8,20 283:1,7,15,22 284:21 285:3,13 289:5 290:25 291:7, 13,16 292:13,24 293:14 294:3,22 298:7

**discovery** 114:8

**discrete** 20:10 210:5 240:6,7

**discuss** 41:7 101:17 127:20 162:8 182:23 210:17 228:15 245:16,25 246:13 247:2,6 264:20 335:1,3,4

**discussed** 58:6 68:15

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 104 of 143   Page ID #:13552

Confidential

Gregory Frykman, M.D.

Hsingching Hsu vs. Puma Biotechnology, Inc., et al.

83:11,12 88:25 126:11 162:13 197:25 198:6,16 213:9 231:18 234:1, 9,12,13,16 235:3,23 253:25 296:1 320:15 343:15,25

discusses 52:22,23, 24 191:6 247:12

discussing 250:10

discussion 18:16 29:7 43:9 52:19,20 62:2 65:9 88:10,15, 16 89:22 94:4 123:9 125:22 157:22,23 159:17 165:11 186:5 225:23 229:16 237:17 238:17 246:23 247:14,18 250:24 258:4 268:7 281:15 282:10,14 284:11 288:13 310:10 324:8 342:2

discussions 60:24 310:7

disease 38:1 91:24 92:5 121:21 200:20 213:19 260:9 288:5 335:23

disease-free 81:18 82:9,15 85:16 91:14, 15 178:20 260:10

diseases 120:18

disputed 229:25 230:1

disseminated 151:24

distinct 113:10

distinction 113:2 119:20 299:10 323:18

distinctions 113:14, 17

District 6:16,17

divergent 196:14

divided 221:22

division 6:17 52:1

doc 135:21

Doctor 215:6 269:6

document 31:19 34:1 45:11 46:1 90:5,8 95:19 169:1,4 172:5 232:5,7 239:22 277:23 284:23 319:11,13

documents 10:11 32:16,21,24 33:9 68:18 75:16 84:2 88:2 95:2,21,23 103:24 106:1,11 165:9,21 166:8 167:11 170:19 177:7,22 194:7 195:3,16,19 230:15 311:15,16 318:12,20 319:22,24 325:8,17 348:8

doing 22:2 23:15 24:15 31:18,20 42:3 69:19 70:22 78:12 115:10 118:20 120:25 194:15 204:20 206:2,16 212:14 310:5

domain 82:6 93:2 101:7,20 102:10,17 103:2,20 236:19,22 237:1

Doxil 49:11 89:10,15 124:13

doxorubicin 49:12

dozen 254:3

dozens 18:9 20:22 47:8 78:7 89:4 175:8,9 204:11 248:4,13 249:9,15 250:1,7 251:16 315:24

Dr 6:10 8:13 61:1 63:22 100:17 132:11 153:11 267:25

draft 55:16 57:23 58:7,10,12,13 64:4, 10 65:5,12 129:7 141:4 166:6 281:19

drafted 63:22 64:1

drafting 56:22 57:9, 14 58:2 64:17,20 111:21 117:20

drafts 72:17,19

draw 112:6 113:1,17 154:19 163:25 164:5 292:12 323:18

drawn 15:15 299:9

drink 338:6

drinks 42:22

driven 224:8

dropout 178:23

drug 16:4 17:20 27:9, 14,20 35:18 36:15 37:4,5,6,11,18 38:1, 14,16,17,22 40:6,7, 21 41:1 45:1 48:7 49:7,10,23 50:3,9,21 52:1,21 69:20 71:12 77:9 78:19 79:1,8,17 80:3,21 82:5,12,17, 22 83:25 84:15 85:1, 2 86:2,3 88:24 89:10 104:1 105:10,14,21 106:21 109:9 111:11

113:16,20,21 120:25 121:7,8,14 122:2,20 123:18 124:13,14 125:13 137:15 144:23 149:9,11,12, 16,18,19 150:11 166:2 170:21 173:5, 8 191:6,16,20,21 192:16 198:16,24,25 199:1 200:21,22 201:4 204:24 206:8 213:20 215:22 218:16,24 219:7 220:6 222:11 239:7 243:13 250:21,25 252:10,22 257:17 268:14,15 271:3 272:11 278:11,25 286:6,7,17 293:12 294:15 298:20 301:19 320:12 327:15,16 328:3,6 330:22 331:13 333:16,17,18,22 340:2,3 344:23

drug's 327:12

drugs 29:14 46:13 49:5 50:4,18 53:7 54:14,17,19,21 83:15 97:19,23 98:4, 6 104:3,4,18 105:4, 18 106:7 107:7,13, 24 115:6 124:9 135:1 137:17 144:9 164:10 192:4,12,13 193:14,15,18 197:3, 25 198:5 220:4 221:19,20 222:2,3 223:9,11 224:2,6 240:6 255:10 257:19 258:21,22 261:22 268:11 270:15 271:13 298:5 301:20 327:8 335:18,19,20,

Index: discusses–drugs

Confidential

Gregory Frykman, M.D.                                    Hsingching Hsu vs. Puma
                                                        Biotechnology, Inc., et al.

24,25

**drugs'** 170:24

**DS** 88:7

**duly** 8:7

**durable** 326:12
327:6,18,23 328:3,
18 329:5

**duties** 45:24 46:4
117:19

**dutifully** 337:4 338:9,
11 339:10,14,21
340:10

---

**E**

**eagerly** 155:18

**earlier** 90:2 92:24
108:5 124:13
126:11,18 128:21
158:12 184:15 206:4
222:23 235:12 237:3
253:13 260:6 277:19
281:12,18,19 308:1
314:19 336:23

**early** 19:25 27:19
29:10 59:15 99:16
121:4 199:15 230:20
268:19

**earnings** 78:14 298:3

**earnings-driven**
61:14

**economy** 308:5

**education** 16:20
112:15

**effect** 13:3 86:15
285:24 293:24,25
294:15 296:10
326:10 327:5,14,17
329:5,6,8,16,20

**effectiveness** 46:15

**effects** 98:8 328:15
335:25

**efficacy** 26:21 71:11
84:6 88:16,25 89:22
90:8,14,19 97:21,23
98:23 101:6 110:21
127:1 204:23 230:21
232:4 233:15,21
239:10,14,19 240:7,
15 241:7,10,23
260:2,19 261:17
270:14,18,23 271:13
294:14 296:14
297:1,6,14 318:24
319:4 321:7,8,9
322:2 327:12

**effort** 119:2 121:5
141:21 188:9
300:10,14 322:11,16
327:8 340:14

**efforts** 322:1

**EGFR** 99:17 105:12

**eight** 68:23 110:13
166:21 252:16

**either** 18:14 36:7 38:9
40:7 49:23 52:19
60:9,16 76:19 78:18
95:14 98:1 113:18,
21 119:12 150:11
156:19 172:16
187:24 188:2,4
192:18 194:17
196:13 207:12
222:22 255:23 286:2
295:23 321:20

**electronic** 197:4

**elements** 171:22,24
175:24 293:20 294:8

**Eleven** 29:6,16,19
30:1,22 31:1,3 32:7

34:24 96:12 117:5,6

**Eli** 38:18 200:14
336:5

**email** 166:9 179:12
241:4

**emanates** 328:23

**emerging** 97:20
101:5

**emphasis** 90:13
181:5

**emphasize** 331:4

**employed** 20:1 59:18

**employee** 56:4

**employment** 42:5

**encapsulate** 94:6
342:6

**encapsulated** 93:20,
21 94:14 342:1
344:1

**encapsulates** 85:24
86:4,6

**encephalopathy**
121:22 125:21

**encompass** 283:7

**encompassed** 46:1,6
182:4

**end-stage** 121:21

**ended** 31:20

**endpoint** 91:3,9,13
92:16 108:25 109:1
110:22 231:4 233:5,
15,21 260:2,20
261:16,17 270:24
272:9 278:10,24
279:4,24 280:14
281:1,7 284:22
285:19 288:15
297:14 321:9 341:18

343:20

**endpoints** 85:14,17
91:12 178:23
233:13,19 260:15
288:8,9 297:10,12
342:10

**engage** 132:12

**engagement** 10:20
24:21 30:15 33:15
36:23 40:22 69:7
136:3 138:17 159:13
161:1 165:22 168:5
169:8,22 174:4,14
175:7 178:13 188:9
191:1,20 193:3
194:11 196:1 197:20
202:17 203:15
204:15 206:19
207:19 213:25
215:11 216:1 217:23
218:4 221:4 222:10
224:1 262:9,20
276:12 294:24
297:5,13 308:16
309:4 322:5 336:18
340:22 341:21 343:5

**engagements** 39:18
68:8

**engaging** 70:4

**enroll** 25:21,25 26:4
27:2 28:11,17

**enrolled** 28:21 288:4
325:15

**enrolling** 17:13 25:23

**ensuring** 46:12,14,
15,22 156:6 157:4

**entailed** 45:19

**entire** 49:25 59:18
88:7,8,21 104:4
225:25 239:2,21,23
289:7,8,19 330:7

**Confidential**

334:16

**entirety** 334:7,16

**entitled** 34:2 45:12 233:2

**envisioned** 121:20

**epidemiology** 16:21, 24

**equity** 310:15

**erase** 170:6

**erlotinib** 98:5 104:5 106:5

**err** 264:19

**errantly** 182:24

**errors** 12:21

**ESMO** 265:12

**especially** 20:18 176:3 218:19

**essence** 25:19

**essentially** 17:25 53:11 336:15,16

**estimate** 215:13 216:23 333:21

**estimates** 81:17 82:9 83:1 84:4

**et** 6:13

**European** 155:7

**evaluation** 17:23

**event** 25:9 200:25 218:25 338:16,17

**event-based** 85:14 89:1 91:3 260:15 297:10,12

**event-free** 260:13

**eventual** 243:15

**eventually** 324:6

**everybody** 26:25

**evolution** 261:25

**evolved** 19:5 29:15

**ex** 16:7

**exact** 32:4 105:25 180:1 250:13 275:23 300:9

**exactly** 32:9 41:10 50:6 60:11 74:20 81:14 83:7 128:4 141:21 157:24 160:10 229:7 241:15 242:1 275:6 293:19 294:14 318:11 321:21 333:14

**exam** 149:22 158:21

**examination** 8:10 72:12 153:8

**examined** 8:9

**example** 38:12 41:3 48:2,24 54:7 60:17 74:22 118:5 144:12 155:6 158:21 169:17 190:14 197:4 200:13 210:23 258:21 259:8 293:11 294:17 305:3 311:2 312:25

**examples** 39:11 74:23 158:19 206:21 215:21 309:3,14,21 310:13,18 313:20 314:2 316:1

**exception** 57:17 58:5 65:14 266:22

**exceptions** 50:16 266:18 267:9

**Exchange** 64:21,25 156:10

**exclude** 181:23

**excluded** 181:21

**exclusively** 54:16 85:18

**excuse** 291:6 318:23 336:25

**execute** 146:12

**executed** 27:13 30:8 48:1

**executing** 30:13

**execution** 18:15

**executive** 117:9

**executive-in-** 117:10

**executives** 313:22 314:3,9

**Exelixis** 202:25 203:3,4,9 313:1 336:4

**exercise** 173:15 218:10

**exhaustive** 185:24

**exhibit** 11:6,7,11 33:25 34:1,6 42:11, 12 45:10,11,15 47:4 94:23,25 103:16 159:10 161:2 166:13 172:3 176:17,22 181:16 184:5 190:7 197:11 309:22 313:21

**exhibits** 11:13 166:22 167:1,5,7,9,14 168:1,4 292:23

**exist** 60:3 110:8 119:17 120:13 128:9 134:9 136:11 174:15,16 192:19 228:1

**existed** 101:6 161:19 216:13

**exists** 128:16

**expanding** 27:13

**expect** 62:3,4 75:23 99:15 142:7 143:21 177:21 273:1 274:6 278:17,19

**expectation** 142:1 149:10 182:18,22

**expected** 64:13 76:18 103:12 140:2 141:1 147:10,15 229:11,18 269:11 270:12 271:5,8 272:4,8,16, 19,22 278:8 279:10 336:9,11,21

**expecting** 142:15

**expenditures** 302:23

**expensive** 75:12 303:5

**experience** 16:14 17:16 50:7 76:18 142:7 206:12 228:24 258:16 333:16 341:4

**experimental** 86:2 125:17

**expert** 10:13 11:8,12 13:12,15 14:10,24 15:18,23 16:10,16 18:19 19:4,9 20:7,12 21:9 22:18,24 29:13, 22 30:2 42:3 47:5 103:7 105:16 129:20 131:5 133:9 135:8 145:20,25 146:7 170:9 201:15 208:19 224:16 225:4,9 243:20 245:4 281:20 344:2

**expertise** 13:16,23 15:12 16:8,12 19:2, 5,17 136:5 206:10

Index: entirety–expertise

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 107 of 143   Page ID #:13555

Gregory Frykman, M.D.

Confidential

Hsingching Hsu vs. Puma Biotechnology, Inc., et al.

226:20 228:24

**experts** 20:14 21:6 131:24

**expire** 112:11

**expired** 112:10

**explain** 41:13,14 59:13 73:17 210:22

**explained** 67:1 277:18

**explaining** 228:21 337:21

**exponentially** 82:25 83:2

**expressed** 12:12 344:1 347:1

**extended** 238:15 327:8 330:23 331:14 332:5,12,16,25 333:6,11 334:4

**Extenet** 14:5,6,11,25 15:14,19 85:5 88:5, 11 91:12 92:14 99:8 104:9,19 106:13,15 107:6,12,22 224:19 226:25 227:13,25 229:6 230:13,17 231:23 234:6,24 235:4,20 236:8,20, 21,24 237:1,24 238:5,14,20 239:14 240:2,10 243:17 244:9 245:1,7 262:25 271:15 272:9,24 278:9,23 279:3,24 280:13,25 281:6 283:17 317:24 318:1 320:19 322:21 325:1,6,15 328:8 332:1 334:20 335:10,13 337:14 338:1,16,23 340:9,

15,24 341:1,9,14,23 342:8,13,18,22 343:11,20 344:5,14 345:6,11,14,17 346:3,7,13 347:14

**extensively** 238:25

**extent** 17:11 32:24 33:5 39:23,24 43:23 73:3 127:12 128:22 173:22 176:10 180:17,19 183:19 194:16 206:9 230:14 232:24 243:7 246:21 252:5 290:13 292:3 322:20 346:23

**extreme** 134:2 289:24 290:6

**extremely** 38:4 287:5

---

**F**

---

**fact** 51:18 91:14 132:20 133:1 145:3 146:1 157:18 158:22 184:24 194:25 195:4 229:24 304:10 327:14

**factors** 107:4 189:17 305:6

**facts** 140:22

**fail** 26:2

**failed** 327:13

**fails** 149:19

**failure** 298:20 327:10

**fair** 139:19,23 193:8 215:13 216:9 217:9 242:3 347:22

**fairly** 10:1

**fall** 20:20 29:1,10

98:7 143:24 304:22

**falls** 42:4 93:18 285:12

**familiar** 52:18 223:16 324:3

**family** 71:22 115:9

**far** 46:12,22 72:5 126:8 220:4 278:6

**fast-track** 54:7

**favorable** 82:18 134:25 288:5

**favorably** 111:10,11

**FDA** 26:12,14,16,19, 22 28:2 36:4,7,12 37:11,20 40:22 44:13,20 45:4,6,13, 20 46:8 47:8,19 48:10 49:3 50:8,23 51:1,19,20,21 52:25 54:6,24 55:3,9,14, 19,25 61:3 62:2,4,5 68:4 70:10 71:3,5 75:19 79:9 83:6,13, 23,24 84:1,3,6,10, 18,21 87:19,20,22 88:1 89:11 90:4,7,23 104:3 106:1,9 115:6 121:2 124:6 137:16 149:11 150:12 157:3,10,13,16,20, 24 158:1,10,12,17 166:1 183:7 191:22 192:18 193:1,13,14, 17,24 194:5,12,18 195:2,10 197:5 206:4 232:10 243:15 253:15 261:20 272:11 288:21 290:17,22 318:11, 16,19 319:21,24 320:1,9,12,18 321:2 325:8,17,21,22

344:16,23

**FDA'S** 37:17 38:5 45:15

**FDA-APPROVED** 26:9 122:1 123:17 195:11

**February** 263:3 266:14

**federal** 156:6,21 183:6 309:6

**feedback** 53:4,20

**feel** 109:7 110:5 134:23

**feeling** 98:15 101:18

**feels** 286:7

**fell** 114:11

**fellow** 43:13

**fellowship** 17:8

**fellowships** 44:5,6

**felt** 71:6 167:24 291:21 321:25 322:22 336:20

**fewer** 295:18

**Fidelity** 271:24 273:3

**field** 20:15 21:9 22:24 24:13 72:9 118:10 131:25 255:9 257:12,13 258:25 264:15

**figure** 24:25 90:18 94:9 187:12 188:14, 23 189:11 217:25 306:18

**figured** 183:3 302:14

**figures** 318:6

**filed** 54:15 64:25 65:6,12 68:19

**files** 53:18 274:24

**filing** 64:21,25 65:6, 12 152:7 277:23

**filings** 163:2,5 164:17 278:1

**filling** 219:8

**final** 76:20 78:18

**financial** 115:17 142:12,14 308:14

**financing** 144:25

**find** 41:6,8,12 83:23 95:3 171:5 177:21 184:3 217:22 227:7 228:19 278:2

**finding** 48:21

**fine** 40:12 135:3

**finish** 8:25 9:1 10:4 62:19

**finished** 30:4

**firm** 7:3 20:1 24:6 29:6,21 37:5 58:19 59:19,22 60:9 61:14, 17 112:20 113:24 114:7,8,11,13 117:2, 4,7 132:10 159:18 230:25 231:1 232:3 271:10 272:2 273:13 311:3 323:12 337:15

**firm's** 67:2

**firms** 67:17 73:7 130:2,16 273:4,16

**first** 8:7 28:20 33:15, 16,17 64:10 91:3,23 96:11 113:22 133:9, 12 142:22 161:9 167:12 211:2 224:15 242:25 255:7 257:25 317:22 343:3

**fit** 29:21 79:9,20 103:12 172:18 207:23 220:22 279:15 281:16 300:20 336:20

**fits** 93:9 334:21 336:8 346:8

**five** 51:17 109:11 181:8 187:15 209:17,20 210:5 296:22 302:4 328:25 329:15 335:3,4

**fixed** 289:2

**flattering** 132:17

**flip** 149:15

**focus** 15:22 20:19 79:19 80:8 84:5 104:15 107:3 162:4 167:21 181:4 184:15 206:4,12 215:17 218:5 245:2 246:11 274:18 278:6 279:12 300:16 311:7,21 313:4,17 335:18

**focused** 30:19 70:22 73:24 110:19 130:8 137:12 162:20 205:22 221:22 263:22 276:14 295:5 311:12,17 335:21

**focuses** 130:25

**focusing** 96:21 115:6

**folks** 41:15 48:3 49:24 53:10 81:6 323:25

**follow** 253:15 254:5

**follow-on** 184:24 185:17

**followed** 17:5 184:19 207:4 208:10 223:21

234:14 249:10 257:17 326:7

**following** 33:22 162:11 185:17,18 187:3,7 188:2,25 205:3 206:23 213:10 248:6 249:4 254:12 303:22 304:3,11,13, 15,24 308:23 309:15 316:11,12,13 326:18 327:20

**follows** 8:9 153:5

**Food** 17:20 45:1 113:20 333:18

**foremost** 129:19

**form** 13:20 16:2,18 18:22 19:12,21,22 22:21 39:21 40:17 49:18 55:12,22 58:9 59:5 61:16 66:1,7,20 69:12 74:6,18 88:13 89:24 90:11,21 98:20 99:13,21 103:22 107:25 108:16 113:12 131:8 132:3 136:17 137:24 138:12 143:14 144:3 150:2 156:2 159:12 163:1,8,14 177:15 179:21 190:3 195:12 205:15 210:11 227:15 236:15 240:16 249:13 257:24 258:14 261:1,13 263:20 266:1 272:10 273:14,17,25 275:4, 23 278:11,24 279:5, 25 280:14 281:1,8 292:20 295:3,21 296:6 299:7 308:19, 25 313:24 314:12 320:12 328:9 332:7

333:13 334:9 338:3, 4,24 345:12

**formal** 16:19,20 117:1 130:24 322:23

**formally** 28:24 47:22 127:18 129:12,15

**format** 137:6 254:5 284:8

**formatted** 232:10

**formatting** 171:11

**formed** 116:24

**forms** 274:24

**forth** 29:14 48:6 52:17 53:1 61:5 68:7 73:9,18 79:10 133:14 135:15 140:13 166:11 175:4 178:25 185:5 194:9 220:23 255:1 281:22 301:20 320:16

**forthcoming** 74:20 77:6 111:13 136:20 201:8 257:4

**forum** 61:25 155:4 177:21 256:2

**forums** 110:8

**forward** 52:24 62:6 243:15

**found** 164:10 172:6 204:19 205:6 278:4 288:16 325:9

**foundation** 80:5,13 84:17 89:25 104:11, 22 105:23 106:23 107:17 108:1 141:16 143:15 147:9,19 149:4 150:3 151:3, 21 152:11 154:10 156:3 157:9 162:16 164:4 189:8 190:4

Index: files–foundation

Gregory Frykman, M.D.

205:16 208:14 211:6 213:6 217:19 219:19 220:17 221:6 222:21 231:15 234:20 235:8 238:7,22 239:12 241:13 245:20 249:14 256:13,24 261:14 264:1,9 266:2 275:14 278:14 280:3,20 281:10 299:8 302:11 306:25 307:18 309:1,10 314:18 315:3,19 320:4 327:25 328:10 339:17 340:18 342:25 343:13 344:9

**four** 42:13 101:1 127:21 201:21,24 203:13,18 204:3 206:18 208:10 209:3,11,20 210:3, 16 211:1,2,9,21 212:8,19 213:24 223:25 248:22 271:20

**fraction** 78:11 216:3 220:5 222:12 223:14 226:10 274:3 316:5

**Framework** 120:7 122:24 123:13,16,23 125:12

**frankly** 115:4 192:21 204:18 212:13 253:23 268:3 292:4

**fraud** 114:10

**free** 172:25

**frequent** 71:21 209:8, 10

**frequently** 36:10 40:2 48:7 68:14 74:7 77:17 78:21 83:18, 19 84:18 112:1

113:6 117:22 126:13,18 128:8 205:1 210:13 257:1 261:18

**friends** 71:22

**front** 242:1

**Frykman** 6:10 8:6,13 11:8 13:13 34:3 42:13 61:1 63:22 100:17 116:25 124:23 132:11 133:6 153:3,11 267:25 348:22

**FTC** 156:22

**fulfilled** 339:4,10

**fulfilling** 338:12

**full** 26:16 38:8 39:13, 21 40:18 59:25 75:3, 19,23 76:20 131:15 196:18 255:12 256:2,21 258:1 285:7 304:5 324:8 337:22,25 347:21 348:1

**full-time** 45:1

**fuller** 187:24 188:3,13 189:5

**fully** 10:9 12:6 97:3 227:6 230:24 231:6, 7,11,13 321:13 330:23 331:2,6,7,17, 20 332:1,3,9,14,20 333:8 334:5,8,17 341:25

**function** 60:3 140:14, 15 141:7 142:17

**functions** 17:25

**fund** 189:14

**fundamental** 61:13

**funded** 175:19

**funds** 36:19,20 73:20, 21 274:14 275:1,4, 11 276:6 323:16

**further** 40:21,22 41:7 86:12 113:21 153:5 243:3,9,12 298:4

**future** 26:22 136:12 154:25 157:21 187:23 196:9 207:12 252:10 284:22 285:7 310:20 324:9

_____

# G

**G-l-e-n-n** 123:5

**G-r-u-e-t-t** 123:5

**gain** 151:10

**gaining** 134:24

**gathering** 32:15,20

**gauge** 77:8

**gee** 105:13 157:24

**gefitinib** 98:5 104:5 106:4,17,19

**Geller** 7:4,7

**Gen** 203:12

**gene** 203:1

**Genentech** 252:18,19

**general** 37:14 98:3,7, 13,15,22 100:23,25 101:4 103:11,25 128:1 140:21 151:6 153:18 158:8 164:6 166:10 167:21 171:22 185:15 191:12 203:25 205:22 241:5 265:3, 20 291:22 302:21

**generally** 14:4 29:25 37:24 46:1 50:11 75:23 78:24 90:22 106:9 120:22 133:21 198:13 274:6 284:16 285:21 293:4 312:2

**generic** 118:10 170:12

**Genetics** 203:10 336:4

**gentlemen** 118:8

**germane** 133:21

**getting** 18:23 33:10 58:21 126:25 141:24 148:10 150:11,12 156:12 167:21 199:16 286:7

**GI** 175:3

**give** 19:13 38:11 41:9 53:17 103:9,14 118:5 132:14 173:25 178:16 180:11 181:1 182:12,19 212:4,14 221:24 241:22 250:13 251:2 257:16 261:15 280:16 300:9 302:2 305:23 306:14,18 307:1,10 343:17

**given** 96:24 99:2 125:9 132:5 137:12 139:9 221:9 348:3

**gives** 92:5

**giving** 21:13 182:17 333:15

**glanced** 263:12 270:6 277:14

**glancing** 277:12

**glean** 137:14 151:13

**Glenn** 123:5

**go** 6:24 8:19 17:10 24:1 32:25 33:6,10, 12 43:6 60:14,21,22 61:7 62:4,8 63:14 89:19 91:4 107:19 111:23 135:15 136:7 139:23 140:19 145:5 155:10 157:12 158:12 159:8 165:12 173:4 186:16 188:22 191:6,8 192:18,20 204:17 205:20 212:3 220:3 226:18 235:18 241:14 243:8 244:17 245:22 250:23 260:6 262:2,17 268:23 272:7 273:10 287:23,25 288:24 293:3 302:24 303:21 309:23 315:4 316:15 317:10 323:7 325:13 338:7

**goal** 192:7 198:9

**goes** 46:22 83:13 86:17 111:19 130:12,19 196:10 199:21 256:25

**going** 8:21 9:18 11:5 24:2 25:8,12 26:1,5, 17,19,24 27:1 28:9 33:13,14 37:17 40:3, 19 41:4 52:24 57:10 60:16,20 62:6,16 63:17 74:13 84:25 85:2 86:23 92:16 100:12 105:13 111:22,23 120:22,23 128:10 133:20 134:18 145:7 150:7 152:18 158:14 165:15 170:18 182:19 199:10 201:2,20 205:24

**208**:2,9 214:12 215:1 232:23 269:1 270:25 279:5 280:14 283:20 289:9 311:19 317:12 333:1 335:23 338:8 345:21 347:16,22 348:19

**good** 7:2 62:16 114:14 136:4 148:11 176:2 184:2 185:4 217:12

**goodness** 143:20

**Google** 166:10 168:23,25 169:7,11, 15,19,23 170:4,13, 17 171:2,17 172:2,6, 11 178:9 186:21 190:20 191:12 192:21 262:15 278:3

**gotten** 186:13,19

**govern** 146:21

**government** 117:25 130:20,21 175:19 183:7

**grade** 105:20 106:12 107:5,11,22

**graphs** 110:15

**great** 17:10 22:6 90:3, 13 164:20 277:8

**greater** 254:21

**greatest** 83:21

**greatly** 35:15

**green** 183:6

**Greg** 28:7 132:11 133:5

**Gregory** 6:10 8:6 13:13 34:3 116:24 153:3 348:22

**grew** 43:4

**Gronborg** 7:2,3,17 8:12 62:18 63:14,21 100:9,16 148:12 152:14 153:10 165:12,19 180:22 214:14,23 215:5 233:1 245:21 265:17 268:23 269:5 317:10,16 346:1 347:25 348:15

**ground** 8:20

**group** 21:9 56:12 59:17,19,22 63:10 67:12,18 72:15,21 73:5 76:6 113:25 115:13,22 127:19 141:11 271:17 308:14

**grow** 43:2

**grown** 264:15

**Gruett** 123:5

**GS** 22:4

**guess** 21:15 39:22 90:12 179:16 186:13 188:15,17,19 227:18 276:21

**guesstimate** 217:12 222:25 223:2 258:9

**guidance** 47:25 48:10 51:21 55:19 56:1 241:22

**guide** 134:16

**guided** 261:21

**guidelines** 241:5

**guys** 97:6 114:15 128:6

## H

**half** 17:19,20 142:22 207:9 208:1 222:24, 25 223:2 225:16 318:13

**hall** 158:12

**hallways** 83:12

**hand** 11:5 16:22 23:7, 9 33:24 42:10 45:9 61:9 86:17 95:19 96:21 163:12 173:18 174:11 218:6 340:1

**handbooks** 171:14

**handed** 41:12

**handful** 61:19 78:7 132:8

**handled** 57:6

**hands** 73:13

**happen** 149:17 189:12 306:5

**happened** 28:3,15 54:2 149:17 251:5 287:1

**happening** 251:10

**happens** 256:4 303:3

**happy** 21:13,17 133:25 227:6,21 228:1,15 240:4 243:21 251:2 273:9 287:25 299:10

**hard** 28:16 96:18 109:10 128:11 145:2 210:21 220:18,23 222:3 301:21

**hastily** 152:2

**hazard** 82:14,23 83:10,12,13,17,20

Case 8:15-cv-00865-AG-SHK Document 400-5 Filed 07/24/18 Page 111 of 143 Page ID #:13559

Gregory Frykman, M.D.

Confidential

Hsingching Hsu vs. Puma Biotechnology, Inc., et al.

84:9 85:6,11,13,20, 22 86:3,6,10,18 87:2 88:4,17,19 89:1,23 90:9,15 91:5 92:12, 17 102:7 231:2,6,12, 18 238:15 239:8,16 259:8,24 260:21,25 285:25 296:9,14 297:2,7,14 318:7,14, 15 321:10 328:5,13 330:2 333:25 337:16 338:4 341:18 343:22

hazards 92:19 260:16

hazy 140:5

head 9:5,6,9 236:2 252:23 253:4 333:15

healthcare 119:18, 21,22 127:20

hear 250:24

heard 45:7 253:20 254:16

hearing 119:3,4

hedge 36:19 73:21 323:16

held 6:19 95:9 96:10 273:16 276:8 277:6, 16,21 312:13,17

help 20:2 26:21 28:8 32:24 48:8 125:1 178:16 346:23

helpful 48:10 69:20 75:25 76:2 77:7,8 79:7,16 80:1,19 82:2 108:8 113:4 126:19 133:6 169:5 195:14

helping 23:2

helps 151:9 220:10 290:3

hematologists 155:10

hematology 17:7,17 155:6

hepatic 121:22 125:20

HER2-TARGETED 330:21

Herceptin 101:3

Herceptin-containing 326:12 328:17 329:22

heretofore 331:15

hesitate 259:18

hey 58:21 267:25

hidden 26:18

high 38:4 43:5 249:16 286:2 287:5 289:4

high-profile 149:18, 19

higher 35:19 107:12 223:14,23

highlighted 208:19

highly 302:5,18 304:18

Highsmith 7:21,22

Hill 119:5

hire 69:24

hired 65:15,19,23 66:4,10 72:16

historical 84:22

history 170:4 174:12, 13 219:1

hit 182:5,9,14,20 183:13 272:9 278:10,23 279:4,24 280:13,25 281:7

hits 169:3 179:23

hmm 144:16

hoc 288:14

holders 276:3 277:20

holding 14:9,23 135:7

Holmstock 6:3

honed 185:16

honestly 163:15,23 278:5 328:12

honing 169:4

honor 133:7

hook 79:4

hopefully 41:12 335:22

hoping 144:22

Hopkins 17:9 44:9

hospitals 44:16 119:22

hosted 162:7,12

hour 22:14 34:23 35:2,10 62:16 166:19

hour's 174:8

hours 34:7,16,21 166:20,21 347:19

Houston 114:20

How'd 165:24

How's 95:21

Hsingching 6:11

Hsu 6:11

human 46:13 173:2

hundred 232:8 315:25

hundreds 18:1,13 75:21 76:14 149:12

155:9 173:11 176:7 187:9,17 188:16 216:7 217:20 220:1, 4 248:4,13 249:10, 16 250:1 290:2 315:15

hypothetical 280:4,9 305:3 328:2

hypotheticals 150:15

I

I-n-t-r-a-d-o-s-e 49:10

I-r-o-q-u-o-i-s 8:15

I-sby 94:21

I-sby2 97:10,11

idea 212:5,14,16 306:8 324:3

ideal 198:13

identical 105:5 200:21 270:20 271:13 320:5,25 325:16 344:19

identification 11:9 34:4 42:14 45:13 108:19,21

identified 11:21,25 12:21 106:13 107:11 131:9 159:22 160:14 161:1,8 172:3 173:6 176:16,21 192:4 193:7 196:4 207:19 208:1 232:14 233:6 248:23 262:12 270:4 309:14 318:14 330:2 340:25 348:5,9

identifies 159:11 233:12

identify 7:1 19:1 20:13 36:22,25

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 112 of 143   Page ID #:13560

Gregory Frykman, M.D.

Confidential

Hsingching Hsu vs. Puma Biotechnology, Inc., et al.

39:10,17 40:25 44:4 54:20 127:4,5 133:25 169:14,16 170:10 179:14 196:22 208:16,24 227:9 229:5,20 252:11 266:18 309:22 310:3,9 336:2,18 340:22 341:8,13,21 342:21 343:10

**identifying** 310:13

**identity** 147:24 148:5

**IDFS** 91:15 321:9

**II** 12:3,5,8 93:17

**illustrate** 316:7

**ima** 165:6

**imagination** 150:9

**imagine** 217:5,6

**imagined** 182:22

**Imclone's** 252:22

**immature** 129:13

**immediate** 173:17

**immediately** 21:23 22:16 38:15 41:5 81:22 91:5 149:21 207:4

**impact** 150:10

**implication** 76:24

**implications** 40:20 48:20 137:15 142:14

**implies** 149:8

**imply** 254:24

**import** 91:10 205:7

**importance** 341:17

**important** 9:19 85:3, 5,11 86:8 90:19

110:20 119:20 142:17 157:17 167:24 194:13,25 205:19,25 218:22,25 239:15 240:17 242:18,25 243:2,18, 21 250:6 251:3 252:24 254:12 255:22 257:3,23 260:7 278:15 284:15 286:8 290:14 291:21 294:1,9 317:25 319:20 332:4,10 333:10 340:3,4 341:1,8,11,13,22 342:7,12,22 343:11, 21 344:4,6,13,14,20, 25 345:5,11,13,17 346:4,19 347:8,11, 13

**importantly** 104:13

**imposed** 158:23

**imposes** 264:11

**impressed** 90:12

**impression** 90:7 170:9 183:11 207:25 214:10,15 216:11,25 235:3 240:13,24 249:8 259:1,7,15 265:21 281:4

**improvement** 328:4

**Inc.'s** 224:17

**include** 50:9 84:11,13 95:17 109:17 112:4 147:6,10,17,24 148:16 150:21 154:19 160:22 213:12 222:1 228:18 233:16,18,20,22,25 234:8 241:1,24 273:3 286:9 288:1,6, 7

**included** 80:19 88:3, 5,6 110:15 178:19 210:18 211:3,11,23 212:9,11,20 214:3 234:18 235:5 240:14,17,21 241:8, 10 260:25 261:7,11 276:19 278:22 279:3 284:10 288:11,12,23 289:13 293:20 294:4,5,25 295:1,9, 12,13 296:13 297:1, 6 314:11 332:23 333:9

**includes** 160:19 238:24 332:3,10,15

**including** 11:13 109:7 220:25 289:7 303:23 305:19

**income** 41:16,18,23 42:7 123:22 206:15

**incorporate** 233:14 294:2

**incorporated** 102:5 176:12 291:2 292:16,22,25 296:21,22,25

**incorrect** 308:24

**incredibly** 278:15

**ind** 228:7 322:16

**independent** 117:17 194:17 228:10 230:15 346:25

**independently** 228:8 230:11 231:1 322:12,17

**indicate** 329:16

**indicated** 59:16 68:11 192:14 327:4

**indicating** 257:25

326:9

**indication** 327:12 333:23

**indications** 27:14

**individual** 82:8,20,25 86:4 88:15 91:8 112:18 129:24 141:3 169:16 176:3 209:15 210:5,7 276:3 293:20 294:8 295:13

**individually** 6:11 112:21

**individuals** 131:10

**INDS** 51:10

**industries** 201:19

**industry** 29:23,24 65:24 66:10,16 69:11,16 70:1 74:5, 16 76:8 79:21 80:16 93:23 98:19 99:9 102:13,20 115:14, 15,16,17,23 119:15, 17,24,25 120:3 125:25 126:3,6 127:6,15 128:1,13 129:20 131:6,25 133:10,15 134:6 135:17 136:9,16 137:23 138:11,25 139:6,12,16 143:13, 25 145:8,17,20 154:2,5 156:24 171:3,18 172:13,18 194:21 195:9 198:18 199:5,22 200:1,7 201:15 204:5 205:4 206:22 213:1 214:16 225:22,24 229:18 242:15 246:10,24 248:1 252:3,15 253:6,8 254:17 255:9 256:18 257:14

Index: identifying–industry

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 113 of 143   Page ID #:13561

Gregory Frykman, M.D.

Confidential

Hsingching Hsu vs. Puma
Biotechnology, Inc., et al.

258:13 280:1,17
281:16 282:11,21
283:23 284:13 285:2
289:16 290:8,18
298:6,11 299:2,5,13
300:18 323:20
336:13 337:5,6
346:9 347:4,5

**inevitable** 60:23
74:12

**inform** 346:23

**information** 14:18,20
33:4 36:16 49:9
55:20 74:8,9,10,13,
21 75:25 76:23 77:7,
12,20 79:16,25
80:18 81:3,6,16,20,
25 82:5,13,16 84:20
86:16 88:8 92:6,22,
25 97:16,22 98:1
99:2 101:19 102:3,5,
9,16 103:10,19
108:8,14 109:8,17,
22 110:25 111:6,13,
22 126:19 128:8
134:22 135:5 137:7,
8,12,19 144:17
147:2,23,25 148:9,
18,20 149:1,23
150:21 151:14
152:13 153:13
154:21 155:11,14,16
158:3,5 163:11
164:2 171:10
176:11,15 182:7
198:22 200:12 201:3
204:18,22 205:14
209:5,12,15 213:18
214:2,17 229:11
232:25 235:11,20
236:18 238:14,20,23
239:3,4,6,10,22,23
241:5 242:7,13
254:6 261:3 268:21

269:11 270:11,14,
18,20,25 271:2,5,19
272:4,8,15,18
278:16,17,19 279:6,
10,18,19 280:24
281:6 286:6,8,11
287:20 288:1 289:3
291:19,24 292:2
293:2,6,8,16,22
294:4,13,18 297:1
302:13 311:24 312:7
313:13,19 314:2,9
324:5 329:18 332:4,
10,15,24 333:10
339:11,14,21

**informative** 163:11,
17 164:1,11 249:1

**informed** 136:14
164:8

**inhibitor** 105:11

**initial** 51:2 67:20 75:7
81:16 121:2 188:12
189:4 192:2,8
193:19 198:10
313:23 314:11

**initially** 120:16
204:20 223:20 278:9

**initiated** 28:20

**initiating** 27:3

**Innovations** 117:11
118:7

**input** 68:1 140:16
141:3,22 143:1

**insight** 71:7 132:15

**insists** 84:19

**inspections** 46:20,21

**inspectors** 271:8

**instances** 313:12

**institute** 17:19,22

44:24 75:20 134:13

**institutional** 19:25
20:24 36:17 60:4
61:20 71:8 73:6,24
102:4 112:20 126:20
127:9 130:1,15,18
132:8,22 133:2
137:2,13 249:25
250:22 253:21
254:22 269:22,24
274:7 294:10 323:11

**institutions** 119:23
275:20

**instruction** 134:13

**instructions** 182:13,
17

**insufficiency** 138:5

**intact** 329:17

**Intelligize** 178:15
179:14,20 182:24
183:19,25 184:1,13
190:2,10

**intend** 11:24 12:3
101:12 292:12

**intended** 73:5,19
172:24 199:20 316:6
336:15 342:15

**intending** 37:11

**intent** 144:10 288:20

**intention** 12:18
122:18

**intentional** 224:4,7

**intentions** 143:2

**interact** 53:21 151:12

**interacted** 323:25

**interacting** 238:12

**interest** 83:21 86:12
173:5 254:22

**interested** 17:11 78:4
126:24 201:11
276:23

**interesting** 27:18
84:5 86:11,14
288:17

**interim** 47:17 76:19
78:18

**intern** 43:12,16

**internal** 17:1 43:25
298:3

**internally** 83:10
321:13

**international** 73:22

**interpret** 83:4 252:8

**interpretation** 13:23
14:10,17,24 15:19
21:5 346:14

**interpreted** 14:1

**interstate** 46:13

**intimately** 23:2

**Intradose** 49:9 89:14

**introduce** 7:18

**invasive** 91:14,24
92:5

**invested** 189:14
271:9

**investigation** 312:11

**investigational** 50:3

**investing** 19:25 20:24
61:20 73:7 112:18
126:21 127:10
130:1,15 294:11
323:11 324:1

**investment** 21:4
36:17 60:1,2,7,14
67:2,15 71:8 130:18

Confidential

Gregory Frykman, M.D.

Hsingching Hsu vs. Puma Biotechnology, Inc., et al.

153:24 271:24 274:10,11 308:1,7 324:2

**investor** 132:22 134:14 140:14 250:22 269:15 276:23 309:17 324:11

**investors** 26:8 59:11 62:12,13 73:25 102:4 112:20 130:1 132:9 133:3 137:3, 14 153:24 229:10 249:25 253:21 254:22 269:10,18, 22,25 270:9,12,13, 18 271:5,8,9,18 272:3,15,19,22,23 273:9,20 275:11,20 276:1,20 277:16 278:8,16 279:10 323:2,8,9,20,21,24 324:15 338:20 339:12,15,22 340:5

**invited** 61:17,18 125:4,6

**involve** 30:15 54:14 58:24 67:20 117:19 124:9 126:14 222:10

**involved** 17:9,12 18:3,6,8,11 26:15 27:16,22 28:4,8,22 30:2,5 31:24 37:3 39:5,7 48:4 61:12 62:21 67:1 104:1 112:17,19 120:24 124:24 140:18 141:7,11,14,18,20, 24 142:2,8,10,18 143:5 146:10 175:18 181:20,24 240:25 257:22 268:13 307:25 311:3

**involvement** 64:23

**involves** 94:10 180:19

**involving** 119:2

**IR** 141:6,11,24

**Iroquois** 8:15

**issuance** 51:19 82:7 141:25

**issue** 24:18 48:8 53:25 54:2 78:2,3,9, 10,22 99:19 144:5, 11 146:9 150:17 151:25 160:7 165:1 183:8 187:22 255:21 304:5

**issued** 39:20,21 51:3 56:22,24 57:4,10,14 58:8,15 69:9 77:21 116:20 118:24 123:14 127:4 128:24 136:21 139:20,24 140:1 143:10,11 144:14 148:4 159:14 160:7 181:12 183:23 215:22 216:20 217:2,15 218:2 219:16,23 220:13 221:2,16 222:16 223:10 279:14 280:12 299:18,23 312:7 314:4,7 325:24

**issues** 61:2 71:2 130:21 202:19 206:13 306:10

**issuing** 109:16 118:12 144:15

**items** 31:13

## J

**J-a-c-k-s-o-n** 21:25

**Jackson** 21:25

**Jan** 203:4

**January** 164:18 165:2 168:15 202:12 303:11,18

**jeopardizing** 155:21, 25

**job** 49:1 79:12 128:11

**Johns** 17:9 44:8

**join** 206:13

**joining** 58:19

**joint** 32:9

**Jordan** 31:25

**journal** 15:9,20,24 19:23 110:13 159:1 197:19,20 198:1,6, 12,16,17 304:6

**journals** 155:12

**JPMORGAN** 60:17,18

**judges** 24:25

**judgment** 241:18

**July** 33:20 79:14 80:14 82:14 93:2,15, 25 94:3,11 96:9 98:16,18 99:6,12,20, 25 100:1 101:10,14, 16,21,24 102:6,11, 19 103:21 104:18 112:5 140:4 141:4 150:22 159:12,15 160:7 161:4 162:1,6, 11,23,25 203:5,6 224:18 228:4,22 229:21 230:17 231:24 232:12

233:25 234:6,11 235:22 237:2 242:14 245:17 246:2,14 247:2,16,20,25 248:11 252:2 263:19 264:7 269:9,14 270:12 271:6,18 272:4,16,19 273:23 274:1 275:12,18,21 276:1,9 277:7 279:2, 9,23 280:23 281:5 282:9,20 283:2,12, 16,22 290:24 291:8 293:16 294:5 295:2 299:3 300:20 318:18,25 319:10 320:1,7,22 321:1 324:16 325:20 326:16 328:8 329:23 330:3 334:7,19 337:5 338:22 339:4 340:24 341:9,14 342:8,23 343:12 344:7,15 346:4,6,19, 24 347:3

**June** 159:15 162:1 344:7

**juries** 24:25

**jury** 9:16 244:19

## K

**keep** 97:20 118:22 165:8,20 166:4 169:10,25 173:12, 14,19 175:12 176:8 293:19 294:24 295:9,11,23 296:2 338:8

**keeping** 111:16 135:1 165:25

**keeps** 173:22

Confidential

Gregory Frykman, M.D.

Hsingching Hsu vs. Puma
Biotechnology, Inc., et al.

**kept** 35:21 75:10
166:6 168:8 170:15
174:6 177:8 194:14
295:8 300:15

**Kevin** 7:12

**key** 110:18 111:19
194:25 238:13,19,23
239:3,4,10,13,19,24
240:1,3,4,14 293:21
333:17

**keying** 333:7

**keyword** 168:25

**keywords** 174:8
178:17,19

**kinase** 105:11

**kind** 50:19 53:15
78:16 118:2 144:16
258:8 270:7 328:1

**kindly** 186:6

**kinds** 60:12 144:5,6
287:23

**knew** 26:16 53:12
75:22 76:3 103:10
106:3 187:21 310:5,
11 321:12

**know** 9:22 10:3 15:7
17:4 19:13 20:9
24:20 28:7,8,14
29:20 31:24 33:5,18,
23 34:9,20 35:17
36:19,20 38:3 42:25
48:24 50:12 52:15
53:17,19,23 54:3,4,5
56:19 57:18 60:25
61:4,6,10,23 62:6
66:12 67:3 68:1
69:14,20 71:23 72:3
73:4,10,14,16,23
74:12,19,24 75:19
76:1,2,11,17,20
77:4,11,15,16,24

78:6,13,14 79:6,10,
11,12 81:5 84:8 86:1
87:24 88:3,7,10,21
90:22 91:11,16 93:8,
15 96:15,20 97:5,6,
7,9,12 98:24 99:16,
22 100:4 101:3
103:23 104:23
105:10 106:2,7
107:10,18,21 109:5,
11 110:23,25 114:10
115:6,7 118:23
119:8,9,20,21
120:23 126:19
127:12 128:3,4
129:4,23 130:12,17,
20,23 131:9,12,15,
21 132:4,11,14,18
133:18,22 136:10,
18,23 137:4 140:3
141:10,13 142:19
143:21 144:21,24
145:2 146:20,25
147:21 148:1,7
150:5,14,24 151:16
152:5 155:9 156:5,
18 157:12,24 158:20
160:4 161:11,14,22
162:6,9,12 163:20,
21 164:19 165:3,5
166:11,12 167:24
168:11 170:7
171:11,22 172:22
173:17,24 174:5,16
176:2,12 179:23
180:1,15,19 181:3,9,
25 182:2,9,11,21
183:7,9,10,18,23
184:14 186:5,14
187:10,13,17,19
188:15,24 189:9
190:14,15 192:21
194:22 199:23 201:5
202:7,16 204:12
205:17 206:8,9,10,

17 207:15 209:16
211:7 216:19 220:3,
10,19 221:8,10,11,
15,20 222:5,7,22
230:16 231:17
232:4,16 239:25
241:3 243:15,19
244:6 245:3 250:6
251:1 252:17 253:24
254:13 256:14
257:15 258:8 262:14
263:4,13,17,23
264:4,5,16 265:1,18,
20 268:2 270:11
271:1 272:1,2
273:11 274:3,6,9,20,
21 275:20,22,24
276:11,15 277:5,8,
22 278:16 279:17
281:11 290:2,3,7,17
293:11 298:25 299:9
300:1,9 302:2,3,4,12
303:9 305:1,25
306:14,16 307:20,
22,23 309:4,11
311:11 312:21
313:2,21 314:2,6,9
318:22 319:1 320:6,
8 328:5,11,22
329:13 331:9 333:14
337:18 340:5
343:21,25

**knowing** 105:9
264:16

**knowledge** 12:9,13
51:4,9,14 53:3 54:10
100:25 103:25
122:6,9 123:20
130:7 141:12 156:9
177:9,14 235:10
256:25 269:18
290:21 314:13
334:14 344:10,18

**known** 40:7,8,16

97:10 98:5,10
105:15 129:5 238:13
302:16 303:21
304:16,23 305:7,9
316:11,16,22

**Kristin** 7:9 10:25
31:23

---

**L**

---

**LA** 124:25

**label** 27:14 39:6 84:7,
10,19 85:6 106:10,
25 107:23 191:23
192:5,9,12 193:1,3
195:3,11 325:8,23

**labels** 106:1 107:7
166:2 191:16,20,22
192:13,19

**labs** 65:20,21 129:6

**lack** 77:18 84:16
104:10 105:22
314:17 315:2 340:17

**lacks** 89:25 106:22
107:16 141:15
143:15 147:8,18
149:3 151:2,20
154:9 156:3 157:8
162:15 164:3 189:7
190:4 205:16 208:13
211:5 213:5 217:18
219:18 220:16 221:5
222:20 231:14
234:19 235:7 238:6,
21 239:11 241:12
245:19 256:12,23
261:14 263:25 264:8
266:2 275:13 278:13
299:8 302:10 306:24
307:17 309:1 315:19
320:3 327:24 328:10
339:16 342:24 344:8

Gregory Frykman, M.D.

Confidential

Hsingching Hsu vs. Puma
Biotechnology, Inc., et al.

lady 21:23

Laforge 7:19

Lancet 15:20,25 244:16

landscape 36:8 40:23 68:5 71:10 79:10 137:17 243:14 254:25

lapatinib 98:6 104:6 106:6

laptop 168:6

large 39:24 52:19 60:19 139:10 199:22 200:11,13,16 201:6 221:25 274:13 302:22 340:2

larger 73:20 86:15

larger-than-anticipated 159:19

late 19:15 29:10 59:15,21 257:18 317:7

latest 78:15 155:11

Latham 6:20 7:10,12 10:21 32:8,12,23 33:2,7,18 96:11 97:5 166:8 168:7 178:16 180:2 181:17 182:12 185:9,25 186:11,20 190:2,9,13 310:7

law 6:20 9:13 153:23 311:3

laws 146:21 147:3 309:6

lawsuit 146:15

lawyer 147:21

Lead 324:21

leader 194:8

lean 111:12

learned 131:1 136:2

leave 70:10 114:6

lectured 127:15

led 39:2 49:16 258:4 321:24

left 54:24 114:3 132:7 142:16

legacy 35:19

legal 22:18 29:23 42:3 66:5 109:25 111:8 112:4,7 134:21 135:8 146:24 147:11 149:25 150:20,25 151:16,17 152:5,8,11 153:14 154:7,12,16 155:24 156:8 157:6 318:21

legalese 266:20

legally 147:14,16 148:15

length 166:18 305:24

lengthier 159:19

lengthy 110:10

lens 69:15

let's 85:14 93:10,20 134:10 159:7,8 165:12 213:23 222:12 263:7 297:16 343:1,2 345:19

leukemia 198:24

level 86:9,19 239:16 243:8 284:25 285:22 286:2 287:5 294:16 318:8 321:11 337:17 338:5

levels 321:10

Lexisnexis 73:9

178:14 179:14 183:19 184:2

liberty 286:9

library 172:24 174:18 175:6,13 177:11,19

license 72:3 78:16 112:9,16

licensed 71:16 120:17,19,20 121:6

licensee 122:18,20

life 243:24 338:17

likelihood 71:2,3 150:11

likes 110:6

Lilly 38:18 39:2 200:14 336:5

limit 199:18

limited 241:16 337:7

Linda 42:20 43:7,8

line 10:5 65:24 66:5 69:10,17 70:1 74:4, 16 76:8,13 79:4 93:22 98:19 99:8,14 102:12,20 115:13,23 119:14 120:2 126:22 127:13 135:3,17 136:9,16 137:23 138:10,25 139:6,13, 16,21 140:1,25 141:1,6 143:12,21 145:7,17 154:19 172:13 194:21,24 195:9 198:18 229:17 246:10,24,25 247:25 248:13 252:3,14 280:1,16 282:10,21 283:23 284:6,7,13, 17,19 287:7 289:15, 22 292:7 293:5 299:4,13

lines 50:5 128:16 174:12 218:17 266:22 267:24 293:12

liposomal 49:12

list 87:11 94:23 99:3 167:8 168:3,18 169:10 179:1,5 189:22 191:15 195:15 197:18 232:19,21 239:21,23 271:20 273:9 289:2

listed 107:7,23 167:14,16,17 181:16 184:12 194:1 197:7 199:23 202:21 215:7

listen 33:18 208:25 250:24 251:17,19

listened 204:10 249:9 250:8,14,16 251:9, 17,18,24 252:6,12 254:9

listening 208:20 250:19 251:5

listing 277:19

lists 166:14

literally 18:13 133:22

literature 50:14,22 87:5 93:15 156:20 173:2

lithium 121:19 122:10

little 32:9 46:16 62:16,19 71:25 151:13 199:14 205:6 218:15 219:5 287:24 292:4

live 251:5,6 335:22

liver 121:21

LLC 120:7 122:25

**Confidential**

**LLP** 6:20

**lobbying** 119:2

**local** 44:16

**located** 6:6

**location** 108:20 148:5

**locked** 160:3

**log** 92:9 178:21

**Loma** 42:20 43:7,8

**long** 28:10 79:11 197:18 232:6,7 248:16 276:23 290:2 305:18 306:8 347:20

**longer** 335:22

**look** 20:25 23:3 33:11 39:11 40:2,4,23 41:11,13 48:5,8,18 52:11 58:22 60:7 67:25 79:1 90:4 91:6 95:12 99:23 100:3 106:9,25 108:4,7 110:4 127:22 128:7 142:13 144:15 159:12 160:1 161:22,23 163:13, 18,22 168:14,17 170:22,23 171:10 173:6 184:4,22 190:14,16 191:9 192:2,12,22 193:3, 17 195:10,13 202:20 212:4 215:15 219:11 224:5 231:21 232:1 240:7,8 241:14 242:23 243:10,13 248:22 253:14,25 254:2 257:19 258:8 263:10 269:24 273:18,21 274:16,20 275:4 279:13 291:24 293:3 299:20,25 300:11,17,18 311:5

315:4 325:7 333:20 335:15 342:9 343:7

**looked** 14:7 41:2,10 47:24 49:21 50:25 69:13 87:25 88:1 90:6,16 95:4,9 100:4 106:10 108:3 115:7 119:10 134:4 138:13,16 140:24 142:25 143:17,24 145:9,10,15 159:25 160:23 163:9,19,21 164:7,14,19,20,23 165:4,9 168:16 171:16 174:1 176:15 181:13 190:22,25 192:4,15 193:10,14 194:2,5,6 202:16 206:19 207:2,7,10 208:9,10 209:4,11, 20 213:19,25 215:10 217:10 218:3 221:12 222:9,24 232:2,3,17, 20 240:9 246:17 254:3 257:19,23 263:24 273:24 274:4 275:7,15,23,25 292:18 300:4 329:13

**looking** 18:10 22:7 29:12 36:12,13 39:5, 7 68:4 103:16 108:6 115:18 124:1 126:14 160:17,21 164:22 168:2 169:2,3 173:16 181:4 183:16 191:14,20,21 194:11 215:6 224:7,10 243:14 248:19 265:10 269:6,21 277:12,25 282:3 286:24 291:18 311:13 313:18 326:1 342:3,6 343:14

**looks** 40:6,8 53:14

193:13 199:10

**lot** 28:3 31:18,20 32:19,24 33:3,12,13 36:13 43:25 45:22 60:19 78:9,10 88:23 91:4 96:18,20 103:10 109:2 113:2 115:9 135:4 138:16 148:8 150:8,15 160:20 173:1 204:19 205:18 206:1,11 249:18 260:14 264:16 288:1,7,8,25 294:1,18

**lots** 78:2 97:18 115:20 131:10,11 133:20 252:6 274:14 286:24,25 287:6

**lousy** 137:5

**low** 286:2 302:24

**lower** 107:12 174:11

**luck** 114:15

**lunch** 148:11

**luncheon** 152:19

**lying** 308:18

**lymphocytic** 198:24

---

**M**

---

**M-a-z-a-n-e-t** 21:24

**M.d** 34:3

**M.D.** 8:6 13:13 21:24, 25 42:20 43:11 116:25 153:3 348:22

**magazine** 132:22

**magnitude** 293:24

**main** 205:7

**majority** 42:2 88:16,

18 145:7 198:7 204:22 205:13 297:8

**making** 21:4 30:7 119:1 140:19 143:1 204:23 211:16 226:3 282:23

**malignancies** 38:2 71:23

**malignancy** 38:20 335:20

**Malley** 22:3

**management** 44:14 46:24 60:25 67:18 151:12 220:22 335:20

**manager** 22:4

**managers** 20:23 36:19 129:25 323:14

**managing** 122:25 123:3,4,23 131:22

**mandatory** 147:1 286:15,19

**manual** 134:12 135:20

**manuals** 135:13

**manufactured** 46:13

**manufacturing** 121:1

**March** 114:3 116:24 163:8 199:12 264:7 313:8

**marginally** 85:4 265:3 307:25

**mark** 23:21 121:12

**marked** 11:6,9 24:4 33:24 34:4 42:10,13 45:9,13

**market** 27:10 38:19 42:7 49:8,11 54:17

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 118 of 143   Page ID #:13566

Gregory Frykman, M.D.

Confidential

Hsingching Hsu vs. Puma Biotechnology, Inc., et al.

75:22 98:7 101:2 106:4 113:19,22 150:14

**marketplace** 150:13

**markets** 14:2 19:15 35:16,23 59:14 77:23 90:24 109:21 126:14 131:17 132:7,8 187:18,21 204:10,13 301:15 323:12 341:4

**Maryland** 8:16 72:2

**matched** 192:24,25

**material** 23:9,11 24:23 25:8 109:24 147:1,23,25 148:9, 18,20 149:1,7,14,20, 25 151:7 153:13 154:21 159:22 191:15 194:16 197:12 200:13,17,25 219:4 290:16 298:21 332:15,23 333:2 338:16,17,19,23 339:11,14,21 340:11,14,23

**materiality** 24:24 109:22 150:6,17 154:17 200:10 255:24 266:24 285:16 324:7 339:25 340:8 341:3 347:9

**materials** 83:23 87:22 94:24 95:17 103:17 159:8 160:15,20 163:18 166:2 168:18 172:1 176:20 184:5 186:10 190:1,25 193:13,14,18,25 194:5,12 195:10 215:8 231:22,24 232:15 248:23

262:13 263:15 270:4 292:19 309:25 318:16 319:12 325:22 330:14

**matter** 6:11 11:4,14 16:22 28:22 29:4 30:3 31:4,7,10,22 32:1,14 34:19 35:18 36:4 47:23 113:15 132:16 146:10 166:12 192:16 207:8 274:19

**mattered** 292:5

**matters** 20:20 29:13 32:10 35:15 61:21 277:13

**maximum** 287:17 289:4,6

**Mazanet** 21:24

**mean** 14:13 25:19 35:13 36:6,25 47:13 74:25 92:2 105:1 113:5 115:5 117:16 128:9,10 130:20 132:16 136:1 138:18,20 146:23 168:22 172:20 174:17 175:9,15 181:7 186:12 195:24 210:21 226:8 227:17 236:12 242:21 255:16 256:10 270:25 283:2 284:7, 17 290:1 297:23 301:11 302:13 304:2,14 318:4 331:2 332:3,10,14 335:19 336:16 337:11,23

**meaning** 259:3 346:14

**meanings** 113:10

**means** 21:3 77:24 128:11 284:19 286:19 336:15 337:19,21 338:11

**meant** 94:6 166:3

**measure** 319:20

**measured** 91:17,20, 22

**measures** 318:1

**mechanism** 104:13 105:3

**medical** 15:8 16:3,20 17:6,16 19:22 20:25 25:1 44:20,25 45:3, 5,12,16 46:5,10 47:10,20 53:6 70:25 72:2 110:5,6,9 111:10,11,25 124:5 125:7,9 131:16 135:6 140:17 141:18 154:25 155:8,10 157:14 158:7,13 170:25 181:20,24 188:1 194:8 196:19 201:8 253:15 255:12 256:21 257:4 258:2 265:4 285:8 324:9

**medically** 20:18,22 118:2 119:10

**medicine** 17:2 43:25 70:22 172:24 173:3

**meet** 30:12 114:16,17 154:20

**meeting** 52:25 53:13 54:6 62:20,25 88:9 89:21 94:21 111:18 125:15 135:6 158:13 174:18 175:6,13 177:10,11,19 196:8 201:13 241:21 266:10

**meetings** 19:23 60:20 63:8 71:5 83:11,14 89:2,7 110:9 111:25 125:7 155:16,20 175:2 253:22

**meets** 201:5

**member** 66:15 123:1, 4 125:4

**members** 14:1 71:22 105:12 123:3 274:11

**memory** 171:23

**mentioned** 104:5 105:4 108:7 124:13 126:17 127:9 133:17 135:13 139:22 141:17 154:22 158:11 198:21 206:3 235:12 249:23 250:21 253:13 260:5 310:4 342:19 347:12

**mere** 145:3 213:16

**merely** 311:17

**mesothelioma** 38:20, 23 39:9

**met** 47:8 63:12 97:5 180:6 185:16

**methodology** 180:18, 23 247:23 248:21 310:2,9,12 331:19

**metics** 259:16

**metric** 83:21 85:5 259:3 260:21 286:1 296:9

**metrics** 259:8,20 260:1,4 296:3

**Metz** 7:12 156:14

**microplace** 219:8

**mid-development** 99:16

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 119 of 143   Page ID
#:13567

Gregory Frykman, M.D.

Confidential

Hsingching Hsu vs. Puma
Biotechnology, Inc., et al.

**middle** 10:3 35:12
134:2

**millions** 149:13

**mind** 21:23 22:16
32:14 38:16 81:23
135:1 170:21
194:14,15 209:16,17
218:6 251:15,23
258:19 260:18 271:9
289:13 300:16

**mine** 23:19 38:22
167:21

**minimal** 298:25

**minimum** 285:11,14
286:3,24 287:10

**minor** 84:20 212:13

**minority** 276:4

**minutes** 62:19 348:11

**missing** 76:23 81:7,
17,21

**misspoke** 210:1
281:12

**Misstates** 94:15
211:13 277:3 339:6

**mistake** 12:23 13:2
281:18

**mistaken** 162:18
282:13

**mix** 222:1

**model** 92:19 205:23

**molecule** 99:17
105:11 238:13

**moment** 45:17 68:13
183:18 203:1,22
214:14

**money** 131:22
300:23,25 301:6,8
302:1 304:3

**monthly** 253:1

**months** 31:12,15
37:15 41:11 62:6
94:20 103:6,15
170:19,20 191:25
304:19,21 305:3
306:5,17,21 310:20

**morning** 7:2

**moved** 277:13

**multi-month** 84:8

**multidisciplinary**
84:8

**multiple** 37:7 255:17
341:11 343:15

**Murphy** 7:9 10:25
16:2,18 18:22 19:12
22:21 24:1 41:22
49:18 55:12,22 58:9
59:5 62:15 65:7
66:1,7,20 69:12
74:6,18 80:4,12,22
84:16 88:13 89:24
90:11,21 94:15
98:20 99:13,21
100:7,10 103:22
104:10,21 105:22
106:22 107:16,25
108:16 113:12 131:8
132:3 136:17 137:24
138:12 141:15
143:14 144:3 147:8,
18 148:10 149:3
150:2 151:2,20
152:10,16 154:9
156:2,15 157:8
162:15 164:3
180:16,24 189:7
190:3 195:12 205:15
208:13 210:11
211:5,13 213:5
214:4,11,24 217:18
219:18 220:16 221:5

222:20 227:15
231:14 232:23
234:19 235:7 236:15
237:14 238:6,21
239:11 240:16
241:12 245:19
249:13 256:12,23
258:14 261:1,13
263:20,25 264:8
265:15 266:1,7
275:13 277:3 278:13
280:2,19 281:9,21
292:20 295:3,21
296:6 299:7 302:10
306:12,24 307:17
308:19,25 309:9
313:24 314:12,17
315:2,12,19 317:6
320:3 327:21,24
328:9 332:7 333:13
334:9 338:24 339:6,
16 340:17 342:24
343:13 344:8,17
345:7,12 346:21
347:15,18 348:12,17

**muscle** 124:21

**mute** 156:14

**muted** 156:16

**mutual** 36:19 73:20
323:16

**myeloma** 37:7 250:21

**myelomas** 38:2

**mystery** 227:17

_____

**N**

_____

**name** 6:3 7:3,6 21:7,
19,20 24:9 38:16
51:24 87:8,14
108:22 113:23
118:22 138:1,9,22
139:3,15 250:25

**named** 21:23 146:14

**names** 21:13,18
22:15 272:1 273:8

**narrow** 24:13 38:19
48:24 250:5

**National** 17:19,21
44:24 75:20 172:24

**natural** 70:15 71:13

**nature** 31:13 80:2,21
82:3 200:12 279:18

**NCI** 18:2,15 44:13
87:19

**NCT** 108:22

**NDA** 49:17 51:1
54:15,18 87:25 88:3
279:5,25 280:15
281:2,8 284:12
344:16

**NDAS** 49:3,14 50:25
51:5

**near** 207:12

**necess** 107:2

**necessarily** 51:15
61:24 76:2 133:24
171:16 199:3 200:4
209:18 220:9 236:6,
9,10,12 249:20
260:21 285:20

**necessary** 195:14

**neck** 252:23

**need** 8:22 9:4,24
10:2,4 23:3,4,22
26:11 78:13,14 87:8
107:9 108:18 134:24
135:3 137:3 159:18
163:21 170:10
195:10,13 212:16
240:21 241:8,10
244:18 298:23

300:22 301:18 303:3,4,8

**needed** 26:6,7 32:10 33:11 49:22 106:11 109:3 121:1 125:1 170:14,23 202:19 229:23 250:23 324:7

**needing** 302:25

**needs** 36:3 137:7 201:5 266:25

**negative** 243:5 292:3

**negativity** 293:23

**negotiated** 28:2

**neither** 177:7 191:10

**neratinib** 79:18 82:3 83:22 84:2,10 88:18 89:21 90:3 92:7 93:1 94:18 96:14 97:16, 17 98:3,16,18,23 100:24 101:13,19 102:9,16 103:1,12, 19 104:8 105:5 106:14 193:25 238:10 245:13,14 271:15 325:9 326:9, 10,18,19 327:5,20 328:16 329:5,6,20 330:4,5,10,11,21 332:16,25 333:11

**Nerlynx** 193:4,25 194:5

**net** 41:23 101:6

**Neurotherapeutics** 125:17

**never** 22:22 50:15 65:2 73:9 75:9 135:23 136:6 151:4 157:1 253:23 258:20 265:9 274:15

**nevertheless** 84:21

**new** 49:22,23 50:3,9, 21 51:24 61:19 77:20 95:6,8 208:22 213:17 214:1,17 249:25 272:11 278:11,25 320:12

**newer** 263:10

**news** 303:23 304:14, 16,21,25 305:4,5,10, 19 306:5 308:24 316:13,14

**NIH** 183:7

**nine** 252:16 296:23, 24

**nodding** 9:5

**nods** 9:9

**nonapproval** 49:24

**noninstitutional** 323:21

**nonresponsive** 348:4

**nonvoting** 123:7

**norm** 253:7,9 254:17

**norms** 242:15 253:6, 10,11,18 337:5

**Northwest** 6:21

**notable** 69:22

**Notary** 8:8

**note** 207:7,15,16

**noted** 201:21 347:25

**notice** 213:18

**noticed** 12:23

**notify** 266:25

**notion** 85:10 98:3

**novel** 82:13 120:17

**November** 202:13

**now-updated** 328:24

**number** 11:7 14:14 18:3 19:6 32:25 34:1 42:12 44:4 45:7,11 82:24 85:24 92:6 108:23 131:10,18 132:6 145:10 178:17 180:5 184:17 186:14 187:13,14 193:16 207:22 221:22,24 222:6 232:5 253:1 257:8,20 261:16 273:15 274:13 276:2,5 277:20 294:7 300:9 302:3 307:20,23 314:20, 21,23,24 316:2 318:9 335:15 343:14,17 348:4

**numbers** 257:16 307:9 308:5

**numerator** 221:9

**numerical** 213:18 214:2,17 235:19 280:16 295:15,18 318:6

**numerous** 72:22 74:23 81:2 87:6

---

## O

**oath** 8:3 9:12

**object** 16:2,18 18:22 19:12 22:21 49:18 55:12,22 58:9 59:5 66:1,7,20 69:12 74:6,18 88:13 89:24 90:11,21 98:20 99:13,21 103:22 113:12 131:8 132:3 136:17 137:24 138:12 143:14 144:3

156:2 190:3 195:12 227:15 232:23 240:16 258:14 261:1,13 263:20 266:1 292:20 295:3, 21 296:6 299:7 308:19,25 313:24 314:12 328:9 332:7 333:13 334:9 338:24 343:13 345:12

**objection** 80:4,12,22 84:16 94:15 104:10, 21 105:22 106:22 107:16,25 108:16 141:15 147:8,18 149:3 150:2 151:2, 20 152:10 154:9 157:8 162:15 164:3 189:7 205:15 208:13 210:11 211:5,13 213:5 214:4 217:18 219:18 220:16 221:5 222:20 231:14 234:19 235:7 236:15 237:14 238:6,21 239:11 241:12 245:19 249:13 256:12,23 263:25 264:8 266:7 275:13 277:3 278:13 280:2, 19 281:9 302:10 306:12,24 307:17 309:9 314:17 315:2, 12 320:3 327:21,24 339:6,16 340:17 342:24 344:8,17 346:21

**obligated** 76:1 147:22 148:1,2,3 151:7 154:24

**obligation** 25:10 77:11 108:10 109:14,16,25 110:5 111:6 112:4 147:11

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 121 of 143   Page ID #:13569
Confidential
Gregory Frykman, M.D.
Hsingching Hsu vs. Puma Biotechnology, Inc., et al.

154:16,20 255:24 266:23 338:13,19 339:3,8,9

**obligations** 30:12 57:21 111:8,15 112:7 134:21 135:8 146:24 150:20 153:12,23 154:13 285:15

**obtain** 178:10 190:8, 25

**obtained** 190:1

**obviously** 147:23

**occasion** 61:10 250:14

**occasional** 128:5

**occasionally** 250:17 253:22

**occasions** 51:16 61:11

**occur** 96:13 157:15 187:19 189:3 249:19 258:12 304:7 306:4 316:11

**occurred** 64:11 73:11 93:25 101:13 184:25 211:7 258:16 262:1 280:10 310:15

**occurrence** 128:5 158:25

**occurring** 64:14

**occurs** 97:21 158:9 196:8 256:10 301:12,15 305:17

**ODAC** 87:21 88:9,18 89:2,7,21 90:3

**odd** 76:22

**offer** 31:18 72:3 98:2 101:12 149:5 185:2

227:21 228:13 243:21 252:5 282:16 328:21,23 333:2,3

**offered** 59:25 74:2 101:9 227:4 303:17, 20 305:12 317:2 345:2 348:8

**offering** 60:10 66:18, 23 67:8,14 68:10,19 70:7 71:1 81:8 93:4 98:17 99:5,10 100:19 101:8 116:19 138:4 150:16,19 160:13 164:18 165:2 184:25 185:1,3,17 186:7,10 187:2 188:5,7 189:19 225:20 228:9,19 243:16 244:1,2,8,18 245:5 282:16,18 283:11,14 284:10 297:20 301:1 303:10,12,18 304:20 305:22 306:11,21 307:5,13 308:9,17, 23 310:15,21,23 311:1,15,19,20 312:1,9 316:23 324:14,18 328:14 329:4 333:8 334:12 344:12,25 345:4,10, 15 346:2,5,17

**offerings** 60:12 67:3 116:22 184:18,19,23 185:7,13,15,22 186:3,22 187:6 188:10,23 189:3 301:16,17 302:1,8 308:2 309:15 310:3, 25 311:14,22 314:14,24 315:9,17, 22 316:3,17

**offers** 219:5 333:25

**office** 51:23 52:2 55:1 114:20 117:24,25 118:9,12

**officer** 44:20,25 45:12,17 46:10 56:15,18 122:23 123:23 124:5 140:17 141:18 253:15

**officer's** 194:8

**officers** 45:3,5 53:6 123:2

**offices** 6:20 61:17

**oh** 54:16,22 72:13 84:12 97:2,8 106:3 112:12 116:10 124:22 138:18 146:23 173:11 181:8 187:9 194:6 202:3 207:22 216:7 217:17 220:1 250:12,16 297:3,8 316:5

**okay** 10:6,15 12:10, 25 13:2 14:21 21:7 24:6 42:25 58:14 87:12 90:18 92:20 97:2 101:11 117:3,8 120:12 121:11,14 152:16 161:8,11 163:25 168:14 179:10 188:21 196:6 202:11 209:23 210:2 214:7 219:14 234:25 243:23 251:22 255:4 259:24 261:4 262:16 265:17 268:25 274:9 282:25 283:5 291:12,15 296:24 307:21 317:10 330:7 338:9 339:19 342:20 345:19 348:15,17

**older** 181:6

**Omeros** 313:1,6

**omissions** 12:22

**onc** 300:3

**once** 73:12 114:21 210:20,24,25 211:7 264:3

**oncologic** 333:23

**oncological** 291:1 292:14 293:15 294:23 296:4,12

**oncologist** 16:3

**oncology** 17:6,16 43:24 44:3 85:18 88:24 155:8,10 221:17,18,19,22 222:2,3,11 223:9,11 224:2,6 244:16 255:10 257:12,13 258:12,19 259:1,6, 19 260:23 261:5,10 264:16 285:10 287:14 293:12 294:4 297:11 299:18,25 300:5,12 333:17

**one's** 220:18 222:3

**ones** 41:10 78:3 85:2 89:16 132:20 133:3 160:7 167:3 181:6 182:14 185:8 186:18,19 202:7,18, 21 207:4 208:18 222:23 226:19 257:22 271:23 275:5 292:17,21 296:15, 16,17 297:4 310:10

**ongoing** 175:22,25

**online** 33:10

**Onyx** 37:5 38:8,11 39:17

**Ooh** 122:13

**Oops** 156:14

**Confidential**

**open** 301:15

**operations** 189:15

**opine** 63:11 112:7 119:13 229:5 252:14

**opined** 227:12 303:13

**opining** 79:15 89:20 112:3 125:24 225:17 226:24 227:24 233:23 267:4,8 299:1,3 303:16 316:16,21 332:22 334:6,15,18 338:21 339:13 342:22 343:11

**opinion** 80:17 81:8 93:4,17,22 94:2 95:6,8,9 98:2,13,14, 17,22 99:5,10 101:8, 9,12 102:11,19 115:21,25 130:3 150:17,19 156:23 172:3 185:1,2 205:11 212:25 225:20 226:3 227:3 228:3,9,13,19 229:8, 14 236:13,17 237:19 243:17 244:1,5,8,19, 24 245:5 246:22 247:15 252:5 271:4 278:7 279:8 280:22, 24 282:8,16,18,23 283:11,14,20,22 284:4 297:17 303:11,20 304:8,9 305:13,14 311:1,4 317:2 319:18 324:14,18 325:4,18 328:14,20 329:4 333:2,8 334:12 337:3 339:20 340:10 344:13,24 345:2,5, 10,16 346:3,6,17,24 347:1,2

**opinions** 11:19,23 12:2,7,11,15,19 13:3 93:17 100:19 159:5 172:7 203:21 204:4 227:9 228:18 247:11,13,20 255:3, 7 269:7 270:9 281:14 282:5 290:24 342:7 348:5,7

**opportunity** 61:15 70:12 136:12 151:12 155:21 347:22,23 348:2

**opposed** 87:2 147:15 153:17 205:12 261:23 335:24

**oral** 125:18 174:23

**order** 155:25 195:7 207:24 252:5 259:11

**organization** 30:8 146:12

**organization's** 262:3

**orphan** 54:8,9

**ought** 81:3 118:21 227:20

**outcome** 15:4 71:9 75:3 84:7 85:5,24 86:6 91:1,8 99:8 110:11 129:1 149:8 151:10 170:22 218:15 220:15,20,21 226:12 233:15 239:14 240:7 242:4 260:2,17 261:22 278:20 285:18 291:20 293:21 294:19 295:25 317:25 319:20 322:2 329:10 331:16 338:16,20 340:1,5 341:1,18 343:22

**outcomes** 71:4 79:22 83:18 110:21 122:4 135:4 150:9 195:1 241:7,10,17 242:4 346:13,14

**outlier** 134:3

**outside** 42:5 60:19 67:17 231:1 232:2 279:20 283:15 289:15,17

**outstanding** 276:16 277:7,17 331:16

**ovarian** 89:12

**overall** 85:15 86:5 178:20 261:23

**overdose** 121:19 122:10

**oversaw** 49:25

**overtly** 243:20

**overwhelming** 89:21

**overwhelmingly** 85:3,4,11 87:1 90:9

**owned** 59:20 275:5

**owner** 114:8

**ownership** 273:13

**owning** 274:14

**owns** 123:7 276:17

---

**P**

**p-value** 86:9,18 91:6 92:12,17 178:22 231:3 239:15

**p-values** 231:3

**p.m.** 152:18,19 153:2, 7 165:15,18 215:1,4 269:1,4 317:12,15 345:21,24 348:19,23

**page** 11:17 12:4 34:3 47:3,6 159:2,4 184:4,5 190:15 191:14,18 197:2,8 199:8,9 202:10,12, 15,23 203:2,4,8,10 215:8 224:13 242:10 246:12 247:1 255:5 262:5,7,8 282:4 309:24 317:5,17 323:6 324:20 326:5 330:17 334:24 336:25 337:1 341:16,20 342:3,9, 21 343:9,14,17,19

**pages** 11:8 42:13 110:14 232:7,8 290:2 342:5

**paid** 73:9 138:4

**papers** 21:1

**paradigm** 220:22

**paragraph** 242:9,12 292:8 322:25 324:21 326:2 330:18 337:2

**parallel** 196:14

**parameters** 180:12, 14

**parcel** 15:4 249:2

**parent** 65:19

**part** 13:22 15:3 18:2 24:21 32:20 47:10 50:15 53:5 60:18 67:21 87:22 98:4 111:15 132:25 160:4 167:20 179:12 194:23 206:25 212:13 224:5 248:21 249:2 262:9,15,19 276:23,25 282:15 292:11 311:6 312:19 319:14 322:23

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 123 of 143   Page ID #:13571

Gregory Frykman, M.D.                    Confidential        Hsingching Hsu vs. Puma
                                                             Biotechnology, Inc., et al.

329:14 346:11 347:1,2

**part-time** 320:9,10

**participants** 105:20 141:3

**participate** 96:25

**participated** 248:5,14 249:9 250:9 251:9

**participating** 17:12

**particular** 15:11 28:22 35:18,23,25 36:3,9,11,15 48:7,21 52:21 57:20 60:22 69:20 71:7,12 75:4 77:20 78:3 79:4 86:5 91:2,9 96:23 99:2 100:5 105:10 107:19 109:7,13 121:5 132:15 136:20,21 137:15 152:4 169:1 170:21,22,23 173:8 199:18 207:7 213:19 249:20 270:5 284:8,9 295:12 333:22,23 340:3

**particularly** 69:22 78:8,11,20 80:8 84:5 167:24 171:6 205:19 206:20 208:22 218:9 248:10 249:1 255:9 257:11 266:21 270:17 275:9 348:3

**parts** 52:14

**party** 146:14 194:18

**patient** 28:21 71:16, 19 92:4,8

**patients** 17:13 25:21, 23,24,25 28:11,18 43:22 44:2,7,9,10, 15,18 85:1 86:20 120:17 121:20

149:13 288:4 326:7 335:22

**pattern** 187:20 204:16 253:16

**pay** 116:5 303:4

**paying** 73:6 78:20

**pediatric** 124:25

**peer** 21:8

**peer-reviewed** 15:9 16:6 96:1,4 110:12 126:8 173:7 187:25 191:5 289:7,20

**peers** 21:21 22:11

**pemetrexed** 38:16 39:4,8

**pending** 6:15

**penult** 39:2

**people** 20:14 22:10 27:15 28:2,3 46:23 57:7 80:6 81:2,12 83:4 84:25 91:4 113:2 131:14,20 132:13 133:5 134:14 140:18 142:2 152:3 157:13,24 158:10,11 175:18 213:21 240:25 264:16,18 328:7 341:2

**people's** 17:14 27:10 73:13

**perceive** 134:20

**perceived** 36:7 155:15 204:20

**perceives** 266:23

**percent** 42:8,9 106:16 189:14 208:5 223:23 255:18 256:5,11 257:6 258:17,18 276:15,18

277:6,17

**percentage** 42:6 189:2 218:1 221:3, 11,21 255:20 256:18 306:19 307:2,4,22 316:2

**period** 18:8 19:24 43:20 46:6 174:8 188:24 216:4,21 217:13 221:14 222:14 330:8

**periodically** 300:25 301:10,11,22

**person** 21:22 40:5 49:16 52:17 141:19, 24 142:12,19,25 148:2,22 210:14 339:24

**personally** 17:4

**personnel** 157:16

**persons** 235:14

**perspective** 140:17

**pertinent** 33:1

**PFS** 261:7,12,23

**ph** 22:1,3 321:20

**Ph.d.** 21:24

**pharma** 20:19 73:23, 24 78:2,4,9 79:21 99:8 111:20 113:3 115:19 119:19,24 126:3 130:10 133:23 134:14 135:19 153:20 154:13 183:20 189:13 218:8 279:15 284:13 300:17 324:1 346:9 347:5

**pharmaceutical** 13:18 14:16 19:20 25:24 30:6,14 60:1

70:20 112:24 130:13 139:12 145:5 146:11 153:16 164:7 183:13 187:4 199:19 201:19 203:19 216:5,12,19 222:15 242:16 253:7 254:13 285:2 303:14 314:15,25 315:10, 18,23 316:3,9,10 334:23

**pharmacology** 142:10 194:9

**phase** 27:4,7,11,15 30:9 37:12,19,20 38:6,9 40:14 54:19 121:4 180:15 199:2, 3 200:16,19 218:18, 19 219:3,11,17,25 220:5,7 221:1 222:16 223:19 249:21,24 250:2,3,6, 11 251:10,11 257:2 259:21,23,24 260:19 261:5,10 285:10 286:14 287:14 298:21 340:2

**phenomenon** 305:17

**phone** 32:11 241:4

**photodynamic** 24:12 268:15

**phrase** 282:14

**physician** 22:2 71:16 72:6

**physicians** 16:23

**pick** 35:10

**piece** 76:22 77:20 82:13,16 86:8,16 92:22 238:13 239:13

**pieces** 109:8,12,22 209:15 284:9 294:19

Confidential

Gregory Frykman, M.D.

Hsingching Hsu vs. Puma Biotechnology, Inc., et al.

**pigeonhole** 29:20

**pilot** 125:1

**pitch** 60:8 67:24

**pivotal** 149:19

**place** 6:23 39:1 252:9 262:25 263:5 265:5 289:14

**placebo** 86:2 92:7 238:15

**placement** 36:8

**places** 14:19 15:6

**plaintiff** 7:4,8

**Plaintiffs** 6:13 8:11 153:9

**plan** 61:4 91:18,21 92:15 233:7,12

**planned** 62:4 125:19

**planning** 142:20 201:7 244:24

**plans** 47:18 52:24 60:15 284:11,22 285:6 286:16

**please** 6:25 7:16 8:3, 13 9:21 40:2 46:17 58:22 96:12 102:14 213:15 225:7 317:17 320:8

**plenty** 49:8 58:11 109:19 130:21 137:25

**plural** 224:22

**plus** 19:16 257:17 290:13

**point** 9:25 12:17 20:9, 10 48:9 54:1 64:19 68:3,4 69:2 81:17 82:9,10,25 84:4 85:9 86:6,24 87:4,6,11

91:9 102:24 103:16 129:23 136:13 139:2,8 157:20 163:2 168:9 170:6 184:22 187:23 196:9 207:11 229:4 246:12,16 253:17 254:15 265:16 276:11 310:16,19 316:7 323:4 326:4,5 329:2 333:15 341:16,20 342:12,20 343:9

**pointed** 126:18 167:12

**points** 82:20 161:9 294:20

**poisoning** 121:23

**policy** 59:16 70:12,22 72:15,16,21 74:2 76:5 77:14 115:5 127:4 194:15 242:23 248:5 262:10,23 263:18,24 264:6,13, 15,23,24 265:8,11, 13,19,25 266:6,17 267:6,10,18 333:20

**politely** 31:21

**pop** 73:13

**population** 288:20, 21,23 324:25 325:5, 15,20

**populations** 288:19, 22

**portfolio** 20:23 22:4 36:18 53:8 129:25 323:14

**portion** 57:23 58:2

**pose** 40:15

**posed** 25:14 30:11

37:13 38:24 40:1 53:9 118:8 151:5 271:12

**position** 45:16,19 46:7 56:20 87:15 117:15 119:8 302:15,20,22

**positions** 45:12 46:11 136:14 274:21 308:10

**positive** 200:14,15,24 220:21 243:5,6,7 278:20 292:2,3,4 294:20 303:23,24 304:4,14,16,21,25 305:4,5,10,19 306:5, 10,22 316:13,14 337:15 338:2

**positiveness** 308:24

**positivity** 293:22

**possi** 231:9

**possible** 110:7 183:9 217:7 231:11

**post** 288:14 330:4,11

**poster** 196:24 197:15

**posters** 174:24

**potency** 46:14

**pour** 298:4

**power** 86:21 178:23

**powered** 329:24

**practice** 23:1 67:9 83:9 90:23 98:19 133:15 134:6 151:9 154:5 187:18 200:7 201:15 206:22 207:14 214:16 255:21 256:6,10 290:9,19 333:20 336:13 337:7

**practices** 13:17 16:8 18:20 19:9 20:15 21:10 22:19 30:16 50:13 63:12 65:25 66:11 70:2 74:5,17 76:9,13 93:23 99:6 102:13,21 115:14,24 119:15 120:3 125:25 126:7 127:6,15 128:1,13 129:21 130:9 131:6,25 133:10 135:17 136:9 137:23 138:11,25 139:7,17 143:13,25 145:8,17,21 156:25 171:3,12,18 172:14 195:9 198:18 200:1 204:5 246:24 252:3, 15 280:18 282:11 283:24 289:16 299:2,5,13 300:19

**practicing** 77:13,14 84:24 155:10

**practitioners** 85:12 87:1 134:25

**pre-march** 251:13

**pre-revenue** 298:1

**preceding** 188:2

**precise** 318:10

**precisely** 317:24 318:5 330:24 331:17 332:2 334:5,8,17

**preclude** 111:24

**precluded** 155:3

**predated** 231:24 232:11

**predict** 205:24

**predisposed** 218:21

**preferentially** 85:19

Gregory Frykman, M.D.

**preferred** 288:21 296:9

**preliminary** 40:17 316:18,24

**preparation** 31:19

**prepared** 11:13 225:14

**preparing** 34:7,16 128:18

**prescribe** 135:1

**present** 6:25 60:5 116:1 154:24 155:5, 21 210:15 286:12 338:19

**presentation** 15:8 61:24 94:20 97:9 111:17,24 125:18 135:5 156:1 157:17 174:23 175:1 187:25 188:3 196:8,11,18 197:15 241:20 257:4 264:21 266:10 267:14 307:7,15

**presentations** 19:22 21:1 71:1 83:15 110:10 125:9

**presented** 13:24 14:16 15:1,2,5,20,24 19:19 94:22 112:2 155:19 157:19 158:6 170:24 192:23 196:20,25 200:12 201:12 205:5 218:14 223:20 256:3 326:16

**presenting** 155:4 201:7 255:12 256:20

**presently** 268:10

**president** 56:17

**press** 13:20,25 14:8, 12 15:1,3,14,16

19:21 20:4,25 23:3 24:18 25:4 29:13 33:20,22 36:6,13,14, 24 37:1,10 39:20 40:4,18,20 41:3,12 50:9,13 51:2,12,18, 22 52:10,12,14,19 53:5,25 54:2,10,12 55:16 56:22 57:4,9, 14,24 58:2,6,7,10, 12,13,14,20,24 63:2 69:25 70:24 74:8,24 75:7,24 76:15 77:2, 21 78:1,9,10,22,25 79:5,14 80:1,15,20 82:1,7,14 94:3,11 99:6,18 100:1 101:9, 16 102:6 108:6,17 109:13,16,17 110:3, 4,18,25 111:2,21,23 112:8 115:19 116:16,21 117:24 118:9,12,23 119:7,9, 14 120:2 123:14 126:15,21 127:11,22 128:22,24 129:7,16 130:9,15,22 131:11 133:20,23 135:16 136:8,21 137:5,12 138:5,9,13,16,23 139:3,10,23 140:2,4 141:4,8,14,25 142:23 143:5,10 144:11 145:3,11,14, 15 147:5,7,17 148:4, 14,16 150:22,25 151:9,11,18 152:9 154:20 157:2,4 159:14 160:6,10 165:25 169:1 171:19 172:11,16 176:25 177:2,12,24 178:2, 11,18 179:21 180:4, 5 181:5,16 182:3,4, 9,13,19 183:8,12,21,

23 184:3,16,17,23, 25 185:6,21 186:2,9 187:22 188:12 189:5,21 190:6,17, 22 191:25 192:3,8, 14,17,23 193:19 194:16,20,24 195:1 196:4,6,15,17 197:24 198:4,10,15, 19,22 199:11,17 201:3 204:8,21 205:3,5,7,11 207:2, 9,18,20,21 208:1,8, 23 209:7,14 210:7, 15,19 211:4,11,23 212:11,23 213:4,10 214:3,19 215:10 216:20 217:3,15 218:1,14 219:10,15, 24 220:8,14,25 221:15 222:9,17,19 223:10,13,20 224:9, 11,25 225:21 226:17,19 228:22 229:1,16 230:3,7,8 234:11,18 235:5,22, 25 242:24 244:16 245:10,11 246:3,9, 10,22 248:19 249:5, 11,18,24 250:2 253:14 254:1,2 255:11,22 256:20 257:24 258:1 259:3, 9,16,20 260:23 261:4,9 273:23 274:1 278:22 279:3, 9,13,16,23 280:12 282:9 283:3,16,23 284:14 286:20,25 287:5,14,16 288:12 289:14 291:8,12 293:1,17 294:5,12, 18 295:6,13,17,19, 24 296:4,13,20,24 297:12 299:4,16,22

300:4,19,20 307:6, 13 309:16 310:6,14, 19,23 311:18 312:14,18,23 313:10,16,23 314:5, 7,11 316:14,18,24 317:23 318:15,19 319:19 320:16,22 322:3 324:4,17 325:10,11,20,23 326:23 327:1 330:3, 13,15 331:20 334:7, 16,19,21 335:1,3 336:7,18 338:22 339:5 346:6,8,24 347:4,5

**Presumably** 34:12

**presume** 53:24

**pretty** 28:15 32:13,14 52:15 136:2 148:12 186:25 187:1 272:17

**previously** 124:24 132:10 153:4 192:15 194:3 237:12,20 251:16,17,18,25 252:7 272:2 314:21

**price** 205:24

**primarily** 44:14,17 134:8 137:2

**primary** 47:9,13 49:13,19 70:3 89:22 91:9,11,13 92:16 106:20 108:25 110:21,22 198:8 231:3 233:5,13,15, 19,21 245:2 260:2, 20 261:17 270:23 272:9 278:10,24 279:4,24 280:14,25 281:7 284:21 285:19 317:25 319:20 321:8

**prior** 22:17 27:3 28:1

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 126 of 143   Page ID #:13574

Confidential

Gregory Frykman, M.D.

Hsingching Hsu vs. Puma
Biotechnology, Inc., et al.

30:1 41:15 51:19
52:22 58:15 61:15
64:13 75:22 82:6
89:15 93:2 98:16,18
99:11,19,25 100:1
101:10,13,20
102:10,18 103:6,20
104:18 141:25
157:21 162:6 163:12
191:25 230:17
253:13 308:10
318:24

**prioritizing** 241:20

**private** 23:18 72:23
90:25 116:12

**Privilege** 180:21

**privileged** 232:25
281:22

**privileges** 44:15

**privy** 308:3

**proactively** 52:6

**probably** 18:8 22:13,
14 24:6,16 31:15
45:6,7 71:17 75:21
76:14 77:13 84:12,
21 90:6 95:9,18
97:13 106:5 108:24
109:24 111:12
112:13 118:21
125:13 131:12
132:19 134:9 139:13
140:12,15 142:4
148:2,3 149:14
150:9 161:19,20
166:19 169:20
171:5,7 172:22
173:11 175:8,10
176:7 181:25 187:9,
16 193:9 198:7
203:24 206:6
216:15,16 220:1,8
223:14,23 248:18

251:12 252:18
262:15 263:12
265:21 267:24 270:5
277:11 315:24
345:18

**problem** 158:8

**proceeds** 230:4

**process** 49:17 50:1
83:8 87:23 142:3,8
145:6 191:13 197:16
322:24

**produce** 130:6

**produced** 73:5 95:5,
7,11,13

**producing** 319:16

**product** 39:6 120:17,
18 121:5 158:16
193:1 222:1

**products** 68:5 70:20
113:18 303:8

**professional** 16:13,
14

**profile** 82:22 98:9
104:8,9,12,16,19
105:7

**prognostic** 235:15
288:2,5

**program** 17:23
200:16

**programs** 104:4

**progress** 164:9

**progression** 70:16
71:14 85:17 178:24
260:8,9

**progression-free**
85:16 178:24 260:10

**prominent** 126:15

**promoting** 158:16

**promotion** 158:14

**promotional** 50:14,22
52:4 156:20

**pronounce** 106:18

**proper** 118:7 284:3

**propitious** 68:13

**proportion** 223:22

**proportional** 92:19

**proposed** 18:14
119:14

**proprietary** 73:2

**prose** 12:24 208:19

**prospectively** 288:9,
15

**prospects** 79:8
254:25

**protocol** 18:12 47:16
288:23

**protocols** 18:9,14
121:3

**provi** 144:2

**provide** 21:17 36:16
41:3 47:25 51:1,6,12
53:4,20 55:25 68:1,9
69:24 76:1 77:12
108:10,14 110:1
111:6 133:2 152:12
175:20 180:9 182:15
185:10,25 224:16
225:5,10 235:17,19,
22 244:24 267:17
278:18 302:12
313:21 347:2

**provided** 9:16 10:17
46:7,23 78:1 102:6
151:23 172:23
174:20 179:2,6,24
182:6 186:11 190:1
198:22 229:10

252:7,13 267:20
269:10 271:1 278:18
283:21 318:7 319:9
327:1 328:3 348:10

**provides** 29:22 55:19

**providing** 48:10
180:2 314:22

**proviso** 144:4,6,8
181:19

**public** 8:8 24:5 26:8
46:25 55:4,5,10,20
56:2,13 60:10 61:25
63:11 65:16,23 66:4,
11,18,23 68:10,19
69:8,14 70:6 71:4
72:17,23 74:4,15
79:21 82:6 93:1,14
96:7,8 101:7,20
102:10,17 103:1,20
104:17 111:17
114:24 115:12,22
116:10 117:20
118:12 122:5,16,19,
21 128:18 135:10
136:15 143:11
146:22 153:17,24
156:7,23 157:5
162:7 171:3 172:25
174:21,22 221:2
236:19,22 237:1
269:21,23 283:7
298:12 300:25 302:7
307:5 308:9,23
316:17 337:8

**publication** 15:10
17:2 86:25 124:17
125:2 126:9,10
133:13,19 135:14,21
173:7 187:25 191:3,
5 244:17 286:23
289:8,20

**publications** 16:6
38:13 39:12 70:25

Case 8:15-cv-00865-AG-SHK  Document 400-5  Filed 07/24/18  Page 127 of 143  Page ID #:13575

Gregory Frykman, M.D.

Confidential

Hsingching Hsu vs. Puma Biotechnology, Inc., et al.

94:17 96:2,4 110:13 124:2 130:6 134:5 173:16

**publicly** 23:8 25:10 26:7 33:4 55:21 56:5,16 57:10 58:8, 15 59:3 61:7 63:23 64:2 65:15,22 66:3,9 68:24 69:4 73:1 76:6,25 78:17 123:11 146:22 147:5,16 151:24 153:15,21 172:23 175:20 194:7 216:5, 14,18 217:1,15 218:2,7,19 219:16, 22 220:13 221:23 222:15 237:12 257:21 278:1

**publish** 98:1

**published** 21:1 36:14 38:8 39:7,14 77:1 105:25 126:5,12 135:23 176:4 188:13 198:12

**Pubmed** 166:11 170:13 172:21,22 173:5,10,13,21,22 174:2,7,9 177:23 178:6,8 191:9,11

**pull** 32:24 37:4 191:7, 9

**Puma** 6:13 80:15 94:2 96:15 99:7,11,18 101:10 112:8 155:17 160:6 162:7,12,22 164:13 195:4 201:11 203:18 215:18 224:17 226:18 228:4,22 229:17 233:24 234:5,15 235:3,17,19 239:1 240:25 243:18

266:11 269:15,18 270:9 271:10,18 272:3,24 274:12,25 275:5,11,20 276:7 277:7 278:8 279:14 280:12 293:2,6,8,16 294:5 303:11 324:25 334:20 335:10 336:7 337:3 338:22 339:3, 9 346:7

**Puma's** 79:14 96:7,8 112:4 140:4 141:3, 11 150:20 159:12,14 161:4 162:2,3 164:17 196:5 201:23 203:13 224:10 225:5,10 229:9 245:17 246:2,3,14 247:2,16,20,24 252:1,14 269:8 270:12 271:5 272:15,19,22 273:20 278:22 279:2,8,22 280:22 281:5 282:8, 20,25 283:12,15,22 290:24 291:10 295:1,9,20 299:3 300:19 309:16 317:23 319:19 324:16 325:5

**purity** 46:14

**purported** 290:8 331:11

**purpose** 27:13 50:4 51:20 52:3 70:4 175:20 191:21 198:8 208:20

**purposes** 13:14 15:17 26:22 99:24 138:17 145:10,16 169:8,21 174:4 175:6 178:12 191:1 194:10 197:20

199:16 202:17 203:15 206:19 213:25 216:1 217:23 218:3 221:4 232:10 266:24 297:5

**pushback** 52:12

**put** 15:14 22:13 39:1 84:19,23 134:10 152:2 156:20 174:9 201:3 214:19 228:20 232:21 238:25 241:4 249:23 257:8 289:1 298:19

**puts** 84:18

**putting** 179:18 287:22 313:18

---

**Q**

**Qualifications** 47:6

**qualified** 145:19,24

**qualify** 39:23

**quarterly** 163:4 302:17,23

**question** 9:21 10:4 13:7 18:25 22:9 23:7,8,10,23 24:22, 23 25:6,13 26:3 27:8,18 30:11 33:8 37:13,14 38:24 39:16 40:5,13,15 46:2 53:9 55:7,23 59:13 60:23 62:10 65:11 66:21 74:12 80:25 86:24 96:23 104:16 108:2 113:7 118:9 132:19 138:20 139:1 151:5,15 173:17 184:21 189:10 190:5 193:8 194:13 196:6,12

198:2 200:9 211:2, 20 212:17 219:20 220:23 223:18 225:7 227:19 231:10 233:8 234:3 235:1 237:3 245:23,24 247:17 250:4 256:8,15,16 259:5,12,18,19 261:8 263:7 266:3 268:20 276:2,4 280:5 281:3 295:7 296:19 298:10 299:21 311:25 312:5,15 313:25 315:8,20 316:20 321:12,14 322:15 332:8,18 335:14 340:12 343:2,6,8 345:9

**questioners** 206:13

**questioning** 348:11

**questions** 8:25 9:20 10:5 26:21 36:10 40:1 91:1 170:20 271:11,14 274:16 308:4 347:21 348:2

**quick** 64:9 274:7

**quickly** 176:2 277:15

**quite** 37:8 39:22 43:14 53:15 136:19 196:5 234:12 255:19 256:7,14 302:23 303:9 347:10

---

**R**

**radiation** 121:23

**radiocesium** 121:24

**raise** 60:10 189:19 274:15 300:23,25 301:6,8,9 302:1,25

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 128 of 143   Page ID
#:13576

Confidential

Gregory Frykman, M.D.

Hsingching Hsu vs. Puma
Biotechnology, Inc., et al.

303:9,22 304:3,11,
17,24 305:2,8,11,21
306:11

**raises** 316:8

**raising** 115:9 298:2

**randomization** 91:23

**randomized** 37:21
92:4

**range** 36:20 187:14
199:13 284:20
285:3,12,14 287:11,
17 289:5,15,17

**ranges** 181:1,4

**rank** 92:9 178:21

**rash** 105:8,13

**rate** 34:22,24 35:21
85:13 88:8 105:19
106:12 107:4,6,11,
22 178:21,23 235:24
236:4,25 237:24
238:10 261:7
302:16,20,23

**rates** 35:18 83:24
84:11 85:12 86:5
87:3 88:5,11,15
89:23 90:10 105:25
231:7,13,20

**rating** 261:12

**ratio** 77:9 79:8 81:5
82:12,15,17,23
83:10,12,13,20,25
84:9 85:6,11,20,22
86:3,6,10,18 87:2
88:4 89:1,23 90:9,15
91:5 92:17 102:7
206:5 219:7 222:23
231:2,7,12 238:15
239:6,8,16 240:5
259:9,25 260:21,25
285:25 296:9,14

297:2,7,14 318:7,14
321:10 328:6 330:2
333:25 337:16 338:4
341:19 343:22

**ration** 92:12 318:15

**rationale** 23:15 25:16

**ratios** 83:17 88:17,19
231:18 260:16
328:13

**raw** 260:7

**reach** 80:9 81:24
102:18 236:17 252:1
325:4

**reached** 29:9 327:23

**reaching** 103:18

**read** 16:5 17:4 64:13
75:21 76:14 95:25
96:3 97:1 133:22
134:15 140:25 166:1
171:24 197:19
209:1,2 228:1 230:8
244:15 247:10
251:16,20,21 254:9
283:2,20 294:10,12
321:19,23 330:13
347:23

**reader** 285:23

**readers** 151:9

**reading** 17:14 46:19
248:2,8,18 251:14,
22 264:13,14 284:3

**reads** 130:22 295:24
317:22

**ready** 58:21

**real** 40:13 64:9 280:5

**realize** 291:22

**realized** 281:17

**really** 40:3 83:20

109:3 119:3 120:4
199:21 220:18,23
279:20 296:1 323:23

**realtime** 65:8

**reask** 66:21 233:8
234:25 281:3 296:19
299:21 315:8

**reason** 10:1,8,16
95:16 107:19 108:4
120:9 132:25 179:13
183:24 193:6,22
218:11 255:25
259:18 270:3,5
312:4 320:17 331:10

**reasonable** 20:9
46:25 95:22 222:25

**reasonably** 190:15

**reasons** 27:1 48:16
84:22 218:17 324:7
327:7

**recall** 24:9 45:25 49:5
76:25 84:3 108:11
141:22 161:21 163:6
172:16 182:17
186:18 194:4 236:3
252:8,17 263:6
264:10 268:22 270:1
275:9 293:18 296:22
314:22 318:18

**receipt** 37:18

**receive** 14:18 54:7

**received** 132:21
133:1 166:8 180:4
181:17,23 182:3
183:12 241:3

**receiving** 43:11
326:11 328:16
329:21

**recess** 63:18 100:13
152:19 165:16 215:2

269:2 317:13 345:22

**recite** 154:12

**reciting** 289:19

**recognize** 73:17

**recognized** 132:21

**recollection** 268:3
276:14,15 277:10,15

**recommendations**
72:4

**record** 6:2,24 8:14
29:8 43:10 63:15,17,
20 65:10 72:6 93:14
100:12,15 123:10
125:23 152:18 153:7
165:11,13,15,18
166:9 170:14 173:8
174:3 215:1,4
237:18 238:18
268:24 269:1,4
317:12,15 345:21,24
348:20

**recorded** 6:9 250:20
251:7 254:10

**recordings** 6:22

**Redlands** 43:4,5

**refer** 94:18 192:14
258:24 292:13
297:20 326:2

**references** 99:4

**referred** 35:22 50:2
96:1 161:20 238:12

**referring** 37:16 64:10,
12 93:24 210:9
224:24 226:10 291:8
292:16 323:1

**refers** 294:19

**refined** 136:5

**reflect** 42:18,19 48:14

Confidential

Gregory Frykman, M.D.

Hsingching Hsu vs. Puma
Biotechnology, Inc., et al.

49:2 124:4 125:3,8
136:23 199:21

**reflected** 143:2
159:17 195:5 242:16
328:25

**refresh** 171:23

**refuted** 194:17

**regard** 11:3 25:3
50:13 56:3 58:17
62:6 67:7,16 80:20
82:19 90:8 92:14
101:8 102:3 108:17
111:16 112:8 115:1,
2 118:9 130:9
134:19 144:10 147:4
148:13 150:21
154:14 163:20
171:21,22 186:2
207:1 226:4 267:21
286:16 287:3 288:18
293:13 310:5 320:23

**regarding** 39:12 51:7,
12 70:6 71:8 84:2
89:11,22 92:25 99:7
100:18 101:13,15,19
102:9,16,25 103:19
108:15 124:20 126:6
127:15 128:13,18
129:8,16 138:9,23
139:4 143:6,11
145:11 148:14,16,20
149:1,24 150:17,20
156:23 160:12
171:11,19 172:12
176:25 177:3,5,12,
17,24 178:4 185:7,
21 186:2,10,22
189:23 198:19 204:4
219:17,24 224:5,17
225:5,10 231:22
240:20 241:23
247:16,20 249:21
250:2,20 251:10

260:24 261:4,9
264:20 267:17 272:4
281:14 283:12,17
287:14 297:19
299:17,24 300:5
314:3 325:19 327:23
329:19 332:11,24
333:10 336:19
342:7,10 344:13
346:7,18 348:3,5,8

**regardless** 154:2
201:17 344:21

**regimen** 328:17
329:22

**regimen[(s)** 326:12

**register** 37:11

**regular** 10:1

**regulate** 83:16
158:18

**regulation** 50:18 52:8
70:18,21

**regulations** 146:21
147:3

**regulatory** 68:4
142:18,24 219:7
284:12,23 286:17
287:4

**related** 15:10 29:13
164:17 173:2
184:18,23 195:16
196:3 247:15 293:11
305:4,5

**relates** 14:12 180:17
292:21

**relations** 117:25
134:14 140:14

**relative** 302:24

**relatively** 192:16
312:3 340:2

**rele** 207:18

**rele-** 300:11

**release** 13:25 14:8,12
15:1,3,14,16 23:3
24:19 25:4 33:20,21,
22 36:13,24 37:1,10
39:20 40:4,18,21
41:3,12 51:22 52:12,
14,19 53:5 55:16
57:9,14,24 58:3,6,7,
15,20,24 74:24 75:7
77:2,22 78:22 79:1,
5,14 80:1,15,20
82:1,7,14 94:3,11
99:7 101:16 102:6
108:17 109:13,17
110:3,25 111:22,23
112:8 116:21 118:23
119:7,9,14 123:14
126:22 127:11
128:22,24 129:7,16
135:16 136:8,21
137:5,13 138:6,9,23
139:3 140:2,4 141:4,
8,14,25 142:23
143:5 144:11 147:17
148:4,14,16 150:22
151:9,11,19 152:9
154:20 160:10 169:1
171:19 182:20
183:12 184:25
185:18 186:9 187:22
188:12 189:5 190:18
192:3,9,17,23
193:20 194:21,24
195:2 196:6,15
198:10,23 201:3
204:8,21 205:3,5,8
208:1,23 209:7,14
210:7,15,19 211:4,
12,24 212:11,23
213:4,10 214:3,20
217:3 218:14 219:10
220:14 222:17,19

223:20 224:11,25
225:21 226:17,19
228:23 229:16
230:3,7 234:11,12,
18 235:6,22,25
242:24 244:16
246:4,9,22 248:20
249:5,11,24 255:11,
22 256:20 257:25
258:1 261:4 267:2
273:23 274:2 278:22
279:3,9,14,16,23
280:12 282:9 283:3,
16,23 286:21
287:14,16 289:14
291:9,12 293:1,17
294:6 295:2,6,14,19
299:4 300:20 307:6,
14 309:16 310:14,
19,24 311:18,25
312:8,14,18,23
313:10,16,23 314:5,
7,10,11 316:18,19,
24 317:23 318:15,19
319:19 320:22 322:3
324:17 325:10,11,
20,23 326:24 327:1
330:3,13,16 331:20
334:8,16,19 336:7,
18 338:22 339:5
346:7,25 347:4,5

**released** 54:10 220:8
311:23

**releases** 13:20 19:22
20:4,25 29:13 36:6,
14 50:9,14 51:2,12,
18 52:10 53:25 54:2,
12 56:22 57:4 58:11,
12,13 63:3 70:1,24
74:8 75:24 76:15
78:1,9,10 99:18
100:1 101:10 108:6
109:16 110:4,18
111:2 115:19 116:16

Gregory Frykman, M.D.

Hsingching Hsu vs. Puma
Biotechnology, Inc., et al.

120:2 126:16 127:23 130:10,15,22 131:11 133:21,23 138:13,17 139:11,23 143:10 145:3,11,15 147:5,7 151:1 157:2,4 159:14 160:6 166:1 172:11,16 176:25 177:3,12,24 178:2, 11,18 179:22 180:6 181:5,17 182:3,5,9, 13 183:8,21,23 184:3,16,18,23 185:6,21 186:2,7 189:22 190:6,22 192:1,14 194:16 196:4 197:24 198:4, 15,19 199:11,17 205:17 207:2,10,20, 21 208:9 215:10 216:20 217:15 218:2 219:15,24 220:25 221:16 222:9 223:10,13 224:9 229:1 230:8 245:10, 12 246:10 249:18 253:14 254:1,2 259:4,10,16,20 260:24 261:9 284:14 286:25 287:6 288:12 291:25 294:12,18 295:17,24 296:4,13, 20,24 297:12 299:16,22 300:5,12 310:6 316:14 320:16 324:4 334:22 335:1, 3 346:8

**releasing** 78:18

**relevance** 100:6 168:25 172:9 173:17 191:19 202:18 205:7 206:5,16,17 209:18 211:18 218:15,23 219:5,6 249:20

256:15

**relevant** 78:8,12 101:22 102:1,2 171:6 172:2,7 176:11,14,20 194:19 203:20,23 204:4,22 205:13 209:9 218:9, 10 220:15 224:9 226:11,15,18 245:7 266:12 270:8,10 348:2

**reliable** 158:6

**relied** 20:1 32:23

**reluctant** 257:8

**remained** 176:1 329:16

**remains** 120:20

**remarkable** 329:9

**remarks** 225:14

**remember** 32:9 52:2 54:22 60:11,20 61:12 77:22 81:14 87:25 92:23 107:1 119:6,16 141:20 160:10 163:15,24 173:24 174:24 180:5 205:21 249:17 250:19 251:2 263:7 271:25 274:4 275:6 278:5 308:12 314:20 320:9 321:21 328:12

**remind** 180:25

**remit** 279:20 343:4

**renegotiation** 78:15

**rented** 158:15

**repeat** 345:8

**repetitive** 187:20

**report** 10:14 11:8,12, 21,25 12:4,10,22

13:5,9,12,13 34:8,16 47:2,3 49:2 73:15 74:14,22 75:1,2,3,8, 13 76:21 78:21,23 93:7,9 95:4,5,7,11 97:14 98:2 99:4 103:7 105:16 111:3 112:23 113:9,16 122:11 159:3,25 160:2,8 179:15 197:17 208:20 224:13 227:4,9,11 228:14,18,20 229:4, 19 243:20 244:3 245:4,16,25 246:13, 20 247:1,5,12,15,19 281:20,25 282:2 283:1,6 289:9 290:1 291:3,5,6 292:16,17, 22 293:1,10 294:3 296:16,18,21,25 303:13 305:15 306:3 317:5,18 319:14,16 334:25 335:5 336:3, 14 341:7,12 342:18 343:10 344:2 348:3, 6,9

**reported** 144:8 346:15

**reporter** 6:5 7:16 8:3, 21 46:16 223:4,7

**reporter-initiated** 29:7 43:9 65:9 123:9 125:22 237:17 238:17

**reporting** 6:4,6 13:19 16:9 18:20 19:10 20:16 21:10 22:19 347:6

**reports** 72:20,22,23, 24,25 74:1 75:5,10, 18 76:4 77:1,16,19 95:13 127:3 329:14

**repre** 15:18

**represent** 7:1 59:10 184:24 289:3 316:4

**representation** 242:3

**representative** 179:4 199:21 206:21 272:23 273:2,7,12, 19 275:25 276:8,20 277:1,6,16 316:6

**representatives** 322:7,14,19

**represented** 10:23 11:1 92:17 276:5 323:10

**representing** 15:18

**represents** 125:2

**reproductive** 159:21

**request** 52:11 118:15 347:23

**require** 54:9 241:15

**required** 50:20 54:7 108:14 113:20 147:6,14,16 148:8, 16 227:8 252:6 267:5 348:9

**requirement** 32:6 151:18 228:17

**requirements** 66:6 68:2 149:25 150:25 151:16 152:6,8 153:15 154:1 155:25 156:8 157:7 158:22 240:20,23 262:4 264:12 267:3

**requires** 240:18 265:24 266:5

**res** 92:24

**research** 30:7 59:19 73:3,5 113:24,25

Confidential

Gregory Frykman, M.D.

Hsingching Hsu vs. Puma Biotechnology, Inc., et al.

115:9 126:13 127:19 130:25 146:12 155:7 300:23

**residence** 117:11

**residency** 17:2

**resident** 43:17,18

**residual** 281:19

**resource** 175:17 176:2 197:4

**respect** 15:13 35:25 47:7 65:18 79:13 83:22 112:15 122:1 135:9 165:2 168:10 223:3,8 234:4 254:17 272:7 324:16 339:4

**respective** 200:11

**response** 9:10 37:24 38:1,3,4 178:21

**responsibilities** 45:25 46:4

**responsibility** 43:21 44:6 55:4,10 56:22 57:3 64:16 66:18,23, 25 67:4 68:17 116:15 128:17 157:4

**responsible** 57:9,13 58:1 64:20

**rest** 7:17 49:20 247:12 294:1

**resul** 318:23

**result** 8:22 14:6 39:12 67:23 75:8 92:1 127:7 128:19,23,25 129:2 133:16 144:13 178:11 181:18 189:4,16 192:25 193:19 195:9 198:4, 11 200:15,19,24 204:25 206:24

210:9,12,17 211:3, 10,16,22 212:10 214:18 217:3 219:11,15 220:15 221:15 222:9 229:13 230:21,23 233:7,10 236:5,8,11,13,16 237:7,25 238:4,5 239:24 240:1 243:1, 3,4,18 251:11 258:7 259:9 262:25 287:15 296:4,14 297:6 298:7 336:19 337:13

**resulted** 329:8

**results** 13:20,24 14:4, 11,15,24,25 15:2,13, 19,24 16:5,9 17:3,14 18:10,21 19:10,19, 21 20:4,16 21:2,11 22:20 26:22 30:17, 18 36:5,11 38:8 39:13,19,21 40:11, 15 48:13 51:3,7,13 52:23 58:25 76:19 78:18,19 93:13 94:21 99:19 100:2 102:25 108:15 109:12,23 110:7,16 112:1 122:15 126:1, 7 127:16,22 128:2, 14 129:3,4,8,10,11, 14,17,21 131:7 132:1 133:11 134:7, 20 136:22 137:22 138:10,24 139:5,11 143:6,12 144:8,22 145:4,11,21 148:14, 17,21 149:2,24 152:7,9 154:6 155:5, 19 157:6,19,25 162:8,13,18 170:1, 24 171:4 172:12 177:1,3,6,12,18,25 178:5 179:19

181:10,11 184:16,20 185:19 187:3,8 188:25 189:6,23 191:24 195:6 196:7, 16,21,23 200:2 201:7,9,12,16 204:6, 9 207:3 209:6,13 212:21 213:2,11,13, 16,22 214:2 215:12, 25 216:21 218:7,13, 21 219:2 220:7,14 221:1,16 223:9,11, 19 224:19 226:8,9, 11,14,21,25 227:13, 16,20,25 228:4,5,8, 11,21,23,24,25 229:2,3,6,10,21,22 230:4,5,12,16,20,21 231:23 232:4 233:14,16,18,24 234:1,5,8,10,17 235:3,16,20 236:20, 21,24,25 237:5,11, 12,20,21 238:8,9,11, 14 239:19 240:15, 17,20 241:1,6,19,24 242:18 243:11 244:9,12,14,20 245:1,6,12 248:7 249:5 250:11 252:20,22 254:12, 18,23 255:11,23,25 256:2,20 257:2,23 258:1,25 259:2 260:24 261:5,10 266:25 269:9 270:15,23 271:15 274:20 278:9 280:16 282:12 283:25 284:9,14,15 286:4 288:6,8,17 289:11 290:10,14,20 291:1, 3 292:14 293:14,20 294:3,23 295:1,8,15, 16,18 298:12

299:17,24 303:24 304:4,5,12 305:20 306:10,22 307:7,8, 15 308:18 309:7 310:14,18 313:14,22 314:4,10 316:11,12, 19 317:1,23 318:23, 24 319:5,8 320:11, 13,19,21,24 321:1,7, 8,15 322:21 324:9 326:16,17 327:20 328:7,24 329:12,14 334:21,22 337:8 338:19,23 340:15,23 341:1,8,13,22 342:7, 22 343:11 344:4,6, 13,15,21 345:1,5,11, 13,16 346:3,8,16,19 347:13

**results'** 296:12

**resumed** 153:4

**retail** 323:20 324:15

**retained** 28:24 35:25 38:13 39:11 62:11 67:6,12 68:23 69:4 133:9 174:9 298:3 329:9

**retaining** 135:4

**retains** 174:3

**retention** 29:3 30:25

**reveal** 281:22

**revenue** 298:19

**review** 18:9,12 36:23 37:2 38:8,13 39:19 45:18 49:17 50:1,23 52:11 53:4 55:15 63:2,5 65:16 69:8 72:16 79:23 83:23 84:1,2,6,9 87:21 88:2 106:1,10 114:23 115:11

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 132 of 143   Page ID #:13580

Gregory Frykman, M.D.
Confidential
Hsingching Hsu vs. Puma Biotechnology, Inc., et al.

129:7,16 140:22 166:22 194:8 195:2 228:8,10 262:10,23 293:7,15 313:6,9 318:12,20 319:21,24 325:8,17

**reviewed** 13:5,9 17:4 58:7,10 64:4 65:5,12 124:12 172:2 201:24 262:24 263:4 291:2 292:15,25 296:5,13 308:15 309:4,13

**reviewer** 267:12

**reviewers** 52:18 241:18

**reviewing** 32:21 47:9, 14 49:13,20 57:3 64:24 68:17 104:2 116:15 117:20 166:17

**reviews** 104:3 124:5

**revolved** 24:11 37:25 53:7 88:17 146:8 159:18 197:1,2 225:12 268:20 304:10 310:12

**revolves** 13:16 89:1 200:9

**revolving** 14:8 52:3 172:17 186:7 223:18 227:19

**rheumatology** 258:21

**right** 9:15 21:16 34:11,15 40:12 43:17 44:22 45:21 46:19 50:6 52:16,17 53:14,15 81:11 88:20 89:19 93:2 97:3 103:2 114:1 116:3,19,21,25 117:12,14 120:15

124:17,18,19 126:2 129:1 133:8 136:6 138:17 142:3 145:12 157:3 161:6,15 162:21 174:10 176:22 178:9 183:11 188:19 190:21 193:12,16 201:24 208:3,12 209:21 212:24 222:6 227:3 228:7 237:10 238:2 239:19 240:1,11,13 241:25 249:12 251:20 260:5 263:8 268:23 269:14 278:25 282:6 283:9 287:9 292:10 297:25 309:24 325:18 340:16,20 344:11 347:15

**right-hand** 174:11

**risk** 155:21,25

**risk/benefit** 77:9 79:8,17 80:2,21 81:4 82:2,11,17,22 83:25 84:14 126:25 206:5 219:6 239:6 240:5

**risumi** 116:23 120:10

**road** 8:16 40:24 41:4 134:2

**Robbins** 7:3,7

**Robert** 21:25

**robust** 62:1

**role** 30:3 59:16 76:5

**roles** 47:25

**room** 207:23

**Rosemary** 21:23

**rotating** 43:24

**rotations** 44:3

**route** 301:8

**routine** 166:12

**routinely** 16:5 20:19

**Rowe** 232:2 238:24, 25 239:22 319:2,4,9 321:13

**rudimentary** 166:3

**rules** 8:20

**Ryan** 7:24 156:15

---

**S**

**S-3** 160:12 164:25

**S-3s** 165:1

**safety** 26:21 46:14 71:11 81:19 82:4 92:25 93:13,14 94:19 97:16,20,23 98:9,23,24 101:5,6, 18 102:3,9,16,25 103:10,19 104:8,12, 15,19 105:7 127:1 204:24 230:20 232:9 236:21 238:19,23 239:3,4,21,24 240:1, 14 241:7,10,24 268:21 270:14,17 271:2,12 286:8,11, 13 318:23 320:23 321:1

**sakes** 143:20

**salary** 117:15

**sale** 46:13

**sample** 272:23 273:2, 7,12,19 275:25 276:8,20,24 277:1,6, 16 284:24 318:8

**San** 6:7 264:24 265:6

**sat** 204:10 205:1

276:21

**satisfactory** 22:11

**saw** 176:20 181:10 189:20 198:15 273:5 318:16 319:3

**saying** 39:23 53:11 69:22 78:25 84:3 94:10 104:7 137:4 169:7 233:23 234:5 241:4 244:2 299:13

**says** 116:1 230:3 241:7 244:6 282:8 286:23 342:12

**scattered** 208:6

**school** 43:5

**Schwab** 56:8,18,21, 24 57:3 58:18 59:20 60:4 67:11,15

**scientific** 15:8 19:23 21:1 47:10,21 70:25 110:9 111:25 116:2 125:7 135:6 154:25 157:14 158:7,13 188:1 196:19 201:8 257:5 258:2 265:4 285:8 324:10

**scope** 100:18 224:14 242:6

**scratch** 120:25

**screwed** 137:6

**script** 63:23 64:2,5,17

**scripted** 64:12,15

**Sea** 203:12

**search** 170:15 171:2, 17 173:19 174:12,13 178:18 179:2,6 180:3,4,10,12 182:5, 10,14,16,20 183:14 185:15,20,24 186:1

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 133 of 143   Page ID #:13581

Confidential

Gregory Frykman, M.D.

Hsinching Hsu vs. Puma Biotechnology, Inc., et al.

190:9 191:12 207:23 262:15 275:3

**searches** 169:7,11, 14,17,18,22 170:1,4, 10,17 172:6,11 173:9,13,20 174:3, 14 175:5,12 176:5,9, 19 179:3,7,20 181:2, 18 186:21 278:3

**searching** 192:21 195:20

**Seattle** 203:10 336:4

**SEC** 65:6,12 68:20 152:7 156:22 159:12 163:2,4 164:17 266:22 290:7,11

**second** 22:5 31:22 165:13 225:16 242:8,12 324:24 326:2,5

**secondary** 160:13 184:19 185:7 187:2 189:19 288:8,9 301:16 310:21 316:8

**secondly** 82:8

**seconds** 277:12

**section** 12:3,5,8 17:22 93:17 166:13 167:12 176:17 184:8 201:21 202:4 208:19 229:9 255:2 282:5 317:5,20 324:21 326:1 334:25 336:2, 7,25 337:3 342:9,17

**securities** 64:21,24 114:10 115:16 205:10,18 309:6

**Security** 156:9

**see** 8:20 37:20 47:11 52:12 60:22 74:10,

11,13,21 77:15 78:6 83:14 91:5,6 93:11, 20 106:9,25 110:6 115:13 124:23 127:10 130:14 134:4 142:9,10 143:22 157:12 166:16 168:20 172:11 173:7 176:24 177:2,6,11, 18,24 178:5 184:23 187:19 188:5 190:22 191:17,22 192:23 195:17 202:3 208:21 212:17 222:13 224:15,20 227:11 241:15 242:19 243:10 253:21 255:14 262:6 269:12,22 270:14, 19,21,22,24 272:12 274:7,21 279:14 284:1 286:15 291:4, 24 300:19 301:2 303:25 308:16,21 309:18 315:4 318:2 323:3,7 324:22 325:2 326:13 330:25 334:25 337:9 342:19

**seeing** 44:9 131:2 172:16 287:6

**seek** 37:11 87:24 155:18 188:14 189:18

**seeking** 144:24,25 272:11

**seen** 48:14 51:15 58:14 74:23 95:14, 15 122:11 131:10 137:21,25 138:23 139:4,15 149:17 157:16 228:25 253:19 261:18 265:12 274:13,15 288:13 307:24

**sees** 285:23

**segues** 348:4

**select** 195:22

**selected** 196:3

**selective** 151:25

**sell** 20:17,18 79:3 130:17 133:4 258:5

**semantics** 27:8

**sen** 322:25

**send** 58:22 72:18 78:24

**senior-most** 141:19 142:11

**sense** 14:22 76:16 133:24 134:1 136:4 242:24 287:7 293:23,24 294:14

**sensitive** 48:16,17

**sent** 33:19 53:5 54:13 166:9 168:7 319:2,4

**sentence** 224:15 247:10 282:7 309:19 317:22 324:24

**September** 89:9 203:11

**series** 37:15 112:9 195:15

**serve** 131:21 342:15

**served** 22:18,23 72:15 117:10

**serves** 213:18

**service** 43:24

**services** 60:1 119:18, 21 267:21

**session** 348:20

**sessions** 109:20

341:5

**set** 157:19 197:5 286:3,24 291:16

**sets** 133:14 135:15

**setting** 238:16 327:9, 13 330:23 331:14 332:6,12,17,25 333:6,12 334:4

**seven** 252:16 347:19

**shake** 71:11 98:24

**shaking** 9:5

**shareholder** 274:8

**shares** 273:15 274:14 276:5,7,16 277:7,17, 20

**sheet** 206:14 295:11

**Sherman** 321:20

**shipped** 50:5

**shops** 20:24

**short** 27:19 100:7 115:4 166:19 197:17 214:12

**show** 40:19 93:16 94:24 95:1 114:21 202:1,6 245:15,24

**showed** 104:18 136:24 278:20

**shrinking** 335:21

**shut** 114:13

**shy** 136:19

**side** 20:17,18 30:9 60:4 79:3 84:6 130:17,19 133:4 142:10 149:15 258:5 264:19 324:2 335:25

**sign** 347:24

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 134 of 143   Page ID #:13582
Confidential
Gregory Frykman, M.D.
Hsingching Hsu vs. Puma Biotechnology, Inc., et al.

**signaling** 134:22 144:19

**signature** 11:16 348:21

**significance** 20:3 84:21 86:9,18 178:22 239:15 241:19 243:8 244:25 284:25 285:22 286:2 293:25 294:16 318:8 321:9,11 337:17 338:5

**Sikora** 6:6

**Sikora-trapp** 8:8

**similar** 98:8,9 101:2 104:12,13,23,25 105:1,5 107:23 196:4,5 200:20,22 251:16,24 253:16 279:6 284:17

**similarities** 335:9,13, 16

**similarity** 281:15 347:3

**similarly** 6:12 200:19

**simple** 192:16

**simply** 33:8 117:2 193:9 218:25 261:3 269:20 274:7,18 275:15 279:23 304:9 310:12 313:2 316:7

**Sinai** 124:25

**single** 85:24 149:9 201:12 215:19 240:7

**single-arm** 37:22

**single-most** 341:11

**sinker** 79:4

**sir** 18:17 73:16 116:17 123:12,25

146:5 163:23 165:10,20,23 167:13 175:14 185:23 186:18 197:21 214:21 251:1 252:24 275:22 307:20 308:20 311:6 324:13 342:17 343:8 344:3

**sit** 97:25 128:5 139:14 169:13 182:8 202:15 243:14 312:21

**sites** 18:11

**sitting** 76:3 105:25 138:8 179:11 341:4

**Situated** 6:12

**situation** 38:12 328:2

**situations** 303:8

**six** 19:16 31:15 41:11 166:21 204:12 257:17 290:13 306:21 315:16,21

**size** 86:19 200:3,7 201:17 220:19 284:24 285:24 294:15 296:10 299:14 318:8

**sized** 200:20

**skeptical** 230:9

**skin** 105:8

**skip** 98:14 159:7

**Slattery** 22:1

**slide** 83:14 97:12 110:10,11 161:23 175:1

**slides** 161:12,16

**slightly** 318:17

**slowly** 46:17

**small** 31:12 32:1,14 52:20 92:22 99:16 105:11 110:24 111:1,2 113:6 189:13 200:11,23,25 201:10 216:2 218:19 219:1 226:10 238:12 249:22 276:3,4 312:3 316:5 324:4

**smaller** 199:23

**snippet** 324:4

**Society** 125:16 155:6, 7,8

**sodium** 121:14 125:20

**somebody** 42:25 109:23 142:9 189:10

**somebody's** 325:10

**somewhat** 298:1

**sons** 123:7

**soon** 223:21 255:25 304:15 305:9

**sophisticated** 323:1, 8,9,22,24 324:11

**sorry** 13:7 27:5 39:15 46:2,18 55:7,23 59:12 62:3,8,15 65:7 66:21 89:14 102:14, 22 130:18 138:19 139:1 146:6 151:15 156:15 165:13 180:10 188:18 196:15 198:2 202:6, 14 203:6 209:2 210:1 213:14 214:11 219:20 231:8 233:8 234:3,25 235:18 242:8 243:10 245:23 247:17 251:1 259:5 261:8 263:1 266:3 279:1 281:3 288:24

298:10 312:15 313:25 315:20 316:20 322:15 323:4 332:8,18 340:12 345:7

**sort** 22:7 31:13,20 36:2 37:14 40:6,24 46:4 48:25 49:21 76:15 79:3 98:13 100:23 108:18 109:5 119:11,23 128:6 134:1,15 140:5 171:11,24 185:21 191:12,13 195:20 205:20 210:21 212:5 250:5 253:5 258:8 260:14 277:10 291:22

**sorted** 239:7

**sorts** 212:15

**sought** 77:13 156:22 187:12

**sound** 34:15 48:12 199:12 201:23

**sounded** 25:9 32:5

**sounds** 97:2 124:18 180:22 193:16

**source** 97:25 178:10 184:2,13 190:8

**sources** 126:15

**Southern** 6:17 43:2

**space** 158:15 324:1

**speak** 8:23 15:21 61:7 62:12 89:7 111:8 118:16 243:12 246:18

**speaker** 213:16 225:13

**speakers** 161:22

Gregory Frykman, M.D.

**speaking** 14:3,4
59:10 112:19 210:14

**special** 291:25

**specialty** 21:21

**specific** 14:8 15:22
16:22 19:14 20:10
25:16 35:17 36:4
37:6 45:24 72:24
74:3 103:9,14,23
129:24 130:24
133:19,25 135:24
146:9 147:13 154:12
169:4,7,14 170:14
181:3 182:17
195:24,25 196:2,5
198:22 201:4 210:22
212:7 225:4,8,9,18
226:4 228:11
240:20,22 252:12
253:3 257:16 269:17
279:17,18 296:7
300:14 301:14,21
302:3 306:18 308:5
343:18

**specifically** 15:13
17:9 24:12 25:2
27:12 30:20 76:12
93:8 106:16 126:20
129:8 132:5 133:14
135:19 147:4 148:13
153:15 159:9 173:2
176:16,21 194:4,22
210:9 211:20 213:13
223:3,8 226:10
227:24 238:11
244:7,22 246:7
258:25 272:14
293:13,18 296:3
300:11 301:13
312:10 321:25
333:17 335:18,20
342:11

**speculating** 140:20

**speed** 121:2 176:3

**spelling** 12:23 13:2

**spend** 44:1 115:18
164:21 166:17

**spending** 36:12
302:17

**spent** 16:4 33:13
34:16,18 44:19
70:16 96:18,20
115:20 131:15 138:6
160:17,20 168:2
189:10 206:1 265:10
277:11

**splitting** 44:23

**spoke** 89:10,14,17
125:11

**spoken** 59:3 89:5
279:2 299:4

**sponsor** 18:1 75:11

**spreadsheet** 166:5,7

**staff** 44:15 52:11
60:14 124:24

**stage** 321:7

**stakeholders** 110:2,3
269:10

**stand** 53:20 143:19
153:5

**standard** 52:15 69:11
108:18 154:7 156:24
171:18 172:13
198:18 200:1,6
201:15 204:5 252:14
255:21 256:6,9
267:2 280:17
291:15,23 298:6,11
326:11 328:17
329:21 336:13

**standards** 69:16
80:16 99:9 136:16

172:19 194:21
225:22,24 248:1
279:16 280:1 281:17
282:22 284:13 299:3
334:21 347:6

**stands** 214:8

**Stanford** 56:12 59:17,
22,25 60:5 63:10
67:11,17,18 113:25
114:9,16,24 115:12,
22 308:13

**start** 35:11 269:8
296:17 323:1

**started** 28:11,17
58:19 59:21 156:13
253:12 254:7 330:10

**starting** 16:19 184:4
188:4 215:8

**starts** 199:8 255:5
324:24

**state** 8:14 32:2,6 50:5
64:8 72:1 305:2
321:3

**stated** 93:9 126:20
222:23 318:12 346:9

**statement** 118:1,13
206:15 226:4 304:23
321:17 330:21
331:5,13,17,22,25
332:19,23 333:4,9
334:2,5

**statements** 65:16,24
66:5 69:9 117:21
252:2 283:8 322:6,
13,18

**States** 6:16 73:21

**stating** 338:1

**statistic** 92:10

**statistical** 86:22
91:17,21 92:15

141:21 178:23 231:1
232:3 233:7,12
243:7 244:25

**statistician** 194:9

**statisticians** 92:11
141:22

**stayed** 344:19

**staying** 121:9

**step** 85:14 208:24
243:9

**step-by-step** 134:15

**steps** 180:1

**stick** 240:4

**stimulators** 124:21

**stock** 66:18,23 67:3,
8,14 68:19 70:7
116:19,21 123:6,8
137:9,11 164:18
165:2 185:21 186:2,
10,22 187:2 188:10
189:2 205:24 276:3,
7 297:20 300:25
302:1,7 303:12
305:22 306:11,21
307:5,13 308:9,17,
23 310:3,23,25
312:1,9 314:14,24
315:9,17,22 316:2,
17,23

**stood** 248:10 249:7

**stop** 86:23 347:16

**stopped** 327:16
328:7

**story** 190:15

**strategic** 134:22
144:10 255:25 324:7

**strategy** 39:1 287:3

**street** 6:21 77:23

**Confidential**

78:25 97:20 132:21 136:25 159:1 206:10 223:17 225:15 248:15 253:12 257:17 271:11 272:1 274:5 290:13 294:11

**strict** 262:3 264:11 265:21

**stricter** 264:23 265:18

**strike** 150:6

**strong** 328:3

**struck** 69:17

**studied** 121:18 325:1 327:11

**studies** 37:12,19 38:6,9 48:15 75:12, 14 159:20,21 223:19 249:21 257:2 286:14

**study** 26:15 27:11 74:22,25 75:2,8,10, 11,13,14,15,18 76:4, 21 111:3 122:9,11 218:18,19 250:11 289:8,25 325:21

**study's** 128:25 201:12

**Studylog** 116:3,7,11, 18

**Studylog's** 116:16

**stuff** 22:6 73:8,12 98:25 128:8 130:7 131:1 287:23

**subject** 16:11,17,22 132:13 248:3 253:23

**sublicensee** 122:18 123:21

**submission** 50:13,21 232:10 241:6

267:14,22 268:21 284:11,23 285:7 286:16 344:16

**submit** 50:22 52:9

**submits** 266:9

**submitted** 51:18,23 54:18 87:22 197:16 240:18 263:2 264:17 266:12 268:9 320:18 321:2 325:22,23

**submitting** 142:21 268:1,12

**subsequent** 15:8,9 60:10 111:17,24 135:5 162:17 310:24 316:19,25

**subsequently** 90:25 348:6

**subset** 111:1,3 131:20 179:4

**subsets** 288:2,18

**subspecialties** 43:25

**subspecialty** 17:6 131:15

**substantiable** 118:2 119:10

**substantial** 143:1 150:10

**substantially** 91:10

**substantiated** 98:2

**subtle** 113:14

**succeeded** 149:9

**success** 298:20

**successful** 150:12,13 261:22

**sudden** 20:11

**sued** 309:6

**sufficiency** 138:5

**sufficiently** 329:24

**suggest** 53:15 86:14 131:11

**suggested** 103:13

**suggestion** 327:17

**suggestions** 149:6

**suggests** 149:8

**suing** 30:6

**suite** 6:7

**summarized** 12:3,8 246:8 287:5

**summary** 12:5 33:19 34:2,6 45:23 93:10, 17 94:14 95:15 159:5 247:11,15,19 255:3 269:7 281:13 282:5 283:19 290:23 297:16 319:8

**summer** 29:10

**supplemental** 89:11, 12

**supplied** 186:20

**support** 86:25 300:23

**supportive** 335:24

**supports** 85:10 87:5, 15

**suppose** 180:14 189:10 263:16

**supposed** 23:24 41:21 157:25 242:2

**sure** 8:23,24,25 10:7 19:5 21:12 23:17 28:13 37:3 39:17 45:6,22 46:3,10 53:14 55:24 58:23 59:12 62:10,14,19

66:22 88:14 90:17 92:2 94:7 106:3 109:2 116:20 124:22 128:15 129:3 137:25 139:8,19 140:10 141:2 142:13 143:1 147:2,21 148:7,22 154:11 157:10 164:5,15 180:24 190:6 198:3 209:19 217:12 219:21 225:8 227:18 229:23 231:16 233:9 234:4 235:2 247:18 248:2 255:19 256:7 259:6 261:9,15 262:18 263:8 266:4 267:23 280:5 281:4,11 282:4 285:14 298:11,16 307:1 314:1 315:5 320:8 332:9,19 338:14 345:9 347:11

**surely** 137:3

**surgeon** 124:25

**surprised** 77:17 79:2 170:7 264:2 265:2

**survey** 272:3

**survival** 81:18 82:9, 15 85:15,16 86:5 91:14,15 178:20,21, 24 260:8,10,11,13 261:23

**sworn** 8:8 9:12 153:4 322:9

**symposia** 125:5,6 175:3

**symposium's** 265:7

**synonymous** 113:8

**synopsis** 175:23 241:16

Gregory Frykman, M.D.

**Systems** 116:3,7,11

---

**T**

---

**table** 31:19 176:13 238:24,25 239:2 306:3 313:18

**tables** 110:14 232:9

**take** 6:23 9:24,25 32:13 36:15 45:17 48:20 62:17 65:2 87:16 100:7 116:18 152:14 189:18 192:16 214:12,23 248:16 265:16 287:24 317:6 338:6 340:20 345:18,19 348:14,16

**taken** 63:18 100:13 107:2 128:12 165:16 180:2 183:1 215:2 269:2 317:13 345:22

**takes** 86:19

**talk** 41:21 47:19 48:7 60:15 61:20 62:5 67:18 75:17 128:5 240:5 253:22 254:21 262:2 323:23 342:13,18

**talked** 31:14 97:4 128:20 143:7 185:8 205:18 233:1 234:21 244:11 254:19 264:18 270:21 285:17 286:18 314:19 315:5 341:10,15

**talking** 40:12 108:5 153:12 234:23 254:22 259:23 281:18 287:10 291:13 341:24

**tally** 293:19 295:10, 11 296:2,7

**taught** 127:14 136:6

**teach** 130:5

**team** 47:10 194:8

**technology** 29:23 183:5

**telephone** 7:23 8:1

**tell** 18:17 23:17 27:6 40:3,5 45:18 66:10 83:7 88:20 94:5 103:24 105:24 106:24 112:12 113:11,13 127:24 129:25 140:10,24 141:2 150:5 158:23 164:6 165:7 167:13, 15 180:18 212:6,8 228:2 242:1 261:18 271:7,19 272:21,22, 25 273:8 276:10 282:1,2 294:8 305:8 307:3 342:5

**telling** 140:21

**tells** 244:19

**tend** 85:19 222:24 264:19

**tended** 206:3,4,11 323:10,13,14

**tends** 16:21 86:12 111:2 221:18 259:25 260:1

**term** 27:7 86:22 113:3 133:6 143:25 205:4 226:7 233:4,9 297:25 324:12 337:18 347:7

**termed** 128:3

**terminal** 77:25

**terminate** 26:5

**terminated** 114:12 128:25

**terminating** 23:14 25:16 57:19

**termination** 25:7

**terminology** 27:10 213:23

**terms** 13:17 16:9 18:20 20:15 21:10 22:19 23:5,14 24:3 30:12 32:15 33:19 34:20 36:6,7 49:22 76:18 79:21 83:20 90:14 110:17,21 112:22 125:6 134:24 137:16,17 173:20 179:2,6,24 180:3,4, 10,15 182:5,10,14, 16,20 183:14 186:1 199:4 218:16 235:15 241:20 254:24 285:15 286:12 287:1,2,3,19 294:7, 14 296:15 301:14 305:15 318:7 321:10 337:16,17 338:4

**test** 92:9 178:21,22

**tested** 121:16

**testified** 8:9 153:5 171:13 172:15 184:15 308:1 336:22

**testify** 10:8 11:24 12:3 146:3 244:13

**testifying** 6:10 93:12

**testimony** 9:15 94:16 100:18 203:17 211:14 224:17 225:4,9 277:4 339:7

**text** 110:14 241:25

242:7,13,24 281:19

**textual** 241:16

**Thank** 100:10 214:24 223:7

**theme** 260:15

**therapeutic** 36:9 68:7 86:15 120:17 285:5 315:15 329:8

**therapeutics** 120:7 122:24 123:13,16,24 125:12 127:2

**therapy** 24:11,12 268:15 326:11 328:16 329:7,21

**they'd** 73:14 327:19

**thing** 17:5 25:1 31:20 33:16,17 40:24 58:22 78:16 91:3 119:3,23 151:22 215:11 253:5 274:7 278:8

**things** 9:18 12:6 14:7 28:3 32:8 33:1,11,22 53:19 70:23 85:15 107:1 108:18 157:15 160:20 166:10 169:24 178:20 181:9 182:23 192:24 193:21 212:15 232:20 239:17,18 253:20

**think** 20:17,20 22:12 23:2 24:2,24 27:23 28:15 30:23 31:11 32:11,12 33:17 34:14 38:19 40:3 41:23 46:6,9,21 54:5,16 58:20 61:1, 2,3 68:11 69:1,6 72:25 80:24 81:4 83:9 84:12 85:6,10

Index: Systems–think

87:15 91:4 93:9 95:22,25 96:11 97:4, 13 108:2 113:10,15 114:9,20 118:2,3,18 122:17 125:15 127:8 128:20 129:11,19 131:4 133:1,17 135:11 137:4 139:18 141:6 142:21 143:7, 16 145:3 149:20,23 150:9 156:11 160:16,25 168:16 170:5,6 174:10,13 176:18 180:13 181:12,13 186:12 194:6 196:25 202:22 203:16,25 206:20 207:22 211:25 214:7 223:17 224:3 227:5, 19 230:1,22 231:9, 11 232:8,13 233:2 234:10 238:19 239:18,22 243:9 244:21 246:6,7 247:4 252:11,20 253:2 254:11 257:9 262:18 264:3 267:1 268:2,20 270:18 272:19 273:24 277:9,25 279:11 281:24 285:17 286:22 287:22 289:7,12 290:5 292:11 293:4 294:10 296:8,23 297:3 302:4 304:16 305:12 307:19 308:3 309:23 311:11,17 319:3 328:25 330:15 331:11 336:22 338:25 340:19 342:6,12,21 343:18 347:21

**thinking** 57:20 96:18 111:20,21 179:17

248:9 251:15 271:21,23

**thinly** 218:20

**thinness** 77:18

**third** 194:18 290:23

**thoroughly** 97:25

**thought** 14:1 22:13 41:10 70:8 71:9 76:10 77:6,18,19 81:21 83:8,24 90:1, 19 92:25 120:11 126:18,21 127:25 131:24 137:22 138:10,24 139:6,16 212:9 215:9 237:24 272:15 275:17 276:21 295:4 315:6 327:4 331:23 341:10,24,25

**thoughtful** 36:17 68:1 132:15

**thoughtfully** 53:4

**thoughts** 119:11 138:4 227:21

**thousand** 169:21 217:21 220:2

**thousands** 76:15 131:19 133:22 143:17,23 149:13 155:9 169:20,22 170:17 171:23 172:10

**three** 20:22 40:23 41:4 46:19 101:1 105:4 123:7 124:5 125:14 133:18 136:19 141:23 192:17 209:16,20,24 271:20,21 327:10 330:9

**three-year** 17:15 330:8

**throw** 203:24

**till** 87:12

**time** 6:1 12:17 17:19, 20 18:8 19:14,24 20:9,10 22:4 25:23 27:24 28:19 33:13 34:13,18 36:13 38:7 44:1,23 47:8,21 49:3 50:21 52:9 55:18,24 59:18 62:1,16,23 63:16,19 68:14,15 69:18,19 70:23 71:15,18 72:11 76:17 77:10 78:17 82:10 83:19 85:17 86:5 87:16 91:9 96:1,5,18,21 100:11, 14 102:23 106:2,6 109:20 111:14,21 112:14 113:22 114:12,21 115:10, 18,20 117:22,23 120:22 124:6 125:19 127:19,20 129:4,11 131:15 133:9,12 135:2 137:18 138:6, 22 139:2,19 143:3 148:11 152:17 153:6 154:22 157:11,13 160:17,21 163:2 164:21 165:14,17 166:16 168:2 174:8 178:24 179:17 186:8 187:21 189:11 196:9 206:2 209:9 214:25 215:3 220:6 223:16 249:3 250:8 251:8 255:18 256:5,11,18 257:7 258:16,17 260:8,9 262:25 265:10 266:9 267:1 268:25 269:3,19,21

273:23 274:1,5 276:11 285:21 289:21 302:7 303:3 305:24 312:2 313:22 314:4 317:11,14 321:4 328:6 329:2 330:8,9 344:21 345:20,23 348:13, 14,18

**timeframe** 24:17 28:23 59:15 251:13 262:1

**times** 6:23 60:21 75:25 79:3 97:5 114:19 133:18 136:19 137:7 149:17 192:22 248:20 255:17 302:3 341:11,15 343:15,25 344:15 346:10 347:12

**timing** 32:4 70:7 185:3,4 310:22

**titled** 13:12 184:8 324:21

**TKIS** 100:25 238:13

**today** 6:5 8:22 9:16, 19,25 10:9,12,24 11:2 34:19 133:18 138:8 139:14 169:13 182:8 202:15 253:18 254:1,15 260:6,7 312:21 341:25 343:16,25 347:12

**today's** 6:2 348:20

**told** 33:18 41:15 131:23 211:25 240:25 340:6 348:6

**Tom** 22:3

**top** 130:1 132:22,24 233:18 236:2,14

Case 8:15-cv-00865-AG-SHK   Document 400-5   Filed 07/24/18   Page 139 of 143   Page ID #:13587

Confidential

Gregory Frykman, M.D.

Hsingching Hsu vs. Puma Biotechnology, Inc., et al.

253:4 262:5,7 287:17,19 289:13 323:15,16

**top-line** 51:7,12 110:17,20 126:1,7 127:7,16 128:2,14, 19,23,24 129:21 131:6 132:1 133:11, 16 134:7,20 137:22 139:5,11 143:6 144:7,13 145:4,21 154:6 176:25 177:5, 12,17,24 178:4,11 181:11 185:18 187:3,7 188:25 189:4,16 193:19 195:8 196:7,16 197:23 198:4 200:2 201:16 204:6,8 206:23 207:3,20 213:10 215:11,24 216:20 217:2,14 218:1,6,13 219:11, 15,24 220:13 221:1, 15 222:8,17 223:11, 19 224:19 226:8,9, 22 227:1,12,16,20, 24 228:5,11,23,25 229:1,3,6,10,13,22 230:4,5,12 232:4 233:7,10,14,16,18, 24 234:5 236:5,7,10, 13,16 237:7,11,21, 25 238:4 249:11 250:10 251:11 254:18 255:10 256:19 258:24 259:3,9 260:24 261:5,10 269:9 282:12 283:24 290:9,19 291:1 292:14 293:14 294:3,23 296:12 298:7 299:17,24 300:4,11 307:6,14

309:15 311:25 312:8,14,18,23 313:14,23 314:4 316:18,24 320:20,21 336:19 337:7

**topic** 135:24

**Tor** 7:3 214:11

**total** 217:10 221:22 222:5 225:25 300:4 316:2

**totality** 240:8

**town** 43:8 59:20

**toxicological** 48:21

**toxicologist** 48:2

**toxicology** 48:15 159:21

**track** 97:20 165:8,21, 25 169:25 173:7,12, 14,19 175:12 176:8 294:25 295:8,9,23

**tracked** 132:10

**trade** 38:16 137:9,11 156:21

**traded** 23:8 56:5,16 57:10 58:8,16 59:3 63:23 64:2 65:15,22 66:3,9 68:24 69:4 123:11 146:22 147:5,16 149:18 153:16,21 216:5,14, 18 217:1,15 218:2,7, 20 219:16,22 220:13 221:23 222:15 257:21

**traditional** 61:13

**trained** 16:23 17:7 20:18,22 48:3

**training** 16:13,20,25 17:16 131:16

**transcript** 24:4 33:21 87:21 88:1,22 90:2 95:25 96:24 97:1 161:5,21 166:20 168:15 203:5,11 209:1,2 211:8 225:1, 2,3 248:3,9,19 251:15,23 263:1

**transcripts** 33:7 51:6 63:6 140:13,23,25 161:25 162:22 166:14,20,23 167:2, 5,15 177:5,17 178:4 201:22,25 202:16 203:15,19 208:17,23 209:3,21,25 210:3, 17 211:1,2,10,21 213:24 248:23 321:19

**transient** 327:17

**traveling** 115:8

**treat** 288:20 335:25

**treated** 71:15,18

**treating** 43:21 44:7 72:5

**treatment** 17:23 121:17 124:10

**trial** 13:19 14:5,6,11, 15,25 15:5,14,19 16:9 17:3 18:9,21 19:10,21 20:4,16 21:2,10 22:20 23:6, 14 24:8,10 25:7,17 26:1,4,10,13,18,20, 24 27:3,4,7,12,15, 16,20,25 28:11,20 30:9,13,17,18 39:12, 19 40:14 47:16,17 48:13 51:3,13 52:23 57:20 58:25 62:7 75:4,7 76:19 77:3 78:19 79:22 83:18

85:6,25 86:7,20,22 88:5,11 91:2,12 92:15 94:21 97:10, 11 99:8,19 100:2 104:2,9,20 105:20 106:13,16,21 107:6, 12,22 108:15,21,22 109:1,12,23 110:11, 16 112:1 122:15 123:17 125:1 127:7, 22 128:2,14,19 129:2,9 133:16 134:19 135:4 136:22,24 137:22 138:10,24 139:4,5 140:19 143:6,12,22 144:13,22 145:11 146:13 148:14,17,20 149:2,7,19,24 152:6 154:15 155:19 157:6,18 158:3 162:8,14 170:24 171:4,20 172:12 175:24 177:1,3,5,17, 25 178:5,11 181:10, 11 184:16,20 187:8 188:12 189:4,6,23 191:24 192:3,8 195:1,6,9 196:7,15, 21,23 197:24 198:4, 11 200:2,14,16,20, 22 201:4,16 204:6,9, 25 206:7,24 207:3, 21 209:5,13 210:6,9, 10,15,18 211:4,11, 16,17,22 212:10,21 213:2,9,11,13,17,22 214:2,18 215:12,17, 19,25 216:21 217:3, 14 218:1 219:3,12, 17,24,25 220:14,20 222:17 223:9,22 224:19 226:11,13, 21,25 227:13,25 228:8 229:6 230:13,

Confidential

Gregory Frykman, M.D.

Hsingching Hsu vs. Puma Biotechnology, Inc., et al.

17 231:23 233:6
234:6,16,17,24
235:4,13,16,21
236:8,21,25 237:1,8,
11,25 238:5,14,20
239:10,14,19 240:2,
10,15 241:1,6,17
242:4,18 243:1,3,11,
17,18,22 244:9,14,
20,25 245:1,6,8,12
248:7 249:4,11,24
250:10 251:11
252:20 254:18
255:11,12,22
256:19,21 257:24
258:25 259:12,22
266:25 268:8,17,19
270:15 271:15 272:9
278:10,19,20,23
279:4,24 280:13,25
281:6 282:12
283:17,25 284:14,15
285:6,8,11,19 286:4
287:15 288:3 289:14
290:10,14,20 291:20
292:1 293:23 294:21
295:1,16,19,25
296:4,12 298:12,21
299:25 300:12
303:24 304:4,12
305:20 306:10,22
307:7,14 308:18
309:7 311:25 312:8
313:14 314:3,10
316:19,25 317:24
318:1,9,22 320:14,
20 322:21 324:5
325:1,6,15 328:8,24
332:1 334:20,22
335:9,10,13 336:19
337:14 338:2,17,23
340:2,9,11,15,24
341:2,9,14,23 342:8,
14,18,23 343:12,21,
22 344:4,5,14 345:1,

3,6,11,14,17 346:3,
8,13,15,18 347:14

**trial's** 26:1 28:14
233:11

**trials** 16:6 17:12,13,
15 18:2,6 19:18
26:13 29:14 36:5,14
37:21,22 38:25 39:8
44:11 48:4,5,6 50:5
51:8 71:9 83:5
87:10,11 89:1
105:17,19 110:19
121:3 122:1,5,7
126:2 127:17 129:22
131:7 132:2 133:11
144:7 145:22 146:9
149:10 171:21
175:19,21,24,25
176:3 177:13 206:7
215:21 218:7,12
221:1,17 227:20
229:2 234:22 238:12
249:19 254:13 257:3
259:2,7,23,24
260:19,23 261:6,11
270:22 287:2 288:12
291:1 292:15 293:15
294:4,23 297:11
299:18 300:5 303:5
316:12 320:11
327:11 335:8,12
342:2

**tried** 90:18 113:1
160:22 165:23
335:17

**troubles** 115:1

**true** 103:14 125:11
164:15

**truly** 204:22

**truthfully** 10:9

**truthfulness** 156:19

**try** 26:4 41:13 67:25
72:3 102:14,22
113:16 165:8,20
188:23 190:5
193:17,21 199:20
207:3 217:22,25
220:11 279:14
333:21

**trying** 36:15 87:13
94:9 98:12 205:23
210:25 212:17 227:7
228:18 259:17
331:23

**TU** 175:3

**tumor** 335:21,23

**turn** 78:21 94:23
159:2 224:12 255:2
269:8 272:10 278:11
281:7 297:16 317:4,
17 334:24 336:24

**turning** 16:7 47:2
199:7 290:23 324:20

**twice** 126:12 210:20,
24,25 211:8

**twist** 325:10

**two** 17:18 20:22
25:22 28:1 31:12
37:12,19,22 38:6,9
40:23 41:4 43:19
44:19 49:3 50:24
51:17 55:18 70:11
81:18,22 84:11
85:25 89:16 94:14,
17 121:3 133:18
136:18 157:15
192:17 202:23 208:7
212:1,8 239:17,18
268:1 294:19 301:12
310:18 318:13
320:10 326:8,18
327:7,15 329:9,25
330:4,10

**two-day** 168:11

**two-drug** 38:22

**two-year** 18:7 28:23
329:1

**two-year-** 82:10

**two-year-and-28-day**
82:10

**type** 155:13 168:24
199:18 259:12 285:5

**typed** 190:20

**types** 221:20

**typical** 65:24 66:10
70:1 74:5,16 76:8,
13,16 77:3,5 93:23
102:12,20 115:14,23
119:15 120:3 125:25
126:6 127:5,15,21,
25 128:13 129:20
131:5,25 133:10,14
134:6 135:17 136:9
137:23 139:16 141:6
143:12,24 145:7,17,
20 154:5 171:3
206:22 213:1 214:16
246:24 282:11
283:23 290:8,18
299:2,5 302:7

**typically** 37:20 50:8
51:11 74:21 79:20
110:6,19 130:5
140:2 158:1,4 167:6
189:11 191:2 205:6,
11 231:18 260:16
270:13,19 271:1
272:25 274:19
278:18 287:8 302:1
323:22

**tyrosine** 105:11

Gregory Frykman, M.D.

Confidential

Hsingching Hsu vs. Puma Biotechnology, Inc., et al.

**U**

**uh-huh** 41:19 47:12 93:3 114:2 124:3 169:24 189:24 199:9 203:9,12 234:7 242:20 255:6 277:2 289:18 297:18,22 301:3 326:6

**Uhm** 203:22 222:12 294:7 300:1

**ultimate** 15:4 39:2,3 192:25 218:23 219:6

**ultimately** 40:19 53:25 190:13 198:12 318:12,20

**un** 180:8

**undergoing** 50:18

**undergraduate** 42:19

**underlying** 20:3 23:15 231:19 335:8, 9

**understand** 9:2,7,11, 19,21 20:2 21:3 82:2,16 92:16 96:13 140:22 147:6,14,15 148:15 155:23 183:2 213:15 227:8 247:12 265:23 266:5,11 274:23,24 295:24 314:24 329:19,23 339:9

**understanding** 19:18 51:11 79:7,17 80:2 100:23 101:5 104:17 108:13 122:14 140:6,9,21 148:25 151:6,10 153:21,25 167:22 199:25 205:9 230:19 231:5 233:17

240:19 274:9 287:1 301:4 320:24 326:15,20,22,25 330:1 338:10

**understood** 45:19 215:9 232:11 300:3 324:16 339:3

**undertake** 159:19 312:10

**undertaken** 40:9 120:21

**undertook** 322:24

**underwriter** 311:9

**underwriters** 308:8 311:9

**underwriting** 308:14

**unequivocal** 230:22

**unfavorable** 288:5

**unfortunately** 71:21 303:2

**uniformly** 109:11

**unique** 32:5

**United** 6:16 73:21

**universal** 259:25

**universe** 223:15

**university** 42:20 127:18

**unplanned** 288:13,18

**unrealized** 331:16

**unrelated** 182:25 183:4

**unsuccessfully** 124:15

**untoward** 128:10

**unusual** 248:11

**unvalidated** 230:20

**upcoming** 201:12 241:21

**update** 161:5

**updated** 162:18 263:9 329:12,14

**upgraded** 263:11

**upper** 46:24

**urgent** 303:9

**USC** 43:18

**use** 24:11 85:1,2 113:8,9 117:4 121:19,22 174:7 186:1 197:1,2 213:23 224:22 226:7 233:4,9 259:2,8,15, 20 282:25 283:7 291:15 292:7,8 297:10,11 310:2 324:12 326:18 327:20 331:19 347:7,11

**users** 106:14

**usually** 110:20 127:1 184:18 285:19 310:20

**V**

**vacuum** 96:14

**vague** 276:14 277:10, 15

**val** 231:6,12

**validate** 231:12

**validated** 230:24 231:6,7,13 321:13

**validation** 230:22 321:4,7 322:1

**validity** 279:18 346:12

**valuable** 155:15 204:19

**value** 82:24 178:22 235:15

**variability** 139:10

**variable** 302:5,18 304:18

**variations** 260:14

**varied** 166:18

**variety** 26:25 48:16 71:2 120:18 126:14

**various** 18:11 167:22 169:24 182:5 198:6 207:2

**vary** 109:4 198:23

**varying** 110:22

**vast** 145:6 198:7 204:22 205:13 297:8

**verbal** 9:5 223:5

**versus** 6:13 86:2,3 153:20 199:2

**vet** 157:2

**vetted** 141:25 279:19

**vetting** 139:23 140:3, 6 141:8,14 142:3,8 143:5 145:6

**vice** 56:17

**video** 6:9,22

**VIDEOGRAPHER** 6:1 7:15,23 8:2 63:16,19 100:11,14 152:17 153:6 165:14,17 214:25 215:3 268:25 269:3 317:11,14 345:20,23 348:18

**videotaped** 348:20

**view** 68:3,4 71:24

Gregory Frykman, M.D.

Confidential

Hsingching Hsu vs. Puma Biotechnology, Inc., et al.

96:10 97:15 118:13
134:9 158:4 205:19
239:14 333:3,24
344:3,20

**viewed** 36:11 111:9,
11 274:12

**views** 71:1 134:25
200:11 203:25 342:1
344:1

**violate** 24:2

**violating** 158:22
309:6

**virtually** 82:11,21
83:24 84:14 86:17
144:14 257:16,20
258:16 296:8 297:15
325:16 344:19

**virtue** 133:1,20
154:24 187:24

**vis-a-vis** 32:5 204:24

**vision** 237:10

**vote** 133:3

**votes** 133:4

**voting** 123:6

————————

**W**

**wait** 87:12 256:1

**waived** 348:21

**wake** 114:7

**walk** 135:3

**Wall** 77:23 97:19
132:20 136:25 159:1
206:10 225:15
248:15 253:12
257:17 271:11
290:12 294:11

**want** 27:5 29:11 33:6

70:14 75:17 87:15
104:15 107:3 128:7
134:22 137:4 147:13
152:15 155:5 156:17
180:24 202:7 209:19
212:6 243:25 246:11
270:13,19,21,22,24
278:17 338:6 340:5

**wanted** 137:9

**wants** 37:20 241:16

**Washington** 6:21
59:19 72:15,21 73:5
76:6 113:25 125:14
271:17

**wasn't** 53:6 70:3
115:9 163:10 179:17
193:22 208:6,7,22
209:9

**water** 10:2

**Watkins** 6:20 7:10,13
10:22 181:17 182:12
186:11 190:9

**way** 23:12 33:2 67:24
74:20 113:8 118:18
128:4 133:7 134:11
154:23 158:9 205:20
229:8 249:2 257:10
301:5,7

**ways** 14:15 38:2
132:16 170:7 257:10

**we'll** 9:25 10:5 87:17
97:12 338:7 348:15

**we're** 10:3 24:6 58:21
63:17 100:15 120:21
152:18 153:7
165:15,18 212:7
232:23 233:2 267:25
269:1,4 291:13
317:12,15 345:21,24
347:15,22 348:14

**we've** 58:6 62:15
73:15 169:2 214:11
244:11 253:25
270:20 285:17
341:10,15,24 343:15
347:19 348:1,4

**website** 190:19,21
191:5,7,11 192:19,
20

**websites** 190:25

**week** 126:12

**weekly** 39:25

**weeks** 62:5 180:3
304:19 310:20

**weird** 144:16

**well-described** 93:1
102:10,17 103:1,20
105:7

**well-established-**
105:6

**well-known** 97:11
272:1 305:16

**well-known-** 105:6

**went** 33:4,23 37:15
42:25 43:7 72:14
88:21 106:9 190:11,
20 226:17 275:3,15,
16,17 300:16

**weren't** 142:15
236:23

**West** 6:7

**when's** 72:11 112:14
251:8

**wide** 36:21

**widely** 151:24 198:23

**wildly** 139:21 149:10

**William** 22:1

**willing** 131:20 261:21
322:3 333:3 334:2
348:14

**wind** 73:8

**window** 301:16

**wisdom** 185:2

**wish** 111:9

**witness** 7:11,14 8:7
21:15 23:24 30:2
31:23 41:20 46:18
180:21

**witnesses** 29:22

**woke** 20:11

**women** 326:10
328:16 329:20
334:1,5

**wondering** 46:3
109:15

**Wong** 321:21

**word** 77:5 98:14
109:14 143:17
240:1,3 301:13
333:7 338:11
347:10,11

**worded** 53:16 74:19

**words** 294:7 295:12

**work** 16:14 28:25
29:5 30:1 32:4 35:20
41:2 42:3 54:25 83:8
100:22 113:20
117:17 121:1 184:15
204:9 250:22 274:18
279:13 300:17 310:5
343:2

**worked** 17:22 23:1
28:15 29:16 30:22,
24 34:7 44:16 48:25
49:3 67:10 118:8
197:5 308:8 311:21

313:5 320:9 323:15

**working** 10:19,21
44:14 65:8 67:2
166:7 268:9 308:1

**world** 327:16

**world's** 173:1

**worlds** 130:13

**worry** 266:21

**worrying** 138:7

**wouldn't** 67:16 131:9
144:23 167:13 199:3
200:21 264:2 265:2
307:10 312:4

**wound** 262:14 318:20

**write** 166:4 255:8
292:17 330:20

**writing** 115:8 121:3

**written** 110:14 159:25
160:2 320:15

**wrote** 47:7 73:3,8

**wsa** 333:5

---

### X

**XYZ** 137:5

---

### Y

**yeah** 36:2 46:9 62:18
80:24 89:15 90:1
97:2,8 104:23
105:24 106:24
107:18 114:14 117:6
142:5 143:16 147:20
151:22 152:12,16
154:11 156:4,18
157:10 161:10 177:7
179:8 190:5 197:1
199:15 202:9 205:17

206:25 208:4 220:18
221:7 222:22 231:16
237:15 242:11
250:16 251:12
259:17 261:2 266:8
280:4 292:11 295:4,
22 296:7,20 299:22
303:20 306:14
307:1,19 308:20
309:11 314:13
317:2,9 328:1,11
333:14 334:10
338:25

**year** 18:18 19:1,8,14
29:2,10 30:4 41:16
122:13 188:25
216:24 249:19 254:4
255:17 264:3 301:12
302:3 306:1 318:13
326:8,17 327:19
329:7 330:4 344:23

**year's** 262:22

**years** 16:4,13,15
17:19 19:6,7,16 22:3
27:23 28:1,6,16
35:20 38:18 39:8
40:24 41:4 43:19
44:19 54:23 55:18
68:23 70:11,16,17
75:21 81:18 83:8
84:11 96:16 97:19,
22 106:3 118:4
125:15 131:2 136:25
138:3,14 143:18
158:24 169:3 175:1,
2 181:9 187:5
191:25 192:17
204:12,19 248:5
250:13 252:16,17
253:1 254:7 257:18
260:22 261:6,19,20
264:17 271:11
290:13 301:13
302:4,25 306:23

307:11 314:16
315:1,11,13,16,21
318:13 320:2,10,11
324:2 326:8,18
327:15 329:1,9,15,
25 330:4,9,10
335:11

**York** 61:19

**young** 219:2

---

### Z

**zero** 212:1,8 214:6