# EXHIBIT A

| Volume II | Confidential | Hsingching Hsu vs. Puma |
|---|---|---|
| Gregory Frykman, M.D. | | Biotechnology, Inc., et al. |

**Page 353**

```
 1         UNITED STATES DISTRICT COURT
 2         CENTRAL DISTRICT OF CALIFORNIA
 3              SOUTHERN DIVISION
 4   ---------------------------x
     HSINGCHING HSU, individually
 5   and on Behalf of All Others
     Similarly Situated,
 6
                Plaintiff,
 7
         vs.                No. 8:15-cv-00865-AG-JCG
 8
     PUMA BIOTECHNOLOGY, INC.,
 9   et al.,
10              Defendants.  Volume II
     ---------------------------x
11
12     **CONFIDENTIAL**  **CONFIDENTIAL**
13     Continued Digital Audiovisual Deposition
14                    of
15          GREGORY K. FRYKMAN, M.D.
16            Washington, D.C.
17         Thursday, July 26, 2018
18              12:58 p.m.
19
20
21
22   Reported By:
23   Amy E. Sikora-Trapp,
24   RPR, CRR, CLR
25   Job No.: 10044960
```

**Page 354**

```
 1   Continued Digital Audiovisual Deposition of
 2   GREGORY K. FRYKMAN, M.D., held at the offices of:
 3      Latham & Watkins LLP
 4      555 Eleventh Street, Northwest
 5      Suite 1000
 6      Washington, D.C.  20004-1304
 7
 8      Pursuant to notice, before Amy E.
 9   Sikora-Trapp, Registered Professional Reporter,
10   Certified Realtime Reporter, Certified LiveNote
11   Reporter, and Notary Public in and for the
12   District of Columbia.
```

**Page 355**

```
 1           A P P E A R A N C E S
 2   ON BEHALF OF THE PLAINTIFF AND THE CLASS:
 3      TOR GRONBORG, ESQUIRE
 4      Robbins Geller Rudman & Dowd LLP
 5      655 West Broadway, Suite 1900
 6      San Diego, California  92101
 7      619-231-1058
 8      torg@rgrdlaw.com
 9   ON BEHALF OF THE DEFENDANTS and THE WITNESS:
10      SARAH TOMKOWIAK, ESQUIRE
11      CLAYTON D. LaFORGE, ESQUIRE
12      KRISTIN N. MURPHY, ESQUIRE
13      (present via video teleconference)
14      Latham & Watkins LLP
15      555 Eleventh Street, Northwest
16      Suite 1000
17      Washington, D.C.  20004-1304
18      202-637-2335
19      k.murphy@lw.com
20      c.laforge@lw.com
21
22   ALSO PRESENT:
23   Daniel Holmstock, Videographer
24
25
```

**Page 356**

```
 1   July 26, 2018
 2           C O N T E N T S
 3   CONTINUED EXAMINATION OF
 4   GREGORY K. FRYKMAN, M.D.                    PAGE
 5   By MR. GRONBORG                        357, 412
 6   By MS. TOMKOWIAK                            408
 7
 8            E X H I B I T S
 9   EXHIBIT                                     PAGE
10   EXHIBIT 668  copy of Frykman 6/12/18 amended   358
11               expert report, 76 pages
12   EXHIBIT 669  document entitled "Search Terms of   359
13               Press Releases:  Dr Gregory K.
14               Frykman"
15   EXHIBIT 670  document entitled "Search Terms of   363
16               Press Releases:   Dr. Gregory K.
17               Frykman," one page
```

| Volume II<br>Gregory Frykman, M.D. | Confidential | Hsingching Hsu vs. Puma<br>Biotechnology, Inc., et al. |
|---|---|---|

**Page 357**

1  THE VIDEOGRAPHER: The time is
2  1:01 p.m. on July 26, 2018. This is video No. 1,
3  volume 2 in the continued video deposition of
4  Dr. Gregory K. Frykman.
5  EXAMINATION (Cont'd.) BY COUNSEL
6  FOR PLAINTIFF and THE CLASS
7  BY MR. GRONBORG:
8  Q. And good afternoon, Dr. Frykman.
9  P R O C E E D I N G S
10  Whereupon,
11  GREGORY K. FRYKMAN, M.D.,
12  having been previously sworn, resumed the stand
13  and testified further as follows:
14  BY MR. GRONBORG:
15  Q. And good afternoon. Thanks for
16  being here. A short continuation of the
17  deposition we began last month.
18  And do you understand this is a
19  continuation of our May 31, 2018, deposition?
20  A. Yes. I do.
21  Q. All right. And you understand
22  you're under oath today?
23  A. Yes.
24  Q. Is there any reason that you cannot
25  testify fully and truthfully today?

**Page 358**

1  A. No.
2  (Exhibit Number 668, copy of
3  Frykman 6/12/18 amended expert report, 76
4  pages, marked for identification as of
5  this date.)
6  Q. And you've been handed what's been
7  marked as Exhibits 668, which is a -- well, tell
8  me, is that a copy of your amended report?
9  A. It looks like it, yes.
10  Q. All right. And does the amended
11  report correct all the errors and omissions that
12  you have identified?
13  A. I believe so.
14  Q. And Exhibit C, near the end, is
15  that a list of your amended materials considered?
16  A. I believe so.
17  Q. All right. And does the report --
18  or does this exhibit now contain all of the
19  material you considered in forming your opinions?
20  A. I sure think so.
21  Q. And are you aware of any materials
22  that you considered that are not in the amended
23  list of materials considered?
24  A. No.
25  Q. Let me hand you what's been marked

**Page 359**

1  as Exhibit 669.
2  (Exhibit Number 669, document
3  entitled "Search Terms of Press Releases:
4  Dr Gregory K. Frykman," marked for
5  identification as of this date.)
6  Q. And do you understand that
7  Exhibit 669 is a list of the search terms that
8  Latham & Watkins used to search press releases
9  for you?
10  A. Yes.
11  Q. And are these search terms that you
12  came up with?
13  A. For the most part, yes.
14  Q. All right. Did -- was anyone else
15  involved in coming up with these search terms?
16  A. I think Latham suggested one or two
17  or three terms, and they were fine. Perhaps, you
18  know, changing the "3" to a Roman numeral III,
19  something like that or relatively minor stuff.
20  Q. Okay. And did you run these search
21  terms on any database?
22  A. Did I personally run them?
23  Q. Correct.
24  A. No, I personally did not.
25  Q. Okay. For example, did you run

**Page 360**

1  these on -- in any of your Google searches did
2  you use these search terms?
3  A. No, sir. I did not.
4  Q. And did you ask Latham to run these
5  search terms for any particular time period?
6  A. Yes. I talked to them about going
7  back I think it was about 10 years.
8  Q. And why about 10 years?
9  A. Certainly the more current ones
10  would probably be more relevant. Going back a
11  long time, say 20 or 30 years, frankly, clinical
12  trial methodology has changed a fair bit, and
13  even within the last 10 years there's been some
14  changes in oncology. So 10 years seemed like a
15  reasonable cutoff.
16  Q. And how many documents do you
17  understand were identified using these search
18  terms?
19  A. I don't know that I ever heard a
20  number. I suspect it was hundreds to maybe a
21  thousand, but I don't know that I ever heard a
22  specific number from Latham.
23  Q. Well, were you provided with all of
24  the documents that hit on these search terms?
25  A. No.

| Volume II | Confidential | Hsingching Hsu vs. Puma |
| Gregory Frykman, M.D. | | Biotechnology, Inc., et al. |

Page 361

1  Q.  Okay.  Are all of the documents
2  that you were provided with that hit on these
3  search terms identified in your list of materials
4  considered?
5  A.  I -- I'm sorry, say that again.
6  Q.  Sure.  Are all of the documents
7  that you were provided with that hit on these
8  search terms identified in your list of materials
9  considered?
10  A.  I think so.
11  Q.  Okay.  And Latham didn't give you a
12  set of press releases that you looked at and
13  decided not to include in your materials
14  considered; is that right?
15  A.  That's correct.
16  Q.  Do you know how many documents hit
17  on the phrase "disease-free survival" or "DFS"?
18  A.  No, sir.  I don't know the specific
19  number for any individual search term.
20  Q.  And actually you're speculating,
21  you think there are hundreds to maybe thousands
22  of documents that hit on these terms.  Of those
23  hundreds of thousands of documents that hit on
24  these terms, what's your understanding of the
25  process by which the ones that you were provided

Page 362

1  with were selected?
2  A.  Right.  So just to clarify.  It's
3  hundreds or maybe a few thousand.  Not hundreds
4  of thousands.
5  Q.  Got it.
6  A.  Okay.  So -- right.  So the -- the
7  list -- the press releases that I looked at were
8  culled from this -- this larger set.  And in
9  discussions with Latham the -- the important
10  criteria were that it had to involve a clinical
11  trial.  It had to be a positive clinical trial.
12  So not something that was negative or -- or
13  equivocal.
14       It also needed to be, as I
15  mentioned, within the last 10 years.  Apparently
16  there's some stragglers that came in later, so it
17  had to be within 10 years.  And there was one
18  other one.  Oh, it needed to be topline results.
19       So sometimes, and maybe frequently,
20  I don't know how often, there are press releases
21  about a particular aspect of a clinical trial but
22  it's not the topline results.  So those weren't
23  included.
24  Q.  And did you provide Latham with a
25  description of what you meant by a "topline

Page 363

1  result"?
2  A.  I -- I don't know that we -- I
3  don't know if we discussed that in great detail
4  or not.  Usually they are identified by the mere
5  word "topline" in the press release itself.
6  Q.  And is it your understanding that
7  of all the documents that hit on these terms,
8  that you received all of the ones that met those
9  four criteria that you just identified?
10  A.  Yes.
11  Q.  And so, as you sit here today, you
12  believe that you received every document that hit
13  on these terms, that involved a clinical trial,
14  that was positive, within the last 10 years, and
15  that involved topline results?
16  A.  That's correct.
17  Q.  Let me hand you what's been marked
18  as Exhibit 670.
19       (Exhibit Number 670, document
20       entitled "Search Terms of Press Releases:
21       Dr. Gregory K. Frykman," one page, marked
22       for identification as of this date.)
23  Q.  And Exhibit 670 is a report of the
24  number of hits on the search terms that we
25  compiled running it on the Lexis Intelligizer

Page 364

1  database for form 8-Ks for the period
2  January 2008 to April 2018.
3       Have you ever seen anything like
4  this before?
5  A.  No, sir.  I have not.
6  Q.  And you can see the total number of
7  hits is about -- is 80,246 documents?
8  A.  Uh-huh.
9  Q.  And is it your belief that, of
10  those 80,246 documents, you were provided with
11  every one that involved a clinical trial, was
12  positive, within the last 10 years, and that
13  involved topline results?
14  A.  Well, I'm -- I'm not sure about
15  that because -- yes, I was provided -- I believe
16  I was provided all the documents that came up
17  when Latham did the search.  But I would point
18  out that it -- this number 80,000 is probably
19  wildly incorrect in terms of actual number of
20  press releases, unique press releases.  Because,
21  for example, the clinical trial that's got the
22  star, then "w/5 result," that -- that -- those
23  10,000 of those probably represent -- one of them
24  represent a similar -- or -- or, represent the
25  same press release, say, as in oncology.

**Page 365**

1  So if you look down about 10 or 12
2  or so, there's the word O-N-C-O-L-O [as spoken]
3  star.  And those -- so one's 10,018 and one's
4  10,509.  It's probably the case, I don't know
5  this, because I didn't do this, that there's a
6  lot of crossover between those.
7       So those are not 10,000 unique
8  press releases, and therefore that number of
9  80,000 is -- is probably greater and probably
10 wildly greater than the actual number of unique
11 press releases that is found when you add up each
12 of the hits by a particular term.
13      Q.   But you don't know how many unique
14 press releases there are that were identified
15 with these terms, do you?
16      A.   I think I've testified I imagine a
17 few hundred to -- several hundred maybe to a few
18 thousand.  But beyond that I -- I don't know.  It
19 would be just a guess.
20      Q.   So would you be surprised if it was
21 more than a few thousand?
22      A.   Ask the question again.
23      Q.   Will you be surprised if it was
24 more than a few thousand?
25      A.   I'm not sure I can really give you

**Page 366**

1  an answer.  I guess, if there were more than -- I
2  mean, this number I think is -- is wildly
3  surprising.  And I've explained to you, you know,
4  why.  For example, here --
5       Q.   Well, that's okay.  Tell me this:
6  Can you -- is it your impression that between
7  January of 2008 and April of 2018 that there were
8  fewer than 100 press releases that were issued
9  that involved a clinical trial that was positive
10 and that involved topline results and hit on one
11 of these search terms?
12      A.   No.  I think it was probably more
13 than that.
14      Q.   Well, how many did you get?
15      A.   I got on the order of, I don't
16 know, 150, 200-ish unique press releases.
17      Q.   That hit on one of these terms that
18 involved a clinical trial, that was positive and
19 involved topline results?
20      A.   Within the last 10 years, yeah.
21      Q.   And is it your impression -- or did
22 you think that was about the right number?
23           MS. TOMKOWIAK:  Objection.  Vague.
24      Q.   In the last 10 years there's been
25 under 200 documents or 200 press releases

**Page 367**

1  involving clinical trials --
2       A.   That's --
3       Q.   -- that were positive?
4            MS. TOMKOWIAK:  Just let him finish
5  the question before you start answering.  This
6  way we have a clear record.  And I object to that
7  question as vague and argumentative.
8       A.   Sure.  I mean, that -- you know,
9  it's hard to -- to know.  Why don't -- try the
10 question again and we'll see if I --
11      Q.   Well, is it your impression that
12 in -- between January of 2008 and April of 2018
13 that there were less than 200 press releases that
14 hit on one of these search terms, that involved a
15 clinical trial, that was positive, and involved
16 topline results?
17           MS. TOMKOWIAK:  Same objection.
18      A.   No.  It was probably more than
19 that, but I can't tell you how many more.
20      Q.   Well, do you think it was more than
21 what you got from Latham?
22      A.   I -- I -- I -- I'm not sure I know
23 how to answer that.  I mean, the -- the -- the
24 procedure that -- that I've explained resulted
25 in, oh, 200-ish, 150, 200-ish press releases that

**Page 368**

1  came to me.  I have every reason to believe that
2  there was no other criteria used by Latham, other
3  than the ones we've talked about that came to me.
4  I didn't do this personally, so I can't say for
5  sure.
6       Q.   So are you speculating?
7            MS. TOMKOWIAK:  Objection.  Asked
8  and answered.
9       A.   I'm telling you my best
10 understanding of what happened.
11      Q.   Looking at that hit list there, you
12 see there's 135 form 8-Ks that included the term
13 "disease-free survival."
14           Do you know if you looked at any of
15 those?
16      A.   I'm sure I did.
17      Q.   How many of those 135 did you look
18 at?
19           MS. TOMKOWIAK:  Objection.
20      A.   Yeah.  Sir, I couldn't -- I
21 couldn't tell you that.
22      Q.   You said you're sure you did,
23 though.  Do you have a specific recollection of
24 any of the press releases that Latham provided
25 you that included the term "disease-free

Case 8:15-cv-00865-AG-SHK   Document 449-1   Filed 08/23/18   Page 6 of 18   Page ID #:23063

Volume II                                Confidential                    Hsingching Hsu vs. Puma
Gregory Frykman, M.D.                                                    Biotechnology, Inc., et al.

Page 369

1  survival"?
2      A.   Not specifically beyond the press
3  release for -- for Puma, but remember that
4  disease-free survival and progression-free
5  survival are very, very similar.
6      Q.   Okay.  Of the --
7      A.   And -- and --
8      Q.   Of the 1,340 document -- form 8-Ks
9  that had the term "progression-free survival,"
10 did you look at any of those?
11     A.   Sure, I did.
12     Q.   Which one?  Can you name for me
13 which ones?
14     A.   Sure.  The one that involved
15 Seattle Genetics' drug, which I think is actually
16 in -- in my report.  I believe the press release
17 about one of the clinical trials for Exelixis for
18 cabozantinib, that was a PFS endpoint.  And
19 probably I think probably the one for
20 Arcule's [ph] drug was a PFS endpoint as well.
21     Q.   So of those 1,340 press releases
22 that included the term "progression-free
23 survival," how many did you consider for this
24 engagement?
25          MS. TOMKOWIAK:  Objection.  Lacks

Page 370

1  foundation.
2      A.   Well, again, I don't know how many
3  of those came to me after the list had been --
4  after the hit list had been winnowed down from --
5  you know, from Latham, but I'm sure there were
6  more than the ones that I just mentioned.
7      Q.   Is there a reason you didn't use
8  the term "adverse event"?
9      A.   Because adverse event, I don't know
10 that that was ever a huge consideration.  But I
11 will say that adverse event is a very commonly
12 used term across all of clinical medicine, and
13 especially in the clinical trial world.  And that
14 would have resulted in numbers much, much greater
15 than 10,000.
16     Q.   Is that your speculation, or you
17 tried it and decided it had too many?
18     A.   No.  I didn't try it.  It wasn't a
19 term that is of particular interest in finding
20 prospective clinical trials that companies are
21 reporting their topline results for.
22     Q.   Is there a reason you didn't use
23 the term "diarrhea"?
24     A.   That is a more specific term that,
25 again, is one of many AEs that are current in

Page 371

1  clinical trial, and that is not how I would have
2  then or now gone to search for the press releases
3  regarding clinical trial topline results.
4      Q.   Let's have you turn to section 4 of
5  your amended report.  It starts on page 9.
6          (Reporter-initiated discussion off
7      the record.)
8      Q.   You see the beginning there you say
9  "When the results of a clinical trial become
10 available, the sponsor of the clinical trial
11 customarily will disclose those results"?
12         Do you see that?
13     A.   Uh-huh.
14     Q.   What do you mean by "customarily"?
15 Is there a particular percentage of time that
16 occurs?
17     A.   I cannot speculate for you what the
18 percentage of time is, but typically, when the
19 results of clinical trials become available, the
20 sponsor is -- either is obligated, as we talked
21 about before, for materiality reasons or is very
22 eager to get those results out to the -- out to
23 the public.
24     Q.   Okay.  And the last sentence in the
25 second paragraph, it says "The results of one or

Page 372

1  more clinical trials can impact, sometimes
2  significantly, the financial prospects of one or
3  more of those [these] companies."
4          Do you see that?
5      A.   Yes.
6      Q.   And in your view does the impact on
7  the financial prospects that a clinical trial
8  result has change how the results are disclosed?
9          MS. TOMKOWIAK:  Objection.  Vague.
10     A.   I'm sorry, ask the question again.
11     Q.   Sure.  Does the impact on the
12 financial prospects of the company change how
13 they disclose clinical trial results?
14     A.   I'm not sure I can tell you that in
15 great detail.  It is certainly the case from my
16 experience, and again I've looked at hundreds and
17 thousands of press releases over the years, both
18 as, you know, a practitioner and then when I was
19 in the capital markets, and even now doing
20 consulting work, and clinical trial -- topline
21 clinical trial results that are reported by
22 companies that are -- that are negative or that
23 are perceived to be negative, the companies, in
24 my impression, tend to try to articulate a lot of
25 positive aspects about that trial, even though

Page 373

1  the topline result might in fact be negative.
2         Companies that have positive
3  clinical trial outcomes typically -- or at least
4  in my impression they don't feel the need to do
5  as much of that.  So those press releases tend to
6  be disclosing less additional positive
7  information, by the mere fact that the result on
8  the primary efficacy endpoint was positive.  But
9  an important factor in all of this is the
10 personality and the nature of that individual
11 company.
12        So some companies are known in the
13 industry to be more promotional.  Some tend to be
14 less promotional.  And that is taken into
15 account, at least as an analyst I did this
16 frequently, tried to take into account where the
17 truth actually lies.
18    Q.   Of the thousands of press releases
19 that you say you've looked at over the course of
20 your career --
21    A.   Uh-huh.
22    Q.   -- how many of those involved a
23 clinical trial result that was positive and
24 involved topline results?
25    A.   What fraction?

Page 374

1    Q.   What fraction.
2    A.   Oh, I don't know that I can tell
3  you that, because there's a lot of reasons to
4  look at press releases, other than ascertaining
5  what the recent outcome of a clinical trial is.
6    Q.   So you don't have any speculation
7  about what percentage of those thousands of press
8  releases you say you've looked at would meet
9  those criteria?
10        MS. TOMKOWIAK:  Objection.  Asked
11 and answered.
12   A.   That's correct.  It would be purely
13 speculation.
14   Q.   Now, at the start of the third
15 paragraph you write "Accordingly, it is common
16 for public company sponsors to promptly disclose
17 basic information about the success (or failure)
18 of a clinical trial to investors once the initial
19 or 'top-line' results are available."
20        Do you see that?
21   A.   Yes.
22   Q.   And based on your experience,
23 typically how long is it after the receipt of
24 initial or topline results until a company
25 discloses this basic information?

Page 375

1    A.   Yeah.  Again, that's going to be a
2  lot of speculation.  The companies generally will
3  not put out topline results in the form of a
4  press release until they are comfortable that the
5  results that they initially hear are in fact
6  validated.
7         And so I can't tell you how long
8  companies typically wait once they -- from the
9  time that they hear of an initial trial result
10 outcome until they disclose it publicly.  But
11 there's a variable amount of time for the company
12 to make sure that it is comfortable that the
13 results have been validated.
14    Q.   And based on your experience, are
15 pharmaceutical companies required to disclose any
16 results of a clinical trial?
17    A.   Well, I think we've talked about
18 this before.  If it's a company that's private,
19 I'm not aware that they're under any legal
20 obligation to disclose the results.  You guys
21 know that better than I do.
22        If it's a publicly traded company,
23 then they're expected to disclose material
24 information to their investors.  Beyond that, I'm
25 not sure I can give you much of an answer.

Page 376

1    Q.   Turning to the section entitled
2  "Press Releases."  If you go to the third
3  paragraph down.
4    A.   Uh-huh.
5    Q.   And it starts "In addition to
6  providing important information to investors, a
7  company disclosing top-line clinical results must
8  also balance the needs of other (sometimes
9  competing) stakeholders."
10        Do you see that?
11   A.   Uh-huh.
12   Q.   What do you mean there by
13 "important information"?
14   A.   It could be information about the
15 results on the primary endpoint.  It could be
16 information about the safety side of the results.
17 It could be about what subsets in a clinical
18 trial either showed significantly positive or
19 equivocal results.  It could be about results in
20 different regions in which that clinical trial
21 was conducted, so Europe versus the United
22 States, for example.  That's all important
23 information to investors.
24   Q.   Are those the only things it could
25 be or is that a --

| Volume II<br>Gregory Frykman, M.D. | Confidential | Hsingching Hsu vs. Puma<br>Biotechnology, Inc., et al. |
|---|---|---|

Page 377

1  A.  No. Of course not. There's other
2  things you could imagine as well.
3  Q.  I mean, is there anything it
4  couldn't be?
5  A.  You could imagine things that are
6  not important information. Knowing about the --
7  you know, a grade one adverse event in a foreign
8  country that occurred in four patients in a
9  thousand-page pivotal trial, that would probably
10 be considered by most people not important
11 information.
12 Q.  And when you refer to "important
13 information to investors," are you aware of any
14 rules or regulations for determining whether
15 information is important to investors?
16 A.  Well, again, that I think is more
17 of a legal determination than a clinical or
18 scientific undertaking, but it gets around to the
19 issue of materiality. And my best understanding
20 is with publicly traded companies, publicly
21 traded companies in general, that with publicly
22 traded pharmaceutical companies that they're
23 obligated to disclose material information to
24 their investors.
25 Q.  And then after the investors -- the

Page 378

1  first stakeholders you discuss are professional
2  societies?
3  A.  Uh-huh.
4  Q.  And you write, the next sentence
5  down, "Top-line announcements must comply with
6  confidentiality restrictions imposed by medical
7  and scientific conferences."
8  Do you see that?
9  A.  Yes.
10 Q.  Now, are you aware of any medical
11 or scientific conference that imposes a
12 restriction on what a company can tell its
13 investors?
14 A.  Not specifically investors, but
15 ASCO -- I think we've talked about this before --
16 and other societies have similar policies that
17 they are reluctant to have clinical trial results
18 presented at their conferences, where those
19 clinical trial results have been presented
20 substantially elsewhere prior to that conference.
21 So the conferences want to retain, you know, some
22 sizzle and some reason to draw audiences to their
23 conference.
24 Q.  And for this engagement did you
25 consider any confidentiality policies other than

Page 379

1  ASCO's?
2  A.  ASCO's I focused on the most
3  closely because that's where Puma had their
4  ExteNET study results presented. But I think I
5  looked at American Society of Hematology, and --
6  at least that one. Maybe AACR. I can't
7  remember. I looked at a couple of other ones.
8  Q.  Did you include those in your
9  materials considered?
10 A.  I did not. But they were something
11 that I probably briefly looked at, and that was
12 it.
13 Q.  Are you aware of any medical or
14 scientific conference that imposes restrictions
15 on what information a company can include in a
16 press release?
17 A.  I'm sorry, ask that question again.
18 Q.  Sure. Are you aware of any medical
19 or scientific conference that imposes
20 restrictions on what information a company can
21 include in its own press release?
22 A.  So as is the case with investors,
23 the professional societies don't preclude a
24 company's -- from articulating results in a press
25 release. That's not how they -- that's not what

Page 380

1  their focus is. Their focus is -- is on -- on
2  the disclosure of -- of anything other than
3  limited topline results prior to their meeting
4  for which a company is considering having their
5  clinical trial result presented at. So the
6  personal -- go ahead.
7  Q.  Does the ASCO confidentiality
8  policy define what limited topline results are?
9  A.  No, sir. I don't believe it does.
10 Q.  Does it actually include the term
11 "limited topline results"?
12 A.  I can't recall the specific
13 language.
14 Q.  Does ASCO's confidentiality policy
15 state that press releases regarding topline
16 clinic -- clinical results must comply with any
17 confidentiality requirement?
18 A.  I don't recall that it specifically
19 does.
20 Q.  Do you know if the ASCO
21 confidentiality policy says anything at all about
22 press releases?
23 A.  At the moment, no. But the ASCO
24 policy, while it wants to diminish the amount of
25 information about a clinical trial result that is

Page 381

1  disclosed prior to its meeting, it also
2  recognizes that there may be other supervening
3  circumstances in which a company may be obligated
4  to disclose results.
5      Q.   Are you aware that ASCO's
6  confidentiality policy has an exception for
7  disclosures required by the securities laws?
8      A.   I am aware of something along those
9  lines, yes.
10     Q.   How do you understand that
11 exception works?
12     A.   Exactly the way that you described.
13 So if a company is -- if a company believes that
14 it is under disclosure obligations because the
15 information is material, and other people
16 determine that this information should be
17 disclosed by the company, even though the company
18 is intending to present its results at an
19 upcoming conference, that there can be an
20 exception made for disclosure of those results.
21     Q.   Do any of the other medical or
22 scientific conference confidentiality policies
23 you looked at have an SEC or a securities law
24 exception?
25     A.   I don't know that information.

Page 382

1      Q.   How about just the ones you looked
2  at for purposes of this engagement, did you see
3  if they had that exception?
4      A.   I don't know.
5      Q.   Now, does the ASCO -- to the best
6  of your understanding, does the ASCO securities
7  law exception apply to press releases?
8      A.   I don't know that it makes a
9  distinction between press releases and full
10 presentations, but the -- my understanding is,
11 because I've seen this a lot, is that the press
12 release for the 8-K is a common means by which a
13 company discloses the results to its investors
14 in -- within the context of the -- of the SEC
15 exception for the ASCO confidentiality policy.
16         (Reporter-initiated discussion off
17     the record.)
18     Q.   And next you write "The
19 professional societies that run these
20 conferences" --
21     A.   I'm sorry.  Where are you, sir?
22     Q.   Sure.  The next line, so it's the
23 fifth line down of the third paragraph.
24     A.   Four, five.
25     Q.   Near the end it says "The

Page 383

1  professional."
2      A.   Uh-huh.
3      Q.   "The professional societies that
4  run these conferences are unlikely to accept an
5  abstract for presentation at a major conference
6  where the relevant clinical trial results have
7  already been disclosed in large part."
8          Do you see that?
9      A.   Yes.
10     Q.   And what do you mean there by
11 "relevant clinical trial results"?
12     A.   Well, that has to do, again, with
13 the -- with the results on the -- on the primary
14 efficacy endpoint, but it also includes -- in
15 large part includes one or more -- and there may
16 be many secondary efficacy endpoints -- it may
17 include some of the safety information.  It may
18 include also the effect of the drug in particular
19 predefined or post hoc defined clinical trial
20 subsets.
21         It may also include results on
22 patients that are taking certain concomitant
23 medications.  It may include a number of other
24 statistical analyses that again may or may not
25 have been effectively defined.  That sort of

Page 384

1  thing.
2      Q.   And when you use that term
3  "relevant," relevant to whom?
4      A.   Relevant to the receivers of the
5  information.
6      Q.   And is there a difference between
7  what you describe there as relevant clinical
8  trial results and what you describe in the first
9  line of that paragraph as important information?
10     A.   Right.  So the -- the information
11 that investors might find important may or may
12 not be relevant to the audience at the American
13 Society of Clinical Oncology, most of whom, but
14 not all, are oncology practitioners.
15     Q.   And does ASCO define what relevant
16 clinical trial results are?
17     A.   To my knowledge, they do not.  But
18 that would be probably the domain of the people
19 that are listening to the results --
20     Q.   Do you believe there's --
21     A.   -- within the audience.
22     Q.   Sorry.  Do you believe there's an
23 industry standard for what relevant clinical
24 trial results are?
25     A.   Within the biotech and pharma

| Volume II<br>Gregory Frykman, M.D. | Confidential | Hsingching Hsu vs. Puma<br>Biotechnology, Inc., et al. |

Page 385
1  industry, I think we've talked about that a lot,
2  but with regard to what clinical oncology
3  practitioners identify as relevant that is
4  customarily acquired in the training in -- in
5  medicine and in -- and specifically in oncology.
6          So, for example, relevant
7  information for a particular practitioner who
8  sees mostly African-American women, he is -- that
9  physician is probably very interested in what the
10 results are for the African-American subset in
11 clinical trial.  A person sitting next to them
12 who practices in a different setting may find
13 that of no relevance.
14     Q.   Okay.  Turning to the top of
15 page 11, the second sort of stakeholder there is
16 "regulatory authorities such as the FDA."
17          Do you see that?
18     A.   Yes.
19     Q.   What regulatory authorities are you
20 referring to other than the FDA?
21     A.   The world is full of regulatory
22 authorities, as you're well aware.  The ones that
23 tend to matter the most in the pharma and biotech
24 industries is the Food and Drug Administration in
25 the United States; the EMA, the European

Page 386
1  Medicines Agency; and then the Japanese
2  equivalent of the FDA.  Those -- yeah.
3     Q.   Are you referring to any regulatory
4  authorities outside of the medical world or
5  outside the pharma -- pharmacology world?
6     A.   I'm not sure I understand your
7  question.
8     Q.   Sure.  I mean, is the SEC one of
9  the regulatory authorities you're talking about
10 here?
11     A.   No.  The -- in this case the -- the
12 regulatory authority that I'm referring to are
13 the -- what they call the competent drug
14 regulatory authorities that are on a national and
15 supernational basis.
16     Q.   Thank you.  And then you write,
17 "regulatory authorities such as the FDA can and
18 likely will carefully vet what has been disclosed
19 about a drug by the company."
20          Do you see that?
21     A.   Yes.
22     Q.   Now, are pharmaceutical companies
23 required to submit their press releases regarding
24 clinical trial results to the FDA?
25     A.   I think we've talked about this

Page 387
1  before.  They're not obligated to, except under I
2  think it's one circumstance, and that's when a
3  drug is going to be approved under what's called
4  subpart X regulations or accelerated approval.
5  And in that case I believe it's still the case
6  that the companies are required to submit, prior
7  to their use, promotional materials to the FDA
8  for the FDA's vetting.
9          Whether or not a -- a specific --
10 whether or not specifically a press release is
11 included in that, that part I don't know.  But on
12 the whole and in the main, companies are not
13 required, to my best knowledge, to have the FDA
14 pre-review their press releases.
15     Q.   Well, are pharmaceutical companies
16 required to notify the FDA when they issue a
17 press release regarding topline clinical trial
18 results?
19     A.   Not to my knowledge.
20     Q.   Are pharmaceutical companies
21 required to include press releases regarding
22 topline clinical trial results in their NDAs?
23     A.   I mean, ask the question again.
24     Q.   Yeah.  Are pharmaceutical companies
25 required to include their press releases

Page 388
1  regarding clinic -- topline clinical trial
2  results in their new drug applications?
3     A.   Not to my knowledge.
4     Q.   Can you identify for me an example
5  of a consequence for a drug sponsor whose public
6  statements about a clinical trial result differ
7  from the results that were attained by the FDA?
8          MS. TOMKOWIAK:  Objection.
9     A.   Whether or not I could give you an
10 example right now, I'm not sure that I can.  But
11 I can tell you that both when I was working at
12 the FDA, and then when I was in the capital
13 markets and would from time to time sit with my
14 former FDA colleagues in the same session at
15 ASCO, for example, where clinical trial results
16 would be presented, there was from time to time a
17 discussion that arose about -- along the lines of
18 "boy, I didn't know that."  Or "haven't seen that
19 before."  Something like that.
20          And that would either be in the
21 context of knowing ahead of time here's the press
22 release, and now the company's at ASCO presenting
23 their clinical trial results.  And there's some
24 result that comes up that wasn't in a press
25 release.

| Volume II<br>Gregory Frykman, M.D. | Confidential | Hsingching Hsu vs. Puma<br>Biotechnology, Inc., et al. |
|---|---|---|

Page 389

1  Or the other case is where -- this
2  is when I was at the FDA -- where we probably had
3  seen the -- the full clinical trial results for a
4  drug by a company -- they told us confidentially
5  at the FDA -- and then weeks to months later
6  we're at ASCO seeing a presentation about the
7  same clinical trial, and that presentation looked
8  some ways quite different than what we'd seen at
9  the FDA.
10     Q.   Which drug was that?
11     A.   Oh, I don't know that I can give
12  you the specific name of the drug.
13     Q.   And was there a consequence for the
14  company in that case?
15     A.   The consequences that I know of
16  would come up, and this is probably not more than
17  twice in the time that I was at the FDA.
18     Q.   I was just talking about that one
19  instance you were just describing.  In that
20  particular instance you were describing about
21  ASCO, was there a consequence for the company?
22     A.   There was not a consequence for
23  that.
24     Q.   Can you give me an example of a
25  time when the FDA's review of a drug was

Page 390

1  jeopardized because the agency identified that
2  public statements about the clinical trial
3  results differed from the results that the agency
4  had?
5     A.   I'm sorry, ask the question again.
6     Q.   Sure.  Can you give me an example
7  of a time where the FDA's review of a drug was
8  jeopardized because the agency identified that
9  public statements about clinical trial results
10  differed from the results that the agency was
11  provided with?
12     A.   I don't know of any examples where
13  the review of a drug was jeopardized because of
14  what the FDA saw a company publicly discuss.  But
15  I can tell you, and you'll -- and it would
16  probably be impossible to ever tease that out,
17  because in cases where the FDA is likely to turn
18  a drug down, there may be press releases out
19  there touting how positive the clinical trials
20  were.
21     And, in fact, the FDA knows that
22  the information they present the company is -- is
23  promotional, may be wildly promotional.  And, in
24  fact, the FDA is going to turn the drug down.
25  But the FDA is not turning the drug down because

Page 391

1  it doesn't like what the public -- what the
2  public comments are to the company.  It's turning
3  the drug down because the safety and efficacy
4  doesn't support approval of that drug.
5     Q.   At the end of that paragraph you
6  say, "The FDA also has the ability to refer
7  matters to the SEC for review."
8          Do you see that?
9     A.   That's correct.  Yes.
10    Q.   During the period you were at the
11  FDA, did you ever review any matter to the SEC
12  for review?
13    A.   Did I personally?  No.
14    Q.   Can you give me an example of a
15  time when the FDA has referred a matter to the
16  SEC for review?
17    A.   I can't think of one now, but that
18  was, again, 15 years ago.  It may have been the
19  case, in a drug that I actually worked on, where
20  the company was saying pretty positive things
21  about the upcoming trial, and in fact we knew at
22  the FDA it was not so good as a publicly traded
23  company.  Whether that was referred to the SE --
24  whether that specific case was referred to the
25  SEC, I don't know that.

Page 392

1     Q.   And not just at the time you were
2  there, but at any time since you've been involved
3  in the industry, can you give me an example of
4  the FDA ever referring a matter to the SEC
5  because of perceived false statements or
6  omissions in a clinical trial result press
7  release?
8     A.   I don't know that I can
9  immediately, but there was an antibiotic, it's
10  actually probably 10 years ago now, where
11  outright fraud was ultimately found by the FDA on
12  its inspection of the clinical trial sites.  The
13  drug, to my knowledge, was put on the market.
14  Whether or not that was -- that specific issue
15  was referred to the SEC, I don't know.
16     And then, before my time, but on a
17  drug that I worked on, there was another example
18  of a drug in which there was, again, outright
19  false information being put into the case report
20  form by at least one person at one clinical trial
21  site.  And that certainly was -- caught the
22  attention of the FDA -- again, this is before I
23  was there, but I'm aware of the matter -- and
24  whether that was -- and it was a publicly traded
25  company.  Whether that was referred to the SEC

Page 393

1  for review, I don't know.
2     Q.   So the two examples you just gave,
3  you don't know if either of those were referred
4  to the SEC; is that right?
5     A.   I don't know that specifically.
6  But I can tell you that within the FDA when I was
7  there, this would come up once in a while.
8  The -- the question of, you know, should --
9  should we, in the -- in the clinical review
10 division, let the -- let the office of the FDA
11 that deals with this, I can't remember which it
12 is now -- is this something that should go to the
13 SEC.  That -- that certainly came up more than
14 once.
15    Q.   Turning to section 4B which starts
16 on page 11 there.
17    A.   Uh-huh.
18    Q.   Titled "Presentation of Clinical
19 Trial Results."
20    A.   Uh-huh.
21    Q.   Can you tell me which of the
22 opinions that you're offering in this matter is
23 this description of the presentation of clinical
24 trial results relevant to?
25    A.   I'm sorry, ask your question again.

Page 394

1     Q.   Sure.  I understand you've offered
2  some opinions on the press release -- Puma's
3  press release and Puma's stock offering.
4         And my question is, which of the
5  opinions that you're offering in this case is
6  this section regarding the presentation of
7  clinical trial results relevant to?
8     A.   This is relevant to the -- sort of
9  to the overall thrust of the expert report.  This
10 is intended to provide context and help those
11 reading the report understand a bit about how
12 clinical trial results are presented.
13        So it's got relevance to the
14 subject press release, but it's -- provides
15 context for the larger way that clinical trial
16 results are presented by the industry.
17    Q.   Okay.  Well, turning to your
18 summary of opinions, which is at page 3 to 4.
19    A.   I'm sorry, page?
20    Q.   3 to 4.  3.
21    A.   3 to 4.  Sure.  Okay.
22    Q.   And you seem to be offering an
23 opinion regarding Puma's press release.  Is a
24 presentation of clinical results, is that
25 relevant to your opinions regarding what the

Page 395

1  industry standard is for press releases?
2         MS. TOMKOWIAK:  Objection.  Asked
3  and answered.
4     A.   Press releases is one form of
5  presentation of clinical trial results, but it's,
6  you know, only the most -- you know, it's the
7  topline results.  The presentation of clinical --
8  the formal full presentation of clinical trials
9  is -- is, you know, both a much bigger subject,
10 and explained here, you know, in -- in more
11 detail.  I guess I'm not fully appreciating what
12 you're -- what you're getting at.
13    Q.   Well, in this case are you opining
14 on Puma's presentation of clinical trial results
15 in anything other than the July 22, 2014, press
16 release?
17    A.   I think I've talked about the fact
18 that it was -- that the ExteNET clinical trial
19 was also presented at ASCO subsequent to that
20 report.  And that constituted a pretty good
21 example of how clinical trial results are
22 presented to practitioners at professional
23 society meetings.
24    Q.   And are you offering an opinion in
25 this case about Puma's presentation of the

Page 396

1  ExteNET trial results at ASCO?
2     A.   No.  That's not the focus of my
3  opinion in this report.  The focus is on the
4  press release, the July 22, 2014, press release
5  and it fitting in comfortably within the industry
6  standards for disclosure of topline clinical
7  trial results.
8     Q.   Turning to page 14.
9     A.   Uh-huh.
10    Q.   10 lines down, the sentence that
11 begins "Indeed, ASCO."
12    A.   I'm sorry.  Point to me where
13 exactly.  Page 14.  "Indeed ASCO."
14    Q.   Nine.  Nine lines down.  You see it
15 says -- you see it says "Indeed, ASCO vigorously
16 enforces its confidentiality policy," and then
17 you go on and you say "As but one example," and
18 you cite to an article about Immunomedics.
19        Do you see that?
20    A.   Uh-huh.
21    Q.   How did you locate that article?
22    A.   I'm sorry, how did I look at that
23 article?
24    Q.   How'd you locate it?  Was that one
25 that came up through your use of search terms?

Page 397

1   A.   How did that come up.  I honestly
2   don't remember.  It was maybe something that I
3   had just remembered seeing.  It may have come up
4   in looking at clinicaltrials.gov or Google.  I
5   honestly don't remember.
6   Q.   Well, did you do a search for
7   articles regarding companies being kicked out of
8   medical conferences?
9   A.   I don't remember doing a formal
10  search, no.
11  Q.   Did you do a search for articles
12  regarding companies violating medical conference
13  confidentiality policies?
14  A.   I don't -- as I said, I don't think
15  I did that formally.  I, you know, tend to
16  remember, you know, these things here and there,
17  and that may have been one that I just
18  remembered, and I probably had to go and look up
19  and see what the details were.
20  Q.   And based on the details, was it
21  your understanding that Immunomedics was kicked
22  out of ASCO because of information they included
23  in a topline clinical trial press release?
24  A.   They had reported information that
25  ASCO thought was beyond what should have been

Page 398

1   disclosed to the public outside of its -- or in
2   violation of its confidentiality policy.  Exactly
3   what was presented now, I can't remember.  To
4   whom it was presented, exactly when, and how far
5   ahead, that I can't remember.
6   Q.   And you say "As but one example."
7   Can you give me another example?
8   A.   I cannot right now.  But this goes
9   on -- you know, it's been going on for years.  I
10  mean, I don't think there's thousands of
11  examples.
12  Q.   Well, how many times in the last 10
13  years do you think ASCO has kicked a company out
14  of its conference for violating its
15  confidentiality policy?
16  A.   I couldn't speculate on that.
17  Q.   Can you identify for me any example
18  prior to July of 2014 when ASCO had kicked a
19  company out of its conference for violating the
20  confidentiality policy?
21  A.   I cannot.
22  Q.   Let's have you turn to page 18.
23  The section of your report entitled
24  "Interpretation of Clinical Trial Results."
25  A.   Uh-huh.

Page 399

1   Q.   And how is this section of your
2   report related to your opinions?
3   A.   Well, again, this has to do with
4   providing context for how clinical trial results
5   are used.  In this case, this section
6   discusses -- only at a very high level --
7   providing context for what happens with clinical
8   trial results.  So one thing is the results
9   themselves.  That's what companies present.
10      When I was in training and in
11  clinical practice, and when I was in the capital
12  markets, and even now doing consulting, the next
13  question becomes, well, okay, the results are
14  this.  What -- what are the implications for
15  managing patients.  What are the implications for
16  the use of that drug in clinical practice.  Or if
17  it's something that's not on the market yet, what
18  are the implications for its potential for
19  approvability or nonapprovability by regulatory
20  authorities.
21      And then a bigger question is what
22  are the implications of that -- of those clinical
23  trial results for influencing the -- what they
24  now call the care pathway.  That's sort of the
25  standard of care that's -- that's written down by

Page 400

1   professional societies.
2       So this is to provide context for
3   the next undertaking after the clinical trial
4   results come out of what to do with them.
5   Q.   And the second paragraph, there you
6   write "In many instances, movement in stock
7   prices for oncology-focused drug companies can be
8   observed to change more than usual going into,
9   during, and following the ASCO Annual Meeting."
10      Do you see that?
11  A.   Uh-huh.
12  Q.   Are you an economist?
13  A.   Am I an economist?  No.
14  Q.   Are you an econ -- have you ever
15  undertaken any analysis of the volatility of
16  oncology-focused drug companies at or around
17  ASCO?
18  A.   Not in a formal way.  But we
19  certainly discussed it when I was in the capital
20  markets with -- both amongst other analysts, as
21  well as with investing pharma and
22  biotech-investing clients the fact that ASCO was
23  coming, and that stock prices were likely to move
24  more than they would otherwise for -- for
25  oncology-focused drug companies.

Page 401

1   Q.  Do you ever undertake any analysis
2   to try and determine how much more stock prices
3   of oncology-focused companies move around ASCO?
4   A.  I personally have not.  But there's
5   a concept out there that is -- is -- it's in the
6   public domain.  It's not something they teach you
7   in medical school or in fellowship or that you're
8   taught about when you are in the capital markets,
9   but it's the concept of what's called "the ASCO
10  effect."  And you can -- you can Google that
11  and -- and see what it says.
12      But it's the observation by many
13  commentators on the markets, as well as some
14  people that are actual market participants, that
15  stock prices tend to be more volatile going into
16  ASCO and -- than -- than, say, six months before
17  or after.
18      Q.  And are you aware of any peer
19  reviewed or academic publication finding that
20  this ASCO effect actually exists?
21      A.  I'm not sure that I've ever seen it
22  written up in a formal peer-reviewed journal, but
23  it is discussed.  I mean, as -- as a lot of
24  things with -- within capital markets, you won't
25  necessarily see it written up in a particular

Page 402

1   journal, but it's something that is discussed
2   amongst many people involved in capital markets.
3       MS. TOMKOWIAK:  Do you have any
4   more questions on this topic or -- I understand
5   that there's a few minutes left on the videotape
6   and that Kristin has lost audio.  So I don't know
7   if you want to wrap up this topic or we can fix
8   those things or --
9       MR. GRONBORG:  Let's take a break.
10      THE VIDEOGRAPHER:  Okay.  The time
11  is 1:58 p.m.  We're going off the record.
12      (Recess taken.)
13      THE VIDEOGRAPHER:  The time is
14  2:11 p.m. and we're back on the record.
15  BY MR. GRONBORG:
16      Q.  Dr. Frykman, are you representing
17  yourself here to be an expert on what causes the
18  stock price of oncology-focused drug companies to
19  move?
20      A.  No.
21      Q.  If I could have you turn to page 4
22  of your report.  The section there titled
23  "Clinical Trials."
24      A.  Uh-huh.
25      Q.  "Clinical Trials in General" in

Page 403

1   classification.
2       A.  Uh-huh.
3       Q.  How is this section of your report
4   related or relevant to the opinions that you're
5   offering?
6       A.  As before, as I mentioned recently,
7   the purpose of this section is primarily to
8   provide context for the -- the opinion regarding
9   the press release for the defined clinical
10  results of Puma's ExteNET trial.  And it is
11  intended to try to explain how clinical trials
12  are conducted, why they're important, how they're
13  conducted, how they're classified.
14      And maybe I get into here some of
15  the information that can be gleaned from
16  particular clinical trials that advances the
17  development of medicine, advances the development
18  of a particular drug, advances the public health,
19  and so forth.  So it's intended to provide
20  context.
21      Q.  Have you ever been a principal
22  investigator for a clinical trial?
23      A.  I have not been a PI for a clinical
24  trial.
25      Q.  Have you ever been a medical

Page 404

1   director for a clinical trial?
2       A.  I did medical monitoring for, as I
3   think I've talked about earlier, for a cancer
4   vaccine trial being run by a company several
5   years ago, and dealt with, you know, on a
6   day-to-day basis sometimes some of the stuff that
7   would come in.
8       Q.  Have you ever been a medical
9   director on a clinical trial?
10      A.  I have not been a medical director.
11  Again, a medical director, the way I tend to
12  think of it is, somebody that works at a
13  pharmaceutical company who manages one or several
14  clinical trials for that company.  So I've not
15  done that.  But I've certainly written protocols.
16  I've certainly vetted protocols.  And continue to
17  do that now.
18      Q.  Have you ever served on a clinical
19  trial steering committee?
20      A.  Formally, no.  But as I mentioned
21  last time, that the drug sodium aluminum
22  silicate, which I had a big hand in developing,
23  the -- the function of the steering committee, in
24  terms of deciding on important clinical trial
25  issues, what sites to use, what to do when a

Case 8:15-cv-00865-AG-SHK   Document 449-1   Filed 08/23/18   Page 15 of 18   Page ID #:23072

Volume II                           Confidential                      Hsingching Hsu vs. Puma
Gregory Frykman, M.D.                                                 Biotechnology, Inc., et al.

Page 405

1  particular issue arises, hence, what the design
2  of that trial might be and so forth, I've done
3  all that.
4       Q.   Have you ever been on a clinical
5  trial independent data monitoring committee?
6       A.   I have not.  I've seen the results
7  of plenty of them.  But, no, I've not been a --
8  an IDMC member.
9       Q.   And have you ever been on an
10 institutional review board for any pharmaceutical
11 company?
12      A.   Ask the question again.
13      Q.   Have you ever been on an
14 institutional review board for any -- any
15 pharmaceutical company?
16      A.   The answer is no, but IRBs are at
17 universities, and they're the ones that are
18 obligated to vet the ethics of a proposed
19 clinical trial by a pharmaceutical company.
20      Q.   Have you ever been on an
21 institutional review board for any university?
22      A.   No.
23      Q.   Okay.  Can I please have you turn
24 to page 7 of your report.
25      A.   Page 7.

Page 406

1       Q.   There's a section there titled
2  "Endpoints"?
3       A.   Yes.
4       Q.   And as you -- you're using them, is
5  there any difference between endpoints and
6  topline results?
7       A.   Well, endpoints refer to the
8  outcome measures that are prospect -- usually
9  prospectively declared for a clinical trial.
10 Topline results are the results of the clinical
11 trial on usually their primary efficacy endpoint.
12      Q.   And then turning to the last
13 sentence you say "Additionally, it is helpful for
14 the endpoint to be represented by a number that
15 measures the endpoint on a continuous -- or over
16 time -- basis, rather than at one specific point
17 in time."
18      Do you see that?
19      A.   I -- I'm -- I'm sorry.  I just
20 found the tail end.  Read it again.
21      Q.   Yeah.  That sentence right there
22 beginning "Additionally"?
23      A.   Uh-huh.  Yes.
24      Q.   Now, are you aware of any FDA
25 guidance that says that?

Page 407

1       A.   Exactly what the language is in ICH
2  E9 and E10, I'm not sure.  But the general
3  principle is that for an endpoint to be most
4  useful to regulatory authorities, this is -- this
5  is with regard to the FDA -- that that endpoint
6  ideally is objectively ascertained, and that it's
7  not a categorical outcome, but it's a continuous
8  outcome.
9       So what I mean by that is, it's not
10 a yes or no, but that there's some number that
11 goes with it.  So in the case of the ExteNET
12 clinical trial, the primary efficacy endpoint was
13 invasive disease-free survival in DFS, and that
14 is a number, in terms of days or months or years,
15 however you want to calculate it.  That's what
16 constitutes a good endpoint.  So that's what I
17 mean by this.
18      Q.   Okay.  You're defining here what
19 would be a good endpoint --
20      A.   For regulatory purposes.
21      Q.   Okay.  And would that be true for
22 all clinical trials?
23      A.   Not necessarily, because all
24 clinical trials is an awfully big universe of
25 studies.  And there's a lot of clinical trials

Page 408

1  that are done that have no intent for the data to
2  be taken to the FDA for registration of a new
3  drug.
4       MR. GRONBORG:  Subject to any
5  cross, that's all we have.
6       MS. TOMKOWIAK:  Excellent.  I just
7  have a few questions.
8       EXAMINATION BY COUNSEL
9       FOR THE DEFENDANTS and THE WITNESS
10 BY MS. TOMKOWIAK:
11      Q.   So just to set the stage,
12 Dr. Frykman, you testified earlier that you
13 reviewed a subset of the press releases that hit
14 upon the search terms that you produced to
15 counsel; is that right?
16      A.   Yes.
17      Q.   Okay.  And I believe you said that
18 Latham applied certain criteria to identify that
19 subset?
20      A.   Yes.
21      Q.   Okay.  And just for the record,
22 again, what were the criteria?  What is your
23 understanding of the criteria that Latham used to
24 identify that subset of press releases?
25      A.   Sure.  So the clinical trials had

Case 8:15-cv-00865-AG-SHK   Document 449-1   Filed 08/23/18   Page 16 of 18   Page ID #:23073

Volume II                              Confidential                    Hsingching Hsu vs. Puma
Gregory Frykman, M.D.                                                  Biotechnology, Inc., et al.

Page 409

1  to have been completed, or the -- at least had to
2  come out within I think the 10 years is one thing
3  we talked about.  It needed to be a positive
4  outcome.  The study needed to be pivotal.  And
5  there's one other one which I can't -- which I
6  can't remember now.  But it was -- it was that
7  set that I mentioned earlier.
8      Q.   Okay.  So I think you mentioned
9  earlier four criteria?
10     A.   There were four, and I can remember
11 of three them, yeah.
12     Q.   Okay.  And then after you received
13 the subset of press releases, what did you do?
14     A.   So then I took each one of them and
15 tried to determine how comparable the clinical
16 trial was, and the drug was to the situation for
17 Puma.
18          So Puma was an oncology-focused
19 company, drug company, with a -- with a cancer
20 drug that was in a registration-directed trial.
21 And the press releases that I received from
22 Latham would refer to a variety of diseases, a
23 variety of drugs, from a variety of companies,
24 and so forth.
25          So what I tried is to take the --

Page 410

1  the press releases that I got from Latham and
2  identify which ones were most comparable to
3  the -- the situation regarding Puma, the ExteNET
4  result, ExteNET trial result, and -- and
5  neratinib.
6      Q.   Okay.
7      A.   So that involved using -- basically
8  winnowing the list down to oncology companies.
9  Winnowed the list down to drugs that even at the
10 time of the press release may have been in
11 development.  For some reason or other the
12 company took them out of development.  That
13 happened once in a while.
14          It might also be the case that what
15 was a positive clinical trial result at the time
16 of the press release in fact did not turn into a
17 registrational study, or supported study, or --
18 or something like that.  And the -- so that the
19 studies that I considered had to have
20 registrational intent.
21          And then the other criteria which
22 was important was to be able to have FDA
23 documents that in some way commented or tried to
24 corroborate or not corroborate what the company's
25 press release was, or what they were saying in

Page 411

1  the -- in the results.
2      Q.   Okay.  So if I understood you,
3  then, you applied additional criteria to identify
4  comparable press releases, and that included
5  whether the press releases related to oncology.
6  Whether the drug had been taken out of
7  development or not.  Was there a registrational
8  intent for the trial.  And whether there was any
9  feedback provided from the FDA?
10     A.   There was some --
11          MR. GRONBORG:  Objection.  Leading.
12 Misstates the testimony.
13     A.   That's essentially --
14     Q.   Is that a fair characterization of
15 your criteria?
16     A.   That -- that's pretty fair.
17     Q.   Were there any other criteria
18 that -- that you applied to identify comparable
19 press releases?
20     A.   That's pretty much it.  That's --
21 that's what I can think of right now.
22          MS. TOMKOWIAK:  Dr. Frykman, that's
23 all the questions that I have.
24          MR. GRONBORG:  Okay.  Just a couple
25 of questions, if I can.

Page 412

1           EXAMINATION (Cont'd.) BY COUNSEL
2           FOR PLAINTIFF and THE CLASS
3  BY MR. GRONBORG:
4      Q.   You described there what you did
5  with these subset of press releases that you
6  received from Latham & Watkins.  And was that the
7  basis of your opinion that Puma's July 22, 2014,
8  press release was in line with an industry
9  standard?
10     A.   That was not the only basis for it.
11 That certainly played a role.  But no less
12 important was the -- was the -- you know, the
13 fact that I'd looked at, you know, hundreds and
14 hundreds of -- of these, you know, over the
15 years, and many cases have been able to hear the
16 clinical trial results presented at ASCO.
17          I've gone to ASCO for years.  I
18 haven't gone recently, but went to ASCO for years
19 where it's just one clinical trial after another,
20 and that all together is the basis for my
21 opinion.
22     Q.   And when you say hundreds and
23 hundreds of these, are you referring to press
24 releases?
25     A.   To press releases, yeah.

| Volume II<br>Gregory Frykman, M.D. | Confidential | Hsingching Hsu vs. Puma<br>Biotechnology, Inc., et al. |
|---|---|---|

Page 413

1    Q.   And of those hundreds and hundreds
2  of press releases that you say you've reviewed
3  over the years, how many meet the criteria that
4  you say you applied to the press releases you
5  received in this case?
6    A.   Well, that's hard to give you a
7  number.  Most of them have been related to
8  oncology drugs.  I'm not sure I can give you a
9  number about what proportion had registrational
10  intent.
11        I'm also not sure I can give you
12  any proportion of those which -- for which there
13  was corresponding, you know, FDA material.  So
14  I'm not sure I can give you an answer to that.
15    Q.   Well, of all the press releases
16  that you received from Latham & Watkins in this
17  case, and I understand you put all of those in
18  your materials considered, of all of those, how
19  many, applying the criteria you've described
20  today, did you determine were comparable to
21  Puma's?
22    A.   Well, I think we winnowed it down
23  to, you know, nine-ish or so is -- is what's in
24  the -- in the -- in the report.
25    Q.   So just the ones that are

Page 414

1  specifically identified in the report itself?
2  Those are the only ones you determined were
3  comparable to Puma?
4    A.   These -- that's -- well, yes.
5  Yeah.  These are the ones that were comparable
6  to -- to the situation that was described or
7  was -- was underlying the July 22, 2014, press
8  release of -- of Puma.
9    Q.   And you're looking at Exhibit A; is
10  that right?
11    A.   I'm looking at Exhibit --
12    Q.   A of your report?
13    A.   Yes.
14    Q.   Okay.  And so is it your opinion
15  that, other than the press releases identified in
16  Exhibit A, that none of the other press releases
17  that are included in your list of materials
18  considered are comparable to Puma's July 22,
19  2014, press release?
20    A.   That's correct.
21    Q.   Okay.  So all of the other press
22  releases that you included in your list of
23  materials considered, did you use -- were those
24  useful at all to you in coming up with your
25  opinion about Puma's press release?

Page 415

1    A.   They were further away from the
2  circumstances with regard to, you know, Puma and
3  neratinib and the ExteNET clinical trial.  There
4  were probably -- I don't know probably -- there
5  were certainly many overlapping elements.  But
6  the -- the -- the focus was as I've described
7  for -- because of Puma's situation, it was a
8  registrational study, ExteNET was a
9  registrational study because it was a -- a
10  cancer-focused drug, and it had registrational
11  intent.
12    Q.   And in your report when you opine
13  that Puma's July 22, 2014, press release was in
14  line with an industry standard, are you referring
15  to just an industry standard for press releases
16  that meet all of the criteria that you've
17  described today?
18    A.   The criteria that I've talked about
19  today relate to the -- the context in which the
20  July 22, 2014, press release from Puma came out.
21  But the -- the -- as we've talked about, I think
22  at great length last time, that there's a broader
23  industry.  And there's a high degree of
24  variability in what companies decide to include
25  and not include in their press releases.  And

Page 416

1  it's that with which Puma's press release fits
2  comfortably.
3        MR. GRONBORG:  That's all I have.
4        MS. TOMKOWIAK:  Okay.  We'll just
5  designate that as confidential, subject to our
6  review, and request we read and sign.
7        THE VIDEOGRAPHER:  Okay.  The time
8  is 2:30 p.m., July 26, 2018.  Going off the
9  record and concluding the videotaped deposition.
10        (Signature not having been waived,
11  the deposition of GREGORY K. FRYKMAN, M.D. was
12  concluded at 2:27 p.m.)

| Volume II<br>Gregory Frykman, M.D. | Confidential | Hsingching Hsu vs. Puma<br>Biotechnology, Inc., et al. |
|---|---|---|

**Page 417**

```
 1        CERTIFICATE OF SHORTHAND REPORTER
 2       I, AMY E. SIKORA-TRAPP, RPR, CRR, CLR, and
 3   Notary Public in and for the District of
 4   Columbia, hereby certify that the foregoing
 5   deposition of GREGORY K. FRYKMAN, M.D. was taken
 6   before me on the 26th day of July, 2018.
 7         That the said witness was duly sworn before
 8   the commencement of the testimony; that the said
 9   testimony was taken stenographically by me and
10   then transcribed.
11        I further certify that I am not kin to any
12   of the parties to this action nor am I interested
13   directly or indirectly in the matter in
14   controversy; nor am I in the employ of any of the
15   counsel in this action.
16        Further, that if the foregoing pertains to the
17   original transcript of a deposition in a federal case,
18   before completion of the proceedings, review of the
19   transcript [X] was [ ] was not requested.
20        IN WITNESS WHEREOF, I have hereunto set my
21   hand this 29th day of July, 2018.
22
23   _____
24        AMY E. SIKORA-TRAPP, RPR, CRR, CLR
              Notary Public
          in and for the District of Columbia
25        My Commission expires:  7/31/19
```

**Page 418**

```
 1        DECLARATION UNDER PENALTY OF PERJURY
 2   Case Name: Hsingching Hsu vs. Puma Biotechnology, Inc., et al.
 3   Date of Deposition: 07/26/2018
 4   Job No.: 10044960
 5
 6         I, GREGORY FRYKMAN, M.D., hereby certify
 7   under penalty of perjury under the laws of the State of
 8   _____ that the foregoing is true and correct.
 9         Executed this _____ day of
10   _____, 2018, at _____.
11
12
13         _____
14              GREGORY FRYKMAN, M.D.
15
16   NOTARIZATION (If Required)
17   State of _____
18   County of _____
19   Subscribed and sworn to (or affirmed) before me on
20   this _____ day of _____, 20__,
21   by_____,    proved to me on the
22   basis of satisfactory evidence to be the person
23   who appeared before me.
24   Signature: _____ (Seal)
25
```

**Page 419**

```
 1   DEPOSITION ERRATA SHEET
 2   Case Name: Hsingching Hsu vs. Puma Biotechnology, Inc., et al.
     Name of Witness: Gregory Frykman, M.D.
 3   Date of Deposition: 07/26/2018
     Job No.: 10044960
 4   Reason Codes:  1. To clarify the record.
                    2. To conform to the facts.
 5                  3. To correct transcription errors.
 6   Page _____ Line _____ Reason _____
 7   From _____ to _____
 8   Page _____ Line _____ Reason _____
 9   From _____ to _____
10   Page _____ Line _____ Reason _____
11   From _____ to _____
12   Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
15   From _____ to _____
16   Page _____ Line _____ Reason _____
17   From _____ to _____
18   Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
21   From _____ to _____
22   Page _____ Line _____ Reason _____
23   From _____ to _____
24   Page _____ Line _____ Reason _____
25   From _____ to _____
```

**Page 420**

```
 1   DEPOSITION ERRATA SHEET
 2   Page _____ Line _____ Reason _____
 3   From _____ to _____
 4   Page _____ Line _____ Reason _____
 5   From _____ to _____
 6   Page _____ Line _____ Reason _____
 7   From _____ to _____
 8   Page _____ Line _____ Reason _____
 9   From _____ to _____
10   Page _____ Line _____ Reason _____
11   From _____ to _____
12   Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
15   From _____ to _____
16   Page _____ Line _____ Reason _____
17   From _____ to _____
18   Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
21   From _____ to _____
22   _____ Subject to the above changes, I certify that the
             transcript is true and correct
23   _____ No changes have been made. I certify that the
             transcript  is true and correct.
24
             _____
25                GREGORY FRYKMAN, M.D.
```