ROBBINS GELLER RUDMAN
  & DOWD LLP
TOR GRONBORG (179109)
JASON A. FORGE (181542)
TRIG R. SMITH (237399)
SUSANNAH R. CONN (205085)
J. MARCO JANOSKI GRAY (306547)
DEBASHISH BAKSHI (311115)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
torg@rgrdlaw.com
jforge@rgrdlaw.com
trigs@rgrdlaw.com
sconn@rgrdlaw.com
mjanoski@rgrdlaw.com
dbakshi@rgrdlaw.com

Counsel for Plaintiff and the Class

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| HSINGCHING HSU, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>        vs.<br><br>PUMA BIOTECHNOLOGY, INC., et al.,<br><br>                              Defendants. | Case No. 8:15-cv-00865-AG-SHK<br><br><u>CLASS ACTION</u><br><br>REPLY IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE THE TESTIMONY OF DEFENDANTS' EXPERT DR. GREGORY K. FRYKMAN<br><br>DATE:      October 1, 2018<br>TIME:      10:00 a.m.<br>CTRM:    10D<br>JUDGE:    Hon. Andrew J. Guilford |

# TABLE OF CONTENTS

**Page**

1.    FRYKMAN IS NOT QUALIFIED TO OPINE ON THE
      PURPORTED INDUSTRY STANDARD FOR THE DISCLOSURE
      OF CLINICAL TRIAL RESULTS ................................................................. 1

2.    FRYKMAN'S DISCLOSURE OPINIONS ARE NOT RELIABLE ............ 4

      2.1    Frykman's Opinions Are Not Grounded in Any Experience ............... 4

      2.2    Frykman's Opinions Are Not the Result of a Reliable
             Methodology ...................................................................................... 6

      2.3    Frykman's Failure to Identify a Discernable Industry Standard
             Makes His Opinions Excludable .......................................................... 8

      2.4    Frykman's Admitted Inability to Opine on Materiality Renders
             His Opinion Regarding Puma's Press Release Meaningless .............. 11

3.    FRYKMAN'S OPINION ON INDUSTRY PRACTICES FOR
      STOCK OFFERINGS IS IMPOSSIBLY VAGUE AND DEVOID OF
      ANY ANALYSIS ...................................................................................... 12

4.    FRYKMAN'S NARRATIVE ON ASCO PRESENTATIONS IS
      UNRELIABLE, UNNECESSARY, AND UNHELPFUL ........................... 13

5.    FRYKMAN'S OPINION REGARDING STOCK PRICE
      MOVEMENTS DURING AND AROUND ASCO MEETINGS HAS
      NO BASIS AND SHOULD BE EXCLUDED ............................................ 14

6.    CONCLUSION ......................................................................................... 15

# TABLE OF AUTHORITIES

(All citations are omitted and emphasis is added unless otherwise noted.)

**Page**

## CASES

*Advo-Sys., Inc. v. Maxway Corp.*,
    37 F.3d 1044 (4th Cir. 1994) .............................................................. 10

*Cage v. City of Chicago*,
    979 F. Supp. 2d 787 (N.D. Ill. 2013)...................................................... 6

*Custom Prods. Corp. v. Intermet Corp.*,
    170 F. Supp. 2d 853 (E.D. Wis. 2001) ................................................. 10

*Daubert v. Merrell Dow Pharm., Inc.*,
    43 F.3d 1311 (9th Cir. 1995) ....................................................... 4, 5, 7

*Filtration Sols. Worldwide, Inc. v. Gulf Coast Filters, Inc.*,
    2010 WL 148442 (W.D. Mo. Jan. 12, 2010) ......................................... 7

*Gable v. Nat'l Broad. Co.*,
    727 F. Supp. 2d 815 (C.D. Cal. 2010),
    *aff'd*, 438 F. App'x 587 (9th Cir. 2011) ............................................... 8

*Hangarter v. Provident Life & Accident Ins. Co.*,
    373 F.3d 998 (9th Cir. 2004) ............................................................... 4

*Huskey v. Ethicon, Inc.*,
    29 F. Supp. 3d 691 (S.D.W. Va. 2014) ................................................. 3

*In re ConAgra Foods, Inc.*,
    90 F. Supp. 3d 919 (C.D. Cal. 2015),
    *aff'd sub nom. Briseno v. ConAgra Foods, Inc.*,
    844 F.3d 1121 (9th Cir. 2017)............................................................. 3

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    299 F. Supp. 3d 430 (S.D.N.Y. 2018) .................................................. 7

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
    32 F. Supp. 3d 453 (S.D.N.Y. 2014) .................................................. 14

1472642_1

1

2                                                                                              **Page**

3
*In re Rezulin Prods. Liab. Litig.*,
4         309 F. Supp. 2d 531 (S.D.N.Y. 2004) ............................................................... 12

5
*In re Tolona Pizza Prods. Corp.*,
6         3 F.3d 1029 (7th Cir. 1993) ............................................................................... 10

7
*In re Xerox Corp. Sec. Litig.*,
8         746 F. Supp. 2d 402 (D. Conn. 2010) ................................................................. 2

9      *Lewert v. Boiron, Inc.*,
10        212 F. Supp. 3d 917 (C.D. Cal. 2016)................................................................ 14

11     *Lewis v. D.A. Stuart Co.*,
          2003 WL 26097791 (E.D. Tex. 2003)................................................................. 3
12
*Matuez v. Lewis*,
13        2012 WL 3582122 (C.D. Cal. May 9, 2012)....................................................... 3

14
*Perez v. State Farm Mut. Auto. Ins. Co.*,
15        2012 WL 3116355 (N.D. Cal. July 31, 2012) ..................................................... 7

16
*Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*,
17        752 F.3d 807 (9th Cir. 2014) .............................................................................. 2

18
*Reser's Fine Foods, Inc. v. Bob Evans Farms, Inc.*,
19        2016 WL 3769361 (D. Or. July 13, 2016) ...................................................... 4, 5

20     *Schueneman v. Arena Pharm., Inc.*,
21        840 F.3d 698 (9th Cir. 2016) ............................................................................ 11

22     *SEC v. Dain Rauscher, Inc.*,
          254 F.3d 852 (9th Cir. 2001) .............................................................................. 8
23
*Stepak v. Addison*,
24        20 F.3d 398 (11th Cir. 1994) ............................................................................ 10

25
*Theranos, Inc. v. Fuisz Pharma LLC*,
26        2014 WL 12695908 (N.D. Cal. Mar. 10, 2014) ................................................ 14
27

28

1472642_1

**Page**

*Thomas v. Newton Int'l Enters.*,
 42 F.3d 1266 (9th Cir. 1994) ............................................................... 2

*Tyree v. Boston Sci. Corp.*,
 54 F. Supp. 3d 501 (S.D.W. Va. 2014) ............................................... 2

*United Phosphorus, Ltd. v. Midland Fumigant, Inc.*,
 173 F.R.D. 675 (D. Kan. 1997) ........................................................ 10

*United States v. Finley*,
 301 F.3d 1000 (9th Cir. 2002) .......................................................... 14

*United States v. Fredette*,
 315 F.3d 1235 (10th Cir. 2003) .......................................................... 4

*Universal Elecs., Inc. v. Universal Remote Control, Inc.*,
 2014 WL 12586737 (C.D. Cal. Apr. 21, 2014) .................................. 8

*VFS Leasing Co. v. G.F. Kelly, Inc.*,
 2007 WL 2069842 (M.D. Ala. July 13, 2007) ................................... 5

*WH Smith Hotel Servs., Inc. v. Wendy's Int'l, Inc.*,
 25 F.3d 422 (7th Cir. 1994) ............................................................... 5

*Wing v. Layton*,
 957 F. Supp. 2d 1307 (D. Utah 2013) ................................................ 5

*Wright v. United States*,
 507 F. Supp. 147 (E.D. La. 1980) ...................................................... 9

*Yeti by Molly Ltd. v. Deckers Outdoor Corp.*,
 259 F.3d 1101 (9th Cir. 2001) ........................................................... 6

**STATUTES, RULES AND REGULATIONS**

Federal Rules of Civil Procedure
 Rule 26(a)(2)(B)(i) ............................................................................. 6
 Rule 37(c)(1)..................................................................................... 10

1472642_1

**Page**

Federal Rules of Evidence
 Rule 403.................................................................................................... 11
 Rule 702........................................................................................... 3, 4, 13
 Rule 702(a) ............................................................................................... 8

17 C.F.R.
 §240.10b-5(b) ......................................................................................... 11

**SECONDARY AUTHORITIES**

*Standard*, Black's Law Dictionary (10th ed. 2014) ............................................... 10

Plaintiff Norfolk County Council, as Administering Authority of the Norfolk Pension Fund, submits this reply in support of its Motion to Exclude the Testimony of Defendants' Expert Dr. Gregory K. Frykman (ECF No. 398).

**1.    FRYKMAN IS NOT QUALIFIED TO OPINE ON THE PURPORTED INDUSTRY STANDARD FOR THE DISCLOSURE OF CLINICAL TRIAL RESULTS**

Confronted with Frykman's lack of any relevant experience in determining the appropriate contents for a press release disclosing clinical trial results, Defendants follow their expert's lead and proclaim that he is the "foremost expert in the field." ECF No. 448 ("Opp.") at 15.  Odd, then, that he's never authored anything on the subject of public disclosures, offered an opinion on the disclosure of any clinical trial results (before this case), taught anything on the subject, nor been employed or retained by any company to draft or comment on a press release disclosing clinical trial results.  *See* ECF No. 399 ("Mot.") at 5-6.  Defendants point to Frykman's various jobs as a physician, a medical officer with the FDA, and policy analyst to argue he is qualified.  Opp. at 7-8.  But Frykman had no responsibility in any of those positions for preparing or approving the contents of any disclosures regarding clinical trial results.  *See* Mot. at 6.[1]

---

[1]    In their effort to bolster Frykman's qualifications, Defendants overstate the facts. For example, they claim "Frykman has worked with or around biotechnology companies like Puma for his entire career." Opp. at 1.  But Frykman has never been an employee of a publicly-traded biotechnology company.  *See* ECF No. 400-5 ("Frykman Tr. I") at 56:4-11. Defendants claim "Frykman reviewed portions of press releases submitted to the FDA by companies regarding drugs in the early stages of development and not yet on the market."  Opp. at 8; *see also id.* at 9 (claiming Frykman "analyz[ed] . . . press releases while at the FDA").  But Frykman testified that no press releases were submitted to the FDA with respect to the only two new drug applications he worked on, and that if press releases were submitted to the FDA they would be reviewed by the agency's Division of Drug Marketing, Advertising, and Communications, which Frykman did not work in.  *See* Frykman Tr. I at 50:7-56:3.  Defendants also say Frykman has "experience reporting on disclosures of thousands of clinical trial results for institutional investors."  Opp. at 9.  But Defendants do not cite to anything substantiating that claim and there is nothing in the record to support it.  Frykman was a ***policy*** analyst and he admitted that he never issued any report discussing whether a company's disclosure was or was not in line with typical industry practices.  *See* Frykman Tr. I at 59:14-16, 76:5-13, 114:23-115:8, 127:3-10.

Defendants' effort to establish Frykman's qualifications largely rests on the untestable claim that he has read thousands of clinical trial press releases over the years.  Opp. at 8; Frykman Tr. I at 76:5-16, 59:14-16.  But there is an obvious distinction between an understanding gained from consuming information versus the specialized knowledge acquired through producing information.  An avid football fan may have read thousands of stories about the NFL, but that wouldn't make her an expert on the league's protocols or standard practices for treating concussions.  Putting this logic to work, in *In re Xerox Corp. Sec. Litig.*, 746 F. Supp. 2d 402, 416-17 (D. Conn. 2010), the court held that an expert purporting to have "experience reviewing documents prepared by individuals who have made determinations of materiality" was not qualified to "mak[e] such determinations himself."   Like Frykman here, the disqualified expert in *Xerox* had never "been in charge of making public disclosures for a company," "never been employed in an operational role in any company," had "not served as a director of any company that is required to make any kind of public disclosure," and "never made a determination of materiality other than his work in [the] case."  *Id*. at 416.  On the medical front, in *Tyree v. Boston Sci. Corp.*, 54 F. Supp. 3d 501, 551 (S.D.W. Va. 2014), the court recognized that a physician generally familiar with medical device warning labels, but who had "never drafted a device warning," was not qualified to offer an opinion whether the contents of a specific warning label were appropriate.  Frykman simply has no relevant experience in determining what information about a clinical trial results should or needs to be publicly disclosed.

The cases cited by Defendants only serve to highlight the level of relevant experience expected of expert witnesses (and that Frykman lacks).  In *Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 814 (9th Cir. 2014) (Opp. at 9-10), the expert's "decades of experience" as "a certified thermographer, certified indoor environmentalist, certified master restorer, certified water control journeyman, and certified mold remediator" qualified him to opine on "relative humidity."  In *Thomas*

1472642_1

1   *v. Newton Int'l Enters.*, 42 F.3d 1266, 1269-70 (9th Cir. 1994) (Opp. at 9), the expert

2   "had 29 years of longshore experience . . . work[ing] in a variety of job categories for

3   numerous stevedoring companies" which qualified him to testify "as to the working

4   conditions of experienced longshore personnel."  And in *In re ConAgra Foods, Inc.*,

5   90 F. Supp. 3d 919, 952-53 (C.D. Cal. 2015) (Opp. at 7), *aff'd sub nom. Briseno v.*

6   *ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017), the expert was qualified to opine

7   on a statistical technique because she had taken doctoral coursework involving the

8   technique, taught the technique to undergraduate and graduate students, conducted

9   more than thirty studies using the technique, served on the editorial review board of

10   journals that extensively covered the technique, and been retained as an expert on the

11   technique in prior litigation.  In contrast, Frykman's unsubstantiated claim to have

12   read "thousands" of clinical trial disclosures doesn't come close to reaching the level

13   of "specialized knowledge" required by Rule 702.[2]

14

15

16

---

17   [2]   Defendants erect a straw man, arguing that a "lack of experience testifying" or that

18   an expert "has never 'taught any course'" does not just mean the expert isn't qualified.
Opp. at 9-10.  But the fact that Frykman has never testified, never published, and
never taught anything about the standard for the disclosure of clinical trial results do

19   not stand alone as the basis for disqualification.  Rather, they are additional evidence
of the fact that Frykman does not have the experience or specialized knowledge

20   necessary to offer expert opinion on any purported disclosure standard for clinical trial
results.  Defendants' authorities are therefore unhelpful to the analysis.  *See, e.g.,*

21   *Matuez v. Lewis*, 2012 WL 3582122, at *8 (C.D. Cal. May 9, 2012) (police officer
who had never testified as a gang expert was nevertheless qualified to do so because,

22   among his other relevant experience, "'he had testified "a dozen or a couple of dozen"
times regarding gangs and gang investigations before joining the gang unit'"); *Huskey*

23   *v. Ethicon, Inc.*, 29 F. Supp. 3d 691, 713-14 (S.D.W. Va. 2014) (physician who had
not taught courses on specific surgical procedure was qualified as an expert to opine

24   on it because he was a renowned professor in the relevant field, had published
textbooks and book chapters in his area of expertise, had discussed the procedure in a

25   publication of a preeminent professional organization, and he had treated several
patients who had suffered complications after undergoing the procedure) (Opp. at 10);

26   *Lewis v. D.A. Stuart Co.*, 2003 WL 26097791, at *5 (E.D. Tex. 2003) (professor who
had not taught courses on metalworking fluids was qualified to opine on the effects of

27   exposure to those fluids because he was an invited member of a national toxicology
society, he had grants and publications in the area of toxicology, and he taught

28   toxicology to doctoral students) (Opp. at 10).

## 2.   FRYKMAN'S DISCLOSURE OPINIONS ARE NOT RELIABLE

### 2.1   Frykman's Opinions Are Not Grounded in Any Experience

Responding to Plaintiff's claim that Frykman's disclosure opinions are not the product of any reliable principle or methodology, Defendants argue that principles and methodology are irrelevant because Frykman's opinions are "based on his 'knowledge and experience.'"  Opp. at 11-12 (quoting *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1018 (9th Cir. 2004)).  But Defendants' effort to hang all of Frykman's disclosure opinions on his "knowledge and experience" ignores the dictates of Rule 702:  "*If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts*."  *See* Fed. R. Evid. 702 advisory committee's note to 2000 amendments.  Neither Frykman's expert report (ECF No. 400-1) ("Report"), nor his testimony addresses any of these requirements.  He simply claims to have "analyzed" clinical trial press releases and concludes that Puma's July 22, 2014 press release is in-line with some industry standard.  But "[t]he trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'"  *Id.* (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995)).  And "[t]he more subjective and controversial the expert's inquiry, the more likely the testimony should be excluded as unreliable."  *Id.*

Courts routinely exclude "industry standard" testimony that is not firmly anchored in the proffered expert's actual experience.  For example, in *Reser's Fine Foods, Inc. v. Bob Evans Farms, Inc.*, 2016 WL 3769361 (D. Or. July 13, 2016), the court found that an expert opinion could "not support the existence of an industry standard" where the expert "fail[ed] to explain how and why his experience support[ed] [his] conclusion" and he did "not describe *specific* examples . . . in the industry that he has personally experienced and witnessed."  *Id.* at *17 (emphasis in original); *see also United States v. Fredette*, 315 F.3d 1235, 1239-40 (10th Cir. 2003)

- 4 -

1   (affirming exclusion of testimony because expert failed to explain why his experience

2   with rebate programs was a sufficient basis for his opinion on defendant's gasoline

3   coupon scheme); *Wing v. Layton*, 957 F. Supp. 2d 1307, 1317-18 (D. Utah 2013)

4   (granting motion to exclude opinion that defendant's compensation was

5   "'reasonable'" and "consistent with industry practice" because expert "[did] not

6   explain how his experience led him to his conclusions"); *VFS Leasing Co. v. G.F.*

7   *Kelly, Inc.*, 2007 WL 2069842, at *5 (M.D. Ala. July 13, 2007) (excluding opinion

8   because "[expert's] affidavit fails to explain why his experience . . . is a sufficient

9   basis for his opinion" that certain cost estimates were "'greatly excessive'" of industry

10   standards).

11        Here, as in *Reser's Fine Foods*, Frykman's opinions as to the industry standard

12   for the disclosure of clinical trial results are unreliable because he "fails to explain

13   how and why his experience supports his conclusion[s]."  *See* 2016 WL 3769361, at

14   *17.  His lack of direct experience deciding what information to include and exclude

15   from a corporate disclosure does not meet Rule 702's requirements for an expert who

16   – as Defendants' repeatedly insist – is relying primarily on his work history as a basis

17   for his opinions.  *See id.*  And beyond generalities, Frykman has repeatedly been

18   unable to "describe *specific* examples" that could have provided a sufficient basis for

19   his opinions.  In fact, while Defendants claim that as a policy analyst Frykman would

20   "'frequently comment on information in the press releases, both information that was

21   there, as well as information that [he] would like to see . . . but was not there'" (Opp.

22   at 8), Frykman could not identify a *single* instance of a press release that wasn't in-

23   line with his purported industry standard.  *See* Mot. at 8-9.  Frykman has not

24   substantiated whether his disclosure opinions are based on any specific experience or

25   how that experience led to his conclusions, and the Court should not simply take his

26   word for it.  *See Daubert*, 43 F.3d at 1319.[3]

27

28   _____

[3]  Given that Frykman is not being offered to interpret a term of art, Defendants' authorities on this point are not relevant.  *See, e.g.*, *WH Smith Hotel Servs., Inc. v.*

- 5 -

1472642_1

### 2.2 Frykman's Opinions Are Not the Result of a Reliable Methodology

Apparently hedging their bet, Defendants step away from the claim that the disclosure opinions are based on "'knowledge and experience alone'" and argue that Frykman "*engaged in a comprehensive review of industry practices based on clearly defined criteria*" that led to his identification of "*discrete, objective criteria*" that "industry standards *dictate*." Opp. at 15. Notably, Defendants cannot cite to any portion of Frykman's Report discussing the purported "comprehensive review" or "clearly defined criteria." The Court will search the Report in vain for any description of any methodology (comprehensive or otherwise) undertaken by Frykman, let alone an explanation of how that purported methodology led to any of his opinions. *See* Fed. R. Civ. P. 26(a)(2)(B)(i) (expert report "must contain . . . complete statement of all opinions the witness will express *and the basis and reasons for them*"); *Yeti by Molly Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) (holding that "exclusion is an appropriate remedy" where expert "fail[s] to fulfill the required disclosure requirements of Rule 26(a)").

Defendants repeatedly refer to Frykman's evaluation of clinical trial press releases as evidence that he employed a reliable methodology (Opp. at 2, 12-14), but his testimony belies that assertion. Frykman claims to have created a list of search terms with Defendants' counsel, who then ran the terms in a LexisNexis database and provided him with about 200 press releases several weeks later. *See* Frykman Tr. I at 178:9-180:15. Frykman admittedly has no idea how many "hits" his search terms generated, but simply assumed that counsel provided him with all relevant search

---

*Wendy's Int'l, Inc.*, 25 F.3d 422, 429 (7th Cir. 1994) (testimony regarding "the customary formats for calculating percentage rent in the commercial real estate industry" was "[e]vidence of custom and usage" that is "relevant to the interpretation of ambiguous language in a contract") (Opp. at 13); *Cage v. City of Chicago*, 979 F. Supp. 2d 787, 803-04 (N.D. Ill. 2013) (forensic serologist could offer his or her interpretation of the meaning of the term "extract" because "an expert witness may opine on the accepted meaning (or lack thereof) of a word or phrase within a particular industry based [on] his or her experience and training") (Opp. at 13).

1472642_1

1    results.  *See* ECF No. 449-1 ("Frykman Tr. II") at 360:16-22, 361:16-19, 363:11-16,

2    365:13-19.  But running precisely the same search terms in the same database yields

3    ***tens of thousands*** of hits.  *See* Declaration of Debashish Bakshi in Further Support of

4    Plaintiff's Motions to Exclude the Testimony of Defendants' Experts Dr. Gregory K.

5    Frykman and Dr. Jackie Walling, Ex. 3 (summarizing results returned per search term,

6    with a total hit count of ***78,618***), filed concurrently herewith.

7         At best, Frykman was provided with a fraction of the press releases that hit on

8    his search terms, and he cannot know whether or how they would be relevant to any of

9    his opinions.  That alone renders his "methodology" unreliable.  *See Perez v. State*

10   *Farm Mut. Auto. Ins. Co.*, 2012 WL 3116355, at \*5-\*6 (N.D. Cal. July 31, 2012)

11   ("When asked to elaborate on what documents he chose to use in his analysis, Mr.

12   Wood testified that he relied largely on documents which he either had on hand or that

13   were sent to him by Plaintiffs' counsel.  When asked how one would be able to judge

14   whether he selected the right data to include, Mr. Wood replied that 'my experience

15   and my report speak for itself.'  The Court finds, however, that this is precisely the

16   type of *ipse dixit* that is not permissible under *Daubert.*"); *In re LIBOR-Based Fin.*

17   *Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 490 (S.D.N.Y. 2018) ("Our concern

18   is heightened here, as [the expert witness] offers no explanation of how the

19   communications that she reviewed were selected."); *Filtration Sols. Worldwide, Inc.*

20   *v. Gulf Coast Filters, Inc.*, 2010 WL 148442, at \*5 (W.D. Mo. Jan. 12, 2010)

21   (excluding expert opinion where the witness "[did] not explain her rationale for

22   picking the 23 reports attached to her affidavit").

23        Frykman also makes no effort to explain how his review of the disclosures

24   selected by Defendants' counsel led to any of his opinions.  Nowhere does he tie the

25   review of press releases by other companies to his opinion about what the industry

26   standard is for the disclosure of clinical trial results or how Puma's July 22, 2014

27   press release was "in-line" with that standard.  Instead, Frykman selects a small subset

28   of press releases (from the subset provided to him by Defendants' counsel) and

- 7 -

1   describes how those are "comparable" to Puma's release.  Report at 23-29.  But the

2   fact that Puma's press release may be "comparable" to five other press releases (out of

3   the "thousands" Frykman claims to have read in his career or the tens of thousands

4   that hit on his search terms) cannot form the foundation for the opinion about any

5   industry standard or whether Puma's press release was in-line with that standard.  *See*

6   *Universal Elecs., Inc. v. Universal Remote Control, Inc.*, 2014 WL 12586737, at *10

7   (C.D. Cal. Apr. 21, 2014) (there is "no authority for the admissibility of expert

8   testimony where the expert ***considers*** relevant material, but fails to provide an opinion

9   explaining how that material leads to his conclusions") (emphasis in original).

10          **2.3     Frykman's Failure to Identify a Discernable Industry
                       Standard Makes His Opinions Excludable**

11

12          Underscoring Frykman's lack of experience or reliable methodology is the fact

13   that he cannot even identify the "industry standard" that he purports to be opining

14   about.  Nowhere in his Report or testimony does Frykman set forth a specific industry

15   standard for the disclosure of clinical trial results or how it can be determined if a

16   press release is in-line with that standard.  *See* Mot. at 7-9.  As a result, his testimony

17   cannot help the jury understand the evidence or determine a fact at issue as to any

18   aspect of liability in this case.  *See* Fed. R. Evid. 702(a).

19          The only conceivable purpose of industry standards evidence in a securities

20   fraud action is to determine whether a defendant departed from those standards, which

21   could, in theory, assist the jury in deciding whether a defendant acted recklessly.  *See*

22   *SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 857 (9th Cir. 2001).  Thus, to be relevant,

23   Frykman would need to offer reliable and useful evidence that supports the existence

24   of a generally accepted practice for the disclosure of clinical trial results by companies

25   in the biotechnology industry.  *See Gable v. Nat'l Broad. Co.*, 727 F. Supp. 2d 815,

26   830 (C.D. Cal. 2010) (excluding unsubstantiated opinion as to industry standards

27   given that an expert "cannot purport to testify as to a custom and practice without first

28   establishing that such a practice existed"), *aff'd*, 438 F. App'x 587 (9th Cir. 2011).

- 8 -

Frykman fails to offer the jury anything of value.  He does not identify any standard at all in either his initial or amended Report, opting instead to give his blessing to Puma's press release without reference to established custom or practice.  *See* Mot. at 7-8.  In deposition, he offered a nebulous "standard" so broad that apparently ***every press release he has ever seen*** is in compliance.  *See id*. at 8-9.  But any semblance of a widely-adopted practice quickly crumbled when Frykman conceded that each pharmaceutical company simply discloses what it wishes to disclose about its drugs and clinical trials on a "case-by-case basis" – again, without any regard for purported industry norms.  *See id*. at 9; *see also* Frykman Tr. II at 373:8-11 ("But an important factor in all of this is the personality and the nature of that individual company."); *id*. at 415:23-25 ("And there's a high degree of variability in what companies decide to include and not include in their press releases.").  Of course, "'a standard which only requires [a company] to use their best judgment is no standard at all.'"  *Wright v. United States*, 507 F. Supp. 147, 156 (E.D. La. 1980).

Defendants now seek to recast Frykman's opinion, claiming he identified an industry standard with "objective criteria" that apparently "dictate[s]" companies must disclose: (1) whether the primary endpoint of the clinical trial has been met; (2) the level of statistical significance of the efficacy metric; and (3) plans for regulatory submissions.  *See* Opp. at 12, 15.  But those opinions are not in Frykman's Report. And Frykman has never testified that there is an industry standard that "dictate[s]" any aspect of a given company's disclosure practices.  Indeed, the testimony cited by Defendants demonstrates the noncommittal nature of Frykman's proffered opinions. *See* Frykman Tr. I at 285:19-22 ("Usually that [efficacy result] is associated with, ***but not necessarily***, but generally, most of the time, it's associated with a significance level."); *id*. at 286:14-21 ("For phase 3 studies, ***it's not mandatory***, but it's commonplace to see what a company's plans are with regard to submission of an application for drug approval to regulatory authorities."); *see also id*. at 285:14-16 ("The minimum range also depends on what the obligations are in terms of

- 9 -

materiality."); *id*. at 109:10-13 ("[I]t's hard to say uniformly that these, you know, five or 10 or 20 pieces of clinical trial results should or should not be in a particular press release.").  Defendants' revisionism will not do.  *See United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 173 F.R.D. 675, 688 (D. Kan. 1997) (rejecting defendants' "attempt to rewrite and recharacterize [their expert's] opinions . . . [s]uch reinterpreted opinions will not be considered by the court") (citing Fed. R. Civ. P. 37(c)(1)).

While wrongly claiming that Frykman's industry standard was "objective" and "dictate[d]" specific disclosures, Defendants simultaneously argue that a "fluid" standard isn't problematic.  Opp. at 16.  But a standard with no discernable boundaries or requirements is not a standard at all.  *See Standard*, Black's Law Dictionary (10th ed. 2014) (defining a "standard" as "[a] model accepted as correct by custom, consent, or authority"); *see also Stepak v. Addison*, 20 F.3d 398, 410 (11th Cir. 1994) ("even the most generous and forgiving standard has its limits or it is no standard at all").

*In re Tolona Pizza Prods. Corp.*, 3 F.3d 1029 (7th Cir. 1993), does not support Defendants' argument.  Opp. at 16.  The Seventh Circuit interpreted an exception to a bankruptcy code provision and found it was common practice for payments to be made within a range (*e.g.*, up to 30 days) as opposed to a fixed deadline (*e.g.*, 7 days).  It did ***not*** endorse expert testimony on an industry standard so vague as to change from company to company.  *Tolona*, 3 F.3d at 1033.  In fact, the following year, the Fourth Circuit addressed the same bankruptcy provision, and made it clear that if creditors were allowed to "characterize[] the industry norm at too high a level of generality," it would render the statute "virtually meaningless."  *Advo-Sys., Inc. v. Maxway Corp.*, 37 F.3d 1044, 1051 (4th Cir. 1994).  Defendants' other case fares no better.  *See Custom Prods. Corp. v. Intermet Corp.*, 170 F. Supp. 2d 853, 859 (E.D. Wis. 2001) (finding that under automotive industry standards set forth across seven written manuals, the production deadline at issue was ***not*** a "flexible" requirement,

and that witnesses had testified that the deadline was "'material,'" "'critical,'" and "'important'") (Opp. at 16).[4]

### 2.4   Frykman's Admitted Inability to Opine on Materiality Renders His Opinion Regarding Puma's Press Release Meaningless

The only actual requirement Frykman has identified for clinical trial disclosures is that they must include "material information." *See* Mot. at 9-11; *see also* Frykman Tr. II at 375:22-24 ("If it's a publicly traded company, then they're expected to disclose material information to their investors."); *id*. at 377:21-24 ("[P]ublicly traded pharmaceutical companies [are] obligated to disclose material information to their investors."). While Frykman leaves that out of his Report (and Defendants don't include it in their attempt to manufacture an industry standard for him), he is correct. A fundamental requirement for disclosures by publicly-traded companies (including biotechnology companies) is that they disclose material information. *See* 17 C.F.R. §240.10b-5(b); *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 705-06 (9th Cir. 2016). So an evaluation of whether a public company's disclosure of clinical trial results complies with any standard necessarily requires a determination of whether that disclosure included all relevant material information.

But Frykman conceded that "'I'm . . . not the person to make the determination of materiality.'" Mot. at 10-11 (quoting Frykman Tr. I at 339:23-25). Defendants acknowledge as much. Opp. at 16. What Defendants do not do is answer the key question: If the industry standard for a clinical trial disclosure is that it must include material information and Frykman did not (and cannot) make any determination of

---

[4]   Frykman's vague industry standard is made worse by the fact that he is only opining on Puma's July 22, 2014 press release and not any of the related statements at issue in this case. Mot. at 12-13. Defendants argue that Frykman's opinions will assist the jury in understanding "industry norms for the timing and content of disclosure of topline clinical trial results." Opp. at 17. Even if that was the case, Frykman's failure to consider the July 22, 2014 press release in the context of the associated investor conference call and other disclosures of the ExteNET trial results (or to set forth any industry standard for disclosures in conference calls or SEC filings) would only serve to confuse or mislead, rather than assist the jury. *See* Fed. R. Evid. 403.

1472642_1

1    what information would be material, how can he opine that Puma's July 22, 2014

2    press release is in-line with the industry standard?  The only answer is that he can't.

3    His proposed testimony would only confuse or mislead the jury.

### 3.   FRYKMAN'S OPINION ON INDUSTRY PRACTICES FOR STOCK OFFERINGS IS IMPOSSIBLY VAGUE AND DEVOID OF ANY ANALYSIS

6         In a brief portion of his Report, Frykman opines that Puma's January 2015

7    stock offering "was in line with biotechnology industry practices."  Report at 30.

8    Once again, Frykman does not identify a supposed standard industry practice for stock

9    offerings, how his (complete lack of relevant) experience could have led him to

10   conclude that Puma's offering was "in line" with any standard practices, or what (if

11   any) principles or methodologies underlie his opinion.  Mot. at 13-14.

12        And, once again, Defendants fabricate the standard missing from Frykman's

13   Report, claiming that "development-stage biotechnology companies, such as Puma at

14   the time, commonly conduct stock offerings in order 'to raise money to support their

15   research and development activities.'"  Opp. at 21.  But the fact that companies that

16   don't have a product to sell need to raise capital through public offerings is a concept

17   well within the grasp of the average juror.  And the generic claim that those offerings

18   can occur at any time before or after clinical trial results are disclosed means there is

19   no industry practice at all.  *See In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531,

20   543 (S.D.N.Y. 2004) ("Even if charitably viewed as a 'standard,' the testimony . . . is

21   'so vague as to be unhelpful to a fact-finder.'").

22        Defendants obviously want the jury to believe that the industry practice is for

23   stock offerings to occur between the initial disclosure of clinical trial results and a

24   later discussion of those results at a medical conference.  *See* Opp. at 19 (Frykman

25   "provides context for why companies routinely raise money on a similar time frame");

26   *see also* ECF No. 372-1 at 20-21; ECF No. 468 at 17-18.  But Frykman offers no basis

27   to opine that there is an industry practice to hold a stock offering in ***any*** particular

28   time frame or that the timing of Puma's January 2015 offering was in-line with any

- 12 -

1472642_1

such industry practice.  *See* Report at 30; Frykman Tr. I at 301:20-22, 302:17-18, 305:23-24, 307:1-2.  Defendants shouldn't be allowed to continue this effort to mislead the jury.

**4.    FRYKMAN'S NARRATIVE ON ASCO PRESENTATIONS IS UNRELIABLE, UNNECESSARY, AND UNHELPFUL**

Frykman's lengthy narrative on the ASCO presentation process lacks foundation and would not assist the jury.  Mot. at 15-16.  Even if Frykman's opinions regarding the industry standard for clinical trial disclosures in press releases, industry practices for stock offerings, and Puma's compliance with those standards met the requirements of Rule 702, they are wholly unrelated to how presentations are submitted or presented at ASCO's conferences.  This "background" is simply not required as foundation for his opinions.

Compounding the problem, Frykman's needless recitation of the timing and requirements for ASCO presentations is not based on his experience or specialized knowledge.  The only experience that Defendants can muster is Frykman's vague testimony that he "attended ASCO 'for years.'"  Opp. at 19 (quoting Frykman Tr. II at 412:4-21 (with Frykman's caveat that "I haven't gone recently")).  But even a cursory review of the ASCO narrative (Report at 12-19), demonstrates that the testimony is not plausibly based on personal knowledge gleaned from his role as an attendee.  Frykman admits that he has had no involvement in the ASCO submission process (other than submitting a single poster in 2002) and he has never been invited by ASCO as a speaker or panelist.  Frykman Tr. I at 267:12-19; ECF No. 400-4 (Frykman CV).  Frykman also opines on the consequences of violating ASCO's confidentiality policy.  Report at 14.  But, he has no experience with that policy, couldn't recall how the policy works, and couldn't identify any examples from his own personal knowledge of the consequences of violating the policy.  Frykman Tr. I at 267:4-19; Frykman Tr. II at 379:18-381:9, 398:12-21.

- 13 -

1    Furthermore, the ASCO submission process is not a topic that requires expert

2    assistance.  At trial, Defendants will have at their disposal *de bene esse* testimony

3    from fact witnesses who have recent and personal knowledge of the ASCO

4    submission process, including Dr. Arlene Chan (who presented the ExteNET results at

5    the ASCO conference in June 2015) and ASCO's Rule 30(b)(6) witness.  Defendants'

6    authorities are therefore not on point.  *See United States v. Finley*, 301 F.3d 1000,

7    1013-14 (9th Cir. 2002) (affirming admission of expert on personality disorders

8    because layperson not qualified to evaluate defendant's mental condition); *Lewert v.*

9    *Boiron, Inc.*, 212 F. Supp. 3d 917, 927 (C.D. Cal. 2016) (expert allowed to opine on

10   dilution because a layperson could not understand or perform expert's dilution

11   calculations); *Theranos, Inc. v. Fuisz Pharma LLC*, 2014 WL 12695908, at *5 (N.D.

12   Cal. Mar. 10, 2014) (expert in patent prosecution admitted because "his testimony will

13   be helpful to the jury on a technical subject related to inventorship").

14   Given its questionable (at best) probative value and cumulative nature,

15   Frykman's ASCO testimony will simply waste the jury's time, providing another basis

16   for its exclusion.  *See In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 32 F. Supp. 3d 453,

17   462 (S.D.N.Y. 2014) (excluding as "excessive and unlikely to assist the jury" a

18   "lengthy assessment" of a company audit where the relevance was "substantially

19   outweighed by the danger of confusing the jury and wasting time").

20   **5.    FRYKMAN'S OPINION REGARDING STOCK PRICE**
     **MOVEMENTS DURING AND AROUND ASCO MEETINGS**
21   **HAS NO BASIS AND SHOULD BE EXCLUDED**

22   Defendants wisely made no effort to defend Frykman's baseless opinion that

23   "'the cancer-focused nature of the ASCO Annual Meeting tends to increase the

24   volatility of shares in small cancer drug-focused pharmaceutical and biotechnology

25   companies.'"  Mot. at 16; Report at 18.  Frykman didn't identify in his Report any

26   basis (whether in experience or some methodology) for that claim.  He was also

27   unable to do so at deposition, and acknowledged that he is not an economist, that he

28   had never "undertaken any analysis of the volatility of oncology-focused drug

- 14 -

1  companies at or around ASCO," that he was not "aware of any peer reviewed or

2  academic publication finding that the ASCO effect actually exists," and that he was

3  not "an expert on what causes the stock price of oncology-focused drug companies to

4  move."  Frykman Tr. II at 400:12-402:20.  Defendants have tacitly conceded this

5  opinion should not be permitted.

6  **6.    CONCLUSION**

7          For the reasons set forth above, the Court should preclude Frykman from

8  testifying at trial.

9  DATED:  September 21, 2018          Respectfully submitted,

10                                     ROBBINS GELLER RUDMAN
                                        & DOWD LLP
11                                     TOR GRONBORG
                                       JASON A. FORGE
12                                     TRIG R. SMITH
                                       SUSANNAH R. CONN
13                                     J. MARCO JANOSKI GRAY
                                       DEBASHISH BAKSHI

14

15                                            s/ DEBASHISH BAKSHI

16                                       DEBASHISH BAKSHI

17                                     655 West Broadway, Suite 1900
                                       San Diego, CA  92101
18                                     Telephone:  619/231-1058
                                       619/231-7423 (fax)
19
                                       Counsel for Plaintiff and the Class
20

21

22

23

24

25

26

27

28

1472642_1

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on September 21, 2018, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ DEBASHISH BAKSHI
DEBASHISH BAKSHI

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  dbakshi@rgrdlaw.com

1472642_1

# Mailing Information for a Case 8:15-cv-00865-AG-SHK HsingChing Hsu v. Puma Biotechnology, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael A Attanasio**
  mattanasio@cooley.com,smiyajima@cooley.com,efiling-notice@ecf.pacerpro.com,michael-attanasio-2678@ecf.pacerpro.com

- **Debashish Bakshi**
  dbakshi@rgrdlaw.com,3472014420@filings.docketbird.com

- **Amanda F Betsch**
  amanda.betsch@lw.com,amanda-betsch-0711@ecf.pacerpro.com

- **Ryan E Blair**
  rblair@cooley.com,efiling-notice@ecf.pacerpro.com,chourani@cooley.com

- **Rosalyn Chapman, RET**
  mdawson@jamsadr.com

- **Rosalyn Chapman (Ret.)**
  mdawson@jamsadr.com

- **Andrew Clubok**
  andrew.clubok@lw.com,DCECFNotificationsDC@lw.com

- **Susannah R Conn**
  sconn@rgrdlaw.com,tdevries@rgrdlaw.com,3022905420@filings.docketbird.com

- **Patrick V Dahlstrom**
  pdahlstrom@pomlaw.com

- **Eric J Eastham**
  ejeastham@mintz.com,docketing@mintz.com,KCosta@mintz.com

- **Koji F Fukumura**
  kfukumura@cooley.com,efiling-notice@ecf.pacerpro.com,chourani@cooley.com

- **Gilardi & Co. LLC**
  classact@gilardi.com

- **Meryn C N Grant**
  meryn.grant@lw.com

- **Joseph Marco Janoski Gray**
  mjanoski@rgrdlaw.com,tdevries@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Tor Gronborg**
  torg@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Michele D Johnson**
  michele.johnson@lw.com,karen.patterson@lw.com,michele-johnson-7426@ecf.pacerpro.com,#ocecf@lw.com,khadijah-fields-2405@ecf.pacerpro.com,jana.roach@lw.com

- **Mary Kathryn Kelley**
  mkkelley@cooley.com,msalas@cooley.com,efiling-notice@ecf.pacerpro.com

- **Jeremy A Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com

- **Kristin Nicole Murphy**
  kristin.murphy@lw.com,kristin-murphy-2919@ecf.pacerpro.com,#ocecf@lw.com,khadijah-fields-2405@ecf.pacerpro.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,ahood@pomlaw.com,kmsaletto@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,CLinehan@glancylaw.com,info@glancylaw.com,robert-prongay-0232@ecf.pacerpro.com

- **John Warren Rissier**
  warren.rissier@morganlewis.com,bernice.worley@morganlewis.com

- **Darren J Robbins**
  darrenr@rgrdlaw.com

- **Laurence M Rosen**
  lrosen@rosenlegal.com

- **Charlene Sachi Shimada**
  charlene.shimada@morganlewis.com

- **Colleen C Smith**
  colleen.smith@lw.com,colleen-c-smith-7786@ecf.pacerpro.com

- **Trig Randall Smith**
  trigs@rgrdlaw.com,kmccormack@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **John F Sylvia**
  jfsylvia@mintz.com

- **Kolin Tang**
  ktang@sfmslaw.com,pleadings@sfmslaw.com

- **Craig Edward TenBroeck**
  ctenbroeck@cooley.com,maraujo@cooley.com,efiling-notice@ecf.pacerpro.com

- **Sarah A Tomkowiak**
  sarah.tomkowiak@lw.com,DCECFNotificationsDC@lw.com

- **Lucy Han Wang**
  lucy.wang@morganlewis.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)