ROBBINS GELLER RUDMAN
 & DOWD LLP
PATRICK J. COUGHLIN (111070)
TOR GRONBORG (179109)
JASON A. FORGE (181542)
TRIG R. SMITH (237399)
SUSANNAH R. CONN (205085)
J. MARCO JANOSKI GRAY (306547)
DEBASHISH BAKSHI (311115)
TING H. LIU (307747)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
patc@rgrdlaw.com
torg@rgrdlaw.com
jforge@rgrdlaw.com
trigs@rgrdlaw.com
sconn@rgrdlaw.com
mjanoski@rgrdlaw.com
dbakshi@rgrdlaw.com
tliu@rgrdlaw.com

Counsel for Plaintiff and the Class

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| HSINGCHING HSU, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> PUMA BIOTECHNOLOGY, INC., et al., <br><br> Defendants. | Case No. 8:15-cv-00865-AG-SHK <br><br> <u>CLASS ACTION</u> <br><br> PLAINTIFFS' LOCAL RULE 16-10 TRIAL BRIEF <br><br> TRIAL DATE:      January 15, 2019 |

1518675_1

# TABLE OF CONTENTS

**Page**

1.   ELEMENTS OF PLAINTIFFS' CLAIMS ............................................. 1

    1.1   Claim 1: Violation of §10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5.................................................. 1

    1.2   Claim 2: Violation of §20(a) of the Exchange Act (Control Person) ................................................................................ 4

2.   KEY EVIDENCE ................................................................................ 5

    2.1   Statements Regarding the 33% Improvement in Disease-Free Survival ................................................................................. 5

    2.2   Statements Regarding the ExteNET Trial DFS Rates ..................... 5

    2.3   Statements Regarding the Kaplan-Meier Curves ................... 7

    2.4   Statements Regarding Safety Results ................................. 9

    2.5   Scienter:  Defendants Acted Knowingly ........................... 11

    2.6   Reliance ............................................................................ 13

    2.7   Loss Causation .................................................................. 15

        2.7.1  May 14, 2015 Stock Price Decline ......................... 15

        2.7.2  June 1-2, 2015 Stock Price Decline......................... 16

    2.8   Damages ............................................................................ 17

3.   AFFIRMATIVE DEFENSES ........................................................ 17

1518675_1

# TABLE OF AUTHORITIES

(All emphasis is added and citations are omitted unless otherwise stated.)

**Page**

## CASES

*Arthur Young & Co. v. United States Dist. Ct.*,
   549 F.2d 686 (9th Cir. 1977) ............................................................................. 14

*Basic Inc. v. Levison*,
   485 U.S. 224 (1988) .......................................................................................... 4

*Brody v. Transitional Hosps. Corp.*,
   280 F.3d 997 (9th Cir. 2002) ......................................................................... 6, 7

*Dura Pharm., Inc. v. Broudo*,
   544 U.S. 336 (2005) ...................................................................................... 1, 2

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014) ............................................................................. 3, 13, 14

*In re Apple Comput. Sec. Litig.*,
   886 F.2d 1109 (9th Cir. 1989) ......................................................................... 3

*In re ChinaCast Educ. Corp. Sec. Litig.*,
   809 F.3d 471 (9th Cir. 2015) ........................................................................... 4

*In re Convergent Techs. Sec. Litig.*,
   948 F.2d 507 (9th Cir. 1991) ........................................................................... 4

*In re Quality Sys., Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017),
   *cert. dismissed sub nom. Quality Sys., Inc. v. City of Miami Fire*
   *Fighters' & Police Officers' Ret. Tr.*,
   __ U.S. __, 2018 WL 575053 (Nov. 27, 2018) ............................................. 11

*In re REMEC Inc. Sec. Litig.*,
   702 F. Supp. 2d 1202 (S.D. Cal. 2010) .......................................................... 14

*In re VeriFone Holdings, Inc. Sec. Litig.*,
   704 F.3d 694 (9th Cir. 2012) ......................................................................... 12

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) ......................................................................................... 12

- ii -

**Page**

*Miller v. Thane Int'l, Inc.,*
    615 F.3d 1095 (9th Cir. 2010) ........................................................................ 4

*No. 84 Employer-Teamster Joint Council Pension Tr.*
    *Fund v. Am. W. Holding Corp.,*
    320 F.3d 920 (9th Cir. 2003) ......................................................................... 16

*Reese v. Malone,*
    747 F.3d 557 (9th Cir. 2014),
    *overruled on other grounds by City of Dearborn Heights Act 345*
    *Police & Fire Ret. Sys. v. Align Tech., Inc.,*
    856 F.3d 605 (9th Cir. 2017) ......................................................................... 11

*S. Ferry LP No. 2 v. Killinger,*
    542 F.3d 776 (9th Cir. 2008) ......................................................................... 11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007) ...................................................................................... 12

*United States v. Dees,*
    34 F.3d 838 (9th Cir. 1994) ........................................................................... 13

*United States v. Green,*
    745 F.2d 1205 (9th Cir. 1984) ....................................................................... 13

*United States v. Jackson,*
    72 F.3d 1370 (9th Cir. 1995) ......................................................................... 13

*United States v. Shipsey,*
    363 F.3d 962 (9th Cir. 2004) ......................................................................... 12

*Zivkovic v. S. Cal. Edison Co.,*
    302 F.3d 1080 (9th Cir. 2002) ....................................................................... 17

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §78bb(a) ........................................................................................................ 17
    §78j(b) ................................................................................................... 1, 2, 4
    §78u-4(e) ...................................................................................................... 17

- iii -

1518675_1

**Page**

Federal Rules of Evidence
    Rule 401................................................................................................9, 10
    Rule 403................................................................................................9, 10

**SECONDARY**

Alba Conte & Herbert B. Newberg,
    *Newberg on Class Actions* (4th ed. 2002)
    §22.61 ........................................................................................................14

1518675_1

Pursuant to Local Rule 16-10, Class Representative Norfolk County Council, as Administering Authority of the Norfolk Pension Fund, and the Class ("Plaintiffs") respectfully submit this trial brief in response to Defendants' Memorandum of Contentions of Fact and Law (ECF No. 548) ("Defs.' CFL").[1]

## 1.   ELEMENTS OF PLAINTIFFS' CLAIMS

### 1.1   Claim 1: Violation of §10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5

The relevant elements of Plaintiffs' Securities Exchange Act of 1934 ("Exchange Act") §10(b) claim are:

1.   Defendants made an untrue statement of a material fact or omitted a material fact necessary under the circumstances to keep the statements that were made from being misleading in connection with the purchase or sale of securities;

2.   Defendants acted knowingly;

3.   Plaintiffs relied on the marketplace to ensure the integrity of the price of Puma shares in buying securities; and

4.   Defendants' misrepresentations and omissions caused Plaintiffs to suffer damages.

*See* Plaintiffs' Proposed Closing Instruction No. 3 (ECF No. 669 at 9); Manual of Model Civil Jury Instructions for the District Courts of the Ninth Circuit (2017) ("Ninth Circuit Model Instruction"), Model Instruction 18.2; *see also Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).

In their CFL, Defendants correctly recognize that this case involves allegations of both false statements and material omissions. *See, e.g.*, Defs.' CFL at 1 ("Plaintiff must prove . . . Defendants made an untrue statement of a material fact or omitted a

---

[1]   Defendants' CFL was filed before the Court issued its ruling on the parties' respective motions for summary judgment, *in limine*, and to exclude certain experts' testimony.  Plaintiffs have noted where those rulings have rendered issues or disputes moot.

1518675_1

material fact . . . and Defendants' misrepresentation or omission caused Plaintiff to suffer losses."). But in their proposed jury instructions, Defendants omit any reference to omissions and argue that the case only involves false statements. *See* ECF No. 667 at 10. That is incorrect. At all times Plaintiffs have alleged that Defendants made false statements ***and*** omitted the true, material facts about the ExteNET trial results. *See* ECF No. 138 (operative complaint), ¶¶92, 95(b), 101, 103, 105, 106, 110, 112; ECF No. 154 (Order Denying Motion to Dismiss First Amended Complaint) at 5 ("As just described, Lead Plaintiff alleges that Defendant Auerbach allegedly made the following misstatements or ***omissions*** regarding the ExteNET trial . . . ."); *id.* at 6 ("Here, Defendant Auerbach's alleged misstatements or ***omissions*** aren't forward-looking because, at the time of the conference call, 'he had the very ExteNET diarrhea . . . and dropout rate[s] that were ultimately disclosed 11 months later.'"); *id.* ("Because the Court concludes that the misstatements or ***omissions*** identified in the amended complaint aren't covered by the safe harbor provision, it need not address whether the purported cautionary language was 'meaningful.'"). The Final PreTrial Conference Order also expressly identifies that Defendants are alleged to have "made an untrue statement of material fact, or omitted a material fact necessary under the circumstances to keep the statements that were made from being misleading." ECF No. 585-1 at 14.

In both their CFL and jury instructions, Defendants do not dispute that an instrumentality of interstate commerce was used in connection with the sale of Puma securities, and thus Plaintiffs do not need to prove this element of their §10(b) claim. *See* Defs.' CFL at 2; ECF No. 667 at 10. Accordingly, the instrumentality of interstate commerce element is not included in the list of §10(b) elements above or in either parties' proposed jury instructions.

In their CFL, as well as in their proposed jury instructions, Defendants assert that Plaintiffs must prove they "justifiably relied on Defendants' untrue statement of a material fact in buying Puma securities." Defs.' CFL at 1; ECF No. 667 at 10. But

- 2 -

1    that is what a plaintiff must prove when it has alleged direct reliance on an alleged

2    untrue statement.  Here, as Plaintiffs alleged and the Court recognized in its December

3    8, 2017 Order approving class certification, Plaintiffs are proceeding under the fraud-

4    on-the-market presumption of reliance.  *See* ECF No. 218 at 6.  Plaintiffs are ***not***

5    alleging direct reliance.  Accordingly, the direct reliance language Defendants identify

6    in their CFL and proposed Instruction No. 3 is inapplicable.  For a fraud-on-the-

7    market case, the appropriate reliance element is set forth above and in Plaintiffs'

8    Proposed Instruction No. 3 (ECF No. 669 at 9) ("Plaintiffs relied on the marketplace

9    to ensure the integrity of the price of Puma shares in buying securities[.]").  That

10   language is drawn from the Ninth Circuit Model Instruction 18.7, is consistent with

11   the Supreme Court and Ninth Circuit authority, and is the correct language to use in a

12   fraud-on-the-market case like this.  *See* Comment to Ninth Circuit Model Instruction

13   18.7 ("Use this instruction [regarding reliance on the integrity of the market] when a

14   theory of fraud on the market is involved."); *see also In re Apple Comput. Sec. Litig.*,

15   886 F.2d 1109, 1113-14 (9th Cir. 1989) (noting that in a direct reliance claim "the

16   plaintiff must show individual reliance on a material misstatement," whereas under a

17   "fraud on the market theory, the plaintiff has the benefit of a presumption that he has

18   indirectly relied on the alleged misstatement, by relying on the integrity of the stock

19   price established by the market").

20          Defendants argue that the fraud-on-the-market presumption does not replace

21   Plaintiffs' burden to prove direct reliance.  But that is the purpose of the presumption.

22   *See* Comment to Ninth Circuit Model Instruction 18.7 ("When the plaintiff

23   demonstrates market efficiency, the law presumes that the market itself has factored in

24   relevant information and the plaintiff need not prove that he or she individually or the

25   class of purchasers whom the plaintiff seeks to represent relied on the statements or

26   omissions on which the action is based."); *Halliburton Co. v. Erica P. John Fund,*

27   *Inc.*, 573 U.S. 258, 268 (2014) (confirming that securities fraud plaintiffs can "satisfy

28   the reliance element of a Rule 10b-5 action by invoking a rebuttable presumption of

- 3 -

reliance, rather than proving direct reliance on a misrepresentation"); *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 512 n.2 (9th Cir. 1991) (holding that in a fraud-on-the-market case the plaintiffs "need only show that they relied on the integrity of the price of the stock as established by the market, which in turn is influenced by information or the lack of it"); *Miller v. Thane Int'l, Inc.*, 615 F.3d 1095, 1102 (9th Cir. 2010) ("the whole market is deceived by a misrepresentation such that '[m]isleading statements . . . defraud purchasers of stock even if the purchasers do not directly rely on the misstatements'") (quoting *Basic Inc. v. Levison*, 485 U.S. 224, 241-42 (1988)).  Because Plaintiffs are proceeding under the fraud-on-the-market presumption of reliance, Defendants' proposed language in their CFL and proposed jury instructions regarding direct reliance is inapplicable.

### 1.2    Claim 2: Violation of §20(a) of the Exchange Act (Control Person)

Since the parties filed their respective CFLs, two developments require an update to the elements of control-person liability under §20(a) of the Exchange Act. First, Charles Eyler is no longer an individual defendant in this action.  *See* ECF No. 557 at 20.  Second, Plaintiffs have abandoned the §20(a) claim against Puma as duplicative of Puma's corporate liability under the doctrine of respondeat superior. *See In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015); *see also* Plaintiffs' Proposed Closing Instruction No. 1 (ECF No. 669 at 2-4); Ninth Circuit Model Instruction 4.2.

In light of these developments, the parties appear to be in agreement that Plaintiffs' burden under §20(a) is to prove the following elements by a preponderance of the evidence:

1.    A violation of §10(b) of the Exchange Act; and

2.    Alan Auerbach possessed, directly or indirectly, the actual power to direct or control the statement(s) for which Plaintiffs have proven a §10(b) claim.

- 4 -

*See* Joint Proposed Closing Instruction No. 10 (Controlling Person Liability) (ECF No. 668 at 30).

**2.   KEY EVIDENCE**

The purpose of this brief is not to provide a comprehensive list of the key evidence in support of Plaintiffs' claims or to respond to all of the evidence Defendants cite in their CFL.  However, throughout their CFL Defendants misstate the law and mischaracterize the factual record.  Accordingly, Plaintiffs provide a brief rebuttal to the various misstatements in Defendants' CFL.

**2.1   Statements Regarding the 33% Improvement in Disease-Free Survival**

While Plaintiffs respectfully disagree with  the Court's summary-judgment ruling regarding Defendants' statements and omissions about neratinib's purported 33% improvement in disease-free survival ("DFS"), in light of that ruling these statements are no longer at issue for purposes of trial.  ECF No. 557 at 11.

**2.2   Statements Regarding the ExteNET Trial DFS Rates**

As a preliminary matter, in their CFL Defendants inaccurately state what Auerbach said on the July 22, 2014 call.  In response to an analyst seeking confirmation that the DFS rate in ExteNET's control arm was 86%, Auerbach responded, "***I would be comfortable with that number***," not, as Defendants claim, "those numbers."  *Compare* ECF No. 138, ¶50, *with* Defs.' CFL at 4; *see also* ECF No. 585-1 at 6-7.  In response to the analyst's further request for confirmation that the DFS rate in ExteNET's treatment arm was 90%-91%, Auerbach responded, "***I think you can do a 33% improvement in DFS and come up with that calculation***, given the numbers we gave."  ECF No. 585-1 at 6-7.

Defendants claim that these statements "did not affirmatively create an impression of a state of affairs that differed in a material way from reality."  Defs.' CFL at 4.  That assertion is belied by documents and testimony showing that analysts and investors, including Plaintiffs' investment advisor, anticipated that the ExteNET

- 5 -

1518675_1

1  trial would show a 4%-5% absolute DFS benefit for patients taking neratinib. But on

2  July 17, 2014, five days before his statements, Auerbach received an email and Top-

3  Line Efficacy Analyses identifying that the actual DFS rate for the placebo arm of the

4  ExteNET trial was 91.6% and that the absolute DFS benefit for neratinib was only

5  2.3%. *See* ECF No. 585-1 at 2-3. That evidence proves falsity. *Brody v. Transitional*

6  *Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002); *see also* Ninth Circuit Model

7  Instruction 18.1 ("A misrepresentation is a statement of material fact that is false or

8  misleading when it is made. A statement may be misleading even if it is literally true

9  if the context in which the statement was made caused the listener or reader to remain

10 unaware of the actual state of affairs."); Plaintiffs' Proposed Closing Instruction No. 2

11 (ECF No. 669 at 6) (same).

12      Defendants also argue that the evidence will show that Auerbach's statements

13 and omissions regarding the DFS rates were not material. ExteNET's primary

14 endpoint was DFS at 2 years, 28 days post-randomization and Auerbach's statements

15 were in response to the very first analyst question during the July 22, 2014 conference

16 call. Nevertheless, Defendants argue that the fact that Puma's stock price increased

17 between May 15, 2015 and May 27, 2015 "shows . . . that the absolute DFS rates for

18 the primary endpoint were not material to investors." Defs.' CFL at 4-5. It is a

19 stipulated fact that Puma's stock price dropped $39.05 per share on May 14, 2015

20 following the disclosure of the true ExteNET trial results. *See* ECF No. 585-1 at 10.

21 And Defendants do not identify any evidence that would support the assertion that any

22 changes in Puma's stock price after May 14, 2015 were related to any disclosure about

23 the DFS rates or were even company-specific price movements, as opposed to

24 changes caused by market or industry factors. Most importantly, Defendants'

25 proffered expert on Puma's stock price movements, Dr. Paul Gompers, did not offer

26 any opinion rebutting Plaintiffs' expert's opinion regarding the May 14 drop and the

27 subsequent changes in Puma's stock price between May 15, 2015 and May 27, 2015.

28

- 6 -

### 2.3    Statements Regarding the Kaplan-Meier Curves

During the July 22, 2014 conference call, Auerbach was also asked about the ExteNET trial Kaplan-Meier ("KM") curves.   He responded: "the curves are continuing to separate" and "the curves appear to be continuing to separate as you go out year over year." ECF No. 138, ¶52; ECF No. 585-1 at 7-8.   Defendants claim the evidence will show this statement was true, because at the time, Puma had "a limited amount of patient data, for patients who had been in the trial for longer than two years" and that a KM curve of that "limited amount of patient data . . . showed a preliminary trend of further separation year-over-year."  Defs.' CFL at 5.

First, there is no dispute that the KM curves were narrowing at the end of the second year of the ExteNET trial.  In their CFL, Defendants concede that there was a "slight narrowing observed at the end of those curves."  *Id*.  And Defendants' own biostatistics expert, Dr. John Kornak, acknowledged that "there is a narrowing of the raw-data Kaplan-Meier estimated curves right before two years.  *See* ECF No. 403-1, ¶89.

Second, as the Court has already recognized, "[t]here's some evidence that Auerbach didn't have Kaplan-Meier curves extending beyond two years at that time, which calls into question whether he could comment on what happened to the curves beyond two years at all."  ECF No. 557 at 12.   In fact, Defendants' purported "evidence" that prior to July 22, 2014 Auerbach had KM curves extending beyond two years is fictional.  In response to an interrogatory regarding the existence of any documents supporting the claim that KM curves extending beyond two years were done prior to July 22, 2014, Defendants initially responded that "[t]he Kaplan-Meier curves Mr. Auerbach recalls reviewing or discussing were substantially similar to those reflected in PUMA00242055[-56]." ECF No. 424-77 at 5.[2]  But Plaintiffs then

---

[2]    In response to a request for admission in this litigation requesting Auerbach "[a]dmit that defendants have not produced any document in this litigation identifying your receipt on or prior to July 22, 2014 of any Kaplan-Meier curves that reflected data for ExteNET trial participants for the period beyond two years (+/- 28 days),"

1518675_1

1   uncovered that PUMA00242055-56 was actually a copy of "optimistic scenario"

2   *simulated* DFS curves that were generated by Puma biostatistician Bin Yao in October

3   2014.  That simulation was created in response to requests by the company that owns

4   neratinib for KM curves or other documentation that would substantiate Auerbach's

5   July 22, 2014 claim that the curves were continuing to separate.  Specifically, on

6   November 5, 2014, Auerbach sent representatives of neratinib's owner the printout of

7   the simulated optimistic scenario KM curves – produced in this case as

8   PUMA00242055-56 – but claimed that they were the Kaplan-Meier curves for the

9   ExteNET trial.  *See* ECF No. 443-10 at PUMA00242054.  At no time in his exchanges

10  with Pfizer did Auerbach ever identify any KM curves beyond two years that actually

11  existed as of July 22, 2014.

12       On the morning of Yao's deposition in this litigation, Defendants' counsel

13  conceded that the KM curves identified at PUMA00242055-56 did not exist prior to

14  July 22, 2014.  Defendants subsequently amended their response to Plaintiffs' request

15  for admission to admit that "the particular Kaplan-Meier curves produced at

16  PUMA00242055-56 were created after July 22, 2014" and that "Auerbach admits that,

17  to date, Defendants have not produced any document that reflects Mr. Auerbach's

18  receipt on or prior to July 22, 2014 of any Kaplan-Meier curves that reflected data for

19  ExteNET trial participants for the period beyond two years."  ECF No. 424-79 at 4-5.

20       Despite this admission, on January 9, 2018 (after the close of document

21  discovery), Defendants produced a set of KM curves that they claimed formed the

22  basis of Auerbach's false statement that the curves were separating and that prior to

23  July 22, 2014 he had seen curves for the period after two years.  But this document

24  was created on January 5, *2018*.[3]  While Defendants claim that the document was

25

26  Auerbach denied the request, identified PUMA00242055-56, and responded "Mr.
     Auerbach saw these three-year curves before July 22, 2014."  ECF No. 424-78 at 4.

27

28  [3]    During the October 30, 2018 deposition of Darcy Kopcho, Defendants' counsel
     introduced the 2018 KM curves as an exhibit.  In response to a request from Plaintiffs'

1   "equivalent to an analysis that **could** have been performed in July 2014" (ECF No.

2   473-7 at 26), it did not exist in July 2014 or at any time during the Class Period.  It

3   was created at Defendants' counsel's direction and solely for this litigation.  Indeed,

4   the DFS rates for years one and two of the ExteNET trial used by Defendants' counsel

5   to create the 2018 KM curves do not even match the DFS rates Defendants had as of

6   July 2014.  *Compare* ECF No. 473-7 at 51, *with* ECF No. 424-29 at 12.  This

7   artificially created document is not admissible evidence.  *See, e.g.*, Fed. R. Evid. 401,

8   403; ECF No. 614 (granting Plaintiffs' Motion *in Limine* No. 4).

9          Defendants also say that Auerbach's statements regarding the KM curves "were

10   not material."  Defs.' CFL at 6.  But in response to Pfizer's inquiries, Auerbach never

11   claimed that his statements about whether the KM curves were in fact separating was

12   immaterial or unimportant.  To the contrary, he had simulated curves prepared and

13   sent them to Pfizer (and later produced to Plaintiffs) to corroborate his statements.

14   And in his deposition, Auerbach testified that the shape of the KM curves and the

15   duration of the treatment effect of neratinib "was very, very important to investors."

16   ECF No. 443-3 at 367:10.  Indeed, the KM curves were specifically identified as the

17   first measurement of the primary endpoint of the ExteNET trial:  DFS rates at two

18   years.

19   ### 2.4    Statements Regarding Safety Results

20          Auerbach remarked on the safety results from the ExteNET trial during Puma's

21   July 22, 2014 conference call, telling investors that Grade 3 and higher diarrhea in the

22   neratinib arm was expected to be 29% to 30% and that the discontinuation rate due to

23   adverse events was expected to be in the 5% to 10% range.  But on July 18, 2014, four

24   days before his statements, Auerbach received an email from Alvin Wong attaching

25   an Executive Summary of safety PowerPoint deck and safety tables for the ExteNET

26   trial.  The first slide in the Executive Summary was titled "Study 3004: Summary of

27   ――――――――――――――――――――――――――

counsel that they identify for the witness the date the document was created, Defendants' counsel falsely represented that the document was not dated.

28

1  Safety Database Snapshot 7 July 2014," and confirmed that the incidence of "grade

2  ≥3" diarrhea in the neratinib arm of the trial was 39.9% (562 out of 1,408 patients),

3  and that 16.8% of patients in the treatment arm of the ITT population (236 out of

4  1,408 patients) discontinued treatment just due to diarrhea. *See* ECF No. 585-1 at 3-4.

5  One of the top-line safety tables attached to the July 18, 2014 email, titled "Clinical

6  Investigation of Neratinib Protocol PUMA-NER-3004, Brief Summary of Adverse

7  Events, Safety Population," identified that 27.6% of patients (389 out of 1,408) taking

8  neratinib discontinued due to adverse events. *Id*.

9          Defendants argue that Auerbach's statements aren't false because he told

10  investors "Puma had not seen the fully validated safety database." Defs.' CFL at 6.

11  In fact, on July 22, 2014, Auerbach falsely claimed that "the Company has not yet

12  seen the safety results from the ExteNET trial for neratinib." ECF No. 585-1 at 4.

13  Not only did the email Auerbach received on July 18, 2014 include the safety results

14  from the ExteNET trial, it specifically confirmed that those results "are now

15  validated." ECF No. 424-26 at PUMA00014833. Evidence from throughout the

16  Class Period further undermines Defendants' argument that the Grade 3 diarrhea rate

17  and discontinuation rate due to adverse events were not validated and "Defendants had

18  reason to believe those results might contain errors." Defs.' CFL at 7. For example,

19  on September 16, 2014, in response to Auerbach's request for "final validation safety

20  data," Wong sent him the exact same safety tables that he had previously sent

21  Auerbach on July 18, 2014. Those tables included the 39.9% Grade 3 diarrhea rate,

22  16.8% discontinuation rate due to diarrhea, and 27.6% discontinuation rate due to

23  adverse events. In response to its requests, Auerbach sent certain of the safety results

24  to Pfizer on September 24, 2014, including the 39.9% Grade 3 diarrhea rate. But he

25  never claimed in his correspondence with Pfizer that those safety results were not

26  validated or may contain errors. Puma also sent certain of the safety results from

27  Wong's July 18, 2014 email to the FDA on September 24, 2014. In that regulatory

28  submission, Puma did not tell the FDA that any of the safety results were not validated

- 10 -

or could contain errors.  And, of course, the Grade 3 diarrhea rate and discontinuation rate due to diarrhea that were disclosed on May 13 and June 1, 2015 were the exact same results that Auerbach received on July 18, 2014.

### 2.5    Scienter:  Defendants Acted Knowingly

With respect to Defendants' state of mind, Plaintiffs must prove that Defendants knew or recklessly disregarded that their statements were not true or omitted information that rendered the statements misleading.  *See* Ninth Circuit Model Instruction 18.5; Plaintiffs' Proposed Closing Instruction No. 5 (ECF No. 669 at 15).[4] It is undisputed that on July 17, 2014, Auerbach received the summary of ExteNET efficacy results which showed the actual DFS rates, including that the absolute difference in DFS was only 2.3%, and the actual KM curves, which were narrowing at the end of two years.  *See* ECF No. 585-1 at 2-3.  And it is undisputed that on July 18, 2014, Auerbach received the summary of ExteNET safety results, which included the 39.9% Grade 3 diarrhea rate, 16.8% discontinuation rate due to diarrhea, and 27.6% discontinuation rate due to adverse events.  *Id.* at 3-4.  This evidence demonstrates that Defendants knew their statements were false and misleading when made on July 22, 2014.  "That's enough to show scienter."  ECF No. 557 at 15.

---

[4]    Defendants argue that the jury should be instructed that "[e]vidence that any Defendant had access to information that was not disclosed to investors is not enough to establish that he acted knowingly."  ECF No. 667 at 39.  But that is a misstatement of the law.  The Ninth Circuit has repeatedly recognized that a defendant's access to information *is* evidence that he acted with scienter (knowingly).  *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017) ("'particularized allegations that defendants had ***actual access to the disputed [internal sales] information*,**' . . . raise a strong inference of scienter'"), *cert. dismissed sub nom. Quality Sys., Inc. v. City of Miami Fire Fighters' & Police Officers' Ret. Tr.*,     U.S.    , 2018 WL 575053 (Nov. 27, 2018); *Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014) ("'[b]y making a detailed factual statement, contradicting important data ***to which she had access***, a strong inference arises that she knowingly misled the public'"), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017); *S. Ferry LP No. 2 v. Killinger*, 542 F.3d 776, 785-86 (9th Cir. 2008) ("allegations regarding management's role in a company . . . may independently satisfy the PSLRA where they are particular ***and suggest that defendants had actual access to the disputed information***").

- 11 -

1    Unable to deny the direct evidence of knowledge, Defendants instead resort to

2    their tired mantra that "Defendants had no motive to commit securities fraud." Defs.'

3    CFL at 8.  But, as the Supreme Court and Ninth Circuit have repeatedly confirmed,

4    motive is not the quintessence of scienter.  *See, e.g.*, *Matrixx Initiatives, Inc. v.*

5    *Siracusano*, 563 U.S. 27, 48 (2011); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551

6    U.S. 308, 325 (2007); *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 702

7    (9th Cir. 2012).  Moreover, the evidence demonstrates that Defendants were motivated

8    to mislead investors, as well as Pfizer and counsel for the underwriters, in order to

9    complete a $218 million stock offering in January 2015.  Indeed, almost immediately

10   after Puma's stock price nearly quadrupled following the July 22, 2014 false

11   statements, Auerbach began plotting a stock offering with investment banks.  This

12   offering was so important, Auerbach altered an official FDA record to hide from the

13   underwriters the true DFS results he had misrepresented on July 22, 2014.  Defendants

14   succeeded in completing the offering in January 2015, selling 1.15 million shares of

15   Puma stock while the price was artificially inflated as a result of the July 22, 2014

16   false statements and omissions.  But for the $218 million in stock sales, Puma would

17   have run out of capital before the end of 2015.

18   Defendants also argue that Auerbach acted in "good faith" when he made the

19   July 22, 2014 false statements and omissions.  Auerbach has abandoned his "good

20   faith" affirmative defense to control person liability.  *See* ECF No. 221 at 4 (asserting

21   that Auerbach is "no longer pursuing his Control Person Defense"); Defs.' CFL at 15

22   ("Defendants abandon the following affirmative defense: . . .  No. 12 (good faith

23   defense to control person liability as to Alan Auerbach) . . . .).  Nevertheless,

24   Auerbach now seeks a "good faith" instruction as a ***negative*** defense to the securities

25   fraud allegations against him.  *See* ECF No. 667 at 47.  But in the Ninth Circuit, it is

26   "well settled" that fraud defendants have "'no right' to ***any*** good faith instruction

27   when the jury has been adequately instructed with regard to the intent required."

28   *United States v. Shipsey*, 363 F.3d 962, 967 (9th Cir. 2004) (emphasis in original);

- 12 -

1   *United States v. Jackson*, 72 F.3d 1370, 1380 (9th Cir. 1995) ("jury instructions that

2   accurately reflect the intent required for the offense obviate the need for a specific

3   instruction on innocent states of mind"); *United States v. Dees*, 34 F.3d 838, 842 (9th

4   Cir. 1994) (good faith instruction "unnecessary" in wire fraud trial); *United States v.*

5   *Green*, 745 F.2d 1205, 1209 (9th Cir. 1984) (mail fraud defendant "not entitled" to

6   good faith instruction).   Moreover, as this Court has already held, Auerbach's

7   purported desire not to disclose the actual ExteNET trial results until a medical

8   conference does not constitute good faith:  "Puma's desire to keep information secret

9   doesn't erase [Defendants'] duty not to make false or misleading statements about the

10  data."  ECF No. 557 at 15.

###    2.6    Reliance

12      In their CFL, but not proposed jury instructions, Defendants acknowledge that

13  Plaintiffs are proceeding under the fraud-on-the-market presumption of reliance.  The

14  Court has already determined that Plaintiffs have satisfied three of the four elements

15  of the fraud-on-the-market presumption.  *Id.* at 8 ("By the parties' agreement that

16  there is no material dispute on the issues of public knowledge, market efficiency, and

17  Plaintiffs' trading during the relevant period, the Court treats those issues as

18  established in Plaintiffs' favor for the fraud-on-the-market presumption.").

19  Accordingly, if the jury finds that Defendants' alleged misstatements or omissions

20  were material, the fraud-on-the-market presumption of reliance is established.

21      Defendants can rebut the presumption of reliance on a classwide basis if they

22  prove by a preponderance of the evidence that the alleged misrepresentations or

23  omissions did not affect the market price of Puma stock.  *See* Ninth Circuit Model

24  Instruction 18.5; Plaintiffs' Proposed Closing Instruction No. 5 (ECF No. 669 at 15);

25  *Halliburton*, 573 U.S. at 268.  Defendants claim that evidence will show that the June

26  1, 2015 disclosures of the actual KM curves and the 16.8% discontinuation rate due to

27  diarrhea "had no impact on Puma's stock price."  Defs.' CFL at 9.  But that ignores

28  the undisputed stock price increase on July 23, 2014, in response to the false and

- 13 -

misleading statements, and the undisputed stock price decline on May 14, 2015, following the disclosure of the true DFS rates and Grade 3 diarrhea rate.  Moreover, Defendants have identified no evidence establishing that the stock price decline on June 1-2, 2015 was unrelated to the disclosures of the KM curves and diarrhea discontinuation rate.  Defendants' expert, Dr. Gompers, did not offer any opinion on price impact or any conclusion on what caused the June 1-2, 2015 Puma stock price decline.

Defendants also argue that they can rebut the presumption of reliance as to Norfolk Pension Fund because "the evidence will show that Plaintiff was indifferent to the alleged misrepresentations and would have purchased the Puma shares even if it had known of the allegedly omitted data in July 2014."  *Id*.[5]  The burden is on Defendants to prove by a preponderance of the evidence that the Norfolk Pension Fund "would have bought or sold the stock even had he been aware that the stock's price was tainted by [the] fraud."  *Halliburton*, 573 U.S. at 269; *see also* Plaintiffs' Proposed Instruction No. 6 (ECF No. 669 at 19).  The record is devoid of any evidence from which a jury could conclude that Norfolk Pension Fund would have purchased Puma common stock, ***at the price it paid***, even if it had known about Defendants' fraud.  To the contrary, witnesses from the Norfolk Pension Fund's investment advisor, Capital International, repeatedly testified that they did not know

---

[5]     In their CFL, Defendants acknowledge that establishing the individual plaintiff would have bought the stock at the price it did even if it had known about the fraud could rebut the presumption of reliance as to the plaintiff, but not as to the Class. Defs.' CFL at 9 ("thereby rebutting the presumption as to Plaintiff, individually"). Defendants' proposed jury instructions, however, assume that rebutting the presumption as to the individual plaintiff (Norfolk Pension Fund) would rebut the presumption of reliance as to all Class members. *See* ECF No. 670 at 44.  That is wrong. *See* 7 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* §22.61 (4th ed. 2002) ("[A] rebuttal of reliance by a particular class member must necessarily be on an individual basis because there can be no class presumption of nonreliance.") (citing *Arthur Young & Co. v. United States Dist. Ct.*, 549 F.2d 686, 693-95 & n.10 (9th Cir. 1977)); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1265 (S.D. Cal. 2010) ("Even if Defendants establish that Sitton cannot recover because he continued to purchase stock after reading a complaint alleging securities fraud, ***the class*** may still use the presumption to establish reliance.") (emphasis in original).

about the fraud, would have wanted to know if Defendants made false statements or material omissions about the ExteNET trial results, and that they would not have bought the stock, at the price they did, if they had known it was tainted by Defendants' fraudulent conduct.  In fact, Defendants abandoned their defense that the Norfolk Pension Fund would have purchased Puma stock even "if it knew of the purportedly false and misleading statements."  Defs.' CFL at 15.

### 2.7   Loss Causation

#### 2.7.1      May 14, 2015 Stock Price Decline

Defendants claim that the May 13, 2015 ExteNET disclosures regarding the DFS rates and the incidence of Grade 3 diarrhea were immaterial and therefore did not cause the price of Puma stock to decline on May 14, 2015.  Defs.' CFL at 9-10.  But Defendants identify nothing in the evidentiary record to support the assertion that the undisputed stock price decline on May 14, 2015 was not substantially caused by the disclosures of the true DFS rates and Grade 3 diarrhea rate in the ASCO abstract released on the evening of May 13, 2015.  *See* Ninth Circuit Model Instruction 18.8 ("To establish causation, the plaintiff must prove that the alleged misrepresentations or omissions played a substantial part in causing the injury or loss the plaintiff suffered."); Plaintiffs' Proposed Closing Instruction No. 7 (ECF No. 669 at 23) (same).

Indeed, in response to an interrogatory requiring the disclosure of all factors other than the corrective disclosures revealing Defendants' fraud that led to any alleged decline in the value of Puma stock on May 14, 2015, Defendants responded that the decline "may" have been caused "in whole or in part" by "general conditions of the market" or "concerns regarding the ExteNET trial that do not relate to the statements Plaintiff challenges."  Defendants asserted that they would "present expert opinion on this topic at the appropriate time."  They didn't: their economic expert, Dr. Gompers, offered no opinion on the May 14, 2015 stock price decline, and specifically

- 15 -

1   refused to say what caused that decline (or the June 1-2, 2015 stock price decline, for

2   that matter), testifying that he "wasn't asked to reach a definitive affirmative

3   conclusions on what caused the stock price to decline."  ECF No. 419 at 19.

### 2.7.2 June 1-2, 2015 Stock Price Decline

5        Repeating arguments made in their motion for summary judgment, Defendants

6   claim that the disclosures of the KM curves and diarrhea discontinuation rate could

7   not have caused Puma's stock price decline on June 1, 2015 and that, in an efficient

8   market, the disclosures on June 1, 2015 could not have caused the stock price decline

9   on June 2, 2015.  Defs.' CFL at 10.  But, as this Court has already recognized,

10  "Defendants have failed to show that factors other than the June 1 corrective

11  disclosures caused the stock's decline."  ECF No. 557 at 17.  Neither Defendants nor

12  their expert have identified anything other than the fraud-related ExteNET trial

13  disclosures that caused any, let alone all, of the June 1-2, 2015 stock price decline.[6]

14       As the Court also recognized, Defendants do not have any evidentiary or legal

15  support for the proposition that the June 1, 2015 disclosures correcting Defendants'

16  prior misrepresentations must have been completely absorbed by the market by the

17  close of trading that day.  ECF No. 557 at 17.  "To the contrary, the Ninth Circuit has

18  explained that 'adoption of a bright-line rule assuming that [a] stock price will

19  instantly react [to negative information] would fail to address the realities of the

20  market.'"  *Id.* at 18 (quoting *No. 84 Employer-Teamster Joint Council Pension Tr.*

21  *Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 934 (9th Cir. 2003)); *see also* ECF No.

22  556 at 6-7 ("there isn't any hard-and-fast rule against two-day loss causation

23  windows, and under the facts of this case it's at least possible that the June 1

24  disclosures caused the dip on June 2").  And neither Defendants nor their expert have

---

26  [6]      Despite the failure to identify a non-fraud factor that actually caused any of the
27  June 1-2, 2015 price decline, Defendants insist that the jury instruction on loss
    causation suggest that some of the share price decline was caused by "other
28  contributing factors."  *See* ECF No. 667 at 62.

- 16 -

1    identified any Puma-specific news, other than the ExteNET trial disclosures on June 1,

2    that would account for the June 2, 2015 stock price decline.

3        **2.8    Damages**

4        Defendants repeat the same loss causation arguments regarding unidentified

5    non-fraud factors with respect to damages.  But as discussed above, Defendants have

6    failed to identify any evidence that any of the May 14, 2015 or June 1-2, 2015 stock

7    price declines were actually due to any non-fraud factors.

8        Defendants also incorrectly state that they are "entitled," post-verdict, to "assess

9    each claim to determine whether offset or other reduction of damages is appropriate."

10   Defs.' CFL at 11.  The Exchange Act mandates that members of the Class may only

11   recover their "actual damages," and the statutory damages formula (as well as

12   Plaintiffs' per-share damages formula) will set the limits on a claimant's damages.  15

13   U.S.C. §§78bb(a), 78u-4(e).  These are straightforward, mechanical calculations that

14   do not require a lengthy post-verdict claims process.  Defendants have also failed to

15   identify any offsets or reductions in damages that would be applicable in this case, and

16   they identify no evidence that would support any offsets or reductions.

17   **3.    AFFIRMATIVE DEFENSES**

18       As the Court has explained, "'[a] defense which demonstrates that plaintiff has

19   not met its burden of proof is not an affirmative defense.'"  ECF No. 557 at 10

20   (quoting *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002)).  Thus,

21   contrary to Defendants' contention, there are ***no*** "affirmative defenses for which

22   Plaintiff bears the burden of proof."  Defs.' CFL at 11.  And, as noted above,

23   "affirmative defenses" related to Class members' entitlement to damages are

24   unnecessary because "Plaintiffs' recovery, if any, is appropriately limited by

25   Plaintiffs' evidence and the relevant law."  ECF No. 557 at 10.  Furthermore, in light

26   of the Court's October 5, 2018 Order (striking Defendants' Fifth, Seventh, Eighth, and

27   Ninth affirmative defenses and dismissing Plaintiffs' claims against Charles Eyler) as

28   well as Defendants' abandonment of their First, Second, Third, Fourth, Sixth,

- 17 -

1  Eleventh, Twelfth, and Thirteenth affirmative defenses (Defs.' CFL at 15), Plaintiffs

2  do not believe Defendants have any remaining affirmative defenses.  To the extent any

3  of Defendants' affirmative defenses survived, consistent with this Court's ruling, it is

4  Defendants' burden to prove them.  ECF No. 557 at 9-10.

5  DATED:  January 8, 2019                    Respectfully submitted,

6                                             ROBBINS GELLER RUDMAN
                                                & DOWD LLP
7                                             PATRICK J. COUGHLIN
                                             TOR GRONBORG
8                                             JASON A. FORGE
                                             TRIG R. SMITH
9                                             SUSANNAH R. CONN
                                             J. MARCO JANOSKI GRAY
10                                            DEBASHISH BAKSHI
                                             TING H. LIU

11

12                                                 s/ SUSANNAH R. CONN
                                                 SUSANNAH R. CONN

13
                                             655 West Broadway, Suite 1900
14                                            San Diego, CA  92101
                                             Telephone:  619/231-1058
15                                            619/231-7423 (fax)

16                                            Counsel for Plaintiff and the Class

17

18

19

20

21

22

23

24

25

26

27

28

- 18 -

1518675_1

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on January 8, 2019, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ SUSANNAH R. CONN
SUSANNAH R. CONN

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  sconn@rgrdlaw.com

# Mailing Information for a Case 8:15-cv-00865-AG-SHK HsingChing Hsu v. Puma Biotechnology, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael A Attanasio**
  mattanasio@cooley.com,smiyajima@cooley.com,efiling-notice@ecf.pacerpro.com,michael-attanasio-2678@ecf.pacerpro.com

- **Debashish Bakshi**
  dbakshi@rgrdlaw.com,3472014420@filings.docketbird.com

- **Amanda F Betsch**
  amanda.betsch@lw.com,amanda-betsch-0711@ecf.pacerpro.com

- **Ryan E Blair**
  rblair@cooley.com,efiling-notice@ecf.pacerpro.com,chourani@cooley.com

- **Christopher Thomas Casamassima**
  chris.casamassima@wilmerhale.com,Amanda.Soun@wilmerhale.com,WHDocketing@wilmerhale.com

- **Rosalyn Chapman, RET**
  mdawson@jamsadr.com

- **Rosalyn Chapman (Ret.)**
  mdawson@jamsadr.com

- **Andrew Clubok**
  andrew.clubok@lw.com,andrew-clubok-9012@ecf.pacerpro.com,washington-dc-litigation-services-5378@ecf.pacerpro.com,DCECFNotificationsDC@lw.com

- **Susannah R Conn**
  sconn@rgrdlaw.com,tdevries@rgrdlaw.com,3022905420@filings.docketbird.com

- **Patrick Joseph Coughlin**
  patc@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Patrick V Dahlstrom**
  pdahlstrom@pomlaw.com

- **Eric J Eastham**
  ejeastham@mintz.com,docketing@mintz.com,KCosta@mintz.com

- **Lorraine Echavarria**
  Lori.Echavarria@wilmerhale.com,joann.ambrosini@wilmerhale.com,gina.gaytan@wilmerhale.com

- **Jason A Forge**
  jforge@rgrdlaw.com,tholindrake@rgrdlaw.com

- **Koji F Fukumura**
  kfukumura@cooley.com,efiling-notice@ecf.pacerpro.com,chourani@cooley.com

- **Gilardi & Co. LLC**
  classact@gilardi.com

- **Meryn C N Grant**
  meryn.grant@lw.com

- **Joseph Marco Janoski Gray**
  mjanoski@rgrdlaw.com,tdevries@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Tor Gronborg**
  torg@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Michele D Johnson**
  michele.johnson@lw.com,karen.patterson@lw.com,michele-johnson-7426@ecf.pacerpro.com,#ocecf@lw.com,khadijah-fields-2405@ecf.pacerpro.com,jana.roach@lw.com

- **Mary Kathryn Kelley**
  mkkelley@cooley.com,msalas@cooley.com,efiling-notice@ecf.pacerpro.com

- **Jeremy A Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com

- **Ting Hsiang Liu**
  tliu@rgrdlaw.com

- **Kristin Nicole Murphy**
  kristin.murphy@lw.com,kristin-murphy-2919@ecf.pacerpro.com,#ocecf@lw.com,khadijah-fields-2405@ecf.pacerpro.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,ahood@pomlaw.com,kmsaletto@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,CLinehan@glancylaw.com,info@glancylaw.com,robert-prongay-0232@ecf.pacerpro.com

- **John Warren Rissier**
  warren.rissier@morganlewis.com,bernice.worley@morganlewis.com

- **Darren J Robbins**
  darrenr@rgrdlaw.com

- **Laurence M Rosen**
  lrosen@rosenlegal.com

- **Charlene Sachi Shimada**
  charlene.shimada@morganlewis.com

- **Colleen C Smith**
  colleen.smith@lw.com,colleen-c-smith-7786@ecf.pacerpro.com

- **Trig Randall Smith**
  trigs@rgrdlaw.com,kmccormack@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **John F Sylvia**
  jfsylvia@mintz.com

- **Kolin Tang**
  ktang@sfmslaw.com,pleadings@sfmslaw.com

- **Craig Edward TenBroeck**
  ctenbroeck@cooley.com,maraujo@cooley.com,efiling-notice@ecf.pacerpro.com

- **Sarah A Tomkowiak**
  sarah.tomkowiak@lw.com,washington-dc-litigation-services-5378@ecf.pacerpro.com,sarah-tomkowiak-4288@ecf.pacerpro.com,DCECFNotificationsDC@lw.com

- **Lucy Han Wang**
  lucy.wang@morganlewis.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)