LATHAM & WATKINS LLP
  Michele D. Johnson (Bar No. 198298)
  *michele.johnson@lw.com*
  Kristin N. Murphy (Bar No. 268285)
  *kristin.murphy@lw.com*
650 Town Center Drive, 20th Floor
Costa Mesa, CA  92626-1925
Tel:  (714) 540-1235
Fax:  (714) 755-8290

LATHAM & WATKINS LLP
  Colleen C. Smith (Bar No. 231216)
  *colleen.smith@lw.com*
12670 High Bluff Drive
San Diego, CA  92130-3086
Tel:  (858) 523-5400
Fax:  (858) 523-5450

LATHAM & WATKINS LLP
  Andrew B. Clubok *(pro hac vice)*
  *andrew.clubok@lw.com*
  Sarah A. Tomkowiak *(pro hac vice)*
  *sarah.tomkowiak@lw.com*
555 Eleventh Street NW, Suite 1000
Washington, DC  20004-1304
Tel:  (202) 637-2200
Fax:  (202) 637-2201

*Attorneys for Defendants Puma Biotechnology, Inc. and Alan H. Auerbach*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HSINGCHING HSU, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>PUMA BIOTECHNOLOGY, INC., and ALAN H. AUERBACH,<br><br>Defendants. | CASE NO. 8:15-cv-00865-AG (SHKx)<br><br>**DEFENDANTS' TRIAL BRIEF**<br><br>Judge:  Hon. Andrew J. Guilford<br><br>Pretrial Conference:  October 22, 2018<br>Trial Date:  January 15, 2019 |

**TABLE OF CONTENTS**

I. UPDATES TO CLAIMS AND SUPPORTING EVIDENCE ........................ 1

    A. Elements of Remaining Claims ............................................................ 1

        1. Claim 1: Section 10(b) ................................................................ 1

        2. Claim 2: Section 20(a) ................................................................ 2

    B. Description of Key Evidence ............................................................... 3

        1. Statements Regarding DFS Rates ............................................... 3

        2. Statements Regarding a Preliminary Trend in the Kaplan-Meier Curves Beyond Two Years ................................ 5

        3. Statements Regarding Safety Results ......................................... 7

        4. Plaintiff Cannot Establish That Defendants Knowingly Committed Fraud ...................................................................... 8

        5. Plaintiff Cannot Establish Justifiable Reliance ........................ 10

        6. Plaintiff Cannot Establish That the Alleged Fraud Caused Its Purported Loss .................................................................... 11

        7. Plaintiff Cannot Establish Damages ......................................... 13

    C. Affirmative Defenses ......................................................................... 14

II. ADDITIONAL MATTERS ............................................................................. 15

    A. Recently Identified Trial Witnesses ................................................... 15

    B. Updates Regarding Plaintiff's Motion *in Limine* No. 4 ..................... 15

Pursuant to Local Rule 16-10, Defendants Puma Biotechnology, Inc. and Alan H. Auerbach ("Defendants") hereby submit their Trial Brief, which updates the Memorandum of Contentions of Fact and Law filed on October 1, 2018, Dkt. 548 ("Puma's Contentions") and sets forth other additional matters for the Court's consideration ahead of trial.

## I. UPDATES TO CLAIMS AND SUPPORTING EVIDENCE

Below is a summary of the remaining claims at issue, along with a brief summary of the key evidence upon which Defendants will rely to refute Plaintiff's allegations. This submission updates Puma's Contentions previously filed with this Court, which were filed before the Court issued its ruling on the parties' respective motions for summary judgment, motions *in limine*, and motions to exclude certain experts' testimony, and responds to Plaintiff's Memorandum of Contentions of Law and Fact ("Plaintiff's Contentions") (Dkt. No. 546). This trial brief is not intended to be an exhaustive summary of all evidence refuting Plaintiff's allegations or to respond to all of the evidence Plaintiff cites in its Contentions.

### A. Elements of Remaining Claims

#### 1. Claim 1: Section 10(b)

Plaintiff must prove each of the following elements by a preponderance of the evidence:

1. That Defendants made an untrue statement of a material fact or omitted a material fact necessary under the circumstances to keep the statements that were made from being misleading in connection with the purchase or sale of securities;
2. That Defendants acted knowingly;
3. That Defendants used an instrumentality of interstate commerce, such as mail or telephone, or a facility of a national

securities exchange in connection with the sale of securities, regardless of whether the instrumentality or facility itself was used to make an untrue statement or a material omission;

4. That Plaintiff justifiably relied on Defendants' untrue statement of a material fact in buying Puma securities; and

5. That Defendants' misrepresentation or omission caused Plaintiff to suffer losses.

15 U.S.C. § 78j; 17 C.F.R. § 240.10b–5; *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005). The statements that are alleged to be false or misleading are listed in Appendix 1 to Defendants' Contentions (Dkt. No. 390), except that Defendants' statements regarding neratinib's 33% improvement in disease-free survival have since been dismissed from the case because those statements were true. Dkt. 557 at 10-11, 20 ("The Court also enters partial summary judgment on the 33% DFS improvement statement. That statement was true.") Plaintiff must prove each of these elements for each of the statements alleged to be false or misleading. Defendants do not dispute the third element—use of an instrumentality of interstate commerce. The remaining elements are in dispute.

**2. Claim 2: Section 20(a)**

Since Puma filed its Contentions, the Court entered summary judgment in Defendant Charles Eyler's favor on all of Plaintiff's claims. Dkt. No. 612. Accordingly, Mr. Eyler is no longer a defendant in this action.

With respect to the remaining Section 20(a) ("control person liability") claim against Mr. Auerbach, Plaintiff must prove each of the following elements by a preponderance of the evidence:

1. A violation of Section 10(b) of the Exchange Act; and

2. That Mr. Auerbach possessed, directly or indirectly, the actual power to direct or control the statement(s) for which Plaintiff has proven a Section 10(b) violation.

*See* 15 U.S.C. § 78t(a).

### B. Description of Key Evidence

Plaintiff has conceded that this case does not allege omissions. Dkt. 443 at 13 ("[M]ost important, this isn't a case about omissions"). Indeed, Plaintiff's Contentions refer only to the alleged "false and misleading statements." Plaintiff's Contentions at 4.

Defendants' Contentions set forth the four categories of statements challenged by Plaintiff. Puma's Contentions at B.1-4. Since that time, the Court's summary judgment ruling found that all of Defendants' challenged statements regarding neratinib's 33% improvement in disease-free survival were true, and accordingly dismissed those statements from the case. Dkt. 557 at 20. Accordingly, every written challenged statement is now out of this case. Following summary judgment, there are three categories of challenged statements remaining, all of which were oral statements made during Puma's July 22, 2014 investor conference call. *Id.* at 10-14; *see also* Puma's Contentions at 2-7. Plaintiff will not be able to meet its burden to prove a material misstatement in any of these categories.

### 1. Statements Regarding DFS Rates

<u>First</u>, Plaintiff challenges statements made by Mr. Auerbach on the July 22, 2014 investor conference call related to the absolute DFS rates for the treatment arm and placebo arm at two years. AC ¶¶ 52-54. Specifically, an analyst asked for "a little bit of a sense" of the DFS on the control arm, and offered Mr. Auerbach some vague and general estimates of those DFS rates: "mid to high 80s, around 86% or so [in the placebo arm]" and "around 90% or 91% [in the treatment arm]." *Id.* To that vague question, Mr. Auerbach responded that he was "comfortable with" with the general sense around those numbers. The evidence will show that Mr. Auerbach intended to provide only generalized response to a vague question, by expressing comfort with an absolute DFS difference for the relevant trial

populations at two years in the 1-6% range. The two-year absolute DFS difference for the ExteNET intent to treat (ITT)—*i.e.*, all patients in the trial—population, 2.3%, was in the middle of that range. The absolute DFS difference for other key populations (for example, 4.1% for the centrally confirmed population) also were squarely within in that range. Analysts were interested in DFS rates for subpopulations of the trial, in order to compare ExteNET to historical trials of another drug, Herceptin, and both Mr. Auerbach and the analysts understood as much. An apples-to-apples comparison of the ExteNET trial with the historical Herceptin trials required a comparison of the subgroups of patients that were directly comparable to the Herceptin trials. Those subgroups displayed higher DFS differences, which were squarely covered by Mr. Auerbach's range.

The evidence will show that Mr. Auerbach's general expression of comfort with the range supplied by the analyst did not "affirmatively create[] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Pompano Beach Police & Firefighters' Ret. Sys. V. Las Vegas Sands Corp.*, 2018 WL 2015510, at *2 (9th Cir. May 1, 2018) (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002); *see also Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 679 F.3d 952, 956 (7th Cir. 2012) (nothing that the law recognizes that "[o]ral exchanges are less precise than written ones"). Mr. Auerbach repeatedly told investors (in the press release and on the conference call) that the disclosures on July 22, 2014 were just the top-line results of the ExteNET trial, and that the full trial results would be presented at a later medical conference. Investors plainly understood that the actual absolute DFS rates, and the DFS difference, had not been disclosed.

On May 13, 2015, the absolute DFS rates (and difference in DFS rates) for the primary endpoint of the ExteNET trial were disclosed in an abstract ("Abstract #508") published in connection with a scientific meeting hosted by the American Society of Clinical Oncology ("ASCO"). Other information was also disclosed in

Abstract #508, including the hazard ratios and DFS rates for certain subpopulations and secondary endpoints. While Puma's stock price dropped the next day, it regained nearly all of its lost value within two week. The rebound in the stock price shows, among other things, that the absolute DFS rates for the primary endpoint were not material to investors. Dkt. 372-1 at 10-11 ("Following the release of Abstract #508, many analysts reacted positively and opined that neratinib's commercial potential remained strong."). The material information regarding the success of the trial was previously disclosed to investors on July 22, 2014: Puma's pivotal trial of its only drug candidate was a success, and therefore, Puma would be filing for FDA approval. Puma's Contentions at 4-5; Dkt. 372-1 at 6-7. Further, positive analyst reactions and investors continuing to purchase Puma stock—including Lead Plaintiff's investment advisor—will show that the 2.3% was not at all material.

### 2. Statements Regarding a Preliminary Trend in the Kaplan-Meier Curves Beyond Two Years

<u>Second</u>, Plaintiff challenges Mr. Auerbach's response to an analyst question regarding Kaplan-Meier curves on the July 22, 2014 conference call. (A Kaplan-Meier analysis generates two graphical depictions (curves) showing the disease free survival rates in the placebo group and the treatment group over time.) Specifically, an analyst asked "can you give us a sense as to whether the separation [between the Kaplan-Meier curves] is widening over time or how would you describe the curve separation?" AC ¶ 52. Mr. Auerbach responded by explaining that there were some patients who had been in the trial for longer than the two-year cut-off—which was undeniably true. And, "[i]f we look at the curves going out beyond that, it looks like the curves are continuing to separate." Mr. Auerbach went on to explain that this was a "preliminary trend . . . where the curves appear to be continuing to separate as you go out year-over-year . . . ." *Id*.

1       The evidence will show that this statement was true. As of July 22, 2014, Puma undisputedly had a limited amount of patient data for patients who had been in the trial for longer than two years. A Kaplan-Meier analysis of all patient data available as of July 22, 2014, undisputedly showed a preliminary trend of further separation year-over-year going out beyond two years. And, the evidence will also show that two-year curves (that Plaintiff claims were narrowing) did not form the basis for Mr. Auerbach's statement. The slight narrowing observed at the end of those curves was not the beginning of a convergence—as Puma knew—and instead was plainly explained by a statistical anomaly. When Puma later was able to collect more patient data, the actual three- and five-year Kaplan-Meier curves did not converge. Puma's Contentions at 5-6. While there is a dispute regarding whether Mr. Auerbach saw information relating to curves beyond two years prior to July 22, 2014, there is no dispute that the data that existed as of July 22 regarding curves beyond two years demonstrates that the curves were continuing to separate. Plaintiff's own experts uniformly agree.

      Further, the evidence will show that Mr. Auerbach's curve statement itself was not material. Mr. Auerbach's statement contained numerous disclaimers: he conveyed to investors that the statement was based on a small amount of incomplete data, and therefore could only be described as a preliminary trend. *See McGonigle v. Combs*, 968 F.2d 810, 817-19 (9th Cir. 1992) (affirming grant of summary judgment where statements contained "specific disclaimers").

      On June 1, 2015, the results of the ExteNET trial were presented at ASCO's annual meeting. The information presented included, among many other things, the two-year Kaplan-Meier curves. Analysts' reaction conclusively demonstrates that the two-year curves were not material, and that Mr. Auerbach's statement was true and not materially misleading. Dkt. No. 372-1 at 22-23. Few analysts even reacted at all to the disclosure of the two-year Kaplan-Meier curves, and those who did react viewed the separation of those curves entirely positively. The evidence

will show that the Kaplan Meier curves were, as a matter of plain arithmetic, separating—and every witness will agree that they were.

### 3. Statements Regarding Safety Results

Third, Plaintiff challenges statements on the July 22, 2014 conference call about the safety results of the ExteNET trial. AC ¶¶ 53-54. First, in his opening remarks, Mr. Auerbach informed investors that the safety data was still being validated, that the main adverse event was diarrhea, and that Puma expected the Grade 3 diarrhea rates to be in line with previous trials.

Then, in response to an analyst question about the safety profile of neratinib, Mr. Auerbach reiterated that the Puma had not seen the fully validated safety database, but anticipated that the main adverse event would be diarrhea, and that the rate would be in line with previous trials. Mr. Auerbach also cautioned that the trial did not use any prophylaxis, and that current trials had shown success reducing grade 3 diarrhea rates using prophylaxis. Later, another analyst asked about the drop-out rate due to side effects. Mr. Auerbach responded that the drop-out rate was part of the safety data still being validated, but that Puma anticipated it would be in line with previous trials without any prophylaxis.

The evidence will show that these statements were true and not materially misleading. Moreover, disclosing the precise rate of grade 3 diarrhea and drop-out rates would not in any manner have altered the total mix of information available to investors.

First, the evidence will show Puma had not completed the statistical validation of safety results that had been provided by its clinical research organization, Rho. Although Rho had validated certain topline safety results, the evidence will show that Defendants had reason to believe those results might contain errors. And in fact, when the validation process began, Puma identified errors in the programming underlying the topline safety tables provided by Rho.

Second, with respect to the Grade 3 diarrhea rates, the evidence will show that Mr. Auerbach's statements were not false or materially misleading. The market well knew that the main side effect of neratinib (and every other drug in this category) was diarrhea—and also knew that the ExteNET trial did not use any prophylaxis to prevent the diarrhea. The market also knew that in ongoing neratinib trials, prophylaxis had been successful in substantially reducing the rate and severity of diarrhea. And, based on previous clinical trials, investors knew that Grade 3 diarrhea rates without prophylaxis could range from 20-51%. When the Grade 3 diarrhea rates were disclosed (along with other information) on May 13, 2015, in Abstract #508, the stock price rebounded in the two weeks following the initial decline on May 14, 2015. This reaction demonstrates that any information about diarrhea rates was not material.

Third, with respect to the drop-out rates due to side effects, the evidence will show that Mr. Auerbach's statements regarding the drop-out rates were not false or materially misleading. When the discontinuation rate due to diarrhea was disclosed on June 1, 2015 (along with a multitude of information regarding the ExteNET trial), investors did not react negatively in the slightest, and viewed this data point as consistent with previous disclosures regarding the (known) high rate of diarrhea.

### 4.  Plaintiff Cannot Establish That Defendants Knowingly Committed Fraud

Plaintiff cannot prove that Defendants acted with the scienter requisite to establish a violation of Section 10(b) of the Exchange Act and Rule 10b-5. Plaintiff's Contentions at 2. First, Plaintiff cannot show that Mr. Auerbach possessed information that contradicted his public statements. The evidence will show that none of the documents in Mr. Auerbach's possession was inconsistent with his statements, and that he made good-faith judgment calls on a live, unrehearsed conference call regarding what information should be disclosed to

investors, in order to protect shareholders and preserve the company's ability to present at a scientific conference.

The evidence, including Defendants' FDA expert, Dr. Jackie Walling, will show that in July 2014, Mr. Auerbach (along with everyone else at Puma and as would any reasonable sponsor) had every reason to view the full ExteNET trial data as strongly positive. *See, e.g.*, Dkt. 406-2 at 98:24-99:12. And they were right—the FDA approved neratinib as safe and effective for every patient group. Plaintiff's theory that Mr. Auerbach was engaged in a calculated scheme to drive the stock price up based on off-the-cuff unplanned answers to analysts' questions on a conference call makes no sense.

The evidence will also show that Defendants had no motive to commit securities fraud. Mr. Auerbach sold no stock during the Class Period, and in fact was substantially harmed by the increase in Puma's stock price in July 2014. Dkt. 375 ¶ 7. At every point during the Class Period, he worked diligently to make sure all of the ExteNET data were presented at the most public forum possible. The evidence will contradict Plaintiff's assertion that Puma's January 2015 secondary stock offering was motive to commit fraud, in order to raise $218.5 million that Puma supposedly would not have otherwise been able to raise. The evidence will show that Puma conducted successful secondary offerings both before and after the release of the full ExteNET data, as biotechnology companies routinely do. *See* Dkt. 448 at 20-21. There is also no evidence that Puma would not have been able to raise money during the Class Period.

Plaintiff's entire motive theory is a sideshow, in which Plaintiff claims it will rely on evidence that Mr. Auerbach's altered FDA meeting minutes. Plaintiff's Contentions at 2. Plaintiff's concocted story is trial within the trial (which has been extensively briefed before this Court), which—while not true— will distract the jury from the issues to be decided in this case.

Finally, Defendants note that the Court has excluded all evidence related to

the Pfizer dispute, Dkt. 614 at 5-6.

### 5. Plaintiff Cannot Establish Justifiable Reliance

Plaintiff is required to prove by a preponderance of the evidence that it justifiably relied on the alleged misstatement. *See Basic Inc. v. Levinson*, 485 U.S. 224, 243–45 (1988). While the fraud-on-the-market theory offers one avenue for Plaintiff to prove reliance, it is not the only one, and it does not replace Plaintiff's burden to establish reliance. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014). While Plaintiff may satisfy its burden of establishing reliance via the fraud-on-the-market theory, Plaintiff must first establish that theory's applicability here. Here, Plaintiff is not entitled to rely on the fraud-on-the-market presumption.

Plaintiff cannot establish the second element required to invoke the fraud-on-the-market presumption of reliance—that the alleged misstatements were material. The evidence will show that the ExteNET data that was not presented in Defendants' announcement of the top-line results did not significantly alter the total mix of information available regarding the ExteNET trial. *See supra* Section I.B.1.

Even if Plaintiff could invoke the presumption of reliance, Defendants will be able to rebut it. First, the evidence will show that the June 1 corrective disclosures (the two-year Kaplan-Meier curves and 16.8% discontinuation rate) had zero impact on Puma's stock price (*see infra*), thereby rebutting the presumption on a class-wide basis. Second, the evidence will show that Plaintiff was indifferent to the alleged misrepresentations, and would have purchased Puma shares even if it had known of the allegedly omitted data in July 2014, thereby rebutting the presumption as to Plaintiff, individually. Indeed, Lead Plaintiff continued to purchase stock long after every piece of supposedly corrective information was disclosed to the market. Plaintiff's investment advisor testified that she was never defrauded in any way, and that at her recommendation Lead

Plaintiff purchased more Puma stock after the alleged corrective disclosures in May and June than it had purchased during the entire Class Period. Dkt. 394 Exs. 18, 19.

### 6. Plaintiff Cannot Establish That the Alleged Fraud Caused Its Purported Loss

Plaintiff alleges that the "truth" was revealed to the market on May 13 and June 1, 2015. AC ¶¶ 12-13; Plaintiff's Contentions at 3. Specifically, Plaintiff contends that four discrete data points corrected Defendants' prior purported misstatements:

- The two-year DFS rate was 93.9% for the treatment arm and 91.6% for the control arm, showing an absolute difference in DFS of 2.3% (disclosed May 13, 2015);
- 39.9% of patients in the treatment arm experience Grade 3-4 diarrhea (disclosed May 13, 2015);
- The Kaplan-Meier curves, which Plaintiff contends were narrowing by the end of year two (disclosed June 1, 2015); and
- 16.8% of patients in the treatment arm discontinued treatment with neratinib due to diarrhea (disclosed June 1, 2015).

In its Contentions, Plaintiff observes that, in response to an audience question, the doctor who presented the ExteNET results, Dr. Chan, disclosed that only 61% of neratinib patients in the ExteNET trial completed a year of treatment with neratinib. Plaintiff's Contentions at 4. But neither Plaintiff nor its expert, Dr. Steven Feinstein, alleges that this disclosure "corrected" anything. Instead, this disclosure of a different metric is confounding information.

Plaintiff claims that Defendants' alleged prior misstatements caused the Class to suffer losses on three days: May 14, June 1, and June 2, 2015.

### a. The Market Did Not React to the May 13, 2015 Corrective Disclosures

The evidence will show that the May 14 stock drop was not attributable to Plaintiff's alleged collective disclosures on May 13. *See* Plaintiff's Contentions at 3. The information disclosed on May 13 about the absolute DFS rates was <u>good news</u>, and the information disclosed about the diarrhea rates was entirely expected. Plaintiff will be unable to satisfy its burden to show that the two corrective disclosures made on May 13—the 2.3% difference in DFS and the 39.9% Grade 3-4 diarrhea rates—were a substantial factor in the stock price decline on May 14, 2015. The evidence will show that: (1) some analysts and doctors reacted positively to the totality of the ExteNET data and maintained their positive view of neratinib after May 13; (2) market participants were not surprised by the Grade 3-4 diarrhea rate, as they understood that later trials would use prophylaxis to reduce the incidence and frequency of Grade 3-4 diarrhea, and as a result of these two facts, the difference between 30% (previously estimated) and 40% Grade 3 diarrhea was immaterial; (3) Puma's stock price regained almost all of its lost value by May 27, 2015; and (4) Plaintiff has not accounted for the impact of confounding factors on Puma's stock price, as it must.

### b. The Market Did Not React to the June 1, 2015 Corrective Disclosures

Plaintiff's (and its economic expert's) theory that the June 1 corrective disclosures caused its loss on June 1-2 suffers from three critical defects, as Defendants' economic expert, Dr. Paul Gompers, will testify. *See* Plaintiff's Contentions at 3-4. *First*, the there is no evidence that either the two-year KM curves or the 16.8% discontinuation rate was a substantial factor in Puma's stock price decline *Second*, Plaintiff has not, and cannot, meet its burden to disaggregate from its losses the portion of Puma's stock drop attributable to non-fraud related disclosures (*i.e.*, everything other than allegedly corrective disclosures, including the node-negative subgroup results, the limitations of the data presented at ASCO, and oncologists' negative reactions). *Mineworkers' Pension Scheme v. First Solar*

*Inc.*, 881 F.3d 750, 754 (9th Cir. 2018) ("The 'ultimate issue' [under loss causation] 'is whether the defendant's misstatement, *as opposed to some other fact*, foreseeably caused the plaintiff's loss.'") (emphasis added). *Third*, Plaintiff's attempt to recover losses from Puma's stock price drop on June 2, 2015 is inconsistent with the undisputed economic principle that Puma's stock traded in an "efficient market" during the Class Period. The market had over three-and-a-half hours after Dr. Chan's ASCO presentation to react to the alleged corrective disclosures. Moreover, an investor presentation occurred the night of June 1, which revealed additional data regarding the ExteNET trial subpopulations, though disappointed others who expected to receive even more clarity regarding neratinib's commercial potential.

It is Plaintiff's burden to establish that the two corrective disclosures on June 1 (the KM curves and 16.8% discontinuation rate) were a substantial factor in the cause of Puma's stock price decline on June 2. Plaintiff will not be able to make that causal connection. Rather, the stock price declines were wholly unrelated to the challenged statements. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 343, 125 S. Ct. 1627, 1632, 161 L. Ed. 2d 577 (2005) (a "lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price"). Investors were not in any way reacting to the KM curves or 16.8% discontinuation rate. The evidence will show that investors were betting on the likelihood of FDA approval and the size of the potential commercial market for neratinib.

### 7. Plaintiff Cannot Establish Damages

Evidence will show that Plaintiff's proposed calculation of per-share damages, supposedly supported by the opinion of its expert, Dr. Steven Feinstein,

is flawed for a number of reasons. Primarily, Plaintiff fails to isolate the portion of Puma's stock declines that corresponds with each corrective disclosure, and also fails to isolate the portion of the stock price declines attributable to each corrective disclosure from the portion of the declines attributable to other company-specific, non-fraud-related factors, including those set forth above. *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 754 (9th Cir. 2018) ("The 'ultimate issue' 'is whether the defendant's misstatement, *as opposed to some other fact*, foreseeably caused the plaintiff's loss.'") (emphasis added).

In addition, if the jury finds against Defendants for liability on a class-wide basis, the amount of damages each individual class member may claim will be evaluated in a post-trial claims process. During this process, Defendants are entitled to assess each claim to determine whether offset or other reduction of damages is appropriate because class members can only recover "actual," out-of-pocket losses.

### C. Affirmative Defenses

Plaintiff has the burden of proof for the Assumption of Risk (No. 5) and Allocation (No. 7) affirmative defenses. *See* Puma's Contentions at I.C.1. The evidence at trial will show that Plaintiff, through its investment advisor, and other market analysts, knew the risks of investing in Puma, which were well-disclosed. Moreover, the evidence will show that the conduct of others, including comments by oncologists who offered negative commentary at ASCO, caused or contributed to the declines in Puma's stock price.

Defendants plan to present evidence supporting the following affirmative defenses at trial: Mitigation of Damages, Offset, and Apportionment of Liability. *See* Puma's Contentions at I.C.2. These affirmative defenses should be evaluated in a post-trial damages phase, if any, only after a jury determines that Defendants committed a violation of the federal securities laws.

Because Plaintiff's Section 20(a) claim against Mr. Eyler has been dismissed, his Good Faith affirmative defense to control person liability is moot.

## II. ADDITIONAL MATTERS

### A. Recently Identified Trial Witnesses

On December 14, 2018, more than a month after the trial was originally set to begin (on November 6, 2018), Plaintiff for the first time indicated that it intends to call at trial Christine Woods, who was the former Global Regulatory Lead at Puma. Ms. Woods has never been previously disclosed in any form as a potential witness in this matter. Ms. Woods was not deposed. Defendants object to the belated identification of Ms. Woods as a trial witness under Rules 26 and 37. Fed. R. Civ. P. 26 (requiring party to timely identify witnesses); Fed. R. Civ. P. 37 (precluding party from calling late-disclosed witnesses at trial unless delay was "substantially justified or is harmless").

Defendants previously objected to the identification of Meryn Grant, an associate on the Latham & Watkins trial team representing Defendants in this matter, on Plaintiff's witness list. Dkt. 548 at 15. Defendants further object to Plaintiff's belated and improper identification of an attorney on its own trial team, Marco Janoski, and note that Plaintiffs' effort to call one of their own attorneys as a witness in this matter potentially raises other concerns. The parties have spent substantial time attempting to negotiate a resolution of this dispute, and Defendants are hopeful the parties will be able to reach an agreement before trial. If necessary, however, Defendants may need to raise the issue with the Court at the appropriate time.

### B. Updates Regarding Plaintiff's Motion *in Limine* No. 4

On October 24, 2018, the Court granted Plaintiff's Motion *in Limine* No. 4 to exclude "evidence of post-class period events, results, or outcomes." Dkt. 614. Since that time, the parties deposed Darcy Kopcho, an employee of Capital International, Plaintiff's investment advisor. In light of the questions Plaintiff's

counsel asked of Ms. Kopcho, as well as the belated identification of Ms. Woods as a trial witness, it is clear that Plaintiff will attempt to adduce evidence about the process leading up to the submission to the FDA of Puma's New Drug Application ("NDA"). It would be highly prejudicial to Defendants to defend the case without being to discuss events after June 2015, including the actual submission of the New Drug Application and the fact that the FDA approved neratinib.

If Plaintiff insists on presenting a speculative narrative regarding Mr. Auerbach's alleged "alteration" of official FDA meeting minutes to make neratinib look like a more approvable drug, it would be manifestly unfair for Defendants not to be able to put forth evidence that the FDA (as well as the European Medicines Agency) approved the drug—based on the DFS rates that were removed from the revised minutes, and the non-clinical studies that were the subject of both the official and revised version of the FDA meeting minutes. *See United States v. Sine*, 493 F.3d 1021, 1037 (9th Cir. 2007) ("The 'opening the door' principle allows parties 'to introduce evidence on the same issue to rebut any false impression'" by evidence admitted); *see also United States v. Mendoza-Prado*, 314 F.3d 1099, 1105 (9th Cir. 2002) (explaining that the "government may introduce otherwise inadmissible evidence when the defendant 'opens the door' by introducing potentially misleading testimony"). Because Plaintiff has opened the door, fairness requires that Defendants have an opportunity to demonstrate why that theory is incorrect.

Defendants continue to reserve the right to raise additional evidentiary issues as this action proceeds.

| | | |
|---|---|---|
| 1 | Dated:  January 8, 2019 | LATHAM & WATKINS LLP |
| 2 | | By:  /s/*Michele D. Johnson* |
| 3 | | Michele D. Johnson |
| | | Andrew B. Clubok |
| 4 | | Colleen C. Smith |
| | | Sarah A. Tomkowiak |
| 5 | | Kristin N. Murphy |
| 6 | | *Attorneys for Defendants Puma Biotechnology, Inc. and Alan H. Auerbach* |