# EXHIBIT B

Execution Version

## Investment Management Agreement

Between

## Norfolk County Council as administering authority for Norfolk Pension Fund

and

## Capital International Limited

October 2004



Contents

Parties

1. Definitions

2. Appointment as Investment Manager

3. Summary Documentation

4. Reports, Valuations and Confirmations

5. Manager's Remuneration

6. Other Services

7. Execution of Purchases and Sales

8. Custody of Assets

9. Voting

10. Delegation and Assignment

11. Warranties

12. Instructions

13. Aggregation and Programme Trades

14. Conflict of Interest and Material Interest

15. Liability

16. Force Majeure

17. Complaints

18. Notices

19. Effective Period of Agreement, Amendments and Termination

20. Entire Agreement

21. Confidential Relationship and Data Protection

22. Contracts (Rights of Third Parties) Act 1999

23. Governing Law


Annex A: Initial Composition of Portfolio

Annex B: Investment Guidelines

Annex C: Summary Documentation

Annex D: Fee Schedule

Annex E: List of Authorised Persons

Annex F: Statements and Warnings

Annex G: List of Affiliates

Confidential

NORF0000920

INVESTMENT MANAGEMENT AGREEMENT

DATED 27th October 2004

PARTIES:

(1) **CAPITAL INTERNATIONAL LIMITED** (registered in England No. 1613098) whose registered office is at 40, Grosvenor Place, London SW1X 7GG, England (the **"Manager"**)

(2) **NORFOLK COUNTY COUNCIL as administering authority for Norfolk Pension Fund** whose registered office is at County Hall, Martineau Lane, Norwich NR1 2DW (the **"Client"**). The Client is a Local Authority with the tax reference number: 49/7.

1.  DEFINITIONS

    Certain words and expressions used in this Agreement are defined here.

    | | |
    |---|---|
    | Affiliate | Any company which is at the relevant time a wholly owned subsidiary of The Capital Group Companies, Inc. of 333 South Hope Street, Los Angeles, California 90071, USA. |
    | Best Execution | The method whereby the Manager seeks to achieve the best terms for the Client in accordance with the Handbook. |
    | Business Day | Day when banks are usually open for business in London. |
    | Custodian | The Northern Trust (or any other custodian bank appointed by the Client in its place). |
    | FSA | The Financial Services Authority. |
    | Guidelines | The investment objectives, guidelines and restrictions contained in **Annex B** as from time to time amended by the Client on giving notice to the Manager in accordance with Clause 18. |
    | Handbook | The FSA's Handbook of rules and guidance. |
    | Portfolio | The securities, funds and other assets listed in **Annex A** as varied from time to time by the Manager in the performance of its duties, and/or by the Client on giving notice to the Manager in accordance with Clause 18. |
    | Regulations | The Local Government Pension Scheme (Management and Investment of Funds) Regulations 1998, as amended. |

Confidential

NORF0000921

| Summary | A summary of the material provisions which may affect |
| Documentation | the investment of the Portfolio which are contained in the |
| | Client's Statement of Investment Principles. |

Any other words or expressions used in this Agreement which are defined in the Handbook shall, if the context so requires, have the same meaning in this Agreement.

2. APPOINTMENT AS INVESTMENT MANAGER

2.1 In accordance with Section 47 of the Pensions Act 1995 (the **"Pensions Act"**), the Client appoints the Manager as investment manager of the Client's assets within the Portfolio to be held in Account No.           by the Custodian or its sub-custodians or agents, as custodian for the Client.

2.2 The Manager shall, as agent for the Client invest the assets comprising the Portfolio at such times and in such securities as it considers are in the best interests of the Client, in accordance with the Guidelines. The Client shall not amend the Guidelines without giving ten business days advance notice to the Manager, subject to clause 19.2.

2.3 Subject to its observing the Guidelines and the requirements of the Regulations, the Manager shall have full discretion to act in respect of the Portfolio and shall have full authority to make any acquisition or disposal, subscription, redemption, and otherwise generally to deal in the Portfolio's assets.

2.4 Neither the Guidelines nor the Summary Documentation will be breached as a result of changes in the price or the value of assets of the Portfolio brought about solely through movements in the market.

2.5 The Manager is authorised and regulated by the FSA in the conduct of its designated investment business. Nothing in this Agreement shall exclude any liability of the Manager to the Client under the Handbook or the Financial Services and Markets Act 2000.

2.6 The Client is an intermediate customer for the purposes of the Handbook.

2.7 On 8 November 2004 or such later date as the parties may agree (the **"Transfer Date"**) and subject to receiving the securities, funds and other assets comprising the Portfolio from the Client or its agents, the Manager shall become responsible for the management of those securities, funds and other assets compromising part of or the entire Portfolio and any other securities, funds and other assets added to the Portfolio from time to time upon such addition and receipt by the Manager. Until the Manager shall have assumed responsibility for such securities, funds and other assets comprising the Portfolio, the Client or the Client's agents shall be responsible for the management of the transition portfolio and, in particular, shall deal appropriately with any corporate action arising in relation to any security within the transition portfolio. For the avoidance of doubt, the Manager shall

V6

4

NORF0000922

not be liable for any actions taken or omissions made in relation to the transition portfolio or the Portfolio before the Transfer Date and, specifically, shall not be responsible for the accuracy of any of the information contained in the transfer list of securities provided to the Manager by the Client or its agent on the Transfer Date but it is acknowledged and agreed by the parties that the Manager will act in good faith in all its dealings with the transition portfolio.

2.8     This Agreement is subject to the requirements of the Regulations.

3.     SUMMARY DOCUMENTATION

The Client shall provide the Manager with the Summary Documentation which shall be comprised in **Annex** C. The Client shall also provide the Manager with updates as and when any material changes are made to the Summary Documentation.

4.     REPORTS, VALUATIONS AND CONFIRMATIONS

4.1     A valuation showing the initial composition and initial value is attached (or will be supplied as soon as reasonably practicable) and constitutes (or will then constitute) part of this Agreement.

4.2     At the end of each calendar quarter, the Manager shall send to the Client, in a timely manner, a list of securities in the Portfolio valued as at the last business day of such quarter, together with performance tabulations against agreed guidelines, a summary of purchases and sales and any other report as shall be agreed in writing by the parties from time to time.

4.3     Valuations shall be prepared on a trade date basis in accordance with the following requirements:

4.3.1     each valuation shall take into account the value of all securities and cash in the Portfolio (including tax and dividend receivables);

4.3.2     securities are valued at the official closing prices on the exchange or market on which the security trades at the close of business on the valuation day, or at the last available traded price where the official closing prices are not available. If the securities in question were not traded on that day, the securities are valued at the closing price or the last available traded price on the latest day prior to the valuation day on which such securities were traded; and

4.3.2     valuations will be based upon the internal pricing sources of an Affiliate, which may in turn be based on those provided by any recognised provider of market data services as it may select from time to time.

4.4     The Manager shall not be required to supply any broker confirmations in connection with any transactions for the Portfolio. The Client reserves the

vs

5

NORF0000923

right to request retrospectively, information in respect of individual transactions regarding the Portfolio.

4.5     Monthly accounting reports and other communications from the Manager may be sent by electronic mail via the Internet in lieu of by hard copy subject to the Client providing the Manager with:

    4.5.1     an IT contact to allow the Manager to ensure that the Client has the necessary set-up to receive our reports electronically; and

    4.5.2     the electronic mail addresses to which such reports should be sent.

The Client acknowledges that the Internet does not provide a completely secure mechanism to ensure confidentiality and the information so transmitted may be observed by third parties whilst in transit.  Accordingly, it is the parties' mutual understanding that it shall not constitute a breach of the confidentiality duties under this Agreement if there should occur a breach of confidentiality arising from the transmission of information via the Internet as requested by the Client.  In addition, the Client acknowledges that there are other risks inherent in communicating through the Internet, such as the possibility of virus contamination and disruptions in service. The Client shall hold the Manager harmless in using the Internet for this purpose, and the Manager shall have no liability for any loss, expense, damage, liability or claim (including attorney's fees) incurred or sustained by the Client or any person claiming through the Client.

## 5.     MANAGER'S REMUNERATION

5.1     The Client shall remunerate the Manager in accordance with **Annex D**.

5.2     The Manager shall not:

    5.2.1     receive any other fee, commission or income whatsoever from any other source in connection with the performance of this Agreement;

    5.2.2     enter into any arrangement whereby it undertakes to place business on behalf of clients with any other person or institution, although it may receive research and other publications from them.

## 6.     OTHER SERVICES

The Manager shall, on invitation and at no cost to the Client, attend meetings at least annually with representatives of the Client to discuss the Portfolio and its management and the immediate investment outlook, or shall submit its views in writing, as the Client may reasonably require from time to time.

V6

6

NORF0000924

7.  **EXECUTION OF PURCHASES AND SALES**

7.1   The Manager shall perform its duties with the standard of skill, care and judgement that would be expected of a professional investment manager.

7.2   The Manager shall provide Best Execution.

8.  **CUSTODY OF ASSETS**

8.1   The Manager shall not take or receive physical possession of any of the Portfolio's assets and the Client confirms the appointment of the Custodian who shall have sole responsibility for:

8.1.1   safekeeping of the assets and related documents of the Client;

8.1.2   settlement of transactions effected by the Manager;

8.1.3   appropriate registration of assets; and

8.1.4   receipt of sale proceeds, dividends and all other monies.

8.2   The Manager shall give in a timely manner all necessary instructions to the Custodian in relation to all investment management decisions made by it hereunder.

9.  **VOTING**

9.1   Unless otherwise directed by the Client, the Manager or the Custodian acting on the Manager's instructions, shall have full discretion to vote or abstain from exercising any voting rights in respect of any securities held in the Portfolio as the Manager thinks fit for **non-UK securities**.

9.2   **For UK securities**, the Manager or the Custodian acting on the Manager's instructions, shall vote in accordance with the recommendations of the National Association of Pension Funds/Institutional Shareholder Services Proxy Service known as Research Recommendations Electronic Voting (**"RREV"**). For items of an investment nature where RREV has not provided a voting recommendation, the Manager shall have full discretion to vote or abstain from exercising these voting rights as the Manager thinks fit.

9.3   For the avoidance of doubt, the Client understands that the operation of a stock lending programme could impact on the ability of the Manager to vote Portfolio securities (since the Manager will lose the ability to vote securities that are out of loan) and that where such voting ability is lost, any proxy voting reporting may be effected (since the Manager may be in a position whereby he believes a security to have been voted when in actual fact the vote was never cast).

vs

7

**EXHIBIT B**
**Page 35**

10.   DELEGATION AND ASSIGNMENT

10.1   The Manager may delegate any of its powers and functions and the exercise of any discretions under this Agreement to an Affiliate and may provide information about the Client and the Portfolio to any such Affiliate but the Manager's liability to the Client for all matters so delegated shall not be affected thereby. A list of all Affiliates is attached on **Annex G** and the Client will be notified by the Manager of any changes to its Affiliates made from time to time.

10.2   Neither party may assign this Agreement without the prior written approval of the other.

11.   WARRANTIES

11.1   By entering into this Agreement the Client warrants and undertakes that:-

11.1.1   it has full power and authority to enter into this Agreement and that all necessary actions to authorise its execution have been taken; and

11.1.2   all securities, funds and other assets which at any time constitute the Portfolio shall be the Client's sole property free from any charge or encumbrance; and

11.1.3   it shall not deal in or remove from the Portfolio any securities, funds or other assets without first giving at least ten days prior written notice to the Manager or terminating this Agreement.

11.2   The Manager hereby warrants and represents to the Client that:

11.2.1   it has all necessary authority, power and capacity to enter into this Agreement and that all necessary actions have been taken to enter into it properly and lawfully;

11.2.2   it is on the date of this Agreement properly constituted and incorporated under the laws of the jurisdiction of its incorporation and has all necessary licences, registrations, consents or approvals from all relevant governmental, quasi-governmental or regulatory bodies to perform its obligations under this Agreement.

11.2.3   it has made all reasonable efforts to ensure that all information supplied in writing by or on behalf of the Manager to the Client in connection with the negotiation and preparation of this Agreement is true and accurate at the date of this Agreement and does not contain any mis-statement of fact or omit any material fact or any fact necessary to make any such information not misleading.

11.2.4   it will comply with all applicable laws, rules, regulations, decrees and other ordinances issued by any competent governmental, supra-governmental, state or other authority relating to the subject matter of

Ve

8

Confidential

NORF0000926

this Agreement and to the performance of its obligations under this Agreement

12. INSTRUCTIONS

The Client may give instructions to the Manager relating to its duties under this Agreement and shall comply with Clause 18. The Manager shall take reasonable steps to ensure that any instruction or communication which purports to have been given by the Client is in fact given by the Client and subject to this obligation the Manager may rely and act on any instruction or communication which purports to have been given (and which is reasonably accepted as having been given) by or on behalf of any person notified by the Client from time to time as being authorised to instruct the Manager or the Custodian in respect of the Portfolio (such persons being listed in **Annex E**).

13. AGGREGATION AND PROGRAMME TRADES

13.1 Subject to the rules set out in the Handbook, the Manager may aggregate transactions for the Client with those of other customers without prior reference to the Client or such other customers. The Client acknowledges that aggregation may operate on some occasions to its advantage and on other occasions to its disadvantage.

13.2 Where the Manager acquires or disposes of, for the Client, all or part of the Portfolio by trading a basket of securities as a single lot (**"programme trade"**), the Client acknowledges that the Manager will be acting as an agent in respect of such programme trade and the Client hereby notifies the Manager that no further notice in this respect is required.

14. CONFLICT OF INTEREST AND MATERIAL INTEREST

14.1 The services which the Manager provides to the Client are not exclusive and the Manager may continue to manage (and be paid for managing) the funds of other clients which may involve investments of the same kind as those held in the Client's Portfolio.

14.2 The Manager (acting as agent for the Client) and any Affiliate may, without prior reference to the Client, enter into transactions with or for the Client in which the Manager or Affiliate has or may have:

14.2.1 a material interest;

14.2.2 a relationship that gives or may give rise to a conflict of interest in relation to such transaction;

14.2.3 an interest in such transaction that is, or may be in conflict with the interests of any of the Manager's customers; or

14.2.4 customers with conflicting interests in relation to such transaction.

V6

9

NORF0000927

14.3 The Manager shall ensure that such transactions are effected on terms which are not materially less favourable to the Client than if the potential conflict had not existed.

14.4 In accordance with the rules set out in the Handbook, the Manager notifies the Client that such potential interests or conflicts may arise because:

14.4.1 subject to the Manager's policy on conflicts of interest, a director or employee of the Manager, or of an Affiliate, is a director of, holds or deals in securities of, or is otherwise interested in any company whose securities are held or dealt in on behalf of the Client;

14.4.2 a transaction is effected in securities issued by the customer of the manager or the customer of an Affiliate;

14.4.3 the Manager may act as agent for the Client in relation to transactions in which it is also acting as agent for the account of other customers and/or Affiliates;

14.4.4 a transaction is effected in units or shares of in-house funds or connected investment trusts or of any company of which the Manager or an Affiliate is the manager, operator or investment adviser;

14.4.5 the Manager or an Affiliate may receive remuneration or other benefits by reason of acting in private equity or similar transactions involving a company whose securities are held by the Client; or

14.4.6 a transaction is effected in securities in respect of which the Manager or an Affiliate, or a director or employee of the Manager or an Affiliate, has traded for its own account or has either a long or short position.

14.5 Neither the Manager nor any Affiliate shall be liable to account to the Client for any profit, commission or remuneration made or received from or by reason of any transactions or any connected transactions described above nor will the Manager's fees, unless otherwise provided, be abated.

14.6 While the Manager shall use its reasonable endeavours to ensure that the Client has an opportunity to participate in all investment opportunities which become available and fall within the Guidelines, provided that the Manager will be entitled to exercise its judgement as to the basis on which to offer such opportunities among its clients.

14.7 None of the services to be provided hereunder nor any other matter shall give rise to any fiduciary or equitable duties which would prevent or hinder the Manager, or any Affiliate, in transactions with or for the Client acting as agent, dealing with other Affiliates and other customers, and generally effecting transactions as provided above, to which the Client consents accordingly.

V6

10

15. LIABILITY

15.1    Neither the Manager nor any Affiliate or third party to whom the Manager may have delegated any one or more of its duties under this Agreement, shall be liable for any direct loss suffered by the Client as a result of any act or omission of the Manager or any such Affiliate or third party save to the extent such loss is caused by the negligence, fraud or wilful default of the Manager or any of its Affiliates (or a person to whom duties of the Manager under this Agreement are delegated).

15.2    The Manager shall not be liable for the negligence, default or fraud of any person, firm or company through whom transactions are effected for the Client's account including, without limitation, any broker, banker or Custodian or any agent, nominee or sub-custodian or any of them (each a Counterparty). The Manager shall use due diligence in its selection and the continued use of any Counterparty. If any Counterparty should fail to deliver any necessary documents or to complete any transaction, the Manager will take all reasonable steps on behalf of the Client after consultation with the Client to rectify such failure or obtain compensation in lieu.  All reasonable costs and expenses properly so incurred by the Manager shall be paid by the Client.

15.3    The Manager gives no warranty as to the performance or profitability of any of the assets held in the Portfolio or the suitability of the Guidelines.

15.4    The Client and any professional tax adviser of the Client are solely responsible for the management of the Client's affairs to the best advantage for tax purposes. The Manager accepts no responsibility for any tax consequences of anything done within the scope of its authority.

15.5    The provisions of this Clause 15 are without prejudice to Section 33 of the Pensions Act.

16. FORCE MAJEURE

16.1    Neither party will be liable for any delay in performing or failure to perform any of its obligations under this Agreement caused by events beyond its reasonable control and in no way caused or contributed to by its act or omission or by the act or omission of any body acting on its behalf.  This shall include, but not be limited to, industrial disputes, acts or regulations of any governmental or supranational bodies or authorities or breakdown failure or malfunction of any telecommunication or computer service or systems provided that the above-mentioned restrictions have been met ("Force Majeure Event")

16.2    The Manager shall have no responsibility of any kind for any loss or damage thereby incurred or suffered by the Client. In any such case, all amounts due to the Manager hereunder shall continue to be paid as and when due, the

v6

11

NORF0000929

EXHIBIT B
Page 39

Manager's remaining obligations shall continue in full force and effect and all the Manager's obligations shall be performed or carried out as soon as legally and practicably possible after the cessation of such events or circumstances.

16.3   The party claiming the Force Majeure Event shall promptly notify the other in writing, as soon as practicable, of the reasons for the delay and the likely duration and will use its reasonable endeavours to overcome the Force Majeure Event.

16.4   If and when the inability to perform or delay in performing exceeds four weeks then the party not claiming the Force Majeure Event shall be entitled to terminate the Agreement with immediate effect by giving notice in writing.

17.   COMPLAINTS

All formal complaints should in the first instance be made in writing to the Compliance Officer at the Manager's address stated in Clause 18.

18.   NOTICES

18.1   Any notices or communications which either the Manager or the Client may make to the other shall be in writing and addressed to the parties as provided hereunder in Sub-clause 18.2 below, and shall be deemed duly given:

18.1.1   upon receipt if delivered in person, by messenger, or by e-mail; or

18.1.2   on the next business day following delivery if delivered by a reputable overnight delivery service which provides evidence of receipt to the parties.

18.2   **For the Manager**:

| | |
|---|---|
| Name of Party: | **Capital International Limited** |
| Address: | 40 Grosvenor Place<br>London<br>SW1X 7GG |
| Telephone: | 020 7864 5000 |
| Facsimile: | 020 7865 5001 |
| Attention: | Director |
| **For the Client**: | |
| Name of Party: | **Norfolk County Council** |
| Address: | Department of Finance |
| | County Hall |

V6

12

NORF0000930

|            | Martineau Lane       |
|            | Norwich              |
|            | Norfolk  NR1 2DW     |
| Telephone: | 01603 222400         |
| Facsimile: | 01603 222694         |
| Attention: | Director of Finance  |

19.  EFFECTIVE PERIOD OF AGREEMENT, AMENDMENTS AND TERMINATION

19.1   This Agreement shall come into effect on the date set out above, unless the parties have agreed in writing to be bound by the terms of this Agreement from some earlier date.

19.2   Any variation to this Agreement shall only be effective if in writing and signed by an authorised officer of both parties to this Agreement.

19.3   The Client may terminate the Agreement by giving the Manager not less than two weeks' written notice as provided above.  The Manager may terminate the Agreement by giving not less than one calendar month's written notice as provided above.  The Client shall also be entitled to terminate this Agreement without notice if a receiver, an administrator or liquidator of the Manager shall be appointed, if the Manager shall make any composition or arrangement with its creditors or if the Manager shall commit a material breach of any of the provisions of this Agreement and shall fail to remedy such breach (if capable of remedy) within 14 days of receiving written notice from the Client specifying the breach.  Termination shall become effective on receipt of written notice by the other party in accordance with Clause 18.

19.4   Termination of this Agreement or removal of assets from the Portfolio shall not affect any outstanding orders or transactions or other legal rights or obligations which may already have arisen.  The Manager shall complete transactions already in progress at the time of termination or removal.

20.  ENTIRE AGREEMENT

This Agreement together with the documents referred to herein constitutes the entire agreement between the Manager and the Client with respect to the matters dealt with herein and supersedes all previous representations and understandings between the Manager and the Client.

21.  CONFIDENTIAL RELATIONSHIP AND DATA PROTECTION

21.1   The parties to this Agreement will, subject to Sub-clause 10.1, keep confidential at all times, information acquired in consequence of it, including,

V6

13

NORF0000931

without limitation, in the case of the Client, information regarding investments made by the Manager in connection with the Portfolio, except for information which they may be entitled or bound to disclose under compulsion of law, or where requested by regulatory agencies, or to their professional advisers where reasonably necessary for the performance of their professional services. Notwithstanding the foregoing, to the extent that any market counterparty with whom the Manager deals requires information relating to the Portfolio (including, but not limited to, the identity of the Client and market value of the Portfolio), the Manager shall be permitted to disclose such information to the extent necessary to effect transactions on behalf of the Client in accordance with the terms of this Agreement. The Manager shall provide all reasonable assistance and information required by the Client to aid the Client in responding to any reasonable requests made under the Freedom of Information Act 2000.

21.2     The Manager will act as data controller (and in certain circumstances, data processor) within the meaning of the Data Protection Act 1998 (the **"Data Protection Act"**). The Client hereby consents to the processing and use by the Manager and its agents and Affiliates of personal data (as defined in the Data Protection Act) given by the Client under this Agreement for the provision of services to the Client, which may include the transfer of such data out of the European Economic Area (as defined in the Data Protection Act). Such data may also be used by the Manager and its agents and Affiliates to update customer records. The Client undertakes to supply personal data to the Manager in accordance with the provisions of the Data Protection Act. Where any personal data is transferred out of the European Economic Area the Manager shall ensure that it is processed and used whilst outside such area on terms which are the same as those required under the Data Protection Act 1998 and where such arrangements are not in place, the transfer of personal data is not permitted.

22.     CONTRACTS (RIGHTS OF THIRD PARTIES) ACT 1999

This Agreement is enforceable by the original parties to it and by their successors in title and permitted assignees. Any rights of any person to enforce the terms of this Agreement pursuant to the Contracts (Rights of Third Parties) Act 1999 are excluded. The parties hereto may rescind, vary or add to the terms hereof without requiring the consent of any third party.

23.     GOVERNING LAW

This Agreement shall be governed by and construed in accordance with the laws of England. The parties submit to the non-exclusive jurisdiction of the English Courts to settle any dispute which may arise out of or in connection with this Agreement.

v6                                          14

**EXHIBIT B**
**Page 42**

## ANNEX A

### INITIAL COMPOSITION OF PORTFOLIO

A statement specifying the initial composition of the Portfolio comprising the cash value and/or initial value of each asset included in the Portfolio (as at the date the Manager assumed responsibility for managing the Portfolio) will be provided by the Manager to the Client as soon as practicable after the information becomes available. Once the statement has been agreed with the Client a copy of it, signed by both parties, will be appended to this Agreement as **"Annex A"**.

V6

15

Confidential

NORF0000933

## ANNEX B

### PART 1 - INVESTMENT BENCHMARK AND OBJECTIVES

(Note: Changes can only be made as set out in Clause 19 of
the Agreement)

Notwithstanding the provisions herein (**Annex B** Parts 1 and 2) the Manager will comply with the restrictions on investments set out in Section 11 (including any cross references) of the Local Government Pension Scheme (Management and Investment of Funds) Regulations 1998 as amended and for the avoidance of doubt Column (1) of Part I of the Schedule to Statutory Instrument 2003 No. 2719 shall apply.

1. **Benchmark**

   The Portfolio's return will be compared with the following composite benchmark, as it may be amended from time to time (the "**Benchmark**")

   |       |                                  |
   |-------|----------------------------------|
   | 37%   | FTSE AWD North America           |
   | 37%   | FTSE AWD Europe (ex UK)          |
   | 9%    | FTSE AWD Japan                   |
   | 14.5% | FTSE AWD Asia Pacific (ex Japan) |
   | 2.5%  | MSCI Emerging Market             |

2. **Objectives**

   To outperform the benchmark by 1.5% (net of fees) per annum over rolling three year periods.

   The Manager has reviewed a number of factors including the Manager's investment process and historical performance, and historical market conditions, in accepting the objective above. The Manager does not manage portfolios to achieve specific client outperformance objectives, and manages accounts using one investment process for all accounts, even if they are subject to different objectives or benchmarks. The Client acknowledges that the Manager cannot provide any guarantee with respect to performance or preservation of assets and that this objective will not impose any liability on the Manager.

v6

16

**EXHIBIT B**
**Page 44**

## ANNEX B

### PART 2 - INVESTMENT GUIDELINES

(Note: Changes can only be made as set out in Clause 19 of
the Agreement)

1. **Mandate**

   Global Equities (ex UK)

2. **Currencies**

   The currency of the account GBP Sterling.

3. **Investment Universe**

   3.1 Up to 10% of the Portfolio may be invested in countries outside the Benchmark universe.

   3.2 Investments in emerging markets may be made in pooled funds (such as Capital International Emerging Markets Fund) and through segregated holdings.

4. **Equities**

   4.1 **Eligible Investments**

   "Eligible Investments" are eligible equities or securities with equity characteristics, which are listed on a formally constituted stock exchange or traded in another recognised market, (including ADRs, GDRs, etc, which will be deemed to be securities of the currency of the security they represent), convertibles, preference shares and preferred stock.

   4.2 **Issuer Limit**

   The Manager may not invest in more than 5% of the outstanding securities of any one issuer (calculated at the time of purchase).

   4.3 **Portfolio Limit**

   No more than 5% of the Portfolio may be invested in the securities of any one issuer (calculated at the time of purchase).

   4.4 **Additional Permitted Investments**

   The following types of investments are permitted in the Portfolio:

   4.4.1 Partly-paid and nil paid securities;

   4.4.2 Rights issues, bonus issues, scrip dividends, warrants and other securities or instruments received as a result of corporate action;

   4.4.3 Private placements/sales, initial placement offerings and offers for sale; and

   4.4.4 Securities issued by companies, which invest in real estate or interests therein (including real estate investment trusts, which in any

V6                                        17

event will be deemed to be corporations and not collective investment schemes for the purpose of these Guidelines).

### 4.6 Sub-Underwriting

The sub-underwriting of any security, which would upon issue qualify as an Eligible Investment with the same percentage limitations as apply to equities, is permitted.

### 4.7 Underwriting

Underwriting is not permitted.

## 5. General

### 5.1 Cash (and Cash Equivalents)

No more than 5% of the Portfolio can be held in cash and cash equivalents (which will exclude any receivables, including without limitation dividends declared but not yet paid or net cash inflows from securities). The cash limit shall apply only to the projected level of cash, which is defined as the effective level of cash in the Portfolio once all transactions, pending at the time of calculation, have settled. The above limit may be exceeded in situations where substantial withdrawals or allocation are made.

### 5.2 Borrowing

The Manager shall not borrow on the Client's behalf. However this limitation shall not prohibit short term overdrafts which may be required from time to time including in connection with, but not limited to, operational difficulties such as "trade fails", "limit orders" or discrepancies in security settlement dates.

### 5.3 Cross-Trading

Trades between the Portfolio and other accounts managed by the Manager or one of its Affiliates are permitted.

### 5.4 Collective Investment Schemes

Subject to the requirements of the Regulations investment may be made in in-house funds or other collective investment schemes (whether regulated or unregulated). The limits set out in Guidelines 4.2 & 4.3 above do not apply to this Guideline.

### 5.5 Currency Transactions

5.5.1 Foreign exchange contracts may be entered into in order to settle trades.

5.5.2 **Hedging** (i.e. sale or purchase of the currency of the Account) is permitted (with a limit of 90% of the value of securities or cash of the relevant currency being hedged).

5.5.3 **Cross-hedging** (i.e. sale or purchase of currencies that does not include the currency of the Account) is not permitted.

v6

18

5.5.4    Any such currency transactions as described in these Guidelines may be entered into with the Custodian or other third party banks.

5.6    **Derivatives**

Investments may not otherwise be made in derivatives except as permitted in these Guidelines.

6.    **Market Movements**

6.1    No Guideline in this Annex shall be breached due to changes in the price or value of assets or by market movements.

6.2    If the Portfolio exceeds a Guideline limit and/or falls outside a Guideline range as a result of market movements (an "**Event**"), the Manager shall ensure that steps are taken to bring the Portfolio within such Guideline limit and/or range within four weeks of detection of the Event.

6.3    Should market movements cause the position to be rectified: (a) any subsequent Event will be treated as a new and separate event; and (b) the Manager shall have four-weeks to rectify the position.

V6                                                    19

Confidential

**EXHIBIT B**
**Page 47**

## ANNEX C

### SUMMARY DOCUMENTATION

Confidential

NORF0000938



Norfolk Pension Fund

# Statement of Investment Principles

## 1. Introduction

1. This is the Statement of Investment Principles adopted by Norfolk County Council (the Council) in relation to the investment of assets of the Council's Pension Fund.

2. Investments are monitored on a regular basis by the Investment Committee of the Council acting on the delegated authority of the Executive Committee. Advice is received as required from professional advisers. In addition, the Committee formally reviews the performance of investments and the overall strategy on an annual basis.

3. In preparing this statement the Committee have taken professional advice from the investment practice of Hymans Robertson Actuaries and Consultants. Due account has been taken of the maturity profile of the Fund (in terms of the relative proportions of liabilities in respect of pensioners and active members), together with the level of disclosed surplus or deficit.

4. The Committee has agreed an asset allocation benchmark, a performance target and various controls on the Fund's investments. These reflect their views on the appropriate balance between maximising the long-term return on investments and minimising short-term volatility and risk. The benchmark reflects the position following the Actuarial Valuation of the Fund as at 31 March 2001. It is intended that strategy will be revised at least every three years following actuarial valuations of the Fund.

5. The Committee is responsible for monitoring the qualitative performance of the Investment Managers and Custodian employed to ensure that they remain suitable Investment Managers/Custodians for the Fund. These qualitative aspects include, inter alia, changes in ownership, changes in personnel, poor administration etc.

6. The Committee will consider the Fund's position in relation to the Statement of Investment Principles. Every 12 months from the effective date of this document the Statement will be reviewed in full (in conjunction with the other parties to the Statement) and a revised Statement prepared and circulated where appropriate.

Confidential

NORF0000939

**EXHIBIT B**
**Page 49**

Norfolk Pension Fund - Statement of Investment Principles

## 2. Objectives

### 1. Primary Objective

The primary objective of the Fund is as follows:

*"To provide for members' pension and lump sum benefits on their retirement or for their dependants' benefits on death before or after retirement, on a defined benefits basis".*

In order that this primary objective can be achieved, the following funding and investment objectives have been agreed.

### 2. Funding Objectives - Ongoing Plan

To fund the Fund in such a manner that, in normal market conditions, all accrued benefits are fully covered by the actuarial value of the Fund's assets and that an appropriate level of contributions is agreed by the administering authority to meet the cost of future benefits accruing. For employee members, benefits will be based on service completed but will take account of future salary increases.

The assumptions used for this test, corresponding with the assumptions used in the latest Actuarial Valuation, are shown in Appendix 1. This position will be reviewed at least at each triennial Actuarial Valuation. The Investment Committee will be advised of any material changes to the Fund during the inter-valuation period.

Confidential

NORF0000940

Norfolk Pension Fund - Statement of Investment Principles

### 3. Investment Objectives

To achieve a return on Fund assets which is sufficient, over the long-term, to meet the funding objectives set out above on an ongoing basis. To achieve this objective the following have been agreed.

1. **Choosing Investments**

   The Committee will ensure that one or more Investment Managers are appointed who are authorised under the Local Government Pension Scheme (Management and Investment of Funds) Regulations 1998 (as amended) to manage the assets of the Fund.

   The Committee, after seeking appropriate investment advice, may give specific directions as to the strategic asset allocation and will ensure the suitability of assets in relation to the needs of the Fund. The Investment Managers will be given full discretion over the choice of individual stocks and are expected to maintain a diversified portfolio.

3. **Investment Managers**

   The Managers appointed to manage the Fund's assets are summarised in Appendix 2. The current structure embraces both multi-asset and specialist management. Within the specialist component of the Fund a range of different Managers are employed, with different benchmarks and targets to reflect their specific mandates.

4. **Custody**

   Northern Trust has been appointed as Global Custodian for the assets managed by the Fund's Investment Managers. The Fund will continue its existing policy of participating in a stock-lending programme managed by its Custodian. This is restricted by Regulations to 25% of the Fund's value.

5. **Kinds of Investments to be held**

   A management agreement is in place for each Investment Manager which sets out the relevant benchmark, performance target, asset allocation ranges and any restrictions, as determined by the Committee. The kinds of investments which the Managers may hold, together with a summary of each Manager's brief, are summarised in Appendix 2.

6. **Balance between kinds of Investments**

   The overall strategy adopted within the Fund was formally reviewed by way of an asset/liability study based on the results of the 1995 Actuarial Valuation.

   The study took account of the following: -

   - The liability profile of the Fund;

   - The solvency of the Fund (i.e. ratio of assets to liabilities);

   - The risk tolerance of the Committee.

Confidential

NORF0000941

### Norfolk Pension Fund - Statement of Investment Principles

In light of the maturing (and likely future maturing) of the Fund the Committee decided in principle to establish a core exposure to property/index-linked.

This strategy remains appropriate following the results of the 2001 Actuarial Valuation.

7. **Risk**

The adoption of an asset allocation benchmark (as described above) and the explicit monitoring of performance relative to a performance target, constrains the Investment Managers from deviating significantly from the intended approach, while permitting flexibility to manage the Fund in such a way as to enhance returns.

The appointment of more than one Investment Manager introduces a meaningful level of diversification of manager risk. Each Manager is expected to maintain a diversified portfolio of investments.

8. **Expected return on investments**

The strategic benchmark is expected to produce a return over the long term in excess of the investment return assumed in the Actuarial Valuation. The Fund's assets are managed on an active basis and are expected to outperform their respective benchmarks over the long term. In this way, the investment performance achieved by the Fund is expected to exceed the rate of return assumed by the Actuary in funding the Fund on an ongoing basis.

8. **Realisation of investments**

The majority of stocks held by the Fund's Investment Managers are quoted on major stock markets and may be realised quickly if required. Property investments, which are relatively illiquid, currently make up a small proportion of the Fund's assets.

9. **Additional Voluntary Contributions (AVCs)**

Members have the opportunity to invest in AVC funds as outlined in Appendix 3.

Confidential

## 4. Other Issues

### 1. Corporate Governance

The Committee believe that the adoption of good practice in Corporate Governance will improve the management of companies and thereby embrace long term shareholder value. The Committee expect the Investment Managers to make regular contact at senior executive level with the companies in which the Fund's assets are invested, both as an important element of the investment process and to ensure good Corporate Governance. The Committee have developed their own policy on Corporate Governance. Details of the current policy are set out in Appendix 4.

The Committee expect the Investment Managers to vote the Fund's shares in line with the policy set out in Appendix 4 in respect of all resolutions at annual and extraordinary general meetings of companies. Where there are votes on issues not covered by the Fund's policy the Committee expect the Investment Managers to vote in line with house Corporate Governance guidelines. Voting actions are reported to the Committee on a regular basis.

### 2. Socially Responsible Investment

The Committee recognise that social, environmental and ethical considerations are among the factors that can affect the financial return on investments. The Committee are currently developing a process of responsible engagement with companies in which the Fund invests with the objective of seeking to enhance shareholder value over the long term. The area of engagement will be business approaches to safeguarding and improving the environment. With effect from 1 March 2000, the Committee have appointed Société Générale Asset Management to manage a UK Equity mandate representing approximately 19% of the total Fund. As part of this appointment SGAM have been asked to develop a responsible engagement approach for the Portfolio and produce a strategy for prioritising engagement with companies held in the Portfolio (Responsible Engagement). Appendix 5 sets out in detail the approach to responsible engagement that has been agreed between the Committee and SGAM.

### 3. Compliance with the Myners Principles

The Myners report on Institutional Investment in the UK was submitted to the Chancellor of the Exchequer on 6 March 2001. This included ten principles of good investment practice.

The local Government Pension Scheme (Management and Investment of Funds) (Amendment) Regulations 2002 require administering authorities to publish the extent to which they comply with the 'ten investment principles'. Accordingly a summary of the level of Compliance of the Norfolk Fund is attached in Appendix 6.

Confidential

NORF0000943

Norfolk Pension Fund - Statement of Investment Principles

## APPENDIX 1

**A. Main Actuarial Assumptions as at 31 March 2001**

|  | % per annum | Relative to RPI % per annum |
|---|---|---|
| RPI Inflation | 2.8 | – |
| Increases in pay (excl. increments) | 4.8 | 2 |
| Investment returns: - * equities | 6.75 | 3.95 |
| bonds | 5.75 | 2.95 |

* net of investment expenses

The Actuarial Valuation as at 31 March 2001 was carried out using a smoothed market related method. The financial assumptions used in the Valuation were derived by considering various average yields in the 12 months leading up to the valuation date. The calculated value of the assets of the Fund was based on the average market value in the 12 months to the valuation date.

Average yields and market values in the 12 months preceding the valuation date were used in order to build in an element of smoothing and stability for the future.

It should be noted that the absolute returns as given above are not critical to the results of the Valuation - it is the returns relative to one another which are more significant (in particular, the return achieved in excess of inflation).

The actuarial assumptions also include statistical assumptions; for example, rates of ill health and mortality. All assumptions are reviewed as part of the formal actuarial valuation that is carried out every 3 years. In addition, the actuary will also review the funding position annually taking into account the actual experience, including early retirements, since the previous triennial actuarial valuation.

**B. Liability Mix**

| Liabilities | % of Total Liabilities | % of Fund Assets |
|---|---|---|
| Employee members | 50.3 | 49.0 |
| Deferred pensioners | 8.9 | 8.7 |
| Pensioners | 40.8 | 39.7 |
| **Total liabilities** | **100** | **97.5** |
| Surplus | 2.6 | 2.5 |
| **Total fund (at actuarial value)** | **102.6** | **100** |

Based on the actuarial valuation as at 31st March 2001

Confidential

NORF0000944

EXHIBIT B
Page 54

Norfolk Pension Fund - Statement of Investment Principles

C. Asset Mix

|  | Fixed Benchmark % [1] | Benchmark implied by portfolio values at 30/06/02 % [2] |
|---|---|---|
| UK Equities | 43.0 | 40.7 |
| Overseas Equities | 29.0 | 27.8 |
| **Total Equity** | **72.0** | **68.5** |
| Index-Linked Gilts | 6.0 | 6.8 |
| Property | 8.0 | 9.2 |
| Real assets |  |  |
| UK Bonds | 5.5 | 6.3 |
| Overseas Bonds | 3.5 | 3.9 |
| Corporate Bonds | 4.0 | 4.3 |
| Cash | 1.0 | 1.0 |
| Monetary assets |  |  |

1. The overall Fund benchmark was fixed as at March 2001 following a review of the investment strategy.

2. The benchmark implied by the portfolio values at 30/06/02 is a combination of the fixed benchmark for each Fund Manager and the value of assets under management at 30/06/02.

Confidential

NORF0000945

Norfolk Pension Fund - Statement of Investment Principles

## APPENDIX 2

**Appointed Managers**
Kinds of Investments held by Each Manager

| Approximate Proportion % | Manager | Mandate | Equities | | Bonds | | Index-Linked | | Property | Cash |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | UK | Over-seas | UK | Over-seas | UK | Over-seas | | |
| 49 | Deutsche | Multi Asset Inc. Property | # | # | # | # | # | # | # | # |
| 18 | Société Générale | Specialist UK Equity Brief | # | | | | | # | | # |
| 16 | Fidelity | Global Equity Brief | # | # | | | | | | # |
| 9 | Henderson | Specialist Global Bond Brief | | | # | # | # | # | | # |
| 8 | Norwich Union | Specialist Property/Index-Linked Brief | | | # | # | # | # | # | # |
| 8 | Internally Managed | Venture Capital and District Council Bond | # | | # | | | | | # |

Confidential

NORF0000946

**EXHIBIT B**
**Page 56**

Norfolk Pension Fund - Statement of Investment Principles

## Benchmark Information

The table below provides details of the fixed benchmark for each Manager (centre column) and the minimum and maximum tactical asset class range for each asset class.

| % of Fund | Deutsche Multi Asset | | | Société Générale UK Equity | | | Fidelity Global Equity | | | Henderson Global Bonds | | | Morley Property & Index-Linked | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Min | 49 | Max | Min | 18.4 | Max | Min | 15.8 | Max | Min | 9.2 | Max | Min | 7.6 | Max |
| UK Equities | 35 | 47 | 58 | 95 | 100 | 100 | 2.5 | 10 | 17.5 | | | | | | |
| Overseas Equities | 20 | 31 | 40 | | | | N/a | 90 | N/a | | | | | | |
| US Equities | 5 | 8.7 | 12 | | | | 17 | 24.5 | 32 | | | | | | |
| European Equities | 5 | 8.7 | 12 | | | | 17 | 24.5 | 32 | | | | | | |
| Japanese Equities | 3 | 6 | 8 | | | | 9.5 | 17 | 24.5 | | | | | | |
| Pacific Equities | 3 | 6 | 8 | | | | 9.5 | 17 | 24.5 | | | | | | |
| Emerging Equities | 0 | 1.6 | 4 | | | | 0 | 5 | 12.5 | | | | | | |
| UK Fixed | 0 | 4 | 7 | | | | | | | 25 | 40 | 55 | 0 | 10 | 20 |
| Corporate Bonds | 0 | 3.5 | 7 | | | | | | | 0 | 15 | 30 | | | |
| Overseas Fixed | 0 | 3.5 | 7 | | | | | | | 5 | 20 | 35 | | | |
| UK Index Linked | 0 | 3.5 | 7 | | | | | | | 10 | 25 | 40 | 10 | 25 | 40 |
| Property | 2 | 6 | 8 | | | | | | | | | | 50 | 65 | 80 |
| Cash | 0 | 1.5 | 5 | 0 | 0 | 5 | 0 | 2 | 5 | 0 | 0 | 20 | 0 | 0 | 10 |

The above ranges apply at the time of investment.

Confidential

NORF0000947

EXHIBIT B
Page 57

**Norfolk Pension Fund - Statement of Investment Principles**

### Performance Objectives

| | |
|---|---|
| Deutsche | Benchmark Return + 1.0% p.a. |
| Société Générale | Benchmark Return + 1.25%p.a. |
| Fidelity | Benchmark Return + 1.5% pa |
| Henderson | Benchmark Return + 0.75%p.a. |
| Morley | Benchmark Return + 0.75% pa |

Performance for Deutsche and Fidelity is measured over 3-year periods (a
performance-related fee operates for these managers).  For Henderson, Norwich
Union and Société Générale a flat fee applies, and performance is measured over
rolling 3 year periods

### Benchmark Indices

| | |
|---|---|
| UK Equities | FTSE All Share |
| US Equities | FT / S&P USA |
| European Equities | FT / S&P Europe ex UK |
| Japanese Equities | FT / S&P Japan |
| Pacific Equities | FT / S&P Pacific Basin ex Japan |
| Emerging Markets | IFC Investible |
| UK Fixed | FTSE-A All stocks ex 0.5 years Index |
| Overseas Fixed | J P Morgan World ex UK (£ Stg) Index |
| UK Index Linked | FTSE-A Over 5 years Index-Linked Index |
| Property | CAPS Pooled Fund Median |
| Cash | Local Authority 7 day rate |

Confidential

NORF0000948

Norfolk Pension Fund - Statement of Investment Principles

## Main Restrictions Applying to Managers

| Deutsche Multi-Asset | Société Générale UK Equity | Fidelity Global Equity | Henderson Global Bonds | Norwich Union Property & Index-Linked |
|---|---|---|---|---|
| Limits | Limits | Limits (Direct Holdings) | Maximum Limits | Limits |
| Single Investment: maximum 5% of Company's Share Capital or 3% above index weight | Single Investment: maximum 5% of Company's Share Capital or 3% above index weight | Single Investment: maximum 5% of Company's Share Capital or 2.5% active money | Single Investment: 10% of Total Fund: | Single Property: 15% of Fund portfolio |
| Non-Listed Securities: None | Non-Listed Securities: None | Non-Listed Securities: None | Non-Listed Securities: n/a | Non-Listed Securities: n/a |
| Derivatives: Limited to 10% of portfolio | Derivatives: Not permitted | Derivatives:- Not permitted | Derivatives:- Limited to 10% of portfolio Bond options not permitted | Derivatives:- Not permitted |
| Cross-Hedging permitted up to 7.5% of the portfolio | | | Cross-Hedging permitted up to 10% of the portfolio | |
| | | | Credit Limit on Corporate Bonds:- Min Single A Max individual holding: 2.5% | |

(*) The above summarises the main restrictions applying. Other restrictions also apply - details are given in the Managers' agreements.

Confidential

NORF0000949

**Norfolk Pension Fund - Statement of Investment Principles**

## APPENDIX 3

**Additional Voluntary Contribution Arrangements**
Two AVC providers have been appointed: Prudential, and Clerical Medical.  In addition, some members retain existing policies with the previous provider, Equitable Life.

Members can select either provider at their discretion.  Each provider offers a comprehensive range of funds.  Details are available on request.

At retirement, the accumulated value of a member's AVC is used to purchase an annuity on the open market or, where appropriate, buy additional scheme service.

Confidential

NORF0000950

**EXHIBIT B**
**Page 60**

Norfolk Pension Fund - Statement of Investment Principles

## APPENDIX 4

### Statement of Corporate Governance Policy
**Directors' Contracts**

| | | |
|---|---|---|
| 1. | Combination of Chairman and Chief Executive posts | **Vote Against** |
| 2. | No requirement for subsequent re-election | **Vote Against** |
| 3. | Rolling contracts up to 1 year | **Vote For** |
| 4. | Rolling contracts longer than one year | **Vote Against** |
| 5. | Fixed contracts up to 2 years | **Vote For** |
| 6. | Fixed contracts over 2 years | **Vote Against** |

**Share Options or Incentive Schemes**

| | | |
|---|---|---|
| 7. | Where full disclosure of all emoluments received by Directors is not made | **Vote Against reappointment of all Directors** |
| 8. | Where full and clear disclosure of the basis of performance related payments is not made | **Vote against reappointment of Chairman of Remuneration Committee as a Director** |
| 9. | Share Options or incentive schemes with no performance targets | **Vote against** |
| 10. | Share Options with unclear or unambitious targets | **Vote against** |

**Internal Committees**

| | | |
|---|---|---|
| 11. | Where the Remuneration Committee is not composed solely of independent Non Executive Directors | **Vote Against all Executive Directors on Remuneration Committee** |
| 12. | Where there is no Audit Committee | **Vote Against acceptance of Accounts** |
| 13. | Where the Audit Committee does not have a majority of Non Executive Directors | **Vote Against acceptance of Accounts** |

**Other Issues**

| | | |
|---|---|---|
| 14. | Issue of shares not consistent with pre-emption guidelines | **Vote Against** |
| 15. | Material Inadequacies in the Annual Report and accounts | **Vote Against acceptance of Accounts** |
| 16. | Resolution to make party political donations | **Vote Against** |

**Remuneration**

The Committee recognise that remuneration has become an emotive subject which, because of excess media attention, can cloud the real issues. Nevertheless it feels that there should be an approved remuneration policy in place which :-

   a. regards performance related bonuses as an investment by the company to improve its performance. Therefore the Remuneration Committee should satisfy itself that, as with any other investment, the returns justify the expenditure.

---

Confidential

NORF0000951

Norfolk Pension Fund - Statement of Investment Principles

    b. should not be based upon performance reward criteria which disbenefit the long term
       interests of the company.
    c. rewards recipients for exceptional and not for average performance.
    d. awards bonuses in the form of shares (held in trust) thereby subjecting Directors to
       the same risks and interests as shareholders.
    e. requires any contractual compensation for loss of office to be paid annually and be
       dependent upon the individual not acquiring another post.

Investment Managers to the Fund will be expected to monitor companies' compliance with
these guidelines and, in the event of any material variation, will vote against the re-
appointment of Remuneration Committee members.

The Committee also recognise that there are certain areas of Corporate Governance where
it is more difficult to be prescriptive. In these circumstances it has asked the Investment
Managers to the Fund to judge each issue on a case by case basis and vote the shares in
the best long term interests of the Fund. Issues which fall into this area are :-
    1. The Board shall consist of at least 3 Non Executive Directors.
    2. Insufficient biographical information on any Director.
    3. Appointment of Directors aged over 70.
    4. Bundled resolutions at AGM.
    5. Resolutions not supported by the Board.

### ENVIRONMENTAL AND ETHICAL POLICIES
The Committee have considered the importance of environmental and ethical
considerations for the Funds investments. They fully endorse statements from the NAPF
that environmental investment risk: -
- is not a matter of corporate governance as such but is more akin to other
  investment or management risks consequent upon business activity.

- has implications for stakeholders and its effective management is likely to result
  in a more efficient and competitive business.

- Should be addressed by a company's directors in a similar manner to other business
  risks facing the company, in order to protect the interests of shareholders.

- expect companies to have due regard for the environment and to fully comply
  with legal requirements and regulations which will ensure companies do not
  attract bad publicity.

- expect all listed UK companies to report on environmental policy in their annual
  report to shareholders. The Investment Managers to the Fund are required to
  monitor compliance with this expectation and abstain from supporting the
  adoption of reports and accounts of those companies that fail to comply.

- Require the Investment Managers to the Fund to take account of the manner in
  which the business is conducted by the companies in which the Fund invests.

This appraisal of business management will eventually be integral to the investment
processes of all the Investment Managers to the Fund and will be taken into account in
investment decisions subject, however, to the overriding requirement that each Investment
Manager shall seek to achieve the investment objective for its mandate.

Confidential

Norfolk Pension Fund - Statement of Investment Principles

## Appendix 5

### Socially Responsible Investment
#### Société Générale Asset Management: Responsible Engagement Policy
##### 1. Background

It is intended that the Investment Manager will develop a process of responsible engagement with UK companies in which the Portfolio holds stock. The area of engagement will be business approaches to safeguarding and improving the environment. In the long term the County Council's LA21 Policy document will set out the areas for detailed engagement, but this will not be formally adopted until November 2000. In the meantime the Investment Manager will assess the propensity and willingness of companies to:

a. examine the environmental impact of their business

b. develop, where appropriate, environmental management systems

c. seek appropriate certification of those systems, for example, through ISO14001 or through the Eco-Management and Audit Scheme (EMAS)

d. publish annual reports on the environmental impact and performance of the company (at least in high environmental impact sectors)

e. undertake environmental initiatives where they are consistent with shareholder interests (for example, energy efficiency projects etc)

From such assessment the Investment Manager will develop a responsible engagement approach for the Portfolio and produce a strategy for prioritising engagement with companies held in the Portfolio (Responsible Engagement).

##### 2. Development

The Committee recognise that their policy and approach to Responsible Engagement is one of evolution and that the policy will continue to develop over time. They also recognise that application of the policy may tend to vary from sector to sector depending on the likely environmental impact of that sector. Having established an outline policy for the Portfolio, the Investment Manager will have a co-ordinating responsibility in relation to the other Investment Managers of the Fund in establishing a template approach to Responsible Engagement to be adopted by such other Investment Managers.

##### 3. Process

The Investment Manager will carry on a dialogue with companies for the promotion of the principle that it is in the long term interests of companies (and their shareholders) to seek continuous improvement in environmental management and disclosure.

It is not expected that all companies of which the Fund is a shareholder at any time will be engaged and the Committee acknowledge that it is better to be able to identify some success with the few rather than be unsuccessful with the many. When the Responsible Engagement policy becomes developed and is adopted by all the other Investment Managers to the Fund, all

Confidential

**Norfolk Pension Fund - Statement of Investment Principles**

managers will need to exchange information where there are common
holdings.

### 4. Reporting

The Committee request that agenda time at the Investment Committee should
be made available for reporting both on Responsible Engagement and voting.
While each Manager might choose to report individually in documentation
prepared for the Investment Committee, the Investment Manager will be
expected from 2001 to produce an interim report in June and an annual report
in December of each year outlining its activities and achievements in relation
to Responsible Engagement.

Page 16 of 25

Confidential

NORF0000954

**EXHIBIT B**
**Page 64**

Norfolk Pension Fund - Statement of Investment Principles

## Appendix 6

### Level of Compliance with the 10 Principle of Good Investment Practice.

| Principle | Description of Principle | Norfolk's Position |
|---|---|---|
| 1. Effective Decision Making | Decisions should only be taken by persons or organisations with the skills, information and resources necessary to take them effectively | The Norfolk Fund has an Investment Committee with members acting as 'quasi' trustees. The Committee is advised by the Director of Finance and the Actuary, who also provides investment advice, and arranges necessary training. |
| | Where Trustees elect to take investment decisions, they must have sufficient expertise and appropriate training to be able to evaluate any advice they take. | The advisers to the Investment Committee keep under continual review the structure and processes followed by the Committee. If changes are required, these will be brought to the Committee. No changes are envisaged at present. |
| | Investment Committee favoured | |
| | Trustees should review their structure and processes to carry out their role effectively | |
| 2. Clear Objectives | Trustees should set out an overall objective for the Fund | The Fund, in accordance with Regulatory requirements, has an objective of keeping the employer's contribution rate as level as is possible while maintaining its solvency. |
| | It should take account of the Fund Liabilities and the contributions paid by employees and employers | The Fund's investment managers have targets based on 'customised' and 'bespoke' benchmarks, which comply with the Myner's principles. |
| | Objectives should not be expressed in terms which have no relationship to the Fund's liabilities (e.g. performance relative to other | |

Confidential

NORF0000955

**EXHIBIT B**
**Page 65**

Norfolk Pension Fund - Statement of Investment Principles

| | (funds or market indices) | |
|---|---|---|
| **3. Focus on Asset Allocation** | Strategic asset allocation decisions should receive a level of attention that reflects the contributions they make towards achieving the Fund's objective.<br><br>Decisions should reflect the Fund's own characteristics | Asset allocation is continually reviewed by the Fund's investment advisers and reflects the most appropriate policy for the Fund to follow. |
| **4. Expert advice** | Actuarial and investment services should be open to separate competition<br><br>Appropriate levels of fees should be paid for each service | The Investment Committee regularly reviews the actuarial services contract currently held by Hymans Robertson.<br><br>Investment advice is commissioned as and when required and Hymans Robertson currently provide that advice.<br><br>This is not necessarily in conflict with Myner's recommendations. The strength of the advice, is evidenced by the leading medium and long-term investment performance. The most recent evidence of this is the 103% funding at March 2001. This places the fund in a highest ranking position. |

Confidential

NORF0000956

**EXHIBIT B**
**Page 66**

Norfolk Pension Fund - Statement of Investment Principles

| 5. Explicit mandates | Trustees should agree explicit written mandates with their managers covering:-<br><br>• the objective, benchmark and risk parameters<br>• the managers approach to achieving the objective, and<br>• a time scale of measurement and evaluation<br><br>Any exclusion of specific financial instruments should be justified<br><br>Trustees should understand transaction related costs | Investment managers have contracts or mandates, which cover these points.<br><br>Financial instruments are only excluded from the portfolio when it is considered prudent to do so.<br><br>Transaction costs have previously been handled by the Director of Finance and the Advisers. In future, information on this will be brought to Investment Committees. |
|---|---|---|
| 6. Activism | The mandate and trust deed should incorporate the US Department of Labour Interpretative Bulletin on Activism | The Fund's proactive position on Corporate Governance and Socially Responsible Investment is set out in detail in the SIP.<br><br>Manager mandates do not currently incorporate the US principles on activism while the Government consults on how this principle could apply to pension funds. When further information has been received a report will be taken to the Investment Committee.<br><br>The Fund does not engage external voting agencies, but takes account of the NAPF's Voting Issue Service. Managers' voting strategies and their effectiveness, are actively monitored and are |

Page 19 of 25

Confidential

NORF0000957

Norfolk Pension Fund - Statement of Investment Principles

| | | discussed with them on a quarterly basis. |
|---|---|---|
| 7. Appropriate Benchmarks | Trustees should ensure (in consultation with their managers) that the index benchmarks set are appropriate.<br><br>Limits on Managers' divergence from index (e.g. tracking errors) should recognise realistic approximations within indices.<br><br>Both active and passive approaches should be considered for each asset class.<br><br>Targets for active management should be appropriate and risk controls should provide leeway for genuine active management. | The Fund's bespoke benchmarks and investment strategies are kept under review by our professional advisers (currently Hymans Robertson) and discussed periodically with the Investment Committee. |
| 8. Performance Measurement | Encompasses not only Fund performance, but a formal assessment of their own procedures and decisions as trustees<br><br>This performance assessment would also apply to advice received and decisions delegated (e.g. to advisers and managers) | Managers are constantly measured against their targets, which in turn are based on the Fund's bespoke benchmarks. Performance is also monitored annually against the peer group.<br><br>Examining the Investment Committee's decisions and effectiveness is good management which can usefully be part of the Annual Review. |

Confidential

NORF0000958

Norfolk Pension Fund - Statement of Investment Principles

| 9. Transparency | A strengthened Statement of Investment Principles (SIP) should set out | The Norfolk Fund SIP is already comprehensive. |
| | • who is taking decisions and why | Norfolk has recently established a Pension Fund Forum comprising representatives of all groups of employers in the Fund. The Forum will be actively involved with reviews of the SIP in future. |
| | • the Funds investment objectives | |
| | • the planned asset allocation strategy, including projected investment returns and why the current strategy has been adopted | |
| | • details of manager and adviser mandates, basis of fee structure | |
| 10. Regular Reporting | Trustees are required to publish the SIP and the results of the monitoring of advisers and managers | The Pension Fund SIP is part of the Fund's communications strategy which is being developed by the Pension Fund Forum. |
| | Key (summary) information should be sent annually to members | |
| | Trustees should explain any departure from these 10 principles | |

Confidential

NORF0000959

**EXHIBIT B**
**Page 69**

Norfolk Pension Fund - Statement of Investment Principles

**Glossary of Terms in Investment Management**

**Active Management**
A style of investment management which seeks to provide outperformance of a relevant benchmark through either asset allocation, market timing or stock selection (or a combination of these). Directly contrasted with Indexation or Passive Management.

**Active Money**
The sum of the absolute differences between the benchmark weight and the fund weight. Active money is consequently a measure of the 'risk' implicit in, for example, sector weightings within an equity portfolio. A higher active money corresponds to a more aggressive, higher, risk.

**Active Risk (also see Risk)**
The extent to which the performance of a fund can be expected to deviate from the performance of a chosen index or benchmark due to "bets" taken in asset allocation or stock selection.

**Actuarial Value of Assets**
The value placed on the assets by the actuary. This may be market value, present value of estimated income and proceeds of sales or redemptions, or some other value.

**Aggressive Portfolio / Aggressive Management**
A portfolio designed to outperform its benchmark by a significant amount. Aggressive management may involve the fund having fewer stocks (a concentrated portfolio) than normal or taking bigger asset allocation "bets".

**Asset Allocation / Asset Mix**
The apportionment of a fund's assets between asset classes and/or markets (also see "bet").
Asset allocation may be either strategic i.e. long-term, or Tactical i.e. short-term, aiming to take advantage of relative market movements.

**Asset / Liability Modelling**
A statistical tool designed to help establish the most appropriate asset mix for a pension fund, in the context of its liabilities.

**Average Fund**
The "Average" fund usually refers to the median or weighted average figure from funds in the CAPS or WM Universes.

**Basis points**
One hundred of 1% i.e. (0.01%).

**Benchmark**
A "notional" fund or model portfolio which is developed to provide a standard against which a manager's performance is measured e.g. for a global equity fund the benchmark against which it will be measured could be made up 70%/30% by UK equities / overseas equities. A target return is generally expressed as some margin over the benchmark.

**"Bet"**
Where a fund manager adopts a weighting which is different from the "average fund", or from the "index", if appropriate. An asset allocation bet would involve a manager being overweight or underweight in a particular asset class compared to the average manager. A "bet" could also be taken on individual stocks or industrial sectors within a particular market.

**Bond**
A certificate of debt, paying a fixed rate of interest, issued by companies, governments or government agencies.

**Brief**
Definition of parameters governing the management of a particular portfolio (generally incorporating clear target and benchmark). (also see Mandate).

Norfolk Pension Fund - Statement of Investment Principles

**"Clean" Fees**
Fund management fees which are all inclusive, to which there will be no extra charges added (e.g. for custody, overseas transactions, administration etc). Note – the exact definition of "clean" will differ from one investment management house to another. Contrasts with ""Dirty" Fees.

**Consensus Indexation**
An approach to investment management where the aim is to match or exceed the performance of the average pension fund, at relatively low risk. The fund's asset allocation is based solely on consensus asset allocation of a universe of pension funds (as supplied by CAPS or WM), then the portion of the fund within each asset class is invested in an index fund designed to track the appropriate index.

**Contra-Cyclical Manager**
A Fund manager who goes against the general trend in investment cycles or against the "herd" e.g. buying stocks which are out of favour in the belief that they are at the bottom of a trough from which their prices will recover.

**Core Portfolio**
A portfolio generally representing the bulk of a fund's assets. The core portfolio will normally be invested in a controlled manner, to provide stable, predictable results (possibly as an indexed fund). The remainder of the fund's assets (often called the satellite portfolio) can then be managed in a more aggressive way, in search of higher returns. This arrangement is called a core/satellite approach.

**Corporate Governance**
Shareholders' right to vote on issues relating to the governance of publicly quoted companies (usually at the AGM).

**Cumulative Rate of Return**
A compounded rate of return, normally for a period of more than one year; often expressed in terms of a "per annum," equivalent return. This is called an annualised return.

**Custody/Custodian**
Safe-keeping of securities by a financial institution. The custodian keeps a register of holdings and will collect income and distribute monies according to client instructions.

**Derivatives / Derivative Instruments**
Securities which derive their value from other securities e.g. financial futures and options – where no physical security is held.

**"Dirty" Fees**
Fund management fees to which "extras" (often not explicit) are added e.g. for custody, overseas transactions etc. Contrasts with "clean" fees.

**Diversification**
The spreading of a fund's investments among different asset classes, markets and geographical areas in order to reduce risk – not "putting all your eggs in one basket". Diversification is a basic principle of multi-asset management.

**Growth Manager**
A fund manager specialising in stocks which he believes will achieve an above average future growth rate of profits.

**Hedging**
A strategy which aims to eliminate the possibility of loss in an investment transaction. Often used in the context of overseas investments to eliminate any potential currency loss (or profit!).

**Indexation / Index Tracking (also called Passive Management)**
A style of investment management which aims to construct a portfolio in such a way as to provide the same return as that of a chosen index i.e. stocks are purchased to be as

Page 23 of 25

NORF0000961

Norfolk Pension Fund - Statement of Investment Principles

representative as possible of the make-up of the index. Contrasts with active management.
(also see consensus indexation).

**Investment Advisor**

A professionally qualified individual or company whose main livelihood is derived from
providing objective, impartial investment advice to companies, pension funds or individuals,
for a stated fee.

**Investment Philosophy**

The set of principles or systems used by Investment Managers to govern the way in which
they manage funds. May also refer to the Manager's style – e.g. are they growth or value
managers, contra-cyclical managers or equity-orientated managers?

**Mandate**

A set of instructions given to the fund manager by the client as to how a fund is to be
managed (e.g. targets for performance against a benchmark may be set or the manager
may be prohibited from investing in certain stocks or sectors, e.g. "no tobacco
investments"). (Also see brief).

**Matching**

The policy of selecting investments of a nature, term or currency similar to that of the
expected outgoings.

**Multi-Asset Management**

A method of fund management where investments are diversified across a range of asset
classes e.g. equities, bonds, property and cash. A fund using this style of management is
called a balanced fund. Contrasts with specialist management.

**Objectives**

Objectives for a pension fund may be expressed in several ways – in terms of performance
against the "average", against a specified benchmark or as a target real rate of return. For
example, a reasonable objective for a UK equity fund might be to outperform the
WM/median return for UK equities by 1% per annum over rolling 3-year periods.

**Open-Ended Funds (e.g. a Unit Trust)**

A fund (generally unitised) where additional units can be created or existing units can be
cancelled at the request of new investors or of existing investors respectively. (Contrasts
with a Closed-Ended Fund, e.g. an investment trust).

**Outperformance/underperformance**

The difference in returns gained by a particular fund against the "average" fund or an index
over a specified time period i.e. a target for a fund may be outperformance of a benchmark
over a 3-year period.

**Performance**

A measure, usually expressed in percentage terms, of how well a fund has done over a
particular time period – either in absolute terms or as measured against the "average" fund
of a particular benchmark.

**Pooled Fund (also called a Co-mingled Fund)**

A fund managed by a fund manager in which investors hold units. Stocks, bonds, properties
etc. are not held directly by each client, but as part of a "pool". Contrasts with a segregated
fund.

**Risk**

Generally taken to mean the variability of returns. Investments with greater risk must usually
promise higher returns than more "stable" investments before investors will buy them.

**Risk/Reward Profile or Risk/Reward Trade-Off**

The balance maintained (or tolerated) between the expected return on an investment or
portfolio and the risk which has to be taken in order to achieve that return. Generally, the
higher the potential return the higher the associated risk.

Page 24 of 25

Confidential

**Norfolk Pension Fund - Statement of Investment Principles**

**Satellite Portfolio**
Part of a fund (generally a relatively small proportion of the total value) often managed in an aggressive way to gain high returns, while the larger proportion of the fund's assets is in a more conservatively managed core portfolio. This arrangement is called a core/satellite approach and it can apply to the whole fund or to a single asset class (e.g. UK equities) within the fund.

**Segregated Fund**
Where the investments of a particular pension fund are managed independently of other funds under the fund manager's control. Asset allocation can then be tailored to the fund's specific requirements. Contrasts with a pooled fund.

**Smoothed Market Value**
The market value of the investments changes constantly. In order to build in an element of stability, market values may be averaged over a period of time. Smoothing out the peaks and troughs of market values is commonly used as part of the actuarial valuation where long-term factors are more important than short-term fluctuations.

**Socially Responsible Investment (SRI)**
Investment where social, environmental or ethical considerations are taken into account in the selection, retention and realisation of investment, and the responsible use of rights (such as voting rights) attaching to investments.

**Volatility/Variability**
Variability about an "average" over time. Usually referred to in terms of volatility of fund returns relative to the "average" returns or to a particular benchmark, as measured by the standard deviation of returns.

**Statement of Investment Principles**
Requirement, arising from the Pensions Act 1995, that all occupational pension plan trustees must prepare and maintain a written Statement of Investment Principles outlining policy on various investment matters (e.g. risk, balance between real and monetary assets, realisability of assets etc).

**Value Manager**
An investment manager specialising in stocks which he perceives to have some measure of value as yet "undiscovered" or "unrecognised" by other investment managers.

**Norfolk Pension Fund Manager Glen Cossey**
**Telephone Number 01603 222159 Email: glen.cossey.dfi@norfolk.gov.uk**

Confidential

NORF0000963

**EXHIBIT B**
**Page 73**

## ANNEX D

FEE SCHEDULE

Confidential

NORF0000964

Capital International Ltd.

## *Norfolk Pension Fund (administered by Norfolk County Council)*

■ **Limited Global/Regional Equity Fee (Incremental Annual Fee Rate as a Percentage of Market Value)**

| | |
|---|---|
| On the first GBP 17.5 million . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.725 of 1% |
| GBP 17.5 million to GBP 35 million . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.575 of 1% |
| GBP 35 million to GBP 175 million . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.450 of 1% |
| Over GBP 175 million . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.400 of 1% |

Minimum fee (based on a minimum account size of GBP 50 million): GBP 295,000 p.a.

Fees will be billed quarterly in arrears based upon the valuation of the Portfolio at the preceding quarter-end and prorated on a quarterly basis for any period during which the Agreement is only in effect for only a portion of the quarter. The Client shall settle the Manager's invoice within 30 days of its date, together with Value Added Tax or other duties or taxes (if any) which may be chargeable. For purposes of calculating the fees, the quarter-end value shall be adjusted on a prorated basis for significant contributions and withdrawals made during the quarter. To the extent that any portion of the Portfolio may be invested in any funds to which a fee for investment management services is charged internally by the Manager or any Affiliate, such assets shall be excluded for purposes of the above schedule of fees for investment management services.

### Fee Aggregation Policies

Fee aggregation will apply to all accounts managed by Capital Group companies, except for emerging market equity investments and investments in funds with internally charged fees ("Eligible Accounts"). In order to achieve the benefit of fee aggregation, the combined actual fees must exceed the combined total of the minimum fee applicable to each of the client's Eligible Accounts.

For additional Eligible Accounts with the same investment objectives and guidelines, all assets for these Eligible Accounts will be aggregated for fee calculation purposes.

For additional Eligible Accounts with different investment objectives and guidelines:

Each additional account within the same country will be charged on the first GBP 10.5 million at the initial breakpoint rate for the appropriate mandate. Any incremental assets over GBP 10.5 million will be aggregated and charged at the incremental rate for the appropriate mandate.

Assets invested in commingled funds will be aggregated and charged at the incremental rate for the appropriate mandate.

The first additional account within a new country will be charged on the first GBP 17.5 million at the initial breakpoint rate for the appropriate mandate. Any incremental assets over GBP 17.5 million will be aggregated and charged at the incremental rate for the appropriate mandate.

The additional non-U.S./global and regional equity breakpoint of GBP 175 million will be applied for clients with aggregate non-U.S./global, regional, and single country (excluding U.S.) equity, and fixed-income (emerging markets) assets which exceed GBP 175 million.

For fee aggregation purposes, accounts will be aggregated in the following order: balanced, equity – developed markets, convertible, fixed-income - high yield, fixed-income – emerging markets, and fixed income - developed markets.

Unless otherwise indicated, the benefit from fee aggregation for clients with multiple accounts will be calculated by comparing total aggregated fees to total aggregated fees for all Eligible Accounts. The resulting percentage discount will be applied to each Eligible Account's unaggregated fees.

If all accounts are not denominated in the same currency, the local currency assets of each account and the related fees calculated on an unaggregated basis will be converted to a designated base currency using the applicable foreign exchange rate. The total of such fees will be compared to total aggregated fees. The resulting percentage discount will then be applied to each account's unaggregated fee as determined in the applicable currency.

### Fee Discounts and Elimination of Fee Breakpoints

The following fee discount will be applied based upon the total aggregated fees:

| | |
|---|---|
| Clients between GBP 875,000 to GBP 2.8 million | 5% discount |
| Clients between GBP 2.8 million to GBP 5.6 million | 7.5% discount |
| Clients between GBP 5.6 million to GBP 8.4 million | 10% discount |
| Clients over GBP 8.4 million | 12.5% discount |

For this purpose, aggregated fees will include all fees from separate accounts, commingled funds and funds with internally charged fees managed by Capital Group companies, except for investments in American Funds/ mutual funds. The resulting fee discount percentage will be applied to each account's fees (excluding fees related to investments in funds with internally charged fees).

For clients whose total aggregated fees (before discounts) exceed GBP 2.1 million, fee breakpoints will be eliminated and each account will be charged at the lowest marginal fee rate applicable to the account's fee schedule.

To calculate the applicable fee discount level and breakpoint elimination threshold, the total aggregated fees for the quarter will be annualized. For this purpose, all local currency fees will be converted to a designated base currency.

Fees related to investments in funds with internally charged fees will be estimated by multiplying the quarter-end value of the investment (adjusted on a prorated basis for any contributions or withdrawals during the quarter) by the fund's effective fee. For this purpose, the effective fee will be based on the value of the fund's quarter-end assets and the fund's current fee schedule.

Applicable discount levels and the elimination of fee breakpoints will be effective beginning with the first quarter in which a discount threshold is exceeded and will remain in effect unless the total fees fall below the discount threshold due to a significant withdrawal of assets. A decline in the market alone will not cause the reinstatement of a lower discount level or fee breakpoints.

Confidential

NORF0000965

**EXHIBIT B**
**Page 75**

## ANNEX E

### LIST OF AUTHORISED PERSONS

Confidential

NORF0000966



**Norfolk** Pension Fund

**Norfolk Pension Fund**

Authorised Signatories

R D Summers
Director Of Finance

P Brittain
Head of Financial Management

N Mark
Head of Client Financial Services and Pension Fund

G Cossey
Pension Fund and Treasury Finance Manager

Any two of the above four signatories to sign.

7 September 2004

**Norfolk Pension Fund** · County Hall · Martineau Lane · Norwich · NR1 2DW
Norfolk County Council is the administering authority of the Norfolk Pension Fund

S:\PensionTeam\Investment\Authorised Signatories.doc

## ANNEX F

### STATEMENTS AND WARNINGS

1.      Stabilisation

The Manager may on behalf of the Client effect transactions in securities the prices of which
may have been influenced by measures taken to stabilise it. A brief explanation of
stabilisation is set out below. The Client agrees that the Manager is authorised to enter into
such transactions on behalf of the Client.

What is stabilisation?

Stabilisation enables the market price of a security to be maintained artificially during the
period when a new issue of securities is sold to the public. Stabilisation may affect not only
the price of the new issue but also the price of other securities relating to it. The FSA allows
stabilisation in order to help counter the fact that, when a new issue comes onto the market for
the first time, the price can sometimes drop for a time before buyers are found. Stabilisation
is carried out by a 'stabilisation manager' (normally the firm chiefly responsible for bringing
a new issue to market). As long as the stabilisation manager follows a strict set of rules, he is
entitled to buy back securities that were previously sold to investors or allotted to institutions
which have decided not to keep them. The effect of this may be to keep the price at a higher
level than it would otherwise be during the period of stabilisation.

The Stabilisation Rules:

(1)     limit the period when a stabilisation manager may stabilise a new issue;

(2)     fix the price at which he may stabilise (in the case of shares and warrants but not
        bonds); and

(3)     require him to disclose that he may be stabilising but not that he is actually doing so.

The fact that a new issue or a related security is being stabilised should not be taken as any
indication of the level of interest from investors, or of the price at which they are prepared to
buy the securities.

2.      Non Readily Realisable Investments

The Manager may, subject to any restrictions stated in this Investment Management
Agreement, invest in non readily realisable investments. There is a restricted market for
investments of this nature and it may therefore be difficult to deal in such investments or to
obtain reliable information about their value or the extent of the risks to which they are
exposed.

3.      Warrants

The Manager may effect transactions in warrants for the Portfolio. Warrants often involve a
high degree of gearing so that a relatively small movement in the price of the security to

Confidential                                                    NORF0000968

**EXHIBIT B**
**Page 78**

which the warrant relates may result in a disproportionately large movement, unfavourable as well as favourable, in the price of the warrant.

A warrant is a time–limited right to subscribe for shares, debentures, loan stock or government securities and is exercisable against the original issuer of the underlying securities. A relatively small movement in the price of the underlying security results in a disproportionately large movement, unfavourable or favourable, in the price of the warrant. The prices of warrants can therefore be volatile. The right to subscribe which a warrant confers is invariably limited in time with the consequence that if the Manager fails to exercise this right within the predetermined time–scale then the investment becomes worthless to the Portfolio. The Portfolio may therefore sustain a total loss of the money invested in such warrants plus any commission or other transaction charges. Some other instruments are also called warrants but are actually options (for example, a right to acquire securities which is exercisable against someone other than the original issuer of the securities, often called a 'covered warrant').

The Manager may also effect transactions in off-exchange warrants on behalf of the Portfolio. Transactions in off–exchange warrants may involve greater risk than dealing in exchange traded warrants because there is no exchange market through which to liquidate the position, or to assess the value of the warrant or the exposure to risk. Bid and offer prices need not be quoted, and even where they are, they will be established by dealers in these instruments and consequently it may be difficult to establish what is a fair price.

4.    Penny Shares

The Manager may effect transactions in penny shares for the Portfolio. There is an extra risk of losing money when shares are bought in some smaller companies including penny shares. There is a big difference between the buying and selling price of these shares. If they have to be sold immediately the Portfolio may get back much less than was originally paid for them. Their price can change quickly and it may go down as well as up.

5.    Additional Risks

A movement of exchange rates may affect, unfavourably as well as favourably, any gain or loss on an investment if an investment is denominated in a currency other than the base currency of the Portfolio.

The value of investments and the income from them can go down as well as up and as a result the Portfolio's value may fall as well as rise, and the Client may not get back the full amount invested.

The Portfolio may contain investments for which a market is made by less than three independent market makers.

v6                                24

NORF0000969

## ANNEX G

### LIST OF AFFILIATES

V6

25

Confidential

NORF0000970

**EXHIBIT B**
**Page 80**

The Capital Group Companies Inc.

The Capital Group International
Capital International Limited
Capital International SA
Capital International KK
Capital International Inc
Capital Guardian Trust Company
Capital Guardian (Canada) Inc
Capital International Research Inc.

The Capital Group Research Inc
Capital International Asset Management
Capital Management Services Inc.
Capital Research and Management Company

American Fund Distributors Inc
American Funds Service Company
Capital Research Company

NORF0000971

**EXECUTION PAGE**

Signature:

Name:                                    MR GLENN COSSEY

Title:                                   PENSION FUND + TREASURY FINANCE MANAGER

Signed for and on behalf of:             Norfolk County Council as administering
                                         authority for Norfolk Pension Fund


Signature:

Name:                                    PAUL BRITTAIN

Title:                                   HEAD OF FINANCIAL MANAGEMENT

Signed for and on behalf of:             Norfolk County Council as administering
                                         authority for Norfolk Pension Fund


Signature:

Name:                                    IDA LEVINE

Title:                                   DIRECTOR

Signed for and on behalf of:             Capital International Limited


V6                              26

Confidential                                                    NORF0000972

**EXHIBIT B**
**Page 82**